1  Adam E. Polk (SBN 273000)
2  Simon Grille (SBN 294914)
   Kimberly Macey (SBN 342019)
3  Jordan Isern (SBN 343159)
   **GIRARD SHARP LLP**
4  601 California Street, Suite 1400
   San Francisco, CA 94108
5  Telephone: (415) 981-4800
   Facsimile: (415) 981-4846
6  apolk@girardsharp.com
   sgrille@girardsharp.com
7  kmacey@girardsharp.com
   jisern@girardsharp.com
8

9  *Attorneys for Plaintiffs*

10

11              **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN FRANCISCO DIVISION**
13

14  BRAYDEN STARK, JUDD OOSTYEN,          Case No. 3:22-cv-03131-JCS
    KEVIN BLACK, and MARYANN OWENS,
15  individually and on behalf of all others similarly
    situated,                                  **PLAINTIFFS' MEMORANDUM OF POINTS**
16                                              **AND AUTHORITIES IN OPPOSITION TO**
                        Plaintiffs,            **DEFENDANT PATREON INC.'S MOTION**
17                                              **TO DISMISS THE COMPLAINT**
            v.
18                                              Judge: Hon. Joseph C. Spero
                                               Date: October 14, 2022
19  PATREON, INC.,                             Time: 9:30 a.m.

20
                        Defendant.
21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................... 2

III.  LEGAL STANDARD ........................................................................................... 3

IV.  ARGUMENT ......................................................................................................... 3

     A.   Plaintiffs' VPPA Claim Should Be Upheld.............................................. 3

          1.   Patreon is a "video tape service provider" under the VPPA. ............................ 4

          2.   Plaintiffs adequately allege Patreon disclosed their PII. ........................................ 7

          3.   Patreon did not provide or obtain the requisite consent. ..................................... 8

          4.   Plaintiffs sufficiently allege Patreon disclosed their PII knowingly. ..................... 9

          5.   The VPPA does not violate the First Amendment. .............................................. 10

               a.   The VPPA regulates commercial speech.................................................. 12

               b.   The VPPA does not violate the First Amendment on its face................. 15

               c.   The VPPA does not violate the First Amendment as applied. ................ 18

                   i.   The VPPA is content-neutral........................................................ 18

                   ii.   The VPPA is subject to—and satisfies—intermediate scrutiny... 19

                   iii.   The VPPA would survive even if strict scrutiny were to apply. ... 22

     B.   Plaintiffs State a Claim Under the UCL and CLRA. ........................................ 23

     C.   Plaintiffs' Unjust Enrichment Claim Should Be Upheld. ................................. 25

V.   CONCLUSION ................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Actividentity Corp. v. Intercede Grp. PLC,*
   2009 WL 8674284 (N.D. Cal. Sept. 11, 2009) ................................................................ 10

4

5

*Allergan, Inc., v. Athena Cosmetics,*
   640 F.3d 1377 (Fed. Cir. 2011) .......................................................................................... 24

6

*Arrix, LLC v. NutriSearch Corp.,*
   985 F.3d 1107 (9th Cir. 2021) ............................................................................................ 13

7

8

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................................. 3

9

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
   140 S. Ct. 2335 (2020) ........................................................................................... 11, 19, 21

10

11

*Bartnicki v. Vopper,*
   532 U.S. 514 (2001) ........................................................................................................... 18

12

*Bd. of Trustees of State Univ. of New York v. Fox,*
   492 U.S. 469 (1989) ..................................................................................................... 16, 21

13

14

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................................. 3

15

16

*Boehner v. McDermott,*
   484 F.3d 573 (D.C. Cir. 2007) ........................................................................................... 11

17

*Boelter v. Advance Mag. Publishers Inc. ("Condé Nast"),*
   210 F. Supp. 3d 579 (S.D.N.Y. 2016) ..................................................................... 12, 20, 22

18

19

*Boelter v. Hearst Commc'ns, Inc.,*
   192 F. Supp. 3d 427 (S.D.N.Y. 2016) ........................................................................*passim*

20

*Bolger v. Youngs Drug Prod. Corp.,*
   463 U.S. 60 (1983) ....................................................................................................... 12, 13

21

22

*Brooks v. Thomson Reuters Corp.,*
   2021 WL 3621837 (N.D. Cal. Aug. 16, 2021) .................................................................. 14

23

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
   447 U.S. 557 (1980) ........................................................................................................... 19

24

25

*ChromaDex, Inc. v. Elysium Health, Inc.,*
   2017 WL 7080237 (C.D. Cal. Nov. 28, 2017) .................................................................. 25

26

27

*Contest Promotions, LLC v. City & Cty. of San Francisco,*
   874 F.3d 597 (9th Cir. 2017) ............................................................................................. 19

28

*Cottrell v. AT&T Inc.*,
   2020 WL 4818606 (N.D. Cal. Aug. 19, 2020) ...................................................................25

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975) ..........................................................................................................17

*Crittenden v. Apple, Inc.*,
   2022 WL 2132224 (N.D. Cal. June 14, 2022) ....................................................................8

*Dahlstrom v. Sun-Times Media, LLC*,
   777 F.3d 937 (7th Cir. 2015)........................................................................................19, 20

*DOJ v. Reporters Comm.*,
   489 U.S. 749 (1989)..........................................................................................................11

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985)..............................................................................................14, 15, 17

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017)......................................................................................*passim*

*Facenda v. N.F.L. Films, Inc.*,
   542 F.3d 1007 (3d Cir. 2008) ...........................................................................................13

*First Resort, Inc. v. Herrera*,
   80 F. Supp. 3d 1043 (N.D. Cal. 2015), *aff'd*, 860 F.3d 1263 (9th Cir. 2017) ....................12

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)..........................................................................................................17

*Griffin v. Sec'y of Veterans Affs.*,
   288 F.3d 1309 (Fed. Cir. 2002) ........................................................................................16

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
   61 Cal. 4th 988 (2015) ......................................................................................................25

*Hodsdon v. Mars, Inc.*,
   891 F.3d 857 (9th Cir. 2018)............................................................................................24

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020)......................................................................11, 13, 14, 15

*In re Adobe Sys., Inc. Privacy Litig.*,
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) ..............................................................................24

*In re Anthem, Inc. Data Breach Litig.*,
   2016 WL 3029783 (N.D. Cal. May 27, 2016) ..................................................................24

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
   402 F. Supp. 3d 767 (N.D. Cal. 2019)........................................................................5, 7, 8

iii

*In re Hulu Privacy Litig.*,
  2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ................................................................. 8, 9

*In re Hulu Privacy Litig.*,
  2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ........................................................... 5, 6, 11

*In re Vizio, Inc., Consumer Privacy Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ................................................................. 4, 5, 6, 7

*In re Woodbridge Invs. Litig.*,
  2020 WL 4529739 (C.D. Cal. Aug. 5, 2020) ....................................................................... 9

*Kellman v. Spokeo, Inc.*,
  2022 WL 1157500 (N.D. Cal. Apr. 19, 2022) ............................................................. 11, 14

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ....................................................................................... 6, 9

*King v. Gen. Info. Servs., Inc.*,
  903 F. Supp. 2d 303 (E.D. Pa. 2012) ........................................................................ 21, 22

*Klein v. Chevron U.S.A., Inc.*,
  202 Cal. App. 4th 1342 (2012) ........................................................................................ 23

*Klein v. San Diego Cty.*,
  463 F.3d 1029 (9th Cir. 2006) ........................................................................................ 18

*Leghorn v. Wells Fargo Bank, N.A.*,
  950 F. Supp. 2d 1093 (N.D. Cal. 2013) ........................................................................... 25

*LiMandri v. Judkins*,
  52 Cal. App. 4th 326 (1997) ........................................................................................... 24

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) .......................................................................................... 3

*Marquez-Reyes v. Garland*,
  36 F.4th 1195 (9th Cir. 2022) ......................................................................................... 18

*McCall L. Firm, PLLC v. Crystal Queen, Inc.*,
  335 F. Supp. 3d 1124 (E.D. Ark. 2018) ........................................................................... 17

*Members of City Council of City of L.A. v. Taxpayers for Vincent*,
  466 U.S. 789 (1984) ................................................................................................. 16, 17

*Mollett v. Netflix, Inc.*,
  2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) .................................................................. 10

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998) ....................................................................................................... 16

iv

*Overstock.com v. Gradient Analytics, Inc.*,
151 Cal. App. 4th 688 (2007) ................................................................................................24

*Pollock v. Fed. Ins. Co.*,
2022 WL 912893 (N.D. Cal. Mar. 29, 2022) ..........................................................................9

*Progressive W. Ins. Co. v. Yolo Cty. Super. Ct.*,
135 Cal. App. 4th 263 (2005) ................................................................................................24

*Recht v. Morrisey*,
32 F.4th 398 (4th Cir. 2022) ..................................................................................................22

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ...............................................................................................................22

*Retail Digital Network, LLC v. Prieto*,
861 F.3d 839 (9th Cir. 2017) ...........................................................................................19, 22

*Simi Mgmt. Corp. v. Bank of Am. Corp.*,
2012 WL 1997232 (N.D. Cal. June 4, 2012) ...........................................................................9

*Snyder v. Phelps*,
562 U.S. 443 (2011) ...............................................................................................................15

*Soo v. Lorex Corp.*,
2020 WL 5408117 (N.D. Cal. Sept. 9, 2020) ........................................................................25

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ...............................................................................................................22

*Sterk v. Redbox Automated Retail, LLC*,
672 F.3d 535 (7th Cir. 2012) .................................................................................................19

*Texas v. Am. Blastfax, Inc.*,
121 F. Supp. 2d 1085 (W.D. Tex. 2000) ...............................................................................17

*The Florida Star v. B.J.F.*,
491 U.S. 524 (1989) ...............................................................................................................17

*Trans Union Corp. v. F.T.C.*,
245 F.3d 809 (D.C. Cir. 2001) ..........................................................................................13, 21

*Trans Union Corp. v. FTC*,
267 F.3d 1138 (D.C. Cir. 2001) .......................................................................................12, 14

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ...........................................................................................................23

*Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*,
2022 WL 2919260 (S.D. Fla. May 18, 2022) ........................................................................20

v

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS
CASE NO. 3:22-cv-03131-JCS

*United Reporting Pub. Corp. v. California Highway Patrol,*
146 F.3d 1133 (9th Cir. 1998) ............................................................................. 12

*United States v. Stanko,*
491 F.3d 408 (8th Cir. 2007) ................................................................................. 6

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................................................................. 15

*United States v. Swisher,*
811 F.3d 299 (9th Cir. 2016) ............................................................................... 19

*United States v. Williams,*
553 U.S. 285 (2008) ............................................................................................. 18

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
455 U.S. 489 (1982) ............................................................................................. 16

*Vugo, Inc. v. City of New York,*
931 F.3d 42 (2d Cir. 2019) .................................................................................. 21

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2008) ............................................................................................. 16

*Whalen v. Roe,*
429 U.S. 589 (1977) ...................................................................................... 10, 19

*Willey v. Harris Cty. Dist. Att'y,*
27 F.4th 1125 (5th Cir. 2022) .............................................................................. 21

*Williams-Yulee v. Fla. Bar,*
575 U.S. 433 (2015) ...................................................................................... 21, 22

*Yershov v. Gannett Satellite Info. Network, Inc.,*
820 F.3d 482 (1st Cir. 2016) ............................................................................. 3, 4

*Young v. Buttigieg,*
2022 WL 1471416 (N.D. Cal. May 10, 2022) ..................................................... 25

*Zapata Fonseca v. Goya Foods Inc.,*
2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) ...................................................... 10

**Statutes**

18 U.S.C. § 2710 ......................................................................................... 1, 10, 13

18 U.S.C. § 2710(a)(4) ................................................................................. 5, 7, 10

18 U.S.C. § 2710(b)(1) ........................................................................................... 4

18 U.S.C. § 2710(b)(2) ......................................................................................... 25

vi

18 U.S.C. § 2721 .................................................................................................................23

Cal. Bus. & Prof. Code § 17200 ..........................................................................................3

Cal. Civ. Code § 1750...........................................................................................................3

Michigan Video Rental Privacy Act, M.C.L. § 445.1711 ...................................................12

**Legislative History**

158 Cong. Rec. S8320-03 .....................................................................................................5

S. Rep. 100–599 .........................................................................................................5, 19, 20

**Rules**

Fed. R. Civ. P. 5.1 ...............................................................................................................12

Fed. R. Civ. P. 5.1(c) ..........................................................................................................13

Fed. R. Civ. P. 8(a)................................................................................................................3

Fed. R. Civ. P. 9(b) ..............................................................................................................4

Fed. R. Civ. P. 15................................................................................................................25

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS
CASE NO. 3:22-cv-03131-JCS

1

## I.   <u>INTRODUCTION</u>

2       Plaintiffs, current and former Patreon subscribers, sue for violations of the Video Privacy

3  Protection Act, 18 U.S.C. § 2710 ("VPPA") and California law. Patreon charges subscribers for access to

4  videos and other independently created content. Plaintiffs allege Patreon uses a software tool provided by

5  Facebook, known as the Pixel, to send Facebook information sufficient to identify the subscriber and the

6  titles of videos the subscriber viewed on the Patreon website. Facebook adds the information to its

7  Facebook subscriber profile, and Patreon in turn receives information about the consumer to refine its

8  product offerings. By knowingly sharing, in a single transmission, information linking a consumer to a

9  specific video title without first securing the consumer's express written consent, Patreon violates the

10  VPPA as well as the UCL, the CLRA, and the common law of unjust enrichment.

11       Patreon's motion to dismiss should be denied. Congress did not limit the VPPA to a particular

12  business model or medium. Patreon's business, centered on delivering video content to subscribers, falls

13  within the plain language of the VPPA's restrictions on businesses that deliver "video cassette tapes *or*

14  *similar audio visual material*" to consumers. Patreon qualifies as a "video tape service provider" because

15  its business involves providing video content to subscribers. Plaintiffs adequately allege for pleading

16  purposes that Patreon acted knowingly when it implanted the Pixel, and the lengthy disclosures Patreon

17  submitted confirm that it neither provided nor obtained the standalone consent required under the statute.

18       Unable to seriously dispute the statutory elements, Patreon asks the Court to strike down the VPPA

19  on constitutional grounds, 34 years after its enactment. The VPPA regulates only commercial speech and

20  furthers a substantial government interest in protecting consumer privacy. Patreon nonetheless makes a

21  facial attack on the VPPA—but such attacks are strongly disfavored. Here, Plaintiffs are not public figures

22  and their video-watching habits are not matters of public record. Moreover, the VPPA targets those most

23  likely to possess or collect this private information and is narrowly tailored, limiting disclosure only of the

24  information necessary to protect the privacy rights of individuals. Though strict scrutiny does not apply,

25  even if it did, the VPPA does not target any specific viewpoint and is narrowly tailored to a compelling

26  interest. Congress's decision to protect consumer privacy through the VPPA's limitations on disclosure

27  without prior written authorization does not offend the First Amendment.

28

1

1    The Court should deny the motion and allow this case to proceed.

2    **II.    STATEMENT OF FACTS**

3    Patreon offers subscribers access to a website where they can watch videos and other works

4    posted by content creators. ¶¶ 34, 51.[1] Patreon uses a "Facebook Pixel" or "Pixel"—a snippet of

5    programming code—on its website to transmit the subscriber's personal information to Facebook. ¶¶ 3,

6    35, 45. When a subscriber watches a video on its website, Patreon sends the subscriber's Facebook

7    Profile ID ("FID") and the title of the video watched to Facebook in a single unencrypted transmission.

8    ¶¶ 35-37.

9    The FID is linked to the user's Facebook Profile, which contains a wide range of demographic

10   and other details such as their personal interests, work history, relationship status, and personal

11   photographs. ¶¶ 37-39. Because the FID serves as a unique identifier for an individual's Facebook

12   account, Facebook—or anyone who receives the information from Facebook—can use it to locate,

13   access, and view the user's corresponding Facebook profile quickly and easily. ¶ 37. Simply put, by

14   transmitting the subscriber's unique identifier together with the video they watched, Patreon's use of the

15   Pixel allows Facebook to know the video-watching habits of a specific user on Patreon's website.

16   The Pixel is an advertising tool that allows website operators to track visitors' activity on their

17   websites in order to refine the targeting of the web business's advertising on Facebook. ¶¶ 41, 44.

18   Facebook uses the information to build a more detailed profile of its users, further refining its ability to

19   sell and display targeted digital ads to them on Facebook. ¶ 43. In exchange for using the Pixel, Patreon

20   receives information from Facebook that allows it to better target its own advertisements, thereby

21   increasing its profits. ¶¶ 41-44.

22   Patreon's Terms of Use, Privacy Policy, Data Practices, and Cookie Policy are posted on

23   Patreon's website. ¶ 47. They do not disclose the use of the Pixel or that Patreon will share in a single

24   transmission with their identifying information the video titles they watched. In other words, Patreon

25   subscribers are not informed that Patreon will disclose information that allows Facebook to identify their

26   specific viewing habits. Even if Patreon's Terms of Use or other disclosures referenced the Pixel, they

27   _____

[1] All "¶" references are to the Class Action Complaint. (Dkt. No. 1.)

28

2

1   would not confer consent on Patreon to collect and share individual subscribers' video selections, as the

2   VPPA requires that a consumer consent separately on a standalone consent form, which Patreon does not

3   provide or require of subscribers. ¶¶ 5, 48.

4          Plaintiffs are current and former Patreon subscribers. In the digital advertising market,

5   information about their identity and video-watching patterns is valuable. ¶ 53. Plaintiffs subscribed to

6   Patreon because it purported to offer greater privacy protection than competing websites for their

7   valuable personally identifiable information ("PII"). ¶¶ 51-54. They were unaware of and never

8   consented to Patreon's disclosure of their viewing preferences and identities to Facebook. ¶¶ 31-33, 46.

9   They suffered economic harm from Patreon's information-sharing practices, which diminished the value

10  of services for which they paid and the value of their PII. ¶ 51. They accordingly sue for violations of

11  (1) the VPPA; (2) the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; (3)

12  California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.* and (4) unjust

13  enrichment. ¶¶ 63-104.

14  **III.   LEGAL STANDARD**

15         The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in

16  the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d

17  1025, 1031 (9th Cir. 2008). Under Rule 8(a), Plaintiffs need only set forth enough facts to state a

18  plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The test calls for

19  "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662,

20  678 (2009). Under Rule 9(b), a defendant's knowledge "may be alleged generally[.]" Fed. R. Civ. P. 9(b).

21  **IV.   ARGUMENT**

22         **A.     Plaintiffs' VPPA Claim Should Be Upheld.**

23         Congress enacted the VPPA "to preserve personal privacy with respect to the rental, purchase or

24  delivery of video tapes or similar audio visual materials." *Yershov v. Gannett Satellite Info. Network, Inc.*,

25  820 F.3d 482, 485 (1st Cir. 2016) (alterations, quotation marks, and citation omitted). "To effectuate this

26  purpose, the VPPA created a civil remedy against 'video service providers' who knowingly disclose

27  information 'which identifies a person as having requested or obtained specific video materials or services

28

3

from a video tape service provider.'" *Id.* at 485-86 (internal quotation marks omitted) (quoting 18 U.S.C. § 2710(b)(1)). Thus the VPPA "provides that '[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person[.]'" *In re Vizio, Inc., Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1220 (C.D. Cal. 2017) (alterations in original) (quoting 18 U.S.C. § 2710(b)(1)).

Plaintiffs allege Patreon violates the VPPA by providing their FID together with their viewing content in a single transmission thereby allowing Facebook to identify their private video-watching habits. Patreon raises four pleading-stage arguments in its motion. Patreon argues that it cannot be held liable under the VPPA because (1) it is not a "video tape service provider"; (2) it did not disclose Plaintiffs' PII; (3) even if it did disclose Plaintiffs' PII, it did not do so knowingly; and (4) the VPPA is unconstitutional because it violates the First Amendment both facially and as applied. (Mot. at 5.) For the reasons provided below, these arguments are without merit and should be rejected.

### 1.    Patreon is a "video tape service provider" under the VPPA.

The VPPA defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, *or delivery* of prerecorded video cassette tapes or similar audio visual materials[.]" 18 U.S.C. § 2710(a)(4) (emphasis added). According to Patreon, it is not a "video tape service provider" because the videos on its website are not sufficiently similar to "video cassette tapes or similar audio visual materials" and it is not in the business of renting or selling such content. Patreon's argument fails because the VPPA's text, purpose, and legislative intent all point to the same conclusion: Congress intended that the VPPA apply to emerging forms of content delivery and not just video cassettes and to cover more than just brick and mortar video rental stores.

Patreon says "[i]it is not enough" that Plaintiffs watched videos on its website, insisting the videos must be similar to the prerecorded VHS tapes that prompted Congress to enact the VPPA in 1988. (Mot. at 6-7.) Courts have rejected similar arguments, pointing to the VPPA's plain language and history to hold that Congress intended for the VPPA to apply not just to video tapes but also to new forms of delivering video content, including online. For instance, Judge Beeler concluded in *In re Hulu Privacy Litigation* that "a plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS
CASE NO. 3:22-cv-03131-JCS

content, not about how that content was delivered (e.g. via the Internet or a bricks-and-mortar store)." 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012). Legislative history shows "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved." *Id.* at *6. The court therefore found that "Congress used 'similar audio video materials' to ensure that VPAA's protections would retain their force even as technologies evolve." *Id.*; *see also, e.g.*, S. Rep. No. 100–599 at 1 (discussing the increasing privacy concern with advances in technology); 158 Cong. Rec. S8320-03, S8321 ("The bill we enact today takes several important steps to accommodate new technologies."). Other courts are in accord. *See, e.g.*, *In re Vizio*, 238 F. Supp. 3d at 1221 ("Congress's use of the phrase 'similar audiovisual materials' indicates that the definition is medium-neutral; the defendant must be in the business of delivering video content, but that content need not be in a particular format."); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (delivering "video content to users" and maintaining "a cache of videos and visual materials" qualified Facebook as a "video tape service provider").

Neither of the cases cited by Patreon supports its claim that the videos Plaintiffs viewed on its website are not "similar audio visual materials." Patreon points to a curated excerpt from the Ninth Circuit's decision in *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017). But that court recognized that new technologies may qualify under the VPPA. *Id.* ("And modern technology may indeed alter—or may already have altered—what qualifies under the statute. A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual."). The portion of the opinion Patreon quotes ("we are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage") did not address whether the defendant was a "video tape service provider," but rather the question of "[u]nder the VPPA, what *information* did Congress intend to cover as 'capable of' identifying an individual?" *Id.* at 984-85 (emphasis added).[1] In contrast to

---

[1] The court in *Eichenberger* concluded that because the defendant only disclosed the serial number for the device the plaintiff used to watch videos and the names of the videos he watched, and it was undisputed that the third party could not actually identify individuals with the information the defendant provided, it was not PII within the meaning of the VPPA. *Id.* at 985-86. Unlike that situation, Patreon provided the FID—which can be readily used to identify individuals—along with the videos those users watched. 876 F.3d at 986.

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS
CASE NO. 3:22-cv-03131-JCS

the unique FID at issue here, which connects with a Facebook profile containing personal information, the *Eichenberger* plaintiff conceded that the device serial number the defendant disclosed could *not* be used to identify an individual when paired with the name of the video viewed. Patreon's criminal authority is entirely inapposite as it concerned whether the defendant's conviction for violating the Federal Meat Inspection Act fell within an exclusion from a statute prohibiting convicted felons from possessing firearms. *United States v. Stanko*, 491 F.3d 408, 410-15 (8th Cir. 2007).

Again, to qualify as a "video type service provider" Patreon must be "engaged in the business of renting, selling, or delivering" similar audio visual materials under 18 U.S.C. § 2710(a)(4). (Mot. at 7.) Patreon contends that it does not qualify because Plaintiffs' allegations are conclusory and it doesn't really engage in the sale or delivery of videos. But Plaintiffs do not, as Patreon claims, merely recite the statutory definition of a "video tape service provider." They instead specifically allege that Patreon's platform allows videos to be delivered by content creators to their supporters or "patrons" (¶¶ 34-35), who pay Patreon a subscription fee in exchange for being able to watch. *E.g.*, ¶¶ 20, 23, 26, 29, 51. Thus, the statutory elements of selling and delivering are met. And, contrary to Patreon's vague assertion that its business is not "tailored to delivering" videos and it only "earns a commission" (Mot. at 7-8), "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the *business model* or media format involved." *In re Hulu*, 2012 WL 3282960, at *6 (emphasis added).

Patreon argues that "the *Vizio* court's reasoning forecloses Plaintiffs' VPPA claims" (Mot. at 8) yet, in fact, this reasoning confirms that Plaintiffs' claims may proceed.[1] In *Vizio*, the court found that to be "engaged in the business of" delivering video content, a defendant must be "substantially involved in the conveyance of video content to consumers [and] significantly tailored to serve that purpose." 238 F. Supp. 3d at 1221. That third-party content creators produce the video content on its site does not absolve Patreon of VPPA liability. *See id.* at 1221 ("Under this definition, a defendant can be 'engaged in the

---

[1] Patreon's reliance on its Terms of Use to dispute Plaintiffs' allegations is improper. (*E.g.*, Mot. at 9:1.) A defendant cannot use judicial notice to insert its "own version of events" and "disput[e] the factual allegations in the complaint." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

business' of delivering video content even if other actors also take part in the delivery of the same video content."). Patreon likens itself to the postal carrier that the court in *Vizio* suggested "could not be characterized as 'engaged in the business' of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package." (Mot. at 8 (quoting 238 F. Supp. 3d at 1221)). But, unlike a provider of general services who has no role in facilitating the relationship between sender and recipient, Patreon profits from connecting users who pay for subscriptions so they can "engage with the creators they support" and watch the videos posted by the creators on Patreon's platform . ¶¶ 20, 23, 26, 29, 35, 37. The *Vizio* court found that a television manufacturer's television app platform *was* sufficiently tailored to delivering video content because it allowed consumers to download and access content from third parties and Vizio charged a premium for televisions with the app. 238 F. Supp. 3d at 1222. Thus, *Vizio* is indistinguishable. By acting as a middleman, Patreon's platform is tailored to video delivery because—as in *Vizio*—it is "designed to enable consumers to seamlessly access" content from third parties. *Id.*; *see also Facebook*, 402 F. Supp. 3d at 799 (delivery of videos and visual materials "from content providers like Netflix" plausibly showed that Facebook is a "video tape service provider").

In a final effort to evade its status as a "video tape service provider" for VPPA purposes, Patreon maintains that if it is found to be engaged in the business of delivering videos then so are "the Ninth Circuit, the United States Congress, countless corporations, consulting firms, accounting firms, non-profit organizations, hardware stores, craft supply stores, and on and on and on." (Mot. at 8.) But courts have rejected similar efforts to invoke a "parade of horribles" because most businesses and other institutions "are far too peripherally or passively involved in the delivery of video content to reasonably constitute 'the business' of delivering video content" and the VPPA only applies to consumers who rent, purchase, or subscribe from the "video tape service provider." *In re Vizio*, 238 F. Supp. 3d at 1222. Plaintiffs adequately allege that Patreon qualifies as such a provider.

### 2. Plaintiffs adequately allege Patreon disclosed their PII.

Patreon also fails in its attempt to challenge Plaintiffs' VPPA claim for failure to allege facts plausibly showing that Patreon disclosed information that "identified them individually." (Mot. at 9.)

Patreon argues that Plaintiffs do not allege "their Facebook profiles have detailed personal information . . . [or] that their Facebook profiles use their own names" (Mot. at 9); but, under the VPPA, PII is not limited to a person's name or any particular type of information but is functionally defined to include any information that can be used by "an ordinary person to identify a specific individual's video-watching behavior." *Eichenberger*, 876 F.3d at 984 (citation omitted); *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *11 (N.D. Cal. Apr. 28, 2014) ("It does not require identification by a name necessarily.").

Plaintiffs plausibly allege that the information Patreon disclosed to Facebook would allow someone to identify Plaintiffs' individual video-watching behavior. Each Plaintiff is a Facebook user (¶¶ 18, 21, 24, 27) and every Facebook user has a unique FID that is tied to their Facebook profile. ¶ 37. "Anyone who possesses a FID may . . . access and view the corresponding Facebook profile." ¶¶ 37-38. The profile contains a "Facebook user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts . . . [as well as] more sensitive information—for instance . . . the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more." ¶ 39. Unlike an online screenname or IP address, "[t]he Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user." *Hulu*, 2014 WL 1724344, at *14. By providing Plaintiffs' FID together with their video-watching information, Patreon enabled Facebook to identify Plaintiffs' individual viewing habits—*i.e.*, their PII under the statute. *See Facebook*, 402 F. Supp. 3d at 798 (finding it "reasonable to infer, at least at the pleading stage, that when a user receives a video or likes a video, he watches the video, such that this information sheds significant light on his video-watching behavior.").[1]

### 3.      Patreon did not provide or obtain the requisite consent.

Patreon also argues that "Plaintiffs cannot recover for disclosures that they actually consented to" (Mot. at 1, 17), but it does not (and cannot) demonstrate that it provided or obtained standalone consent forms as the VPPA mandates. Adequate consent under the VPPA requires "informed, written

---

[1] Because Plaintiffs have alleged sufficient facts from which it may be inferred that Patreon disclosed their PII to Facebook, Patreon's argument is not helped by its citation to cases dismissing claims based on a plaintiff's failure to plead facts within their control. *See, e.g.*, *Crittenden v. Apple, Inc.*, 2022 WL 2132224, at *4 (N.D. Cal. June 14, 2022).

8

consent . . . of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (ii) at the election of the consumer . . . [and] (iii) the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election[.]" 18 U.S.C. § 2710. Patreon complains about the "very specific, formalized way" that consent must be obtained for its conduct to be lawful, acknowledging by its silence that it did not follow this procedure prescribed by Congress. (Mot. at 18; *see also* Mot. at 6:1-3 (conceding that "a defendant cannot avoid liability under the VPPA" if it does not meet these consent requirements).)

Plaintiffs oppose Patreon's request for judicial notice of its terms of use, privacy policy and cookie policy (Dkt. No. 23), documents outside the complaint that cannot be used to dispute Plaintiffs' allegations, including that neither they nor any other user consented to Patreon's relevant practices on a separate form. ¶¶ 5, 48, 69. *See Pollock v. Fed. Ins. Co.*, No. 21-CV-09975-JCS, 2022 WL 912893, at *5 (N.D. Cal. Mar. 29, 2022) (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)). Even if the Court were to consider these materials, they confirm what Patreon's argument effectively concedes—Patreon's disclosures to users do not satisfy the VPPA's consent provisions.

### 4. Plaintiffs sufficiently allege Patreon disclosed their PII knowingly.

The VPPA declares liable video tape providers who "knowingly disclos[e], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(a)(4). "'[K]nowingly' means consciousness of transmitting the private information." *Hulu¸* 2014 WL 1724344, at *15. Patreon accordingly is liable if it knew what Facebook's "[Pixel] contained and knew that it was transmitting PII[.]" *Hulu*, 2014 WL 1724344, at *16. Patreon contends it cannot be inferred that it acted with knowledge, but it demands detailed facts about its state of mind that neither the Federal Rules nor federal courts have required. A standard lower than Patreon's "vaulted pleading standard" applies, as Rule 9 provides that knowledge may be alleged generally. *Simi Mgmt. Corp. v. Bank of Am. Corp.*, 2012 WL 1997232, at *6 (N.D. Cal. June 4, 2012); *see also In re Woodbridge Invs. Litig.*, 2020 WL 4529739, at *5 (C.D. Cal. Aug. 5, 2020) (rejecting argument that knowledge allegations must satisfy Rule 9's heightened pleading standard).

Plaintiffs' knowledge allegations satisfy Rule 9(b) and are not merely the equivalent of saying "Patreon knew because it knew." (Mot. at 10.) Patreon advocates by isolating one paragraph in the Complaint (*id.* (citing ¶ 71)) while ignoring the other allegations. Unlike the *Iqbal* plaintiff who only recited the elements of his claims, Plaintiffs allege facts related to Patreon's decision making that support their allegation that Patreon knew that the Pixel it embedded collects personal information of users and discloses it to Facebook. Plaintiffs allege Patreon acted deliberately when it "programmed the Facebook Pixel" onto the website it controlled. ¶¶ 3, 41-43, 71. Patreon added the code so it could profit by optimizing its promotion of its video-content services to Facebook users. ¶ 44. *See, e.g.*, *Zapata Fonseca v. Goya Foods Inc.*, 2016 WL 4698942, at *6 (N.D. Cal. Sept. 8, 2016) ("Plaintiff's allegations are not legal conclusions, and the complaint does not simply recite the elements of a cause of action."); *Actividentity Corp. v. Intercede Grp. PLC*, 2009 WL 8674284, at *3 (N.D. Cal. Sept. 11, 2009) (plaintiff does not need to make "elaborate factual recitals beyond what is necessary to state a claim").

Comparing the allegations in Patreon's cases to Plaintiffs' knowledge allegations confirms they are sufficient. *Mollett v. Netflix, Inc.*, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) involved a screen that automatically appeared when anyone opened a "Netflix Ready Device" and which then displayed the user's video-watching history. *Id.* at *1. Whether third parties opened a Netflix Ready Device was "necessarily outside of Netflix's control or potential knowledge when it serves the information to the device." *Id.* at 4. Patreon, however, maintained control over its content-delivery platform at all times. Patreon for its own financial gain decided to program Pixel onto its website, and hence it controlled—and knew about—the associated disclosures to Facebook.

### 5. The VPPA does not violate the First Amendment.

Patreon further invites the Court to strike down the VPPA under the First Amendment, without good grounds. (Mot. at 10–20). Far from being abridged, the First Amendment recognizes personal liberty interests like those *protected* by the VPPA, and the statute also advances and supports important constitutional privacy rights. *See Eichenberger*, 876 F.3d at 983 (noting that the VPPA "codifies a context-specific extension of the substantive right to privacy" and that "[v]iolations of the right to privacy have long been actionable at common law"); *see also Whalen v. Roe*, 429 U.S. 589, 606 (1977) ("The Court

recognizes that an individual's "interest in avoiding disclosure of personal matters" is an aspect of the right of privacy[.]"); *DOJ v. Reporters Comm.*, 489 U.S. 749, 763 (1989); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2348 (2020) (noting "Congress's continuing interest in protecting consumer privacy"); *Kellman*, 2022 WL 1157500, at *15 ("The protection of privacy interests is, as discussed, a longstanding commitment of the law—and an important one.").[1]

The VPPA is constitutional because it limits commercial speech, addressing only the private matter of consumers' video watching habits. The "VPPA follows a long line of statutes passed by Congress to extend privacy protections to records that contain information about individuals." *In re Hulu*, 2012 WL 3282960, at *6; *Hearst*, 192 F. Supp. 3d at 448 n.13 (twelve states have enacted laws that mirror the VPPA). In fact, the primary decision that Patreon relies on *cites* the VPPA in recognizing that "such statutes regulate the *misuse* of information by entities that obtain that information from individuals through some exchange"—hence, the VPPA "'regulate[s] data collection and disclosure' *without* implicating the First Amendment." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1124 (9th Cir. 2020) (emphasis added) (citing, *inter alia*, 18 U.S.C. § 2710).

No court has suggested that the VPPA is unconstitutional and "[t]here are many federal provisions that forbid individuals from disclosing information they have lawfully obtained. The validity of these provisions has long been assumed." *Boehner v. McDermott*, 484 F.3d 573, 578 (D.C. Cir. 2007). Courts have thus upheld the constitutionality of state laws modelled on the VPPA, rejecting similar arguments to the ones Patreon now raises. *See, e.g.*, *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 435 (S.D.N.Y. 2016) (upholding statute that "paralleled" the VPPA under the First Amendment, facially and as applied); *see also Boehner*, 484 F.3d at 578 n.2 (citing VPPA for the principle that "government can also limit disclosures by persons who are not its employees without running afoul of the First Amendment . . . those who sell or rent video tapes or DVDs ordinarily may not reveal 'personally identifiable information concerning' their customers.").

---

[1] Under Federal Rule of Civil Procedure 5.1 and Local Civil Rule 3-8(a), the U.S. Department of Justice may intervene in regard to Patreon's constitutional challenge of a federal statute. Even so, "[b]efore the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional." Fed. R. Civ. P. 5.1(c).

### a. The VPPA regulates commercial speech.

Before turning to Patreon's facial challenge, it is first necessary to determine whether the VPPA regulates commercial speech as it is afforded less protection and laws regulating it are subject to only intermediate rather than strict scrutiny. *See, e.g.*, *First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1049 (N.D. Cal. 2015) (first examining whether ordinance at issue regulated commercial speech to determine degree of constitutional protection), *aff'd*, 860 F.3d 1263 (9th Cir. 2017). Patreon's provision of user information to Facebook for its own benefit is the type of "pure economic transaction" that fits "comfortably within the 'core notion' of commercial speech." *United Reporting Pub. Corp. v. California Highway Patrol*, 146 F.3d 1133, 1136 (9th Cir. 1998) (selling arrestee information to clients was commercial speech and "nothing more") (quoting *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983), *rev'd on other grounds*, *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999)). This conclusion is consistent with decisions rejecting First Amendment challenges to analogous state statutes. For example, the court in *Hearst* considered the constitutionality of Michigan's Video Rental Privacy Act, M.C.L. § 445.1711 *et seq.* ("VRPA")—a statute that largely mirrors the VPPA—and upheld it against both facial and as-applied First Amendment challenges. 192 F. Supp. 3d at 445. The court concluded the statute regulated commercial speech because the speech "solely related to the economic interests of the speaker and the audience." *Id.* at 444-52. Noting "the increased availability and profitability of data," the court found that businesses' growing ability to profit by disclosing such data supported the conclusion "that disclosing consumer information is—primarily, if not entirely—an economic act" and the video information at issue "relays an individual's economic decisions, elucidates an individual's economic preferences, and facilitates the proposal of new commercial transactions[.]" *Id.* at 445; *see Boelter v. Advance Mag. Publishers Inc. ("Condé Nast")*, 210 F. Supp. 3d 579, 597 (S.D.N.Y. 2016) (agreeing that speech regulated by VRPA is commercial speech only entitled to "reduced constitutional protection"); *see also Trans Union Corp. v. FTC ("Trans Union I")*, 267 F.3d 1138, 1141 (D.C. Cir. 2001) (Fair Credit Reporting Act's marketing limitations regulated only commercial speech).

Patreon contends that sharing its users' video-watching history does not propose a commercial transaction (Mot. at 15), yet "speech that does not propose a commercial transaction on its face can still be

commercial speech." *Arrix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (citation omitted). Patreon also argues that the speech at issue in this case is not commercial because it does not involve advertisements or refer to a specific product. Nevertheless, only "[w]here the facts present a close question" do courts apply the "*Bolger* factors," under which speech is commercial if: "[1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Ariix*, 985 F.3d at 1115–16. These three non-dispositive factors do not apply here because the VPPA's limitation to commercial speech is apparent. *Ariix*, 985 F.3d at 1115-16; *cf. IMDb*, 962 F.3d at 1122.

Moreover, even if the *Bolger* factors apply, they show that Patreon's speech is commercial in nature. Patreon's speech does identify a specific product: the videos its users viewed. ¶¶ 3-4. *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008) (videos qualified as product or service). That Patreon's speech is not an advertisement is not dispositive. (Mot. at 15.) In *Ariix* the Ninth Circuit held that speech that did not constitute an advertisement may still be commercial speech if the speaker's motivations are primarily economic. *Id.* at 1116-17 (citing *Bolger*, 463 U.S. at 66-67). As the court explained, the question is "whether he speaker acted *primarily* out of economic motivation" which "is not limited simply to the expectation of a direct commercial transaction with consumers. Courts have found commercial speech even when it involves indirect benefits" and "the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking." *Id.* at 1117. Patreon's primary motivation in speaking is economic because it is a for-profit business that shares information with Facebook out of a financial motive. ¶ 41. In contrast to a newspaper, which has economic incentives but is otherwise significantly motivated by the free expression of facts and opinions, Patreon's speech was "solely in the interest of the speaker and its specific business audience" and accordingly is only entitled to "reduced constitutional protection." *Trans Union Corp. v. F.T.C. ("Trans Union II")*, 245 F.3d 809, 818 (D.C. Cir. 2001).

Patreon insists that the VPPA is subject to strict scrutiny under the Ninth Circuit's *IMDb* decision involving a California statute that prohibited online entertainment employment service providers from publishing subscribers' dates of birth on publicly available profiles. 962 F.3d at 1117–18. *IMDb* does not

13

control in this case because the speech at issue in *IMDb* (1) concerned "free, publicly available profiles" that were "encyclopedic" and "similar to Wikipedia"; and (2) the law's restrictions extended even to content uploaded to the web by members of the public. 962 F.3d at 1117, 1124. Unlike the public profiles on IMDb.com, the public has no interest in Plaintiffs' private viewing habits, which are non-public, and the VPPA only limits the disclosure of information by "video tape service providers" and no other source. *Kellman v. Spokeo, Inc.*, 2022 WL 1157500, at \*14 (N.D. Cal. Apr. 19, 2022) (speech was commercial based in part on fact that it did not concern matters of public interest).

Limiting Patreon's ability to disclose personal and confidential information without its users' consent does not run afoul of the First Amendment. Patreon's disclosure of Plaintiffs' personal information and viewing habits distinguishes this case from the public figures and information at issue in *IMDb* and other cases cited by Patreon. With respect to claims like Plaintiffs', "[t]he public does not have a particular cognizable interest in the 'speech' at issue here—the dissemination of Plaintiffs' personal information—because that information is purely a matter of private concern, does not relate to any matter of 'political' or 'social' concern, and does [not] seek to communicate a political or social point of view." *Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at \*15 (N.D. Cal. Aug. 16, 2021); *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (the interest in disclosing a credit score "warrants no special protection" because a "credit report concerns no public issue"); *Trans Union I*, 267 F.3d at 1140 ("But the particular information at issue in this case—people's names, addresses, and financial circumstances—is less public than the same information about companies whose articles of incorporation and financial statements are generally available for inspection.").

Patreon is incorrect that the Ninth Circuit "emphatically rejected" the notion that "speech of a purely private concern is entitled only to reduced protection." (Mot. at 16 (quotation marks and citation omitted)). In *IMDb*, the court focused on the aspect of AB 1687 (the law at issue there) that barred "a provider from publishing age information on any public 'companion' website, such as IMDb.com, without regard to the source of the information." 962 F.3d at 1119-20. The court declined "to create" a category of reduced protection for "public speech touching on private issues" noting that the Supreme Court had never done so. 962 F.3d at 1123-34 (emphasis added). The Supreme Court, however, has repeatedly held that

14

"where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); *see, e.g.*, *Dun & Bradstreet*, 472 U.S. at 762 (credit report not entitled to any "special protection" under the First Amendment where it "concerns no public issue" and was not widely disseminated). *IMDb* therefore did not reject longstanding jurisprudence holding that non-public speech concerning private personal matters is not entitled to heightened protection. In fact, the *IMDb* court distinguished AB 1687 *from the VPPA* and other statutes that limit the disclosure of information "without implicating the First Amendment" because, unlike AB 1687, they "regulate the misuse of information by entities that obtain that information from individuals through some exchange" instead of forbidding "publication . . . without regard to how it was obtained." Of further significance, the Ninth Circuit also reasoned that, unlike in the D.C. Circuit's *Trans Union* decision, where "the 'speech' at issue—the sale of data—was itself an inherently private exchange between private parties," "IMDb posts the information on its website free of charge for the public to review. This fact alone imparts an inherently public character to the speech at issue." *Id.* at 1124-25.

Patreon does not post the viewing habits of its users for public review. This case does not involve the type of "public speech touching on private issues" that could justify strict scrutiny. The VPPA implicates only commercial speech and is thus subject only to intermediate scrutiny.

### b.   The VPPA does not violate the First Amendment on its face.

Patreon asks this Court to make a sweeping and unprecedented ruling invalidating the VPPA under the First Amendment as facially overbroad. As discussed, however, this case implicates commercial speech that is not ordinarily subject to a facial attack on overbreadth grounds. Even if it were appropriate to consider an overbreadth challenge, such attacks are disfavored and Patreon has not carried its burden of showing that a "substantial number of applications" under the VPPA are unconstitutional. *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted).

Again relying on the Ninth Circuit's decision in *IMDb*, Patreon claims the VPPA is overbroad because it prohibits disclosure of viewing information "if that consent does not comply with the VPPA's peculiar formalities." (Mot. at 12.) Setting aside that Patreon never explains what is "peculiar" or onerous about the VPPA's consent requirements, the VPPA regulates commercial speech, unlike the

15

statute in *IMDb*, and "it is irrelevant whether the ordinance has an overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commercial speech." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 496–97 (1982); *see Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ("[O]verbreadth analysis does not normally apply to commercial speech[.]"). Consequently, the VPPA is not subject to a facial overbreadth challenge.

Even if Patreon could assert an overbreadth challenge here, such "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). Patreon has not met its "heavy burden" as the party making a facial attack to "demonstrate a substantial risk that the application of the provision will lead to the suppression of speech." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). In support of its overbreadth argument, Patreon musters only a handful of hypothetical examples (Mot. at 12-13), but "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *Washington State Grange*, 552 U.S. at 449–50 ("In determining whether a law is facially invalid, we must be careful not to . . . speculate about 'hypothetical' or 'imaginary' cases."). Rather, the party challenging the statute must show there is a "*realistic* possibility that the application [of the regulation] will suppress a substantial amount of constitutionally protected speech." *Griffin v. Sec'y of Veterans Affs.*, 288 F.3d 1309, 1321 (Fed. Cir. 2002) (emphasis added). None of Patreon's hypothetical concerns rise to the level required to sustain a facial challenge. (*See* Mot. at 12–13.)

Patreon first uses the disclosure of Judge Robert Bork's video rentals 34 years ago to demonstrate the VPPA's alleged overbreadth. (Mot. at 12.) But that very episode confirms that "commercial speech does not become non-commercial—and thus less subject to regulation—because it may implicate matters of public concern." *Hearst*, 192 F. Supp. 3d at 452. Patreon does not dispute (and has not presented any evidence to the contrary) that in the vast majority of applications, the VPPA regulates the disclosure of PII belonging to individuals—like Plaintiffs—who are not public figures. In any event, a single application concerning a public figure is "not sufficient to render it susceptible to an

16

overbreadth challenge." *Members of City Council of City of Los Angeles*, 466 U.S. at 800.

Citing two Supreme Court decisions striking down restrictions on public reporting of sexual assault victims, Patreon further argues the VPPA is overbroad because it prohibits disclosure even when consumers have disclosed their viewing history to others or when it involves a matter of public concern. Nonetheless, unlike the newsworthy information at issue in those cases, what videos consumers watch is not a matter of public interest. Moreover, Patreon is not a media organization and the VPPA does not threaten the free press like the statutes struck down by the Supreme Court in Patreon's cited authorities. For instance, *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989) concerned a law aimed at prohibiting the press from publishing the names of victims of sexual assault—a matter of public importance. In striking down the law, the Supreme Court stressed the importance of the "free press" emphasizing that "[w]e have previously noted the impermissibility of categorical prohibitions upon media access where important First Amendment interests are at stake[.]" *Id.* at 539-40; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975) ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it.").

Patreon next claims that the VPPA has a chilling effect that is "exacerbated" by the statutory damages Congress made available, citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974). (Mot. at 13.) Yet, after deciding *Gertz*, the Supreme Court *upheld* the recovery of presumed and punitive damages even where the First Amendment is concerned. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 763 (1985) ("[P]ermitting recovery of presumed and punitive damages in defamation cases . . . does not violate the First Amendment when the . . . statements do not involve matters of public concern."). Again, Plaintiffs' video-watching habits are not matters of public concern and, as Patreon acknowledges, the Supreme Court did not decide—let alone hold—in *Florida Star* that assessing statutory damages for publication of certain information violates the First Amendment. *Cf. McCall L. Firm, PLLC v. Crystal Queen, Inc.*, 335 F. Supp. 3d 1124, 1135 (E.D. Ark. 2018) (rejecting argument that the TCPA's damages provision chilled speech and violated the First Amendment); *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1092 n.10 (W.D. Tex. 2000).

Patreon resorts to arguing that the VPPA is overbroad because Congress *could* have enacted a law that exempted speech when "(a) the consumer consented, (b) the disclosure related to a matter of public concern, or (c) the disclosed conduct was already publicly known." (Mot. at 13.) In fact, the VPPA already exempts speech when the consumer has consented—Patreon just failed to secure consent in the manner prescribed. And even if the public had some interest in a particular consumer's video-watching preferences, the VPPA does not restrict the disclosure of such information from news outlets or other sources that are *not* "video tape service providers." *Hearst*, 192 F. Supp. 3d at 452.

Patreon's inability to offer anything more than hypotheticals and cases involving public figures and newsworthy information underscores "there is no realistic danger" that this statute aimed at protecting consumer privacy could "significantly compromise recognized First Amendment protection[.]" *Klein v. San Diego Cty.*, 463 F.3d 1029, 1038 (9th Cir. 2006) (quotation marks and citation omitted); *see also United States v. Williams*, 553 U.S. 285, 303 (2008) ("In the vast majority of its applications, this statute raises no constitutional problems whatever."); *Marquez-Reyes v. Garland*, 36 F.4th 1195, 1207 (9th Cir. 2022) ("It is enough to say that, to the extent the statute may reach some protected speech, it is not substantially overbroad relative to its legitimate sweep.").

For these reasons, the VPPA is not facially overbroad.

### c.    The VPPA does not violate the First Amendment as applied.

Patreon also argues that the VPPA violates the First Amendment as applied in this case because it purportedly imposes content-based restrictions that trigger strict scrutiny. To the contrary, the VPPA does not impose content-based restrictions. It is concerned only with the source of the information. Moreover, even if the VPPA were not content-neutral (which it plainly is), the VPPA regulates only commercial speech that is not subject to strict scrutiny even when the applicable regulations are content-based. Finally, even if strict scrutiny were to apply, the VPPA also would satisfy that standard.

### i.    The VPPA is content-neutral.

Patreon's contention that the VPPA is "content-based" is far-fetched. (Mot. at 14.) The VPPA regulates only the source of the information, not its particular content, and is therefore subject only to intermediate scrutiny. *See Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001). The Seventh Circuit has held

18

that the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 *et seq.*, "a parallel statute to the

Video Privacy Protection Act," *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 539 (7th Cir. 2012),

is content-neutral because its "goals are 'unrelated to the content of [the regulated] expression.'"

*Dahlstrom v. Sun-Times Media, LLC,* 777 F.3d 937, 950 (7th Cir. 2015) (citation omitted). Like the

VPPA, the DPPA does not prohibit "the dissemination of the very same information acquired from a

lawful source" and "because the Act permits publication of identical information so long as that

information flows from a source other than driving records, it implicates the First Amendment rights of the

restricted party to a far lesser extent than would restraints on dissemination of information in a different

context." *Id.* at 950 (quotation marks and citation omitted). Regardless, the VPPA need only pass

intermediate scrutiny because laws regulating commercial speech are not subject to strict scrutiny even if

they are content or speaker-based. *See Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 846 (9th Cir.

2017) (rejecting argument that "content-or speaker-based regulations of commercial speech" were subject

to heightened constitutional scrutiny) (en banc); *United States v. Swisher*, 811 F.3d 299, 313 (9th Cir.

2016) (en banc).

### ii.    The VPPA is subject to—and satisfies—intermediate scrutiny.

Applying intermediate scrutiny, where the communication at issue "is neither misleading nor

related to unlawful activity," a government restriction on speech must satisfy a three-part test: (1) the

restriction must seek to further a substantial government interest, (2) the restriction must directly advance

the government's interest, and (3) the restriction must reach no further than necessary to accomplish the

given objective. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564

(1980); *Contest Promotions, LLC v. City & Cty. of San Francisco*, 874 F.3d 597, 601 (9th Cir. 2017). The

VPPA survives intermediate scrutiny under this standard.

First, the VPPA's limited restrictions on speech seek to protect and defend the privacy of

consumers. S. Rep. No. 100–599 at 2–4. As the Supreme Court has recognized, the government has a

substantial interest in the protection of personal privacy. *See Whalen*, 429 U.S. at 606 ("The Court

recognizes that an individual's "interest in avoiding disclosure of personal matters" is an aspect of the right

of privacy[.]"); *Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. at 2348 (noting "Congress's continuing

interest in protecting consumer privacy"); *see also, e.g.*, *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 2022 WL 2919260, at *10 (S.D. Fla. May 18, 2022) ("Plaintiff identifies a substantial government interest that courts have consistently recognized: consumer protection and privacy."); *Hearst*, 192 F. Supp. 3d at 448 (finding the state has substantial interest in protecting consumer privacy); *Condé Nast*, 210 F. Supp. 3d at 599 (same).

Second, the VPPA directly and materially advances the government interest of protecting consumer privacy. As the court in *Hearst* concluded in upholding the analogous VRPA: "The statute brings within its ambit the individuals who sell those goods, restricting the reasons for which they can disclose the identifying information they collect about their customers. Preventing the disclosure of consumer data to third parties by sellers—those most likely to possess and collect that information— reduces the likelihood of consumers' private details becoming public." 192 F. Supp. 3d at 449; *see also* S. Rep. 100–599.

Third, the VPPA reaches no further than necessary to accomplish this objective. It limits disclosure of the type of private consumer information that Congress determined should be protected, and nothing else. Like Michigan's VRPA, the VPPA "advances the [government]'s goals without unduly burdening Defendant's ability to engage in commerce." *Hearst*, 192 F. Supp. 3d at 449; *Condé Nast*, 210 F. Supp. 3d at 602 (finding "the PPPA is sufficiently narrowly drawn. The law protects Condé Nast's interests in collecting payments and direct marketing, and it permits disclosure for any reason with the customer's permission."). Further demonstrating that the statute is narrowly tailored, a defendant cannot be held liable under the VPPA unless it had knowledge of its actions. *See Dahlstrom*, 777 F.3d at 955 (the DPPA's scienter requirement "to provide fair warning to potential offenders" was a factor in the statute withstanding intermediate scrutiny).

While Patreon suggests that VPPA has various exceptions that undermine its effectiveness, in reality, the law contains only narrowly tailored exceptions, such as for law enforcement purposes or pursuant to court order. 18 U.S.C. § 2710(b)(2). These "narrow, sensible exceptions" also show that the VPPA is appropriately tailored to advance the government's substantial interest. *Hearst*, 192 F. Supp. 3d at 449; *Condé Nast*, 210 F. Supp. 3d at 599. Patreon makes much of the fact that the VPPA does not apply

20

to non-commercial entities such as a public library, but "[t]he fact that Congress leaves unregulated other sources of the same information . . . does not prevent it from meaningfully advancing its governmental interests." *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 313 (E.D. Pa. 2012). The D.C. Circuit *rejected* a similar argument that the "the FCRA is underinclusive because it applies only to consumer reporting agencies and not to other companies that sell consumer information," explaining that a "regulation is not fatally underinclusive simply because an alternative regulation, which would restrict more speech or the speech of more people, could be more effective." *Trans Union II*, 245 F.3d at 819 (citation and emphasis omitted). Under-inclusion may be problematic if it renders the statute ineffective at promoting the relevant interest, but the VPPA does not suffer from this problem as it targets the primary source of potential disclosures of personal video-watching habits. *King*, 903 F. Supp. 2d at 313 ("Targeting a major source, rather than every conceivable source, of potentially harmful information is consistent with First Amendment standards.").[1]

Patreon complains that Congress could have required general consent instead of consent only in written, separate form (Mot. at 20), but the "fit" does not have to be "perfect," only reasonable," *Fox*, 492 U.S. at 480, and the possibility of an alternative consent regime that Congress did not adopt is not grounds for invalidation. *See Hearst*, 192 F. Supp. 3d at 450-51 ("The VRPA is sufficiently tailored to meet the state's goals without intolerably burdening Defendant's speech."). Patreon further insists that there is not a reasonable fit between the VPPA's statutory damages and the conduct Congress sought to deter, but while Patreon continues to be dismissive of the privacy rights of its users (Mot. at 20), courts have recognized the importance of protecting such interests and Patreon cites no authority suggesting the VPPA's statutory damage provision is disproportionate to the interest served. *Barr*, 140 S. Ct. at 2348; *Eichenberger*, 876

---

[1] Nor is the VPPA underinclusive because it stops short of imposing the same types of disclosure restrictions upon entities other than "video tape service providers." (Mot. at 18.) *See Williams-Yulee*, 575 U.S. at 449 ("It is . . . somewhat counterintuitive to argue that a law violates the First Amendment by abridging too little speech."); *see Vugo, Inc. v. City of New York*, 931 F.3d 42, 53 (2d Cir. 2019); *Willey v. Harris Cty. Dist. Att'y*, 27 F.4th 1125, 1134 (5th Cir. 2022) ("under-inclusivity tests the sincerity of the [government]'s interest"). While the VPPA does not regulate all entities that may reveal a consumer's video-viewing preferences, the government "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams-Yulee*, 575 U.S. at 449.

F.3d at 983.

   *Sorrell v. IMS Health Inc*., 564 U.S. 552 (2011) is distinguishable.[1] *Sorrell* involved a Vermont law that barred pharmacies from disclosing "prescriber identifying information in order to curb the use of brand name drugs." *King*, 903 F. Supp. 2d at 308. By protecting individual doctors' prescribing decisions, Vermont hoped to protect them from brand name drug makers' marketing tactics. *See* 564 U.S. at 560-61. But the Supreme Court held that Vermont's effort to restrict speech "to 'tilt public debate in a preferred direction' and discourage demand for a particular disfavored product (brand name drugs) was unconstitutional." *Id.* The VPPA does not suffer from such infirmities. In contrast to the Vermont law, which "was too narrowly targeted at certain speakers who were but a minority of those able to acquire or use the protected information," the VPPA targets those most likely to have information about consumers' video-watching preferences. *Hearst*, 192 F. Supp. 3d at 450. And, in contrast to the VPPA's narrow consent and law enforcement exceptions, the law at issue in *Sorrell* was saddled with a "host of" exceptions because Vermont wished "to impede the success of pharmaceutical marketers[.]" *Id.* Moreover, while Vermont's law targeted promotion of brand-name drugs, there is no evidence that Congress in enacting the VPPA was motivated by disagreement with any particular message communicated by video tape providers. *Id.* As such, *Sorrell* "supports the conclusion that the [VPPA] is comparatively well-crafted." *Condé Nast*, 210 F. Supp. 3d at 601.

###        iii.        The VPPA would survive even if strict scrutiny were to apply.

   Although the VPPA is not subject to strict scrutiny, it still meets that more exacting standard because it is "narrowly tailored to further a compelling government interest." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Narrowly tailored" does not require that a statute be "perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015). Despite conceding that the VPPA advances the compelling interest in "consumer privacy," Patreon asserts there is "no compelling state interest in punishing a speaker" for disclosing information "with the consumer's permission [and] in a manner that

---

[1] *Sorrell* does not "suggest[] that strict scrutiny would apply" in this case (Mot. at 19) as it did not modify the settled *Central Hudson* standard. *Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 841 (9th Cir. 2017); *see also Recht v. Morrisey*, 32 F.4th 398, 409 (4th Cir. 2022) ("Far from overruling *Central Hudson*, the Supreme Court has again and again indicated that it remains good law. Our court has continued to recognize as much, even after *Sorrell*.").

causes the consumer no harm." (Mot. at 17.) The VPPA, however, exempts disclosures made with permission, and disclosures that violate the VPPA invade consumers' personal privacy rights, even absent "embarrassment." (Mot. at 4, 20.) *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2209-11 (2021) (holding that class members whose credit reports were disseminated to a third party had Article III standing to recover out of verdict based on traditional privacy principles). As the Ninth Circuit explained in *Eichenberger*, "the VPPA identifies a substantive right to privacy that suffers any time a video service provider discloses otherwise private information" and every violation of the VPPA constitutes the type of harm Congress sought to limit by enacting the VPPA. 876 F.3d at 983.

> **B.    Plaintiffs State a Claim Under the UCL and CLRA.**

Plaintiffs adequately plead claims under each of the UCL's prongs and the CLRA. In challenging Plaintiffs' UCL and CLRA claims, Patreon argues that (1) its conduct was neither unlawful nor unfair under the UCL, (2) it did not have a duty to disclose that it would share its user's video-watching preferences with Facebook, and (3) Plaintiffs did not suffer an economic injury from its disclosures. (Mot. at 21-24.) None of these arguments has merit. To start with, the UCL "borrows" violations of other federal and state laws and makes them actionable. *Klein v. Chevron U.S.A., Inc.*, 202 Cal. App. 4th 1342, 1383 (2012), *as modified on denial of reh'g* (Feb. 24, 2012). Plaintiffs have adequately alleged a violation of the VPPA and therefore stated a claim under the unlawful prong.

According to Patreon, its disclosures to Facebook are not unfair as a matter of law because its Privacy Policy "expressly discloses" that it shares such information for marketing purposes. (Mot. at 21.) Nevertheless, the Privacy Policy does not inform consumers that Patreon shares information that will allow a third party such as Facebook to identify their *individual* video preferences. The Privacy Policy for instance, states that Patreon "collect[s] information automatically as you navigate the site or through our third-party analytics providers" but only lists information such as the user's operating system, browser, IP address, search terms, and the pages they visit. (Dkt. No. 23 at 118.) That is not the type of information that would allow a third party to identify Plaintiffs individually like a FID. Patreon's unfairness argument based on its RJN materials raises fact questions not capable of resolution under Rule 12. Patreon also points to the fact that it lists information it shares with third parties in "bolded heading" (Mot. at 3), but the

text it cites again does not disclose that the data it shares with third parties will allow identification of consumers' specific video-watching records. Multiplying the questions of fact, other statements in the Privacy Policy suggest that Patreon will *not* disclose such information. *See id.* ("We will never provide your information to third parties for marketing purposes without your prior consent."). Patreon's conduct satisfies the tethering test because its unauthorized disclosure violates the legislatively declared policy of protecting consumer privacy. ¶ 79. Whether conduct is unfair under the consumer balancing test is not appropriately resolved on a motion to dismiss. *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018); *Progressive W. Ins. Co. v. Yolo Cty. Super. Ct.*, 135 Cal. App. 4th 263, 287 (2005).

Plaintiffs also have stated a claim for violation of the UCL's fraud prong and the CLRA based on Patreon's misleading partial disclosures regarding its data privacy policies, which, as discussed above, neither state nor imply that Patreon will share enough information with Facebook to allow it to identify their video-watching preferences individually. Patreon was obligated to disclose this material fact to Plaintiffs because it made misleading partial disclosures that listed various ways it would share information with third parties, creating the impression that the information would not allow another party to identify the consumer's individual viewing habits. ¶¶ 84-86. *See LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997) (discussing duty to disclose based on misleading partial representations).

Patreon also argues that Plaintiffs lack standing to bring a UCL claim because they did not suffer economic harm from its disclosures. (Mot. at 21–22.) Diminution of value is a form of economic injury, including under the UCL. *Allergan, Inc., v. Athena Cosmetics*, 640 F.3d 1377, 1381, 1382 (Fed. Cir. 2011) ("[L]ost sales, revenue, market share, and asset value [are] sufficient to allege an economic injury."); *Overstock.com v. Gradient Analytics, Inc*., 151 Cal. App. 4th 688, 716 (2007). As Patreon acknowledges, Plaintiffs allege that its disclosures reduced the value of Plaintiffs' PII and courts recognize "economic injury for purposes of the UCL" in privacy cases based on allegations that disclosed information lost value. *In re Anthem, Inc. Data Breach Litig*., 2016 WL 3029783, at *14-15, *30 (N.D. Cal. May 27, 2016). Plaintiffs are not, as Patreon asserts (Mot. at 23), "required to plead that there was a market for their PII and that they somehow also intended to sell their own PII." *Id.* at *15; *see also In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1224 (N.D. Cal. 2014).

1    **C.    Plaintiffs' Unjust Enrichment Claim Should Be Upheld.**

2          Patreon moves to dismiss Plaintiffs' unjust enrichment claim arguing it is not a cause of action

3    under California law (Mot. at 24–25), but courts in this District have repeatedly held that, notwithstanding

4    "some disagreement," unjust enrichment may be asserted as a standalone claim under California law and

5    Patreon offers no reason to depart from these holdings. *Leghorn v. Wells Fargo Bank, N.A.*, 950 F. Supp.

6    2d 1093, 1122 (N.D. Cal. 2013); *Cottrell v. AT&T Inc.,* 2020 WL 4818606, at *4 n.4 (N.D. Cal. Aug. 19,

7    2020) (same); *Young v. Buttigieg*, 2022 WL 1471416, at *4 (N.D. Cal. May 10, 2022) (citing *Hartford*

8    *Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000, 1008 (2015)).

9          Plaintiffs adequately allege unjust enrichment. "Under California law, the elements of unjust

10   enrichment are: (1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another."

11   *ChromaDex, Inc. v. Elysium Health, Inc.*, 2017 WL 7080237, at *4 (C.D. Cal. Nov. 28, 2017). Although

12   "no underlying contract claim is required . . . there must be an actionable wrong to furnish a basis for

13   relief." *Soo v. Lorex Corp.*, 2020 WL 5408117, at *8 (N.D. Cal. Sept. 9, 2020). Plaintiffs have alleged an

14   "actionable wrong" here as Patreon does not fairly disclose to users that their PII and video-viewing

15   records will be shared with Facebook without their consent, for profit.

16   **V.    <u>CONCLUSION</u>**

17         For the foregoing reasons, Patreon's motion should be denied in its entirety. If the Court grants

18   the motion in whole or part, Plaintiffs respectfully request leave to amend under Rule 15.

19

20   Dated: September 9, 2022                          Respectfully submitted,

21                                                     <u>/s/  Simon Grille</u>
                                                       Adam E. Polk (SBN 273000)
22                                                     Simon Grille (SBN 294914)
                                                       Kimberly Macey (SBN 342019)
23                                                     Jordan Isern (SBN 343159)
24                                                     **GIRARD SHARP LLP**
                                                       601 California Street, Suite 1400
25                                                     San Francisco, CA 94108
                                                       Telephone: (415) 981-4800
26                                                     apolk@girardsharp.com
27                                                     sgrille@girardsharp.com
                                                       kmacey@girardsharp.com
28
                                              25

jisern@girardsharp.com

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS
CASE NO. 3:22-cv-03131-JCS