1    Fred Norton (CA SBN 224725)
     fnorton@nortonlaw.com
2    Nathan Walker (CA SBN 206128)
     nwalker@nortonlaw.com
3    Bree Hann (CA SBN 215695)
     bhann@nortonlaw.com
4    Gil Walton (CA SBN 324133)
     gwalton@nortonlaw.com
5    THE NORTON LAW FIRM PC
     299 Third Street, Suite 200
6    Oakland, CA 94607
     Telephone: (510) 906-4900
7

8
     Attorneys for Defendant
9    PATREON, INC.

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13   BRAYDEN STARK, JUDD OOSTYEN,            Case No. 3:22-cv-03131-JCS
     KEVIN BLACK, and MARYANN OWENS,
14   individually and on behalf of all others similarly
     situated,                              **DEFENDANT PATREON, INC.'S**
15                                          **REPLY IN SUPPORT OF ITS**
                    Plaintiffs,             **MOTION TO DISMISS COMPLAINT**
16
            v.                              Date:    October 14, 2022
17                                          Time:    9:30 a.m.
                                            Judge:   Hon. Joseph C. Spero
18   PATREON, INC.,

19                  Defendant.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

II.  ARGUMENT ............................................................................................................... 2

   A.   The Court Should Dismiss Plaintiffs' VPPA Claims ........................................ 2

      1.   Patreon Is Not a "Video Tape Service Provider" ................................. 2

      2.   Plaintiffs Fail to Plausibly Allege Patreon Disclosed Their Identities ...... 3

      3.   Plaintiffs Fail to Plausibly Allege Patreon "Knowingly" Disclosed
           PII to Facebook ...................................................................................... 4

      4.   The VPPA, on Its Face and as Applied to Patreon, Violates the
           First Amendment to the United States Constitution ............................. 5

         a.   The VPPA, on Its Face, Violates the First Amendment ........................ 6

         b.   The Speech that Plaintiffs Challenge Is Not Commercial
              Speech and Would Also Be Restricted by the VPPA .............................. 9

         c.   The VPPA, as Applied in this Case, Violates the First Amendment ....... 10

            i.    The VPPA Imposes a Content-Based Restriction....................... 11

            ii.   The VPPA fails to satisfy strict or intermediate scrutiny
                  on the alleged facts of this lawsuit ............................................... 11

   B.   Plaintiffs Do Not State A Claim For Violation of the UCL or the CLRA...................... 13

      1.   Plaintiffs Fail To State a UCL Claim Based on Patreon's Alleged
           Disclosure of Information to Facebook ................................................. 13

      2.   Plaintiffs Fail To State a UCL or CLRA Claim Based on Patreon's
           Alleged Failure to Disclose ................................................................... 14

   C.   Plaintiffs' Claim for Unjust Enrichment Should Be Dismissed ...................................... 15

III. CONCLUSION............................................................................................................ 15

# TABLE OF AUTHORITES

Page(s)

**Cases**

*Americans for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ................................................................................................ 6

*Arce v. Douglas*,
  793 F.3d 968 (9th Cir. 2015) ...................................................................................... 6

*Ariix, LLC v. NutriSearch Corp.*
  985 F.3d 1107 (9th Cir. 2021) .................................................................................. 10

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) .................................................................................................. 11

*Bartnicki v. Vopper*,
  200 F.3d 109 (3d Cir. 1999) .................................................................................... 8, 9

*Baxter Bailey & Assocs. v. Ready Pac Foods, Inc.*,
  2020 WL 1625257 (C.D. Cal. Feb. 26, 2020) ......................................................... 15

*Bd. of Trustees of State Univ. of New York v. Fox*,
  492 U.S. 469 (1989) .................................................................................................... 6

*Boelter v. Advance Mag. Publishers Inc.*,
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........................................................................ 5

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ................................................................... 5, 11

*Brown v. Ent. Merchants Ass'n*,
  564 U.S. 786 (2011) ............................................................................................. 6, 11

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ........................................................................................................ 5

*Comet Theatre Enterprises, Inc. v. Cartwright*,
  195 F.2d 80 (9th Cir. 1952) ...................................................................................... 15

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*
  472 U.S. 74 .................................................................................................................. 8

*Epic Sys. Corp. v. Lewis*,
  138 S. Ct. 1612 (2018) ................................................................................................ 3

*Garrison v. State of La.*,
  379 U.S. 64 (1964) .................................................................................................... 12

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .............................................................................................. 8, 12

*Harris v. Quinn*,
  573 U.S. 616, (2014) ................................................................................................... 9

*Hodson v. Mars, Inc.*,
  891 F.3d 857 (9th Cir. 2018) .................................................................................... 13

*Iancu v. Brunetti*,
139 S. Ct. 2294 (2019) ........................................................................................... 6

*IMDb.com Inc. v. Becerra*,
962 F.3d 1111 (9th Cir. 2020) ...................................................................... *passim*

*In re Anthem, Inc. Data Breach Litig.*,
2016 WL 3029783 (N.D. Cal. May 27, 2016) ...................................................... 14

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ................................................... 3, 4

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ........................................................................... 15

*Kidstar v. Facebook Inc.*,
No. 20-CV-05408-SK, 2021 WL 1110227 (N.D. Cal. Mar. 23, 2021) ............... 13

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) ...................................................... 2, 12

*Mollett v. Netflix, Inc.*,
2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) .................................................... 4, 5

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ............................................................................................... 6

*Perry v. Cable News Network, Inc.*,
854 F.3d 1336 (11th Cir, 2017) .......................................................................... 12

*Sanchez v. Nurture, Inc.*,
2022 WL 4097337 (N.D. Cal. Sept. 7, 2022) ..................................................... 15

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ............................................................................................. 13

*The Fla. Star v. B.J.F.*,
491 U.S. 524 (1989) .......................................................................................... 8, 12

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ........................................................................................... 8

*Tschida v. Motl*,
924 F.3d 1297 (9th Cir. 2019) ............................................................................... 6

*United States v. Hansen*,
25 F.4th 1103 (9th Cir. 2022) ........................................................................... 6, 9

*United States v. McAdory*,
935 F.3d 838 (9th Cir. 2019) ................................................................................. 5

*United States v. Rundo*,
990 F.3d 709 (9th Cir. 2021) ................................................................................. 6

*United States v. Stevens*,
559 U.S. 460 (2010) ............................................................................................... 9

iii

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976) ............................................................................................................. 9

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) ............................................................................................................. 6

*Wilson v. Triller, Inc.*,
  2022 WL 1138073 (S.D.N.Y. Apr. 18, 2022) ..................................................................... 3

*Woods v. City of Hayward*,
  No. 19-CV-01350-JCS, 2020 WL 1233841 (N.D. Cal. Mar. 13, 2020) ........................... 13

**Statutes**

18 U.S.C. § 2511 ........................................................................................................... 5, 11

18 U.S.C. § 2710 ........................................................................................................... 2, 10

Mich. Comp. Laws Ann. § 445.1713(a) (1989) .................................................................. 11

**Regulations**

Cal. Code Regs. tit. 10 § 2188.8 ............................................................................................ 7

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
CASE NO. 3:22-cv-03131-JCS

# I.      INTRODUCTION

Plaintiffs' opposition makes clear that they have not pled a VPPA claim.  Not only does the Complaint allege no facts that Patreon is a "video tape service provider," Plaintiffs concede that Patreon's business is to connect content creators and fans and that any video is "delivered by content creators to their supporters," not by Patreon.  That alone ends the VPPA claim, but Plaintiffs still can identify no facts to show that the video that creators deliver is "similar" to "prerecorded video cassette tapes" as the VPPA requires; no facts to show that disclosing Plaintiffs' Facebook IDs identified any one of the Plaintiffs individually; and no facts to show that Patreon knew that it was (allegedly) providing Facebook with the names of videos they watched ***and*** information sufficient to identify them.

Even if Plaintiffs did plead a VPPA claim – and again, they don't – the VPPA violates the First Amendment.  Plaintiffs concede that the VPPA regulates speech, and even concede that the purpose for which it was enacted, to protect public officials from embarrassment, cannot be defended.  But the VPPA does not stop at core political speech.  In the name of privacy it impermissibly penalizes broad categories of routine, truthful, non-commercial speech, any time a consumer watches video, without exceptions for circumstances that are well established as constitutionally protected, e.g., when there is no actual injury, when there is actual consent, or when the subject of the statement is already publicly disclosed.  For these reasons the VPPA is overbroad and invalid on its face.  The VPPA is also unconstitutional as applied to the facts Plaintiffs do allege.  Plaintiffs do not allege any facts to suggest that Patreon's alleged disclosure of their viewing history to Facebook in any way "proposes a commercial transaction," so they do not allege commercial speech.   And because the VPPA singles out one type of speaker making one type of statement, it is a content-based restriction, subject to strict scrutiny.  But regardless of the level of scrutiny, the VPPA falls short, lacking any fit between its ostensible privacy objectives and its actual application.  The VPPA claim cannot proceed.

Plaintiffs' UCL, CLRA, and unjust enrichment claims meet the same fate.  Plaintiffs consented to the disclosures they now complain about, and they suffered no economic injury (or any other injury) from Patreon purportedly using Pixel to transmit data to Facebook about which videos Plaintiffs watched.  The UCL, CLRA, and the tacked-on "unjust enrichment" claim all should be dismissed.

1

## II.  ARGUMENT

### A.  The Court Should Dismiss Plaintiffs' VPPA Claims

#### 1.  Patreon Is Not a "Video Tape Service Provider"

Plaintiffs failed to plausibly allege that Patreon is a "video tape service provider" under the VPPA.  As Patreon made clear in its Motion, the Complaint alleges that each Plaintiff "viewed videos" on the Patreon website (Dkt. 1, ¶¶ 20, 23, 26, 29), "but offers no description or factual detail that would permit the Court to infer that those videos were 'similar' to prerecorded video cassette tapes."  (Dkt. 21 at 6-7).  Plaintiffs' contention that Congress intended the VPPA to apply to emerging forms of "content delivery," such as the internet (Dkt. 31 at 5), does nothing to remedy the Complaint's failure to allege that Patreon's internet-based business focuses on "renting, selling, or delivering" pre-recorded audio visual materials.  To the contrary, as Patreon demonstrated in its opening brief (Dkt. 21 at 7-8), the Terms of Use that each Plaintiff accepted demonstrate that Patreon's business is connecting creators and patrons.  Plaintiffs concede this critical point in their opposition, admitting that "Patreon's platform allows videos ***to be delivered by content creators*** to their supporters or 'patrons.'"  (Dkt. 31 at 6 (emphasis added) (citing Dkt. 1 ¶¶ 34-35).  Plaintiffs thus admit that creators, not Patreon, deliver video.  Patreon merely makes it possible for them to meet.  For that reason alone, the VPPA claim must be dismissed.

The Complaint also fails to allege any facts showing that the specific videos Plaintiffs allegedly viewed were "similar" to "prerecorded video cassette tapes"; the Complaint wholly fails to allege, for example, that the videos Plaintiffs watched were ***pre-recorded***, and not live streamed.  18 U.S.C. § 2710(a)(4).  *See Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022).  Congress could have, of course, defined a "video tape service provider" as someone in the business of delivering prerecorded video cassette tapes or "*any other* audio-visual materials," such that the definition would include any type of video.  But it did not, because Congress did not intend for the VPPA to apply to *all* videos or *all* audio-visual materials, only those like the films rented by Judge Bork.  *See Video and Library Privacy Protection Act of 1988: Hearing on H.R. 4947 & S. 2361*, 100th Cong. 27 (1988) (Testimony of Alfred McCandless) ("There's a gut feeling that people ought to be able to read books and watch *films* without the whole world knowing.  Books and *films* are the intellectual vitamins

that fuel the growth of individual thought." (emphasis added)); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018) ("[W]here, as here, a more general term follows more specific terms in a list, the general term is usually understood to 'embrace only objects similar in nature to those objects enumerated by the preceding specific words.'") (citation omitted)).

Plaintiffs' admission that creators, not Patreon, deliver video to patrons, as well as their failure to plausibly allege that the videos Plaintiffs watched on Patreon's website are "similar" to pre-recorded video cassette tapes, doom the VPPA claim.

### 2.   Plaintiffs Fail to Plausibly Allege Patreon Disclosed Their Identities

In their Opposition, Plaintiffs assert that they plausibly allege Patreon disclosed their identities to Facebook, because they allege that (1) Patreon disclosed Plaintiffs' FIDs to Facebook, (2) anyone who possesses a FID may view the corresponding Facebook profile, and (3) "[t]he profile contains a 'Facebook user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts ….'" Dkt. 31 at 8.  Plaintiffs are wrong.

Plaintiffs nowhere allege that any of ***Plaintiffs'*** Facebook profiles ***in fact contained*** information that identified them individually; instead, they only generally allege that "Facebook profiles may" contain the Facebook users' names and other personally identifying information.  Dkt. 1 ¶ 39 (emphasis added).  Plaintiffs thus do not plausibly allege that Patreon disclosed their identities to Facebook, and so they fail to state a VPPA claim.  *See Wilson v. Triller, Inc.*, 2022 WL 1138073, at *6 (S.D.N.Y. Apr. 18, 2022) (dismissing VPPA claim, where complaint alleged defendant disclosed plaintiffs' unique user identification number for social media platform and what sort of information "could be included on a user's profile" but contained "no allegation as to what information was actually included on [plaintiff's] profile nor how that information could be used by a third party to identify [him]").

Plaintiffs' reliance on *In re Hulu Priv. Litig.*, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014), is misplaced for two reasons.  *First*, although the *Hulu* court stated that a Facebook ID "identifies a Facebook user" (*see* Dkt. 31 at 8), the court did ***not*** hold or state that a Facebook ID personally identifies ***the consumer*** as required for a VPPA claim.  *See Hulu*, 2014 WL 1724344, at *14.  The fact that an FID may be a unique Facebook user identification number does not mean that the FID discloses the ***consumer's*** identity.  *See Triller*, 2022 WL 1138073, at *6 (holding that disclosure of a unique

3

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT
CASE NO. 3:22-CV-03131-JCS

social-media user identification number was not by itself a disclosure of the consumer's identity for purposes of VPPA). Second, *Hulu* is also inapposite because plaintiffs there submitted expert testimony to establish that FIDs indirectly identified specific consumers by name. *Hulu*, 2014 WL 1724344, at *14. The Complaint here does not offer any such detail.

### 3. Plaintiffs Fail to Plausibly Allege Patreon "Knowingly" Disclosed PII to Facebook

Plaintiffs argue they plausibly allege that Patreon "knowingly" disclosed their PII (their FID and video-watching history) to Facebook, because they allege that (1) Patreon deliberately "programmed the Facebook Pixel" into its website code; and (2) "[u]sing the Facebook Pixel … benefits Patreon by improving its ability to promote its content and services to its Users." (Dkt. 31 at 10). Not so.

The allegations of the Complaint do not support a reasonable inference that Patreon knowingly transmitted ***Plaintiffs' Facebook IDs*** to Facebook. Although the Complaint alleges Patreon "programmed" the Pixel code into Patreon's website code, the Complaint does not allege that the Pixel code programmed into the Patreon website – as opposed to other code that resides only on Facebook's servers and the users' web browsers – reveals or indicates that any Facebook ID would be obtained or transmitted to Facebook. Moreover, the Complaint does not allege facts to support an inference that Patreon knew that any of the Plaintiffs even had a Facebook account and an associated Facebook ID. Likewise, although the Complaint alleges that "using the Pixel benefitted Patreon by improving its ability to promote its content and services to its Users," the Complaint does ***not*** allege that Patreon ever used the Pixel to target ads to Plaintiffs or any other particular users. The Complaint thus fails to plausibly allege Patreon actually knew it disclosed Plaintiffs' Facebook IDs to Facebook.

Plaintiffs' reliance on *Mollett* is misplaced. *Mollett* involved a screen that automatically appeared when anyone opened a "Netflix Ready Device" and which then displayed the user's video-watching history. *Mollett v. Netflix, Inc.*, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012). The plaintiffs alleged that "Netflix knew that some of its subscribers accessed their devices in the presence of other people some of the time." *Id.* The Court, however, held that plaintiffs' allegations did not support a reasonable inference that Netflix knowingly disclosed plaintiffs' PII to any third party because the allegations did not support an inference that Netflix "knew that people other than the Plaintiffs were

present when it displayed PII on any individual occasion." *Id.* Similarly, Plaintiffs' allegations here do not support a reasonable inference that Patreon knowingly disclosed Plaintiffs' PII to Facebook on any individual occasion, since they fail to allege that (a) the Pixel code Patreon programmed into its website reveals that any user's Facebook ID would be transmitted to Facebook, or (b) Patreon knew Plaintiffs had Facebook accounts and associated Facebook IDs.

### 4. The VPPA, on Its Face and as Applied to Patreon, Violates the First Amendment to the United States Constitution

In response to Patreon's First Amendment challenge to the VPPA, Plaintiffs try to seize the mantle of the First Amendment themselves, suggesting that the VPPA cannot "abridge[]" the First Amendment because it "advances and supports important constitutional privacy rights." (Dkt. 31 at 10). Plaintiffs are not on the side of the First Amendment. The First Amendment protects free speech; the VPPA curtails speech in favor of a legislatively created privacy interest. "[T]he concept that government may restrict the speech of some … to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976).

Plaintiffs next assert that "[n]o court has suggested that the VPPA is unconstitutional," while *other* privacy statutes have withstood constitutional challenge. (Dkt. 31 at 11). The argument is equal parts true and irrelevant. No court has passed on the constitutionality of the VPPA at all. Plaintiffs cite *IMDb.com Inc. v. Becerra,* 962 F.3d 1111, 1124 (9th Cir. 2020), as if it upheld the VPPA against a First Amendment challenge, but its offhand reference to the statute is the weakest form of *dicta*, a mere "prelude to another legal issue that commands the panel's full attention," *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019), and thus not binding.[1] Likewise, Plaintiffs cite *dicta* in a footnote in *Boehner v. McDermott*, a 5-4 decision by the D.C. Circuit that concerned the Wiretap Act, 18 U.S.C. § 2511, not the VPPA. Last, Plaintiffs point to two district court decisions rejecting challenges to *state* statutes that were "modeled on," but different from, the VPPA. (Dkt. 31 at 12, citing *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 435 (S.D.N.Y. 2016); *Boelter v. Advance Mag. Publishers Inc.*,

---

[1] The appellate briefing of *IMDb* had only a single reference to the VPPA, and the State did not even argue the VPPA complied with the First Amendment, just that it was an example of "state and federal laws [that] regulate data collection and disclosure in different contexts." *See IMDb.Com v. Becerra*, Opening Brief of Appellant Xavier Becerra, No. 18-15463, 18-15469 (9th Cir. Sept. 27, 2018) at p. 31.

210 F. Supp. 3d 579, 597 (S.D.N.Y. 2016)).  The issue is not whether Congress **could have** passed a privacy law that complied with the First Amendment, but whether it did so in the VPPA.  It did not.

a.       **The VPPA, on Its Face, Violates the First Amendment**

Plaintiffs begin their defense of the VPPA with a thumb on the scale, arguing that facial invalidation is "disfavored" and Patreon's burden is "heavy."  (Dkt. 31 at 16, citing *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)).  But that language is merely window dressing for the objective standard:  Patreon must "demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *Finley*, 524 U.S. at 580.  And however "heavy" that burden, it is not an immovable object.  The Supreme Court and Ninth Circuit have repeatedly invalidated laws on overbreadth grounds in recent years.[2]

Plaintiffs next mistakenly claim that, to evaluate Patreon's facial challenge under the First Amendment, "it is first necessary to determine whether the VPPA regulates commercial speech" (Dkt. 31 at 12) because the overbreadth doctrine "does not apply" to commercial speech (Dkt. 31 at 15, 16).  But that is ***not*** the law, as Plaintiffs' own cited authority makes clear:

> Although it is true that overbreadth analysis does not normally apply to commercial speech, that means only that a statute whose overbreadth consists of unlawful restriction of commercial speech will not be facially invalidated on that ground—our reasoning being that commercial speech is more hardy, less likely to be "chilled," and not in need of surrogate litigators. Here, however, although the principal attack upon the resolution concerned its application to commercial speech, the alleged overbreadth (if the commercial-speech application is assumed to be valid) consists of its application to *non*-commercial speech, and that is what counts.

*Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 481 (1989) (citations omitted).

The correct statement of the law has two important consequences for the facial challenge.  ***One***, even if Patreon's accused speech is commercial, the statute still falls if it impermissibly restricts a substantial amount of other, non-commercial speech (it does).  ***Two***, if Patreon's accused speech is not

---

[2] *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011); *United States v. Hansen*, 25 F.4th 1103, 1106 (9th Cir. 2022); *United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021), *cert. denied*, 211 L. Ed. 2d 570, 142 S. Ct. 865 (2022); *Tschida v. Motl*, 924 F.3d 1297, 1304 (9th Cir. 2019); *Arce v. Douglas*, 793 F.3d 968, 986 (9th Cir. 2015).

6

commercial (it is not), the VPPA's facial overbreadth is still greater, and its invalidity still more clear.

Congress enacted the VPPA for the express purpose of silencing speech that might embarrass political figures (Dkt. 21 at 11-12), and in its zeal to pursue that improper goal it swept up significant amounts of other protected, non-commercial speech as well.  Plaintiffs do not dispute that the First Amendment would protect disclosure of Judge Bork's video rentals; the VPPA unlawfully punishes that disclosure.  Instead, they argue "a single application concerning a public figure" fails to establish overbreadth.  (Dkt. 31 at 16-17; *see also id.* at 16 (arguing that Patreon offers "only a handful of hypothetical examples")).  But Patreon does not rely on a single example, or just hypotheticals.  The VPPA does not just silence speech about all public figures, as bad as that is.  It also prohibits a video store clerk from telling a customer that their minister, or spouse, or child's babysitter rented highly pornographic or extremely violent videos.  It prohibits a video tape service provider from informing a parent that their teenaged child obtained and viewed similar material.  It prohibits traffic schools from certifying to courts that a person completed an online driver safety course.[3]  It prohibits online continuing education providers from certifying to regulators that a licensee completed a required video course.[4]  If any "consumer" watches any "pre-recorded video," the VPPA restricts its disclosure.

The VPPA also penalizes disclosures even if the consumer has already made the same information public, for example by sharing their viewing history on social media.  As Patreon noted earlier (Dkt. 21 at 12-13), the First Amendment forbids penalizing speech on privacy grounds without

---

[3] For example, for persons sentenced to traffic school, California courts require that an online traffic school notify the court directly that the person completed the course.  *See*, *e.g.*, Superior Court of California, County of San Diego, "Traffic School," available at https://www.sdcourt.ca.gov/sdcourt/traffic3/trafficschool ("Traffic schools are now required to **electronically** notify the court of traffic school completion.…  California licensed drivers should rely on the schools to notify the court." (emphasis in original)).

[4] For example, in many states, providers of continuing education for insurance agents are required to submit certificates of completion directly to the Department of Insurance.  *See, e.g.*, Cal. Code Regs. tit. 10 § 2188.8  (identifying information that providers of continuing education must provide directly to the department, including student name and social security number and the title of the course); Nebraska Department of Insurance, "Frequently Asked Questions for Continuing Education Providers," FAQ No. 5 available at https://doi.nebraska.gov/producers/provide-education (explaining that course results are "required to be uploaded by the course provider electronically" to the department); Kansas Insurance Department, "Continuing Education for Insurance Providers," available at https://insurance.kansas.gov/continuing-education/ ("Continuing education completion information must be submitted electronically to State Based System (SBS) by the continuing education provider").

regard to whether the information has already been disclosed or whether the plaintiff "has voluntarily called public attention to" it. *The Fla. Star v. B.J.F.*, 491 U.S. 524, 539 (1989). Plaintiffs suggest *Florida Star* rested on the importance of allowing "media access" and publication by "the press." (Dkt. 31 at 17). But *Florida Star* actually rejects singling out some speakers for special treatment: "When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant." *The Fla. Star*, 491 U.S. at 540.

Still worse, the VPPA imposes minimum statutory damages of $2500, in the absence of any actual injury or even allegation of falsity. That alone violates the First Amendment, as the Supreme Court has held that the state's interest in compensating "private individuals" for harm to reputation "extends no further than compensation for ***actual injury***." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) (emphasis added). Plaintiffs cite Justice Powell's opinion in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* to argue that presumed damages are permitted for statements that "do not involve matters of public concern," but that language specifically dealt with defamatory – *i.e.*, ***false*** – statements, 472 U.S. 749, 763 (1985), which the Court had by then held have "no constitutional value," *Gertz*, 418 U.S. at 340. In contrast, in *Bartnicki v. Vopper*, the Third Circuit held that applying the Wiretap Act to hold defendants liable for disclosing electronic communications that they knew to have been illegally intercepted by third parties would violate the First Amendment: "the government's significant interest in protecting privacy is not sufficient to justify the serious burdens the damages provisions of the Wiretapping Acts place on free speech." 200 F.3d 109, 129 (3d Cir. 1999), *aff'd*, 532 U.S. 514 (2001). So too here. To justify presumed damages, Plaintiffs also try to argue that mere disclosure of their viewing behavior to Facebook, without any falsity or public exposure, and with their express consent, is an "injury." (Dkt. 31 at 23 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2209-11 (2021)). But Plaintiffs misstate *TransUnion*, which held only that consumers, whom defendant misleadingly described as potential terrorists in statements to third parties, had Article III standing. As the Third Circuit noted in *Bartnicki*, the Supreme Court had been "asked to permit a state to penalize the publication of ***truthful information*** in at least four instances," and each time concluded that the government's "interests were insufficient to justify the burdens imposed on First Amendment

freedoms." 200 F.3d at 129 (emphasis added).  Plaintiffs' insistence that Congress can impose

presumed damages for truthful speech without actual injury finds no support in First Amendment law.

Even Plaintiffs concede that an overbreadth challenge requires only a "realistic possibility that

the application [of the regulation] will suppress a substantial amount of constitutionally protected

speech."  (Dkt. 31 at 16 (citation omitted)).  The examples cited above meet and exceed that standard.

Accordingly, the VPPA is overbroad and facially invalid under the First Amendment.  *See United States*

*v. Stevens*, 559 U.S. 460, 474-475 (2010) (statute prohibiting depictions of illegal acts of "animal

cruelty" was impermissibly overbroad because prohibition included depictions of an animal being

"wounded, or killed," such as the "humane slaughter of a stolen cow"); *see also United States v.*

*Hansen*, 25 F.4th 1103, 1110 (9th Cir. 2022).

> **b.**     **The Speech that Plaintiffs Challenge Is Not Commercial Speech**
> **and Would Also Be Restricted by the VPPA**

Plaintiffs allege that Patreon and "30% of popular websites" use Pixel to share information with

Facebook, allowing both websites and Facebook to better promote and market their services to their

users.  (Dkt. 1 at ¶¶ 41-44).  Even assuming the accuracy of those allegations for this 12(b)(6) motion,

the speech Plaintiffs challenge is not commercial speech.  The disclosure of viewing information itself is

not an advertisement, and Patreon's disclosures to Facebook do not propose any commercial transaction.

This is not commercial speech.  As the Ninth Circuit recently confirmed in *IMDb.com*,

"[c]ommercial speech 'does no more than propose a commercial transaction.'"  962 F.3d at 1122

(quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976));

*see also Harris v. Quinn*, 573 U.S. 616, 648, (2014) ("Our precedents define commercial speech as

'speech that does no more than propose a commercial transaction.'") (citation omitted).  In *IMDb.com*,

the Ninth Circuit held that publishing the ages of entertainment professionals in an "encyclopedic"

database was not commercial speech because that speech did not propose a commercial transaction –

despite the fact the parties also agreed that IMDb was a "'commercial online entertainment employment

service provider' that 'provides employment services' to 'subscribers' through IMDbPro."  962 F.3d at

1118 n.3.  Plaintiffs' only explanation why that speech was ***non***-commercial, but Patreon's ***is***

commercial, is that IMDb made its information publicly available, whereas Patreon allegedly has

disclosed only to Facebook.  (Dkt. 31 at 14).  But there is no rule that the commercial speech doctrine depends on the size of the audience, and Plaintiffs cite no authority for that claim.

Falling short of the *Virginia State Board* standard, Plaintiffs argue that "sale" of information is an "economic act," motivated by "profit," which is enough to render speech commercial.  (Dkt. 31 at 12).  But they do not allege a "sale," and even if they did, that is not the law.  As the Ninth Circuit held in *Ariix, LLC v. NutriSearch Corp.,* "not all types of economic motivation support commercial speech. A simple profit motive to sell copies of a publication or to obtain an incidental economic benefit, without more, does not make something commercial speech.  Otherwise, virtually any newspaper, magazine, or book for sale could be considered a commercial publication."  985 F.3d 1107, 1117 (9th Cir. 2021) (citing cases).  In *Ariix* (a "narrow" decision "tied specifically to the troubling allegations in this case," *id.* at 1118), the court did find that the speech was commercial, but the case does not help Plaintiffs.  There, the defendant published sham, purportedly "independent" nutritional supplement guides that were really paid product promotion for one company's products.  *Id.* at 1117-18.  The speech was advertising in disguise, and even then, whether it was commercial speech was "a close question." *Id.* at 1116.  Plaintiffs' allegations here present no such complexity.

The use of Pixel, as alleged by Plaintiffs, is not commercial speech.  Consequently, to the extent that "30% of popular websites" use Pixel and disclose consumers' video-watching and PII to Facebook, that non-commercial speech must also be considered in evaluating Patreon's overbreadth challenge – the VPPA is even ***more*** overbroad and falls even farther below the constitutional standard.  Further, because Patreon's alleged speech is not commercial, if the Court reaches Patreon's as-applied challenge, strict scrutiny applies.  *See IMDb.com*, 962 F.3d at 1125.

       **c.**     **The VPPA, as Applied in this Case, Violates the First Amendment**

As alleged by Plaintiffs, the VPPA penalizes truthful speech made with the actual consent of the consumer, that causes no actual injury, about conduct that need not even be private, when it concerns one arbitrarily specific category of speech – that concerning prerecorded video, viewed by a statutorily defined "consumer."  18 U.S.C. § 2710.  At the same time, it ignores identical speech about live video; pre-recorded video if the viewer is not a paying customer or subscriber; and video delivered by libraries, web-browsing, podcasts, print material, and other forms of equally private non-video media.  Whether

evaluated under strict or intermediate scrutiny, the VPPA violates the First Amendment as applied.

### i.      The VPPA Imposes a Content-Based Restriction

Realizing that "[i]t is rare that a regulation restricting speech because of its content will ever be permissible," *Brown*, 564 U.S. at 799, Plaintiffs first try to argue that the VPPA is content-neutral.  Once again, however, they cannot escape *IMDb.com*.  Just like the VPPA, AB 1687 prohibited one category of speech (there, age of entertainment professionals; here, video-watching behavior) by one category of speaker (there, "commercial online entertainment employment service providers"; here, "video tape service providers").  Like the VPPA, AB 1687 singled out "particular content for differential treatment," 962 F.3d at 1120, making it content-based.  In response, Plaintiffs cite *Bartnicki v. Vopper*, 532 U.S. 514, 517 (2001).  But *Bartnicki* dealt with 18 U.S.C. § 2511, which generally prohibits any person from intercepting or disclosing any wire communications, without regard to the subject matter.  The VPPA is entirely different and targets a specific category of speech based on its content.

### ii.      The VPPA fails to satisfy strict or intermediate scrutiny on the alleged facts of this lawsuit

Because Patreon's accused speech is not commercial speech, and because it is content-based, Plaintiffs have the burden of showing that the VPPA as applied satisfies strict scrutiny.  *IMDb.com*, 962 F.3d at 1120.  They cannot.  But even if the *Central Hudson* intermediate scrutiny standard applies, Plaintiffs still fail to meet their burden.

First, Plaintiffs have failed to show that Congress could not have advanced an interest in consumer privacy by narrower means (strict scrutiny) or that the VPPA directly advances such an interest by means that fit the ends (intermediate scrutiny).  The VPPA requires a separate, standalone consent and ignores the consumer's express consent by any other means.  *See IMDb.com*, 962 F.3d at 1127 (restriction on speech only when subject declined consent still not narrowly tailored).  Plaintiffs' response is to cite *Hearst*, a district court decision that upheld Michigan's VRPA.  (Dkt 31 at 21, citing *Hearst*, 192 F. Supp. 3d at 450-51).  But *Hearst* was decided under intermediate scrutiny, not strict scrutiny, and more importantly, the VRPA required only "written consent" like what Patreon obtained – not a separate form like the VPPA requires.  *See* Mich. Comp. Laws Ann. § 445.1713(a) (1989).  And in any event, Plaintiffs make no argument that requiring a separate consent form is narrowly tailored.

As noted above, the VPPA imposes liability even if the plaintiff already disclosed the same information publicly.  *See* discussion *supra* Part II.A.4.a.  Plaintiffs make no effort to explain how a statute that punishes disclosure of public information advances any interest in "privacy."

The VPPA also imposes liability – and presumed statutory damages of $2500 – even if the plaintiff consented to the disclosure or has no actual injury at all.  *See* discussion *supra* Part II.A.4.a.  Yet again, Plaintiffs make no effort to explain why significant presumed damages, in the absence of injury, are narrowly tailored to an interest in consumer privacy.  Just as the Court held that it was "appropriate to require that state remedies for defamatory falsehood reach no farther than is necessary to protect the legitimate interest involved," *Gertz*, 418 U.S. at 349, and not unnecessarily impose presumed damages that go beyond proven compensatory damages, it is even more appropriate to require that as to communication of *true* statements.

The VPPA makes no exception for statements on matters of public concern, or about public officials, despite such statements meriting the highest protection.  *See Garrison v. State of La.*, 379 U.S. 64, 77 (1964); *Florida Star*, 491 U.S. at 539 (a categorical ban on publishing even the names of rape victims is not narrowly tailored when it lacks an exception for situations where "the identity of the victim has otherwise become a reasonable subject of public concern").  Plaintiffs offer no argument at all that the lack of such an exception is narrowly tailored or directly advances an interest in privacy.

Second, the VPPA's defects are exacerbated by the fact that it is underinclusive.  (Dkt. 21 at 17-18).  Plaintiffs' rejoinder is that the VPPA is not underinclusive because it "targets the primary source of potential disclosures of personal video-watching habits."  (Dkt. 31 at 21).  In support of that factual assertion, Plaintiffs cite … nothing at all.  In fact, the VPPA ***does not apply*** to video viewed on popular websites where the consumer has no subscriber relationship, like CNN, Fox News, or the Cartoon Network.  *See Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1342 (11th Cir, 2017) (no VPPA claim where plaintiff downloaded an app and watched video on CNN website because he was not a "subscriber" to the website); Dkt. 21 at 14.  It ***does not apply*** to live video like sports, news broadcasts, and livestreaming.  *See Louth*, 2022 WL 4130866, at *4 (rejecting argument that the VPPA applies to live video).  It ***does not apply*** to any of the thousands of libraries in the United States.  It ***does not apply*** to content that lacks video altogether, like podcasts, websites, music, books, or magazines.  The VPPA is

1   not effective at promoting an interest in consumer privacy if it arbitrarily allows disclosure of so much

2   video viewing and makes no effort at all to restrict disclosure of other kinds of equally private

3   information.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572-76 (2011); *IMDb.com*, 962 F.3d at 1127.

4          The VPPA cannot satisfy strict or intermediate scrutiny.  It is a blunderbuss, striking erratically

5   and devastatingly at speech that causes no cognizable injury to privacy, while leaving wide swaths of

6   truly harmful disclosures untargeted and unscathed.  Liability under the VPPA would violate the First

7   Amendment, and Plaintiffs' VPPA claim therefore must be dismissed.

8          **B.       Plaintiffs Do Not State a Claim For Violation of the UCL or the CLRA**

9                  **1.     Plaintiffs Fail to State a UCL Claim Based on Patreon's Alleged Disclosure
                           of Information to Facebook**

10         Plaintiffs fail to state a UCL claim based on Patreon's alleged disclosure of their video-viewing

11  information to Facebook for two reasons: (1) they fail to plausibly allege that the alleged disclosure was

12  either "unlawful" or "unfair," and (2) they fail to plausibly allege they suffered economic injury from

13  the alleged disclosure.  Plaintiffs' contrary assertions lack merit.

14         *First*, Plaintiffs assert that Patreon's alleged disclosure to Facebook was "unlawful" because it

15  violated the VPPA and was "unfair" because Patreon does not inform consumers that it discloses

16  their "*individual* video preferences" to third parties.  (Dkt. 31 at 23 (emphasis in original)).  But

17  Plaintiffs have not plausibly alleged that Patreon violated the VPPA, as discussed above.  And Patreon

18  in fact does notify users in its Privacy Policy that it (1) collects personally identifying information,

19  including "First and Last Name," "Email Address," and "State and Country of Residence" (RJN Ex. A

20  at Ex. 5 at 2), as well as "usage information such as the … the pages [the user] visit[s] or request[s],"

21  links clicked, referring sites, user interactions and [user] search terms," (RJN Ex. A at Ex. 5 at 5); and

22  (2) will "share" this data with third-party service providers like Facebook (RJN Ex. A at Ex. 5 at 11).[5]

23

24

_____

25  [5] Plaintiffs assert that their UCL "unfair" prong claims raise "fact questions not capable of resolution
    under Rule 12."  (Opp. at 23).  Not so.  UCL "unfair" prong claims are properly dismissed under Rule
26  12 where, as here, they are premised on allegations about documents that are contradicted by the
    documents themselves.  *See Kidstar v. Facebook Inc.*, No. 20-CV-05408-SK, 2021 WL 1110227, at *1
27  (N.D. Cal. Mar. 23, 2021); *Woods v. City of Hayward*, No. 19-CV-01350-JCS, 2020 WL 1233841, at *7
    (N.D. Cal. Mar. 13, 2020); *Hodson v. Mars, Inc.*, 891 F.3d 857, 866-67 (9th Cir. 2018) (cited by
28  Plaintiffs themselves (Dkt. 31 and 24)) (dismissing UCL "unfairness" claim).

***Second***, Plaintiffs assert that they allege "economic injury" because they allege that Patreon's disclosure of their video-viewing information to Facebook "reduced the value" of that information. (Dkt. 31 at 24). But Plaintiffs ***fail to allege facts*** in their Complaint that support their "reduction in value" allegation. And consequently – as made clear by the case authority Patreon cited in its Motion (none of which Plaintiffs even attempt to address) – Plaintiffs fail to plausibly allege they suffered economic injury. (*See* Dkt. 21 at 23).

Plaintiffs' cited cases do not support Plaintiffs' contrary position. In *Anthem*, for example, unlike in this case, the complaint contained factual allegations that "could be read to infer that an ***economic market*** existed for Plaintiffs' PII, and that the value of Plaintiffs' PII decreased as a result of [defendant's disclosure]," including allegations (1) that Plaintiffs' PII "is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the cyber black-market for years"; and (2) that with access to an individual's PII, "criminals can do more than just empty a victim's bank account – they can also commit various types of fraud ... [they] may obtain a job using the victim's Social Security Number." *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 3029783, at *15 (N.D. Cal. May 27, 2016) (emphasis added). In *Anthem*, the court held that plaintiffs were "not required to plead that there was a market for their PII ***and*** that they somehow also intended to sell their own PII." (*Id.* (emphasis in original)). Plaintiffs here, however, have not alleged ***either*** of those things. And even if Plaintiffs had alleged that there is a market for their video-viewing information and that they intended to sell it, Plaintiffs have not alleged facts showing that Patreon's alleged disclosures to Facebook in confidence impaired Plaintiffs' ability to sell their information.

### 2. Plaintiffs Fail To State a UCL or CLRA Claim Based on Patreon's Alleged Failure to Disclose

Plaintiffs fail to state a claim for violation of the UCL "fraud" prong or CLRA based on Patreon's alleged failure to disclose that it shares users' video viewing information with Facebook, for three reasons: (1) Patreon ***does disclose*** that it shares user information with third parties such as Facebook, as discussed above; (2) Plaintiffs fail to allege facts showing Patreon had a ***duty to disclose*** that it shares user video history information with Facebook; and (3) they do not plausibly allege ***economic injury*** or ***damage***. (Dkt. 21 at 23-24).

In their Opposition, Plaintiffs assert that they adequately allege Patreon had a duty to disclose because Patreon made "misleading" partial disclosures.  (Dkt. 31 at 24).  But the Complaint does **not** allege that Patreon made any "misleading" partial disclosure.  Plaintiffs' suggestion that such an allegation can be found in paragraphs 84 through 86 the Complaint (Dkt. 31 at 24) is false.[6]

### C.     Plaintiffs' Claim for Unjust Enrichment Should Be Dismissed

Plaintiffs attempt to salvage their unjust enrichment claim by stating that, despite "'some disagreement,' unjust enrichment may be asserted as a standalone claim under California law."  (Dkt. 31 at 25).  But this "disagreement" cuts against Plaintiffs' position: "the *majority* of state and federal district courts in California do not recognize unjust enrichment as a freestanding claim," including a decision from this District rendered earlier this month.  *Baxter Bailey & Assocs. v. Ready Pac Foods, Inc.*, 2020 WL 1625257, at *6 (C.D. Cal. Feb. 26, 2020) (emphasis added) (quotation omitted); *Sanchez v. Nurture, Inc.*, 2022 WL 4097337, at *8 (N.D. Cal. Sept. 7, 2022).

Even if unjust enrichment could be asserted as a standalone claim, Plaintiffs do not plausibly allege Patreon has been unjustly enriched.  Plaintiffs assert that they have "alleged an 'actionable wrong' here as Patreon does not fairly disclose to users that their PII and video-viewing records will be shared with Facebook without their consent."  (Dkt. 31 at 25).  But Patreon's TOU and Privacy Policy affirmatively demonstrate that Patreon **did** disclose to users that Patreon would share user information, including user names, other PII, and user activity, with third parties like Facebook.  "There is no equitable reason for invoking restitution when[,]" as here, "the plaintiff gets the exchange which he expected."  *Comet Theatre Enterprises, Inc. v. Cartwright*, 195 F.2d 80, 83 (9th Cir. 1952).  In any event, Plaintiffs fail to plausibly allege Patreon has been enriched from disclosing their video-viewing history to Facebook.  The unjust enrichment claim fails.

## III.     CONCLUSION

For all the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice under Rule 12(b)(6).

---

[6] UCL and CLRA claims that are grounded in alleged fraud must be pleaded with particularity under Rule 9(b).  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1122 (9th Cir. 2009).  Plaintiffs have not met this standard either.

Dated:  September 30, 2022

Respectfully submitted,
THE NORTON LAW FIRM PC

*/s/ Fred Norton*

Fred Norton

Attorneys for Defendant
PATREON, INC.