UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAYDEN STARK, et al., <br><br> Plaintiff, <br><br> v. <br><br> PATREON, INC., <br><br> Defendant. | Case No. 22-cv-03131-JCS <br><br> **ORDER REGARDING MOTION TO DISMISS** <br><br> Re: Dkt. No. 21 |

## I.   INTRODUCTION

Plaintiffs Brayden Stark, Judd Oostyen, Kevin Black, and Maryann Owens bring this putative class action against Defendant Patreon, Inc. asserting claims under the federal Video Privacy Protection Act ("VPPA") and California law based on Patreon's alleged sharing of user data with Facebook. Patreon moves to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim on which relief may be granted. The Court finds the matter suitable for resolution without oral argument and VACATES the hearing previously set for October 14, 2022. The case management conference previously set for the same time is CONTINUED to November 18, 2022 at 2:00 PM, to occur via Zoom webinar.

For the reasons discussed below, Patreon's motion is GRANTED as to Plaintiffs' claim under the VPPA, as well as a California claim to the extent it is directly derivative of their VPPA claim, which are dismissed with leave to amend. The motion is otherwise DENIED. Plaintiffs may file an amended complaint no later than October 27, 2022.[1]

The Court does not reach the parties' constitutional arguments at this time, and the deadline for the United States to intervene remains set as November 4, 2022.

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Allegations of the Complaint

Because the allegations of a complaint are generally taken as true in resolving a motion to dismiss under Rule 12(b)(6), this section summarizes Plaintiffs' allegations as if true. Nothing in this order should be construed as resolving any issue of fact that might be disputed.

Patreon allows its users or members to "access a variety of content on Patreon's website, including music, podcasts, and video content posted by content creators." Compl. (dkt. 1) ¶ 34. Plaintiffs assert that Patreon is therefore a "video tape service provider" as that term is defined in the VPPA "because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce." *Id.* ¶ 65.

Plaintiffs Stark, Oostyen, and Black are current Patreon members and Facebook users. *Id.* ¶¶ 18, 21, 24. They pay Patreon subscription fees ranging from $5 to $15 per month and regularly watch video content on Patreon's website. *Id* ¶¶ 19–26. Plaintiff Owens is a Facebook user and former Patreon member, who paid Patreon around $35 per month for two months in 2021 and regularly watched videos on Patreon's website during that time, but will not use Patreon in the future unless it takes greater steps to protect her privacy. *Id.* ¶¶ 27–30.

When users view video content on Patreon's website, Patreon transmits the title of the video they are viewing, as well as the user's Facebook ID ("FID") to Facebook, the ubiquitous social network, using a tracking tool created by Facebook called the "Pixel." *Id.* ¶¶ 35, 37, 40, 45. An FID can be used "to quickly and easily locate, access, and view the corresponding Facebook profile" of the user. *Id.* ¶ 38. "Facebook profiles may contain a Facebook user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts," among other information. *Id.* ¶ 39. The Pixel "is a snippet of programming code that, once installed on a webpage, sends information to Facebook," thus "allow[ing] website owners to track visitor actions on their websites for the purposes of sending the corresponding information to Facebook" so that the website owners can better target their products and advertising towards users and Facebook can compile more comprehensive profiles of

its users. *Id.* ¶¶ 40–44.

Plaintiffs assert that they did not know of or authorize Patreon sharing their video usage information with Facebook and other third parties, *id.* ¶ 46, and that Patreon's "Terms of Use, . . . Privacy Policy, Data Practices, and . . . Cookie Policy" do not inform users "of Patreon's use of the Facebook Pixel or its practice of sharing Users' personal information and video content choices with Facebook and other third parties," *id.* ¶ 47. In any event, Patreon never obtained a standalone agreement from users to share that information as required by the VPPA. *Id.* ¶ 48.

Plaintiffs contend that they and other putative class members suffered harm in that Patreon shared data that users expected would be kept private, users lost the potential to obtain any value for that data themselves, and users paid greater subscription fees to Patreon than they would have if they had known how Patreon was sharing their data. *Id.* ¶¶ 49–54.

Plaintiffs assert the following claims: (1) violation of the VPPA, *id.* ¶¶ 63–73; (2) violation of the "unlawful," "unfair," and "fraudulent" prongs of California's Unfair Competition Law (the "UCL"), *id.* ¶¶ 74–88; (3) violation of California's Consumer Legal Remedies Act (the "CLRA"), *id.* ¶¶ 89–98; and (4) unjust enrichment, *id.* ¶¶ 99–104.

### B. Request for Judicial Notice

Patreon requests that the Court take judicial notice of the various versions of its terms of use, privacy policy, and cookie policy that were in effect during the period at issue, arguing that Plaintiffs' complaint incorporates those documents by reference. *See generally* Request for Judicial Notice ("RJN," dkt. 23).[2] The terms of use describe Patreon's business as connecting individual "creators" with fans, who pay membership fees to the creators for access to content and merchandise that the creators provide through Patreon's website, with Patreon taking a cut of those membership fees in return for providing its platform and payment processing. *See, e.g.*, RJN Ex. 1 at 1, 3–6. The privacy policy states that users provide personal information including their names and email addresses, *e.g.*, RJN Ex. 5 at 2, that Patreon automatically collects information as

---

[2] The request for judicial notice attaches a declaration by a Patreon in-house attorney as Exhibit A, which in turn attaches the agreements and policies at issue as Exhibits 1 through 11. For simplicity, this order cites those documents as exhibits to the request for judicial notice.

users navigate the site and through third-party analytics, including information about the pages users visit and how they interact with the website, *id.* at 5, and that Patreon shares user data with, among other recipients, its "service providers," including companies Patreon contracts with for "analysing [sic] data trends" and "increasing [Patreon's] brand awareness and user engagement with marketing initiatives," *id.* at 11. The privacy policy notes that the service providers with which Patreon shares data "are obligated by contract to safeguard any of your data they receive from [Patreon] to the same extent that Patreon protects it." *Id.* at 12.

Plaintiffs oppose the request for judicial notice, arguing that Patreon cannot offer documents outside the complaint to dispute Plaintiffs' allegations. Opp'n (dkt. 31) at 6 n.1, 9.

### C.   The Parties' Arguments

Patreon moves to dismiss all of Plaintiffs' claims. *See generally* Mot. (dkt. 21). With respect to the VPPA, Patreon contends that Plaintiffs have not offered sufficient factual allegations to show that the videos they viewed on Patreon's website "were 'similar' to prerecorded video cassette tapes" as required by the statute," or "that Patreon is 'engaged in the business of renting, selling, or delivering' such audio visual materials." *Id.* at 7 (quoting 18 U.S.C. § 2710(a)(4)). According to Patreon, the terms of use make clear that its business is instead "providing a membership platform" to connect creators and fans, which in Patreon's view is distinct from the business of renting, selling, or delivering videos. *Id.* at 7–8. Patreon notes that many entities and businesses that are not primarily engaged in renting or delivering videos provide video content through the internet. *Id.* at 8. Patreon also argues that Plaintiffs have not sufficiently alleged that it "disclosed information to Facebook that identified them individually," nor that "knowingly" transmitted any such information. *Id.* at 9–10.

Plaintiffs contend that the VPPA's use of "similar audio visual materials" has been construed broadly and not limited to videocassettes or other physical media. Opp'n at 4–5. They also argue that their allegations regarding Patreon's business model, allowing video content to be delivered from creators to their subscription-paying supporters is a business of "delivering" videos within the meaning of the statute. *Id.* at 6–7. Plaintiffs further contend that they have adequately alleged that Patreon shared personal information because a Facebook user's FID is sufficient to

4

identify that individual, and that Patreon knew what information it was sharing when it installed the Pixel on its website. *Id.* at 8, 9–10. According to Plaintiffs, even if the Court considers the terms of use and other policies that Patreon offers for judicial notice, those documents do not show compliance with the VPPA's required procedure for obtaining user consent to share information. *Id.* at 8–9.

In its reply, Patreon notes that Plaintiffs have not specifically alleged that the videos they watched were prerecorded rather than broadcast live, and reiterates its view that videos are provided by the content creators who use Patreon's service rather than by Patreon itself. Reply (dkt. 35) at 2–3. Patreon also argues that Plaintiffs have not plausibly alleged that an FID discloses a user's identity, nor that Patreon actually knew either that the Pixel tool it implemented transmitted FIDs or that the specific plaintiffs in this case had Facebook accounts. *Id.* at 3–5.

Patreon also argues that the VPPA is unconstitutional both facially and as applied, as a restriction of speech in violation of the First Amendment. Mot. at 10–20; Reply at 5–13. Plaintiffs argue that it is not. Opp'n at 10–23. The parties and the United States stipulated to an extension of time through November 4, 2022 for the United States to decide whether to intervene and defend the statute. *See* Stip. (dkt. 33); Order Granting Stip. (dkt. 34). To avoid a premature decision without the benefit of all potential briefing, the Court declines to address the constitutionality of the VPPA before the United States makes that determination. This order therefore does not address the parties' constitutional arguments in detail, and should not be construed as suggesting any opinion as to whether the statute is constitutional.

Patreon contends that Plaintiffs have not stated a claim under the "unlawful" prong of the UCL because their underlying VPPA claim is not viable, nor under the "unfair" prong because the policies for which Patreon requests judicial notice disclose that Patreon shares user data with third parties, nor under the "fraudulent" prong or the CLRA because Patreon had no duty to disclose how it shared user data (and also because it in fact disclosed that it shared such data). Mot. at 21, 24. Patreon also argues that Plaintiffs do not have standing to bring a claim under the UCL because they have not alleged a cognizable loss of money or property, nor under the CLRA because they did not suffer damage. *Id.* at 21–23, 24 n.12.

1    Plaintiffs argue that their UCL "unlawful" claim should survive because their VPPA claim
2    is sufficient. Opp'n at 23. With respect to the "unfair" and "fraudulent" prongs, they contend that
3    although Patreon's privacy policy disclosed categories of information it shared with third parties,
4    it did not disclose that Patreon would share sufficient information for Facebook to identify specific
5    individual users' video-watching history, thus rendering the partial disclosure of data sharing
6    misleading. *Id.* at 23–24. Patreon disagrees, asserting in its reply that users' names and site
7    interactions are among the categories of data it specifically discloses that it collects and shares
8    under certain circumstances. Reply at 13. Plaintiffs also note that other statements in the privacy
9    policy suggest that Patreon would not share user data in that manner, such as an assertion that
10   Patreon "'will never provide your information to third parties for marketing purposes without your
11   prior consent.'" Opp'n at 24 (quoting RJN Ex. 9[3]). Patreon contends that Plaintiffs have not
12   asserted in their complaint a theory of misleading partial disclosures giving rise to a duty of
13   further disclosure. Reply at 14–15. Patreon also asserts for the first time in a single-sentence
14   footnote of its reply that Plaintiffs' claims under the CLRA and the "fraudulent" prong of the UCL
15   must be pleaded with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, and
16   that they fail to meet that standard. Reply at 15 n.6.

17   Plaintiffs contend that courts have recognized diminution of value of personally identifying
18   information as economic injury for the purpose of the UCL, without requiring a plaintiff to allege
19   that there was a market for such information or that they intended to sell it themselves. Opp'n at
20   24. Patreon argues that in the leading case where a court has permitted such a theory to proceed,
21   there were more significant allegations of the personal information's monetary value and the
22   potential for monetary harm to the plaintiffs. Reply at 14 (citing *In re Anthem, Inc. Data Breach*
23   *Litig.*, No. 15-MD-02617-LHK, 2016 WL 3029783, at *15 (N.D. Cal. May 27, 2016)).

---

[3] Some exhibits to Patreon's request for judicial notice consist of long policies compressed to a single page of the PDF file Patreon submitted to the Court's ECF filing system. Although the document preserves sufficient resolution for those exhibits to be legible when viewed electronically, this format prevents the use of meaningful pin citations to specific portions of those exhibits and would render them unsuitable for printing. Counsel is encouraged to break documents into normal pagination in the future—as they have done here with, for example, Exhibits 1 and 4 to the request for judicial notice.

1    Patreon argues that Plaintiffs' unjust enrichment claim should be dismissed because
2    California law does not recognize unjust enrichment as a cause of action, and because Plaintiffs
3    have not plausibly alleged either that Patreon failed to disclose its data sharing or that it was
4    unjustly enriched by membership fees it otherwise would not have received. Mot. at 24–25.
5    Plaintiffs argue that despite some disagreement, courts have generally recognized unjust
6    enrichment as a viable claim under California law, and that their allegations satisfy the elements of
7    such a claim. Opp'n at 25. Patreon argues in its reply that the majority of courts have declined to
8    recognize unjust enrichment claims, and that even if such a claim exists, Patreon's disclosures of
9    its data sharing practices are sufficient to undercut any claim of injustice. Reply at 15.

### III. ANALYSIS

#### A. Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). In ruling on a motion under Rule 12(c), the Court must accept all factual allegations in the complaint as true and view them in the light most favorable to the non-moving party. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

Dismissal at the pleading stage may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S.

7

662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient factual allegations to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).[4]

### B. The Complaint Incorporates Patreon's Policies by Reference

Patreon asks the Court to consider the terms of use, privacy policies, and cookie policy it has offered because Plaintiffs' complaint incorporates those documents by reference. Generally, the Court may not consider material outside the pleadings in ruling on a motion to dismiss for failure to state a claim. *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). Under the "incorporation by reference" doctrine, however, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss." *Id.* at 454. "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.*

Here, Plaintiffs specifically allege that "Patreon's website includes its Terms of Use, a Privacy Policy, Data Practices, and a Cookie Policy," none of which "informs Users of Patreon's use of the Facebook Pixel or its practice of sharing Users' personal information and video content choices with Facebook and other third parties." Compl. ¶ 47. Plaintiffs do not question the

---

[4] Although claims sounding in fraud are subject to a higher pleading standard under Rule 9(b), the Court declines here to consider Patreon's conclusory assertion, raised only in a footnote on the last page of argument in its reply brief, that Plaintiffs' UCL and CLRA claims fail to meet that standard. *See* Reply at 15 n.6; *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) (noting that arguments raised for the first time in a reply brief are waived); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.").

authenticity of the versions of those policies that Patreon has offered for judicial notice. The Court may therefore consider them as incorporated by reference by the complaint.

That said, the function of judicial notice is limited. The Court takes judicial notice of the existence of those documents and their contents—as is relevant, for example, to show what exactly Patreon *disclosed* in its policies. But "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. While courts have greater leeway to assume the truth of a document incorporated by reference than with respect to documents subject to other forms of judicial notice, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* at 1003. It is not self-evident that descriptions of Patreon's business model in its terms of use and other policies accurately describe how the business actually functions. Accordingly, to the extent the terms of use might conflict with Plaintiffs' allegations of what Patreon *did*, rather than what it *disclosed*, the Court accepts Plaintiffs' allegations as true for the purpose of the present motion.

### C. VPPA Claim

The VPPA, passed in 1988 in response to concerns about the disclosure of Supreme Court nominee Robert Bork's video rental history, "prohibits a 'video tape service provider' from (1) knowingly disclosing to any person (2) personally identifiable information concerning any consumer of such provider (3) except for certain disclosures—such as to the consumer or law enforcement—allowed under section 2710(b)(2)." *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *4 (N.D. Cal. Aug. 10, 2012) (citing 18 U.S.C. § 2710). The statute defines a "video tape service provider" in relevant part as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). It defines "personally identifiable information" as including "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3).

While a service provider may share personally identifiable information if it obtains written consent from the consumer, such consent must meet strict requirements, including being "in a

form distinct and separate from any form setting forth other legal or financial obligations of the consumer." *Id.* § 2710(b)(2)(B).  If a service provider violates the VPPA, a consumer may bring a civil action for remedies that include (but are not limited to) "liquidated damages in an amount of $2,500."  *Id.* § 2710(c)(2)(A).

### 1. Plaintiffs Have Not Sufficiently Alleged Similar Audio Visual Materials

Patreon argues that it is not a "video tape service provider" because Plaintiffs have not sufficiently alleged that the videos they watched were "prerecorded video cassette tapes or similar audio visual materials."  *See* 18 U.S.C. § 2710(a)(4).  Courts have generally construed "similar audio visual materials" broadly, finding that streaming video delivered electronically falls within that definition.  *E.g.*, *Hulu*, 2012 WL 328960, at *5–6 (noting that "a plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video content, not about how that content was delivered (e.g. via the Internet or a bricks-and-mortar store)," and finding that conclusion bolstered by dictionary definitions and the statute's purpose); *Ambrose v. Boston Globe Media Partners LLC*, No. 21-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017).

The scope of the statute is not, however, unbounded.  At least one court has recently held that live broadcasts do not fall within the definition of regulated content:

> The plaintiff asserts that live content should be included as a "similar audio visual materia[l]" but the Court finds this interpretation goes too far.  The adjective "prerecorded" modifies both "video cassette tapes" and "similar audio visual materials."  This is confirmed in a [Senate] Report recommending passage of the VPPA, specifically identifying "laser discs, open-reel movies, and CDI technologies," as the types of technologies that provide "similar audio visual materials," beyond video cassette tapes.  *See* S. Rep. No. 100-599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342.  This Report "suggests Congress' intent to cover new technologies for pre-recorded video content."  *Hulu*, 2012 WL 328960, at * 6.

*Louth v. NFL Enterprises LLC*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (first alteration in original).

This Court is aware of no authority to the contrary, and finds that analysis persuasive.  It is also notable that while broadcast, cable, and satellite television were all well established at the time of the VPPA's passage, there is nothing in the statute's language suggesting that providers of

10

such live broadcasts fall within its scope. The Court therefore holds that a video must be prerecorded to fall within the VPPA's definition of "similar audio visual materials."

Here, Plaintiffs complaint includes numerous references to "videos" and "video content," but does not specify whether they were broadcast live or prerecorded and available on demand. Nothing in the complaint suggests an inference one way or the other on that question. Accordingly, Plaintiffs have not sufficiently alleged that Patreon provided "similar audio visual materials," and their VPPA claim is DISMISSED with leave to amend.

### 2. Plaintiffs' Other VPPA Allegations Are Sufficient

Although the failure to specify whether Patreon's video content is prerecorded requires dismissal, the Court addresses several of the parties' other arguments as to this claim in the interest of avoiding unnecessary further motion practice if Plaintiffs are able to amend to cure that deficiency.

Patreon argues that Plaintiffs have not sufficiently alleged that it is "in the business . . . of rental, sale, or delivery" of regulated video materials, *see* 18 U.S.C. § 2710(a)(4), because it instead merely provides a platform to allow *creators* to deliver their videos.

There is some authority for the proposition that not all who deliver videos are in the business of doing so. One district court has stated in dicta that "a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox," despite obviously "delivering" the videotape, "could not be characterized as 'engaged in *the business*' of delivering video content because her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package," and that "the developers of many other products or services that might be peripherally or passively involved in video content delivery [similarly] do not fall within the statutory definition of a video tape service provider." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221–22 (C.D. Cal. 2017). The *Vizio* court acknowledged, however, that "a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content," so long "the defendant's product [is both] substantially involved in the conveyance of video content to consumers [and] significantly tailored to serve that purpose." *Id.* at 1221. The court therefore

11

held that a provider of "Smart TVs" that were "designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their home" was sufficiently alleged to be a "video tape service provider" within the meaning of the VPPA. *Id.* at 1222.

Perhaps Patreon will be able to show on factual record that it does not meet that test. On the pleadings, however, Plaintiffs have alleged that they paid Patreon subscription fees to watch videos on its website. Drawing all reasonable inferences in Plaintiffs favor for the purpose of the present motion, it is reasonable to think that developing a website to deliver video content requires more significant "tailor[ing] to serve that purpose" than a package delivery service shipping videocassettes along with other physical goods. *See id.* at 1221. That third-party "creators" may also be involved in developing and delivering the videos at issue does not absolve Patreon of liability—"a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content." *Id.* Nothing in Patreon's terms of use or other policies offered for judicial notice dispels the inference that Patreon "delivers" videos through its platform, even if those videos are created by third parties.

In accordance with other cases declining to dismiss claims based on similar allegations, the Court finds Plaintiffs' allegations that Patreon is "in the business of" delivering video content sufficient to proceed beyond the pleadings, if Plaintiffs are able to amend to allege that the videos at issue are prerecorded. *See, e.g.*, *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) ("The plaintiffs allege that Facebook 'regularly delivers' video content to users and maintains a cache of videos and visual materials, including from content providers like Netflix, for their delivery to users. . . . Although one could imagine a different conclusion at summary judgment once the evidence is examined, it is plausible to conclude from these and related allegations that Facebook engages in the business of delivering audio visual materials, and that its business is 'significantly tailored to serve that purpose.'" (quoting *Vizio*, 238 F. Supp. 3d at 1221)).

Plaintiffs have also sufficiently alleged the disclosure of personally identifying information, and Patreon's knowledge of such disclosure.

As noted above, "personally identifiable information" within the meaning of the VPPA is

"information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). The Ninth Circuit has held "that 'personally identifiable information' means only that information that would 'readily permit an ordinary person to identify a specific individual's video-watching behavior.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016)). While the Ninth Circuit concluded that disclosure of a device serial number of similar "information [that] *cannot* identify an individual unless it is combined with other data in [the recipient's] possession" does not meet the statutory definition, it recognized that "modern technology may indeed alter—or may already have altered—what qualifies under the statute," such that a "Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual." *Id.* at 986.

        Under that standard, it is not enough that *Facebook* could be expected to be able to identify users based on their FIDs, regardless of how obvious that might be to Patreon when it allegedly disclosed FIDs to Facebook. The Ninth Circuit held that in order to "better inform[] video service providers of their obligations under the VPPA . . . 'personally identifiable information' must have the same meaning without regard to its recipient's capabilities." *Id.* at 985. The circuit therefore held insufficient a plaintiff's allegations that a disclosing party actually knew the recipient of information could use it, in conjunction with other information already in the recipient's possession, to identify individuals. *See id.* at 981–82, 986. While reasonable minds might differ as to whether a standard that disregards a disclosing party's actual knowledge is necessary to ensure that party's understanding of its obligations, this Court is bound by that precedent. The test is therefore whether an "ordinary person" could use the FIDs Patreon allegedly disclosed to identify individual users, not whether Facebook could do so or whether Patreon knew that Facebook could do so.

        Nevertheless, Plaintiffs have alleged that "[a]nyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile," which in turn can reveal a user's name or other personal information. Compl. ¶¶ 38–39. Patreon notes that Plaintiffs have not specifically alleged that *their* Facebook profiles included their real names

13

or that Patreon knew that these individuals in particular had Facebook profiles, but cites no authority applying that granular a test, particularly at the pleading stage. To do so would risk undermining the statute entirely. To use an example more closely aligned with the era of the statute's enactment, it is unlikely that a Congress intended a video rental business could avoid liability for disclosing a list of customers' names and rental histories by asserting that it had not verified that every customer on the list used their real name when creating an account.

Patreon remains free to challenge on an evidentiary record what information an ordinary person could derive from an FID in general or from Plaintiffs' specific FIDs, as well as what Patreon knew about the Pixel it implemented on its website. Drawing all inferences in Plaintiffs favor, however, their allegations as to these issues are sufficient to proceed. *See generally Ambrose*, 2022 WL 4329373 (denying a motion to dismiss a VPPA claim based on similar allegations regarding the Boston Globe's use of Facebook's Pixel tool on the Globe's website).

### 3. The Court Does Not Reach Patreon's Constitutional Challenge

As noted above, the parties agreed to extend the deadline for the United States to determine whether to intervene and address the constitutionality of the VPPA through November 4, 2022. The Court therefore declines at this time to address the parties' arguments regarding that issue, in order to ensure that any decision on that question benefits from all briefing that might be offered in the case. Moreover, because Plaintiffs' VPPA claim is subject to dismissal for failure to allege that the video content at issue was prerecorded, it is conceivable that the Court may not need to reach the constitutional question to resolve the case. The approach of not addressing that issue at this time should not be taken to imply any view on its merits.

### D. UCL Claim

The UCL broadly prohibits unlawful, unfair, and fraudulent business acts. Cal. Bus. & Prof. Code § 17200; *see Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003). "Unlawful acts are anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made, where court-made law is, for example a violation of a prior court order." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008) (ellipsis in

14

original) (citations and internal quotation marks omitted). "Unfair acts among *competitors* means 'conduct that threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.'" *Id.* at 1152 (quoting *Cel-Tech*, 20 Cal. 4th at 187) (emphasis added). For *consumers*, the test is unsettled, with courts generally continuing to apply a broader standard—now rejected for competitor claims—encompassing business practices that "'offend[] an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *See In re Seagate Tech. LLC Litig.*, 233 F. Supp. 3d 776, 797–98 (N.D. Cal. 2017) (quoting *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal.App.4th 861, 886–87 (1999)); *see also Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018). "Finally, fraudulent acts are ones where members of the public are likely to be deceived." *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d at 1152.

To bring a private action under the UCL, a plaintiff must allege a loss of "money or property" as a result of the defendant's violation. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048–49 (9th 2017). The parties dispute whether Plaintiffs' allegations of diminution of value of their personal information are sufficient to meet that standard. The Court does not reach that question, because the complaint presents a more straightforward theory of economic harm sufficient to establish statutory standing under the UCL: Plaintiffs allege that if Patreon had disclosed the manner in which it shared user data with Facebook, they would not have paid Patreon subscription fees, or at least not in the same amounts. *See, e.g.*, Compl. ¶ 52 ("Plaintiffs and Class members paid for access to Patreon's website, and not another competitor's website, because they trusted that Patreon's privacy practices comported with their privacy preferences."); *id.* ¶ 94 ("Had California Plaintiffs and Subclass members known that Patreon engages in these business practices, they would not have subscribed for Patreon's services or would have paid less for the subscription."); *id.* ¶ 102 ("Patreon's practice of sharing Users' personal information and viewing content with Facebook without their consent, and its failure to disclose this practice, caused Patreon to profit from membership fees it would otherwise not have received."). While those allegations—which Patreon has not addressed in its briefing—may be subject to challenge

on an evidentiary record, the Court takes them as true for the purpose of the present motion. Plaintiffs have therefore sufficiently alleged economic loss establishing statutory standing for their UCL claim. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (finding statutory standing under the UCL where a plaintiff alleged that he would not have purchased a product but for the defendant's alleged misrepresentation).[5]

Turning to the merits of each prong of this claim, Plaintiffs' claim under the "unlawful" prong is based on Patreon's alleged violations of the VPPA and the CLRA. Compl. ¶ 77. Because the VPPA claim is dismissed as discussed above, Plaintiffs' claim under the "unlawful" prong of the UCL is also DISMISSED with leave to amend to the extent it depends on the VPPA claim. Patreon's motion is DENIED to the extent this claim is based on the CLRA claim, which may proceed as discussed below.

A plaintiff may proceed under the "fraudulent" prong based on a theory of omission if the defendant had a duty to disclose. One circumstance in which such a duty arises is "when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). Patreon asserts in its reply that "the Complaint does *not* allege that Patreon made any 'misleading' partial disclosure," and that "Plaintiffs' suggestion that such an allegation can be found in paragraphs 84 through 86 the Complaint . . . is false." Reply at 15. Patreon is incorrect. Paragraph 86 of the complaint alleges that "Patreon also has a duty to disclose this information because *it made partial representations about its data-sharing practices* yet neglected to disclose that it shares Users' personal information and viewing content to Facebook." Compl. ¶ 86 (emphasis added). To the extent that allegation might have been insufficient on its own, the documents Patreon offers for judicial notice provide additional context. Patreon's privacy policies lay out particular circumstances in which it shares user data with certain

---

[5] Without specifically addressing Plaintiffs' allegations that they would not have paid the same subscription fees but for Patreon's alleged conduct at issue, Patreon cites *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 730 (N.D. Cal. 2014), for its holding that a plaintiff who asserted misuse of personal information did not establish loss of money or property where she "allege[d] that she purchased an App for $1.77 and received that App." Nothing in the *Svenson* decision indicates that the plaintiff alleged she would not have purchased the app if she had known how the defendant used her data.

16

third parties contracted to perform certain services for Patreon, with those third parties bound by contract to protect user data to the same extent as Patreon. *E.g.*, RJN Ex. 5 at 11–12. As Plaintiffs note, at least some versions of the privacy policy also state that Patreon "'will never provide your information to third parties for marketing purposes without your prior consent.'" RJN Ex. 9.

If, as Patreon contends, its sharing of data with Facebook falls within the circumstances specifically disclosed in the privacy policy, Plaintiffs' claim under the "fraudulent" prong would likely fail. But the nature of Patreon's relationship with Facebook is not clear from either the complaint or the policies subject to judicial notice. There is no allegation or judicially noticeable evidence, for example, that Facebook was "contractually engaged with Patreon" to provide services as specified in the privacy policy, nor that Facebook was "obligated by contract to safeguard any [user] data they receive from [Patreon] to the same extent that Patreon protects it." *Cf.* RJN Ex. 5 at 11–12. Taking Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, the Court understands and accepts the allegation that Patreon's privacy policies did not "inform[] Users of Patreon's use of the Facebook Pixel or its practice of sharing Users' personal information and video content choices with Facebook and other third parties," Compl. ¶ 47, as asserting that the use of Pixel did not fall within the limited data sharing disclosed by the privacy policies. Perhaps Patreon can show otherwise on an evidentiary record, but it has not done so on the pleadings. With that premise established, Plaintiffs may proceed on a theory that Patreon's disclosure of limited data sharing gave rise to a duty to disclose any further data sharing beyond that scope, including its use of the Pixel. Patreon's motion to dismiss Plaintiffs' claim under the "fraudulent" prong is therefore DENIED.

Patreon's arguments for dismissal of the "unfair" prong rest largely on the premise that Plaintiffs' other claims are subject to dismissal. If, as Patreon contends, it lacked a duty to disclose specifically that it used the Pixel to share data with Facebook, Plaintiffs "unfair" prong claim—based primarily on that failure to disclose—would likely also be subject to dismissal. *See Hodsdon*, 891 F.3d at 867 (holding for the purpose of the "unfair" prong that a defendant's "failure to disclose information it had no duty to disclose in the first place is not substantially injurious, immoral, or unethical"). But since Plaintiffs have alleged a duty to disclose sufficient to

17

proceed on their claim under the "fraudulent" prong, the Court declines to dismiss their "unfair" prong claim, even if it is perhaps redundant to Plaintiffs other theories. Patreon's motion is DENIED as to this claim.

### E. CLRA Claim

The CLRA prohibits certain misrepresentations regarding goods or services. *See generally* Cal. Civ. Code § 1770. At least for the purpose of the present motion, the parties treat Plaintiffs' CLRA claim as coextensive with their claim under the "fraudulent" prong of the UCL. Mot. at 23–24; Opp'n at 24; Reply at 14–15. Because, as discussed above, the Court declines to dismiss the "fraudulent" prong claim, Patreon's motion is also DENIED as to the CLRA claim.

### F. Unjust Enrichment Claim

Patreon contends that Plaintiffs' unjust enrichment claim should be dismissed because no such claim exists under California law.

Based on California appellate court decisions, the Ninth Circuit held in April of 2015 that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (citing *Durell v. Sharp Healthcare*, 108 Cal. Rptr. 3d 682, 699 (2010); *Jogani v. Superior Court*, 81 Cal. Rptr. 3d 503, 511 (2008)). A few months later, the California Supreme Court recognized that an unjust enrichment claim is valid in at least some circumstances. *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015) ("Squire Sanders and its amici curiae raise numerous objections to the proposition that a direct action by the insurer for unjust enrichment can lie against *Cumis* counsel. None of these arguments compels the conclusion that such a claim is absolutely foreclosed.").

A Ninth Circuit panel's interpretation of state law is "only binding in the absence of any subsequent indication from the California courts that [its] interpretation was incorrect." *Owen ex rel. Owen v. United States*, 713 F.2d 1461, 1464 (9th Cir. 1983). The California Supreme Court's decision in *Hartford* indicates that the Ninth Circuit was incorrect to conclude that no cause of action of unjust enrichment exists under California law. Accordingly, while district courts remain

divided on the subject,[6] the Court concludes here that such a claim exists. In any event, even under the Ninth Circuit's *Astiana* decision, a court may construe a purportedly non-existent claim for unjust enrichment as a valid "quasi-contract claim seeking restitution," *Astiana*, 783 F.3d at 762, the elements of which are "that the defendant received and unjustly retained a benefit at the plaintiff's expense," *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016).

Patreon's only arguments for dismissal if this claim exists are: (1) there is no injustice when Patreon sufficiently disclosed its data sharing; and (2) Plaintiffs have not plausibly alleged that Patreon was unjustly enriched by sharing data with Facebook. Mot. at 25; Reply at 15. As discussed above, Plaintiffs have sufficiently alleged that Patreon did not disclose the particular data sharing at issue, and that Plaintiffs would not have paid Patreon the same subscription fees if it had disclosed that practice. Patreon's motion to dismiss Plaintiffs' unjust enrichment claim is therefore DENIED.

## IV. CONCLUSION

For the reasons discussed above, Patreon's motion to dismiss is GRANTED as to Plaintiffs' VPPA claim, as well as their claim under the "unlawful" prong of the UCL to the extent it is based on a violation of the VPPA, with leave to amend if Plaintiffs can allege that the videos at issue were prerecorded. The motion is otherwise DENIED.

If Plaintiffs choose to file an amended complaint, they must do so no later than October 27, 2022. Because it appears clear that Patreon would renew its constitutional challenge if Plaintiffs reassert their VPPA claim, the deadline for the United States to determine whether to intervene to address that challenge remains set for November 4, 2022.

**IT IS SO ORDERED.**

Dated: October 13, 2022

JOSEPH C. SPERO
Chief Magistrate Judge

---

[6] One likely reason this issue has not been conclusively resolved in the years since *Astiana* and *Hartford* were decided is that unjust enrichment claims are often redundant to other asserted claims of less ambiguous viability, or construed by the court as a valid quasi-contract claim, and there is thus little reason to pursue the argument beyond an initial motion to dismiss—if at all. This case appears to be no exception to that general rule.