Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Trevor T. Tan (SBN 281045)
Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
ttan@girardsharp.com
kmacey@girardsharp.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAYDEN STARK, JUDD OOSTYEN, KEVIN BLACK, and MARYANN OWENS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PATREON, INC.,<br><br>Defendant. | Case No. 3:22-cv-03131-JCS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Joseph C. Spero |

Plaintiffs, on behalf of themselves and all others similarly situated, allege as follows against Defendant Patreon, Inc. ("Patreon"):

**INTRODUCTION**

1. This is a consumer privacy action against Patreon for disclosing its digital subscribers' identities and video-viewing preferences to Meta Platforms Inc. ("Meta"), which owns the social networking website and app Facebook, in violation of the Video Privacy Protection Act ("VPPA" or "the Act") and state law.

2. The VPPA prohibits "video tape service providers," such as Patreon, from knowingly disclosing a consumer's personally identifiable information ("PII")—in particular, "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider"—unless the consumer expressly consented to the disclosure in a standalone consent form.

3. Patreon collects and shares users' personal information with Meta using a "Meta Pixel" or "Pixel"—a snippet of programming code that, once installed on a webpage, sends information to Meta.[1] The Meta Pixel sends information to Meta in a data packet containing PII, such as the users' IP address, name, email, or phone number. Meta then stores this data on its own servers.

4. The information that Patreon shares with Meta includes the user's unique Facebook ID ("FID") and the titles of prerecorded videos that Patreon delivered to the user for viewing. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details.

5. Patreon discloses the user's FID and viewing content to Meta together in a single transmission. Because the user's FID uniquely identifies an individual's Facebook account, Meta—and any other ordinary person—can use the FID to quickly and easily locate, access, and view the user's corresponding Facebook profile. In simplest terms, the Pixel allows Meta to know what video content one of its users viewed on Patreon's website.

---

[1] While Plaintiffs' prior Class Action Complaint used the term "Facebook Pixel," Meta refers to this code sequence as the "Meta Pixel." *See* https://developers.facebook.com/docs/meta-pixel/ (last visited Oct. 24, 2022).

6.     At no point are Patreon users informed about Patreon's dissemination of their individual video-watching preferences to a third party. Nor do Patreon users consent to such sharing through a standalone consent form, as required by the VPPA. As a result, Patreon violates the VPPA by disclosing this information to Meta.

7.     On behalf of a Class of similarly situated Patreon users, Plaintiffs seek appropriate relief through this action. Plaintiffs also assert causes of action arising out of the same practice under California law. Based on the facts set forth in this Complaint, Patreon violates the Unfair Competition Law ("UCL") and the Consumers Legal Remedies Act ("CLRA"), and is liable for unjust enrichment.

## PARTIES

8.     Each Plaintiff used his or her Internet-connected device and Web-browsing software ("browser") installed on that device to visit and watch video content on Defendant's website, http://www.Patreon.com, during the Class Period as defined herein.

9.     Plaintiff Brayden Stark is a citizen and resident of Van Nuys, California.

10.    Plaintiff Judd Oostyen is a citizen and resident of Kaysville, Utah.

11.    Plaintiff Kevin Black is a citizen and resident of Cambridge, Massachusetts.

12.    Plaintiff Maryann Owens is a citizen and resident of Los Angeles, California.

13.    Defendant Patreon is a Delaware corporation headquartered at 600 Townsend Street, Suite 500, San Francisco, California 94103.

## DIVISIONAL ASSIGNMENT

14.    Pursuant to Civil L.R. 3-5(b), assignment to the San Francisco Division is appropriate under Civil L.R. 3-2(c) because Patreon is headquartered in San Francisco and a substantial part of the conduct at issue in this case occurred in San Francisco County.

## JURISDICTION AND VENUE

15.    This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

16.    This Court also has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (1) there are at least 100 Class

1  members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest,
2  attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different
3  states.

4      17.    This Court has personal jurisdiction over Patreon because its principal place of business
5  is within this District and it has sufficient minimum contacts in California to render the exercise of
6  jurisdiction by this Court proper and necessary.

7      18.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of
8  the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Brayden Stark

19. Plaintiff Stark is a Patreon member and a Facebook user. He has been a Patreon member since 2019 and is therefore a "subscriber" to Patreon under the VPPA.

20. Mr. Stark's Facebook profile includes his name and other personal details.

21. Mr. Stark has consistently paid Patreon approximately $15.00 per month in subscription fees.

22. When he initially subscribed to Patreon, Mr. Stark watched prerecorded video content on patreon.com daily. He continues to watch prerecorded video content on the Patreon website, though not as frequently as before.

23. Mr. Stark visited Patreon's website to request and watch prerecorded video content using the same browser that he uses to log in to Facebook, including while he was logged in to Facebook. He also uses the same device to request and watch prerecorded videos on Patreon that he uses for Facebook.

### Judd Oostyen

24. Plaintiff Oostyen is a Patreon member and a Facebook user. He has been a Patreon member since 2021 and is therefore a "subscriber" to Patreon under the VPPA.

25. Mr. Oostyen's Facebook profile includes his name and other personal details.

26. Mr. Oostyen has consistently paid Patreon approximately $5.00 per month in subscription fees.

27. When he initially subscribed to Patreon, Mr. Oostyen watched prerecorded video content on patreon.com daily. He continues to watch prerecorded video content on the Patreon website, though not as frequently as before.

28. Mr. Oostyen visited Patreon's website to request and watch prerecorded video content using the same browser that he uses to log in to Facebook, including while he was logged in to Facebook. He also uses the same device to request and watch prerecorded videos on Patreon that he uses for Facebook.

### Kevin Black

29. Plaintiff Black is a Patreon member and a Facebook user. He has been a Patreon member since 2019 and is therefore a "subscriber" to Patreon under the VPPA.

30. Mr. Black's Facebook profile includes his name and other personal details.

31. Mr. Black has consistently paid Patreon approximately $10.00 per month in subscription fees.

32. Mr. Black consistently views prerecorded videos on the Patreon website.

33. Mr. Black visited Patreon's website to request and watch prerecorded video content using the same browser that he uses to log in to Facebook, including while he was logged in to Facebook. He also uses the same device to request and watch prerecorded videos on Patreon that he uses for Facebook.

### Maryann Owens

34. Plaintiff Owens was a Patreon member for approximately two months beginning around August 2021 and is a Facebook user. She was therefore a "subscriber" to Patreon under the VPPA.

35. Ms. Owens's Facebook profile includes her name and other personal details.

36. Ms. Owens paid Patreon approximately $35.00 per month in subscription fees.

37. When she was a Patreon member, Ms. Owens consistently viewed prerecorded videos on the Patreon website.

38. Ms. Owens visited Patreon's website to request and watch prerecorded video content using the same browser that she used to log in to Facebook, including while she was logged in to Facebook. She also used the same device to request and watch prerecorded videos on Patreon that she used for Facebook.

39. Although Ms. Owens would like to watch videos on Patreon in the future, she will not do so unless Patreon takes sufficient steps to protect the privacy of her personal information and ensure the accuracy of its privacy commitments and representations.

\* \* \*

40. Patreon sent Plaintiffs' PII, including their FIDs, as well as the title of each prerecorded video they viewed, to Meta without obtaining their consent through a standalone consent form.

41. Plaintiffs value their privacy while web-browsing and watching videos.

42. Plaintiffs' viewing preferences constitute personal information of a private and confidential nature and are assets to which no third party has a presumptive right to access.

## COMMON ALLEGATIONS

**A.  Patreon Disclosed Plaintiffs' and Class Members' Private Viewing Information to Meta.**

43. Patreon's members ("Users") can access a variety of content on Patreon's website, including music, podcasts, and video content posted by content creators.

44. Patreon provides and delivers prerecorded audiovisual content to its users.

45. Patreon allows content creators to upload or share prerecorded videos which Patreon users can then view on the content creator's page. Plaintiffs requested and viewed prerecorded audiovisual content from Patreon.

46. While Plaintiffs and Class members were viewing prerecorded video content on Patreon's website, Patreon transmitted their viewing choices to Meta.

47. Patreon's transmission of viewing information to Meta includes the specific names of video content viewed by Users, as well as the User's FID—a string of numbers unique to each Facebook profile that personally identifies the User.

48. Anyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile, which contains personal information, often in large quantities.

49. A Facebook profile typically shows the Facebook user's name, gender, place of residence, career, educational history, a multitude of photos, and the content of the user's posts. This

1  information may reveal even more sensitive personal information—for instance, posted photos may
2  disclose the identity of family members, and written posts may disclose religious preferences, political
3  affiliations, personal interests and more.

4      50.    Just as Meta can easily identify any individual on its Facebook platform with only their
5  unique FID, so too can any ordinary person who comes into possession of a FID. Facebook admits as
6  much on its website. Thus, equipped with a FID and the video content name and URL—all of which
7  Patreon knowingly provides to Meta without appropriate consent from its subscribers—any ordinary
8  person could determine the identity of the Patreon subscriber and the specific video or media content
9  they viewed on Patreon's website.

10     51.    Patreon transmits the FID and video title to Meta in a single transmission, through an
11 invisible tracking tool called a "Meta Pixel." A Meta Pixel is a snippet of a programming code that, once
12 installed on a webpage, sends information to Meta. This transmission occurs when a User views a
13 prerecorded video on Patreon's website.

14     52.    The transmission is shown in the screenshots below:

[Screenshot 1: Shows network inspector with Structure/Sequence panel listing https://www.patreon.com and https://www.facebook.com with tr folder containing multiple ?id=267568703576098&ev=Page entries. Contents panel shows Name/Value pairs: sb = B94DY39qbDogJixdWh42po6Y; datr = B94DY_VS2Ld738DZLz9uIuEP; c_user = 100084957787778 (highlighted in red); xs = 8%3AtPEvZCHswExVMA%3A2%3...; fr = 0dNuR6PV8TANcr0tB.AWWc9YQ...]

[Screenshot 2: Shows network inspector with similar Structure/Sequence panel. Contents panel shows Name/Value pairs: id = 267568703576098; ev = Microdata; dl = https://www.patreon.com/posts/nra-conference-67314328; rl = https://www.patreon.com/channel5/posts; if = false; ts = 1661204397807; cd[DataLayer] = []; cd[Meta] = {"title":"NRA Conference (Uvalde) | Channel 5 on Patreon" (highlighted in red)]

53. In the exemplar scenario above, when a Patreon subscriber visits the Patreon page of a local news channel and requests and watches a prerecorded video, the Pixel transmits both the title of the video and the subscriber's FID (highlighted in the red boxes) to Meta.

54. The Pixel is an advertising tool that allows website owners to track visitor actions on their websites for purposes of sending the corresponding information to Meta; websites use the Pixel in hopes of better targeting their products and services on Facebook to interested consumers. Thus, a business such as Patreon chooses to install the Pixel on its website in order to increase its profits.

55. According to Meta's website, the Pixel allows it "to match your website visitors to their respective Facebook User accounts" and that "[o]nce matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[2]

56. Patreon knew that by installing the Pixel on its website, the Pixel would send Meta information identifying its Users and their video-watching habits.

57. Meta's website explains that, to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website[.]"[3] Patreon made the conscious decision to undertake this installation process.

58. Further demonstrating that Patreon knowingly placed the Pixel in its website code, Meta's website states that "[d]evelopers and marketers can *optionally choose* to send information about" a visitor's activity on its website. (Emphasis added).[4]

59. Meta offers its Pixel tool to websites across the internet. As of January 2022, more than 30 percent of popular websites have an embedded Facebook Pixel.

60. Meta benefits from websites like Patreon installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from providing more targeted ads. The Pixel is installed on websites all over the internet

---

[2] https://developers.facebook.com/docs/meta-pixel/get-started (last visited October 24, 2022).
[3] *Id.*; https://www.facebook.com/business/tools/meta-pixel/get-started (last visited October 24, 2022).
[4] https://developers.facebook.com/docs/meta-pixel (last visited October 24, 2022).

and, accordingly, provides Meta with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

61. Using the Meta Pixel likewise benefits Patreon's business by improving its ability to promote its content and services to its Users, thereby increasing its profits.

62. Through use of the Meta Pixel, Patreon discloses to Meta the full name of each video a User watched, together with the User's FID, thus linking Users' viewing content choices and preferences to their Facebook profiles. In other words, this single transmission connects a User's viewing content with their FID.

63. Patreon violates and invades the privacy rights of Users with its practice of sending their FIDs, together with their viewing content, to Meta. Plaintiffs and Class members neither knew of nor authorized, nor otherwise consented to, Patreon's disclosure of their prerecorded video and video-services requests and their identities to Meta.

**B.   Patreon's Terms of Use, Privacy Policies, and Data Practices Do Not Disclose Patreon's Use of the Facebook Pixel.**

64. Patreon's website includes its Terms of Use, a Privacy Policy, Data Practices, and a Cookie Policy. None of these informs Users of Patreon's use of the Meta Pixel or its practice of sharing Users' personal information and video content choices with Meta in a way that allows Meta to identify their specific video-watching preferences.

65. The VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. At no point were Plaintiffs or other Patreon Users given a standalone or any consent form disclosing Patreon's practices at issue and requesting User consent. Hence, no User knew of or consented to Patreon's offending practice of sharing video preferences with third parties.

**C.   Plaintiffs and the Class Were Harmed by Patreon's Privacy Invasions.**

66. Patreon shared with Meta the personal information of Plaintiffs and Class members, including their video-viewing histories and associated FIDs, which they reasonably expected would be kept private.

67. The personal information Patreon obtained from Plaintiffs and Class members constitutes valuable data in the digital advertising-related market for consumer information. Patreon's wrongful acquisition and use of their personal and private information deprived Plaintiffs and Class members of control over that information, and prevented them from realizing its full value for themselves.

68. Patreon's conduct caused economic harm to Plaintiffs and Class members who were Patreon subscribers during the Class Period in that they have paid subscription fees to Patreon for services that they reasonably did not expect would subject them to the practices described herein, thereby diminishing the value of services for which they paid Defendant, and constituting loss. Plaintiffs and Class members didn't get what they paid for.

69. Plaintiffs and Class members paid for access to Patreon's website, and not another competitor's website, because they trusted that Patreon's privacy practices comported with their privacy preferences.

70. If Plaintiffs and Class members had known that Patreon discloses to Meta the personal information of its Users, including their video-viewing histories and associated FIDs, Plaintiffs and Class members would not have subscribed for Patreon's services or would have paid less for the subscription.

71. Patreon's practice of sharing Users' personal information and prerecorded video content with Facebook without their consent, and its failure to disclose this practice, caused Patreon to profit from membership fees it would otherwise not have received.

72. Plaintiffs and Class members' experiences and injuries are consistent with and borne out by research showing that consumers prefer to transact with online retailers that better protect their privacy, and are willing to pay a premium to purchase goods and services from websites that afford greater privacy protection. *See* J. Tsai, S. Egelman, L. Cranor & A. Acquisiti [Carnegie Mellon Univ.], "The Effect of Online Privacy Information on Purchasing Behavior: An Experimental Study" (June 2007), Information Systems Research, Vol. 22 at 254–268, available at: https://www.researchgate.net/publication/220079706_The_Effect_of_Online_Privacy_Information_on_Purchasing_Behavior_An_Experimental_Study.

73. The harms described above are aggravated by Patreon's continued retention and commercial use of Plaintiffs' and Class members' personal information, including their private video-viewing histories.

## CLASS ACTION ALLEGATIONS

74. Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following Class and constituent Subclass:

> **Nationwide Class**: All persons in the United States who subscribed to Patreon.com, viewed prerecorded video content on Patreon.com, and used Facebook during the time Meta's Pixel was active on Patreon.com.
>
> **California Subclass**: All persons in California who subscribed to Patreon.com, viewed prerecorded video content on Patreon.com, and used Facebook during the time Meta's Pixel was active on Patreon.com.

75. The "Class Period" is from April 1, 2016 to the present.

76. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

77. **Numerosity**: The Class consists of at least hundreds of thousands of individuals, making joinder impractical.

78. **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include:

 a. Whether Patreon's use of the Meta Pixel was without User consent or authorization;

 b. Whether Patreon obtained and shared or caused to be obtained and shared Plaintiffs and Class members' personal information through tracking using the Meta Pixel, which Patreon installed on its webpages;

 c. Whether third parties obtained Plaintiffs and Class members' personal information as a result of Patreon's conduct described herein;

        d.      Whether Patreon's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

        e.      Whether Patreon's conduct violates California consumer protection law;

        f.      Whether Patreon's acquisition and transmission of Plaintiffs and Class members' personal information resulted in harm; and

        g.      Whether Patreon should be enjoined from engaging in such conduct in the future.

79. **Typicality**: Plaintiffs' claims are typical of the claims of the Class members in that Plaintiffs, like all Class members, have been injured by Patreon's misconduct at issue—i.e., disclosing Users' PII and viewing content to Meta without appropriate consent.

80. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

81. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce Patreon to comply with applicable law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of Patreon's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this Complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

82. **Injunctive relief**: Patreon has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## FIRST CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act (Video Privacy Protection Act), 18 U.S.C. § 2710, *et seq.*
### (On Behalf of the Nationwide Class)

83. Plaintiffs incorporate and reallege the above factual allegations by reference.

84. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

85. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Patreon is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiffs viewed—through its online platform that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

86. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

87. Patreon knowingly caused personal viewing information, including FIDs, concerning Plaintiffs and Class members to be disclosed to Meta. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Meta as an individual who viewed Patreon's video content, including the specific prerecorded video materials each such individual watched on Patreon's website. This information allowed Meta to identify each Plaintiff and Class members' specific individual video-viewing preferences and habits.

88. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiffs are subscribers to Patreon's services providing video content to Users on its website and viewed prerecorded videos provided on Patreon's platform. Hence, Plaintiffs are "consumers" under this definition.

89. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Patreon failed to obtain informed, written consent under this definition.

90. Additionally, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). The Act requires video tape service providers to "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Patreon failed to provide an opportunity to opt out as required by the Act.

91. Patreon was aware that the disclosures to Meta that were shared through the Pixel identified Plaintiffs and Class members. Patreon also knew that Plaintiffs' and Class members' personal viewing content was disclosed to Meta because Patreon programmed the Meta Pixel into its website code, knowing that Meta would receive video titles and the subscriber's FID when a user watched a prerecorded video.

92. By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Patreon violated Plaintiffs' and Class members' statutorily protected right to privacy in their prerecorded video-watching habits. *See* 18 U.S.C. § 2710(c).

93. As a result of the above violations, Patreon is liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "liquidated damages not less than $2,500 per plaintiff." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Patreon also is liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Patreon in the future.

**SECOND CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (the "UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of the California Subclass)**

94. California Plaintiffs incorporate and reallege the above factual allegations by reference.

95. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

### Unlawful

96. A business practice is "unlawful" under the UCL if it violates any other law or regulation.

97. Patreon's business acts and practices are unlawful because they violate the Video Privacy Protection Act as set forth above. They also violate California's Consumers Legal Remedies Act, for the reasons stated below. Patreon is therefore in violation of the "unlawful" prong of the UCL.

### Unfair

98. Patreon's conduct is unfair in violation of the UCL because it violates California's and the nation's legislatively declared public policy in favor of protection of consumer privacy. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2017) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

99. Further, Patreon's conduct is unfair because it is unethical, unscrupulous, offensive, and substantially injurious. The gravity of harm resulting from Patreon's unfair conduct outweighs any potential utility therefrom. The disclosure of California Plaintiffs' and Subclass members' personal information without their express consent raises significant privacy concerns, and any potential utility from these disclosures (such as increased Patreon revenue due to more targeted advertising) is outweighed by their considerable harm to California Plaintiffs and the Subclass.

100. Patreon's unfair business practices include disclosing California Plaintiffs' and Subclass members' FIDs and viewing content to Meta without authorization or consent, causing harm to California Plaintiffs and Subclass members.

101. Patreon actually and proximately caused harm to California Plaintiffs and Subclass members in that, among other things, they suffered economic injury by overpaying for their subscriptions.

102. For these reasons, Patreon is in violation of the "unfair" prong of the UCL.

**Fraud by Omission**

103. Patreon's conduct is fraudulent in violation of the UCL because its business acts were likely to deceive a reasonable consumer.

104. Patreon knowingly concealed that it shares California Plaintiffs' and Subclass members' FIDs and viewing content with Meta such that Meta would be able to understand their specific video-watching habits.

105. Patreon's undisclosed practices in this regard are material to a reasonable consumer.

106. Patreon had ample means and opportunities to alert California Plaintiffs and Subclass members to the fact that it shares Users' FIDs and viewing content with Meta. For example, Patreon could have disclosed this information in its Terms of Use, Privacy Policy, Data Practices, or Cookie Policy.

107. As the entity that collects and shares this information, Patreon had a duty to disclose that it shares information with Meta that allows Meta to identify their personal video-watching preferences. Patreon also has a duty to disclose this information because it made partial representations about its data-sharing practices yet neglected to disclose that it shares Users' personal information and viewing content to Meta.

108. California Plaintiffs and Subclass members suffered injury in fact, including lost money or property, as a result of Patreon's deceptive and fraudulent acts and omissions.

109. California Plaintiffs and Subclass members accordingly seek appropriate relief, including (1) restitution under the UCL; and (2) such orders or judgments as may be necessary to enjoin Patreon from continuing its unfair, unlawful, and fraudulent practices. There is no adequate remedy at law that would provide redress to California Plaintiffs and the Subclass or ensure that Patreon will not engage in the same data practices in the future. California Plaintiffs also seek reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure section 1021.5.

**THIRD CAUSE OF ACTION**
**Violation of California's Consumers Legal Remedies Act**
**Cal. Civ. Code § 1750, *et seq.***
**(On Behalf of the California Subclass)**

110. California Plaintiffs incorporate and reallege the above factual allegations by reference.

111. Patreon is a "person" within the meaning of Cal. Civ. Code §§ 1761(c) and 1770, and provides "services" within the meaning of Cal. Civ. Code §§ 1671(b) and 1770.

112. California Plaintiffs and Subclass members are "consumers" as defined by Cal. Civ. Code §§ 1761(d) and 1770, and engaged in a "transaction," as defined by Cal. Civ. Code §§ 1761(e) and 1770.

113. Patreon's acts and practices, as alleged in this complaint, violate the CLRA, Cal. Civ. Code §§ 1770(a)(5), (7), and (9), because its practice of sharing Users' FIDs and viewing content with Meta without their consent materially misled California consumers. In describing its services and privacy policies, Patreon misrepresented and/or omitted the true nature of its information-sharing practices.

114. Patreon's practices implicate significant privacy concerns and caused economic harm to California Plaintiffs and Subclass members as alleged above.

115. Patreon's misrepresentations and omissions were material. Had California Plaintiffs and Subclass members known that Patreon engages in these business practices, they would not have subscribed for Patreon's services or would have paid less for the subscription.

116. Patreon's CLRA violations caused California Plaintiffs and Subclass members to sustain ascertainable losses, to be determined according to proof at trial.

117. California Plaintiffs also seek an order enjoining Patreon from engaging in practices that violate the CLRA.

118. Under California Civil Code section 1782(a), on their own behalf and on behalf of the Class, each California Plaintiff sent a CLRA notice on May 27, 2022 via certified mail, return receipt requested, to Patreon's principal place of business, advising Patreon that it is in violation of the CLRA and must cease its practice of disclosing Users' personal information to third parties without appropriate consent, and reimburse subscription fees. Patreon failed to correct its business practices or provide the requested relief within 30 days. Accordingly, Plaintiffs now seek monetary damages under the CLRA.

119. Attached as Exhibit A to this Complaint is a declaration of venue and place of trial under California Civil Code section 1780(d).

### FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

120. Plaintiffs incorporate and reallege the above factual allegations by reference.

121. Plaintiffs and Class members conferred a benefit on Patreon by paying it membership fees for online subscription services.

122. Patreon acted wrongfully by sharing Users' FIDs and viewing content to Meta without their consent.

123. Patreon's practice of sharing Users' personal information and viewing content with Meta without their consent, and its failure to disclose this practice, caused Patreon to profit from membership fees it would otherwise not have received.

124. Patreon's retention of these ill-gotten gains is unjust and inequitable.

125. Plaintiffs, on behalf of themselves and the Class, accordingly seek restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust enrichment, including reasonable attorneys' fees and costs. There is no adequate remedy at law that would provide redress to Plaintiffs and the Class or ensure that Patreon will not deploy the same data practices in the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

    A. Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

    B. Enter judgment in favor of Plaintiffs and the Class;

    C. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

D. Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

E. Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F. Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

G. Enter such other orders as may be necessary to restore to Plaintiffs and Class members any money and property acquired by Defendant through its wrongful conduct;

H. Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

I. Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: October 27, 2022                     Respectfully submitted,

By: /s/ Simon S. Grille
Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Trevor T. Tan (SBN 281045)
Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
ttan@girardsharp.com
kmacey@girardsharp.com

*Attorneys for Plaintiffs*