Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Trevor T. Tan (SBN 280145)
Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
apolk@girardsharp.com
sgrille@girardsharp.com
ttan@girardsharp.com
kmacey@girardsharp.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BRAYDEN STARK and JUDD OOSTYEN, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>       v.<br><br>PATREON, INC.,<br><br>              Defendant. | Case No. 3:22-cv-03131-JCS<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PATREON INC.'S MOTION TO DISMISS PLAINTIFFS' CLAIMS UNDER THE VPPA, THE CLRA, AND THE FRAUD PRONG OF THE UCL**<br><br>Judge: Hon. Joseph C. Spero<br>Date: January 27, 2023<br>Time: 9:30 a.m. |

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ...................................... 2

III. LEGAL STANDARD ....................................................................................... 3

IV.  ARGUMENT ................................................................................................. 3

    A.   The VPPA Does Not Violate the First Amendment ................................................ 3

        1.   The VPPA Protects Constitutionally Recognized Privacy Interests. ................... 5

        2.   The VPPA Does Not Violate the First Amendment on Its Face. ........................ 6

            i.    The Law Regulates Commercial Speech. ................................................. 7

            ii.   The VPPA Protects Private Matters From Disclosure. ........................... 10

            iii.  The VPPA is Content-Neutral. .......................................................... 12

            iv.   The VPPA Does Not Substantially Infringe on Protected Speech. ........ 13

        3.   The VPPA is Subject to—And Meets—Intermediate Scrutiny. ...................... 21

        4.   Even if Strict Scrutiny Were to Apply, the VPPA Would Survive. ................... 23

    B.   Plaintiffs' Deceptive Trade Practices Claims Are Adequately Alleged. ...................... 23

V.   CONCLUSION ............................................................................................. 25

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS THE FAC
CASE NO. 3:22-cv-03131-JCS

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**Cases**

4

*Amazon.com LLC v. Lay*,
  758 F. Supp. 2d 1154 (W.D. Wash. 2010) .................................................. 5

5

*American Civil Liberties Union v. Clearview AI, Inc.*,

6

  2021 WL 4164452 (Ill. Cir. Ct. Aug. 27, 2021) ........................................ 13

7

*Americans for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) .............................................................................. 14

8

*Ariix, LLC v. NutriSearch Corp.*,

9

  985 F.3d 1107 (9th Cir. 2021) ........................................................... 8, 9, 10

10

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ................................................................................... 14

11

*Baggett v. Hewlett-Packard Co.*,

12

  582 F. Supp. 2d 1261 (C.D. Cal. 2007) ..................................................... 25

13

*Baldwin v. Redwood City*,
  540 F.2d 1360 (9th Cir. 1976) ................................................................... 17

14

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,

15

  140 S. Ct. 2335 (2020) ........................................................................... 5, 23

16

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) ................................................................................... 13

17

*Bd. of Trustees of State Univ. of New York v. Fox*,
  492 U.S. 469 (1989) ................................................................................... 14

18

*Bell Atl. Corp. v. Twombly*,

19

  550 U.S. 544 (2007) ..................................................................................... 3

20

*Boehner v. McDermott*,
  484 F.3d 573 (D.C. Cir. 2007) ................................................................. 5, 6

21

*Boelter v. Advance Mag. Publishers Inc.*,
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) .............................................. 5, 9, 23

22

*Boelter v. Hearst Commc'ns, Inc.*,

23

  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ................................................*passim*

24

*Bolger v. Youngs Drug Prod. Corp.*,
  463 U.S. 60 (1983) ............................................................................7, 10, 12

25

*Briggs & Stratton Corp. v. Baldrige*,
  728 F.2d 915 (7th Cir. 1984) ....................................................................... 8

26

*Brooks v. Thomson Reuters Corp.*,

27

  2021 WL 3621837 (N.D. Cal. Aug. 16, 2021) .................................... 11, 19

28

ii

*Campidoglio LLC v. Wells Fargo & Co.*,
  870 F.3d 963 (9th Cir. 2017) ................................................................. 3

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) ............................................................. 8, 12, 22

*Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014) ............................................................ 15

*City of San Diego, Cal. v. Roe*,
  543 U.S. 77 (2004) ............................................................. 6, 11, 16

*Cohen v. Cowles Media Co.*,
  501 U.S. 663 (1991) ......................................................................... 19

*Connecticut Bar Ass'n v. United States*,
  620 F.3d 81 (2d Cir. 2010) ................................................................. 8

*Contest Promotions, LLC v. City & Cty. of San Francisco*,
  874 F.3d 597 (9th Cir. 2017) ............................................................... 22

*Coplin v. Fairfield Pub. Access Television Comm.*,
  111 F.3d 1395 (8th Cir. 1997) ....................................................... 6, 19, 20

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ......................................................................... 18

*Dahlstrom v. Sun-Times Media, LLC*,
  777 F.3d 937 (7th Cir. 2015) ........................................................ 13, 23

*Daniel v. Ford Motor Co.*,
  806 F.3d 1217 (9th Cir. 2015) .............................................................. 26

*DOJ v. Reporters Comm.*,
  489 U.S. 749 (1989) ......................................................... 5, 7, 18

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) ................................................................. *passim*

*DVD Copy Control Assn., Inc. v. Bunner*,
  31 Cal. 4th 864 (2003) ..................................................................... 19

*Edwards v. FCA US LLC*,
  2022 WL 1814144 (N.D. Cal. June 2, 2022) ................................................ 26

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) .......................................................... *passim*

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) ............................................................ 17

*Entler v. Gregoire*,
  872 F.3d 1031 (9th Cir. 2017) ............................................................. 15

*Facenda v. N.F.L. Films, Inc.*,
  542 F.3d 1007 (3d Cir. 2008) ............................................................. 10

iii

*First Resort, Inc. v. Herrera*,
   80 F. Supp. 3d 1043 (N.D. Cal. 2015) ..................................................................7

*Foti v. City of Menlo Park*,
   146 F.3d 629 (9th Cir. 1998) ...............................................................................3

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ...........................................................................................21

*Grocery Mfrs. Ass'n v. Sorrell*,
   102 F. Supp. 3d 583 (D. Vt. 2015) ......................................................................8

*Herbert v. Lando*,
   441 U.S. 153 (1979) ...........................................................................................21

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ..........................................................6, 10, 11, 12

*In re Hulu Priv. Litig.*,
   2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .....................................................5

*In re Nat'l Sec. Letter*,
   33 F.4th 1058 (9th Cir. 2022) ..............................................................................3

*Individual Reference Servs. Grp., Inc. v. F.T.C.*,
   145 F. Supp. 2d 6 (D.D.C. 2001) ......................................................................10

*Kellman v. Spokeo, Inc.*,
   2022 WL 1157500 (N.D. Cal. Apr. 19, 2022) ...............................................5, 10

*King v. Gen. Info. Servs., Inc.*,
   903 F. Supp. 2d 303 (E.D. Pa. 2012) ......................................................8, 18, 22

*Klein v. San Diego Cty.*,
   463 F.3d 1029 (9th Cir. 2006) ...........................................................................22

*Landmark Commc'ns, Inc. v. Virginia*,
   435 U.S. 829 (1978) ...........................................................................................19

*MacDonald v. Ford Motor Co.*,
   37 F. Supp. 3d 1087 (N.D. Cal. 2014) ...............................................................25

*Marquez-Reyes v. Garland*,
   36 F.4th 1195 (9th Cir. 2022) ............................................................................22

*McCall L. Firm, PLLC v. Crystal Queen, Inc.*,
   335 F. Supp. 3d 1124 (E.D. Ark. 2018) ............................................................21

*McFarland v. Don Lau*,
   2013 WL 12173592 (N.D. Cal. Jan. 3, 2013) ......................................................3

*Members of City Council of City of L.A. v. Taxpayers for Vincent*,
   466 U.S. 789 (1984) ...........................................................................................14

*Mollett v. Netflix, Inc.*,
   795 F.3d 1062 (9th Cir. 2015) .....................................................................12, 18

iv

*Morgan v. AT&T Wireless Servs., Inc.,*
177 Cal. App. 4th 1235 (2009) ............................................................................25

*Nat'l Endowment for the Arts v. Finley,*
524 U.S. 569 (1998) ..............................................................................................7

*Nation Mag., Washington Bureau v. U.S. Customs Serv.,*
71 F.3d 885 (D.C. Cir. 1995) .............................................................................15

*Nayab v. Cap. One Bank (USA), N.A.,*
942 F.3d 480 (9th Cir. 2019) ..............................................................................21

*NetChoice, LLC v. Attorney General, Florida,*
34 F.4th 1196 (11th Cir. 2022) ..........................................................................21

*Olosoni v. HRB Tax Grp., Inc.,*
2020 WL 11563095 (N.D. Cal. Mar. 24, 2020) ................................................25

*Peel v. BrooksAmerica Mortg. Corp.,*
788 F. Supp. 2d 1149 (C.D. Cal. 2011) .............................................................25

*Perry v. Cable News Network, Inc.,*
854 F.3d 1336 (11th Cir. 2017) ..........................................................................20

*Reed v. Town of Gilbert, Ariz.,*
576 U.S. 155 (2015) .............................................................................................23

*Retail Digital Network, LLC v. Prieto,*
861 F.3d 839 (9th Cir. 2017) ..............................................................................22

*Smith v. Daily Mail Pub. Co.,*
443 U.S. 97 (1979) ...............................................................................................19

*Snyder v. Phelps,*
562 U.S. 443 (2011) .....................................................................................4, 7, 12

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) .............................................................................................22

*Sosa v. Onfido, Inc.,*
2022 WL 1211506 (N.D. Ill. Apr. 25, 2022) ....................................................13

*Stanley v. Georgia,*
394 U.S. 557 (1969) .............................................................................................20

*Sterk v. Redbox Automated Retail, LLC,*
672 F.3d 535 (7th Cir. 2012) ..............................................................................13

*Texas v. Am. Blastfax, Inc.,*
121 F. Supp. 2d 1085 (W.D. Tex. 2000) ............................................................21

*The Fla. Star v. B.J.F.,*
491 U.S. 524 (1989) ....................................................................................6, 18, 19

*Trans Union Corp. v. F.T.C. ("Trans Union I"),*
245 F.3d 809 (D.C. Cir. 2001) .......................................................................4, 10

v

*Trans Union Corp. v. F.T.C. ("Trans Union II")*,
   267 F.3d 1138 (D.C. Cir. 2001) ..................................................................6, 9, 11, 19

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ...........................................................................................24

*Turner Broad. Sys., Inc. v. F.C.C.*,
   512 U.S. 622 (1994) ................................................................................................13

*United Reporting Pub. Corp. v. California Highway Patrol*,
   146 F.3d 1133 (9th Cir. 1998) ..................................................................................7

*United States v. Hansen*,
   25 F.4th 1103 (9th Cir. 2022) ...............................................................7, 13, 14, 15

*United States v. Swisher*,
   811 F.3d 299 (9th Cir. 2016) ..................................................................................22

*United States v. Williams*,
   553 U.S. 285 (2008) ................................................................................................22

*Velasco v. Chrysler Grp. LLC*,
   2014 WL 4187796 (C.D. Cal. Aug. 22, 2014) ........................................................25

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ..................................................................................3

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
   455 U.S. 489 (1982) ................................................................................................14

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ................................................................................................13

*Warren v. Whole Foods Mkt. Cal., Inc.*,
   2022 WL 2644103 (N.D. Cal. July 8, 2022) ...........................................................24

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) ............................................................................................4, 14

*Whalen v. Roe*,
   429 U.S. 589 (1977) ............................................................................................5, 23

*Williams-Yulee v. Fla. Bar*,
   575 U.S. 433 (2015) ................................................................................................24

**Statutes**

18 U.S.C. § 2710 .................................................................................................................1

18 U.S.C. § 2710(b)(2)(B) .................................................................................................16

18 U.S.C. § 2721 ...............................................................................................................13

Cal. Bus. & Prof. Code § 17200 .........................................................................................2

Cal. Civ. Code § 1750 ........................................................................................................2

vi

**Other Authorities**

Restatement (Second) of Torts § 652B ............................................................20

S. Rep. 100–599, 2d Sess. (1988)...........................................................*passim*

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................3

Fed. R. Civ. P. 15 ..........................................................................................25

Fed. R. Civ. P. 8 .............................................................................................3

Fed. R. Civ. P. 9(b).............................................................................1, 3, 24

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS THE FAC
CASE NO. 3:22-cv-03131-JCS

1   I.        **INTRODUCTION**

2           In its second motion to dismiss Patreon argues that the Video Privacy Protection Act, 18 U.S.C.

3   § 2710 ("VPPA"), violates the First Amendment on its face.[1] As the Supreme Court has pointed out,

4   such facial challenges are disfavored and often speculative, and Patreon's is no different. Patreon relies

5   on far-fetched hypotheticals that fail to demonstrate a realistic possibility of the VPPA infringing

6   protected speech. The Government supports Plaintiffs' position and submitted a brief in opposition to

7   Patreon's constitutional arguments. *See* Dkt. 49-1. Patreon fares no better with its renewed attempt to

8   avoid Plaintiffs' claims based on its deceptive trade practices. Plaintiffs allege Patreon made

9   incomplete and misleading representations related to its privacy and data-sharing practices. Patreon

10  misstates the applicable standard for such deception-based claims, rewrites Plaintiffs' allegations, and

11  advances newfound Rule 9(b) arguments at odds with its prior positions in this case.

12          While Patreon attempts to analogize the VPPA to laws penalizing speech on a matter of public

13  interest, the VPPA was enacted to protect important privacy interests that the Supreme Court has long

14  recognized, including the right to control the disclosure of personal matters. Plaintiffs' video-watching

15  habits are private matters. The disclosure of these personal choices is commercial speech because

16  consumers' viewing preferences have substantial economic value and Plaintiffs paid to access these

17  prerecorded videos. Under Supreme Court precedent, limitations on such commercial speech do not

18  raise the same constitutional concerns as laws aimed at suppressing the discussion of public issues, and

19  therefore merit substantially more deference. Patreon's contention that strict scrutiny applies is

20  misguided because the VPPA regulates commercial speech. Intermediate scrutiny therefore applies

21  regardless of whether the VPPA imposes content-based restrictions. Even so, the VPPA's limitations are

22  not content-based because the VPPA does not single out any particular viewpoint. As Patreon does not

23  assert that the VPPA fails intermediate scrutiny, its constitutional challenge is fundamentally flawed. In

24  fact, as the Government points out, courts have consistently upheld state laws modeled on the VPPA as

25  well as other federal privacy statutes, applying intermediate scrutiny. Patreon fails to cite any case to the

26  contrary. Its main Ninth Circuit authority explains that privacy statutes like the VPPA do *not* implicate

27

28

---

[1] The Court previously granted Patreon's motion to dismiss in part, permitting amendment and deferring a decision on Patreon's First Amendment arguments. Dkt. 40.

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION TO DISMISS THE FAC
CASE NO. 3:22-cv-03131-JCS

the First Amendment, because they regulate the exchange of private information between private parties.

Finally, although the VPPA need not pass strict scrutiny, it would survive even under that heightened

standard because it is narrowly tailored to further compelling interests in personal privacy.

The Court should deny Patreon's motion to dismiss.

## II.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

Patreon offers subscribers access to a website on which they can watch prerecorded videos and

other works posted by content creators. ¶¶ 43-45.[2] While Plaintiffs were viewing such prerecorded

content, Patreon used a snippet of programming code called the "Meta Pixel" on its website to transmit

their personal viewing information to Meta. ¶¶ 3, 46-47. When a subscriber watches a video on its

website, Patreon, in a single, unencrypted transmission, sends their Facebook Profile ID and the title of

the video watched to Meta. ¶¶ 5, 51-53. This package of information identifies the personal information

of a Patreon subscriber and their video-watching habits. ¶¶ 48-50.

Plaintiffs filed this action against Patreon on May 27, 2022. Dkt. 1. Brayden Stark and Judd

Oostyen are current Patreon subscribers and allege Patreon shared their video-watching information to

Meta in violation of federal and state law. They bring claims for violations of (1) the VPPA; (2) the

Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*; (3) the Consumers Legal

Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; and (4) for unjust enrichment. ¶¶ 83-125.

Patreon moved to dismiss the initial complaint on August 5 arguing, among other things, that

the VPPA violates the First Amendment. Dkt. 21. The United States filed an acknowledgment of

Patreon's constitutional challenge on September 16 and the parties stipulated to give the Government

until November 4 to determine whether to intervene to defend the constitutionality of the VPPA. Dkts.

33, 34. On October 13, the Court entered an order granting in part and denying in part Patreon's

motion. Dkt. 40. The Court concluded that while their other VPPA allegations were sufficient,

Plaintiffs had not adequately alleged that the videos they watched on Patreon's website were

prerecorded videos within the scope of the VPPA, and therefore dismissed with leave to amend their

VPPA claim along with their claim under the UCL's "unlawful" prong to the extent it relied on a VPPA

---

[2] "¶" references are to the First Amended Class Action Complaint ("FAC"). Dkt. 41.

1   violation. *Id.* at 10-14. The Court declined to reach Patreon's constitutional challenge. *Id.* at 14. In

2   addition, the Court denied Patreon's challenge to Plaintiffs' CLRA, UCL "unfair" and "fraudulent,"

3   and unjust enrichment claims. *Id.* at 16-19. Plaintiffs filed the operative FAC on October 27 clarifying

4   that they viewed prerecorded video content on Patreon's website. Dkt. 41. Patreon again moved to

5   dismiss on November 23, advancing a modified First Amendment challenge. Dkt. 48. The Government

6   filed a memorandum defending the constitutionality of the VPPA on December 5. Dkt. 49-1.

7   **III.   LEGAL STANDARD**

8       On a Rule 12(b)(6) motion, the Court accepts all factual allegations in the complaint as true and

9   construes them together and in the light most favorable to Plaintiffs. *Campidoglio LLC v. Wells Fargo*

10  *& Co.*, 870 F.3d 963, 970 (9th Cir. 2017). Rule 8 requires Plaintiffs to set forth enough facts to state a

11  plausible entitlement to relief. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). The motion must

12  be denied if the allegations "raise a right to relief above the speculative level." *McFarland v. Don Lau*,

13  2013 WL 12173592, at *1 (N.D. Cal. Jan. 3, 2013) (quoting *Twombly*, 550 U.S. at 555). Rule 9(b)

14  requires that fraud allegations "be specific enough to give defendants notice of the particular

15  misconduct." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted).

16  **IV.   ARGUMENT**

17      **A.     The VPPA Does Not Violate the First Amendment.**

18      The Court's "constitutional analysis" begins by determining whether Patreon makes "a facial

19  challenge or an as-applied challenge" to the VPPA. *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1070 (9th

20  Cir. 2022). Although Patreon previously raised both facial and as-applied challenges to the VPPA

21  (Dkt. 21 at 10), it no longer argues that the VPPA is unconstitutional when applied to it. Mot. at 5. It

22  instead asks the Court to strike down the VPPA solely on overbreadth grounds—in other words, on the

23  basis that "the statute is written so broadly that it may inhibit the constitutionally protected speech of

24  third parties, even if [its] own speech may be prohibited." *Foti v. City of Menlo Park*, 146 F.3d 629,

25  635 (9th Cir. 1998) (discussing difference between facial and as-applied challenges). The Supreme

26  Court has explained that "[f]acial challenges are disfavored" as they "often rest on speculation", "run

27  contrary to the fundamental principle of judicial restraint", and "threaten to short circuit the

28  democratic process by preventing laws embodying the will of the people from being implemented in a

1  manner consistent with the Constitution." *Washington State Grange v. Washington State Republican*
2  *Party*, 552 U.S. 442, 450 (2008). So here: Patreon's remaining facial challenge rests on a series of
3  unlikely hypotheticals that fail to show a realistic possibility of the VPPA suppressing a significant
4  amount of protected speech. Contrary to Patreon's arguments, the VPPA regulates commercial speech
5  concerning purely private matters—and such speech is not entitled to heightened protection.

6      The Supreme Court has made clear "that not all speech is of equal First Amendment
7  importance" and that speech implicating matters of public concern is "at the heart of the First
8  Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59
9  (1985) (quotation marks and citation omitted). The Court has further stated that "restricting speech on
10 purely private matters does not implicate the same constitutional concerns as limiting speech on
11 matters of public interest" because "[t]here is no threat to the free and robust debate of public issues;
12 there is no potential interference with a meaningful dialogue of ideas; and the threat of liability does
13 not pose the risk of a reaction of self-censorship on matters of public import." *Snyder v. Phelps*, 562
14 U.S. 443, 452 (2011) (quotation marks and citation omitted). The Court thus held that restrictions on
15 commercial speech, such as disclosing a consumer's credit report, do *not* violate the First Amendment,
16 particularly when it "concerns no public issue." *Dun & Bradstreet*, 472 U.S. at 762.

17     The VPPA is concerned with commercial speech. The disclosure of private information
18 obtained as part of an economic transaction with a consumer is speech that is primarily driven by an
19 economic motive. Moreover, rather than prohibiting discussion of matters of public interest, the VPPA
20 limits the disclosure of purely private facts; a consumer's personal video preferences are not of
21 legitimate news interest to the public. *See Trans Union Corp. v. F.T.C. ("Trans Union I")*, 245 F.3d
22 809, 818 (D.C. Cir. 2001) ("[T]he information about individual consumers and their credit
23 performance communicated by . . . marketing lists is solely of interest to the company and its business
24 customers and relates to no matter of public concern. Trans Union target marketing lists thus warrant
25 reduced constitutional protection.") (quotation marks omitted). So there is no overbreadth problem. In
26 addition, while Patreon insists that the VPPA must pass strict scrutiny, limitations on commercial
27 speech are not subject to strict scrutiny even if they are content-based restrictions. And the VPPA does
28 not impose content-based restrictions as it is concerned only with the source of the information and

4

does not single out disfavored viewpoints. Because the VPPA readily meets intermediate scrutiny—Patreon does not argue otherwise—its First Amendment challenge is infirm.

### 1.    The VPPA Protects Constitutionally Recognized Privacy Interests.

The First Amendment protects the right "to receive information and ideas through books, films, and other expressive materials anonymously." *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1167 (W.D. Wash. 2010); *Kellman v. Spokeo, Inc.*, — F. Supp. 3d —, 2022 WL 1157500, at *15 (N.D. Cal. Apr. 19, 2022) ("The protection of privacy interests is, as discussed, a longstanding commitment of the law—and an important one."). Far from undermining the First Amendment, Congress recognized and sought to protect these important personal liberty interests when it enacted the VPPA. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "codifies a context-specific extension of the *substantive* right to privacy" and "[v]iolations of the right to privacy have long been actionable at common law") (emphasis in original); *see also Whalen v. Roe*, 429 U.S. 589, 606 (1977) (Brennan, J., concurring) ("The Court recognizes that an individual's 'interest in avoiding disclosure of personal matters' is an aspect of the right of privacy[.]"); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2348 (2020) (noting "Congress's continuing interest in protecting consumer privacy").

The "VPPA follows a long line of statutes passed by Congress to extend privacy protections to records that contain information about individuals." *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 448 n.13 (S.D.N.Y. 2016) (noting that twelve states have enacted laws that mirror the VPPA). More than 30 years after its enactment, no court has ever suggested that the VPPA is unconstitutional and in fact "[t]here are many federal provisions that forbid individuals from disclosing information they have lawfully obtained. The validity of these provisions has long been assumed." *Boehner v. McDermott*, 484 F.3d 573, 578 (D.C. Cir. 2007). Courts have specifically upheld the constitutionality of state laws modelled on the VPPA, rejecting arguments similar to the ones advanced by Patreon. *See, e.g.*, *Hearst*, 192 F. Supp. 3d at 435; *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 602 (S.D.N.Y. 2016).

Patreon provides no reason to reach a different conclusion here. The primary decision relied on by Patreon cites the VPPA and other privacy statutes, and notes that they permissibly "regulate data collection and disclosure *without implicating* the First Amendment" because they only "regulate the

misuse of information by entities that obtain [consumer] information from individuals through some exchange." *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1124 (9th Cir. 2020) (emphasis added) (quotation marks omitted); *see also Boehner*, 484 F.3d at 578 n.2 (citing VPPA for the principle that "government can also limit disclosures by persons who are not its employees without running afoul of the First Amendment . . . those who sell or rent video tapes or DVDs ordinarily may not reveal 'personally identifiable information concerning' their customers."). Patreon's reliance on cases grappling with the tension between the free press and personal privacy rights is misplaced because the VPPA is not aimed at punishing speech on matters of public interest. *E.g.*, Mot. at 4-5 (citing, *inter alia*, *The Fla. Star v. B.J.F.*, 491 U.S. 524, 530 (1989); *Coplin v. Fairfield Pub. Access Television Comm.*, 111 F.3d 1395, 1404 (8th Cir. 1997)). Plaintiffs' and other citizens' video-watching habits in their own homes, and on their own devices, simply are not the subject of legitimate public concern. *See Trans Union Corp. v. F.T.C. ("Trans Union II")*, 267 F.3d 1138, 1140 (D.C. Cir. 2001) (rejecting First Amendment challenge based on cases such as *Florida Star* because those cases "involve speech on matters of public concern"); *cf. City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004) (videos of government employee were not a public concern). Additionally, in the unlikely event that a consumer's private film preferences become relevant to public discourse, the VPPA does not prohibit the disclosure of such information from sources *other* than a video tape service provider. *See Hearst*, 192 F. Supp. 3d at 452 (noting that to the extent the public had an interest in a consumer's information, the law did not restrict disclosure from other sources and a business could still obtain consumer consent).

### 2.     The VPPA Does Not Violate the First Amendment on Its Face.

"There are two situations in which a facial overbreadth challenge can succeed: (1) when a party establishes that there is no set of circumstances under which [the statute] would be valid or that the statute lacks any plainly legitimate sweep;" and (2) where a substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Hansen*, 25 F.4th 1103, 1106 (9th Cir. 2022) (quotation marks and citation omitted). Patreon invokes the second situation (Mot. at 5) but has not met its "heavy burden." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998). Patreon's facial challenge consequently fails.

An overbreadth analysis begins by construing the statute and examining its "plainly legitimate

6

sweep" or the speech that the government may properly limit. *Hansen*, 25 F.4th at 1108-09. The VPPA is aimed at protecting key privacy interests that the Supreme Court has recognized. *See DOJ v. Reporters Comm.*, 489 U.S. 749, 763 (1989) (the Court has "recognized the privacy interest in keeping personal facts away from the public eye."). The VPPA regulates commercial speech and restricts the disclosure of private facts that are "of less First Amendment concern." *Dun & Bradstreet*, 472 U.S. at 758–59. It also is content neutral, and even if it were not, content-based restrictions on commercial speech do not raise serious First Amendment concerns. Thus, for the reasons elaborated on below, the VPPA's prohibitions fall well within constitutional bounds.

### i.   The Law Regulates Commercial Speech.

The VPPA regulates commercial speech, which is afforded less First Amendment protection and laws regulating it are subject to only intermediate scrutiny. *See, e.g.*, *First Resort, Inc. v. Herrera*, 80 F. Supp. 3d 1043, 1049 (N.D. Cal. 2015), *aff'd*, 860 F.3d 1263 (9th Cir. 2017). Patreon's provision of user information to Meta for its own benefit is the type of "pure economic transaction" that fits "comfortably within the 'core notion' of commercial speech." *United Reporting Pub. Corp. v. California Highway Patrol*, 146 F.3d 1133, 1136 (9th Cir. 1998) (selling arrestee information to clients was commercial speech and "nothing more") (quoting *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66 (1983), *rev'd on other grounds*, *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999)). The user information shared by Patreon for its financial gain is neither political speech nor speech in a public forum, nor any other type of speech meriting heightened protection.

Patreon contends that sharing its users' video-watching histories cannot be commercial speech because it does not propose a commercial transaction (Mot. at 8), but proposing a transaction only constitutes the "core" of commercial speech, *Hearst*, 192 F. Supp. 3d at 445, and is only a "starting point" for the analysis. *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021). As other courts have noted, the Supreme Court has defined commercial speech in more than one way. *See Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 93 (2d Cir. 2010); *Briggs & Stratton Corp. v. Baldrige*, 728 F.2d 915, 917 (7th Cir. 1984); *see, e.g.*, *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 627 (D. Vt. 2015) (rejecting argument that speech at issue was not commercial because it did not propose a commercial transaction). For instance, the Supreme Court has held that commercial speech is

7

"expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). Applying that standard, the Court held that the disclosure of a consumer's credit report constitutes commercial speech because "[i]t was speech solely in the individual interest of the speaker and its specific business audience." *Dun & Bradstreet*, 472 U.S. at 762. It is accordingly clear that "speech that does not propose a commercial transaction on its face can still be commercial speech." *Arrix*, 985 F.3d at 1115 (citation omitted).

Businesses in today's data-driven economy collect, sell, and exchange information about consumer habits because it has substantial economic value. *See Hearst*, 192 F. Supp. 3d at 445 (noting "businesses' increasing ability to profit from the collection and sale of data supports the conclusion that disclosing consumer information is—primarily, if not entirely—an economic act."); *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 307 (E.D. Pa. 2012) ("The very fact that GIS compiles consumer reporting information for the purpose of making a profit and its business customers purchase such reports in order to make business decisions supports the proposition that the dissemination of this information is of sole interest to the speaker (GIS) and its audience (business customers)."). Recognizing the primarily economic motive behind collecting and exchanging consumer information, courts have rejected First Amendment challenges to analogous state and federal statutes, finding they regulate only commercial speech. For example, the court in *Hearst* considered the constitutionality of Michigan's Video Rental Privacy Act, M.C.L. § 445.1711 *et seq.* ("VRPA")—a statute that parallels the VPPA—and upheld it against both facial and as-applied First Amendment challenges. 192 F. Supp. 3d at 445. The court concluded the law regulates commercial speech because it "solely related to the economic interests of the speaker and the audience" and the consumer information at issue "relays an individual's economic decisions, elucidates an individual's economic preferences, and facilitates the proposal of new commercial transactions[.]" *Id.* at 444-52; *see Advance Mag.*, 210 F. Supp. 3d at 597 (speech regulated by VRPA is commercial speech only entitled to "reduced constitutional protection"); *see also Trans Union II*, 267 F.3d at 1141 (Fair Credit Reporting Act's marketing limitations regulate only commercial speech). In short, as the Government notes, "[t]he type of speech the VPPA regulates fits comfortably within the commercial speech doctrine." Dkt. 79-1 at 12.

The *Bolger* factors come into play when the facts present a close question, but that is not the

8

case here because the consumer information that the VPPA regulates is transactional in nature. Mot. at 8-9. Patreon obtains information from its users when they pay for subscriptions to gain access to content on its platform. ¶¶ 54–55, 61. This consumer data is "intended for use by its audience to initiate commercial activity" by improving Patreon and Meta's ability to target advertising toward their users. *Advance Mag.*, 210 F. Supp. 3d at 597. Similarly, the legislative history shows that the VPPA's restriction on revealing "personally identifiable information is intended to be *transaction*-oriented. It is information that identifies a particular person as having engaged in a specific *transaction* with a video tape service provider." S. Rep. 100–599, 2d Sess., at 12 (1988) (emphasis added). That the VPPA regulates speech relating to the economic interests of businesses is confirmed by other VPPA cases. As the Government points out, in the 34 years since its enactment, the "vast majority of cases alleging violations of the VPPA" have concerned disclosures of private video-viewing history made for an economic motive. Dkt. 49-1 at 17-18. At bottom, the speech the VPPA regulates—"disclosing consumer information is—primarily, if not entirely—an economic act" and therefore is commercial. *Hearst*, 192 F. Supp. 3d at 445; *Dun & Bradstreet, Inc.*, 472 U.S. at 762 (disclosing a credit score "warrants no special protection" because it "concerns no public issue"); *Trans Union II*, 267 F.3d at 1140–41 (similar).

Even if the speech here presents a close question—and it does not—it readily satisfies the *Bolger* standard for what constitutes commercial speech. That test examines whether: "[1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." *Ariix*, 985 F.3d at 1115–16. Each characteristic need not "necessarily be present in order for speech to be commercial." *Bolger*, 463 U.S. at 67 n.14. Patreon's speech identifies a specific product: the videos its users viewed. ¶¶ 3-4. *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008) (videos qualified as product or service). That Patreon's speech may not be an advertisement is not dispositive—in *Ariix*, for example, the Ninth Circuit held that speech not constituting an advertisement may still be commercial speech. *Id.* at 1116-17 (citing *Bolger*, 463 U.S. at 66-67). In analyzing the key economic motivation factor, "the type of economic motivation is not the focus; rather, the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking" and "economic motivation is not limited

9

simply to the expectation of a direct commercial transaction with consumers. Courts have found commercial speech even when it involves indirect benefits[.]" *Id.* at 1117. Under the *Bolger* analysis, Patreon's motivation in sharing the information in question is economic: Patreon, a for-profit business, discloses this information, obtained through a commercial transaction, to Meta for purely financial reasons. Because the speech is "solely in the interest of the speaker and its specific business audience" it is only entitled to "reduced constitutional protection." *Trans Union I*, 245 F.3d at 818; *Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 41 (D.D.C. 2001) (similar).

Patreon argues that the Ninth Circuit's *IMDb* decision requires the Court to apply heightened scrutiny to the VPPA, but Patreon's reliance on that case is unavailing. Mot. at 9. *IMDb* involved a California statute (AB 1687) that appeared to be aimed solely at preventing IMDb.com from publishing subscribers' dates of birth on publicly available profiles. 962 F.3d at 1117–18. The speech at issue in *IMDb* was plainly *not* commercial as it (1) concerned "*free*, publicly available profiles" that were "encyclopedic" in nature and "similar to Wikipedia"; (2) the law's restrictions extended to content uploaded to IMDb by members of the public; and (3) IMDb lacked any financial interest in the information. 962 F.3d at 1117, 1124 (emphasis added). This case presents a clear contrast with the free public profiles on IMDb.com. The public has no interest in Plaintiffs' private viewing habits, the VPPA limits the disclosure of information only by "video tape service providers" and by no other source, and consumers' video-viewing habits have substantial economic value, which is why Patreon does not make the information freely available. *See Kellman.*, 2022 WL 1157500, at *14 (speech was commercial based in part on fact that it did not concern matters of public interest); *Trans Union II*, 267 F.3d at 1140 (marketing lists were commercial speech "of purely private concern").

### ii.   The VPPA Protects Private Matters From Disclosure.

The VPPA aims at protecting sensitive private viewing habits. This speech regarding consumer video-watching preferences is not a matter of public concern entitled to heightened First Amendment protection because their habits are not "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *San Diego*, 543 U.S. at 84; *see Dun & Bradstreet*, 472 U.S. at 758–59; *Trans Union Corp. II*, 267 F.3d at 1140. Nor does such speech "seek to communicate to the public or to advance a political or social point of view." *Brooks v.*

10

*Thomson Reuters Corp.*, 2021 WL 3621837, at *14 (N.D. Cal. Aug. 16, 2021) (citation omitted).

Rejecting an argument that disclosure of consumers' personal and private information resembles news reporting entitled to greater First Amendment protection, Judge Chen of this District explained that "[t]he public does not have a particular cognizable interest in the 'speech' at issue here— the dissemination of Plaintiffs' personal information—because that information is purely a matter of private concern, does not relate to any matter of 'political' or 'social' concern, and does they seek to communicate a political or social point of view." *Brooks*, 2021 WL 3621837, at *15. The court concluded that consistent with *IMDb*, the sale of the "Plaintiffs' personal information is 'an inherently private exchange between private parties,' not a matter of public concern." *Id.* (quoting *IMDb*, 962 F.3d at 1124-25). Likewise, the VPPA only restricts the disclosure of information obtained through an exchange between private parties, and the fact that Patreon only shares its users' viewing habits with Meta (for commercial reasons) "and not with the general public, cuts heavily against concluding that [Patreon's] conduct is of public concern" warranting enhanced constitutional protection. *Id.*

In *IMDb*, by contrast, the court focused its analysis on the aspect of AB 1687 that barred "a provider from publishing age information on any *public* 'companion' website, such as IMDb.com, without regard to the source of the information." 962 F.3d at 1119-20 (emphasis added). The Ninth Circuit declined to allow reduced protection for that "public speech touching on private issues," noting that the Supreme Court had never done so. 962 F.3d at 1123-34 (emphasis added). Unlike matters of public significance that happen to touch on private concerns, however, "where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder*, 562 U.S. at 452; *see, e.g.*, *Dun & Bradstreet*, 472 U.S. at 762 (credit report not entitled to any "special protection" under the First Amendment where it "concerns no public issue" and was not widely disseminated). Patreon therefore takes *IMDb* out of context when it argues the court rejected the position that the "speech of a purely private concern is entitled only to reduced protection." Mot. at 9 (citing 962 F.3d at 1123-24). Contrary to that simplistic notion, the Supreme Court held that speech that is commercial in nature does not cease to be commercial even if it alludes to a matter of public debate. *Bolger*, 463 U.S. at 67–68 (treating advertisements for contraceptives as commercial speech "notwithstanding the fact that they contain[ed] discussions of important public issues"); *Central Hudson Gas & Elec. Corp. v. Pub. Serv.*

11

*Comm'n of New York*, 447 U.S. 557, 562 n.5 (1980) (rejecting suggestion that any link between product offered for sale and current public debate transformed commercial speech into noncommercial speech). The cited portion of *IMDb* that Patreon relies on did not reject longstanding jurisprudence holding that heightened protection does *not* apply to commercial speech concerning private matters.

That Patreon's reading of *IMDb* is off base is underscored by the fact that the Ninth Circuit expressly distinguished AB 1687 from *the VPPA* itself and other statutes that limit the disclosure of information "without implicating the First Amendment." 962 F.3d at 1124. The *IMDb* court's reference to the VPPA not offending First Amendment principles also is consistent with the Ninth Circuit's previous recognition that the VPPA "reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent. Congress's intent in passing the VPPA therefore evinces the principle that protection is merited when the consumer lacks control over the dissemination of the information at issue." *Mollett v. Netflix, Inc*., 795 F.3d 1062, 1065–66 (9th Cir. 2015). Of further significance, the Ninth Circuit reasoned that, unlike in the D.C. Circuit's *Trans Union II* decision, where "the 'speech' at issue—the sale of data—was itself an inherently private exchange between private parties," "IMDb posts the information on its website free of charge for the public to review. This fact alone imparts an inherently *public character* to the speech at issue." *Id.* at 1124-25 (emphasis added). Because the VPPA, in contrast, is aimed at private rather than public speech, *IMDb* does not control.

### iii.    The VPPA is Content-Neutral.

Patreon's contention that the VPPA is "content-based" restriction is misguided. Mot. at 14. "[T]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (citation omitted). "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based . . . By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Id.* at 643; *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (same). The VPPA regulates speech based on the source of the information, not the ideas or views expressed, and is therefore a content-neutral law.

1  *See Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001).

2      The Seventh Circuit has held that the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §

3  2721 *et seq.*, "a parallel statute to the Video Privacy Protection Act," *Sterk v. Redbox Automated Retail,*

4  *LLC*, 672 F.3d 535, 539 (7th Cir. 2012), is content-neutral because its "goals are 'unrelated to the

5  content of [the regulated] expression.'" *Dahlstrom v. Sun-Times Media, LLC,* 777 F.3d 937, 950 (7th

6  Cir. 2015) (citation omitted). Just like the VPPA, the DPPA does not prohibit "the dissemination of the

7  very same information acquired from a lawful source" and "because the Act permits publication of

8  identical information so long as that information flows from a source other than driving records, it

9  implicates the First Amendment rights of the restricted party to a far lesser extent than would restraints

10  on dissemination of information in a different context." *Id.* at 950 (quotation marks and citation

11  omitted); *see also Sosa v. Onfido, Inc.,* 2022 WL 1211506, at *15 (N.D. Ill. Apr. 25, 2022) (finding

12  content neutral an Illinois law restricting collection of certain types of biometric information but not

13  others); *American Civil Liberties Union v. Clearview AI, Inc.*, 2021 WL 4164452, at *7 (Ill. Cir. Ct.

14  Aug. 27, 2021) (same).

15      **iv.     The VPPA Does Not Substantially Infringe on Protected Speech.**

16      In comparison to the VPPA's legitimate sweep of regulating commercial speech and limiting

17  the disclosure of private matters, there is little "realistic danger" that the VPPA would "significantly

18  compromise recognized First Amendment protections of parties not before the Court" or that it is

19  "susceptible of regular application to protected expression[.]" *Hansen*, 25 F.4th at 1103 (citations

20  omitted). Patreon acknowledges that "[o]verbreadth analysis does not apply to commercial speech."

21  Mot. at 10 n.2; *see also Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 496–97

22  (1982) ("the overbreadth doctrine does not apply to commercial speech."). Consequently, the only

23  relevant inquiry is whether the VPPA restricts a substantial amount of protected *non*-commercial

24  speech. *See Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) ("[O]verbreadth

25  analysis does not normally apply to commercial speech" unless "the alleged overbreadth . . . consists of

26  its application to non-commercial speech"). Because the VPPA does not, Patreon's challenge fails.

27      Seeking to avoid the high burden that comes with its overbreadth challenge, Patreon begins by

28  pointing to cases where the Supreme Court and Ninth Circuit struck down laws on overbreadth

grounds. Mot. at 5-6. Yet those cases highlight that the "hypothetical parade of horribles" Patreon invokes is insufficient to sustain its facial challenge. *Hansen*, 25 F.4th at 1110. In contrast to the VPPA, the challenged law in *Hansen* implicated many "everyday statements or conduct that are likely repeated countless times across the country everyday." *Id.* at 1110. The other cases Patreon cites similarly prohibited numerous instances of lawful speech, not private activity like the VPPA. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 246 (2002) (law prohibiting depiction of teenage sexual activity swept in "countless literary works"); *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2386 (2021) ("lack of tailoring" in state's charity donor disclosure law made it overbroad because that flaw was "present in every case"). By contrast, Patreon musters a few implausible hypothetical scenarios (Mot. at 10-15)—but "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *Washington State Grange*, 552 U.S. at 449–50 (courts "must be careful not to . . . speculate about 'hypothetical' or 'imaginary' cases."). In any event, none of Patreon's seven hypothetical examples of "non-commercial speech" that the VPPA may reach renders the law violative of the First Amendment. Mot. at 10.

**First,** Patreon begins with a flawed argument that the incident that prompted Congress to pass the VPPA demonstrates its overbreadth because "[s]peech discussing whether a public official has taken hypocritical positions on important issues" implicates public concerns subject to the highest levels of First Amendment protection. Mot. at 10. Yet public figures' private video-watching habits may not even reflect their personal views on important issues, let alone demonstrate that they are hypocrites or lack fitness for office. Both public figures and private citizens may wish to watch videos and films with messages or content they disagree with so that they can be exposed to *different* viewpoints. In fact, this was one of the main reasons Congress enacted the VPPA in the first place: to protect intellectual freedom by ensuring that people can freely view videos in private without public scrutiny, thereby promoting the free exchange of ideas. S. Rep. 100–599 at 7-8.

Even assuming that Judge Bork's personal viewing habits were a matter of public interest because of the unique circumstances of his nomination and personal views on liberty, "commercial speech does not become non-commercial—and thus less subject to regulation—because it may

1   implicate matters of public concern." *Hearst*, 192 F. Supp. 3d at 452. Nor is it the case, as Patreon

2   suggests, that every time the VPPA prohibits the disclosure of a public official's private video-viewing

3   habits, it amounts to a restriction on protected speech. Public figures still retain privacy interests and

4   their recreational habits are not presumptively matters of legitimate public interest. *See Nation Mag.,*

5   *Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) ("Although candidacy for

6   federal office may diminish an individual's right to privacy; it does not eliminate it."); *Citizens for*

7   *Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 746 F.3d 1082, 1092 (D.C. Cir. 2014).

8           ***Second***, Patreon argues that the VPPA is overbroad because it prevents businesses from

9   voluntarily notifying law enforcement of illegal activity on their platforms. Mot. at 11. But the case

10   Patreon cites holds that filing a *complaint* with a governmental entity or court constitutes the exercise

11   of the right to petition the government for the redress of grievances and hence is protected by the First

12   Amendment. *See Entler v. Gregoire*, 872 F.3d 1031, 1043-44 (9th Cir. 2017). The hypothetical

13   scenarios involving illegal activity that Patreon posits do not implicate a video tape service provider's

14   right to obtain redress of its own grievances. And, as the Government points out, it is unlikely that a

15   business would report such activity to law enforcement because it would effectively be reporting itself;

16   it would only be aware that a consumer was viewing illegal content if it were providing that unlawful

17   content to the consumer. Dkt. 49-1 at 18-19. This hypothetical therefore does not present the type of

18   "realistic danger" to protected speech that could establish overbreadth. *Hansen*, 25 F.4th at 1103.

19           ***Third***, while conceding that none of the various situations actually implicate public concerns

20   entitled to heightened constitutional protection, Patreon asserts that the VPPA nonetheless prohibits

21   certain disclosures involving "important First Amendment interests." Mot. at 11-12. Setting aside that it

22   offers no authority for what the "important" interests are, none of the hypothetical situations implicate

23   the First Amendment. To start with, prohibiting disclosure of a citizen's video-watching habits to

24   another private person safeguards important constitutional rights of privacy and personal liberty, and

25   the possibility that an employee of a video tape service provider may find a customer's viewing habits

26   worthy of disclosure does not convert them into "legitimate news interest." *San Diego*, 543 U.S. at 83-

27   84. If anything, the scenario posited by Patreon underscores the importance of the VPPA in protecting a

28   private citizen's video-watching history from disclosure at the whim of a single employee.

15

Patreon is also incorrect when it claims that the VPPA prevents businesses such as online education providers and traffic schools from certifying that someone completed a video course. The statute expressly allows a business to do so, as long as it obtains informed, written consent from the consumer beforehand. 18 U.S.C. § 2710(b)(2)(B). Those education providers can readily include the disclosure in their paperwork given to students. In addition, the VPPA only prohibits the disclosure of information that would permit an ordinary person to identify that an individual consumer watched a specific video. *Eichenberger*, 876 F.3d at 985. It is unlikely that a traffic school would need to disclose the *specific* videos a participant watched. Indeed, the very website that Patreon cites merely states that traffic schools must "notify the court of traffic school completion." Mot. at 12 n.4. Nor would it be difficult for an online continuing education provider to obtain consent, as the VPPA expressly allows consent to be obtained "through an electronic means using the Internet." 18 U.S.C. § 2710(b)(2)(B). There is no reason to think that a participant in a continuing education course would object to the disclosure of such information when the reason they are taking the course is so that the provider can certify to regulators that they completed the course.

**Fourth**, again relying on the Ninth Circuit's decision in *IMDb*, Patreon argues that the VPPA is overbroad because it prohibits disclosure of viewing information "if that consent does not comply with the VPPA's peculiar formalities." Mot. at 12. That case again lends no support to Patreon's claim because *IMDb* did not strike down the law at issue for imposing unduly burdensome consent requirements. Rather, the court applied strict scrutiny and held that the law was fatally underinclusive because it only prohibited the disclosure of age information of entertainment-industry professionals who specifically requested removal of the information, which "call[ed] into question the State's true motives in enacting the statute." *Id.* at 1127. In contrast, the VPPA does not pick and choose restrictions in the manner of AB 1687, and concerns commercial speech that is not subject to strict scrutiny.

The other case Patreon cites is readily distinguishable. *See Baldwin v. Redwood City*, 540 F.2d 1360 (9th Cir. 1976). That case involved "[s]ignificant First Amendment interests" not at issue here because the city's regulations regarding temporary signs within the city substantially burdened core political speech. *Id.* at 1366. The court held that certain signage restrictions were unconstitutional

1    because the city required an application, fee, and removal charge "for each sign" even though a large

2    number of political signs would normally be used in the city, and as a result "[t]he burden is so great as

3    to inhibit the use of this means of communication." *Id.* at 1370-71. The city's application also required

4    "detailed information" that was "burdensome to obtain" even though the city admitted the information

5    was largely "irrelevant." *Id.* at 1371. On top of these problems, the city also required that applicants

6    obtain "written consent" from each property owner where any sign was to be placed—a significant

7    burden "where it is desirable to employ a large number of small posters"—yet the city did not even

8    require that these written consents be produced, which suggested that the city's interests in fact would

9    be "adequately served" by a mere "statement that the applicant has the property owner's consent." *Id.* at

10   1371 n.30.

11          In contrast to the difficulties of obtaining a large number of physical signatures, the VPPA

12   simply mandates that video tape service providers wishing to disclose subscriber video-watching

13   information obtain the subscribers' informed, written consent in a standalone form; and Congress also

14   "amended the VPPA in 2012 to reflect the realities of the 21st century." *Ellis v. Cartoon Network, Inc.*,

15   803 F.3d 1251, 1253 (11th Cir. 2015) (quotation marks and citation omitted). As noted, Congress made

16   it easier for businesses to obtain consent "by clarifying that video tape service providers may obtain

17   informed, written consent of consumers on an ongoing basis via the Internet." *Id.* Patreon does not

18   claim that it is difficult to obtain consent from consumers through the internet. Nor could it, as Patreon

19   previously argued that Plaintiffs consented to the disclosure of their viewing habits (albeit not in the

20   form the VPPA mandates) by agreeing to its terms of use and privacy policy online. Dkt. 21 at 11. The

21   VPPA's consent option is not onerous.

22          ***Fifth and sixth***, Patreon argues that the VPPA is overbroad because it prohibits the disclosure

23   of private video-viewing history even if a consumer may have disclosed it to others and regardless of

24   whether the disclosure is harmful to a privacy interest. Mot. at 13-14. The Supreme Court has rejected

25   as a "cramped notion of personal privacy" the idea that because private information has been disclosed

26   to the public, a plaintiff no longer has any privacy interest in the information. *Reps. Comm.*, 489 U.S. at

27   763. This is because "both the common law and the literal understandings of privacy encompass the

28   individual's control of information concerning his or her person." 489 U.S. at 763 & n.15. As another

17

court explained when rejecting a similar argument with respect to the Fair Credit Reporting Act, "the mere fact that an individual piece of information may be found in a public record does not mean that it should receive widespread publicity if it does not involve a matter of public concern." *King*, 903 F. Supp. 2d at 311 (citing *Reps. Comm.*, 489 U.S. at 763 n.15.). So even when consumers share what they watched with others on social media, the VPPA still protects an important privacy interest by ensuring that the consumers maintain an ability to control that information and limit its dissemination. *See Eichenberger*, 876 F.3d at 983 (the VPPA "also protects privacy interests more generally by ensuring that consumers retain control over their personal information"); *Mollett*, 795 F.3d at 1065–66 (same).

Patreon fails to cite a single case that supports its contention that "the First Amendment does not permit liability" here. Mot. at 13. In the cases it primarily relies on, courts invalidated laws prohibiting the press from reporting truthful information regarding matters of public concern. For instance, *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989) involved a law aimed at prohibiting the press from publishing the names of victims of sexual assault—a matter of public importance. In striking down the law, the Supreme Court stressed the importance of the "free press" emphasizing that "[w]e have previously noted the impermissibility of categorical prohibitions upon media access where important First Amendment interests are at stake[.]" *Id.* at 539-40; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 496 (1975) ("Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it."); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 837 (1978) ("The narrow and limited question presented, then, is whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission.").[3] Unlike the newsworthy information at issue in those cases, what movies a private citizen watched is not of legitimate interest to the public.

---

[3] In *Florida Star*, the Supreme Court made clear that it was concerned with the law's impact on the free press: "[T]his case is appropriately analyzed with reference to such a limited First Amendment principle. It is the one, in fact, which we articulated in *Daily Mail* in our synthesis of prior cases involving attempts to punish truthful publication: '[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.'" 491 U.S. at 533 (quoting *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979) (alteration in original)).

*See DVD Copy Control Assn., Inc. v. Bunner*, 31 Cal. 4th 864, 885 n.7 (2003) ("[T]hose cases where the United States Supreme Court found unconstitutional statutes or injunctions prohibiting or penalizing the disclosure of confidential information lawfully obtained and substantially related to a matter of public significance are inapposite."). Patreon is not a media organization and the VPPA does not threaten the free press like the statutes struck down in Patreon's cited authorities. *See Brooks*, 2021 WL 3621837, at *9 ("All the other cases cited by Thomson Reuters to suggest that there is no privacy right in speech derived from public records are similarly inapposite because they involve *journalists* disclosing publicly available information to the *general public*.") (emphasis in original); *see also Trans Union II*, 267 F.3d at 1141 (rejecting reliance on cases such as *Florida Star* because they concern "speech on matters of public concern"). Even if the VPPA were applied to a media organization, it is a law of general applicability that does not target the press. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991); *cf.* Dkt. 49-1 at 11 (the Government noting that the VPPA "does not apply to news organizations . . . .").

Patreon's citation to a decision from the Eighth Circuit again misses the mark. *See Coplin*, 111 F.3d at 1398-1401. In that case, the host of a local public access television channel brought civil rights claims against a local city council and television committee after being punished for hosting a call-in program on the channel discussing the sexual habits of local residents. *Coplin* does not set the relevant standard here. Unlike the VPPA, which regulates commercial speech regarding purely private matters, *Coplin* involved retaliation against the plaintiff because of disagreement with the sexually focused content of his public television program. *Id.* at 1401-03. Even if *Coplin* applied, the VPPA still would pass muster because: (1) it does not discriminate based on viewpoint, *see supra* at IV.A.2.iii, (2) consumers' private video-watching habits are not in the public domain, (3) personal video-watching preferences are not a legitimate subject of public interest, and (4) the disclosure of these video-watching habits may be highly offensive. *Id.* at 1405. As to the fourth factor, Patreon makes the fact-intensive claim that the disclosure of video-watching habits is not highly offensive. Mot. at 13-14. It not only fails to cite any authority, but by enacting the VPPA, Congress has indicated otherwise. In enacting a law to safeguard a specific aspect of personal privacy, Congress believed that consumers would strongly object to the release of such information noting, among other things, that the Supreme

19

Court has recognized privacy rights and "an individual's choice of books and films is a second pillar of intellectual freedom under the first amendment." S. Rep. 100–599, at 4 (citing *Stanley v. Georgia*, 394 U.S. 557, 565 (1969)). The VPPA "attempts to give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" and Patreon's dismissive attitude towards its subscribers' privacy rights does not mean an average person would not find such a disclosure of their viewing habits highly offensive. *Id.* at 6. That is a question of fact in any event.

**Seventh**, Patreon further claims that the VPPA's chilling effect is "exacerbated" by its statutory damages provision because such damages can be awarded even "for speech that causes no actual injury." Mot. at 14. Patreon's own cases undermine its argument. In *Perry v. Cable News Network, Inc.*, the Eleventh Circuit explained that a VPPA claim is similar to the traditional common law tort of intrusion upon seclusion, and at common law, "'[t]he *intrusion itself* makes the defendant subject to liability, even though there is no publication or other use,' meaning a showing of additional harm is not necessary to create liability." 854 F.3d 1336, 1341 (11th Cir. 2017) (quoting Restatement (Second) of Torts § 652B cmt. b) (emphasis in original). In *Eichenberger*, the Ninth Circuit similarly recognized that "[t]he VPPA does not protect only against harms such as embarrassment and harassment—as Defendant argues. Rather, the statute also protects privacy interests more generally by ensuring that consumers retain control over their personal information" and "[a]ccordingly, *every* disclosure of an individual's 'personally identifiable information' and video-viewing history offends the interests that the statute protects." 876 F.3d at 983 (emphasis in original); *see also Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 491 (9th Cir. 2019). Patreon is therefore wrong when it asserts that the VPPA punishes "inconsequential disclosures" that cause no harm. Mot. at 14-15. The statute is consistent with the common law recognition that a defendant may be liable for disclosing private facts because the disclosure itself may constitute the injury-producing violation. *Perry*, 854 F.3d at 1341.

Patreon's position that the First Amendment does not permit the imposition of monetary damages in this case also lacks support. Mot. at 14. Patreon cites *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), but *Gertz* and other similar cases are inapposite—they "rested primarily on the conviction that the common law of libel gave insufficient protection to the First Amendment guarantees of freedom of speech and freedom of press and that to avoid self-censorship it was essential that liability

for damages be conditioned on the specified showing of culpable conduct by those who publish

damaging falsehood." *Herbert v. Lando*, 441 U.S. 153, 159 (1979). Regardless, the Supreme Court later

*upheld* the recovery of presumed and punitive damages where the offending speech implicated only

private matters. *See Dun & Bradstreet*, 472 U.S. at 763 ("[P]ermitting recovery of presumed and

punitive damages in defamation cases . . . does not violate the First Amendment when the . . .

statements do not involve matters of public concern."). Plaintiffs' video-watching habits are not matters

of public concern and, as Patreon acknowledges, the Supreme Court did not decide—much less hold—

in *Florida Star* that imposing statutory damages for publication of certain information violates the First

Amendment. *Cf. McCall L. Firm, PLLC v. Crystal Queen, Inc.*, 335 F. Supp. 3d 1124, 1135 (E.D. Ark.

2018) (rejecting argument that the TCPA's damages provision chilled speech and violated the First

Amendment); *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1092 n.10 (W.D. Tex. 2000).[4]

Patreon's inability to offer anything more than remote hypotheticals shows "there is no realistic

danger" that this statute aimed at protecting consumer privacy could "significantly compromise

recognized First Amendment protection[.]" *Klein v. San Diego Cty.*, 463 F.3d 1029, 1038 (9th Cir.

2006) (quotation marks and citation omitted); *see United States v. Williams*, 553 U.S. 285, 303 (2008)

("In the vast majority of its applications, this statute raises no constitutional problems whatever.");

*Marquez-Reyes v. Garland*, 36 F.4th 1195, 1207 (9th Cir. 2022) ("[T]o the extent the statute may reach

some protected speech, it is not substantially overbroad relative to its legitimate sweep.").

For these reasons, the VPPA is not facially overbroad.

### 3.   The VPPA is Subject to—And Meets—Intermediate Scrutiny.

Because the VPPA limits only commercial speech, it is subject to intermediate rather than strict

scrutiny. Laws regulating commercial speech are not subject to strict scrutiny even if they are content

---

[4] The VPPA is not like a Florida law restricting the ability of social media companies to moderate content on their platforms that was challenged in *NetChoice, LLC v. Attorney General, Florida*, 34 F.4th 1196 (11th Cir. 2022). That law aimed to punish social media platforms for their editorial decisions in removing user posts even though they routinely remove "millions of posts per day" and the "law provides for up to $100,000 in statutory damages per claim and pegs liability to vague terms like 'thorough' and 'precise'", meaning a social media company would be potentially liable for billions of dollars if "it didn't provide sufficiently 'thorough' explanations when removing posts." *Id.* at 1230-31. The VPPA provides for $2,500 in statutory damages and Patreon does not assert it is unconstitutionally vague.

or speaker-based. *See* Mot. at 8; *see also Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 846 (9th Cir. 2017) (rejecting argument that "content-or speaker-based regulations of commercial speech" are subject to heightened constitutional scrutiny) (en banc); *United States v. Swisher*, 811 F.3d 299, 313 (9th Cir. 2016) (en banc).[5] As Patreon does not argue that the VPPA fails intermediate scrutiny, its constitutional challenge should be rejected on this basis alone. And, even if the Court considers such an argument *sua sponte*, the VPPA survives because it: (1) furthers a substantial government interest in protecting consumer privacy, (2) directly advances that interest, and (3) its restrictions reach no further than necessary to accomplish the objective. *Central Hudson*, 447 U.S. at 564; *see Contest Promotions, LLC v. City & Cty. of San Francisco*, 874 F.3d 597, 601 (9th Cir. 2017) ("[A] law need not deal perfectly and fully with an identified problem to survive intermediate scrutiny.").

As discussed above, the VPPA's targeted restrictions on speech seek to protect and defend the privacy and liberty interests of consumers. S. Rep. No. 100–599 at 2–4. The Supreme Court has recognized the government's substantial interest in the protection of personal privacy. *See Whalen*, 429 U.S. at 606 (Brennan, J., concurring) ("The Court recognizes that an individual's 'interest in avoiding disclosure of personal matters' is an aspect of the right of privacy[.]"); *Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. at 2348 (noting "Congress's continuing interest in protecting consumer privacy"); *see also, e.g.*, *Hearst*, 192 F. Supp. 3d at 448 (finding the state has substantial interest in protecting consumer privacy); *Advance Mag.*, 210 F. Supp. 3d at 599 (same). The VPPA directly and materially advances this governmental interest: "The statute brings within its ambit the individuals who sell those goods, restricting the reasons for which they can disclose the identifying information they collect about their customers. Preventing the disclosure of consumer data to third parties by sellers—those most likely to possess and collect that information—reduces the likelihood of consumers' private details becoming public." *Hearst*, 192 F. Supp. 3d at 449; *see also* S. Rep. 100–599.

---

[5] To the extent Patreon is suggesting that under *Sorrell v. IMS Health Inc*., 564 U.S. 552 (2011), the Court should apply heightened scrutiny to commercial speech (Mot. at 8), the Ninth Circuit rejected that argument in *Retail Digital*, 861 F.3d at 846-50. Also, unlike here, the record in *Sorrell* showed that the statute was enacted because the State of Vermont disagreed with the message conveyed by specific group of speakers. *See Hearst*, 192 F. Supp. 3d at 449-50; *King*, 903 F. Supp. 2d at 308-09; Dkt. 31 at p. 30 of 34 (Plaintiffs' prior brief distinguishing *Sorrell*).

22

The VPPA reaches no further than necessary to accomplish this objective, limiting disclosure of the type of private information that Congress determined should be protected, and nothing else. Like Michigan's VRPA, the VPPA "advances the [government]'s goals without unduly burdening Defendant's ability to engage in commerce." *Hearst*, 192 F. Supp. 3d at 449; *Advance Mag.*, 210 F. Supp. 3d at 602. The possibility of an alternative consent regime that Congress did not adopt is not grounds for invalidation. *See Hearst*, 192 F. Supp. 3d at 450-51 ("The VRPA is sufficiently tailored to meet the state's goals without intolerably burdening Defendant's speech."). Confirming that the statute is sufficiently narrow, a defendant cannot be held liable under the VPPA unless it had knowledge of its relevant actions. *See Dahlstrom*, 777 F.3d at 955 (the DPPA's scienter requirement, which "provide[s] fair warning to potential offenders", was a factor in the statute withstanding intermediate scrutiny).

### 4.    Even if Strict Scrutiny Were to Apply, the VPPA Would Survive.

Although the VPPA is not subject to strict scrutiny, it still meets that more exacting standard because it is "narrowly tailored to further a compelling government interest." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Narrowly tailored" does not require that a statute be "perfectly tailored." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015). The VPPA applies to the entities most likely to have information about consumers' video-watching preferences. *Id.* at 449 (law is narrowly tailored where its prohibition "aims squarely at the conduct most likely" to cause the harm the law was intended to guard against); *cf. Hearst*, 192 F. Supp. 3d at 450. The VPPA exempts disclosures made with permission, and disclosures that violate its provisions invade consumers' privacy rights even absent "embarrassment." Mot. at 4, 20. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2209-11 (2021) (class members whose credit reports were disseminated to a third party had Article III standing to recover out of verdict based on traditional privacy principles); *Eichenberger*, 876 F.3d at 983 (every violation of the VPPA gives rise to the type of harm Congress sought to prevent).

### B.    Plaintiffs' Deceptive Trade Practices Claims Are Adequately Alleged.

The Court upheld Plaintiffs' claims under the UCL's "fraud" prong and the CLRA based on Patreon's misleading incomplete disclosures regarding its data sharing and privacy practices, finding that Patreon's website and documents, including its Privacy Policy, may not sufficiently disclose to its users that it uses the Pixel and shares personal information and video content choices with Meta. Dkt.

23

40 at 16-17. The Court thus held that "Plaintiffs may proceed on a theory that Patreon's disclosure of limited data sharing gave rise to a duty to disclose any further data sharing beyond that scope, including its use of the Pixel." *Id.* at 17. Though Patreon renews its challenge to these claims, it fails to provide the Court any reason to revisit its decision.

Patreon first argues that the allegations regarding its misleading disclosures do not meet the requirements of Rule 9(b). Mot. at 17-18. "The purpose of Rule 9(b) is to require that a plaintiff's allegations be specific enough to give defendants notice of the particular misconduct which is alleged . . . so that they can defend against the charge[.]" *Warren v. Whole Foods Mkt. Cal., Inc.*, 2022 WL 2644103, at *3 (N.D. Cal. July 8, 2022) (quotation marks and citation omitted). Plaintiffs allege that Patreon's website, including its Terms of Use, Privacy Policy, Data Practices, and Cookie Policy do not adequately inform users that Patreon shares their personal information and video content with Meta and that it had a duty to disclose this true fact because it made misleading partial representations regarding its privacy and data sharing practices. ¶¶ 64, 104-07. Patreon's insistence that it has not received sufficient notice to defend itself under Rule 9(b) is implausible when Patreon itself attached the very documents underlying Plaintiffs' claims to its request for judicial notice in support of its previous motion to dismiss. Dkt. 23. As the Court noted, "the documents Patreon offers for judicial notice provide additional context" for Plaintiffs' allegations as they do not clearly disclose Patreon's relationship and data sharing practices with Meta. Dkt. 40 at 17. That Patreon does not ask the Court to take judicial notice of the same documents for purposes of its second motion does not change the fact that Plaintiffs have identified the relevant documents underlying their claims, the Court assessed the relevant documents in preparing its opinion, and Patreon has possession of the documents. Therefore, Patreon has received sufficient notice and its challenge under Rule 9(b) should be rejected.

Patreon also is incorrect in contending that Plaintiffs' allegations must contain the same level of specificity as affirmative fraud claims. Mot. at 20. Plaintiffs' deception claims are "based on a theory of omission[.]" Dkt. 40 at 16. By definition, with this type of claim, "a plaintiff cannot plead a specific time or place of a failure to act." *Peel v. BrooksAmerica Mortg. Corp.*, 788 F. Supp. 2d 1149, 1160 (C.D. Cal. 2011). Instead, given the "inherent limitations" of an omissions claim, *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1096 (N.D. Cal. 2014), such a claim "can succeed without the same

24

  
level of specificity required by" a claim of affirmative fraud. *Baggett v. Hewlett-Packard Co.*, 582 F. Supp. 2d 1261, 1267 (C.D. Cal. 2007); *accord Velasco v. Chrysler Grp. LLC*, 2014 WL 4187796, at *4 (C.D. Cal. Aug. 22, 2014). Because Patreon has received adequate notice of its material omissions, this challenge comes up short. *See Olosoni v. HRB Tax Grp., Inc.*, 2020 WL 11563095, at *8 (N.D. Cal. Mar. 24, 2020) ("Defendants do not need the Plaintiffs to be able to reconstruct the exact webpages they viewed in order to put them on notice . . . Requiring Plaintiffs 'to allege the precise web pages viewed and the precise dates' they viewed them 'would be unrealistic and needlessly impede access to an important remedial statute.'") (citation omitted).

Lastly, Patreon's contention that the deception-based claims must fail because Plaintiffs did not actually see its misleading partial representations is implausible. Mot. at 20-21. Patreon itself previously argued that Plaintiffs' "claim that they did not know about, and did not consent to, the disclosure of their viewing conduct to third parties" was belied by its Terms of Use and Privacy Policy. Dkt. 21 at 11-12. It further claimed that Plaintiffs "consented in writing" to its disclosures. *Id.* at 25. Thus, in conflict with its new argument that Plaintiffs did not read them, Patreon suggested that Plaintiffs *were aware* of its disclosures. Moreover, Plaintiffs allege that if Patreon had disclosed the truth about its information sharing practices with Meta, they would have learned about it (¶ 106), thereby satisfying the elements of their claim of an incomplete, misleading disclosure. *See Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015); *see, e.g.*, *Edwards v. FCA US LLC*, 2022 WL 1814144, at *6 (N.D. Cal. June 2, 2022) (denying motion to dismiss where the plaintiff alleged, among things, where the material information could have been disclosed).

## V.   **CONCLUSION**

For the foregoing reasons, Patreon's motion should be denied. If the Court grants the motion in whole or part, Plaintiffs respectfully request leave to amend under Rule 15.


Dated: December 21, 2022                          Respectfully submitted,

                                                  /s/   *Simon Grille*
                                                  Adam E. Polk (SBN 273000)
                                                  Simon Grille (SBN 294914)
                                                  Trevor T. Tan (SBN 281045)

Kimberly Macey (SBN 342019)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
ttan@girardsharp.com
kmacey@girardsharp.com

*Attorneys for Plaintiffs*

## CERTIFICATION OF SERVICE

I hereby certify that on December 21, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered users.

/s/ *Simon Grille*
Simon Grille