UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRAYDEN STARK, et al.,

      Plaintiffs,

    v.

PATREON, INC.,

      Defendant.

Case No.  22-cv-03131-JCS

**ORDER REGARDING MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Re: Dkt. No. 48

## I.    INTRODUCTION

Plaintiffs Brayden Stark and Judd Oostyen[1] bring this putative class action against Defendant Patreon, Inc. asserting claims under the federal Video Privacy Protection Act ("VPPA") and California law based on Patreon's alleged sharing of user data with Facebook.  Patreon moves to dismiss Plaintiffs' first amended complaint on the grounds that the VPPA facially violates the First Amendment and that Plaintiffs have not met the heightened pleading standard applicable to their state law claims sounding in fraud.  The United States intervened to defendant the constitutionality of the VPPA, and the Court held a hearing on February 10, 2023.  For the reasons discussed below, Patreon's motion to dismiss the VPPA claim is DENIED without prejudice to addressing the constitutionality of that statute on a factual record.  Patreon's motion is GRANTED as to Plaintiffs' claims sounding in fraud, which are DISMISSED with leave to amend.[2]

---

[1] Kevin Black and Maryann Owens were formerly also plaintiffs in this case but have voluntarily dismissed their claims without prejudice.  Notice of Voluntary Dismissal (dkt. 50).

[2] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

## II.      BACKGROUND

### A.      Allegations of the First Amended Complaint

Because the allegations of a complaint are generally taken as true in resolving a motion to dismiss under Rule 12(b)(6), this section summarizes Plaintiffs' allegations as if true. Nothing in this order should be construed as resolving any issue of fact that might be disputed.

Patreon allows its users or members to "access a variety of content on Patreon's website, including music, podcasts, and video content posted by content creators." 1st Am. Compl. ("FAC," dkt. 41) ¶ 43. Plaintiffs assert that Patreon is therefore a "video tape service provider" as that term is defined in the VPPA "because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce." *Id.* ¶ 85.

Plaintiffs are current users of both Patreon and Facebook, the ubiquitous social network. *Id.* ¶¶ 19, 24. They pay Patreon subscription fees of around $15 and $5 respectively per month and regularly watch prerecorded video content on Patreon's website. *Id.* ¶¶ 21, 22, 26, 27. Their Facebook profiles include their "name[s] and other personal details," and they have used the same devices and browsers to access Patreon that they use to access Facebook, while logged into Facebook. *Id.* ¶¶ 23, 28.

When users view video content on Patreon's website, Patreon transmits the title of the video they are viewing, as well as the user's Facebook ID ("FID") to Meta, the company that owns Facebook, using a tracking tool created by Meta called the "Pixel." *Id.* ¶¶ 3–5, 47. An FID can be used "to quickly and easily locate, access, and view the user's corresponding Facebook profile," "which typically shows the Facebook user's name, gender, place of residence, career, educational history, a multitude of photos, and the content of the user's posts," among other information. *Id.* ¶¶ 4–5, 48 49. The Pixel "is a snippet of programming code that, once installed on a webpage, sends information to Meta," thus "allow[ing] website owners to track visitor actions on their websites for the purposes of sending the corresponding information to Meta" so that the website owners can better target their products and advertising towards users and Meta can compile more comprehensive profiles of its users. *Id.* ¶¶ 51–61.

Plaintiffs assert that they did not know of or authorize Patreon sharing their video usage information with Meta, *id.* ¶ 63, and that the "Terms of Use, . . . Privacy Policy, Data Practices, and . . . Cookie Policy" included on Patreon's website do not inform users "of Patreon's use of the Meta Pixel or its practice of sharing Users' personal information and video content choices with Meta in a way that allows Meta to identify their specific video-watching preferences," *id.* ¶ 64. In any event, Patreon never obtained a standalone agreement from users to share that information as required by the VPPA. *Id.* ¶ 65.

Plaintiffs contend that Patreon profited from this conduct and that Plaintiffs and other putative class members suffered harm in that Patreon shared data that users expected would be kept private, users lost the potential to obtain any value for that data themselves, and users paid greater subscription fees to Patreon than they would have if they had known how Patreon was sharing their data. *Id.* ¶¶ 66–72.

Plaintiffs assert the following claims: (1) violation of the VPPA, *id.* ¶¶ 83–93; (2) violation of the "unlawful," "unfair," and "fraudulent" prongs of California's Unfair Competition Law (the "UCL"), *id.* ¶¶ 94–109; (3) violation of California's Consumers Legal Remedies Act (the "CLRA"), *id.* ¶¶ 110–19; and (4) unjust enrichment, *id.* ¶¶ 120–25.

The Court previously granted a motion to dismiss some of Plaintiffs' claims for failure to allege that the videos at issue were prerecorded, a defect that Plaintiffs have remedied in their amended complaint. *See generally* Order Re Mot. to Dismiss ("1st MTD Order," dkt. 40).[3] That previous order declined to reach Patreon's constitutional challenge to the VPPA. *Id.* at 14.

### B.   Request for Judicial Notice

In conjunction with its previous motion to dismiss, Patreon requested that the Court take judicial notice of the various versions of its terms of use, privacy policy, and cookie policy that were in effect during the period at issue, arguing that Plaintiffs' complaint incorporated those documents by reference. *See generally* Request for Judicial Notice ("RJN," dkt. 23).[4] The terms

---

[3] *Stark v. Patreon, Inc.*, No. 22-cv-03131-JCS, 2022 WL 7652166, at *1 (N.D. Cal. Oct. 13, 2022). Citations herein to this previous order refer to page numbers of the version filed in the Court's ECF docket.

[4] The request for judicial notice attaches a declaration by a Patreon in-house attorney as Exhibit A,

United States District Court
Northern District of California

of use describe Patreon's business as connecting individual "creators" with fans, who pay membership fees to the creators for access to content and merchandise that the creators provide through Patreon's website, with Patreon taking a cut of those membership fees in return for providing its platform and payment processing. *See, e.g.*, RJN Ex. 1 at 1, 3–6. The privacy policy states that users provide personal information including their names and email addresses, *e.g.*, RJN Ex. 5 at 2, that Patreon automatically collects information as users navigate the site and through third-party analytics, including information about the pages users visit and how they interact with the website, *id.* at 5, and that Patreon shares user data with, among other recipients, its "service providers," including companies Patreon contracts with for "analysing [sic] data trends" and "increasing [Patreon's] brand awareness and user engagement with marketing initiatives," *id.* at 11. The privacy policy notes that the service providers with which Patreon shares data "are obligated by contract to safeguard any of your data they receive from [Patreon] to the same extent that Patreon protects it." *Id.* at 12.

The Court previously found those documents subject to judicial notice for the purpose of showing what Patreon disclosed to its users, but held that at the pleading stage, they could not be used to contradict Plaintiffs' allegations regarding how Patreon operates its business. 1st MTD Order at 8–9.

### C.     The Parties' Arguments

#### 1.     Patreon's Arguments

Patreon contends that the VPPA violates the First Amendment by imposing a content-based restriction on speech without sufficiently compelling reason. *See* Mot. (dkt. 48) at 4–5. It contends that a substantial number of the VPPA's potential applications are unconstitutional, rendering the statute subject to facial invalidation. *Id.* at 5–6. (Unlike Patreon's previous motion, the present motion does not include an as-applied challenge.) Patreon argues that the VPPA is content-based because it applies only to "speech that discloses a particular consumer's video-viewing history," and that its limitation to certain speakers—video service providers—also

---

which in turn attaches the agreements and policies at issue as Exhibits 1 through 11. For simplicity, this order cites those documents as exhibits to the request for judicial notice.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  warrants heightened scrutiny. *Id.* at 7–8. Patreon contends that the VPPA is not entitled to

2  reduced scrutiny as a regulation of "commercial speech" because the speech at issue does not

3  propose a commercial transaction. *Id.* at 8–9. Even if the disclosure at issue in this case were

4  deemed commercial, Patreon offers a number of examples of speech that could be regulated by the

5  VPPA in less commercial contexts, and argues that the statute is unconstitutional based on its

6  overbreadth. *Id.* at 10–12. Patreon also argues that the statute's prohibition of sharing

7  information even with a consumer's consent (if not provided in the specific form required by the

8  statute) and even if the information had separately been made public is impermissible, that it is not

9  limited to information that is actually sensitive, and that its liquidated damages provision is

10  unconstitutional with respect to truthful speech that causes no actual harm. *Id.* at 12–15.

11       According to Patreon, the VPPA is not narrowly tailored to serve any compelling interest,

12  and it also arbitrarily excludes other speech that would presumably implicate the same interests it

13  is intended to serve, like disclosure of consumer information by libraries or bookstores. *Id.* at 15–

14  17. Patreon acknowledges "a substantial governmental interest in protecting consumer privacy,"

15  and concedes for the purpose of its present motion that this interest is "compelling," but argues

16  that the VPPA nevertheless violates the First Amendment in that it is not sufficiently tailored to

17  further that interest. *Id.* at 15.

18       Patreon also contends that Plaintiffs have not satisfied the heightened pleading standard for

19  claims sounding in fraud with respect to their claims under the CLRA and the fraud prong of the

20  UCL, because they do not allege that they actually reviewed any purportedly misleading

21  statements giving rise to a duty to disclose Patreon's use of the Pixel (thus failing to sufficiently

22  allege causation), and because they have not specifically identified any such statements. *Id.* at 17–

23  21.

24       Patreon's reply reiterates arguments raised in its motion, responds to some of Plaintiffs'

25  and the United States' arguments addressed below, and cites for the first time several cases

26  applying the VPPA in contexts other than corporate data sharing. *See generally* Reply (dkt. 54).

27              **2.       The United States' Arguments**

28       The United States intervened in this case to defend the constitutionality of the VPPA

1    pursuant to 28 U.S.C. §§ 517 and 2403(a) and Rules 5.1(c) and 24(a)(1) of the Federal Rules of

2    Civil Procedure.  Notice of Intervention (dkt. 49).

3            It argues that although the VPPA has not previously been subject to a constitutional

4    challenge, three decisions from the Southern District of New York upholding an analogous

5    Michigan statute are persuasive authority that the VPPA does not violate the First Amendment.

6    U.S. Br. (dkt. 49-1) at 3–5.  The United States also contends that the VPPA primarily regulates

7    commercial speech, which is not subject to overbreadth analysis, and that it withstands the

8    intermediate scrutiny applicable to such speech.  *Id.* at 8–17.  The United States disagrees with

9    Patreon's view that commercial speech is limited to speech that proposes a transaction.  *Id.* at 13.

10   In the United States' view, Patreon's examples of less commercial contexts where the VPPA could

11   apply are improbable or unlikely to occur with significant frequency in relation to its regulation of

12   more clearly commercial speech, and that its consent requirement is not a substantial burden.  *Id.*

13   at 17–20.

14           The United States' brief does not address whether the VPPA would survive strict scrutiny.

15   *See generally id.*

16                   **3.      Plaintiffs' Arguments**

17           Plaintiffs argue that the VPPA protects private information and privacy interests that courts

18   have recognized as constitutionally significant, and that the speech it restricts does not implicate

19   matters of public concern.  Opp'n (dkt. 51) at 5–6, 10–12.  Like the United States, they contend

20   that it restricts only commercial speech based on a broader definition of such speech than that

21   propounded by Patreon, and that Patreon's examples of the VPPA regulating less clearly

22   commercial speech are implausible and unlikely to arise often.  *Id.* 7–10, 13–16.  Plaintiffs also

23   argue that the statute is content-neutral because it does not discriminate by viewpoint or turn on

24   whether the government agrees or disagrees with a speaker's message.  *Id.* at 12–13.  They

25   contend that the statute is not impermissibly underinclusive, that its consent requirement is not

26   unduly burdensome, that its damages provision is permissible, and that even where consumers

27   may have disclosed the same information in a particular context or forum, they do not lose their

28   privacy interest in preventing further disclosure by others.  *Id.* at 16–18, 20–21.  Plaintiffs

United States District Court
Northern District of California

6

distinguish cases cited by Patreon that regulated media organizations or implicated more sensitive information. *Id.* at 18–20.  Plaintiffs argue that the VPPA is subject to and survives intermediate scrutiny. *Id.* at 21–23.  In a short paragraph, they argue that it would also survive strict scrutiny. *Id.* at 23.

Plaintiffs contend that they have sufficiently alleged their CLRA and UCL claims. *Id.* at 23–25.

## III.    ANALYSIS

### A.    Legal Standard

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).   Generally, a plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil Procedure states that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  In ruling on a motion under Rule 12(c), the Court must accept all factual allegations in the complaint as true and view them in the light most favorable to the non-moving party. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

Dismissal at the pleading stage may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead

1  sufficient factual allegations to "allow[] the court to draw the reasonable inference that the

2  defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

3      Claims sounding in fraud are subject to a heightened pleading standard under Rule 9(b) of

4  the Federal Rules of Civil Procedure, which this order addresses separately below.

5          **B.    Constitutional Challenge**

6              **1.    The VPPA**

7      The VPPA "prohibits a 'video tape service provider' from (1) knowingly disclosing to any

8  person (2) personally identifiable information concerning any consumer of such provider (3)

9  except for certain disclosures—such as to the consumer or law enforcement [but only pursuant to a

10  court order or search warrant]—allowed under section 2710(b)(2)." *In re Hulu Priv. Litig.*, No. C

11  11-03764 LB, 2012 WL 3282960, at *4 (N.D. Cal. Aug. 10, 2012) (citing 18 U.S.C. § 2710).  The

12  statute defines a "video tape service provider" in relevant part as "any person, engaged in the

13  business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual

14  materials."  18 U.S.C. § 2710(a)(4).  It defines "personally identifiable information" as including

15  "information which identifies a person as having requested or obtained specific video materials or

16  services from a video tape service provider."  *Id.* § 2710(a)(3).

17      While a service provider may share personally identifiable information if it obtains written

18  consent from the consumer, such consent must meet strict requirements, including being "in a

19  form distinct and separate from any form setting forth other legal or financial obligations of the

20  consumer."  *Id.* § 2710(b)(2)(B).  If a service provider violates the VPPA, a consumer may bring a

21  civil action for remedies that include (but are not limited to) "actual damages but not less than

22  liquidated damages in an amount of $2,500."  *Id.* § 2710(c)(2)(A).[5]

23          The VPPA was enacted in 1988 in response to the Washington City
            Paper's publication of then-Supreme Court nominee Robert Bork's
24          video rental history. *See* S. Rep. 100-599, at 5 (1988), reprinted in
            1988 U.S.C.C.A.N. 4342-1. The paper had obtained (without Judge
25          Bork's knowledge or consent) a list of the 146 films that the Bork
            family had rented from a Washington, D.C.-area video store. *Id.*
26          Members of the Judiciary Committee "denounced the disclosure" and

27  ────────────────

28  [5] Although the VPPA is situated in Title 18 of the U.S. Code, it authorizes only private civil
    enforcement, not criminal penalties.

United States District Court
Northern District of California

> Congress acted swiftly to enact the VPPA. *Id.* According to the Senate Report on the VPPA, Congress's purpose when enacting the statute was "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.* at 1.

*Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015).[6] Similar proposed provisions governing library records were removed from the draft legislation due to disputes regarding law enforcement access. S. Rep. 100-599, at 8 (1988).

A Senate Report quotes the following statement from Senator Patrick Leahy, a cosponsor of the law:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. * * * [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. * * * I think that is wrong. I think that really is Big Brother, and I think it is something that we have to guard against.

*Id.* at 5–6 (alterations in original). Other portions of the Senate Report address similar concerns about the then-nascent threat of computerized mass data collection. *Id.* at 6–8. The only specific example of a disclosure of video rental history besides Judge Bork's experience was a report "that the attorney for a women [sic] in a child custody proceeding made an informal request for the records of every film rented by her husband in an effort to show that, based on his viewing habits, he was an unfit father." *Id.* at 6.

### 2. Restrictions on Speech

"Content-based regulations [of speech] are presumptively invalid" under the First Amendment. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Such regulations generally are subject to strict scrutiny "and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155,

---

[6] There is no indication that the films Judge Bork rented were in any way scandalous. To the contrary, he reportedly "joked about how embarrassed he [was] to have the world learn that he watches dull movies." S. Rep. 100-599, at 8.

163–64 (2015).

Courts have recognized that some categories of speech warrant lesser protection even when regulated based on their content.  "Commercial speech" is subject to a standard of "intermediate scrutiny":

> "For commercial speech to [be protected], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

*Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 844 (9th Cir. 2017) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)).

Although "[t]he traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court," the Supreme Court has treated "challenges to statutes based on First Amendment overbreadth" as the "[p]rototypical exceptions to [that] traditional rule," based on "the transcendent value to all society of constitutionally protected expression" and the risk that "persons whose expression is constitutionally protected may well refrain from exercising their right for fear of" legal consequences.  *L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 38 (1999) (cleaned up).  "There are two situations in which a facial overbreadth challenge can succeed: (1) when a party establishes that there is 'no set of circumstances under which [the statute] would be valid or that the statute lacks any plainly legitimate sweep;' and (2) where 'a substantial number of [the statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' "  *United States v. Hansen*, 25 F.4th 1103, 1106 (9th Cir.) (quoting *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)), *cert. granted*, 143 S. Ct. 555 (2022)

"[O]verbreadth analysis does not normally apply to commercial speech," in the sense that courts will not concern themselves with other commercial speech beyond the speech at issue in a given case, but a party whose own speech is commercial may still bring an overbreadth challenge based on a statute's restriction of other noncommercial speech.  *Bd. of Trustees of State Univ. of*

1    *N.Y. v. Fox* ("*SUNY*"), 492 U.S. 469, 481 (1989).

2    **3.    Caselaw Addressing the VPPA and an Analogous State Law**

3    Two appellate opinions have indicated in dicta that the VPPA does not violate the First

4    Amendment, but neither was faced with a challenge to the statute, and neither offers detailed

5    analysis as to how it would survive First Amendment scrutiny.  In *IMDb.com Inc. v. Becerra*, the

6    Ninth Circuit stated that "[a]lthough many state and federal statutes 'regulate data collection and

7    disclosure' without implicating the First Amendment, such statutes regulate the misuse of

8    information by entities that obtain that information from individuals through some exchange."

9    962 F.3d 1111, 1124 (9th Cir. 2020).  The court cited statutes including the VPPA, but no caselaw

10   for the principle that regulating any information initially obtained through an exchange implicates

11   lesser First Amendment scrutiny, *see id.*, and neither Plaintiffs nor the United States have

12   articulated any argument here as to why that would be so.  In *Boehner v. McDermott*, the D.C.

13   Circuit stated in a footnote that the "government can also limit disclosures by persons who are not

14   its employees without running afoul of the First Amendment," citing the VPPA and the principle

15   that attorneys can be punished for disclosing clients' confidences, but offered no analysis as to

16   why the First Amendment permits such regulation.  484 F.3d 573, 578 (D.C. Cir. 2007).  This

17   Court does not construe *IMDb* as binding precedent on the constitutionality of a statute not

18   challenged in the case before that court, and does not consider either opinion persuasive as to this

19   issue that they addressed only in passing.

20   Three district court decisions, all from the Southern District of New York, have held that a

21   Michigan statute similar to the VPPA survived First Amendment scrutiny.  The Michigan

22   Preservation of Personal Privacy Act ("MPPPA"), Mich. Compl. Laws § 445.1711,[7] largely

23   parallels the VPPA but also governs written materials and sound recordings.  *Boelter v. Hearst*

24   *Commc'ns, Inc.* ("*Hearst I*"), 192 F. Supp. 3d 427, 435 (S.D.N.Y. 2016).  Plaintiffs and the United

25   States rely on these cases to argue that the VPPA similarly does not violate the First Amendment.

26

27   ───────────────

28   [7] This law is also known as the Video Rental Privacy Act or VRPA.  *See Boelter v. Advance Mag.*
     *Publishers Inc.*, 210 F. Supp. 3d 579, 586 n.3 (S.D.N.Y. 2016) (discussing the terminology used
     by different courts).

United States District Court
Northern District of California

*See* U.S. Br. at 3–5, 10, 13, 15, 17, 18; Opp'n at 5, 6, 7, 8, 9, 14–15, 22–23.  Patreon does not

address these cases in either its motion or its reply.  *See generally* Mot.; Reply.  The Court is not

aware of any decisions addressing First Amendment challenges to the VPPA itself or to any

similar state law besides the MPPPA.

In the first of the cases challenging the MPPPA, *Hearst I*, magazine subscribers sued a

publisher that allegedly disclosed information about them to third parties, either for those third

parties' own commercial purposes or to build more complete profiles of the subscribers for the

publisher's commercial purposes.  192 F. Supp. 3d at 435.  The Southern District of New York

held that the MPPPA regulated commercial speech because it "restricts the sellers of certain

products from disclosing the identity of individuals who purchase those products," through speech

that "is 'solely related to the economic interests of the speaker and the audience.' "  *Id.* at 445

(quoting *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010)).[8]  The court noted that

the speech at issue described "individual's economic decisions" for the purpose of identifying

their "economic preferences, and facilitat[ing] the proposal of new commercial transactions on the

part of third parties," and that "businesses' increasing ability to profit from the collection and sale

of data supports the conclusion that disclosing consumer information is—primarily, if not

entirely—an economic act."  *Id.* (cleaned up).  The court held that the potential for customer

information to be "used for non-economic purposes," like "reporting the reading habits of political

candidates," did "not dilute the speech's commercial character," *id.* at 445–46, and even if the law

were applied, say, to "a newsstand merchant confirming the identity of celebrity customer to the

customer behind her in line" or "a publisher . . . printing an article identifying a political candidate

as one of its subscribers," that is "precisely what the law was designed to do," and constitutes a

valid regulation of commercial speech that, " 'in the vast majority of [the statute's] applications,

. . . raises no constitutional problems whatsoever.' "  *Id.* at 451–52 (quoting *United States v.*

[8] The *Hearst I* court slightly misquotes *Connecticut Bar Association* by reversing the order of the words "solely" and "related," and by substituting the word "the" for "its."  *See Conn. Bar Ass'n*, 620 F.3d at 94 (quoting the Supreme Court's decision in *Central Hudson* for the standard of "expression related solely to the economic interests of the speaker and its audience").  Those errors are not material.

United States District Court
Northern District of California

*Williams*, 553 U.S. 285, 3003 (2008)) (bracketed alteration in original).[9]  Finding the law justified by a "substantial state interest" in consumer privacy, the *Hearst I* court therefore rejected both facial and as-applied First Amendment challenges to the MPPPA.  *Id.* at 447–52.  In a footnote, the *Hearst I* court appears to accept that the MPPPA imposes a content-based restriction, but holds that it is nevertheless subject to reduced scrutiny because it regulates commercial speech.  *Id.* at 447 n.10.

The next case, *Boelter v. Advance Magazine Publishers Inc.*, concerned essentially the same fact pattern with a different magazine publisher, Condé Nast, as the defendant.  210 F. Supp. 3d 579, 584 (S.D.N.Y. 2016).  That decision quoted legislative history indicating that the MPPPA was motivated by the same concerns arising from the disclosure of Judge Bork's video rental history that led to passage of the VPPA.  *Id.* at 586.  "[N]oting the recent passage of the VPPA, the analysis states that '[m]any in Michigan also believe that one's choice in videos, records, and books is nobody's business but one's own, and suggest the enactment of a statute to explicitly protect a consumer's privacy in buying and borrowing such items.' "  *Id.* (quoting a House Legislative Analysis document from the Michigan legislature).  The court found *Hearst I*'s analysis persuasive with respect to the plaintiff's as-applied challenge, and held that "even if Condé Nast's disclosures here 'do not fit within the "core" of commercial speech,' the combination of the transactional context, the conveyance of 'strictly private affairs,' and the motivations of both speaker and audience lead [to the conclusion] that the speech should still be afforded reduced constitutional protection."  *Id.* at 598 (quoting *Hearst I*, 192 F. Supp. 3d at 446).  As in *Hearst I*, the *Advance Magazine* court rejected an argument that regulations of even commercial speech are subject to strict scrutiny if they are content-based, and therefore did not clearly decide whether the MPPPA imposed a content-based restriction.  *Id.* at 598 n.15.  The court held that regulation of the commercial speech at issue survived intermediate scrutiny under *Central Hudson*.  *Id.* at 598–602.

Turning to the plaintiff's facial overbreadth challenge, the *Advance Magazine* court noted a

---

[9] The *Hearst I* court slightly misquotes *Williams* by replacing the word "whatever" with "whatsoever."  That error is not material.

1    hypothetical example raised by the defendant where, if multiple news outlets accurately reported

2    that a political figure read a particular newspaper, the MPPPA could prohibit that newspaper from

3    reporting the same story.  *Id.* at 602.  The court acknowledged that the Supreme Court has

4    expressed concern about whether the First Amendment permits restrictions on newspapers

5    publishing truthful information, but taking into account precedent cautioning against sweeping

6    rulings in cases that balance free speech against privacy, declined to resolve the facial challenge

7    on the pleadings.  *Id.* at 602–03.  Since the lack of a factual record available on Condé Nast's

8    motion to dismiss prevented the court from comparing the MPPPA's "legitimate sweep . . . to any

9    conceivable impermissible applications" and from "weigh[ing] the interests of such hypothetical

10   publishers against the privacy interests the [M]PPPA serves," the court concluded that the facial

11   challenge was "premature."  *Id.* at 603.

12       In the third and final decision addressing First Amendment challenges to the MPPPA, the

13   *Hearst* court reaffirmed on summary judgment its determination that the statute was not

14   unconstitutional as applied because it satisfied the *Central Hudson* test for restrictions of

15   commercial speech.  *Boelter v. Hearst Commc'ns, Inc.* ("*Hearst II*"), 269 F. Supp. 3d 172, 197–98

16   (S.D.N.Y. 2017).  Among other relevant considerations, the court construed the statute as not

17   restricting "disclosures to a person's employees or agents."  *Id.* at 198; *see id.* at 191–95.  The

18   defendant in that case does not appear to have reasserted a facial challenge or any argument that

19   the speech at issue was noncommercial.  *See id.* at 197–98.

20                    **4.    The VPPA Is a Content-Based Restriction**

21       The parties dispute whether the VPPA's regulation of speech is content-based or content-

22   neutral.  Mot. at 7–8; Opp'n at 12–13.[10]  Plaintiffs are correct that some decisions have framed the

23   "principal inquiry" in assessing that distinction as " 'whether the government has adopted a

24   regulation of speech because of [agreement or] disagreement with the message it

25   conveys.' "  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (quoting *Ward v. Rock*

26   *Against Racism,* 491 U.S. 781, 791 (1989)) (alteration in original); *see* Opp'n at 12.  But more

27

28   ──────────────

[10] The United States' brief does not address whether the VPPA is a content-based restriction.

United States District Court
Northern District of California

recent Supreme Court authority has clarified that while the question of agreement or disagreement is relevant to assessing whether "a facially content-*neutral*" law was *motivated* by the content of the regulated speech, a "law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 165–67 (2015).

> Thus, a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter. For example, a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed.

*Id.* at 169 (cleaned up).

Recent Ninth Circuit authority has accordingly looked to whether a statute " 'singles out particular content for differential treatment,' " without necessarily requiring a distinction based on viewpoint or agreement with a message. *IMDb*, 962 F.3d at 1120 (quoting *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc)). In *IMDb*, the Ninth Circuit held that a law regulating the disclosure of entertainment professionals' "date of birth or age information" facially "restricts speech because of its content." *Id.* at 1120. The same is true here. The VPPA governs only the disclosure of "personally identifiable information concerning any consumer" of a video tape service provider; it does not govern any other content the provider might wish to communicate. 18 U.S.C. § 2710(b)(1). Plaintiffs do not attempt to square their view that this is not a content-based restriction with the Ninth Circuit's decision in *IMDb*. *See* Opp'n at 12–13.

A Seventh Circuit case cited in Plaintiffs' opposition brief, *Dahlstrom v. Sun-Times Media, LLC*, held that a restriction on publishing "personal information that has been obtained from motor vehicle records" was content-neutral because it was based on " 'the source, rather than the subject matter' " of the information, and was "agnostic to the dissemination of the very same information acquired from a lawful source." 777 F.3d 937, 949 (7th Cir. 2015) (quoting *Bartnicki*, 532 U.S. at 526). In contrast, the VPPA restricts a video service provider's disclosure of particular content, with no reference to where the video service provider obtained that content. *Dahlstrom* recites older authority treating viewpoint discrimination as the touchstone of whether a regulation of

United States District Court
Northern District of California

speech is based on content, *see id.* at 950 (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012)), but that distinction was not necessary to its holding, and *Dahlstrom* predated the Supreme Court's clarification of the standard for facially content-based restrictions in *Reed*.

Just as a law regulating disclosure of the age of entertainment professionals was content-based in *IMDb*, the VPPA's regulation of video service providers disclosing consumers' personal information—as opposed to any other information—is content-based here.

### 5. Patreon's Alleged Disclosure Is Commercial Speech

Even where a restriction is content-based, it is subject to lesser scrutiny when the speech at issue falls within "select categories of speech" including commercial speech. *IMDb*, 962 F.3d at 1121. Some Supreme Court and Ninth Circuit decisions have defined "commercial speech" as speech that " 'does no more than propose a commercial transaction.' " *Id.* at 1222 (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)); *SUNY*, 492 U.S. at 73–74; *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 & n.6. Patreon rests on that definition to argue that its own alleged disclosure of Plaintiffs' information to Meta was not "commercial speech." Mot. at 8–9. But as Plaintiffs and the United States note, other equally binding authority from the Ninth Circuit (along with persuasive authority from other circuits) has held that the "commercial transaction" test merely describes the "core" of the commercial speech doctrine, and serves as a "starting point" for identifying commercial speech. *See* Opp'n at 7–10; U.S. Br. at 12–14.

In *Ariix, LLC v. NutriSearch Corporation*, the Ninth Circuit held that while "[c]ommercial speech is *usually* defined as speech that does no more than propose a commercial transaction . . . [c]ourts view this definition as just a starting point, . . . and instead try to give effect to a common-sense distinction between commercial speech and other varieties of speech" through "analysis [that] is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Ariix*, 985 F.3d 1107, 1115 (9th Cir. 2021) (cleaned up) (emphasis added). Courts use the "*Bolger* factors" as part of this inquiry: " 'Where the facts present a close question, "strong support" that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular

product, and [3] the speaker has an economic motivation.' " *Id.* at 1115–16 (quoting *Hunt*, 638 F.3d at 715 (in turn quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983))) (brackets in original). In the case originally identifying those factors, the Supreme Court made clear that it did not "mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial." *Bolger*, 463 U.S. at 68 n.14; *see Ariix*, 985 F.3d at 1116 ("These so-called *Bolger* factors are important guideposts, but they are not dispositive."). It also made clear that individual factors alone are not necessarily sufficient to render speech commercial. *Bolger*, 463 U.S. at 66–67. Notably, the Supreme Court case that established the modern standard of review for commercial speech suggested that such speech is "expression related solely to the economic interests of the speaker and its audience," *Cent. Hudson*, 447 U.S. at 561, although subsequent decisions have backed away from treating that as an operative definition, *see, e.g.*, *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993).

Patreon suggests that *Ariix* and the *Bolger* factors are limited to determining whether speech that might not appear to propose a commercial transaction on its face nevertheless does so implicitly. *See* Reply at 7 (noting that in *Ariix*, "the defendant published sham, purportedly 'independent' nutritional supplement guides that were really paid promotion for one company's products"). But *Ariix*'s discussion of the "economic motivation" factor forecloses such a reading, holding that even though "not all types of economic motivation support commercial speech,"[11] economic motives distinct from completing a particular transaction can support a finding of commercial speech:

> [E]conomic motivation is not limited simply to the expectation of a direct commercial transaction with consumers. Courts have found commercial speech even when it involves indirect benefits, such as benefits to employee compensation (*First Resort* [*Inc. v. Herera*, 860 F.3d 1263, 1273 (9th Cir. 2017)]), improvements to a brand's image (*Jordan* [*v. Jewel Food Stores, Inc.*, 743 F.3d 509, 519–20 (7th Cir.

---

[11] For example, since "a simple profit motive to sell copies of a publication" would encompass "virtually any newspaper, magazine, or book for sale," that sort of economic interest does not establish commercial speech. *Ariix*, 985 F.3d at 1117. Of course, such publications are generally not "related *solely* to the economic interests of the speaker *and its audience*." *See Cent. Hudson*, 447 U.S. at 561 (emphasis added).

2014)]), general exposure of a product (*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008)), and protection of licensees' interests (*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 568–69 (E.D. Va. 2016)). Importantly, the type of economic motivation is not the focus; rather, the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking.

*Ariix*, 985 F.3d at 1117.

Applying the *Bolger* factors here does not produce a clear outcome. Patreon's alleged disclosure of user information to Meta is not an advertisement, although it allegedly informed the placement of advertisements. *See* FAC ¶ 60 (alleging that user data shared via the Pixel "allows Meta to profit from providing more targeted ads"). While the disclosure did not refer to a particular product in the sense that an advertisement might, it referred to the video products that Plaintiffs viewed, and Plaintiffs' personal information is arguably itself a product in the information ecosystem in which companies like Meta and Patreon operate. *See* FAC ¶ 67 ("The personal information Patreon obtained from Plaintiffs . . . constitutes valuable data in the digital advertising-related market for consumer information. Patreon[] . . . deprived Plaintiffs . . . of control over that information, and prevented them from realizing its full value for themselves."). As for economic motivation, Plaintiffs have alleged that both Patreon and Meta were motivated to derive economic gain from building better profiles of their users for the purpose of targeting their products. *Id.* ¶ 54 ("[W]ebsites use the Pixel in hopes of better targeting their products and services on Facebook to interested consumers. Thus, a business such as Patreon chooses to install the Pixel on its website in order to increase its profits."); *id.* ¶ 60 (alleging that "Meta benefits from websites like Patreon installing its Pixel" because "the business has a greater incentive to advertise through Facebook" and "the Pixel assists Meta in building more fulsome profiles of its own users" in order to "profit from providing more targeted ads"). There is no indication that either party to this transfer of information had any non-economic motivation.

Taking at face value *Ariix*'s instructions that neither the proposing-a-transaction test nor the *Bolger* factors are dispositive and that courts should "try to give effect to a common-sense distinction between commercial speech and other varieties of speech," 985 F.3d at 1115–16, the Court takes a wholistic approach to Patreon's alleged transfer of Plaintiffs' personal information

and video viewing activity to Meta.  As alleged, it is a disclosure of Plaintiffs' commercial interactions with Patreon, motivated by the commercial interests of both Patreon and Meta to more effectively sell or otherwise monetize their products, with no expressive or creative content beyond the fact of Plaintiffs' personal information and interactions, containing nothing of public interest, and serving no non-economic purpose to either the speaker or the recipient.  While none of those factors alone would likely be dispositive, viewing the context of the disclosure as a whole, this Court is satisfied that Patreon's alleged speech at issue is commercial—as is most similar speech governed by the VPPA in the context of corporate data collection and analysis.[12]

Since Patreon has offered no argument that the VPPA fails to meet the reduced scrutiny afforded to commercial speech, and regulation of commercial speech by entities who are not parties to the case cannot support a facial First Amendment overbreadth challenge as a matter of law, the statute's regulation of commercial disclosures similar to those at issue in this case do not support Patreon's contention that the VPPA violates the First Amendment.

**6.      Other Forms of Speech Governed by the VPPA Are Not Commercial**

As described above, even though the specific speech by Patreon in this case may be commercial, that does not end the First Amendment analysis.  The next step is to determine whether there is a meritorious First Amendment challenge to the statute based on overbreadth: does the statute's regulation of *other* sorts of speech impermissibly burdens noncommercial speech?

---

[12] The Supreme Court has recognized that speech that is similarly "solely in the individual interest of the speaker and its specific business audience" and does not involve matters of public concern can be subject to "many of the same concerns that argue in favor of reduced constitutional protection" for commercial speech even if it does not strictly fall within the definition of commercial speech.  *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761–62 & n.8 (1985).  If, contrary to *Ariix*, the definition of commercial speech were limited to its "core" of speech proposing a commercial transaction, this Court would hold that Patreon's alleged disclosure (and similar data sharing by other service providers) is nevertheless subject to similarly "reduced constitutional protection" under the reasoning of *Dun & Bradstreet*.  *See also Trans Union Corp. v. FTC*, 267 F.3d 1138 (D.C. Cir. 2001) (applying to *Dun & Bradstreet* and analogizing to the commercial speech doctrine to hold that regulation of consumer reports under the Fair Credit Reporting Act is subject to intermediate scrutiny); *IMDb*, 962 F.3d at 1124–25 (distinguishing *Trans Union* on the basis that "the 'speech' at issue—the sale of data—was itself an inherently private exchange between private parties," as opposed to information that the plaintiff in *IMDb* posted "on its website free of charge for the public to review").

The Court begins by noting the statute's legislative history.  Although its sponsors were troubled in part by the increasing prevalence of commercial databases tracking and sharing consumers' personal information, "[t]he impetus for this legislation occurred when a weekly newspaper in Washington published a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store," and the legislative history also notes an incident where an attorney "made an informal request" for an individual's video rental history in an attempt to demonstrate that he was unfit to care for his children.  S. Rep. 100-599, at 5–6.

Whatever might be said of the legitimacy or value of public interest in Judge Bork's video rental history, that disclosure apparently served no commercial interest of the speaker (the store clerk who disclosed it), implicated at most the sort of economics-of-publication interest that *Ariix* explained is insufficient to establish commerciality with respect to the recipient (the reporter), *see* 985 F.3d at 1117, and bore few if any other hallmarks of commercial speech.  The same is true of the reported incident involving a lawyer's request for his client's husband's rental history.

In its reply, Patreon lists cases implicating the VPPA in other noncommercial contexts.  Reply at 6.[13]  In a Sixth Circuit decision, a pro se plaintiff who pled guilty to molesting minors, allegedly having shown them pornographic movies as "part of his *modus operandi*," brought a VPPA claim alleging that a video rental store disclosed his rental history to law enforcement and the parents of his victims.  *Daniel v. Cantrell*, 375 F.3d 37, 379–80 (6th Cir. 2004) (affirming dismissal based on the statute of limitations and the fact that some defendants were not video rental service providers governed by the statute).  In a Tenth Circuit case, a plaintiff prevailed on a VPPA claim where a rental store disclosed to police that he had rented an Academy Award–winning film that a state judge determined was obscenity.  *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1217–21 (10th Cir. 2001) (noting the successful VPPA claim but not addressing its merits because the appeal was filed by the plaintiff as to other claims on which he did not prevail

---

[13] It is not clear why Patreon did not raise these cases in its motion.  If the Court were inclined to grant the motion to dismiss Plaintiffs' VPPA claim, the Court might consider whether to allow Plaintiffs and the United States a further opportunity to respond to these arguments.  Since the Court instead denies the motion to dismiss that claim at least for the time being, those parties will have ample opportunity to address these issues at a later stage of the case if necessary.

United States District Court
Northern District of California

at trial).  In more recent decisions, the Western District of Washington held that a state tax agency

could not require Amazon to disclose personally identifiable information about its customers

because doing so without a court order would violate the VPPA and the agency had not shown a

compelling need for that information, *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1170 (W.D.

Wash. 2010), and the District of Oregon considered—but rejected based on sovereign immunity

and the statute of limitations—a state criminal defendant's claim that the Attorney General

violated the VPPA by obtaining his video rental history to corroborate charges that he sexually

abused a minor, *Gakuba v. Hollywood Video, Inc.*, No. 3:15-cv-00496-BR, 2015 WL 5737589, at

*1–2, *6–7 (D. Or. Sept. 30, 2015) (also noting that the plaintiff successfully moved to exclude

evidence obtained in violation of the VPPA in his criminal trial).  In an older case from the

District of New Jersey, the court denied summary judgment on a claim that a police department

violated the VPPA by obtaining an officer's rental history from a video store to corroborate

disciplinary charges.  *Dirkes v. Borough of Runnemede*, 936 F. Supp. 235, 236 (D.N.J. 1996).[14]

Patreon also raises a number of other hypothetical circumstances in which the personal

information of a video consumer might be disclosed, including video providers reporting that

consumers viewed or requested bomb-making videos or child pornography, Mot. at 11, "a video

store clerk . . . telling a customer that the customer's minister, or spouse, . . . child's babysitter," or

child rented offensive videos, *id.* at 12, or discussion of facts that consumers themselves have

already disclosed publicly, *id.* at 13.  To that list, the Court adds the more mundane—but no more

commercial—possibility that a video service provider's employees might casually discuss their

customer's viewing habits with friends, acquaintances, or other customers.  *Cf. Hearst I*, 192 F.

Supp. 3d at 451 (considering the example of "a newsstand merchant confirming the identity of a

celebrity customer to the customer behind her in line," but holding the prohibition of such speech

permissible as "precisely what the [MPPPA] was designed to do").  Particularly in the now fading

---

[14] The Third Circuit later rejected the *Dirkes* court's conclusion that parties seeking disclosure of video rental history, rather than the video service provider who discloses it, can be held liable under the VPPA.  *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 280–81 (3d Cir. 2016). The facts of *Dirkes* nevertheless present an example of noncommercial disclosure that was prohibited by the VPPA.

United States District Court
Northern District of California

(but ubiquitous at the time of the VPPA's passage) context of brick-and-mortar video stores, it is not hard to imagine a clerk telling a customer whom the clerk knows personally that, say, a mutual friend rented, purchased, or requested the same movie as that customer, with no economic motive behind such a comment. The VPPA would hold the clerk liable for at least $2,500 for doing so.

Recognizing the risk that such speech could be chilled by the VPPA does not require the Court to endorse the decisions of people who might disclose consumer information in all such circumstances. *Cf.* U.S. Br. at 19 (questioning whether a typical video store clerk would "have the proper combination of nosiness, moral certitude, and disregard for others' privacy to disclose this information" where someone rented potentially offensive content). Plaintiffs and the United States also question the example of reports regarding illegal content on the grounds that it would implicate the speaker itself in illegal activity. Opp'n at 15; U.S. Br. at 18. But as Patreon notes in its reply, the VPPA would encompass reports that consumers merely *requested* illegal videos, 18 U.S.C. § 2710(a)(3), or that they viewed illegal content uploaded by other users and only later detected and removed by a service provider, or (as in *Camfield*) where a video was only later determined to be illegal. Reply at 9–10.

The *Hearst I* decision suggests that all of these potential disclosures fall within the bounds of commercial speech since "commercial speech does not become non-commercial—and thus less subject to regulation—because it may implicate matters of public concern." 192 F. Supp. 3d at 452; *see also id.* at 445–46 (holding that "reporting the reading habits of political candidates" remains commercial speech because " '[s]peech does not cease to be commercial merely because it alludes to a matter of public debate' " (quoting *Conn. Bar Ass'n*, 620 F.3d at 94)). This Court is aware of no other decision holding that any comment that touches on a commercial transaction (like a video rental or purchase) is commercial speech subject to reduced constitutional protection, and declines to so hold. Applying a "common-sense distinction between commercial speech and other varieties of speech," *Ariix*, 985 F.3d at 1115–16, disclosures of a video consumer's information for the purpose of criminal investigations, political debate, casual conversation, or impugning the consumer's moral character are not commercial speech. Plaintiffs also question whether many of these historical and hypothetical examples of noncommercial disclosure

implicate matters of legitimate public concern, *see* Opp'n at 14 (arguing that "public figures' private video-watching habits may not even reflect their personal views on important issues"), but that alone does not remove such noncommercial speech from the rigor of strict scrutiny.

### 7.  Facial Review of the VPPA Is Required but Premature

Since the VPPA implicates noncommercial speech by others besides Patreon, it is subject to overbreadth review to determine whether it substantially violates those potential speakers' rights under the First Amendment.

The United States' brief could perhaps be understood as suggesting that such review should be avoided because courts have been "particularly careful to avoid broad pronouncements in cases involving 'clashes between the First Amendment and privacy rights' in light of the 'sensitivity and significance of the interests presented,' " and instead will usually "opt[] to 'rely[] on limited principles that sweep no more broadly than the appropriate context of the instant case.' "  U.S. Br. at 9 (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001)).  In both *Bartnicki* and *Florida Star v. B.J.F.* (which *Bartnicki* in turn quoted for that rule), the Supreme Court held that the statutes at issue violated the First Amendment as applied, and therefore declined to reach more sweeping questions of whether the government may ever prohibit publication of truthful information.  *See Bartnicki*, 532 U.S. at 533–34; *Fla. Star*, 491 U.S. 524, 533, 541 (1989).  The broader questions in those cases were unnecessary because narrower analysis of the statutes as applied were sufficient to afford relief to the parties subject to unconstitutional enforcement.

Here, Patreon has abandoned its as-applied challenge, concedes that consumer privacy is a substantial state interest (and for the purpose of this motion, that it is "compelling"), and offers no argument that the VPPA would not withstand the intermediate scrutiny applied to commercial speech.  Taking into account the Court's conclusion above that Patreon's own alleged speech at issue is commercial, or at least similarly subject to reduced First Amendment protection, the VPPA would not be invalid if it only regulated speech like Patreon's alleged disclosures to Meta. The Court therefore cannot resolve Patreon's motion on that narrow basis and must proceed to a facial review, because First Amendment overbreadth is an established exception to the presumption against facial review—even in cases involving commercial speech, so long as the

overbreadth review is limited to noncommercial speech.[15]

The fact that facial review is required does not, however, mean it is required right now. Overbreadth analysis depends not only on statutory text but also on "actual fact," with the burden on the party challenging the law to demonstrate that it is substantially too broad. *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988); *see Advance Mag.*, 210 F. Supp. 3d at 602. Courts therefore consider factual records—or the absence of a sufficient record—in determining whether to declare a law facially unconstitutional. *See, e.g., N.Y. State Club Ass'n*, 487 U.S. at 13–14 ("We could hardly hold [that a substantial number of clubs would have their expressive purposes impaired by being unable to discriminate against protected classes of potential members] on the record before us, which contains no specific evidence on the characteristics of *any* club covered by the Law."); *Advance Mag.*, 210 F. Supp. 3d at 603 ("On this motion to dismiss, we cannot determine the degree of the [M]PPPA's plainly legitimate sweep as compared to any conceivably impermissible applications . . . , nor can we easily weigh the interests of such hypothetical publishers against the privacy interests the [M]PPPA serves.").

The Court is satisfied that the VPPA regulates noncommercial speech, but whether it does so impermissibly still requires weighing the interests implicated by that speech and its regulation. Privacy can, in at least some circumstances, be a compelling state interest. *See, e.g., Victory Processing, LLC v. Fox*, 937 F.3d 1218, 1227 & n.7 (9th Cir. 2019) (recognizing a compelling interest in safeguarding privacy within a person's home, and holding that a state restriction on certain robocalls implicated that interest but was not sufficiently tailored to it); *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1253–54 (S.D. Fla. 2019) (citing a number of district court decisions holding that the Telephone Consumer Protection Act ("TCPA") serves a

---

[15] The United States also cites *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), as an example of the rule that First Amendment rulings should sweep no more broadly than necessary, because in that case the Supreme Court severed an offending provision, leaving the remaining statute compliant with the First Amendment, rather than striking down the statute as a whole. U.S. Br. at 9 (citing *Barr*, 140 S. Ct. at 2348–56 (Kavanaugh, J., plurality op.)). Nothing in *Barr* suggests that the Court here should refrain from considering whether the VPPA facially violates the First Amendment, and no party has suggested that severing an isolated provision could cure that defect if it does.

compelling interest in protecting consumer privacy).[16]  The Court is aware of no decision addressing whether the privacy interest in consumers' video viewing history is "compelling."

For the purpose of the present motion, Patreon assumes a compelling interest in consumer privacy, Mot. at 15, but that limited-purpose concession of an abstract interest is difficult to apply to the context-specific balancing text of strict scrutiny.  Assessing the degree to which consumers expect privacy in the videos they watch, the degree to which such privacy can be secured without regulation, and thus the government's interest in protecting that privacy through the VPPA, would benefit from a factual record as to consumer preferences and their ability to effect such preferences through contract or other private conduct.  A factual record to better understand the nature of the interests at issue would also help to determine whether the VPPA is sufficiently narrowly tailored to protect those interests.   Patreon further argues that the VPPA is fatally underinclusive for failure to regulate all providers of video content (like live video, or recorded video offered in public libraries) and for failure to address other information content like written materials or music.  Mot at 16 (citing *e.g.*, *IMDb*, 962 F.3d at 1127, as considering whether a "selective ban . . . satisfactorily accomplishes its stated purpose").  Assessing the degree to which regulating those other areas would be necessary to serve the drafters' goals of consumer privacy would also benefit from factual record.

Even if the VPPA does not satisfy strict scrutiny, and thus impermissibly burdens the noncommercial speech of strangers to this case, it is subject to facial invalidation only if it does so in a "substantial number of it applications, judged in relation to the statute's plainly legitimate sweep." *See Stevens*, 559 U.S. at 473.  Weighing the VPPA's legitimate applications to commercial speech against its potentially illegitimate applications to noncommercial speech would, again, benefit from a factual record.

---

[16] To the extent that *Schaevitz* and cases cited therein concluded that the TCPA survived strict scrutiny even with its exception for government debt collection, they conflict with the Supreme Court's later decision in *Barr*, 140 S. Ct. 2335, invalidating that exception.  *Barr* focused on whether the government had a sufficient interest in that content-based exception and held that it did not.  The plurality opinion recognized that the TCPA's overall restriction of robocalls served a congressional interest in consumer privacy, but it did not address whether that interest was "compelling."  140 S. Ct. at 2348–49 (Kavanaugh, J., plurality op.).

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Accordingly, taking into account "the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights," *Fla. Star*, 491 U.S. at 533, this Court follows the lead of *Advance Magazine* in finding Patreon's facial challenge premature on a motion to dismiss.  *See* 210 F. Supp. 3d at 579, 603.  Patreon's motion to dismiss the VPPA claim is DENIED, without prejudice to Patreon reasserting its constitutional arguments on a factual record.

### C.    Claims Sounding in Fraud

Rule 9(b) of the Federal Rules of Civil Procedure sets a heightened pleading standard for claims based on fraud.  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Ninth Circuit has held that in order to meet this standard, a "complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity," *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993), or in other words, " 'the who, what, when, where, and how' of the misconduct charged," *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation omitted).  "Rule 9(b) demands that the circumstances constituting the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.' " *Kearns*, 567 F.3d at 1124 (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)) (ellipsis in original).

Plaintiffs base their CLRA claim and their claim under the fraud prong of the UCL on a theory of omission: that Patreon failed to disclose the manner in which it shared user data with Meta.  FAC ¶¶ 104, 113, 115; *see* Opp'n at 24.  The Court previously allowed those claims to proceed based on a duty to disclose arising from potentially misleading partial representations in Patreon's terms of use and similar documents describing the manner in which Patreon shared user data.  1st MTD Order at 16–18.  Plaintiffs do not argue that anything besides those purported partial representations supports a duty to disclose.  *See* Opp'n at 23–25.  The Court's previous order specifically declined to consider whether Plaintiffs' original allegations satisfied Rule 9(b) because, on its first motion to dismiss, Patreon raised that issue only in a footnote of its reply brief.  1st MTD Order at 8 n.4.

Patreon argues that Plaintiffs have not satisfied the heightened pleading standard under

Rule 9(b), and that they have not alleged that they saw or relied on the purportedly misleading statements.  Mot. at 19–21.

The Ninth Circuit has held that Rule 9(b) applies to nondisclosure claims under the CLRA and the UCL, and that such claims therefore must be alleged with particularity.  *Kearns.*, 567 F.3d at 1126–27.  Some courts district courts have held that for " 'an omission-based fraud or misrepresentation claim, a plaintiff will not be able to specify the time, place, and specific content of an omission as would a plaintiff in a false representation claim,' " and thus have not required the same degree of specificity as in a case involving affirmative misrepresentations.  *Edwards v. FCA US LLC*, No. 22-cv-01871-WHO, 2022 WL 1814144, at *6 (N.D. Cal. June 2, 2022) (quoting *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1006 (N.D. Cal. 2020)).  Those cases generally do not involve a duty to disclose arising from partial affirmative representations, the circumstances of which a plaintiff *can* specify with particularity.  The Court therefore holds that Plaintiffs are required to satisfy Rule 9(b) with respect to the affirmative representations on which they base their omission claims.

Considering class certification of a UCL omission claim based on misleading partial affirmative representations, the Ninth Circuit has held that "[f]or everyone in the class to have been exposed to the omissions, . . . it is necessary for everyone in the class to have viewed the allegedly misleading advertising."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc).  That ruling implies that such a claim requires not only that a defendant made a misleading statement giving rise to a duty to disclose, but also that a plaintiff actually saw that statement.  The Court is aware of no reason to think a different standard would apply under the CLRA.

Patreon is correct that Plaintiffs have not alleged either that they reviewed the terms of use and similar documents, or that they relied on the potentially misleading statements contained therein.  Plaintiffs contend that the Court should reject that argument because Patreon previously argued that Plaintiffs agreed to the terms of use.  Opp'n at 25.  The most relevant portion of Patreon's previous motion is as follows:

> Plaintiffs claim that they did not know about, and did not consent to, the disclosure of their viewing conduct to third parties. (Dkt. 1, ¶¶ 5, 46, 79) Patreon's ToU and Privacy Policy say otherwise.

1st Mot. to Dismiss (dkt. 21) at 3. Patreon also previously argued that Plaintiffs "expressly consented in writing (albeit in a different form than that specified by the VPPA)" to Patreon sharing data about them. *Id.* at 17. The Court does not understand those arguments as conceding that Plaintiffs actually read the terms of use and privacy policy. Patreon argued that Plaintiffs *consented to* those terms, but Plaintiffs could have done that without reading them.

Without allegations that they actually read the terms of use and other documents containing purportedly misleading partial representations, Plaintiffs' amended complaint does not sufficiently support an inference that their misunderstanding of how Patreon used their data was caused by Patreon's failure to disclose that information in conjunction with its purported partial representations. Patreon's motion to dismiss Plaintiff's CLRA claim and UCL fraud claim is therefore GRANTED, with leave to amend if Plaintiffs can allege that they read the relevant documents.

Because those claims are subject to dismissal on that basis, the Court does not reach the question of whether Plaintiffs must allege the specific partial representations at issue with particularity under the circumstances of this case, where Patreon previously offered the documents containing them for judicial notice and the Court has already identified representations therein that could support Plaintiffs' claims. To avoid an unnecessary third motion to dismiss, Plaintiffs are encouraged to include such allegations if they amend their complaint to pursue these claims.

## IV.    CONCLUSION

For the reasons discussed above, Patreon's motion to dismiss Plaintiffs' claim under the VPPA is DENIED, and its motion to dismiss Plaintiffs' claims under the CLRA and the fraud prong of the UCL is GRANTED with leave to amend. If Plaintiffs wish to pursue those claims, they may file a second amended complaint no later than March 3, 2023.

**IT IS SO ORDERED.**

Dated: February 17, 2023

JOSEPH C. SPERO
Chief Magistrate Judge