Pages 1 - 49

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Magistrate Judge

| | |
|---|---|
| BRAYDEN STARK, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>  VS.<br><br>PATREON, INC., a Delaware corporation,<br><br>          Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)  **NO. C 22-03131-JCS**<br>)<br>)<br>)<br>)<br>)<br>) |

San Francisco, California
Friday, February 10, 2023

**TRANSCRIPT OF REMOTE PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom videoconference.)

For Plaintiffs:

                    GIRARD SHARP LLP
                    601 California Street - Suite 1400
                    San Francisco, California 94108
          BY:  **TREVOR T. TAN, ATTORNEY AT LAW**
               **SIMON S. GRILLE, ATTORNEY AT LAW**

For Defendant:

                    THE NORTON LAW FIRM, PC
                    299 Third Street - Suite 200
                    Oakland, California 94607
          BY:  **WILLIAM NORTON, JR., ATTORNEY AT LAW**
               **NATHAN L. WALKER, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


Reported Remotely By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
                       Official Reporter, CSR No. 12219

1    **APPEARANCES**:   (CONTINUED)

2    For Interested Party
     The United States of America:

3                              U.S. DEPARTMENT OF JUSTICE
                              Civil Division Federal Programs Branch

4                              1100 L Street, NW
                              Washington, D.C. 20005

5              **BY:   LESLIE COOPER VIGEN, ATTORNEY AT LAW**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
1  **Friday - February 10, 2023**                  **9:31 a.m.**

2                    **P R O C E E D I N G S**

3                       ---o0o---

4       **THE CLERK:**  We are calling Case Number 22-CV-3131,

5  Stark versus Patreon.

6      Counsel, would you please raise your hands.

7                 (Pause in proceedings.)

8       **THE CLERK:**  Okay.  Good morning, everyone.

9      Appearances, please, first starting with the plaintiff,

10  then the defendant, and we also have an interested party here.

11       **MR. GRILLE:**  Good morning, Your Honor.  This is Simon

12  Grille on behalf of the plaintiffs.

13       **THE COURT:**  Good morning.

14       **MR. TAN:**  Good morning, Your Honor.  This is Trevor

15  Tan, also on behalf of the plaintiffs.

16       **THE COURT:**  Good morning.

17       **MR. NORTON:**  Good morning, Your Honor.  On behalf of

18  defendant Patreon, Fred Norton.  And I believe my colleague

19  Nathan Walker is also a participant today and -- but I don't

20  see him on my screen.

21       **THE CLERK:**  Hold on.  He didn't -- let me get him

22  promoted.

23       **MR. NORTON:**  Thank you.

24               (Pause in proceedings.)

25       **MS. VIGEN:**  And good morning, Your Honor.  Leslie

**PROCEEDINGS**

 1   Cooper Vigen on behalf of the United States, which has

 2   intervened for the limited purpose of defending the

 3   constitutionality of the Video Privacy Protection Act.

 4          **THE COURT:**  Good morning.  There's Mr. Walker.

 5      Okay.  So thank you for your briefing on this.  I -- you

 6   can say whatever you'd like.  I'll, obviously, hear your

 7   argument.  I've read the materials and the cases that -- where

 8   I'm going with this is this:  The question is whether or not

 9   this 12(b) motion is the right context in which to decide the

10   overbreadth challenge.

11      I think that, tentatively, that the -- under *IMDB*, the

12   restriction on the disclosure of permanent information is a

13   content-based restriction that the VPPA clearly applies to at

14   least some noncommercial expressions -- not to mention --

15   including the one this Congress actually aimed this law at,

16   disclosure of a Supreme Court nominee's video viewing history,

17   and that it's, therefore, subject to a facial overbreadth

18   challenge.

19      But the overbreadth challenge itself -- and this is that

20   lovely gray area of law where courts decide legal questions

21   based on facts, and how they get those facts is anybody's

22   guess.  But to accomplish the overbreadth analysis, there's a

23   comparison:  The Court must analyze whether there are a

24   substantial number of the statute's applications that are

25   unconstitutional, balanced or judged against the legitimate

**PROCEEDINGS**

1    sweep of the statute.

2         At least one court in the Southern District of New York

3    held that that should be done on a more full record than is

4    available on a 12(b).

5         Does the analysis require a more well-developed factual

6    record than we have here?

7         Does it require more facts on what noncommercial

8    expressions this statute has been applied to?

9         Does it require more facts on the plainly legitimate sweep

10   of the statute, including the disclosures of the type that are

11   at issue in this case; whether the privacy at issue is a

12   compelling state interest; the consumer expectations about

13   privacy in this context; whether there are ways to secure that

14   privacy without the scope of the regulation that's at issue

15   here?

16        I -- I'm happy to do that analysis.  The question is

17   whether or not to do it on a 12(b) motion.

18        So in your discussions today, I'd like you to address --

19   and whatever else you'd like to address -- that question for

20   me, whether this is the right context to do it in; whether we

21   gain something by doing it on a more fulsome factual record;

22   whether you call it summary judgement or something else; what's

23   your views and why that makes more sense, your proposed way of

24   doing it makes more sense.

25        So let me start with the moving party.

1          **MR. NORTON:**  Thank you, Your Honor.

2      And setting the stakes there is quite helpful for the

3  points I'd like to make this morning.

4      We certainly agree that the Court's analysis --

5          **THE COURT:**  So can I interrupt you, sir?  I'm sorry.

6  Can I interrupt you, sir?

7      Have I been breaking up at all when I've been talking?

8          **MR. NORTON:**  No, you're entirely clear on my end.

9          **THE COURT:**  Okay.  Because occasionally, I'm

10  getting -- I don't know if it's incoming, when Karen was

11  speaking and now when you're speaking, Mr. Norton, a little bit

12  of scratchiness.  But let's see how that goes.

13          **MR. NORTON:**  Is that any better now?

14          **THE COURT:**  That's good.

15          **MR. NORTON:**  Whatever I'm doing, I'll try to keep

16  doing.

17      So we certainly agree that under *IMDB.com*, there's no

18  daylight between that statute and the VPPA.  This is a

19  content-based restriction.  And we certainly agree, as

20  Your Honor noted, that the VPPA applies to speech that is by no

21  measure commercial speech.

22      And then the question becomes:  What is the appropriate

23  comparison between the speech that it proscribes, and

24  unconstitutionally proscribes, and the legitimate sweep?

25      I share -- I do think there's a challenge on this record.

**PROCEEDINGS**

1 We tried to confine ourselves to this record in making that

2 determination.   Nonetheless, I do think you have sufficient

3 record here to conclude that the applications of the VPPA to

4 noncommercial speech are substantial, and substantial in

5 relation to whatever we could characterize as the legitimate

6 sweep.  And so, let me speak to that briefly about -- let me

7 focus on the categories of speech that we know are not

8 commercial and yet the VPPA would proscribe.

9     And as the Court noted, the first of those is speech on

10 matters of public concern.  And we gave two examples of these:

11 One is the example of Judge Bork.  And there's really no

12 dispute, I think, that that is constitutionally-protected

13 speech and the VPPA would proscribe it.

14     How substantial it is -- I think one thing is important to

15 keep in mind here is when we say "substantial" in this context,

16 we're not just counting, all right?  So it's substantial in

17 terms of number, but also it can be substantial in terms of the

18 importance of that type of speech.  It's not simply some

19 census-taking of how frequently does one type of speech occur

20 as opposed to another.

21     But if you look at the cases that have actually found

22 statutes to be unconstitutional -- and I think it's important

23 to the Court's concern about, well, what record do we need --

24 those cases typically don't come up after a summary judgment

25 motion.  If you look at *Hansen*, which is the Ninth Circuit

1   decision striking down a statute that prohibited encouragement

2   or inducement of an undocumented person to remain in the United

3   States, that's not a summary judgment record.  The Court looked

4   at the possible applications of that statute that would be

5   unconstitutional and said:  Those are substantial in the sense

6   that they -- they would occur.

7        The Court can make its own determination that those are

8   not fanciful or speculative.  And they would be important of

9   the sorts of things that we would want the First Amendment to

10  protect.

11       In *Stevens*, *Stevens* is the case that involved crush

12  videos, a very specific type of video that was the target of

13  the statute, but the question was:  Were these videos, in which

14  animals were harmed -- did the statute go beyond that and

15  actually proscribe other kinds of conduct, other kinds of

16  speech that ought to be protected by the First Amendment?

17       And the Supreme Court's analysis -- again, not on a

18  summary judgment record -- but Justice Scalia said.  Well, this

19  would reach hunting.  And there's lots of hunting magazines and

20  lots of hunting enthusiasts, and there's a lot of speech there

21  that's being that proscribed that shouldn't be.

22       So that was a sufficient record for that statute to be

23  struck down.

24       I could do more examples.  But I think the point is that

25  it's an analysis that could be done short of a summary

**PROCEEDINGS**

1  judgement record.  And, again, I think the record here we have

2  is enough.

3      So, one, the Bork example is a very powerful example.

4      The second example that we gave had to do with reporting

5  of criminal or potentially criminal conduct.  That is an issue

6  of public concern.  That is core First Amendment conduct.

7      We, you know, cited a Ninth Circuit decision that talks

8  about how that particular type of conduct is protected by the

9  First Amendment.  And there's no question the VPPA would

10 prohibit that type of speech.

11     So one example we gave is, there are certain types of

12 videos that are illegal under federal law; bomb-making videos,

13 for example.  If someone wanted to -- if a video service

14 provider wanted to report that they were aware someone was

15 requesting such videos -- right? -- because that -- the VPPA

16 prohibits even the disclosure of the request -- that would

17 violate the VPPA.

18     The second example that we gave was tips to the

19 CyberTipline that's operated by the National Center for Missing

20 and Exploited Children.  This is not a small thing.  It is an

21 issue of great public importance.  It is of great public

22 concern.  And it is not small in terms of numbers.

23     Now, I can see this is not within the record the Court has

24 now, but we did cite a case that discusses the obligation of

25 electronic service providers to make such tips.  Google is one

**PROCEEDINGS**

1   of them.  Google is not a small service provider.  There are

2   obviously many others.  In 2020, there were 21.7 million tips

3   made to the CyberTipline.  In 2021, there were 29 million tips

4   made.  This is not something that happens on the margins.  And

5   the VPPA prohibits every single one of them.

6        So if I stopped there, I think we would have satisfied our

7   burden to show that the VPPA is substantially overbroad.

8        **THE COURT:**  So where do you get those numbers?  Those

9   aren't in the record, I assume.

10       **MR. NORTON:**  I readily concede that the National

11  Center for Missing and Exploited Children publishes, on its

12  website, the CyberTipline itself, the number of tips that were

13  made, and the number of providers that made such tips; and that

14  information is readily available, and I think would be --

15  although we've not made such a request -- the Court could take

16  judicial notice of it.

17       It's certainly the type of information that Justice Scalia

18  relied upon when he cited an amicus brief in *United States*

19  *versus Stevens*.

20       **THE COURT:**  So I approach this question it's -- I try

21  not to think of myself as sitting as the United States Supreme

22  Court, let alone as Justice Scalia.

23       I try to think of -- you know, to be quite frank --

24  protecting the case, doing it in a fashion that provides

25  everyone with the opportunity to do what they need to do, and

**PROCEEDINGS**

 1   in a way that will result in a fair decision that will

 2   withstand scrutiny.

 3        And you're -- if I'm the United States Supreme Court, I

 4   don't have to worry about that second case.

 5        And so the question is whether or not -- and it seems to

 6   me there have been facial challenges that have been done, other

 7   than on 12(b) motion.  There are cases in the Supreme Court

 8   where there are facial challenges that have come up on summary

 9   judgment.

10        I'm wondering what's the more -- what's the better course?

11   I mean, I could, suppose, do -- I couldn't cite the kind of

12   statistics that you're talking about; but you can glean from

13   case law the examples of various things that might be

14   noncommercial speech, but I'm wondering what's the more

15   prudential way to proceed in this.

16        **MR. NORTON:**  So, I -- I'll say, I do think that

17   there's sufficient information before the Court without using

18   the statistics that I just cited, but -- the cases that we've

19   cited to find substantial overbreadth.  That said, I recognize

20   that I -- I think, on a larger record or on an evidentiary

21   record, we would have a stronger argument.  And there are -- I

22   could explain why I think that's so, but I don't think that's

23   necessary.

24        I do think there's more information that we could put

25   before the Court which would both -- which would address all of

**PROCEEDINGS**

1    the issues in the analysis.  And I don't think that would

2    necessarily require, whether it were done at a summary

3    judgment -- on a summary judgment standard or as a summary

4    judgment motion, I think that, if we could put in more evidence

5    for all of our arguments, I think we would be in a stronger

6    position.  And the Court's interest in protecting the record,

7    protecting the case, I certainly understand that, and I think

8    we could give the Court more information that would give

9    greater confidence that we have the better of the argument.

10        I feel like I should pause here because I can go through

11   my entire argument, but I'm hearing from the Court that maybe

12   you feel this is premature and that we would be better suited

13   to do this in a different way.

14        THE COURT:  Why don't I hear from the others -- other

15   counsel first; and then, if it's appropriate, we can come back

16   and elaborate more fully on the substantive argument.

17        MR. NORTON:  On the -- would you like to hear from

18   them on this question, or would you like for me to continue my

19   argument and hear from plaintiffs' counsels?

20        THE COURT:  If you have anything more on the

21   overbreadth challenge, you should say it now.

22        MR. NORTON:  So I do.  So there are specific points in

23   our overbreadth analysis that are, in some sense, factual.  And

24   so for that, I understand that the Court would want to have

25   additional information to perform the analysis.  But there are

**PROCEEDINGS**

1  a number of points in our analysis that are not factual, and I

2  think that those points, again, are sufficient for us to

3  prevail.

4      And it's true that in the Southern District of New York

5  case, the most recent of the three, the Court declined to do

6  the -- the facial analysis at that point because it needed a

7  larger record.  But we've made arguments that were not

8  presented in that case.  And I think that, again, that they're

9  sufficient.

10      So the other nonfactual issues that we cited are that

11  disclosure with -- of conduct that is of concern -- right? --

12  and we've cited that this has actually happened but -- so those

13  are in the record and before the Court -- but where a video

14  service provider notifies a parent or a teacher or a close

15  relative that there's somebody who's renting videos, watching

16  videos, asking for videos that suggest that there is

17  something -- a cause for concern.  And there are cases in which

18  that has happened, because the person who was doing this was

19  actually engaging in sexual harassment or molestation of a

20  minor.  So that happens.

21      We pointed to when it's happened.  It's been -- not only

22  happened but been the subject of litigation of the VPPA,

23  because it's not permitted; right?  So that is a particular

24  type of conduct, a disclosure, that's subject to the VPPA

25  that's constitutionally protected, subject to strict scrutiny,

1   but is overbroad.

2        The other is -- and the VPPA prohibits speech, even when

3   the customer actually consents, if that content is not in the

4   precise form that the VPPA requires.  And it's a very precise

5   form.  It's not just a separate document.  It's not just a

6   separate document in the last two years.  It also has to give

7   the consumer the opportunity to opt out and so forth.

8        And we cite the Baldwin case.  It's a Ninth Circuit case

9   from some decades ago.  But it says those kinds of burdens,

10  arbitrary burdens on speech -- or on consent, rather, are

11  impermissible under the Ninth -- under the First Amendment;

12  right?  So that alone tells you that it's overbroad.

13       And we know because we looked at other statutes, including

14  the Michigan statute, and including the statute that applies to

15  cable viewing, that you don't need that kind of consent; right?

16  Simple consent is enough under those other statutes.  So we

17  know that it's overbroad in the sense that it imposes

18  unnecessary burdens, even in the context of consent, and

19  prohibits, punishes speech to which consumers consented.  And

20  that, too, is overbroad.

21       And then we also know that the VPPA punishes speech that

22  doesn't actually cause any harm -- right? -- because it has

23  this provision that says the plaintiff gets $2,500 without

24  needing to have any actual damages.  And, again, that's

25  different from the Michigan statute, which requires actual

**PROCEEDINGS**

1    damages.

2        So that, too, is overbroad.  That, too, on its face,

3    without doing any other analysis, you know the statute that

4    does that, imposes damages in the absence of harm and restricts

5    speech in the absence of harm, is overbroad.

6        **THE COURT:**  Is there a case that says that?

7        **MR. NORTON:**  That -- for that we cite -- so for the

8    premise that a statute that imposes damages in the absence of

9    any actual harm, for that we cite *Gertz*.  And when we cite

10   *Gertz*, we're reasoning by analogy; but the issue there is that

11   in *Gertz*, the Court said you can't presume damages under the

12   First Amendment without making this heightened showing; right?

13       And in -- the heightened showing in that case, because

14   it's a defamation case, is actual malice.  And since we don't

15   have falsity under the VPPA, the VPPA is punishing truthful

16   speech, the question is:  What does the First Amendment require

17   to presume damages in the context of truthful speech?

18       Because that's never happened.  There is no case that

19   says -- that I'm aware of -- that says you can have presumed

20   damages for the disclosure of truthful information.  So we

21   think *Gertz* is the place to look to for that.

22       And then the other -- and the last category that I'll

23   point to, that I think the Court could use purely on a legal

24   basis without any additional factual information, is the

25   disclosure of information that's already public, that the

1    consumer herself has already put out in the world.

2        And we know, from *Florida Star*, that the First Amendment

3    doesn't allow you to punish someone for disclosing something on

4    privacy grounds.  It's already out there in the world.

5        And further, if you can't -- if the justification is

6    privacy, a statute consistent with the First Amendment cannot

7    prohibit speech that is not highly offensive.  Right?  And the

8    kind of speech that's the subject of the VPPA, the fact that

9    a -- that that information might be disclosed is not the sort

10   of thing that a reasonable person would find to be highly

11   offensive; and that's required under the -- you know, yes,

12   there are privacy interests, but they're not sufficient to

13   overcome the First Amendment for just any piece of information.

14   And the VPPA, on its face, makes no provision for that.

15       So those are the categories of speech that we've pointed

16   out in our papers.  And I think not all of them require further

17   factual exploration.

18       **THE COURT:**  Okay.  How do I measure the privacy

19   interests in this case in order to decide that last bit?

20       I mean, one of my hesitations about doing a 12(b)(6)

21   motion is -- I have -- is I have concerns that I don't have a

22   developed enough record on the significance of the privacy

23   concerns at issue in this case.

24       **MR. NORTON:**  So I think that the way the analysis

25   works here is that it is more categorical such that you don't

**PROCEEDINGS**

1    do a balancing in that sense.  And so, if the interest is a

2    compelling one, then it's a compelling one.  And you don't say

3    it's very, very compelling or somewhat compelling.  It's just

4    compelling.  And for purposes of the --

5            **THE COURT:**  How do I decide whether or not this

6    particular privacy interest is compelling?

7            **MR. NORTON:**  Well, we made it easy for you:  For

8    purposes of this motion, we conceded it.  So we concede, for

9    purposes of this motion, that the interest in privacy is a

10   compelling state interest.

11           **THE COURT:**  Right.

12           **MR. NORTON:**  And then the question is -- we get to:

13   Is the statute narrowly-tailored?

14       But that's not -- it's not an ad hoc kind of balancing.

15   It's -- for the purposes of this analysis, it's:  Is there --

16   is there a compelling state interest?

17       And for this motion, we concede that there is.

18       And then:  If there is, does the statute further that

19   interest by narrowly tailored means?

20       And we argue that it does not, for the reasons set out in

21   our brief, and I won't belabor them now.

22       But you don't have to weigh the privacy interest.  You

23   just have to see:  Does it clear the privacy threshold of

24   compelling?

25       And we've given you that.

1            **THE COURT:**  So just to be clear -- because I didn't

2    read this in your brief -- you agree that the privacy interest

3    which is -- which this statute seeks to protect is a compelling

4    state interest.  Because I don't -- because that wasn't said

5    specifically in the brief.  You -- there was some discussion of

6    a substantial interest, or something slightly less categorical,

7    as you would say.

8            **MR. NORTON:**  That's fair.  On page 23 of our brief, we

9    acknowledge it is "substantial."  We do not say "compelling."

10   But for purposes of the motion, we would concede that it is a

11   compelling state interest for purposes of the strict scrutiny

12   analysis.

13           **THE COURT:**  Why don't I hear from other counsel on the

14   issues that you and I have been discussing.  And I'll start

15   with defendant.

16           **MR. NORTON:**  Thank you, Your Honor.

17           **MR. TAN:**  Hello, Your Honor.  This is Trevor Tan from

18   the plaintiffs.

19           **THE COURT:**  Yes.  I'm sorry.  The plaintiffs.  I'm

20   sorry.  Of course, I'm sorry.

21           **MR. TAN:**  Thank you, Your Honor.

22       So going back to your underlying question of whether it

23   might be too early to decide the issue now, we think, under the

24   relevant appellate authorities, you could decide the issue now;

25   but based on what Mr. Norton said in terms of the CyberTipline

**PROCEEDINGS**

1  and facts outside the record, the case would probably benefit

2  from further factual development of the record.

3      And -- but I do want to address the six points Mr. Norton

4  raised, one by one, if I could, starting with the Judge Bork

5  example.

6      Now, the Judge Bork example was a very, very unique

7  situation where, obviously, he was a very controversial nominee

8  for the Supreme Court --

9          **THE COURT:**  We never have those.

10         **MR. TAN:**  But also his privacy, views on privacy were

11  directly at issue and highly publicized.

12         **THE COURT:**  Again, we never have that.

13     The last three nominees, their issues -- their positions

14  on the scope of privacy, personal privacy were directly at

15  issue in the --

16         **MR. TAN:**  Right.  Right, Your Honor.

17     But it's also not the case that every public figure or a

18  nominee for public office does not have a privacy interest.

19  It's a reduced privacy interest, but it's not true that in

20  every instance -- that their video-watching habits are a matter

21  of public interest.  It's very fact-specific.

22     And in the 35 years that the VPPA has been in -- on the

23  books, there has been no other instance that we're aware of

24  that the VPPA restricted the dissemination of that information.

25  And the VPPA does not restrict -- to the extent that the

**PROCEEDINGS**

1   information is a matter of public interest -- the disclosure

2   from sources other than the videotape service provider.

3        So even if it is true that another potential Supreme Court

4   justice's views on privacy and their videotape-watching habits

5   were a matter of public interest, the information could still

6   be disclosed from a source other than the videotape service

7   provider.

8        **THE COURT:**  I don't understand what that means in this

9   context.

10       The question is not whether the specific nominee was a

11   privacy -- was a privacy zealot or a person who thought privacy

12   was a made-up part of the Constitution.  The question is

13   whether or not, in Judge Bork's case, they could find something

14   interesting about him in his video-watching habits.  It didn't

15   have to do with his -- just his specific privacy concern.  So I

16   don't understand that.

17       But in any event, it's not the only example.  But you

18   would have to concede, would you not, that that would be an

19   unconstitutional application of the statute, if it prohibited

20   that disclosure; is that right?

21       **MR. TAN:**  Yes, for the Judge Bork scenario, yes.  Yes,

22   Your Honor.

23       **THE COURT:**  Right.  And it would be an

24   unconstitutional application of the statute to apply it to the

25   CyberTipline.

**PROCEEDINGS**

1      **MR. TAN:**  No.  No.  We would strongly disagree with

2  that, Your Honor.

3      **THE COURT:**  Oh, you think it would be okay to prohibit

4  them from giving information on the CyberTipline?

5      **MR. TAN:**  Well, Your Honor, the Ninth Circuit case

6  *Entler* that Patreon cites, that does not support their argument

7  that that constitutes the unconstitutional infringement on

8  speech.  That case simply says if someone attempts to petition

9  the government for a redress of their personal grievance, the

10  government cannot prohibit that under the First Amendment's

11  petitions clause.

12      **THE COURT:**  Well, my personal grievance is I don't

13  like people being molested when they're -- at any age, let

14  alone underage, and I call the tipline, and I tell them.

15      You think I don't have a First Amendment right to do that?

16      **MR. TAN:**  Well, I certainly don't dispute that that's

17  obviously important and reprehensible behavior to report.  But

18  the issue is whether that constitutes a protected interest

19  under the First Amendment.

20      And in the *Entler* case, the cases that the Ninth Circuit

21  cited indicated that a citizen lacks a judicially cognizable

22  interest in the prosecution or non-prosecution of someone else.

23      **THE COURT:**  This isn't about prosecution; this is

24  about reporting.  It's about petitioning the government.

25      You don't think that they can -- do you think that those

**PROCEEDINGS**

1  cases say I don't have a constitutional right to tell law

2  enforcement about potential criminal conduct?

3        **MR. TAN:**  Well, if you obtained that information

4  through a private exchange with another party --

5        **THE COURT:**  Then I don't have the constitutional right

6  to tell law enforcement?

7        **MR. TAN:**  Well, you've -- you've bargained for that.

8  You bargained for that information, which is something that the

9  *IMDB* court recognized was a separate category of speech that's

10  entitled to reduced constitutional protection.

11        **THE COURT:**  Still, so -- but that's the -- that's the

12  commercial argument.  This is not commercial.  This is --

13  you know, I don't -- and I'm going to ask the United States

14  about this -- but this seems to me there are categories here

15  which are plainly not commercial speech.  And there may --

16  there are categories here which are plainly commercial speech.

17  And I think the speech at issue here is plainly commercial

18  speech, the actual speech involves commercial speech.

19      But we're talking about a facial challenge.  And what I'm

20  asking you to agree, Mr. Tan, is that there are categories to

21  which this statute applies that are plainly noncommercial

22  speech that are entitled to strict scrutiny analysis.

23        **MR. TAN:**  Well, Your Honor, in *IMDB*, the Ninth Circuit

24  recognized that the Supreme Court has held that commercial

25  speech and speech touching on purely private matters are

1   subject to reduced constitutional protection.

2       Now, the Court also recognized that information obtained

3   through an exchange between private parties falls under the

4   latter category:  That is, speech touching on purely private

5   matters.

6       THE COURT:  I hardly think it's very -- that the

7   examples, the two examples I've been given are purely private

8   matters, but I understand the argument.

9       Go ahead.  You can proceed.

10      MR. TAN:  And the other issue with the CyberTipline --

11  and I believe it's another child pornography statute -- in the

12  *YouTube* case, looking at the statute itself, it does not

13  require a service provider to identify the specific videos that

14  someone watched, which is what the VPPA restricts.  The

15  restriction on videotape service providers and personally

16  identifiable information under the VPPA is relatively narrow.

17      Under the Ninth Circuit's *Eichenberger* decision, it has to

18  identify a specific video that someone watched.  So even under

19  that *YouTube* example involving the child pornography statute,

20  the service provider could still comply with both statutes

21  simply because the information that they must provide to the

22  government does not necessarily -- the statute does not require

23  them to identify the specific videos.

24      THE COURT:  So if they say that -- you know, a

25  particular -- they think of a disclosure.  The disclosure is

**PROCEEDINGS**

1   that the video service provider says, "Well, this person," so

2   it identifies a human being, "is watching -- has requested

3   child pornography videos."

4        That doesn't run afoul of the statute?

5        **MR. TAN:**  If YouTube or the service provider just says

6   "child pornography videos," I do not believe that would fall

7   under the definition of PII as articulated by the Ninth Circuit

8   in *Eichenberger*, which requires disclosure of information that

9   would allow an ordinary person to identify the specific videos

10  that a plaintiff -- a consumer watched.

11       So I believe, under your hypothetical, that would not run

12  afoul of the VPPA.

13       **THE COURT:**  Okay.  So if he -- what -- if the person

14  wanted to say they watched X, then they -- a specific video,

15  then it would violate the VPPA.

16       **MR. TAN:**  That's right, Your Honor.

17       **THE COURT:**  So the publication of the list of

18  Judge Bork's videos would violate the VPPA.

19       **MR. TAN:**  Right.  And I mean, we --

20       **THE COURT:**  No, I agree.  I'm not contesting.  I'm

21  just trying to make sure I understand.

22       And the disclosure to the CyberTipline a specific human

23  being -- requesting or watching specific pornographic videos --

24  which, by the way, is what actually happens; right?  They -- in

25  the cyberworld they say, you know, Google or somebody will send

1    a tip to the Tipline saying "This person has watched this video

2    or downloaded this specific video link," and it will also be --

3    identify a specific video.

4        So that -- I'm not -- that may or may not be in the record

5    here, but that's how it actually works.

6        So I'm not sure it changes much to say that there's a way

7    to go to law enforcement where you don't run afoul of the

8    statute because the question is whether there are substantial

9    uses that do that are non- -- that are not commercial, that are

10   subject to strict scrutiny.

11       But go ahead.

12       **MR. TAN:**  Well, the other thing is that it's not

13   entirely clear from the record, based on what Mr. Norton just

14   said, how many of those tips actually come from videotape

15   service providers.

16       **THE COURT:**  Why does that matter?

17       It's not -- it's not very important; right?  Why does it

18   matter how many there are?

19       **MR. TAN:**  Well, that's part of the overbreadth

20   analysis in terms of whether the VPPA overreaches and

21   substantially infringes on --

22       **THE COURT:**  So you disagree with Mr. Norton's

23   contentions; this isn't about counting, this is about how

24   significant is the subject that we're talking about.  The more

25   significant the subject is that we're talking about disclosing,

**PROCEEDINGS**

1    the easier it is to sustain an overbreadth challenge.

2       That would be -- I'm putting words in his mouth, but you

3    disagree and think you have to figure out how many there

4    actually are?

5          **MR. TAN:**  Well, you don't need to put a precise

6    testimony on it, Your Honor, but the quantity does matter.

7       For instance, in the *Hansen* case, recent *Hansen* case in

8    the Ninth Circuit, the court found that law at issue would

9    restrict everyday speech.  It was kind of a commonsense

10   approach.  But then in the *Ashcroft* case involving another

11   child pornography statute, the Supreme Court suggested that the

12   law would infringe on hundreds of artistic films.

13      So it seems like there is a quantity aspect of the

14   overbreadth analysis.  So I don't think you need to put a

15   precise number, Your Honor, but it is relevant to the Court's

16   analysis here.

17         **THE COURT:**  Okay.  Thank you.

18      Go ahead.  Anything more on this preliminary discussion

19   we're having, or anything else on the overbreadth analysis?

20         **MR. TAN:**  Yes, Your Honor.  Just turning to the

21   argument that the VPPA can -- some requirements are especially

22   onerous, there's really no indication, again, in the record

23   that it is.  As a matter of common sense, I mean, we regularly

24   receive updates from businesses saying that they've updated

25   their terms of use or privacy policy.  They can easily do that

1   online.  And that's also true for the VPPA, because Congress

2   amended the VPPA in 2012 to make it easier for businesses to

3   obtain consent from consumers specifically because they can now

4   do it online and through the Internet.

5       And the only case that Patreon cites is a statute that was

6   struck down because it substantially infringed on political

7   speech, because there are very onerous requirements involving

8   putting signs up around -- I believe it was Redwood City or

9   some other city in the Bay Area.  But there's a big difference

10  between having to go around collecting signs and signatures in

11  the 1970s and obtaining consent online via e-mail or through a

12  web page.  So there's really no prior precedent that suggests

13  that the VPPA's consent requirements are especially onerous

14  such that they constitute a violation of the First Amendment.

15      And turning to whether or not the VPPA allows the

16  plaintiffs to obtain liquidated damages, even without a showing

17  of any type of harm, what the *Perry* case and *Eichenberger* --

18  the *Perry* case is from the Eleventh Circuit, and *Eichenberger*,

19  Ninth Circuit -- both those cases have recognized that VPPA is

20  really a codification of the common law tort of intrusion upon

21  seclusion.  And under the restatement of torts, it's the

22  intrusion itself that causes the harm to the plaintiff and

23  therefore renders the defendant liable.

24      And the language in *Eichenberger* about consequential harm,

25  means that there's no showing of additional harm -- such as

1    monetary damages -- is required to prevail on a claim for

2    intrusion upon seclusion.  But that doesn't mean that a

3    plaintiff hasn't suffered any injury in that context.  If

4    someone opens your wallet or rifles through your mail -- as in

5    a more, you know, traditional analogy of intrusion upon

6    seclusion situation -- you still have suffered injury,

7    precisely because your privacy interests have been invaded.  So

8    the VPPA does protect that important privacy interest by its

9    statutory damages provision.

10        And sorry, I just want to add, in terms of *Gertz* -- the

11   *Gertz* case, *Gertz* was limited to the defamation context.  And

12   there's no court that has applied *Gertz* to hold that a

13   statutory damages provision violates the First Amendment.  In

14   fact, in *Dunn & Bradstreet*, the Supreme Court narrowed the

15   scope of *Gertz* and upheld the award of presumed damages when

16   the matter does not concern -- when the information does not

17   concern a matter of public interest.

18        And the last point I want to make, in terms of whether the

19   VPPA punishes information that's already public, Patreon relies

20   heavily on the *Florida Star* case, but that case is just really

21   in the context of a statute that was aimed at newspapers or an

22   instrument of mass communication.  And in that case, the

23   Supreme Court applied the so-called Daily Mail principle, under

24   which the government cannot punish the press for the disclosure

25   of lawfully obtained information and truthful information

**PROCEEDINGS**

1    that's a matter of public interest.

2         And here, your -- the VPPA is not a statute that is aimed

3    directly at the press.  It's a law of general applicability

4    and, under *Cohen*, to the extent that the VPPA might apply to a

5    media organization, that's only an incidental effect that's

6    insufficient to constitute a First Amendment violation.

7         And, moreover, the discussion about whether the Government

8    is allowed to punish the press for the disclosure of

9    information that's already public, it's important to, again,

10   understand the context of the *Florida Star* decision, which is

11   part of a long line of Supreme Court cases that have struck

12   down restrictions aimed directly at the press.  So those

13   concerns do not apply here because the VPPA is a law of general

14   application.

15        **THE COURT:**  Let me hear from the United States.  And

16   my question for the United States is this:  What are you doing?

17        And here's what I mean by that:  If I decide that strict

18   scrutiny applies to this statute, does the United States take

19   the position that this statute survives strict scrutiny?  Or is

20   the position of the United States that we think that the

21   intermediate level of scrutiny applies, that the statute is

22   constitutional under that level of scrutiny, but that if -- if

23   it is ultimately decided by me or somebody else that this

24   statute is subject to strict scrutiny, then the United States

25   concedes that it would be unconstitutional.

1      **MS. VIGEN:**  Thank you, Your Honor.

2      The United States does not concede that the statute would

3  be unconstitutional if Your Honor believes strict scrutiny

4  applies here.

5      **THE COURT:**  Got it.

6      **MS. VIGEN:**  However, we do not believe that strict

7  scrutiny is the right analysis or the right lens through which

8  to analyze this statute, and it's for the reasons expressed in

9  our brief:  We think that this is a statute that applies

10  primarily to commercial speech; it's targeted at business

11  providers; and it restricts disclosure of information that

12  involves either fulfilling or requesting a commercial

13  transaction.

14      And in these statutes --

15      **THE COURT:**  I've got to tell you, I'm astounded by

16  that position.  Totally astounded.

17      What you are saying is that the application of this

18  statute to the Bork situation, that would be constitutional;

19  you could prohibit someone from making that political speech.

20  That's not -- that that's -- and it's -- strict scrutiny

21  doesn't apply because that's just a commercial -- commercial

22  speech.

23      **MS. VIGEN:**  So, Your Honor, I'll just -- just to sort

24  of focus us in here, that's not the case that's before us.  The

25  case that's before us --

**PROCEEDINGS**

1           **THE COURT:**  I don't care what case is before us.

2       My question is about the statute.  They're trying to raise

3   a facial challenge.  In a facial challenge, if you show that

4   the subject of the statute is nearly exclusively commercial

5   transactions -- whatever that means -- then you have one

6   approach.

7       If there are applications of the statute that are,

8   you know, based on content or applies to at least some

9   noncommercial expression, then you apply strict scrutiny, at

10  least as I understand it.

11      Is it -- it is undoubtedly the case, is it not -- I'll put

12  it in that way -- that the expression of the video provider

13  providing to the newspaper Judge Bork's viewing history was

14  noncommercial expression, to which -- you know, if the

15  statute -- if the statute would apply to that, if that was

16  happening today, and that was -- and that would be a

17  noncommercial application of the statute.  Isn't that right?

18      They're not doing that for commercial reasons.  The --

19  neither the provider of the information nor the recipient of

20  the information, presumptively -- it's a matter of public

21  interest.  It's a political question.

22          **MS. VIGEN:**  So in that instance -- and I think that we

23  acknowledge in our brief that there are limited examples of

24  where the statute could apply to noncommercial speech.  And I

25  think, in that instance, you've identified one of those limited

1   examples.

2        But as plaintiffs' counsel said, there's never been

3   another situation where the VPPA has been held to apply to that

4   type of disclosure.

5        Defendants' counsel is arguing that --

6        **THE COURT:**  But it would; right?  It would; right?  It

7   would.

8        **MS. VIGEN:**  I believe, in that limited instance, that

9   is an example of noncommercial speech to which the statute

10  would apply, yes.

11       But I do think it's very important here to look back to

12  the way that the Supreme Court has described how to analyze

13  those overbreadth challenges.

14       And a statute can only be invalidated under a First

15  Amendment overbreadth challenge where we're not dealing with

16  the specific situation in front of the Court, but rather with

17  any hypothetical application of the statute where it reaches a

18  substantial amount of protected conduct, and that's relative to

19  the statute's legitimate sweeps.  You don't only look at

20  whether or not the statute applies to some instances of

21  noncommercial conduct --

22       **THE COURT:**  So just to be clear:  That's not the

23  gatekeeper question.  That's the ultimate question on

24  overbreadth.  The gatekeeping question on whether this is

25  commercial speech, you're essentially conceding that there are

1   some noncommercial expressions; and so we need to do an

2   overbreadth analysis, and then we do the analysis you're

3   talking about; isn't that right?  That's strict scrutiny.

4        **MS. VIGEN:**  Well, Your Honor, I mean, I think there's

5   sort of two -- two aspects of that question which is made a

6   little complicated here because defendants haven't brought

7   an -- and they purposely haven't brought an as-applied

8   challenge, because I think it's clear, at least from what's

9   alleged in the complaint, that the speech at issue here is

10  commercial speech.  So defendant then said:  Okay.  How can we

11  challenge the statute on First Amendment grounds, then?  Let's

12  move on to an overbreadth challenge.

13       So that's the situation we're in.  But I do think it's

14  important to look at this through the lens of the case that is

15  before us, which is a case involving commercial speech and of

16  which there are quite a number going around in other district

17  courts in the country right now involving this same type of

18  disclosure, this same type of commercial disclosure.  So that's

19  sort of the point through which to start.

20       And all of those applications of the statute would be

21  subject to the intermediate scrutiny test that we discussed in

22  our brief.

23       **THE COURT:**  If it was an as-applied question; right?

24       **MS. VIGEN:**  Correct.  As applied.

25       Once we get to the question of overbreadth, then we do

1    look at only the noncommercial instances because the Supreme

2    Court has held that overbreadth analysis doesn't apply to

3    commercial speech, so we look at only the noncommercial

4    instances of the statute.  And then, only then -- and then I

5    think that the first step there, before you even apply the

6    analysis, is to say:  Are there even enough of these

7    noncommercial applications to get past that sort of -- to

8    engage any further in the overbreadth analysis?

9         And our position is that there is not.

10        And I think -- you know, I want to go through the -- if --

11   unless Your Honor has questions, I'll pause.

12             **THE COURT:**  No.  No.  Go ahead.

13             **MS. VIGEN:**  But I'd like to go through the examples

14   that defense counsel brought up because we've sort of -- and

15   we've addressed, and plaintiffs' counsel also addressed in

16   their briefs and in this hearing, the sort of very limited

17   instance of the Bork examples that precipitated the passage of

18   the statute.

19        But I also want to talk about the cases that the

20   plaintiffs cite in their brief because I don't think they stand

21   for the proposition that the VPPA applies to individuals

22   seeking out law enforcement, trying to report behavior that

23   they believe is illegal or illicit.

24        In fact, what happened in those cases is police went to

25   video rental stores and asked for information from employees

 1    without first obtaining a warrant, which, under the statute, if

 2    they had gotten a warrant first or a court order, they would

 3    have been able to get that information without a problem,

 4    without violating the statute.

 5        But, instead, the police didn't go through that required

 6    step.  They went to these employees and they got information

 7    that was prohibited -- that the employees were prohibited from

 8    providing under the VPPA.  So that's what happened in the

 9    *Gakuba* case -- which I may be mispronouncing, which is cited in

10    defendant's brief on page 6; the *Dirk*s case, which is cited in

11    defendant's brief on page 6; the *Canfield* case, which is cited

12    in defendant's brief on page 6.

13        And I think the *Daniel versus Cantrell* case may or may not

14    be the one limited example in which it's possible that a video

15    service provider went to police first, but it's very unclear

16    from what is described in the opinion there.  And, in fact, the

17    defendant there who is -- there's a criminal defendant who is

18    the plaintiff in that case who is -- who has alleged that

19    police officers and others are liable under the VPPA for --

20    because they obtained video -- or I'm sorry -- information

21    about his video viewing history as part of a criminal

22    prosecution.

23        **THE COURT:**  So let me interrupt you because we're

24    getting a little too far out into the weeds.

25        **MS. VIGEN:**  Sure.

1         **THE COURT:** Why does any of this matter? Why does it

2  matter that the police asked for it? The disclosure is what is

3  prohibited. Whether they asked or not, when the -- when the

4  clerk at the counter gives them information that they're not

5  allowed to give under the VPPA, that's the violation, and it's

6  by the video provider.

7     Why does it matter whether there's a question from police?

8         **MS. VIGEN:** Because the police could have lawfully

9  obtained that information had they had a warrant.

10         **THE COURT:** But they didn't. They didn't. There was

11  still a violation. That's why the cases go and talk about it

12  at all.

13         **MS. VIGEN:** So, yes. But, really, it's the -- the

14  officers had the chance to get that information lawfully and

15  didn't follow the proper procedures. So the VPPA wants that

16  disclosure to be made through proper means that properly

17  protect the privacy interests at issue in the statute.

18     And I do think it's important --

19         **THE COURT:** Well, it does two things. It does -- it

20  says that, and it says the flip side, which is: Otherwise,

21  don't.

22     So there's the clerk who gave them the information,

23  violated the statute, and that's what the prohibition applies

24  to, that conduct.

25     So I don't understand why that matters at all, that the

1    police asked for the information when they could have gotten a

2    warrant.  Of course, that's on them.  But this is not -- the

3    statute is not about what's on them.  Instead, there's

4    questions whether or not the prohibition of the disclosure to

5    police without a warrant -- among other things -- violates the

6    First Amendment, violates the statute, and whether that

7    prohibition violates the First Amendment.

8            MS. VIGEN:  I mean, what you're really talking about,

9    Your Honor, is a value judgment that Congress made about the

10   value of privacy here.  And Congress decided that the privacy

11   interests at stake here were valuable enough to require the

12   police to get a warrant first.

13       They didn't want the police to not be able to get

14   information that they needed, but they said, you need to get a

15   warrant first.  And we make the police get a warrant in other

16   situations as well.  Obviously, you know, the police are not

17   allowed to just walk into your house and violate the Fourth

18   Amendment.  They have to get a warrant for that too, because

19   the founders of our country determined that those privacy

20   interests were --

21           THE COURT:  That's not a reasonable interpretation of

22   the statute.  They didn't decide that the police have to get a

23   warrant.  What they decided is:  In the absence of a warrant,

24   you cannot provide or disclose it to the them.

25       That's what they decided:  In the absence of a warrant,

**PROCEEDINGS**

1    you can't.

2        And the judgment for this Court is that lots of people

3    provide lots of information to the police all the time without

4    a warrant, and -- probably 90-something percent, the vast

5    majority of information provided to police is without a

6    warrant.  And the question is whether prohibiting those

7    disclosures, non-warrant-based disclosures, which are most

8    disclosures to police, violate the statute.

9        And I think you're essentially conceding it does.  If it's

10   got the bells and whistles, X person did X, viewed X, or

11   requested X video, or Y video, then that's -- then we look at

12   that and we decide:  Is that subject to an overbreadth

13   challenge?

14       **MS. VIGEN:**  I mean, again, we're looking at a very

15   narrow set of individuals and circumstances to which the

16   statute applies:  Only videotape service providers and only

17   personally identifying information about an individual's

18   viewing history.

19       And, yes, in that -- in that limited sort of universe,

20   Congress made a value judgment that the privacy of that

21   person's video rental choices or video viewing choices,

22   you know, as part of their right to intellectual freedom, was

23   worth protecting, and they protected it in the form of this

24   statute.

25       And, again, I just want to -- just to not lose the point

1    of my, perhaps, getting a little too far into the weeds and

2    distinguishing plaintiffs' cases cited in their reply, I did

3    want to point out the reason why I wanted to sort of make a

4    distinction between those cases and -- in the context of the

5    overbreadth challenge -- is that the VPPA does permit

6    disclosures to law enforcement when law enforcement goes

7    through the proper procedures.

8        And so, you know, if you're looking at the balance between

9    the types of cases that have been brought under the VPPA, where

10   the VPPA intended to prohibit certain types of commercial

11   disclosures, versus situations in which the VPPA provided an

12   opportunity -- even if the person didn't follow the

13   opportunity, even if the law enforcement agent didn't take the

14   proper course, the VPPA provided the opportunity for that

15   individual to obtain the information they needed without

16   violating the statute.

17       So I think that that is relevant in determining whether or

18   not the statute is overly broad.  And I would also point to the

19   limited number of those cases that plaintiffs cited to.

20       And then I'll pause there, and then I have another point

21   about disclosure --

22           **THE COURT:**  While you're pausing there, my fundamental

23   concern, that I raised at the beginning of the hearing, is

24   whether we should do this now or do this later.  And the more

25   you talk, the more I am convinced that might be the way to go,

1    is to do it later.  Because you keep talking about that there's

2    a limited number of cases where this arises; there's a limited

3    number where that arises.

4         You know, I don't know how I make that judgment just by

5    looking at the record that you've all put in front of me.

6    Because the record that I put in front of me is:  Well, there's

7    this and there's this and there's this.  And they seem

8    important, but I don't have any clue as to how many there are.

9    I'm not sure it matters too much how many there are, but it

10   matters some.

11        But I'm just concerned that we're in the wrong place in

12   the case, and that what we ought to do is press the pause

13   button, develop a record, and put it before the Court on a

14   motion and do this on a more fulsome record than what there is.

15        What's United States' position on that?

16        **MS. VIGEN:**  So the United States -- it's our position

17   that this can be decided on a 12(b)(6), because we don't think

18   that the defendant has fulfilled its burden to demonstrate that

19   the statute is actually overly broad here.

20        And in addition, the --

21        **THE COURT:**  Because there aren't enough instances

22   where there's an overbroad application?  How do we do that

23   based on this record?

24        **MS. VIGEN:**  Well, again, that's where defendant has

25   put itself in a bit of a difficult position by bringing this

1  overbreadth challenge and not an as-applied challenge.  An

2  as-applied challenge, you can really dig into the facts of this

3  case.  But in an overbreadth challenge, the Court is sort of in

4  a position where it has to weigh hypotheticals, and that is

5  really what is required in an overbreadth analysis.

6       And if it's not apparent --

7            THE COURT:  So.  Okay.  If you think that's right,

8  talk to me about the CyberTipline.

9            MS. VIGEN:  Yes, Your Honor.

10            THE COURT:  Because, actually, Mr. Norton is a hundred

11  percent correct in a lot of ways.

12       Number one:  There are an extraordinary number of very

13  important tips that go through that line.  It's a matter of

14  grave public concern.

15       Number two:  Those tips typically -- or not typically --

16  often have videos and human beings identified in them,

17  specifically child pornography videos attached to specific

18  human beings who were involved in them, downloading or viewing

19  them, whatever they were involved in.

20       Why isn't that something I should be concerned about

21  for -- in the overbreadth analysis?

22            MS. VIGEN:  Well, Your Honor, there's a specific

23  statute that requires providers to provide that information to

24  the tipline.  And so if anyone brought a challenge under the

25  VPPA, those providers could point to 18 U.S.C. 2258(a) and say:

**PROCEEDINGS**

 1  We were required to provide this information under the statute.

 2       And so I don't -- I think we're arguing about a little bit

 3  of a red herring here because there are separate duly-enacted

 4  statutes by Congress that allow providers to provide this

 5  information to the tipline and to law enforcement.

 6            **THE COURT:**  All right.

 7            **MS. VIGEN:**  And there's never been a challenge to

 8  that --

 9            **THE COURT:**  How do they decide --

10            **MS. VIGEN:**  -- statute under the VPPA.

11            **THE COURT:**  Well, I'm not saying we're going to

12  challenge that statute.

13       But how do they -- how does a video provider -- this is

14  the clerk -- right? -- kind of person, or it's the Google kind

15  of person who sees the traffic -- decide which statute to

16  follow?

17       Does the -- it's the -- or does the -- you know, are they

18  faced with looking at this, which says "don't tell anyone," and

19  the other, which says "must tell someone," number one.

20       Number two is:  Is it relevant -- as I assume it is --

21  true that the tipline statute, that the criminal code, the

22  section that requires disclosure, was enacted after the VPPA?

23       The VPPA is fairly old.

24       Does it matter for the First Amendment analysis?  Because

25  it's what this person's -- it's the burden on this person's

**PROCEEDINGS**

1   speech.

2       So I'm not sure where -- where this all fits together.

3       **MS. VIGEN:**  Your Honor, these are all ready good

4   questions --

5       **THE COURT:**  Thank you.

6       **MS. VIGEN:**  And I think questions that would benefit

7   from more analysis than I've been able to, you know, engage in

8   just sitting here paying attention.

9       If Your Honor would like supplemental briefing on this

10  question, I think that would be beneficial.  Because I'd like

11  to -- I'd like to provide a more considered position of the

12  Government, if that would be something Your Honor would be

13  interested in.

14      **THE COURT:**  Well, you know, I'm not -- well, maybe.

15      My instinct is to:  Well, if we're going to do

16  supplemental briefing, why don't we do this motion on a more

17  fulsome record and just do it once, and then you can address

18  everything at once and there won't be any issues about "Had I

19  allowed sufficient factual development, this could have been

20  shown" or something like that.  So I'm sort of disinclined to

21  just do supplemental briefing.

22      Let me -- did you have anything else you want to say on

23  this subject before I go back to plaintiff -- defendant for a

24  final word?  Because I've got a 10:30 calendar.

25      **MS. VIGEN:**  I had one more just sort of general point,

1   that we brought up in our briefs but I just wanted to emphasize

2   here, which is that in situations where there's a, you know,

3   sort of tension between the First Amendment and privacy

4   interests, the first -- I'm sorry -- the Supreme Court has been

5   very careful to avoid making broad pronouncements and instead

6   to really focus on the surgical application of the First

7   Amendment when privacy interests are implicated, such as in the

8   *Bartnicki* case, which we cite in our briefs, or more recently

9   in the *TCPA* case.  And so I just urge the Court to similarly

10  consider a more narrow approach here that I don't think is

11  consistent with the overbreadth challenge that defendant has

12  brought.

13          And that's all I have.  Thank you, Your Honor.

14          **THE COURT:**  Let me just -- Mr. Norton, if you could

15  wrap up.

16          **MR. NORTON:**  I'll be very brief.

17      I think the argument has highlighted the Court's concern

18  that this argument, this issue would benefit from further fact

19  development.

20      I don't think that the fact development that would be

21  required to brief this adequately is the kind of discovery that

22  we planned for the entire case -- right? -- that it could be

23  fairly targeted and done fairly efficiently.

24          And this is an issue that the case stands or falls on.

25  And so I think setting forth the process that allows us to get

**PROCEEDINGS**

1   this issue before the Court on a record that allows the Court

2   to make a decision with confidence, but to do so quickly, is in

3   the best interest of the parties and the Court.

4        One of the other issues that we would want to explore is,

5   I want to note that, I think, both defendants and the

6   Government, in a kind of hand-wavy way, say that there's a

7   tremendous amount of commercial speech that's the subject of

8   the VPPA.  And I think there's a lot of factual evidence that

9   could be developed quickly that would show that a lot of that

10  speech does not satisfy the commercial speech standard,

11  certainly not in the Ninth Circuit.

12       But I think these are issues that we can flesh out and

13  present to the Court and -- but I think we can do it relatively

14  quickly.  And we would like to do it relatively quickly because

15  we do think we prevail on this issue on a full record.  And I

16  would welcome the --

17       **THE COURT:**  So the plaintiff would like to do it

18  relatively quickly too, for equal and opposite reasons.

19       What kind of process would you propose?

20       **MR. NORTON:**  So this is the kind of thing where I --

21       **THE COURT:**  Maybe you should do it among yourselves.

22       **MR. NORTON:**  It would probably benefit from discussion

23  with plaintiffs' counsel and my complaint.

24       But speaking out of turn, I think, a relatively short

25  period of focused discovery on the order of a few months to

1   exchange requests, to the extent third-party requests are

2   necessary to figure out what we can stipulate to, and then, on

3   that record, come back to the Court.  And, of course, we all

4   know the legal questions pretty well, so the briefing of that,

5   hopefully, would be -- we can do that fairly expeditiously.

6        So I think that what it would require is a few months.

7   The nature of discovery is nothing gets done in under 30 days;

8   it usually takes a little longer.  But that -- I don't think

9   these are insurmountable or extraordinarily difficult

10  questions, but we didn't try to answer those questions because

11  it was a 12(b)(6) motion and we tried to confine ourselves to

12  the complaint.  If we can go farther, we don't have to go a lot

13  farther.

14       **THE COURT:**  I want you to discuss in your discussions

15  what's the -- what's the procedural mechanism because I would

16  want to be able to look at, in the way that courts look at

17  whatever factual development the parties bring to me about the

18  privacy interests at stake, the significant -- relative

19  significance or the un-significance of the noncommercial areas,

20  et cetera, et cetera.  I want to be able to take those facts

21  into consideration without being bogged down by some factual

22  dispute over exactly how many, or, you know, whatever it is.

23  So maybe one of the things you need to talk about is what

24  exactly is the mechanism.

25       Does anyone else have thoughts on the mechanism?

**PROCEEDINGS**

1          Maybe I'll start with you, Mr. Tan, and then Ms. Vigen can

2    weigh in.

3          **MR. TAN:**  Your Honor, I'm sure the parties can work

4    something out.  I mean, obviously, the Court and Mr. Norton

5    have raised some very interesting questions today that I'm sure

6    we could discuss further in terms of how we could further

7    address those concerns of the Court.

8          **THE COURT:**  Okay.  Ms. Vigen.  So does the United

9    States have a view on this one?

10         **MS. VIGEN:**  No, Your Honor.  I would have to discuss

11   with others the scope of the United States' continued

12   participation.

13         **THE COURT:**  All right.  Well, so here's what I'd like

14   to do:  I'm going to take this under submission.  I'm going to

15   look at it again, see if I feel comfortable deciding it now.

16   If I don't feel comfortable deciding it now, I'm going to

17   probably kick the can, kick the ball into your court and give

18   you a brief period of time to have a meet and confer, and

19   propose to us, you know, the timing, the mechanism, what -- the

20   scope of discovery that would be permitted, all those things,

21   and then come back.

22         I'm going to set, just as a -- so that we don't lose track

23   of this, a case management conference in about 45 days, just as

24   a safety, just because I always set a date because it's the

25   only way I keep track of these things.

**PROCEEDINGS**

1  So, Karen, if you could give us a date about 45 days out,

2  probably about the end of March or beginning of April, for our

3  case management conference.

4      **THE CLERK:**  Yes.  That date would be March 31st, if

5  that works for the parties.  If not, we could go to April 7th .

6      **MR. NORTON:**  I apologize.  I'm out of the country from

7  March 31st to April 9th.  I managed to plan that precisely.

8      **THE COURT:**  That would be perfect.

9  What's next?

10      **THE CLERK:**  The 14th, April 14th.

11      **MR. NORTON:**  I have no conflicts.  That would work

12  fine for plaintiff -- for defendants.  I'm sorry.

13      **MR. GRILLE:**  Okay for plaintiffs as well.

14  This is Simon Grille.

15      **MS. VIGEN:**  To the extent you'd want the United States

16  to participate in that, I am available.

17      **THE COURT:**  Oh, I want you to participate.  I do.  I

18  mean, I think that, you know, you've an important role to play

19  in these kind of cases.

20  Plus, you have a scope that I find, you know, very

21  helpful, and you talk about, you know, these -- what cases are

22  pending in courts around the country, and that sort of thing is

23  always very helpful.

24  All right.  So we'll help set that, and updated case

25  management statement one week in advance.  But, long before

**PROCEEDINGS**

1  that, I hope to get this out with instructions on the timing

2  and filing of something to guide our next steps.  Okay?

3      Thank you very much.

4          **MR. NORTON:**  Thank you, Your Honor.

5          **MS. VIGEN:**  Thank you, Your Honor.

6              (Proceedings adjourned at 10:43 a.m.)

7                    ---oOo---

8

9              **CERTIFICATE OF REPORTER**

10      I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13  DATE:   Thursday, February 23, 2023

14

15

16

17

18  _____
    Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
19        Official Reporter, U.S. District Court

20

21

22

23

24

25