Fred Norton (CA SBN 224725)
fnorton@nortonlaw.com
Nathan Walker (CA SBN 206128)
nwalker@nortonlaw.com
Bree Hann (CA SBN 215695)
bhann@nortonlaw.com
Celine G. Purcell (CA SNB 305158)
cpurcell@nortonlaw.com
Gil Walton (CA SBN 324133)
gwalton@nortonlaw.com
THE NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Telephone: (510) 906-4900

Attorneys for Defendant
PATREON, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAYDEN STARK and JUDD OOSTYEN, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br>          v.<br><br>PATREON, INC.,<br><br>                    Defendant. | Case No. 3:22-CV-03131-JCS<br><br>**DEFENDANT PATREON, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' VPPA CLAIMS ON THE GROUND THAT THE VPPA VIOLATES THE FIRST AMENDMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    February 16, 2024<br>Time:   9:30 a.m.<br>Judge:  Hon. Joseph C. Spero |

# NOTICE OF MOTION AND MOTION

TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD, PLEASE TAKE NOTICE that on February 16, 2024, at 9:30 a.m. or as soon thereafter as counsel may be heard, in Courtroom D, 15th Floor of this Court, located at 450 Golden Gate Ave., San Francisco, CA 94102, Defendant Patreon, Inc. ("Patreon") will, and hereby does, move – under Rule 56 of the Federal Rules of Civil Procedure – for summary judgment, or in the alternative summary adjudication, in its favor on Plaintiffs' claims under the Video Privacy Protection Act ("VPPA") on the ground that the VPPA, both as applied to Patreon and on its face, violates the First Amendment to the United States Constitution. This motion is based on this notice of motion and motion; the following memorandum of points and authorities; the declarations filed contemporaneously with this motion and the exhibits attached thereto (namely, the Declaration of Fred Norton ("Norton Decl."); the Declaration of Jason Byttow ("Byttow Decl."); the Declaration of John Shehan on Behalf of the National Center for Missing & Exploited Children ("Sheehan Decl."); the Declaration of Jennifer Penrose on Behalf of the National Center for Missing & Exploited Children (Exhibit G to the Shehan Decl.) ("Penrose Decl."); the Declaration of Dontae Nelson on Behalf of Meta Platforms, Inc. ("Nelson Decl."); the Declaration of Luke Morris on Behalf of Google LLC ("Morris Decl."); the Declaration of Lili Nguyen on Behalf of TikTok Inc. ("Nguyen Decl.")); Patreon's request for judicial notice, filed contemporaneously with this motion ("RJN"); the pleadings, orders, and other filings appearing in the docket of this matter; any additional evidence or argument presented at the hearing on the motion; and any other matters the Court deems proper.

# STATEMENT OF RELIEF SOUGHT

Patreon moves for summary judgment in its favor on Plaintiffs' claims under the VPPA on the ground that the VPPA, both as applied to Patreon and on its face, violates the First Amendment to the United States Constitution.  In the alternative, Patreon seeks summary adjudication that the VPPA's specific consent requirement, 18 U.S.C. § 2710(b)(2)(B), and its liquidated damages provision, 18 U.S.C. § 2710(c)(2)(A), each violate the First Amendment and must be severed from the law.

# TABLE OF CONTENTS

I.    INTRODUCTION AND STATEMENT OF ISSUES ....................................................... 1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................... 1

    A.   Facts Patreon Assumes To Be True Solely For Purposes Of Summary Judgment ........... 1

    B.   Patreon Is A Platform Where Creators Offer Fans Access To Content For A Fee ........... 1

    C.   Neither Plaintiff Suffered Any Harm from a Superficial Disclosure to Meta ................... 2

    D.   Each Plaintiff Affirmatively Consented to the Disclosure of Their Internet
        Activity to Patreon, Including Which Videos the Requested or Obtained ....................... 2

    E.   Internet Users, Like Plaintiffs, Can Effectively Protect Any Genuine Interest in the
        Privacy of Their Internet Video Viewing by Blocking or Disabling the Meta Pixel ......... 4

    F.   The VPPA Applies to a Substantial Amount of Non-Commercial Speech ....................... 5

        1.   Disclosures Concerning Public Officials ................................................. 5

        2.   Disclosures Concerning Potential Crimes ............................................... 6

        3.   Disclosures Concerning Threats to Individual or Public Safety ........................... 9

        4.   Litigation and Testimonial Disclosures ................................................. 10

        5.   Disclosures by Continuing Education Providers, Traffic Schools ........................ 11

        6.   Disclosures to Teachers and Educational Institutions ......................................... 12

        7.   Other Protected Disclosures ................................................................... 13

III.  ARGUMENT ..................................................................................................................... 13

    A.   Overview of the VPPA ................................................................................. 13

    B.   Legal Standard ........................................................................................... 14

    C.   Constitutional Standards of Review ............................................................. 15

    D.   Patreon's As-Applied Challenge Must Succeed Because the VPPA Does Not
        Materially Advance Any Substantial Interest ............................................... 16

    E.   The VPPA Is Overbroad Because It Prohibits a Wide Range of Constitutionally
        Protected, Non-Commercial Speech an so is Unconstitutional On Its Face ................... 20

    F.   The VPPA Does Not Further a Compelling Governmental Interest in Privacy by
        Narrowly Tailored Means ......................................................................... 25

IV.   CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*44 Liquormart, Inc. v Rhode Island*,
   517 U.S. 484 (plurality op.) ............................................................................ 17, 19

*Americans for Prosperity Found. v. Bonta*,
   141 S. Ct. 2373 (2021) ............................................................................................ 16

*Ashcroft v. Free Speech Coal.*,
   535 U.S. 234 (2002) ................................................................................................ 15

*Austin-Spearman v. AMC Network Ent, LLC*,
   98 F.Supp.3d 662 (S.D.N.Y. 2015) ........................................................................ 20

*Baldwin v. Redwood City*,
   540 F.2d 1360 (9th Cir. 1976) ................................................................................ 23

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. ___, 140 S.Ct. 2335 (2020) ............................................................... 16, 19

*Bd. of Trustees of State Univ. of New York v. Fox*,
   492 U.S. 469 (1989) ................................................................................................ 21

*Berger v. City of Seattle*,
   569 F.3d 1029 (9th Cir. 2009) ................................................................................ 16

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) ................................................................................... 16, 20, 25

*Camfield v. City of Oklahoma City*,
   248 F.3d 1214 (10th Cir. 2001) ................................................................................ 8

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
   447 U.S. 557 (1980) ................................................................................................ 15

*City of Cincinnati v. Discovery Network, Inc.*,
   507 U.S. 410 (1993) ................................................................................................ 20

*Conant v. Walters*,
   309 F.3d 629 (9th Cir. 2002) .................................................................................. 18

*Coplin v. Fairfield Pub. Access Television Comm.*,
   111 F.3d 1395 (8th Cir. 1997) .......................................................................... 18, 24

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975) .......................................................................................... 23, 24

*Daniel v. Cantrell*,
   375 F.3d 377 (6th Cir. 2004) .................................................................................. 10

*Dirkes v. Borough of Runnemede*,
   936 F. Supp. 235 (D.N.J. 1996) .............................................................................. 10

*Eichenberger v. ESPN, Inc.*,
   876 F.3d 979 (9th Cir. 2017) .................................................................................... 5

iii

*Ellis v. Cartoon Network, Inc.*,
   803 F.3d 1251 (11th Cir. 2015) ................................................................ 14, 20

*Entler v. Gregoire*,
   872 F.3d 1031 (9th Cir. 2017) .......................................................................... 21

*Forsyth Cnty., Ga. v. Nationalist Movement*,
   505 U.S. 123 (1992) ......................................................................................... 15

*Fraser v. Goodale*,
   342 F.3d 1032 (9th Cir. 2003) ......................................................................... 15

*Fujikura Ltd. v. Finisar Corp.*,
   2015 WL 5782351 (N.D. Cal. Oct. 5, 2015) ...................................................... 8

*Fulton v. City of Philadelphia*,
   593 U.S. ___, 141 S. Ct. 1868 (2021) ......................................................... 16, 17

*Gakuba v. Hollywood Video, Inc.*,
   2015 WL 5737589 (D. Or. Sept. 30, 2015) ....................................................... 8

*Garrison v. State of La.*,
   379 U.S. 64 (1964) ........................................................................................... 21

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ................................................................................... 19, 24

*Green v. Miss United States of Am., LLC*,
   52 F.4th 773 (9th Cir. 2022) ...................................................................... 16, 17

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) .................................................................................... 16

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of,*
   *Acct.*, 512 U.S. 136 (1994) ............................................................................. 19

*IMDb.com Inc. v. Becerra*,
   962 F.3d 1111 (9th Cir. 2020) ............................................................. 16, 20, 23

*Italian Colors Rest. v. Becerra*,
   878 F.3d 1165 (9th Cir. 2018) ......................................................................... 15

*Junior Sports Mags. Inc. v. Bonta*,
   80 F.4th 1109 (9th Cir. 2023) ......................................................................... 15

*Linmark Assocs., Inc. v. Willingboro Township*,
   431 U.S. 85 (1977) ........................................................................................... 17

*Louth v. NFL Enterprises LLC*,
   2022 WL 4130866 (D.R.I. Sept. 12, 2022) ................................................ 14, 20

*McKay v. Nugs.net Enters, Inc.*,
   No. 23-cv-01900-JSC (N.D. Cal. Oct. 10, 2023) ............................................. 10

*M. K. v. Google LLC*,
   2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) ............................................. 12, 13

*Magic Link Garment Ltd. v. ThirdLove, Inc.*,
   445 F. Supp. 3d 346 (N.D. Cal. 2020) ....................................................... 14, 15

iv

*Mason v. Fla. Bar,*
   208 F.3d 952 (11th Cir. 2000) ..................................................................... 19, 25

*McDougal v. Fox News Network, LLC,*
   489 F. Supp. 3d 174 (S.D.N.Y. 2020) ................................................................ 21

*Metro Lights, L.L.C. v. City of Los Angeles,*
   551 F.3d 898 (9th Cir. 2009) ............................................................................. 20

*NetChoice, LLC v. Att'y Gen., Fla.,*
   34 F.4th 1196 (11th Cir. 2022) ..................................................................... 19, 25

*New York v. Ferber,*
   458 U.S. 747 (1982) .......................................................................................... 15

*Old Dominion Elec. Coop. v. FERC,*
   892 F.3d 1223 (D.C. Cir. 2018) .......................................................................... 8

*Perry v. Cable News Network, Inc.,*
   854 F.3d 1336 (11th Cir. 2017) ......................................................................... 14

*R.A.V v. City of St. Paul,*
   505 U.S. 377 (1992) .......................................................................................... 16

*Reed v. Town of Gilbert, A.Z.,*
   576 U.S. 155 (2015) .......................................................................................... 16

*San Francisco Cnty. Democratic Cent. Comm. v. Eu,*
   826 F.2d 814 (9th Cir. 1987) ....................................................................... 18, 23

*Shoner v. Carrier Corp.,*
   30 F.4th 1144 (9th Cir. 2022) ............................................................................ 22

*Smith v. Daily Mail Pub. Co.,*
   443 U.S. 97 (1979) ............................................................................................ 17

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) .......................................................................................... 15

*Stark, et al. v. Patreon, Inc,*
   2023 WL 2090979 ....................................................................................... 15, 16

*State v. VanBuren,*
   214 A.3d 791 (2019) ........................................................................................... 8

*The Fla. Star v. B.J.F.,*
   491 U.S. 524 (1989) ............................................................................... 18, 23, 24

*United States v. Dadamuratov,*
   2008 WL 11438269 (N.D. Fla. Aug. 13, 2008) ................................................... 7

*United States v. Hassan,*
   742 F.3d 104 (4th Cir. 2014) ............................................................................... 8

*United States v. Jones,*
   79 F.4th 844 (7th Cir. 2023) ................................................................................ 7

*United States v. Morel,*
   922 F.3d 1 (1st Cir. 2019) ................................................................................. 11

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ............................................................................................ 16

*United States v. Stevens*,
    559 U.S. 460 (2010) .............................................................................. 15, 20, 25

*United States v. Velentzas*,
    2019 WL 3252961 (E.D.N.Y. July 16, 2019) ........................................................ 7

*United States v. Williamson*,
    2023 WL 4056324 (M.D. Fla. Feb. 10, 2023) ..................................................... 11

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) ......................................................................... 18

**Statutes**

5 U.S.C. § 6504(c)(2) ................................................................................................. 6

17 U.S.C. § 506 .......................................................................................................... 7

18 U.S.C. § 842(p) ..................................................................................................... 7

18 U.S.C. § 2258A .............................................................................................. 6, 22

18 U.S.C. § 2258B ................................................................................................... 22

18 U.S.C. § 2702 ............................................................................................... *Passim*

18 U.S.C. § 2710 ............................................................................................... *Passim*

47 U.S.C. § 338(i)(4)(A) ......................................................................................... 19

47 U.S.C. § 551(b)(1) ............................................................................................. 19

Cal. Civil Code § 1708.85 ......................................................................................... 8

Cal. Penal Code Section 647(j)(4)(A) ....................................................................... 8

Cal. Veh. Code § 11205 .......................................................................................... 12

18 U.S.C. § 2339B ................................................................................................ 7, 8

I.     INTRODUCTION AND STATEMENT OF ISSUES

Defendant Patreon, Inc. moves for summary judgment that the Video Privacy Protection Act (VPPA), both as applied to Patreon and on its face, violates the First Amendment.

The VPPA is unconstitutional as applied to Patreon.  First, the VPPA would impose liability for Patreon's protected speech that plaintiffs themselves affirmatively consented to, and would impose liquidated damages of $2500 per plaintiff for speech that caused them no harm, neither of which the First Amendment allows.  Second, the VPPA's imposition of liability in this case fails intermediate scrutiny, as the plaintiffs and the government cannot hope to show that VPPA's burdening of Patreon's speech in this case, on these facts, directly or materially advances any substantial governmental interest.

The VPPA is also unconstitutional on its face.  In addition to its improper burden on Patreon, the poorly conceived, poorly drafted law impermissibly burdens a substantial amount of constitutionally protected, non-commercial speech:  core political speech; petitioning for redress; valuable speech to protect life and safety; and disclosures that implicate no privacy interest, that are made with consent, or that cause no harm at all.  The Court has already held that the VPPA is a content-based speech restriction, subject to strict scrutiny in its non-commercial applications.  As a result, the VPPA can stand only if Plaintiffs and the United States show that punishing these other, valuable categories of speech advances a compelling government interest by narrowly tailored means.  That task is impossible.  The government has no interest in curtailing most of the speech the VPPA proscribes, and nothing about the VPPA is "narrowly tailored."  The law is unconstitutional.

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

A.     Facts Patreon Assumes To Be True Solely For Purposes Of Summary Judgment

Solely for this motion, Patreon assumes, as alleged in the First Amended Complaint (FAC), that (a) Patreon is a "video tape service provider" (VTSP) as defined by the VPPA; (b) through its use of the Meta Pixel, Patreon disclosed information to Meta sufficient to identify the two plaintiffs and titles of videos they had requested or obtained on the Patreon website; and (c) Patreon did so knowingly.  If the Court does not grant the motion, Patreon will refute these assumed facts in subsequent proceedings.

B.     Patreon Is A Platform Where Creators Offer Fans Access To Content For A Fee

Patreon is an internet-based membership platform that enables creators to be paid by their fans,

known on the site as patrons.  Byttow Decl. ¶ 3.  A creator creates a membership page on Patreon to engage with their patrons by offering access, merchandise, exclusivity, and engaging experiences.  *Id.* ¶ 3.  Patrons purchase memberships for specific creators on a monthly, annual, or per-creation basis.  *Id.* ¶ 3.  The subscription fees go to the creators, except for a percentage that Patreon retains as a platform and payment-processing fee.  *Id.* ¶ 3.

Both Patreon and its creator members depend on content being exclusively available to patrons, so almost all creator content on the Patreon website is paywalled – meaning that for a given creator, only their currently paying patrons can access or see that creator's content.  *Id.* ¶ 4.  With respect to the two plaintiffs in this case, all videos they watched on the Patreon website were paywalled with access limited to paying patrons of those specific creators.  *Id.* ¶¶ 4, 35-38. As a result, even if a third party (such as Meta) learned the titles of those videos (or the titles and URLs of the webpages), it would know only the titles and would have no meaningful knowledge of the videos' content.  *Id.*

### C.     Neither Plaintiff Suffered Any Harm from a Superficial Disclosure to Meta

Given how superficial and vacuous the alleged disclosure is, stripped of any reference that would give it meaning, and given that plaintiffs allege no disclosure other an algorithmic, coded message to Meta, it is unsurprising that neither plaintiff can identify any public embarrassment, humiliation, harm to reputation, or other injury to a privacy interest, nor any economic harm either. Norton Decl. Ex. 68 at 77 (Stark testimony), Ex. 69 (Oostyen testimony); Ex. 73 at 84, 85 (Response to Interrogatories 6, 8).

### D.     Each Plaintiff Affirmatively Consented to the Disclosure of Their Internet Activity to Patreon, Including Which Videos the Requested or Obtained

Stark and Oostyen each created a Patreon account, Stark in November 2019 and Oostyen in February 2021.  To create an account, each Plaintiff was required to consent to Patreon's Terms of Use (ToU) and Privacy Policy.  Byttow Decl. ¶¶ 7-34; Norton Decl. Ex. 70 at 67-71 (Byttow testimony); Ex. 69 at 32 (Oostyen testimony).  Both Plaintiffs conceded that by accepting Patreon's ToU and Privacy Policy, they formed an agreement with Patreon, whether they read those documents or not.  Norton Decl. Ex. 68 at 26-31 (Stark testimony); Ex. 69 at 32-34 (Oostyen testimony).

In its Privacy Policy, Patreon disclosed the data it may collect:

- Through their accounts, members provide their first and last name, email address, and state and country of residence.  Byttow Decl. Ex. 90 at 2.

- ▪ Patreon stated "[w]e collect information automatically as you navigate the site or through our third-party analytics providers." *Id.* at 5.

- ▪ Patreon stated it collects "usage information such as the type of device you use to access Patreon, your operating system, browser type, IP address, device ID, the pages you visit or request, links clicked, referring sites, user interactions and your search terms." *Id.*

In addition, Patreon's Privacy Policy disclosed, under the bolded heading "Information We Share With Third Parties," that it would share that data with third parties like Facebook:

**INFORMATION WE SHARE WITH THIRD PARTIES**

... We will only ***share data with third parties***, other than with creators, under the following circumstances: ***... with our service providers, who are companies that are contractually engaged with us to provide us with services***, ***such as*** order fulfilment, email management, ***analysing data trends***, credit card processing, multi-currency settlement solutions, increasing our brand awareness and ***user engagement with marketing initiatives***, and fraud detection and prevention.

*Id.* at 11 (body text emphasis added).  Patreon's use of the Meta Pixel was subject to and governed by the Facebook Business Tools Terms, a contract.  Norton Decl. ¶¶ 86-87, Ex. 74, 75.

Stark and Oostyen are also both Facebook users, and both consented to Facebook's separate terms and policies that state Facebook uses cookies to track users' online activity both on and off the Facebook platform.  Norton Decl. Ex. 68 at 32-34, Ex. 69 at 34-38.  To create and maintain a Facebook account, each Plaintiff had to accept Facebook's (now Meta's) Terms of Use, Privacy Policy, and Cookie Policy.  Norton Decl. Ex. 7 at 9-10, 12; *id.* Ex. 56, 58, 59.  Meta's Privacy Policy explains that Meta uses cookies to track its users' online activity, including on third-party websites.  *See id.* ¶¶ 65-67, Ex. 56, 59; Nelson Decl. ¶ 3.  For example, the Meta Privacy Policy states, "We collect and receive information from partners, measurement vendors, marketing vendors and other third parties about a variety of your information and activities on and off our Products."  Norton Decl. Ex. 56 at PS4802-03.  It lists specific categories of information that Meta collects from third parties, including "Websites you visit," "Purchases and transactions you make off of our Products using non-Meta checkout experiences," and "How you use our partners' products and services, online or in person."  *Id.*  The Privacy Policy further states that "We also receive information using cookies and similar technologies, like the Meta Pixel or Social Plugins, when you visit other websites and apps that use our Business Tools or other Meta Products."  *Id.* at PS4805.  The Cookie Policy provides still more detail:

"**Where do we use cookies?**  We may place cookies on your computer or device and receive information stored in cookies when you use or visit ... Websites or apps provided

3

by other companies that use the Meta products, including companies that incorporate Meta technologies into their websites and apps. Meta uses cookies and receives information when you visit those sites and apps, including device information and information about your activity, without any further action from you. This occurs whether or not you have a Facebook account or are logged in."

*Id.* Ex. 59 at PS5255.

### E.    Internet Users, Like Plaintiffs, Can Effectively Protect Any Genuine Interest in the Privacy of Their Internet Video Viewing by Blocking or Disabling the Meta Pixel

Meta terms and policies make clear that, by default, Meta seeks to collect information about its users both on and off Facebook . Use of "cookies" to track browsing behavior has been commonplace, and common knowledge, for years. Norton Decl. Ex. 43 (Disconnect app to block tracking cookies named "best privacy tool" by *The New York Times* in 2016). Plaintiffs were aware of cookies and their uses. Norton Decl. Ex. 68 at 34-38 (Stark testimony); Ex. 69 at 39-43 (Oostyen testimony). Before he signed up for Patreon, Stark was specifically aware of Facebook's use of pixels for internet tracking and even used a VPN to enhance his privacy at times. *Id.* Ex. 68 at 81:17-84:13; Ex. 73 (Interrogatory 4). Oostyen modified his browser settings to control what cookies were installed. *Id.* Ex. 69 at 39-41.

Stark and Oostyen did not have to accept tracking by Facebook and had tools to prevent it. Privacy-minded consumers have long been able to use software, like Disconnect and Ghostery, to block Facebook cookies and trackers that would otherwise identify them to Meta when they visit other sites. Norton Decl. ¶¶ 52-58; Ex. 43 (highly rated, award-winning Disconnect enables users to "visualize and block the invisible websites that track you"); Ex. 44 (Disconnect blocks trackers that collect "data regarding a particular user's or device's activity across multiple websites or applications that aren't owned by the data collector"); Ex. 45 (Disconnect permits users to identify and block web tracking by specific platforms, including "facebook"); Ex. 46 (Disconnect "prevent[s] trackers from collecting sensitive data and connecting online activity back to you through cookies, pixels, … and other surveillance technologies"); Ex. 47 (Ghostery mobile app blocks "trackers that carry your personal information across the web"); Ex. 48 (Ghostery has "more than 100+ million downloads worldwide").

But Stark and Oostyen did not even need to resort to these measures because, at all times they were Patreon users, Meta itself provided a simple user-settings toggle that allowed plaintiffs and any other user to turn off Facebook's off-platform tracking. *Id.* ¶¶ 58-63; Ex. 52 (Meta announcement of new feature in August 2019); Ex. 53 (Facebook Help Center page describing how to turn off tracking);

4

Ex. 57 (screenshot of toggle setting).  The Meta Privacy Policy – a contract both plaintiffs agreed to as Facebook users – linked directly to the setting, which is simple and clear, explaining if a user chooses "Disconnect future activity," Facebook will "disconnect information that businesses and organizations send us about your interactions with them."  *Id.* at Ex. 56 at PS4854; Ex. 57.

### F.   The VPPA Applies to a Substantial Amount of Non-Commercial Speech

With a few narrow exceptions, the VPPA applies to any disclosures by a VTSP that a particular consumer requested or obtained a specific video.  18 U.S.C. § 2710.  As Patreon explained in its motion to dismiss the FAC, Dkt. 48 at 10-15, Dkt. 54 at 14-18, the VPPA is startlingly overbroad and burdens a wide range of non-commercial speech.  In the section below, we document the breadth of the VPPA's reach and the real-world frequency of these examples as confirmed in discovery.  In the Argument section that follows, we explain why that overbreadth makes the VPPA unconstitutional.

### 1.   Disclosures Concerning Public Officials

The VPPA was enacted expressly to stifle disclosures about videos public officials watched, even if directly relevant to their fitness for public office.  The ***very incident*** that prompted Congress to pass the VPPA was the disclosure of videos Supreme Court nominee Judge Bork had rented from a local video store.  Given Judge Bork's views on the right to privacy and other issues, critics of the nominee urged then-Chairman of the Senate Judiciary Committee Joe Biden to subpoena Bork's video rental records, speculating they might reveal pornography.[1]  Biden refused, and a reporter obtained the records just by asking for them.[2]  Senators Patrick Leahy and Alan Simpson denounced the disclosure:  "It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home," and that sentiment led directly to the VPPA.  *See* S. REP. 100-599 Section III(A); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 984 n.2 (9th Cir. 2017).

Judge Bork's nomination is the highest profile example, but the video-watching behavior of all public employees continues to be of great interest and importance to the public.  For example, concerns

---

[1]  *See* Jeffrey Rosen, "The Myth of Biden v. Bork," *The New York Times* (Aug. 26, 2008), available at https://www.nytimes.com/2008/08/27/opinion/27rosen.html.

[2]  *See* Michael Dolan, "Borking Around," *The New Republic* (Dec. 19, 2012), available at https://newrepublic.com/article/111331/robert-bork-dead-video-rental-records-story-sparked-privacy-laws.

5

about government employees viewing pornography at work were significant enough that Congress

mandated guidelines to "prevent inappropriate use of official time or resources that violates [Executive

Branch ethical standards] by viewing, downloading, or exchanging pornography, including child

pornography." 5 U.S.C. § 6504(c)(2).  Nonetheless, reports persist of an "epidemic" of government

employees engaging in such conduct, raising concerns not just about impropriety, productivity, and

waste of taxpayer funds, but also national security.[3]  While taxpayers might learn about these incidents if

government agencies policed themselves, the VPPA prohibits any VTSP from disclosing to the media or

any other person the identities of public officials and specific videos they have requested or obtained.

### 2.    Disclosures Concerning Potential Crimes

The VPPA forbids disclosures to report a crime, whether to law enforcement or to other affected

parties, without a warrant.  There are numerous real-world examples of such disclosures by VTSPs.

*First*, electronic service providers in the United States are required by a separate statute, 18

U.S.C. § 2258A, to report potential child sexual exploitation material (CSAM) to the National Center for

Missing & Exploited Children (NCMEC).  As NCMEC attests, it receives *millions* of such reports each

year, from internet platforms that plainly satisfy Plaintiffs' definition of VTSPs under the VPPA.

Shehan Decl. ¶ 4 (since its inception in 1998, NCMEC has received over 198 million CSAM reports);

¶ 8 (NCMEC received 31,901,234 reports in 2022); ¶ 5 (listing Facebook, Instagram, Google,

WhatsApp, and Omegle as the top five tip reporters to NCMEC in 2022); Ex. B, C, D (identifying

hundreds of CSAM reporters in 2019, 2020, and 2021 and the number of reports for each).  Reports to

NCMEC include detailed information identifying the specific person(s) who requested or obtained the

---

[3] *See, e.g.*, Judicial Watch, "Epidemic of Government Employees Watching Porn on Taxpayer Time" (January 7, 2020), available at https://www.judicialwatch.org/epidemic-of-government-employees-watching-porn-on-taxpayer-time/ (listing incidents and calling for legislation); Kellie Mejdrich, "Porn Still Turning Up in the Federal Workplace Despite Ban," *Roll Call* (Mar. 7, 2018), available at https://rollcall.com/2018/03/07/porn-still-turning-up-in-the-federal-workplace-despite-ban (describing numerous incidents); ABC News, "SEC Porn Problem: Officials Surfing Sites During Financial Crisis, Report Finds" ((April 22, 2010), available at https://abcnews.go.com/GMA/sec-pornography-employees-spent-hours-surfing-porn-sites/story?id=10452544 (describing investigation made at Senator Grassley's request); National Science Foundation, Office of Inspector General, "Semiannual Report to Congress September 2008" at 30-32, available at https://www.nsf.gov/pubs/2009/oig0901/oig0901.pdf (documenting instances of National Sciences Foundation employees, including "an NSF senior official," watching pornographic videos at work on government computers).

video as well as attachments of the actual videos or information identifying them.  *Id.* Ex. ¶¶ 9-10, Ex. A (NCMEC reporting template); Norton Decl. ¶ 4, Ex. 2 (Twitter NCMEC reports with identifying information and indicating video file attached); *id. ¶¶* 6-8, Ex. 4, 5 (Google NCMEC report, same); *id. ¶¶* 9-10, Ex. 8, 9 (Meta NCMEC report, same).  Evidence from major platforms like Google, Meta, TikTok, and Twitter further demonstrates these disclosures' enormous volume and detail.  Morris Decl. ¶¶ 10-12 (Google makes hundreds of thousands of NCMEC reports each year); Nelson Decl. ¶ 4 (describing content in Meta NCMEC reports); Nguyen Decl. ¶¶ 9-10 (describing TikTok NCMEC reporting, over 288,000 reports in 2022 alone); Norton Decl. Ex. 7 at 12-13, 17-18, 46-51 (Meta reporting to NCMEC); *id.* Ex. 6 (Google "voluntarily" reports; made over 870,000 reports in 2021); *id.* Ex. 1 at 13-16, 39, 41-48 (Twitter reporting to NCMEC).  Even when NCMEC's reports are limited to reports (a) from domestic electronic service providers, (b) that contain video files, and (c) specifically identify a person who requested or obtained the videos, NCMEC receives ***nearly a million reports*** of CSAM videos each year (Shehan Decl. Ex. E, F) – and every one a VPPA violation.

   ***Second***, video distribution platforms confirm they also make disclosures to law enforcement of specific users' viewing videos to report crimes ***other than*** child pornography, though they do not track the number of such reports.  Morris Decl. ¶¶ 13, 15 (Google/YouTube); Nelson Decl. ¶¶ 6, 8 (Meta); Nguyen Decl. ¶¶ 11-12 (TikTok).  There are serious crimes for which a user requesting or obtaining a particular video would be evidence of a crime.  For example, **bombmaking tutorials**, *see, e.g.*, 18 U.S.C. § 842(p) (federal crime to "teach or demonstrate the making or use of an explosive" with the intent that the information will be used in furtherance of a federal crime); *United States v. Velentzas*, 2019 WL 3252961, at *8 (E.D.N.Y. July 16, 2019) (prosecution for violation of section 842 based on online video); **criminal copyright infringement**, *see, e.g.*, 17 U.S.C. § 506; *United States v. Dadamuratov*, 2008 WL 11438269 (N.D. Fla. Aug. 13, 2008) (evidence of criminal copyright infringement supported by "video rental log showing that Defendant rented movies" to a specific named person (not a defendant), as well as "Defendant's DVD rental history at the Movie Gallery video rental store which shows that Defendant had a knowledge of what an authentic DVD looked like"); **providing material support to terrorists**, *see, e.g.*, 18. U.S.C. § 2339B; *United States v. Jones*, 79 F.4th 844, 848 (7th Cir. 2023) (FBI investigation for violations of Section 2339B began based on defendant's

interactions "on Google Plus with videos depicting violent beheadings and fatal stabbings"); *United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) (prosecution under Section 2339B based in part on videos defendants had posted online); **non-consensual pornography ("revenge porn")**, *see, e.g.*, Cal. Penal Code Section 647(j)(4)(A); Cal. Civil Code § 1708.85; *State v. VanBuren*, 214 A.3d 791, 795 (2019) ("Facebook received more than 51,000 reports of revenge porn in January 2017 alone").[4]

Law enforcement reliance on voluntary tips to investigate and prosecute crimes – and the VPPA's interference – is in no way hypothetical. *See, e.g.*, *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1219–20 (10th Cir. 2001) (describing VPPA violation where video stores voluntarily disclosed to police that plaintiff and others had rented an obscene movie); *Gakuba v. Hollywood Video, Inc.*, 2015 WL 5737589, at *6 (D. Or. Sept. 30, 2015) (VPPA violation where state police officers corroborated allegations of sexual abuse of minor by obtaining customer's video rental records).

It is not possible to count the voluntary tips VTSPs make to law enforcement – as the United States readily admits. Patreon sought discovery about the number of relevant tips VTSPs have given federal law enforcement alone in the last decade, but the United States complained it would be "extraordinarily overly burdensome" to respond, the federal government makes no effort to track such information, and consequently the United States could not respond.[5] Norton Decl. ¶¶ 16-24, Ex. 17. While the United States maintains it is unable to locate such tips, it also concedes it made no inquiries to any of the 96 U.S. Attorneys' Offices that actually prosecute crimes, admitted "components of the United States [DOJ] do not routinely maintain records about any such voluntary tips or reports— particularly those that are not credible or do not lead to the opening of an investigation," and argued tips related to ongoing investigations, grand jury proceedings, and international terrorism are secret and

---

[4] As of October 2023, 48 states and Washington D.C. had passed laws prohibiting the distribution or production of nonconsensual pornography. *See* Ballotpedia, "Nonconsensual pornography (revenge porn) laws in the United States," available at https://ballotpedia.org/Nonconsensual_pornography_(revenge_porn)_laws_in_the_United_States.

[5] The United States gave notice of its intervention in this action on December 5, 2022. Dkt. 49. Upon intervening the United States became a party and by that time, if not before, had a duty to preserve relevant evidence. *See Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1232 (D.C. Cir. 2018) ("Intervenors become full-blown parties to litigation…"); *Fujikura Ltd. v. Finisar Corp.*, 2015 WL 5782351, at *4 (N.D. Cal. Oct. 5, 2015) ("Once a party has intervened, it is subject to discovery obligations under Rules 30 and 34 just like a party."). The United States has offered no explanation for its failure to document or preserve any evidence of tips from VTSPs once it became a party.

confidential such that the government can disclose nothing about them.  Norton Decl. ¶¶ 16-24, Ex. 17.

There is, however, some evidence about the potential number and significance of relevant voluntary tips the federal government receives.  The Electronic Communications Privacy Act (ECPA), 18 U.S.C. § 2702, similar to the VPPA, generally forbids electronic communications service providers from disclosing the contents of consumers' electronic communications.  Unlike the VPPA, however, ECPA permits voluntary disclosures to government entities, without a warrant or subpoena, where the provider "in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency."  18 U.S.C. 2702(b)(8).  ECPA requires the DOJ to track and report to Congress the number of voluntary disclosures it receives each year under Section 2710(b)(8).  (DOJ does not report such disclosures to *state* law enforcement.)  Those reports show electronic communication service providers annually provide scores of voluntary tips to DOJ that disclose the contents of consumers' electronic communications about possible kidnappings; bomb threats; terrorist activity; threats to the White House, federal prosecutors, other federal officials, and a presidential candidate; an investigation of a missing federal agent; prisoner escapes; death threats; mass shooting threats; school shooting threats; a "claim to have a low yield nuclear weapon," and *separate from that incident*, a "national security emergency."  Norton Decl. Ex. 14.  While the United States claims it cannot produce records of tips from VTSPs, it is fair to infer that VTSPs provide similar critical information to the government.

### 3.    Disclosures Concerning Threats to Individual or Public Safety

Separate from crime reporting, video distribution platforms also make voluntary disclosures to law enforcement of specific users viewing particular videos where VTSPs perceive an imminent risk to individual users, public safety, or even property.  Morris Decl. ¶¶ 14-15, Ex. D-R (confirming Google/YouTube disclosures and policies); Nelson Decl. ¶¶ 6-8 (confirming Meta disclosures and policies); Nguyen Decl. ¶¶ 11-12, Ex. C (confirming TikTok disclosures and policies); Norton Decl. Ex. 61 at PS4963 (Reddit may disclose users' PII "in an emergency … if we believe it's necessary to prevent imminent and serious bodily harm to a person"); *id.* Ex. 67 (Twitter policy, to same effect).

The VPPA also prohibits a video store clerk from telling a customer that the customer's minister, or spouse, or child's babysitter rented highly pornographic or extremely violent videos, or informing a

9

parent that their teenaged child obtained and viewed similar material.  VTSPs have in fact disclosed, to persons other than law enforcement, that a particular person watched specific videos when an employee of the provider believed the disclosure was necessary to protect a third party.  *See, e.g., Daniel v. Cantrell*, 375 F.3d 377, 380 (6th Cir. 2004) (video rental store owners and their employees disclosed, to plaintiff's parents and to parents of alleged victim of molestation by plaintiff, that plaintiff had rented pornographic movies); *Dirkes v. Borough of Runnemede*, 936 F. Supp. 235, 236 (D.N.J. 1996) (violation of VPPA when video store informed employer that employee had rented pornographic videos).

### 4.      Litigation and Testimonial Disclosures

The VPPA also has no exception for disclosures in litigation or testimony (unless the VTSP obtains a court order in advance, after notice to the consumer), leading to absurd results.  For example, even a filing or testimony under seal would violate the VPPA through disclosure to court personnel and litigation adversaries.  Yet the need for such disclosures is commonplace.  Patreon itself filed a lawsuit against patrons who violate its terms of service by accessing and copying paywalled creator content, or inducing other patrons to do so, and then reposting that content on a third-party website.  *Patreon v. Doe,* No. CGC-22-602931 (San Francisco Superior); Norton Decl. ¶ 80, Ex. 71.  The VPPA would prohibit Patreon from filing a document, or providing a discovery response to a defendant, that identified the particular video content that a defendant or co-conspirator had improperly obtained.

Even in ***VPPA litigation***, ironically, the VPPA gets in its own way.  In support of its summary judgment motion, Patreon cannot even tell the Court the titles of the particular videos plaintiffs watched without getting their consent or obtaining an order.  And if the case proceeds to class discovery, Patreon would be prohibited from producing such information about absent class members – even to class counsel – unless all putative class members first received notice and had an opportunity to oppose.  *See McKay v. Nugs.net Enters, Inc.*, No. 23-cv-01900-JSC (N.D. Cal. Oct. 10, 2023), Dkt. 40 at 1.

As yet another example, in child pornography cases, defendants frequently seek to suppress NCMEC reports or the fruits of government investigation based on such reports, arguing that NCMEC is a government agent and the reports violate the Fourth Amendment.  At the suppression hearing, the government calls an employee of the VTSP as a witness, who authenticates the company's NCMEC report.  Norton Decl. Ex. 1, 7. Yet that testimony is another disclosure of PII by the VTSP, for which the

VPPA has no exception.[6]  Notably, in the two cases for which Patreon obtained suppression hearing transcripts, the docket reveals no court order permitting a testimonial disclosure of the defendant's PII, and counsel for Patreon can find no example of *any* court ever having issued one.  Norton Decl. Ex. 72.  Indeed, in discovery, Patreon asked the government to admit it has *never*, in the entire history of the VPPA, sought a court order under Section 2710(b)(3) authorizing a disclosure under the VPPA.  If the government had filed *one* such motion in the last 34 years, it could have simply denied the request.  Instead, the United States declined to admit or deny at all.  Norton Decl. Ex. 15 (RFA 13).

### 5.  Disclosures by Continuing Education Providers, Traffic Schools

It is a common practice for professional education course providers to report to a regulatory or licensing organization that individuals have satisfied their requirements by completing specific, identified courses, including video courses.  For example, the United States Internal Revenue Service requires tax professionals to attend continuing education courses from authorized providers.  Norton Decl. Ex. 19, 20, 21.  To be authorized, the provider must submit descriptions of its courses with titles and whether the program is offered in person or online; the IRS then assigns each approved course a "program number."  *Id.* Ex. 19, 20.  As the IRS explains in its guidance, "Mandatory Information Reporting for Continuing Education Providers," the providers must also periodically report to the IRS the full name of each person who has attended its courses, their Tax Payer Identification Number, and the program numbers of the courses the individuals attended.  *Id.* Ex. 21, 22.  Of course, approved courses include pre-recorded video.  *Id.* Ex. 23 (provider website describing "6-hour IRS-approved online video course"); Ex. 24 (provider website describing catalog of "online video based CE" to satisfy education requirements for tax professionals).  The IRS is not unique – other agencies and other continuing education providers use the same model.  *Id.* Ex. 25 (Kansas Department of Insurance approves continuing education materials, including "online" materials, in advance, and "continuing education completion information must be submitted electronically … by the continuing education provider"); Ex. 26 (Nebraska Department of Insurance, same).

---

[6] There are literally too many cases to cite and still comply with the page limits for this motion.  *See*, *e.g.*, *United States v. Morel*, 922 F.3d 1, 6 (1st Cir. 2019) (suppression hearing testimony by Imgur employee); *United States v. Williamson*, 2023 WL 4056324, at *1 (M.D. Fla. Feb. 10, 2023) (suppression hearing testimony by Yahoo employees); *etc.*

Traffic schools work the same way, offering online video courses to satisfy mandatory traffic school attendance for traffic violations, and reporting completion directly to the court. Indeed, California mandated this model over a decade ago. Cal. Veh. Code § 11205 provides that

> The [Department of Motor Vehicles] shall, by April 1, 2012, develop a Web-based database that will enable the department, the courts, and traffic violator schools to monitor, report, and track participation and course completion. Traffic violator schools shall update course information within three business days of class completion and provide to the courts class completion information on a daily basis.

*See also* Norton Decl. Ex. 27 (state court website dictating that traffic school participants must provide school their full name, DOB, and driver's license number for course completion credit, and that "[t]raffic schools are now required to electronically notify the court of traffic school completion"); Ex. 28 (traffic school website offering "online video course" and stating, "When you finish your online [] traffic school course, we [] report your completion information directly to the DMV").

### 6.    Disclosures to Teachers and Educational Institutions

Even prior to the Covid pandemic, schools from kindergarten through college were widely using learning management software (LMS) to present video course materials to students and track their progress. Three of the LMS market leaders in the United States are Blackboard (offered by Anthology, Inc.), Canvas (offered by Instructure, Inc.) and Google Classroom (offered by Google). Norton Decl. ¶¶ 35, 41, Ex. 33. For these products, students must have their own user accounts, governed by the terms of service and privacy policies. *Id.* Ex. 31 at PS4597-98; Ex. 32 at PS4623-25; Ex. 33 at PS5297; Ex. 41 at PS4789; Ex. 42 at PS4777-80*; see also M. K. v. Google LLC*, 2023 WL 4937287, at *4-7 (N.D. Cal. Aug. 1, 2023) (denying motion to dismiss VPPA claim against Google and finding that student who used Google Classroom was a "consumer" of Google under VPPA).

According to Instructure's 10-K for calendar year 2021, the company is the "U.S. LMS market share leader in both Higher Education and paid K-12 with nearly 7,000 global customers, representing Higher Education institutions and districts and schools in more than 100 countries." *Id.* Ex. 33 at PS5298. Instructure's "customers include State Universities of California, Florida, and Utah, all of the Ivy League universities, international Higher Education and K-12 systems, and many of our nation's largest K-12 systems." *Id.* at PS5298.

A feature of Canvas, Blackboard, and Google Classroom software is that the companies disclose,

1   to educational institutions and individual teachers, what specific content students have requested and

2   obtained, including pre-recorded instructional videos.  *See*, *e.g.*, *id.* Ex. 32 at PS4625 (Anthology

3   Privacy Policy: "much of the information we collect and use about you is shared with your institution

4   that uses our products and services and with other institutional users"); Ex. 42 (Instructure Privacy

5   Policy: "[w]e may share your personal information with the Academic Institution or company which is

6   linked to your use of our Products").  Manuals and tutorials for LMS products provide detailed

7   descriptions of how teachers can use the software to know whether a student accessed specific content,

8   even to the point of knowing which videos a student watched, how much of a video they watched, and

9   how many times.  *Id.* ¶¶ 36-37, 42-49; Ex. 29-30, 34-40.  Moreover, some of these disclosures are not

10   for the purpose of instruction or assessment, but to manage school safety or discipline.  In *M. K. v.*

11   *Google LLC*, pending in this District, the student alleges that Google violated the VPPA by disclosing

12   information about his online activity to teachers and administrators, resulting in discipline and

13   suspension.  *M. K.*, 2023 WL 4937287, at *2.

### 7.   Other Protected Disclosures

15   Still other examples abound.  As the Court itself noted, yet another non-commercial disclosure is

16   the scenario where "a video service provider's employees might casually discuss their customer's

17   viewing habits with friends, acquaintances, or other customers."  Dkt. 59 at 21.  Even a video store

18   employee telling a customer, "you owe a late fee for *Godfather III*," while in earshot of another

19   customer – or in earshot of the delinquent customer's ***spouse*** – would violate the inflexible VPPA.

## III.   ARGUMENT

### A.   Overview of the VPPA

22   The VPPA imposes civil liability on a "video tape service provider" that knowingly discloses

23   information that identifies a "consumer" as having "requested or obtained specific video materials or

24   services" from the VTSP, unless the consumer has provided written consent "in a form distinct and

25   separate from any form setting forth other legal or financial obligations of the consumer."  18 U.S.C.

26   § 2710(b).  Even if the consumer expressly consents to the disclosure in writing, a defendant cannot

27   avoid liability unless the particular requirements of Section 2710(b)(2)(B) are satisfied.  And even if the

28   consumer does expressly consent, and does so in a separate form, consent must either be obtained "at the

time the disclosure is sought" or if consent is obtained in advance, it is effective for no more than two years, and the consumer can withdraw consent at any time or on a "case-by-case basis." *Id.* No other consent term in the U.S. Code contains these baroque provisos, and the term is so burdensome for an online VTSP it is essentially impossible. Byttow Decl. ¶¶ 40-42; Norton Decl. ¶¶ 88-89.[7]

"Video tape service provider" and "consumer" are defined terms in the statute. A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). It does not, however, include providers of video cassette tapes or similar audio visual materials, such as public libraries, if they are not "engaged in business" at all, nor does it apply to disclosures of live rather than prerecorded video. *See Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022). A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Courts interpret the VPPA's definition of subscriber to require some kind of "ongoing commitment or relationship" with the video provider, such that a person who watches news, cartoons, or other video content through an app or website, but does not sign up for an account or pay money, is not a "consumer" and falls outside the VPPA's reach. *See*, *e.g.*, *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1343 (11th Cir. 2017); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1257 (11th Cir. 2015).

A plaintiff who prevails on a claim for violation of the VPPA is entitled to actual damages, but not less than liquidated damages of $2500, plus punitive damages, reasonable attorneys' fees and costs, and other equitable relief. 18 U.S.C. § 2710(c)(2).

### B.   Legal Standard

Patreon is entitled to summary judgment if there is no genuine dispute as to any material fact and Patreon is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

---

[7] The VPPA has a small number of other exceptions: disclosures in the "ordinary course of business," 18 U.S.C. § 2710(b)(2)(E), which is another defined term, meaning "only debt collection activities, order fulfillment, request processing, and the transfer of ownership," 18 U.S.C. § 2710(a)(2); disclosures to law enforcement agencies but only in response to a search warrant or court order, 18 U.S.C. § 2710(b)(2)(C); and disclosures in response to a civil court order after notice to the consumer and a showing of compelling need, 18 U.S.C. § 2710(b)(2)(F).

party." *Magic Link Garment Ltd. v. ThirdLove, Inc.*, 445 F. Supp. 3d 346, 354 (N.D. Cal. 2020). "A 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' is not sufficient to present a genuine issue as to a material fact." *Id.* (citations omitted). Patreon need not present evidence in a form that is admissible at trial, but the contents of the evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

## C.   Constitutional Standards of Review

The VPPA violates the First Amendment, both as applied to Patreon on the particular facts of this case, and on its face because it is impermissibly overbroad.

The Court has previously held that Patreon's own speech, at least as alleged in the FAC, is commercial speech, such that Patreon's as-applied challenge is subject to intermediate scrutiny under *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). *See Stark*, 2023 WL 2090979 at *9-11. (For purposes of summary judgment, Patreon assumes its speech is commercial speech.) Under intermediate scrutiny, Plaintiffs and the government have the burden to prove the VPPA "directly and materially advances a substantial governmental interest" and "'is not more extensive than is necessary to further that interest.'" *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1116 (9th Cir. 2023) (citation omitted). "There must be a fit between the legislature's ends and the means chosen to accomplish those ends." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011) (quotation omitted). Plaintiffs' burden here is "heavy." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1176 (9th Cir. 2018). Patreon also challenges the VPPA on its face. A law can be facially unconstitutional under the First Amendment because of overbreadth, even if as applied it would be "constitutionally unobjectionable." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992); *Stark*, 2023 WL 2090979, at *6, *11. In the First Amendment context, a law is facially invalid if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation omitted); *see also Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002). For example, the *Ashcroft* Court struck down the Child Pornography Prevention Act of 1996 (CCPA), which prohibited any visual depiction of or appearing to be a minor engaging in sexual conduct. 535 U.S. at 241. While Congress certainly has the power to ban child pornography, and the Court had upheld a prior ban, *see New York v. Ferber*, 458 U.S. 747 (1982), the

15

CCPA would also ban protected expression such as modern depictions of *Romeo & Juliet*.  *See* 535 U.S. at 248.  Because the CCPA swept too far, it was facially unconstitutional.  *See also Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (state's charity donor disclosure requirement was overbroad); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019) (Lanham Act's prohibition on registering "immoral or scandalous" matter was overbroad); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 805 (2011) (state law restricting sale of violent video games to minors was overbroad).

For purposes of Patreon's facial challenge, strict scrutiny applies because, as Patreon has argued and the Court has already held, the VPPA is a content-based regulation of speech. Dkt. 48 at 15-16; *Stark*, 2023 WL 2090979, at *8-9; *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. ___, 140 S.Ct. 2335, 2346 (2020); *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (*en banc*); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020).  Under strict scrutiny, the VPPA can stand only if it "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed v. Town of Gilbert A.Z.,* 576 U.S. at 171.  Plaintiffs and the United States have the burden to specifically identify an "actual problem" in need of solving, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822-23 (2000), and the curtailment of free speech must be "reasonably necessary" to the solution, *R.A.V v. City of St. Paul,* 505 U.S. 377, 395 (1992).  "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy,* 529 U.S. at 813.  Further, a statute is not narrowly tailored if its scope is either under- or overinclusive.  *See IMDB.com*, 962 F.3d at 1125.  Given how demanding the standard is, "'[i]t is rare that a regulation restricting speech because of its content will ever be permissible.'" *Brown*, 564 U.S. at 799 (citation omitted).

### D.   Patreon's As-Applied Challenge Must Succeed Because the VPPA Does Not Materially Advance Any Substantial Interest

Plaintiffs and the United States have the burden of showing that the VPPA advances a substantial governmental interest.  It does not, however, and even if it did, the VPPA fails to advance that interest directly, materially, or by means no more extensive than necessary.

Plaintiffs and the United States cannot defend the VPPA because it broadly protects "consumer privacy."  The Supreme Court and Ninth Circuit have made clear that "the First Amendment demands a more precise analysis" of the asserted interest than privacy generally.  *Fulton v. City of Philadelphia*, 593 U.S. ___, 141 S. Ct. 1868, 1881 (2021); *see also Green v. Miss United States of Am., LLC*, 52 F.4th

16

773, 791 (9th Cir. 2022).  In *Fulton*, the Supreme Court confronted a requirement that religiously affiliated foster care agencies certify same-sex parents as foster parents.  The city defended the rule as serving an interest in enforcing non-discrimination policies, but the Supreme Court found that "broadly formulated interest" missed the mark. *Fulton,* 141 S.Ct. 1881.  "The question, then, is not whether the City has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to CSS." *Id.*  Likewise, in *Green*, the Ninth Circuit held requiring a private beauty pageant to accept transgender contestants would violate the First Amendment.  The state defended its interest as "eliminating discrimination against LGBTQ individuals," but as the Ninth Circuit held, "this broad formulation alone cannot suffice." *Green*, 52 F.4th at 791, 792.

In this case, "the question, then," is whether the government has a substantial interest in prohibiting Patreon from disclosing (a) lawfully acquired, accurate information, (b) to Meta alone, (c) consisting of titles of videos that appeared on paywalled webpages that Stark and Oostyen had requested or obtained, (d) without disclosing the content of the videos themselves, (e) with Stark's and Oostyen's affirmative consent, (f) where Stark and Oostyen have means to prevent the disclosure if they choose to do so, and (g) that narrowly confined disclosure causes no embarrassment, humiliation, or other injury to privacy interests.  Properly framed, it is clear that the government has no substantial interest imposing these restrictions on Patreon's protected speech.

*First*, there is generally no state interest in prohibiting a speaker like Patreon from disclosing lawfully acquired, accurate factual information about a consumer.  For example, in *Linmark Assocs., Inc. v. Willingboro Township*, the Supreme Court struck down an ordinance that prohibited "For Sale" yard signs that contributed to panic selling and white flight.  431 U.S. 85, 86-89 (1977).  Though the ordinance was "enacted to achieve an important governmental objective," *id.* at 95, that objective could not be reconciled with the First Amendment, which "disabled the State from achieving its goal by restricting the free flow of truthful information." *Id.* (citation omitted).  *See also Smith v. Daily Mail Pub. Co*., 443 U.S. 97, 104-106 (1979) (no compelling state interest in punishing the "truthful publication" of lawfully obtained identifying information); *44 Liquormart, Inc. v Rhode Island*, 517 U.S. 484 at 497 (plurality op.) ("a State's paternalistic assumption that the public will use truthful, nonmisleading commercial information unwisely cannot justify a decision to suppress it").

*Second*, on the facts of this case, the VPPA cannot be defended by invoking privacy interests, because the prohibited disclosure is so narrow and devoid of meaningful content that no genuine privacy interests are implicated.  Here, Patreon is accused of providing Meta, and only Meta, with titles of videos that appeared on paywalled webpages Stark and Oostyen had requested or obtained.  Norton Decl. ¶ 84, Ex. 73.  The "disclosure" is utterly vacuous.  With only a title and no access to the video content, Meta could not "know" whether the video was 2 seconds or 2 hours long; whether it was a feature film, a parody, a news clip, or a documentary; even whether it had sound, color, or moving images.  And there is no assertion that Meta disclosed this information to anyone else.  Prohibitions on truthful speech have been upheld on privacy grounds only in extreme cases where the disclosure is one a "reasonable person would find highly offensive."  *The Fla. Star v. B.J.F.*, 491 U.S. 524, 539 (1989); *Coplin v. Fairfield Pub. Access Television Comm.*, 111 F.3d 1395, 1404-05 (8th Cir. 1997).  Under the First Amendment, a law cannot prohibit disclosure of private details unless they "would not be merely embarrassing and painful but deeply shocking to the average person[.]"  *Coplin*, 111 F.3d at 1405 (citation omitted).  The narrowly confined disclosures here fall far short of that demanding standard.

*Third*, there is no substantial privacy interest in prohibiting a disclosure that plaintiffs *actually consented to*, both in their agreements with Meta and their agreements with Patreon.  Both plaintiffs are adults.  They were free to reject Facebook's offerings or Patreon's if they preferred to watch online videos without the possibility that information would be shared or disclosed.  The First Amendment does not permit restrictions on speech to be justified by paternalistic assumptions that consumers cannot make their own decisions, or speculation they might not understand what they agreed to.  *See San Francisco Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 830 (9th Cir. 1987), *aff'd*, 489 U.S. 214 (1989) ("We have no trouble concluding that the First Amendment forecloses paternalistic state action designed to protect parties from choosing rules of governance that may prove to be harmful to party interests."); *Wollschlaeger v. Governor, Fla.,* 848 F.3d 1293, 1310 (11th Cir. 2017) (speech restriction could not be justified by "government's paternalistic assertion that the policy was valid because patients might otherwise make bad decisions") (citing *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002)).

*Fourth*, the government's interest is still weaker where, as here, government intervention is unnecessary because plaintiffs have readily available, well-publicized tools to protect their own privacy,

and a robust market exists to provide those tools.  Facebook has settings that disable tracking, while third parties offer tools like Disconnect or Ghostery.  *See supra* at § II.E.

Further, however narrowly or broadly the interest is framed, and however substantial the interest might be, the VPPA does not advance that interest by means no more extensive than necessary.  In contrast to the VPPA's unworkably burdensome consent term, Byttow Decl. ¶¶ 40-42, Congress has passed other statutes to protect consumers' interests in privacy, including video privacy, without the VPPA's onerous requirement of time-limited, intermittently revocable written consent in a separate document.  *Compare* 18 U.S.C. 2710(b)(2)(B) (the VPPA) *with* 47 U.S.C. § 551(b)(1) (Cable Communications Privacy Act, requiring only "written or electronic consent"); 47 U.S.C. § 338(i)(4)(A) (disclosure of information about satellite television viewers, requiring only "written or electronic consent"); 18 U.S.C. § 2702(b)(3) (ECPA, requiring only "lawful consent").  "The availability of less burdensome alternatives to reach the stated goal signals that the fit between the legislature's ends and the means chosen to accomplish those ends may be too imprecise to withstand First Amendment scrutiny."  *44 Liquormart,* 517 U.S. at 529 (O'Connor, J., concurring).

The VPPA also, independently, fails intermediate scrutiny because it imposes $2500 in presumed damages, 18 U.S.C. § 2710(c)(2)(A), even where neither plaintiff suffered any injury to any privacy interest or any economic loss.  That arbitrary penalty on protected speech is not narrowly tailored, and is far more extensive than necessary.  "Even partial restrictions on commercial speech must be supported by a showing of some identifiable harm."  *Mason v. Fla. Bar,* 208 F.3d 952, 958 (11th Cir. 2000).  *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) (presumed damages even for false defamatory statements impermissible without actual malice); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1231 (11th Cir. 2022) (noting impermissible chilling effect of statutory damages exposure in striking down statute).  Whatever interest the government claims to regulate speech, it has zero legitimate interest in imposing liability for speech that causes no proven harm.  *See Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.,* 512 U.S. 136, 146 (1994) (striking down compelled speech where state failed to establish "any harm that is potentially real, not purely hypothetical").

At a minimum, then, the Court must strike the arbitrary and onerous consent terms and the presumed damages clause.  If VPPA had only those defects, the Court could sever those offending

provisions and leave the rest of the law intact.  *See Barr*, 140 S. Ct. at 2349–54.  But there is more.

A speech-restrictive law is not narrowly tailored if it eliminates one type of speech while at the same time allowing other types that create the same purported problem.  *See IMDB.com*, 962 F.3d at 1126.  "To put it in the context of the *Central Hudson* test, a regulation may have exceptions that 'undermine and counteract' the interest the government claims it adopted the law to further; such a regulation cannot 'directly and materially advance its aim.'"  *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 905 (9th Cir. 2009) (citation omitted).  That is yet another problem with the VPPA.  It prevents "<u>video tape service providers</u>" from disclosing which <u>pre-recorded</u> <u>videos</u> "<u>consumers</u>" have watched.  But it permits disclosure of the exact same information (a) by persons who are not "video tape service providers" (*e.g.*, libraries, employers); or (b) by "video tape service providers" if the information concerns individuals who fail to meet the definition of "consumer," *Ellis*, 803 F.3d at 1255-57; *Austin-Spearman v. AMC Network Ent, LLC*, 98 F.Supp.3d 662, 669 (S.D.N.Y. 2015); or (c) if the video was "live" rather than pre-recorded, *Louth*, 2022 WL 4130866, at *4; or (d) if the information concerns other consumer behavior that is equally private, if not more so – *e.g.*, live video, books, magazines, newspapers, web browsing, podcasts, music, *etc*.  *See City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 428 (1993) (city ordinance prohibiting "commercial handbills" news racks but not "newspapers" news racks failed intermediate scrutiny as fatally underinclusive). "Because [the VPPA] leaves open the possibility that others may disseminate [video-viewing] information unfettered, we cannot conclude that its 'selective ban ... satisfactorily accomplishes its stated purpose.'"  *IMDB.com*, 962 F.3d at 1127 (citation omitted).  The VPPA's under-inclusiveness is fatal to the statute, and fatal to plaintiffs' claims.

For all these reasons, the VPPA is unconstitutional as applied to Patreon in this case.

### E.     The VPPA Is Overbroad Because It Prohibits a Wide Range of Constitutionally Protected, Non-Commercial Speech an so is Unconstitutional On Its Face

The VPPA also violates the First Amendment on its face because it is fatally overbroad.  There are numerous examples of speech that the VPPA restricts and punishes, without furthering a compelling interest in privacy, and without furthering such an interest by narrowly tailored means.  *Brown*, 564 U.S. at 799.  These impermissible applications to non-commercial speech are substantial, both in number and in consequence, in relation to any characterization of the VPPA's "plainly legitimate sweep."  *Stevens*,

559 U.S. at 473.[8]  In fact, given the substantial defects in the VPPA, even in its application to commercial speech, the VPPA seems to have little or no "legitimate sweep" at all.

*First*, and once again, the incident that prompted Congress to pass the VPPA – disclosure of videos Judge Bork rented from his local video store – is protected speech.  Senators Leahy and Simpson were motivated by a belief that it was "nobody's business" what videos they and Judge Bork watched, but they were wrong.  Speech discussing whether a public official has taken hypocritical positions on important issues are statements "'on matters of public concern' that deserve the highest protection." *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 183 (S.D.N.Y. 2020) (citation omitted). First Amendment protection of this speech "protects the paramount public interest in a free flow of information to the people concerning public officials," and "anything which might touch on an official's fitness for office is relevant," even though it may also concern "the official's private character." *Garrison v. State of La.*, 379 U.S. 64, 77 (1964).  As noted above, while Judge Bork is the most prominent example, the video watching behavior of many government employees is of intense public interest. *See supra* at § II.F.1. The VPPA precludes speech on that protected subject and sweeps too far.

*Second*, the VPPA prohibits video service providers from voluntarily notifying law enforcement that consumers are requesting or obtaining content that actually violates state or federal law about child pornography, terrorism, bomb-making, piracy, and other crimes.  Reports to NCMEC alone number in the *millions, see supra* at § II.F.2, without counting tips about other federal and state crimes.  By prohibiting providers from voluntarily reporting possible illegal activity, the VPPA violates the First Amendment.  *See Entler v. Gregoire*, 872 F.3d 1031, 1043-44 (9th Cir. 2017) ( "the filing of criminal complaints falls within the embrace of the First Amendment").  Under strict scrutiny, there is no justification for this prohibition on reports to law enforcement, which Congress carved out from similar laws, even in other parts of the chapter where the VPPA is found.  *See* 18 U.S.C. § 2702(b)(7).

Plaintiffs and the United States may argue that *one subset* of these reports, CyberTipline reports by U.S. companies[9] to NCMEC do not violate the VPPA, though all its elements are met, because a

---

[8] In deciding whether a statute is overbroad, "the alleged overbreadth … consists of its application to *non*-commercial speech." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 481 (1989).
[9] NCMEC states that 17% of the reporting entities are not in the U.S. but report voluntarily.  Shehan Decl. ¶ 5.  However, their customers or the customers' victims may be in the U.S.

different statute, 18 U.S.C. § 2258A, requires such reports.  Not so.  While there is a defense for compliance with Section 2258A, found in 18 U.S.C. § 2258B, it excludes claims for "intentional misconduct," *see* 18 U.S.C. § 2258B(b)(1).  ***Any*** violation of the VPPA is necessarily "intentional misconduct" because VPPA liability arises only for "wrongful" disclosures made "knowingly," 18 U.S.C. § 2710(b)(1), so the defense does not apply.  Were there any doubt, ***in the very same chapter of Title 18***, when Congress intended to say that a disclosure of consumer information to NCMEC was permitted, ***it expressly said so***.  *See* 18 U.S.C. § 2702(b)(6) (expressly excluding liability under the ECPA for disclosures "to [NCMEC], in connection with a report submitted thereto under section 2258A").  But when Congress enacted (and amended) the VPPA, it included no such safe harbor.[10]  The VPPA prohibits reports to NCMEC, as well as all voluntary, direct reports to law enforcement.

***Third***, as noted above, the VPPA irrationally and unnecessarily prohibits VTSP disclosures even in public safety emergencies.  *Compare* 18 U.S.C. § 2702(b)(8) (authorizing emergency disclosures under the ECPA).  These disclosures are neither hypothetical nor trivial, as discovery from the United States and third parties shows.  *See supra* at § II.F.2.  But the VPPA prohibits these disclosures too.

***Fourth***, the VPPA has no exception for disclosure in litigation or testimony, except in civil proceedings as permitted by a court after notice, a showing of compelling need, and an opportunity for the consumer to oppose.  *See* 18 U.S.C. § 2710(b)(2)(F).  As noted above, evidence that a specific person watched a specific video is relevant in criminal child pornography proceedings, both in suppression hearings and at trial, as well as criminal copyright proceedings.  *See supra* at § II.F.  The government provides that evidence at times with testimony and evidence from VTSPs.  But the VPPA has ***no exception*** for disclosure in ***criminal*** proceedings, and in any event, there is no evidence the federal government has ever sought an order that would permit that disclosure.  *See supra* at II.F.4.  There is no compelling interest in burdening the disclosure of relevant evidence in civil and criminal proceedings, yet the VPPA once again over-reaches.

***Fifth***, the VPPA sweeps in a wide range of other non-commercial speech, such as continuing

---

[10] "When interpreting an unclear statutory provision … [courts] cannot simply assume an omission was 'unintentional,' particularly when that very omission tips the scale in favor of one interpretation over another."  *Shoner v. Carrier Corp.*, 30 F.4th 1144, 1149 (9th Cir. 2022).

education providers complying with obligations to report to the government that professionals have completed approved video courses necessary to keep their licenses, and traffic schools that notify courts that violators have completed video traffic school. *See supra* at § II.F.5.

**Sixth**, the VPPA also applies to teachers' use of educational software to monitor whether particular students have viewed videos assigned to them, and how students are using the computer resources made available to them by schools. Such software is used by millions of American students and their schools every day, not just for pedagogy but also for discipline. *See supra* at § II.F.6. But under the VPPA, a school can use such software only if it obtains consent under Section 2710(2)(B) – an unworkable regime in which a student could withdraw consent at any time, or on a case-by-case basis.

**Seventh**, the law also forbids disclosure of viewing information even with a consumer's express written consent, if that consent does not comply with the VPPA's peculiar formalities. *See* 18 U.S.C. § 2710(b)(2)(B). As discussed above, there is no First Amendment justification for punishing the disclosure of truthful information the consumer has actually and expressly consented to. *See Eu*, 826 F.2d at 830; *IMDb.com*, 962 F.3d at 1127 (statute regulating public disclosure of the ages of entertainment industry professionals violated the First Amendment, even though prohibition applied only if subscriber objected to disclosure). Moreover, even if some consent requirement is justified, unnecessarily burdensome consent requirements run afoul of the First Amendment. *See*, *e.g.*, *Baldwin v. Redwood City*, 540 F.2d 1360, 1371 n.30 (9th Cir. 1976) (written consent requirement "insufficient to justify the heavy additional burdens imposed on the exercise of First Amendment rights.").

**Eighth**, the VPPA punishes disclosure of information that is not even private: the fact that the consumer may have also disclosed their video viewing history to others, recommending favorite videos, sharing them on social media, endorsing them, even writing reviews about them, appears irrelevant to liability under the VPPA. But again, the First Amendment does not permit liability in such cases. *See The Florida Star*, 491 U.S. at 539 (First Amendment precluded liability for disclosure of information without regard to whether it had already been disclosed within plaintiff's community or whether plaintiff had "voluntarily called public attention to" it); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975) (striking down prohibition on disclosure of name of rape victim that was already disclosed in public records). As the *Cox* Court noted, "even the prevailing law of invasion of privacy generally recognizes

that the interests in privacy fade when the information involved already appears on the public record."

*Id.; see also The Florida Star*, 491 U.S. at 535 (punishing a speaker for "dissemination of information [] already publicly available is relatively unlikely to advance [privacy] interests"). The VPPA, in contrast, punishes disclosure without regard to whether the information is publicly known or private at all.

**Ninth**, the VPPA prohibits any disclosure of a consumer's video-watching history, regardless of whether the nature of the information is harmful to any privacy interest. Under the VPPA, plaintiffs need not even show they had a subjective desire to keep the information private, much less establish that the disclosure was "one that a reasonable person would find highly offensive," *see The Florida Star*, 491 U.S. at 539. But the First Amendment requires that a privacy law be limited to revelation of facts that would be "highly offensive," "those intimate physical details the publicizing of which would not be merely embarrassing and painful but deeply shocking to the average person subjected to such exposure[.]" *Coplin*, 111 F.3d at 1405 (citation omitted). The VPPA is not limited as the First Amendment requires, but indiscriminately and impermissibly treats all video-viewing as if it were the most sensitive, private, and personal information about a person.

**Tenth and finally**, all these defects are exacerbated by the VPPA's "liquidated damages" provision, which imposes liability of $2500 even when the plaintiff has *no* actual damages. Assume a plaintiff who posts on Facebook the ten best children's movies that she has watched on the defendant's platform in the preceding year. Assume further that she has consented to disclosure of the videos she watched, albeit in the defendant's general terms of use, not a standalone form. And last, assume that the defendant's disclosure was limited to using Meta Pixel to inform Facebook, and no one else, that the plaintiff had watched the particular movies she posted about. Under the VPPA, the plaintiff would claim to be entitled to at least $2500 in mandatory liquidated "damages," despite having suffered no damages or any other harm of any kind, and despite having voluntarily published that same information to a far broader audience than the defendant had.[11] The First Amendment does not permit imposition of monetary damages for speech that causes no actual injury. *See Ibanez,* 512 U.S. at 146 (1994); *Gertz,*

---

[11] This is not the only unharmed plaintiff who could demand $2500. So too the criminal who distributed child pornography or illegally copied movies; a person who promoted a video threatening to blow up a school or claiming to have a nuclear device; a person who took an online course or attended online traffic school; and a student who did not want their teacher to know whether they did their homework.

418 U.S. at 349; *NetChoice*, 34 F.4th at 1231; *Mason,* 208 F.3d at 958.  By imposing damages for truthful speech without any injury, the VPPA violates the First Amendment.

### F.    The VPPA Does Not Further a Compelling Governmental Interest in Privacy by Narrowly Tailored Means

On Patreon's facial challenge, plaintiffs and the government bear the burden to show that the examples detailed above satisfy strict scrutiny.  *Brown*, 564 U.S. at 799-800.  In defending the statute, plaintiffs and the government "bear the risk of uncertainty … and ambiguous evidence will not suffice." *Id.* at 800.  The VPPA fails ***intermediate scrutiny***, *see supra* at § III.C.; strict scrutiny is insurmountable.

Congress could have passed a different law that appropriately protected legitimate consumer privacy interests in watching videos.  Congress could have enacted a law that allowed solely for ***actual damages*** suffered from knowing disclosure of a consumer's private video-watching information – unless (a) the disclosure related to a matter of public concern including disclosures to law enforcement, in emergencies, or in court proceedings; or (b) disclosure itself was part of the ordinary course of business of the provider; or (c) the consumer consented in some form, or (d) the disclosed conduct was already publicly known.  But the VPPA is not that law.  It restricts speech on matters of public concern at the core of the First Amendment.  It restricts speech that the consumer actually consented to.  It restricts speech that is already public.  It imposes substantial presumed damages in the absence of any actual harm, and without regard to whether the speech is on a matter of public concern, is actually consented to, or concerns matters that are not even private.  And at the same time, it fails to do anything to protect equally important, and equally private, forms of consumer conduct.  For all these reasons, the VPPA is "substantially overbroad, and therefore invalid under the First Amendment."  *Stevens*, 559 U.S. at 482.

The VPPA violates the First Amendment on its face; it is unconstitutional.

## IV.    CONCLUSION

For all the foregoing reasons, the Court should enter summary judgment in Patreon's favor on Plaintiffs' claims under the VPPA on the ground that the VPPA, both as applied to Patreon and on its face, violates the First Amendment to the United States Constitution.

1

Dated:  November 17, 2023

Respectfully submitted,

2

THE NORTON LAW FIRM PC

3

*/s/ Fred Norton*

4

Fred Norton

5

Attorneys for Defendant
PATREON, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28