Fred Norton (CA SBN 224725)
fnorton@nortonlaw.com
Nathan Walker (CA SBN 206128)
nwalker@nortonlaw.com
Bree Hann (CA SBN 215695)
bhann@nortonlaw.com
Gilbert Walton (CA SBN 324133)
gwalton@nortonlaw.com
THE NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Telephone: (510) 906-4900

Attorneys for Defendant
PATREON, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| BRAYDEN STARK, JUDD OOSTYEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PATREON, INC.,<br><br>Defendant. | Case No. 3:22-cv-03131-JCS<br><br>**DECLARATION OF JASON BYTTOW IN SUPPORT OF DEFENDANT PATREON, INC.'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' VPPA CLAIMS ON THE GROUND THAT THE VPPA VIOLATES THE FIRST AMENDMENT**<br><br>Date:  February 16, 2024<br>Time:  9:30 a.m.<br>Judge:  Hon. Joseph C. Spero |

Doc ID: 3a230ac6593a58a0da2e261a3478bbbcc6acf565

I, Jason Byttow, declare as follows:

1.      I submit this declaration in support of Patreon, Inc.'s Motion for Summary Judgment. Except as otherwise indicated, I make this declaration based on personal knowledge.  If called upon as a witness to testify to the truth of these statements, I could do so competently under oath.

2.      I have been employed by Patreon, Inc. ("Patreon") since February 2016.  I have held four titles at Patreon:  Software Engineer (February 2016 – October 2017); Engineering Manager (October 2017 – January 2019); Senior Engineering Manager (January 2019 – approximately January 2022); and Staff Engineer (approximately January 2022 – present).

**Patreon and its Platform**

3.      Patreon provides an online platform that allows individual fans, known as "patrons," to provide financial support to artists, known as "creators," on an ongoing basis.  A creator is someone who creates a membership page on Patreon to engage with their fans – known on the site as patrons – by offering access, merchandise, exclusivity, and engaging experiences.  Patrons purchase memberships for specific creators on a monthly, annual, or per creation basis.  The subscription fees go to the creators, except for a percentage (5-12%) that Patreon retains as a platform and payment-processing fee.

4.      Because both Patreon and its creator members depend on content being exclusively available to patrons, almost all of the millions of creator posts on Patreon are paywalled such that only a currently paying patron of a given creator can access or see that creator's content.

5.      As part of my job at Patreon, I am familiar with the process by which prospective users set up Patreon accounts and accept the terms of the Patreon's Terms of Use, Privacy Policy, and Cookie Policy.

6.      I am also familiar with the way in which user account information is electronically logged and stored at Patreon, and I understand how to retrieve and interpret those records.  As a regular

business practice, Patreon maintains a log of various actions taken by users in connection with their Patreon accounts (the "User Account Activity Log").  Entries in the User Account Activity Log are recorded automatically at or near the time of the events the entries record.  To be clear, the User Account Activity Log relies on Patreon's own software and is in no way related to or derived from information collected by the Meta Pixel that I understand to be at issue in this case.  I am personally familiar with these records and use them to perform my job functions in the regular course of Patreon's business.

7.      All Patreon users, whether patrons or creators, must agree to Patreon's Terms of Use as a precondition to creating a Patreon account and using the Patreon platform.

8.      Whenever a Patreon user creates a Patreon account and accepts Patreon's Terms of Use, that information is recorded in the User Account Activity Log.  It is Patreon's regular practice to store such records in the User Account Activity Log.

**Brayden Stark**

9.      I understand that Patreon user Brayden Stark is one of the two named plaintiffs in the above-captioned case against Patreon.

10.     I have reviewed Patreon's User Account Activity Log for event entries related to Mr. Stark.

11.     The User Account Activity log shows Mr. Stark created a Patreon account and accepted the Patreon Terms of Use, using a sign-up page on Patreon's website via a web browser and using his Google account to authenticate himself, on November 30, 2019, at 21:54 UTC.  True and correct copies of screenshots from Patreon's User Account Activity Log, showing Mr. Stark created a Patreon account and accepted Patreon's Terms of Use on November 30, 2019, are attached hereto as Exhibits 76 and 77 (Exhibits 76 and 77 have been redacted to remove user ID, IP address, device ID, and other identifying information).

Doc ID: 3a230ac6593a68a90da2e261a3478bbb6c6acf565

12.     I am familiar with the Patreon account creation and Terms of Use acceptance process that existed at the time Mr. Stark created his Patreon account on November 30, 2019.  The process worked as follows.  First, to create a Patreon account using an internet browser on a computer or mobile device, a prospective user had to navigate to the Patreon website page accessible at https://www.patreon.com/signup.[1]  On this webpage, which was entitled "Sign up," the prospective user could choose to sign up for a Patreon account by either (1) entering their first name, last name, email address, and a Patreon-specific password, and then clicking a button labeled "Sign up;" or (2) clicking a button labeled "Sign up with Google" or a button labeled "Sign up with Facebook," and then authenticating their identity to Patreon using their verified Google account or Facebook account.  On the "Sign up" screen, below these buttons for signing up, was the following text: "By signing up, you agree to Patreon's Terms of Use, Privacy Policy and Cookie Policy."  The words "Terms of Use," "Privacy Policy," and "Cookie Policy" each were underlined and hyperlinked, such that a user could click on those words to be taken to the full text of Patreon's then-effective Terms of Use, Privacy Policy, and Cookie Policy on Patreon's publicly available website.

13.     To the best of my knowledge, Patreon does not maintain a repository of historical screenshots of the Patreon sign-up webpage as it has appeared in the past.

14.     To obtain a screenshot of the Patreon sign-up webpage as it would have appeared to Mr. Stark when he signed up for Patreon on November 30, 2019, I used the Internet Archive Wayback Machine ("Wayback Machine") at https://web.archive.org/.  The Wayback Machine is an online digital archive that allows the user to see how webpages looked on specific dates in the past.  When I accessed Wayback Machine in November 2023, the Wayback Machine did not appear to have a snapshot of

---

[1] On November 30, 2019, when Mr. Stark created his account, a prospective user could alternatively create a Patreon account by browsing to the URL https://www.patreon.com/signup?ru=%2Fcreate.  The webpage associated with that URL was identical to the webpage found at https://www.patreon.com/signup, and the signup process, as described in this declaration, was the same.

Doc ID: 3a230ac6593a68a0da2e261a3478bbb6c6acf565

Patreon's sign-up webpage taken on November 30, 2019; however, I obtained from the Wayback Machine screenshots of the Patreon sign-up page (http://www.patreon.com/signup) on November 10, 2019, and January 12, 2020, at the URLs below:

- Nov. 10, 2019: https://web.archive.org/web/20191110093331/https://www.patreon.com/signup

- Jan. 12, 2020: https://web.archive.org/web/20200112005020/https://www.patreon.com/signup

True and correct copies of the screenshots of the Patreon sign-up page on November 10, 2019, and January 12, 2020 are attached hereto as Exhibit 78 and Exhibit 79, respectively.  As shown in Exhibits 78 and 79, the Patreon sign-up page was the same on both November 10, 2019, and January 12, 2020.

15.     The screenshots of the Patreon sign-up page on November 10, 2019, and January 12, 2020 (Exhibits 78 and 79) accurately reflect how the Patreon sign-up page would have appeared to Mr. Stark when he created his account on November 30, 2019.  I have reviewed the source code for the Patreon sign-up page, and the source code indicates there were no changes to the Patreon sign-up page from November 10, 2019 to January 12, 2020.  Thus, the screenshots from November 10, 2019 and January 12, 2020 accurately reflect how the Patreon sign-up page would have appeared when Mr. Stark created his account on November 30, 2019.  As you can see from the screenshot in Exhibit 78, which is reproduced below, the following statement was included at the bottom of the sign-up page: "By signing up, you agree to Patreon's Terms of Use, Privacy Policy, and Cookie Policy." *Id*.

4

Doc ID: 3a230ac6593a68a90a2e261a3478bbb6c6acf565

*See* Exhibit 78 (November 10, 2019 screenshot of sign-up page).  As part of my work for Patreon, I have

seen the Patreon sign-up page before, and I know what it looked like.  It looked like what you see in the

screenshot from the Wayback Machine set forth in Exhibit 78 and reproduced above.

16.     To create a Patreon account on Patreon's website at the time Mr. Stark created his account

on November 30, 2019, a prospective user had to click the "Sign up with Google" button, the "Sign up

with Facebook" button, or the "Sign Up" button, under which was the statement "By signing up, you

agree to Patreon's Terms of Use, Privacy Policy, and Cookie Policy."  Thus, when Mr. Stark created his

Patreon account, it was impossible for him to do so without expressly indicating that he agreed to the Terms of Use, Privacy Policy, and Cookie Policy.

17.     The User Account Activity Log shows Mr. Stark created his Patreon account on Patreon's website and accepted Patreon's Terms of Use on November 30, 2019.  *See* Exhibits 76 and 77.

18.     Based on my knowledge and review of the source code for Patreon's website, I can confirm that if Mr. Stark, or any user, clicked on the Terms of Use, Privacy Policy, and Cookie Policy hyperlinks on the Patreon sign-up page on November 19, 2019, they would be presented with the full text of Patreon's Terms of Use, Privacy Policy, and Cookie Policy as were then available on Patreon's public website.

19.     Through my work for Patreon, I am familiar with how Patreon maintains, as part of its source code database for its website, historical, plain-text, html versions of its Terms of Use and Cookie Policy, in the ordinary course of business.  I understand how to retrieve historical versions of the Terms of Use and Cookie Policy from the source code database.

20.     Attached as Exhibit 80 is a true and correct copy of a plain-text, html version of Patreon's Terms of Use/Cookie Policy (in one document) that were in effect and posted on Patreon's public website when Mr. Stark created his Patreon account on November 30, 2019, and to which Mr. Stark agreed during the sign-up process.  I obtained this document from Patreon's source code database on or about November 15, 2023.  The formatting of this document reflects how the data appears in Patreon's source code; the document includes the text of the policies, as well as webpage formatting instructions that were used by the system to format the webpage but which would not have been visible on screen.

21.     I am familiar with how Patreon maintains an archive of copies of historical versions of its Terms of Use, Cookie Policy, and Privacy Policy, in the format in which they were visible on-screen on Patreon's website.  I understand how to retrieve historical versions of terms and policies from this archive.  Attached hereto as Exhibit 81, 82, and 83, respectively, are true and correct copies of Patreon's

Doc ID: 3a230ac6593a68a90da2e261a3478bbb6c6acf565

Terms of Use, Cookie Policy, and Privacy Policy, from this archive that the archive records indicate (based on the dates of the archived historical versions) were in effect on November 30, 2019 (when Mr. Stark created his Patreon account).

**Judd Oostyen**

22.     I understand that Patreon user Judd Oostyen is one of the two named plaintiffs in the above-captioned case against Patreon.

23.     I have reviewed Patreon's User Account Activity Log for event entries related to Mr. Oostyen.

24.     The User Account Activity log shows that Mr. Oostyen created a Patreon account and accepted the Patreon Terms of Use, on Patreon's website using an internet browser, by entering his name, email address, and a password, on February 12, 2021, at 12:52 UTC.  True and correct copies of screenshots from Patreon's User Account Activity Log, showing Mr. Oostyen created a Patreon account and accepted Patreon's Terms of Use on February 12, 2021, are attached hereto as Exhibits 84 and 85 (Exhibits 84 and 85 have been redacted to remove user ID, IP address, device ID, and other identifying information).  I am familiar with the Patreon account creation and Terms of Use acceptance process as it existed at the time Mr. Oostyen created his Patreon account on February 12, 2021.  The process worked on February 12, 2021, just as I described it worked on November 30, 2021, as set forth above.  First, to create a Patreon account using an internet browser on a computer or mobile device, a prospective user had to navigate to the Patreon website page accessible at https://www.patreon.com/signup.[2]  On this webpage, which was entitled "Sign up," the prospective user could choose to sign up for a Patreon account by either (1) entering their first and last name, email address, and a Patreon-specific password, and then clicking a button labeled "Sign up;" or (2) clicking a button labeled "Sign up with Google" or a

---

[2] On February 12, 2021, when Oostyen created his account, a prospective user could alternatively create a Patreon account by browsing to the URL https://www.patreon.com/signup?ru=%2Fcreate.  The webpage associated with that URL was identical to the webpage found at https://www.patreon.com/signup, and the signup process, as described in this declaration, was the same.

7

button labeled "Sign up with Facebook," and then authenticating their identity to Patreon using their verified Google account or Facebook account.  On the "Sign up" screen, below these buttons for signing up, was the following text: "By signing up, you agree to Patreon's Terms of Use, Privacy Policy and Cookie Policy."  The words "Terms of Use," "Privacy Policy," and "Cookie Policy" each were underlined and hyperlinked, such that a user could click on those words to be taken to the full text of Patreon's then-effective Terms of Use, Privacy Policy, and Cookie Policy on Patreon's publicly available website.

25.      To obtain a screenshot of the Patreon sign-up page as it would have appeared to Mr. Oostyen when he signed up for Patreon on February 12, 2021, I used the Wayback Machine.  When I accessed the Wayback Machine in or about November , 2023, the Wayback Machine did not appear to have a snapshot of Patreon's sign-up page taken on February 12, 2021; however, I obtained screenshots of the Patreon sign-up page, http://www.patreon.com/signup, as it existed on January 25, 2021 and March 10, 2021, at the Wayback Machine URLs shown below:

- January 25, 2021:

https://web.archive.org/web/20210125061615/https://www.patreon.com/signup

- March 10, 2021:

https://web.archive.org/web/20210310173248/https://www.patreon.com/signup

True and correct copies of the screenshots of the Patreon sign-up page on January 25, 2021, and March 10, 2021 are attached hereto as Exhibit 86 and Exhibit 87, respectively.  As shown in Exhibits 86 and 87, the sign-up page was the same on both January 25, 2021, and March 10, 2021.

26.      The screenshots of the Patreon sign-up page on January 25, 2021 and March 10, 2021 (Exhibits 86 and 87) accurately reflect how the Patreon sign-up page would have appeared to Mr. Oostyen when he created his account on February 12, 2021.  I have reviewed the source code for the Patreon sign-up page, and the source code shows there were no changes to the sign-up page from

8

January 25, 2021 to March 10, 2021.  Thus, the screenshots from January 25, 2021 and March 10, 2021 accurately reflect how the Patreon sign up page would have appeared when Mr. Oostyen created his account on February 12, 2021.  As shown in the screenshot in Exhibit 87, reproduced below, the following language and links were included at the bottom of the sign up page: "By signing up, you agree to Patreon's Terms of Use, Privacy Policy, and Cookie Policy."

*See* Exhibit 87 (March 10, 2021 screenshot of Sign Up page).  As part of my work for Patreon, I have seen the Patreon sign-up page before, and I know what it looked like.  It looked like what you see in the screenshot from the Wayback Machine set forth in Exhibit 87 and reproduced above.

9

Doc ID: 3a230ac6593a68a90da2e261a3478bbb6c6acf565

27.     To create an account on Patreon's website at the time Mr. Oostyen created his account on February 12, 2021, a prospective user had to click the "Sign up with Google" button, the "Sign up with Facebook" button, or the "Sign Up" button, under which was the statement "By signing up, you agree to Patreon's <u>Terms of Use</u>, <u>Privacy Policy</u>, and <u>Cookie Policy</u>."  Thus, when Mr. Oostyen created his Patreon account it was impossible for him to do so without expressly indicating that he agreed to the Terms of Use, Privacy Policy, and Cookie Policy.

28.     The User Account Activity Log that shows Mr. Oostyen created his Patreon account and accepted Patreon's Terms of Use, Privacy Policy, and Cookie Policy, on Patreon's website using a web browser, by entering his name, email address, and a password, and pressing a "Sign up" button, on February 12, 2021.  *See* Exhibits 84 and 85.

29.     Based on my knowledge and review of the source code for Patreon's website, I can confirm that if Mr. Oostyen, or any user, clicked on the Terms of Use, Privacy Policy, and Cookie Policy hyperlinks on the Patreon sign-up page on February 12, 2021, they would be presented with the full text of Patreon's Terms of Use, Privacy Policy, and Cookie Policy as were then available on Patreon's public website.

30.     Through my work for Patreon, I am familiar with how Patreon maintains, as part of its source code database for its website, historical plain-text, html versions of its Terms of Use and Cookie Policy, in the ordinary course of business.  I understand how to retrieve historical versions of the Terms of Use and Cookie Policy from the  source code database.

31.     Attached as Exhibit 88 and 89, respectively, are true and correct copies of plain-text, html versions of Patreon's Terms of Use and Cookie Policy that were in effect and posted on Patreon's public website when Mr. Oostyen created his Patreon account on February 12, 2021, and to which Mr. Oostyen agreed during the sign-up process.  I obtained these documents from Patreon's source code database and the third-party hosting application on or about November 15, 2023. The formatting of these documents

Doc ID: 3a230ac6593a68a90a2e261a3478bbd6c6acf565

reflect how the data appears in Patreon's source code; the document includes the text of the policies, as well as webpage formatting instructions that were used by the system to format the webpage but which would not have been visible on screen.

32.     I am familiar with how Patreon maintains an archive of copies of historical versions of its Cookie Policy and Privacy Policy, in the format in which they were visible on-screen on the Patreon website.  I understand how to retrieve historical versions of terms and policies from this archive. Attached hereto as Exhibit 82 and 90, respectively, are true and correct copies of Patreon's Cookie Policy and Privacy Policy from Patreon's archive that the archive records indicate (based on the dates of the archived historical versions) were in effect on February 21, 2021 (when Mr. Oostyen created his Patreon account).

33.     In or about November, 2023, I obtained through the Wayback Machine, the Terms of Use as they appeared on Patreon's public website at www.patreon.com/policy/legal on February 9, 2021 and February 13, 2021, at the Wayback Machine URLs shown below:

-     February 9, 2021 Terms of Use:

https://web.archive.org/web/20210209064533/https://www.patreon.com/policy/legal

-     February 13, 2021 Terms of Use:

https://web.archive.org/web/20210213045053/http://www.patreon.com/policy/legal

True and correct copies of Patreon's Terms of Use as they appeared on Patreon's public website on February 9, 2021 and February 13, 2021, obtained from the Wayback Machine, are attached as Exhibit 91 and Exhibit 92, respectively.  As shown in Exhibits 91 and 92, the Patreon Terms of Use were the same on both February 9, 2021 and February 13, 2021.

34.     I have reviewed the source code, and those records show there were no changes to the Patreon Terms of Use between February 9, 2021 and February 13, 2021.  Thus, the Terms of Use available on Patreon's public website on February 9, 2021 and February 13, 2021 (shown in Exhibits 91

Doc ID: 3a230ac6593a68a90a2e261a3478bbb6c6acf565

and 92) are the Patreon Terms of Use that were on Patreon's public website on February 12, 2021 when Mr. Oostyen created his account.

**Videos Watched By Plaintiffs**

35.     With respect to the two plaintiffs in this case, Mr. Stark and Mr. Oosyten, I reviewed a spreadsheet that I understand Patreon previously produced in this case with the Bates number PATREON_019019, which reflects the posts with videos that the two plaintiffs viewed on the Patreon website according to Patreon's User Account Activity Log.  Based on my familiarity with our User Account Activity Log and record of user events, I can confirm that all the posts with videos the two plaintiffs visited on the Patreon website were paywalled with access limited to paying patrons of those specific creators.

36.     Patreon does not impose any naming conventions for post titles or video titles, so post titles or video titles need not be unique.  There are over 250,000 different creators on Patreon and tens of millions of posts.  As a result, multiple posts or videos with different content can and do share the same name.

37.     During the time that Mr. Stark and Mr. Oostyen have had Patreon accounts, and prior to the filing of this lawsuit (which I understand occurred on May 27, 2022), the appearance of paywalled content to a person who is not a logged-in patron of the specific creator has varied.

    a.  At all times, posts of creators identified as creators of explicit or "Not Safe for Work" content were fully obscured (heavily blurred so the video player had no discernible image) to anyone who was not a logged-in patron of that creator.

    b.  At the beginning of the period when Mr. Stark and Mr. Oostyen had accounts, all posts, regardless of whether they contained explicit or "Not Safe for Work" content, were also fully obscured in this same manner if the person visiting the page was not a subscribed patron of that creator and signed in to their account.

Doc ID: 3a230ac6593a68a90da2e261a3478bbb6c6acf565

c. Beginning in or around July or August 2022, for some posts that were <u>not</u> from a creator of explicit or "Not Safe for Work" content, a person who visited the page but was not a subscribed patron of that creator and signed in to their account, the post would have a thumbnail image without blurring, which would not indicate whether the content was video.

d. For any kind of post, for all or nearly all times, a creator could choose to include a brief textual statement describing the specific post that would appear to someone who was not a logged-in patron of that creator.

e. Sometimes posts are removed by the creator or removed by Patreon, or a creator's entire account is terminated.  In that case, a person who had the link to the original post with the video would be unable to retrieve any information about the post or the video by going to that URL.  This is true of at least some of the posts Mr. Stark accessed through his Patreon account.

f. Finally, creators have the ability to change their posts to modify the contents of a given post in any way and at any time, without changing the URL or the title of the content. For example, a creator could change the type of media in a given post from a video to an audio clip or to a static image and vice versa.

38.   As a result, for the posts with videos that Mr. Stark and Mr. Oostyen viewed prior to filing their lawsuit in May 2022, if a third party (a) learned the titles of those videos and (b) also learned the URLs where the videos were located, and (c) then used a web browser to navigate to those URLs, the third party would be unable to see that the post actually contained video, to play any portion of the video, or to see any content of the video, other than a blurred image or a still image thumbnail—unless they created a Patreon account and paid to become a patron of that specific creator.  If the post has been

Doc ID: 3a230ac6593a68a90da2e261a3478bbb6c6acf565

removed, the third party would be unable to obtain any information about its content by trying to visit the page, whether they created an account or not.

39.     In the latter part of 2022, after the filing of the lawsuit, Patreon began to introduce native video on selected creators' pages.  Where native video had been introduced, a creator could choose to permit a preview of the video, lasting no more than two minutes, that would play for persons who were not logged-in patrons of that creator.

**VPPA Consent Mechanisms**

40.     I understand that Mr. Stark and Mr. Oostyen have alleged that Patreon violated the Video Privacy Protection Act (VPPA) by use of the Meta Pixel.[3]  I also understand that the VPPA states:

> (2) A video tape service provider may disclose personally identifiable information concerning any consumer--
>           ….
>           (B) to any person with the informed, written consent (including through an electronic means using the Internet) of the consumer that--
>
>                   (i) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer;
>
>                   (ii) at the election of the consumer--
>
>                           (I) is given at the time the disclosure is sought; or
>
>                           (II) is given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner; and
>
>                   (iii) the video tape service provider has provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by- case basis or to withdraw from ongoing disclosures, at the consumer's election;

41.     I am not aware of Patreon ever having disclosed any information that is protected by the VPPA, for which satisfying the foregoing VPAA consent requirements was or would be needed.

---

[3] I am familiar with the Meta Pixel base code that was incorporated into Patreon's codebase to implement the Meta Pixel on the Patreon website.

42.     Implementing a consent mechanism for the Patreon website (or for any video-distribution website) that would meet the foregoing VPPA-consent requirements would (1) require substantial engineering work, and (2) degrade the user's experience on the website, if it were possible at all.

a.  Building and presenting such a consent management system for consumers would come at a high cost:  (1) The friction necessary to present and/or generalize these rules into a set of management tools would be a huge burden to the end-user experience, so much so, that users would likely become frustrated and abandon viewership on the platform; (2) On the management tools front, attempting to generalize these rules into global settings would be a complex design challenge and would require a lot of overhead and burden on our creators and end consumers; (3) In addition, tools for revoking historical consent would require a UI to present every video watched regardless of duration to the consumer which would require robust searching and management tools to control access on a per-video basis.

b.  To this end, the engineering complexity to build the end user experience on a per-video basis, generalized consent-management tools and scale this to millions of users would require a major engineering effort that would require a dedicated team to build, maintain, and scale.  If a video consent is revoked, percolating the consent into downstream systems would also require a significant undertaking, including tools we integrate with that may not provide such controls.  Lastly, there would be an indefinite on-going experimentation necessary to hone in the user experience to minimize the on-going loss due to friction and overhead as well as misaligned incentives on an intra-team level.

15

Doc ID: 3a230ac6593a68a90da2e261a3478bb6c6acf565

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on November 17, 2023, in Brooklyn, New York.


Dated:  November 17, 2023

_____

Jason Byttow

Doc ID: 3a230ac6593a68a90da2e261a3478bbb56c6acf565

 **Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Stark lawsuit -- declaration |
| **File name** | 2023.11.17 Byttow Decl. ISO MSJ_.pdf |
| **Document ID** | 3a230ac6593a58a0da2e261a3478bbbcc6acf565 |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ● Signed |

## Document History

| | | |
|---|---|---|
| SENT | **11 / 18 / 2023**<br>00:06:04 UTC | Sent for signature to Jason Byttow (jason@patreon.com) from dabad@nortonlaw.com<br>IP: 24.4.199.41 |
| VIEWED | **11 / 18 / 2023**<br>00:59:36 UTC | Viewed by Jason Byttow (jason@patreon.com)<br>IP: 70.107.204.240 |
| SIGNED | **11 / 18 / 2023**<br>01:01:40 UTC | Signed by Jason Byttow (jason@patreon.com)<br>IP: 70.107.204.240 |
| COMPLETED | **11 / 18 / 2023**<br>01:01:40 UTC | The document has been completed. |