# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Criminal Action** |
| | ) | |
| **v.** | ) | **No. 21-10016-EFM** |
| | ) | |
| **RANDY SPORN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (Doc. 24)

The defendant, a twice-convicted sex offender, used his "survivinglife8" Twitter account to entice a minor to engage in the production of child pornography and to store child pornography. The defendant did so despite Twitter's clear warning in its Terms of Service (TOS) that it enforced a zero tolerance policy for child exploitation. Moreover, the defendant did so despite his personal experience with Twitter suspending and reporting his "mikeyfromtumbl1" Twitter account for child pornography just a few weeks earlier. It should have come as little surprise to the defendant when Twitter again detected child pornography in his "survivinglife8" Twitter account and undertook enforcement action: suspending and preserving his account information, and then compiling a report to the National Center for Missing and Exploited Children (NCMEC), which contained his account information. Well after Twitter suspended and terminated the defendant's access to his accounts, law enforcement reviewed the information

PTRN-STARK_000575

disclosed by Twitter, finding child pornography along with the communications with the minor.

The defendant now challenges law enforcements' review of Twitter's reports. This Court should reject the defendant's arguments and find:

1) The defendant lacked any reasonable expectation of privacy in the content of his accounts, in part due to Twitter's independent action of detecting, suspending, preserving, and disclosing the content of the accounts to NCMEC.[1]

2) Twitter's TOS were sufficiently robust to alert the defendant that he could not reasonably expect any level of privacy in child sexual exploitation material on Twitter's servers, particularly after he had already experience with Twitter's enforcement practice.[2]

3) The defendant lacked any possessory or property interest in the .ZIP files created by Twitter that were submitted to the NCMEC as part of its report.

4) The defendant consented to Twitter's search and full disclosure of his account by agreeing to Twitter's TOS.[3]

5) The Good Faith exception would apply because law enforcement could reasonably rely upon this Court's analysis and holding in *Ackerman* to justify the review of the account information.

6) The defendant's argument, that the state search warrants for business records authorized a "search for" but not a "search of," should be rejected because he lacks standing to even assert a Fourth Amendment claim against the providers' business records at issue.

---

[1] This is in accordance with this Court's previous ruling in *United States v. Ackerman*, 296 F. Supp. 3d 1267, 1272 (D. Kan. 2017).

[2] This is in accordance with *United States v. Stratton*, 229 F. Supp. 3d 1230, 1242 (D. Kan. 2017) (holding Sony's Terms of Service defeated the defendant's expectation of privacy in his gaming device). *See also United States v. Warshak*, 631 F.3d 266, 287 (6th Cir. 2010) ("[I]f the ISP expresses an intention to 'audit, inspect, and monitor' its subscriber's emails, that might be enough to render an expectation of privacy unreasonable.")

[3] This is in accordance with *United States v. Bohannon*, 2020 WL 7319430 (N.D. Cal. Dec. 11, 2020).

PTRN-STARK_000576

## I.    Factual Background

The defendant Randy Sporn is a twice-convicted sex offender[4] who operated the Twitter account "mikeyfromtumbl1" until Twitter detected child pornography in the account, suspended the account, and submitted a report to NCMEC on December 23, 2019.

Despite having his account suspended for violation of Twitter's zero-tolerance child exploitation policy a week earlier, the defendant registered a second Twitter account, "survivinglife8," on December 31, 2019. With this account, the defendant again engaged in child pornography activities. Twitter detected child pornography in this account, suspended it, and submitted a report to NCMEC on April 28, 2020.

Both of Twitter's submitted reports to NCMEC included .ZIP files containing business records and content (including child pornography and communications with a minor) pertaining to the accounts.

### A.  Background on Twitter and its Terms, Rules, and Policies

Twitter is an American microblogging and social networking service on which users post and interact with messages known as "tweets". Registered users can post, like, and retweet tweets, but unregistered users can only read those that are publicly available. Twitter also allows users to engage in direct messaging

---

[4] The defendant has a 1989 conviction in Sedgwick County Case 89-CR-777 for Aggravated Criminal Sodomy (with a 15 year old boy), and a 1996 conviction in Sedgwick County Case 96-CR-739 for Aggravated Criminal Sodomy (with a 13 year old boy), Aggravated Indecent Liberties (with the same 13 year old boy), and Indecent Solicitation of a Child (with a different 14 year old boy).

PTRN-STARK_000577

with other users. Both "tweets" and direct messages remain on Twitter's servers unless and until they are deleted by the user or by Twitter.

To use Twitter, a user must agree to Twitter's User Agreement, including the TOS, Privacy Policy, and Twitter's Rules and Policies. These inform users that Twitter can (and does) detect child sexual exploitation material. Twitter also makes clear that it has a zero tolerance policy for child sexual exploitation in any form, and that it will report the same to NCMEC.

### i.    Twitter's Terms of Service[5]

In its Terms of Service (TOS), Twitter advised users "By using the Services you agree to be bound by these Terms." In Section 3, Twitter advised users that users were responsible for "compliance with applicable laws" and that users "should only provided Content that you are comfortable sharing with others." Twitter further advised users that it reserved the right to remove Content that violates the User Agreement, including unlawful conduct. In Section 4, Twitter warned users:

> We also reserve the right to **access, read, preserve, and disclose any information** as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request, (ii) **enforce the Terms, including investigation of potential violations** hereof, (iii) detect, prevent, or otherwise address fraud, security or technical issues, (iv) respond to user support requests, or (v) **protect the rights, property or safety of Twitter, its users and the public**.

---

[5] Unless otherwise denoted, the quotes herein refer to the TOS in place in December 2019, when both accounts were in operation. The TOS in place as that time is available here: https://web.archive.org/web/20191223004607/https://twitter.com/en/tos

PTRN-STARK_000578

(emphasis added). Thus, Twitter alerted users that it could unilaterally remove content to enforce the TOS, and that Twitter could unilaterally access, read, preserve and disclose any information necessary to enforce the TOS. The TOS went on to advise:

> **We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason**, including, but not limited to, **if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines**, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to prolonged inactivity; or (iv) our provision of the Services to you is no longer commercially viable.[6]

(emphasis added). Throughout the TOS, Twitter directed users to its Privacy Policy as well as its Rules and Policies, incorporating them as part of the TOS.

### ii.   Twitter's Privacy Policy[7]

In its Privacy Policy, Twitter alerted users to the types of information that it requires from users and, conversely, information that it may choose to share with others. For example, in Section 1.4 of its Privacy Policy, Twitter advised users that

---

[6] This section of the TOS was revised on January 1, 2020. The red portion below was in place at the time of the Twitter's report relating to the "survivinglife8" account on April 27, 2020:

> We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason, including, but not limited to, if we reasonably believe: (i) you have violated these Terms or the Twitter Rules and Policies or Periscope Community Guidelines, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct, (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable
> .

The TOS in place on April 27, 2020, is available here:
https://web.archive.org/web/20200427001350/https://twitter.com/en/tos

[7] The Privacy Policy from December 2019 is available here:
https://web.archive.org/web/20191223004623/https://twitter.com/en/privacy

PTRN-STARK_000579

it would store, process, and scan direct messages for malicious content and to detect prohibited images. In Section 3.3 of its Privacy Policy, Twitter advised users:

> Notwithstanding anything to the contrary in this Privacy Policy or controls we may otherwise offer to you, **we may preserve, use, or disclose your personal data** or other safety data if we believe that it is reasonably necessary to comply with a law, regulation, legal process, or governmental request; **to protect the safety of any person; to protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services,** … or **to protect our rights or property** or the rights or property of those who use our services.

(emphasis added). Thus, Twitter advised users that, in its discretion, it may preserve, use, and disclose the user's data if Twitter believes that it is reasonably necessary to protect the public, Twitter's platform, or to prevent a variety of conduct that Twitter finds objectionable.

### iii.    Twitter's Rules and Policies[8]

In its Rules and Policies preamble, Twitter advised users of "**We have zero tolerance for child sexual exploitation on Twitter.**" (emphasis in original). Twitter directed users to its Child Sexual Exploitation Policy[9] page, wherein Twitter reiterated its zero tolerance policy in more detail:

---

[8] The Rules and Policies from December 2019 are available here:
https://web.archive.org/web/20191218203658/https://help.twitter.com/en/rules-and-policies

[9] The Child Sexual Exploitation Policy from December 2019 is available here:
https://web.archive.org/web/20191203055354/https://help.twitter.com/en/rules-and-policies/sexual-exploitation-policy

PTRN-STARK_000580

> Twitter has **zero tolerance towards any material that features or promotes child sexual exploitation**, one of the most serious violations of the Twitter Rules. This may include media, text, illustrated, or computer-generated images. Regardless of the intent, viewing, sharing, or linking to child sexual exploitation material contributes to the re-victimization of the depicted children. This also applies to content that may further contribute to victimization of children through the promotion or glorification of child sexual exploitation. For the purposes of this policy, a minor is any person under the age of 18.

(emphasis in original). Twitter then listed what, in its view, would constitute a violation of its rules:

> Any content that depicts or promotes child sexual exploitation including, but not limited to: **visual depictions of a child engaging in sexually explicit or sexually suggestive acts**; illustrated, computer-generated or other forms of realistic depictions of a human child in a sexually explicit context, or engaging in sexually explicit acts; **sexualized commentaries about or directed at a known or unknown minor**; and links to third-party sites that host child sexual exploitation material.

(emphasis added). Twitter further advised users:

> The following behaviors are also not permitted: sharing fantasies about or **promoting engagement in child sexual exploitation**; **expressing a desire to obtain materials that feature child sexual exploitation**; recruiting, advertising or expressing an interest in a commercial sex act involving a child, or in harboring and/or transporting a child for sexual purposes; **sending sexually explicit media to a child**; **engaging or trying to engage a child in a sexually explicit conversation**; **trying to obtain sexually explicit media from a child** or trying to engage a child in sexual activity through blackmail or other incentives; and identifying alleged victims of childhood sexual exploitation by name or image.

(emphasis added). Twitter went on to explain "the consequence for violating our child sexual exploitation policy is immediate and permanent suspension." Twitter further advised users:

PTRN-STARK_000581

> **Note: when we're made aware of content depicting or promoting child sexual exploitation, including links to third party sites where this content can be accessed, they will be removed without further notice and reported to the National Center for Missing & Exploited Children (NCMEC).**

Altogether, Twitter repeatedly advised users that it has zero tolerance for child sexual exploitation, that Twitter affirmatively tries to detect such material, that Twitter will permanently suspend (terminate) the user's account, and that Twitter will report the same to NCMEC.

Much of this is again reiterated in Twitter's Enforcement Philosophy,[10] wherein Twitter advised users:

> Certain types of behavior may pose serious safety and security risks and/or result in physical, emotional, and financial hardship for the people involved. **These egregious violations of the Twitter Rules — such as ... content that sexually exploits children — result in the immediate and permanent suspension of an account**.

(emphasis added). Suffice to say, at the time of the defendant's use of the service, Twitter had repeatedly conveyed its zero tolerance policy and enforcement actions relative to child sexual exploitation content.

### B. Twitter detects child pornography in the "mikeyfromtumbl1" account and suspends the account

On August 26, 2019, the defendant registered (created) his "mikeyfromtumbl1" account. To open the account, he had to accept the TOS discussed above.

---

[10] The Enforcement Philosophy from December 2019 is available here: https://web.archive.org/web/20191207105549/https://help.twitter.com/en/rules-and-policies/enforcement-philosophy

PTRN-STARK_000582

On or about December 23, 2019, Twitter detected child pornography in the "mikeyfromtumbl1" account. In accordance with its TOS, Twitter preserved and suspended the account. Twitter submitted a report to NCMEC through the CyberTipline portal: CyberTip 61606638.[11] For its report, Twitter provided the user's email address, screen name, registration information and IP address, recent IP history, and device ID. The account had been registered on August 26, 2019, from IP address 24.248.224.234. Twitter also uploaded six files.

The first file was a .ZIP file, which Twitter advised "for Twitter accounts reported to NCMEC, we provide a copy of the preserved files, mentioned above, within the report in the form of a .zip file." This .ZIP file included the account name and identifiers, as well as IP logs, Tweet ID/Status IDs, Account Images media, Direct Message media, and Direct Message text. This information had been extracted by Twitter into separate formats. Because of the separate formats, Twitter's report also explained how to match Tweet ID to IP logs; similarly, Twitter explained how to match the Direct Message Media to Direct Message Text. Thusly, Twitter conveyed the explanation and instructions so that the contents could and would be reviewed.

The second file was a movie file that Twitter identified as child pornography. Twitter advised it had reviewed the file and that it had been publicly

---

[11] CyberTip 61606638 is attached, without the six uploaded files, as Government's Exhibit 1. Twitter submitted another report for this same account the following day, on December 24, 2019, in CyberTip 61621395.

PTRN-STARK_000583

available. The next four files were image files that Twitter identified as child pornography, each of which Twitter advised it had reviewed and which had been publicly available.

Based on the geolocation of IP address history indicating IP connections in the Wichita area, the CyberTip was made available to the Kansas Internet Crimes Against Children Task Force on February 10, 2020.

### C. Twitter detects child pornography in the "survivinglife8" account and suspends the account

On December 31, 2019, the defendant registered (created) his "survivinglife8" account. To open the account, he had to accept the TOS discussed above. The defendant created the account roughly a week after Twitter had suspended his "mikeyfromtumbl1" account, pursuant to its TOS, for his child sexual exploitation policy violations.

On or about April 27, 2020, Twitter detected child pornography in the defendant's account. In accordance with its TOS, Twitter preserved and suspended the account. The following day, Twitter submitted a report to NCMEC through the CyberTipline portal: CyberTip 71133752.[12] For its report, Twitter provided the user's phone number,[13] email address, screen name, registration IP address, recent IP history, and device ID (which matched the device ID seen in the earlier CyberTip). Twitter reported the account had been registered on December 31,

---

[12] CyberTip 71133752 is attached, without the two uploaded files, as Government's Exhibit 2.

[13] This had not been included in the "mikeyfromtumbl1" account information. This phone number was later found to associate to the defendant, Randy Sporn.

PTRN-STARK_000584

2019, from the same IP address used to register the "mikeyfromtumbl1" account in August 2019. Twitter also advised "This user engaged with apparent child sexual exploitation material. This account is part of an active law enforcement investigation." Twitter uploaded two files as part of its report.

The first file was an image file that Twitter identified as child pornography. Twitter advised it had reviewed the file and that it had been publicly available.

The second file was .ZIP file, which Twitter advised "for Twitter accounts reported to NCMEC, we provide a copy of the preserved files, mentioned above, within the report in the form of a .zip file." Like the earlier .ZIP file, Twitter included the user-generated information (account name, bio, etc.), IP logs, Tweet ID/Status IDs, Tweet Media files, Direct Message media, and Direct Message text. This .ZIP file also included the suspension timestamp textfile,[14] as well as additional information (e.g., connected applications, contacts, branch links, device token, lists-created, lists-subscribed, like, saved-search, and so on). This information had been extracted by Twitter from its servers into separate formats (generally as text, or .TXT, files) for inclusion in its report. As before, Twitter's report explained how to match Tweet ID to IP logs; similarly, Twitter explained how to match the Direct Message Media to Direct Message Text. Thusly, Twitter

---

[14] This indicated suspension of the account on April 27, 2020, the day before Twitter submitted the report.

PTRN-STARK_000585

conveyed the explanation and instruction so that the contents could and would be reviewed.

Based on the geolocation of IP address history indicating IP connections in the Wichita area, this CyberTip was made available to the Kansas Internet Crimes Against Children (ICAC) Task Force on May 11, 2020, well after Twitter had suspended the account. NCMEC also identified that this CyberTip may be related to the earlier CyberTip(s).

### D. Det. Neal begins her investigation

The CyberTips were assigned to Detective Stephanie Neal of the Kansas ICAC. Det. Neal reviewed the images reported in each CyberTip.[15] Det. Neal also reviewed the material disclosed by Twitter in both .ZIP files, consistent with Twitter's "matching" instructions.[16] By the time Det. Neal reviewed the contents of the accounts, the accounts had long been suspended and terminated by Twitter.

Det. Neal also observed that the phone number connected to the "survivinglife8" account was attributed to Randy Sporn, a twice-convicted registered sex offender. Sedgwick County Offender Registration confirmed this was the defendant's registered phone number.

The content observed by Det. Neal included extensive child pornography in both accounts. Det. Neal also found messaging in the "survivinglife8" account

---

[15] Det. Neal's description of the content is recited in the search warrant applications, such that it is unnecessary to repeat the description here.

[16] Same as Footnote 15, above.

PTRN-STARK_000586

which revealed the defendant communicated with a minor to obtain child pornography. Along with discussing the boy's minority status, the defendant offered pictures of himself and told the minor "1 can't wait to see you naked and jack off to you." The defendant sent several pictures (not of himself, but of a much younger male, naked), enticing and persuading the minor to send nude images of himself.[17] These communications started on January 21, 2020, just four weeks and a day after Twitter suspended the defendant's "mikeyfromtumbl1" account.

On May 21, 2020, Det. Neal applied for, and obtained, five state search warrants for subscriber information from AT&T, Cox Communications, Google, Oath Holdings (Yahoo), and Twitter.[18]

Cox Communications advised its subscriber (at the time of logins for both accounts) returned to Calvin Opp Concrete at 1375 S Bebe in Wichita. This was found to be the defendant's place of employment. Similarly, AT&T advised its subscriber (at the time of logins for both accounts) returned to the defendant at his home address.

Oath Holding's response revealed a phone number associated with the Yahoo email (associated with "mikeyfromtumbl1" account). That phone number was the defendant's registered number. It was also the number that appeared in the

---

[17] These communications are described in more detail in Det. Neal's search warrant applications.

[18] These warrants and applications are already included in the Defense Exhibits, and are not reproduced here nor fully described here.

PTRN-STARK_000587

"survivinglife8" account. Google's response showed the email (associated with "survivinglife8") was accessed through a Samsung SM-N910P smartphone.

Twitter provided subscriber information for the minor's account, from which Det. Neal identified the minor's physical location, email and phone number. Local investigators in California identified and interviewed the minor. The minor identified himself in the pictures sent to "survivinglife8" and confirmed they were taken when he was minor.

Det. Neal requested the matter proceed federally. On March 10, 2021, after discussion with Det. Neal, Special Agent Jay Ferreira of Homeland Security Investigations obtained search warrants for the residence of the defendant Randy Sporn (21-6023-GEB) as well as his place of employment (21-6024-GEB). Those warrants resulted in the seizure of various devices, including the defendant's phone and a removable storage device which was found to contain child pornography. The defendant was arrested and subsequently indicted.

While in jail awaiting trial, the defendant contacted a friend to go to his residence to collect and hide various devices that law enforcement had missed during the search. Rather than hide these devices, the friend handed them to the defendant's former roommate who in turn contacted the police to turn over the devices. A search warrant issued for these various devices (21-6029-GEB), which also revealed the presence of child pornography on several items.

PTRN-STARK_000588

## II.      Analysis and Argument

The defendant seeks suppression of evidence directly derived from Twitter's report, as well as business records obtained from various providers through state search warrants.[19] To invoke the Fourth Amendment concern, the defendant offers an "expectation of privacy" theory as well as a "trespass-to-chattels" theory. Neither avails the defendant, requiring the Court deny the motion.

### A.      The defendant cannot show any Reasonable Expectation of Privacy in the reported information

This Court has previously confronted the issue raised by the defendant – whether he has a privacy interest in content disclosed by the provider – in *United States v. Ackerman*, 296 F. Supp. 3d 1267 (D. Kan. 2017). As this Court framed the question in *Ackerman*:

> A search only violates an individual's Fourth Amendment rights if he or she has a legitimate expectation of privacy in the area searched. There is a two-part test in determining whether a reasonable expectation of privacy exists. First, the defendant must demonstrate that he manifested a subjective expectation of privacy in the area searched. Next, there is the question of whether society is prepared to recognize that expectation as objectively reasonable.

296 F. Supp. 3d at 1271, aff'd on other grounds, 804 F. App'x 900 (10th Cir. 2020).

---

[19] The defendant does not challenge the federal search warrants (21-6023-GEB, 21-6024-GEB, and 21-6029-GEB) for the defendant's residence, place of employment, and devices. These search warrants lead to the discovery of child pornography, which is the subject matter of Count 3 of the Indictment. If the defendant expands his arguments to include these search warrants, the United States reserves the right to address those arguments when they are presented (though many of the same arguments below would apply, and particularly the Good Faith Exception in accordance with this Court's decision in *Ackerman*).

PTRN-STARK_000589

To answer those questions, the Court focused in part on the provider's TOS, listing a variety of terms wherein the provider (AOL) required users to comply with the law, prohibited the posting of explicit content, and advised AOL could take any technical, legal, or other actions to prevent violations of the TOS. *Ackerman*, 296 F. Supp. 3d at 1269. In its review, this Court determined these terms "limits Defendant's objectively reasonable expectation of privacy," and more specifically found:

> [T]he TOS informed Defendant that he must comply with applicable laws and that he could not participate in illegal activities. AOL's TOS also informed Defendant that if he participated in illegal activities or did not comply with AOL's TOS, it could take technical, legal, or other actions without notice to him. Thus, the Court concludes that Defendant cannot establish a reasonably objective expectation of privacy in this particular email and its four attachments (containing child pornography) after AOL terminated his account for violating its TOS.

*Id*. at 1272. This Court determined the defendant could not show an objectively reasonable expectation of privacy in the content reported by AOL, and, thus, there was no Fourth Amendment violation and suppression was not warranted. *Id*. at 1273.

This Court revisited its analysis in *United States v. Irving*, 347 F. Supp. 3d 615 (D. Kan. 2018), again focusing on the explicit terms of the TOS as well as whether the provider undertook action to enforce its TOS. As explanation of its holding in *Ackerman*, this Court observed in *Irving*:

> Facebook's TOS does not have explicit terms about monitoring user's accounts for illegal activities and reporting those activities to law enforcement. Instead, Facebook's TOS generally states that

PTRN-STARK_000590

> Facebook can collect data and information. It also states, however, that the user owns all of the content and information and can control how to share it. Although Facebook's TOS does state that a user should not post content that is pornographic or unlawful, it makes these statements in the context of safety and in asking for the user's help "to keep Facebook safe." Furthermore, unlike the service providers in *Stratton* (Sony PSN) and *Ackerman* (AOL), Facebook did not terminate Defendant's account due to a violation of its TOS.

*Irving*, 347 F. Supp. 3d at 623. The *Irving* case highlighted the importance of robust TOS language as well as action by the provider, specifically termination of the account due to violation of the TOS.

Likewise, in *United States v. Stratton*, 229 F. Supp. 3d 1230 (D. Kan. 2017), Judge Crabtree denied a similar motion to suppress based on Sony's TOS. Relative to the TOS, the court observed:

> Sony's policy explicitly nullified its users reasonable expectation of privacy. Before users could sign up for a PSN account, they had to agree to the Terms of Service Agreement. And the Terms of Service Agreement provides that Sony reserves the right to monitor "online activity on PSN." The agreement also warns users that they must not use the PSN to violate any local, state, or federal laws, and that any information Sony acquires while monitoring the users' activities may be turned over to appropriate law enforcement authorities. This agreement seemingly prevented defendant from having a reasonable expectation of privacy in information he stored on his PS3 device.

229 F. Supp. 3d at 1242 (D. Kan. 2017). Notably, the Court likened the analysis to that in *United States v. Angevine*, 281 F.3d 1130, 1135 (10th Cir. 2002), wherein the Tenth Circuit determined a university's policy (which expressly reserved the right to audit internet use) meant that the defendant could not manifest an objectively reasonable expectation of privacy in the child pornography he downloaded through the university network.

Page **17** of 37

PTRN-STARK_000591

In the present case, Twitter's TOS (which includes its rules and policies) demonstrates that Twitter expressly advised users of its zero tolerance for any child sexual exploitation content. Moreover, Twitter's TOS further advised users that Twitter could unilaterally access, read, preserve, and disclose any information from a user's account. Twitter expressly advised users it would report child sexual exploitation material to NCMEC. On its face, Twitter's TOS is considerably more robust than the terms discussed in *Irving*, *Stratton*, *Ackerman,* and *Angevine*.

As a non-digital example of the "terms-of-service" analysis, in *United States v. Young*, 350 F.3d 1302, 1304 (11th Cir. 2003), the IRS asked Federal Express to turn over packages shipped by targets of an IRS investigation; after Federal Express complied, the government then x-rayed fourteen packages and found large amounts of currency. It was only after this initial search that the government obtained search warrants to open the packages and search the defendant's residence and business. *Id*. at 1305. The court held that when the defendants: "elected to ship the ill-gotten proceeds of their tax fraud scheme through Federal Express despite explicit warnings on the airbill and envelopes that (1) sending cash was illegal, and (2) Federal Express retained the right to inspect any package for any reason, defendants had no legitimate expectation of privacy in the contents of the packages." *Id*. at 1303.

The defendant does not reckon with Twitter's TOS. The United States contends that the defendant could not subjectively expect any level of privacy in child sexual exploitation material that he stored located on Twitter's servers, given

PTRN-STARK_000592

the strong language contained in Twitter's TOS. Even if this Court assumed the defendant manifested a subjective expectation of privacy for either of his account's content, that expectation would be objectively unreasonable in light of Twitter's TOS. This is particularly true as it relates to child exploitation material, which Twitter expressly advised it had zero tolerance and would report to NCMEC.

When the Court adds in Twitter's independent enforcement of its TOS, the question is even easier to resolve: as soon as Twitter took independent action to detect, suspend (terminate), preserve and disclose his account contents, the defendant lacked both a subjective and objective expectation of privacy in those contents. This is particularly true for the "survivinglife8" account, because the defendant created that account *after* experiencing Twitter's TOS enforcement action against his "mikeyfromtumbl1" account. The Fourth Amendment is not implicated. The defendant's motion should be denied in accordance with this Court's prior holding in *Ackerman*, 296 F. Supp. 3d at 1272.

### B.     The defendant has no property interest in Twitter's report, nor the contraband contained therein

Courts have not relied upon "property law" concepts in the context of resolving an interest in digital communications. This makes sense, in part because there is no concept of real or personal property law that could rationally apply to such communications. *See Katz v. United States*, 389 U.S. 347 (1967); *see also Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("By reason of our decision in

PTRN-STARK_000593

*Katz v. United States*, property rights are not the sole measure of Fourth Amendment violations…"). By its very nature, a communication implies the divestiture of interest in the thing communicated to another – it is a conveyance of information to another. Instead, courts have applied and relied on the "privacy" interest analysis for communications. *See United States v. Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999) ("In order to challenge the seizure of the letters, Defendant must have a reasonable expectation of privacy in the items seized.").

Even so, the defendant contends that he maintains standing under a Fourth Amendment "trespass-to-chattels" theory. This appears to derive from comments made by then-Judge Gorsuch in the initial *Ackerman* opinion, wherein he asserted the following:

> [M]any courts have already applied the common law's ancient trespass to chattels doctrine to electronic, not just written, communications. *See, e.g., eBay, Inc. v. Bidder's Edge, Inc.*, 100 F.Supp.2d 1058, 1063, 1069–70 (N.D. Cal. 2000); *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F.Supp. 1015, 1019, 1027 (S.D. Ohio 1997); *Thrifty–Tel, Inc. v. Bezenek*, 46 Cal.App.4th 1559, 1565–67, 54 Cal.Rptr.2d 468 (1996).

*United States v. Ackerman*, 831 F.3d 1292, 1308 (10th Cir. 2016). This dicta was and remains a significant overstatement, or misstatement, of these cases.

To illustrate, the *eBay* case involved a motion for preliminary injunction by eBay to prevent a web-crawler from accessing eBay's servers. *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070 (N.D. Cal. 2000). In addressing the question, the court observed, "eBay's servers are private property, conditional access to which eBay grants the public." *Id*. The court went on to point out:

PTRN-STARK_000594

> Even if BE's web crawlers were authorized to make individual queries of eBay's system, BE's web crawlers exceeded the scope of any such consent when they began acting like robots by making repeated queries. *See City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F.Supp. 1273, 1281 (E.D.N.Y.1995) ("One who uses a chattel with the consent of another is subject to liability in trespass for any harm to the chattel which is caused by or occurs in the course of any use exceeding the consent, even though such use is not a conversion."). Moreover, eBay repeatedly and explicitly notified BE that its use of eBay's computer system was unauthorized.

*Id*. If anything, the *eBay* opinion informs this Court that Twitter could exclude (prevent the trespass) of the defendant when it discovered his violation of its TOS. It would be the defendant who was subject to "liability in trespass" for exceeding the consent, i.e., the TOS. Very simply, the *eBay* case does not commend the "trespass-to-chattels" theory for use by the defendant. In fact, the *eBay* case makes clear the defendant was an unauthorized trespasser.

The *CompuServe* case similarly involved a motion for preliminary injunction, where CompuServe, an online communications service provider, sought to prevent the unsolicited email advertising to its subscribers. *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015 (S.D. Ohio 1997). As the court there described:

> In the present case, plaintiff is physically the recipient of the defendants' messages and is the owner of the property upon which the transgression is occurring. As has been discussed, plaintiff is not a government agency or state actor which seeks to preempt defendants' ability to communicate but is instead a private actor trying to tailor the nuances of its service to provide the maximum utility to its customers. Defendants' intentional use of plaintiff's proprietary computer equipment exceeds plaintiff's consent and, indeed, continued after repeated demands that defendants cease. Such use is an actionable trespass to plaintiff's chattel.

PTRN-STARK_000595

*Id*. at 1027. Again, the case involved the *provider* excluding a *user* from its servers under a trespass theory. Like *eBay*, the *CompuServe* opinion does not commend the "trespass-to-chattels" theory for the defendant; to the contrary, it confirms Twitter is "physically the recipient of the defendant's messages and is the owner of the property upon which the transgression is occurring." *CompuServe* does not commend the "trespass-to-chattels" theory for use by the defendant; to the contrary, the *CompuServe* opinion confirms that Twitter had authority over defendant's content as the physical recipient and repository of the content.

The *Thrifty-Tel* case involved an appeal from a civil verdict, wherein a long-distance telephone provider successfully sued the Bezeneks, as parents of children who engaged in fraud and conversion. *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1565 (1996). The case involved the Bezeneks's children gaining entry into Thrifty-Tel's system with a confidential code, and then using Thrifty-Tel's system to generate automated calls that overburdened the system, denying some subscribers access to phones lines. *Id*. at 1564. The Bezeneks asserted that the unauthorized use of confidential codes to gain computer access did not rise to a cause of action for conversion. *Id*. at 1565. To avoid grappling with the question of whether conversion could apply to an intangible code, the court determined "it is not necessary to resolve the question because the evidence supports the verdict on a trespass theory." *Id*. at 1566. The court noted "defense counsel essentially conceded Ryan and Gerry trespassed," and observed trespass

PTRN-STARK_000596

was the "little brother of conversion," such that Thrifty-Tel plead and proved a claim for trespass to personal property. *Id*. at 1566. Contrary to then-Judge Gorsuch's analysis, the *Thrifty-Tel* opinion did not so much involve a trespass to electronic communications, but a trespass to the system itself. This opinion does not involve a "trespass-to-chattels" theory applied to communications; it does make clear that the communications may constitute the trespass itself, in which the offending party has no rights. *Thrifty-Tel* makes clear that the defendant had no lawful interest when defendant used Twitter's services in an unauthorized manner, and certainly no lawful interest after Twitter terminated his access to the information on its servers.

Recent application of the "trespass-to-chattels" theory by the Supreme Court has been in the context of actual physical trespass by law enforcement. *See, e.g., United States v. Jones*, 565 U.S. 400, 404, 132 S. Ct. 945, 949, 181 L. Ed. 2d 911 (2012) ("It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information."); *see also Carpenter v. United States*, 138 S. Ct. 2206, 2222 (2018) (applying "legitimate expectation of privacy" analysis instead of "trespass-to-chattels" analysis for cell-site location information). The *Carpenter* opinion is instructive, as the court's majority declined to apply the "trespass-to-chattels" analysis. When the dissent of Kennedy, Alito, and Thomas referenced the "property" analysis, they opined, "Here **the Government did not search anything over which Carpenter could assert ownership or control**." 138 S. Ct.

PTRN-STARK_000597

at 2235 (emphasis added). Thus, even the dissent would commend rejection of the defendant's argument, because the defendant could not assert ownership nor control over Twitter's CyberTip reports, including the .ZIP files therein. Going even deeper into *Carpenter*, Justice Gorsuch's dissent (in which no other justice joined) opined that use of a third-party service constituted a bailment. *Id.* at 2268. ("Entrusting your stuff to others is a bailment."). However, Justice Gorsuch did not address the third-party provider's interest in its own servers, much less what happens when the third-party provider terminates the user's account and boxes up the contents for disclosure to law enforcement. To the extent one walks with Justice Gorsuch down that lonely path, the path aligns with the "hotel room" eviction cases. *See* e.g., *United States v. Croft*, 429 F. 2d 884, 887 (10th Cir. 1970) (since a guest's privacy rights in a hotel room are dependent on the continuing right to occupy the room, entry of officers after the rental period elapsed did not violate any Fourth Amendment privacy rights); *United States v. Creighton*, 639 F.3d 1281, 1287-88 (10th Cir. 2011) (assuming that defendant had reasonable expectation of privacy in hotel room during some part of occupancy, society would not consider as reasonable any expectation of privacy in hotel room after management took steps to evict occupants for non-payment of rent); *Gordon*, 168 F.3d at 1227 (defendant who arrived shortly before search of motel room leased to another person failed to produce sufficient evidence to establish that he was an overnight guest with a reasonable expectation of privacy in the room); *cf. United States v. Johnson*, 584 F. 3d 995, 1003-04 (10th Cir. 2009) (no legitimate

PTRN-STARK_000598

expectation of privacy in storage unit obtained using stolen identity, even where rental contract had not been voided, because rental agreement was "voidable at the storage unit owner's option" and defendant's "contractual right to the storage unit was in jeopardy of rescission."). Where the provider has terminated access (evicted) a user for violation of the provider's TOS, the defendant's "possessory interest" and conjoined "expectation of privacy" are substantively if not entirely diminished.[20]

Nor can the defendant establish constructive possession over the .ZIP files at the time of Det. Neal's review. *See, e.g., United States v. Lopez*, 372 F.3d 1207, 1212 (10th Cir. 2004) ("constructive possession exists where the defendant knowingly has the power to exercise control or dominion over the item."). Regarding control, consider whether the defendant could prevail in a suit to enjoin Twitter from disclosing the .ZIP files to NCMEC? 18 U.S.C. § 2258B states that no civil claim can be brought against the provider arising from the performance of the reporting or preservation responsibilities of such provider under section 2258A. To the extent then-Judge Gorsuch's opinion in *Ackerman* suggests that review of information submitted to NCMEC might be considered a "trespass-to-chattels" under the framework of *United States v. Jones*, the defendant would lack standing to bring such a claim because he neither controlled nor had constructive

---

[20] Of course, defendant can have no lawful property or possessory interest in the contraband child pornography files themselves. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 250, (2002); *Osborne v. Ohio,* 495 U.S. 103, 110 (1990); cf. *Illinois v. Caballes,* 543 U.S. 405, 408 (2005) ("[A]ny interest in possessing contraband cannot be deemed 'legitimate.'").

PTRN-STARK_000599

or actual possession of the .ZIP files (nor the accounts from which they derived) at the time of the purported intrusion. Did the defendant undertake any effort to exert control over the account and its contents, or did he abandon the accounts when he learned Twitter had detected his child pornography? Given the creation of the "survivinglife8" account a week after the first account was suspended, it appears the defendant decided to abandon the earlier account upon detection rather than assert control or appeal the termination/suspension.

The defendant's claim draws no support from concepts of "real or personal property law," as discussed above. Instead, the law confirms that Twitter exercised its lawful right to access the defendant's account information, including the media and text communications, which the defendant stored on Twitter's servers. Twitter determined he had violated its TOS, undertaking to preserve and suspend (terminate) his accounts, thus excluding the defendant's access and control of the information on Twitter's servers. Twitter then generated its own report, containing the .ZIP files of each account's information, drawn from Twitter's servers. That report was Twitter's, and the defendant cannot show a possessory interest in it. Because the defendant lacked any possessory interest in Twitter's CyberTip reports, including the .ZIP files, the defendant lacks standing to raise a Fourth Amendment claim under a "trespass-to-chattels" theory. His motion must be rejected on this basis.

PTRN-STARK_000600

**C.      By using Twitter's services, the defendant consented to Twitter's disclosure of his account information**

Given the express terms of Twitter's TOS, the Court should also find that the defendant consented to Twitter's search and disclosure of his account information by agreeing to Twitter's terms of service. *See, e.g., United States v. Bohannon*, 2020 WL 7319430 (N.D. Cal. Dec. 11, 2020); *United States v. DiTomasso*, 56 F. Supp. 3d 584, 597 (S.D.N.Y. 2014). The Supreme Court has long recognized that "[c]ommon carriers have a common law right to inspect packages they accept for shipment, based on their duty to refrain from carrying contraband." *Illinois v. Andreas*, 463 U.S. 765, 769 n. 1 (1983).

Twitter advised the defendant that Twitter could "access, read, preserve, and disclose any information" and that it would affirmatively disclose child exploitation material to NCMEC, whom the 10th Circuit had already determined was a governmental entity (in *United States v. Ackerman*, 831 F.3d 1292, 1308 (10th Cir. 2016)). By using Twitter's services, the defendant consented and agreed to those terms. Under the plain terms, the defendant consented to Twitter turning over any information to the government, which Twitter did upon detection of his TOS violations and child exploitation activity. This is particularly true where, as here, the defendant had already experienced Twitter's enforcement of its terms.

The concept of "consent through the terms" has been similarly applied in the non-digital context. In the *Young* case (above), the court held that irrespective of any privacy interest, the "right to inspect" defeated the defendants' Fourth

Amendment challenge because they "assumed the risk that Federal Express might consent to a search" and could claim no Fourth Amendment violation. *Id*. at 1308-09. *See also United States v. Leffall*, 82 F. 3d 343, 345-347 (10th Cir. 1996) (contract with air freight company authorized search by air freight employee); *United States v. Matlock*, 415 U.S. 164, 171 (1974) (consent to search may be given by a "third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected). As in these cases, Twitter independently decided to access, preserve, and disclose the defendant's account information, without any government involvement, as plainly allowed under its TOS. As in the *Young* case, the defendant's agreement with Twitter allowed Twitter to unilaterally (consensually) provide anything and everything from his account to the government upon Twitter's discovery of child exploitation material. As in the *Stratton* case, "because the Terms of Service Agreement reduced defendant's reasonable expectation of privacy in the information," the Court should find the Fourth Amendment does not apply. *See Stratton*, 229 F. Supp. 3d at 1242. The defendant's motion should be denied on this basis.

### D.     The Good Faith exception would otherwise apply

When the police act with an objectively reasonable good-faith belief that their conduct is lawful, the deterrence rationale loses much of its force, and exclusion cannot pay its way. *Davis v. United States*, 564 U.S. 229, 238 (2011). "Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id*. at 241.

PTRN-STARK_000602

At the time of Det. Neal's review of Twitter's .ZIP files, the District Courts in Kansas had decided both *Ackerman*, 296 F. Supp. 3d 1267 (D. Kan. 2017) and *Stratton*, 229 F. Supp. 3d 1230 (D. Kan. 2017). Both of these cases relied on previous binding appellate authority to determine no Fourth Amendment violation occurred due to the TOS' language and the independent enforcement actions of the provider. Thus, it was objectively reasonable for law enforcement to rely upon the courts' analysis to justify the review of the account information submitted by Twitter. Even if the Court reversed itself, the Good Faith exception would apply to Det. Neal's review, as well as the usage of that information in later warrants.

### E. Exclusion would not be the appropriate remedy as Det. Neal's search was reasonable

Even if the defendant could establish that he has a Fourth Amendment interest in the contents of Twitter's CyberTipline Reports, Det. Neal's review of the contents of those reports was reasonable and therefore complied with the Fourth Amendment.

"As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness.'" *Maryland v. King*, 569 U.S. 435, 447 (2013) (citation omitted). A "warrant is not required to establish the reasonableness of *all* government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). In deciding whether a warrantless search is permissible, this Court

PTRN-STARK_000603

"balance[s] the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *King*, 569 U.S. at 448 (citation omitted). That balancing weighs "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate government interests." *United States v. Knights*, 534 U.S. 112, 119 (2001).   In light of those principles, even if Det. Neal's review of Twitter's CyberTip reports qualified as a Fourth Amendment search, that review would be constitutionally reasonable.

Under traditional Fourth Amendment standards, the defendant had no legitimate expectation of privacy in the contents Twitter attached to its CyberTip report at the time of Det. Neal's review.  But even if this Court disagreed, the defendant could at most assert only a substantially diminished expectation of privacy for the reasons set forth above.  The defendant's diminished expectation of privacy is a factor that "may render a warrantless search or seizure reasonable." *King*, 569 U.S. at 447 (citation omitted).   Furthermore, any invasion of the defendant's privacy interest was minimal because – at the time of Det. Neal's review – Twitter had already identified contents of the account as containing child pornography in violation of its TOS. In addition, it is significant that the defendant's messaging contained child pornography, in which he could have no legitimate interest in possessing. *Cf. Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("[A]ny interest in possessing contraband cannot be deemed 'legitimate.'").

PTRN-STARK_000604

On the other side of the reasonableness balance, the government has "a compelling interest in safeguarding the physical and psychological well-being of minors, destroying the market for child pornography, and preventing the re-victimization of abused and exploited children." *Nelson v. Roberts*, No. 15-3083-EFM, 2016 WL 7405664, at *4 (D. Kan. Dec. 21, 2016) (citing *Osborne v. Ohio*, 495 U.S. 103, 111 (1990), and *New York v. Ferber*, 458 U.S. 747, 756, 760-62 (1982)). "The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." *Ferber*, 458 U.S. at 757. Likewise, Twitter has a compelling interest to keep its services and servers free from child exploitation material. The prevention of such exploitation and abuse features centrally in Twitter's TOS, which includes direct reference to reporting such content to NCMEC. The statutory scheme that authorizes NCMEC to operate the CyberTipline advances that interest by providing ISPs, such as Twitter, a means to report actual knowledge of apparent child-pornography crimes. *See* 18 U.S.C. § 2258A(a). In enacting this scheme, Congress specified that the contents of such reports were "at the sole discretion of the provider." *See* 18 U.S.C. § 2258A(b). The provider's report is then made available to law enforcement. *See* 18 U.S.C. § 2258A(c). In this instance, the statutory scheme allows Twitter to determine how little, or how much, to provide in its report. Because Twitter apparently took its zero tolerance stance seriously, Twitter provided account information beyond merely child pornography images.

PTRN-STARK_000605

It is absolutely reasonable for Twitter to take action against individuals who use its services and servers to deal in child pornography. Twitter, like any business, should be able to easily contact law enforcement to report a crime occurring on its property (servers) and to provide as much information as it desires. It is reasonable to allow law enforcement to review whatever information Twitter, in its sole discretion, provides as part of its report, as Congress allows.

To the contrary, it is unreasonable to purposely frustrate Twitter's interest in reporting child exploitation conduct, by creating unnecessary obstacles and limitations on the review of Twitter's reports. Put another way, if Congress intended to limit the quantum of information that a reporting provider, like Twitter, could make available for law enforcement review[21] through a report to NCMEC, Congress could have done so. Instead, Congress left the determination up to the provider "in its sole discretion." *See* 18 U.S.C. § 2258A(b). Likewise, if Congress had intended to limit *how* a provider, like Twitter, compiled and generated its report, Congress surely would have used different language than "in its sole discretion." Discussions of property interests of privacy interests in the contents of a CyberTip report tend to overlook the rather obvious fact that the report is whatever the provider decides it should be – the reported information, in whatever form and delivered by whatever mechanism, is "in [the provider's] sole discretion," which is to say it is statutorily divorced from the defendant's interest

---

[21] 18 U.S.C. § 2258A(c) requires "NCMEC shall make available each report made under subsection (a)(1) to one or more of the following law enforcement agencies…"

PTRN-STARK_000606

and control. In this case, the defendant seeks to assert control, which Congress has expressly stated he does not have, by limiting the quantum of information that is considered Twitter's report.

The unreasonableness of the defendant's position on the balancing scale is even clearer when one considers the purpose of the CyberTips. Much like a 911 call, the CyberTipline allows providers and private citizens alike to submit reports of apparent child exploitation activity.[22] A defendant has no legitimate interest in what is reported in a 911 call, nor how it is received or listened to by police. That analysis is not any different if the reporting party used an automated process (e.g., an alarm system). In this context, it makes no practical sense to require law enforcement to undertake some additional process to review the contents of a report submitted by a provider to NCMEC, particularly when the provider has already terminated or suspended the user's account. Under the "reasonableness" standard in the Fourth Amendment, it is reasonable to allow law enforcement to review any and all information independently disclosed by a provider or private actor through the CyberTipline.

The traditional balancing of interests supports the conclusion that Det. Neal acted reasonably when she reviewed the content that Twitter included in its CyberTipline report about the defendant. Accordingly, even if Det. Neal's review constituted a search of property in which the defendant maintained a "possessory"

---

[22] It bears pointing out, the CyberTipline is specific to child-related matters, such as child pornography, kidnapping, or sex trafficking. The CyberTipline is not a "general crime" reporting tipline.

PTRN-STARK_000607

or "privacy" interest, that search still complied with the Fourth Amendment because it was reasonably done.

**F.   The state search warrants should not be suppressed**

The United States contends that the Fourth Amendment does not apply to Twitter's reports, including the .ZIP files, because 1) the defendant lacked any reasonable expectation of privacy in them, 2) the defendant lacked a possessory interest in them, and 3) the defendant consented to the search under the TOS. Because there was no illegal search to justify suppression, the "fruit of the poisonous tree" doctrine does not apply.

Because Det. Neal could reasonably rely on the Court's analysis of binding appellate precedent to review the .ZIP files, the Good Faith exception would apply to prevent suppression of the subsequently issued search warrants which relied, in part, on that review. "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir.1999); *see also United States v. Ackerman*, 804 F. App'x 900, 904 (10th Cir.), cert. denied, 141 S. Ct. 458, 208 L. Ed. 2d 148 (2020) (finding Good Faith exception applied to report submitted to and reviewed by NCMEC).

The United States also contends that, even without reference to the media files and communications derived from the .ZIP files, the search warrants to AT&T, Cox Communications, Google, and Oath Holdings (Yahoo) contained

Page **34** of 37

PTRN-STARK_000608

enough facts to support probable cause existed to issue the warrants for evidence related to child pornography offenses. That information included these facts:

1) Twitter had identified two Twitter accounts dealing in apparent child pornography.

2) The two Twitter accounts were connected to each other, via the same registration IP.

3) The phone number showed the accounts were connected to a twice convicted sex offender (the defendant) with a history of abusing 13-15 year old boys.

4) The user of the account posed as "mikey," posting images with text that indicated the images were of school-aged children.

5) The description of the images (not from the .ZIP file) with the posted text showed the user was apparently offering nude pictures of school-aged boys.

In light of all of the foregoing information, it would be reasonable for a judge to find it more probable than not that the user was engaged in child pornography offenses, and that these providers might have evidence which would "assist in the identification of the individual behind the use of the account." It would be similarly reasonable for Det. Neal to conclude the warrant was facially valid.

Moreover, Det. Neal did not need a search warrant to obtain these business records. They could have been obtained by either an inquisition subpoena,[23] or an administrative subpoena issued by HSI SA Ferreira. Indeed, had the state judge not issued the search warrants, subpoenas would have inevitably issued, which would not have required any probable cause statement. *See Nix v. Williams,* 467

---

[23] At the state level, business records may be obtained, without presentation of probable cause, through the issuance of an inquisition subpoena under KSA 22-3101.

PTRN-STARK_000609

U.S. 431, 443–444 (1984) (applying "inevitable discovery" doctrine). Instead, Det. Neal went above and beyond to seek a search warrant, and then relied on that warrant to obtain the information. In light of her reliance on an apparently valid search warrant to obtain the information, the Good Faith exception would apply with equal force to prevent suppression. *See Davis v. United States*, 564 U.S. 229, 238 (2011).

For these reasons, the Court should deny the defendant's request to suppress the information obtained from Cox Communications, AT&T, Google, Oath Holdings (Yahoo), and Twitter.

### G. The defendant lacks standing to raise his alternative challenge to the state search warrants

As an alternative to his "illegal search" challenge, the defendant argues that four of the state search warrants authorized a search *for* particular information, but not a search *of* the information provided. The defendant lacks standing to make this argument. "Every federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation." *United States v. Perrine*, 518 F.3d 1196, 1204 (10th Cir. 2008)(listing cases). The defendant has neither a privacy interest, nor a possessory interest, in any of the providers' business records. The defendant's motion on this point must be rejected.

### CONCLUSION

PTRN-STARK_000610

Based on the foregoing facts and authority, this Court should find that the Fourth Amendment is not implicated by Det. Neal's review of the .ZIP files submitted by Twitter. This Court should find the defendant lacked any reasonable expectation of privacy in both accounts at the time of Det. Neal's review of the .ZIP files, that the defendant lacked a possessory or property interest in his accounts or the .ZIP file at the time of Det. Neal's review, that the defendant consented to the search through Twitter's TOS, and that the Good Faith exception would otherwise apply. For those reasons, and others articulated herein, the Court should deny the defendant's motion in its entirety.

Respectfully submitted,

DUSTIN J. SLINKARD
United States Attorney

 s/ Jason W. Hart
JASON W. HART
Ks. S.Ct. No. 20276
Assistant United States Attorney
District of Kansas
301 N. Main, Suite 1200
Wichita, Kansas 67202
(316) 269-6481
jason.hart2@usdoj.gov

CERTIFICATE OF SERVICE

I certify that on November 24, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to Mitch Biebighauser, attorney for defendant.

s/ Jason W. Hart
JASON W. HART
Assistant United States Attorney

PTRN-STARK_000611

**GOVERNMENT'S EXHIBIT 1**



NATIONAL CENTER FOR
**MISSING &
EXPLOITED**
C H I L D R E N ®

---

# CyberTipline Report 61606638

## Priority Level: E
## (Report submitted by a registered Electronic Service Provider)

Received by NCMEC on 12-23-2019 17:04:33 UTC

All dates are displayed as MM-DD-YYYY

Except for times provided in Additional Information sections, all time zones are displayed in UTC

---

# Executive Summary

The following is a brief overview of information contained in this CyberTipline report:

**Incident Type:** Apparent Child Pornography (Unconfirmed)

NCMEC Incident Type is based on NCMEC's review of the report **OR** a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

NCMEC staff have viewed one or more of the files submitted with this CyberTipline report and have categorized one or more of the files as designated in the Incident Type.

Please see Section C for additional information related to the files that were viewed and categorized by NCMEC.

**Total Uploaded Files:** 6

---

The National Center for Missing & Exploited Children (NCMEC) was incorporated in 1984 by child advocates as a private, non-profit 501(c)(3) organization to serve as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues. To further our mission to help find missing children, reduce child sexual exploitation, and prevent future victimization, NCMEC operates the CyberTipline and Child Victim Identification Program. NCMEC makes information submitted to the CyberTipline and Child Victim Identification Program available to law enforcement and also uses this information to help identify trends and create child safety and prevention messages. As a clearinghouse, NCMEC also works with Electronic Service Providers, law enforcement and the public in a combined effort to reduce online child sexual abuse images. NCMEC performs its programs of work pursuant to its own private mission and independent business operations. NCMEC does not act in the capacity of or under the direction or control of the government or law enforcement agencies. NCMEC does not investigate and cannot verify the accuracy of the information submitted by reporting parties.

RD01_SPORN-000050
PTRN-STARK_000612



## Contents

**Section A: Reported Information** — 1

Reporting Electronic Service Provider (ESP) — 1
Company Information — 1
Incident Information — 2
Webpage/URL — 2
Webpage/URL — 2
Webpage/URL — 2
Webpage/URL — 2
Webpage/URL — 3
Suspect — 3
Uploaded File Information — 3–5

**Section B: Automated Information Added by NCMEC Systems** — 6

Explanation of Automated Information (in alphabetical order) — 6
Geo-Lookup (Suspect) — 6

**Section C: Additional Information Provided by NCMEC** — 7

NCMEC Note #1 — 7
Uploaded File Information — 7

**Section D: Law Enforcement Contact Information** — 9

Wichita/Sedgwick County Exploited and Missing — 9

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000051
PTRN-STARK_000613



# Section A: Reported Information

The following information was submitted to the CyberTipline by the Reporting Person or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

## Reporting Electronic Service Provider (ESP)

**Submitter:**
Twitter, Inc. / Vine.co
Twitter Inc.
1355 Market St Suite 900
San Francisco, CA 94103 US

**Point of Contact for Law Enforcement:**
https://support.twitter.com/articles/41949-guidelines-for-law-enforcement

## Company Information

Twitter has provided NCMEC with the following explanation on how it reports to the CyberTipline.

General information:
This report was submitted from the Electronic Service Provider (ESP) Twitter, a free service that provides micro-blogging to its users. This is being reported to NCMEC in accordance with Title 18 U.S.C. 22558A. The submitted media along with the .zip file containing preservation files will be kept for 90 days for law enforcement follow-up. Twitter retains different types of information for different time periods. Given Twitter's real-time nature, some information may only be stored for a very brief period of time. Information on our retention policies can be found in our Privacy Policy (https://twitter.com/privacy).

Please note that for Twitter accounts reported to NCMEC, we provide a copy of the preserved files, mentioned above, within the report in the form of a .zip file.

Time zones:
All times in this report are in UTC.

Incident Date/Time:
The incident date/time is the timestamp from the earliest reported Tweet; however, if a Tweet is not reported, then the incident date/time will represent the account creation timestamp.

IP addresses:
Twitter logs IPs in connection with user authentications to Twitter (i.e., sessions, which may span multiple days) rather than individual Tweet postings; as a result, we are unable to provide insight into which IP address a specific Tweet was posted from. While Twitter does not capture IPs for individual Tweets, we have provided an accurate log of IPs for the timeframe relevant to the report.

Matching IP sessions with reported media:
The Tweet ID/Status ID is the numeric portion of the URL associated with each reported Tweet.
Copy this Status ID .
Open the [username]-tweets.txt file and using Ctrl+F(PC)/Cmd+F(Mac), paste in the Tweet ID to highlight the corresponding Tweet information.
Once you have obtained the date/time information for the Tweet from the [username]-tweets.txt file, open the [username]-ipaudit.txt file. The IP address most likely associated with the session in which the reported Tweet occurred will be the most recent IP in the log before the date/time of the Tweet.

Matching Direct Message (DM) media to DM text:

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000052
PTRN-STARK_000614



The DM ID is the numeric portion of the filename of media found within the [username]-dm-media folder.
For the DM media file, copy the numeric portion of the filename.
Open the [username]-dm-media-preserve.txt file and using Ctrl+F(PC)/Cmd+F(Mac), and paste in the DM ID to highlight the corresponding DM information (user ID if sender, message, user ID of recipient)

User-generated information:
The account name, bio, URL, and location found in the Additional Information section are user-generated.

Tweet text:
Text content of Tweets from the reported account are contained in the file named USERNAME-tweets.txt (attached to the report in the zip file). The file contains status IDs, the text content of the Tweet, and a timestamp in UTC.

Special Instructions:
When law enforcement serves legal process, law enforcement should reference both the CyberTipline report number and the account username (example: @username or twitter.com/username) and user ID.

Additional questions:
For more information, please refer to the Evidence Key included in the reported zip file, or to our Guidelines for Law Enforcement (https://support.twitter.com/articles/41949#section4).

## Incident Information

**Incident Type:**   Child Pornography (possession, manufacture, and distribution)
**Incident Time:**   11-14-2019 07:24:08 UTC

## Webpage/URL

**URL:**   https://twitter.com/mikeyfromtumbl1/status/1208106707659964417
**Additional Information:**   Type: Tweet
Text: After school nut

Cashapp  $mikeythenudist

https://t.co/nHNWiKGprQ https://t.co/ptxCeOgNGc
Created At: 2019-12-20T19:27:39+00:00

## Webpage/URL

**URL:**   https://twitter.com/mikeyfromtumbl1/status/1206970845920419841
**Additional Information:**   Type: Tweet
Text: Adam and his uncles ski at the Colorado nudist resort.

Cashapp  $mikeythenudist https://t.co/V4lC3mtZnQ
Created At: 2019-12-17T16:14:08+00:00

## Webpage/URL

**URL:**   https://twitter.com/mikeyfromtumbl1/status/1206961632938790912
**Additional Information:**   Type: Tweet
Text: Sam is getting his senior portraits taken today

Cashapp  $mikeythenudist https://t.co/68YgNaQhT1
Created At: 2019-12-17T15:37:32+00:00

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000053
PTRN-STARK_000615



| Webpage/URL | |
|---|---|
| URL: | https://twitter.com/mikeyfromtumbl1/status/1194992859147046913 |
| Additional Information: | Type: Tweet |
| | Text: Doing homework |
| | Cashapp $mikeythenudist https://t.co/k1StxERKre |
| | Created At: 2019-11-14T14:57:54+00:00 |

| Webpage/URL | |
|---|---|
| URL: | https://twitter.com/mikeyfromtumbl1/status/1194878664573440000 |
| Additional Information: | Type: Tweet |
| | Text: Like my selfie? |
| | Cashapp $mikeythenudist https://t.co/Xxhy6bweFz |
| | Created At: 2019-11-14T07:24:08+00:00 |

| Suspect | |
|---|---|
| Email Address: | jordanpatterson426@yahoo.com |
| Screen/User Name: | mikeyfromtumbl1 |
| ESP User ID: | 1166023345470615552 |
| Profile URL: | https://twitter.com/mikeyfromtumbl1 |
| IP Address: | 24.248.224.234 (Registration) |
| | 08-26-2019 16:23:39 UTC |
| IP Address: | 107.133.232.207 (Login) |
| | 12-23-2019 06:42:35 UTC |
| IP Address: | 107.133.232.207 (Login) |
| | 12-21-2019 15:49:29 UTC |
| IP Address: | 24.248.224.234 (Login) |
| | 12-20-2019 23:16:56 UTC |
| IP Address: | 24.248.225.42 (Login) |
| | 12-19-2019 19:53:36 UTC |
| IP Address: | 24.248.224.234 (Login) |
| | 12-13-2019 18:41:48 UTC |
| IP Address: | 24.248.225.42 (Login) |
| | 12-11-2019 15:11:20 UTC |
| Device ID (Twitter for Android): | d48c46156e89e99a |
| | 12-18-2019 16:49:29 UTC |
| Additional Information: | User-provided account information: |
| | Full Name: mikeyfromtumblr |
| | Location: |
| | Description: I was on Tumblr many times & nuked. I am going thru a rough spell. cashapp: $mikeythenudist http://amazon.com/hz/wishlist/ls/2LLKFA2EXB368?ref |
| | URL: |
| | Additional user emails on record: |
| | Additional user phone numbers on record: |

| Uploaded File Information | |
|---|---|
| Number of uploaded files: | 6 |

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000054
PTRN-STARK_000616



CyberTipline Report 61606638 | 4

## Uploaded File Information

| | |
|---|---|
| Filename: | mikeyfromtumbl1-1166023345470615552-2019-12-23-2274158.zip |
| MD5: | 731c046c2855a9aa41d318b58a9541d3 |
| Submittal ID: | 742fd17c6ae3466e7058a077ff0c9b31 |
| Did Reporting ESP view entire contents of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | (Information Not Provided by Company) |

## Uploaded File Information

| | |
|---|---|
| Filename: | IJ0zdwgTLUXHDgNS.mp4 |
| MD5: | e9629ca57a1e26211cefb8356ceea94b |
| Submittal ID: | 76fac6410c76b7bc39f352f70afee87b |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | Yes |
| Original URL Where File was Located: | https://twitter.com/mikeyfromtumbl1/status/1208106707659964417 |

## Uploaded File Information

| | |
|---|---|
| Filename: | EJUP0BUXkAAkJD2.jpg |
| MD5: | 60fe71c3403af0bcbec38570dc66f90f |
| Submittal ID: | 17379890938a252b264f0eb5145b60d4 |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | Yes |
| Original URL Where File was Located: | https://twitter.com/mikeyfromtumbl1/status/1194878664573440000 |

## Uploaded File Information

| | |
|---|---|
| Filename: | EMAFlpAWsAUgOi5.jpg |
| MD5: | 312e5d0168967bcfaca9f41c500da1ae |
| Submittal ID: | 4bcf58fe6825310d4a3cc9c04dc58ba1 |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | Yes |
| Original URL Where File was Located: | https://twitter.com/mikeyfromtumbl1/status/1206970845920419841 |

## Uploaded File Information

| | |
|---|---|
| Filename: | EL_9NOxXYAABXnV.jpg |

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000055
PTRN-STARK_000617



| | |
|---|---|
| MD5: | d1f13b3544621ab055eb9c914c1a366e |
| Submittal ID: | 5a3bc400b46d7b6ae64baf49d613fbee |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | Yes |
| Original URL Where File was Located: | https://twitter.com/mikeyfromtumbl1/status/1206961632938790912 |

## Uploaded File Information

| | |
|---|---|
| Filename: | EJV3rBjWwAA42yK.jpg |
| MD5: | c7e0cc05273852818fcdc4fa52a7c3fd |
| Submittal ID: | e45d0bca05b8520ea1b69c240eb7e03e |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | Yes |
| Original URL Where File was Located: | https://twitter.com/mikeyfromtumbl1/status/1194992859147046913 |

This concludes Section A. All of the information in this section was submitted electronically to the CyberTipline by the Reporting Person, NCMEC Call Center or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000056
PTRN-STARK_000618



# Section B: Automated Information Added by NCMEC Systems

Upon receipt of a CyberTipline report, NCMEC Systems may conduct automated processes on the information submitted in Section A. The information found in Section B of this CyberTipline Report has been automatically generated by NCMEC Systems. If the CyberTipline Report was submitted by a member of the public, Section B will be blank.

## Explanation of Automated Information (in alphabetical order)

**Geo-Lookup:** When a Reporting ESP voluntarily reports an IP address for the "Suspect," NCMEC Systems will geographically resolve the IP address via a publicly-available online query. The results of this lookup are displayed.

Geolocation data is approximate and may not display a user's exact location. Please be aware that the geolocation information provided is not exact but is providing a reliable estimate of location based on IP address(es) voluntarily provided by the reporting ESP.

## Geo-Lookup (Suspect)

| IP Address | Country | Region | City | Metro Area | Postal Code | Area Code | Lat/Long | ISP/Org |
|---|---|---|---|---|---|---|---|---|
| 107.133.232.207 | US | KS | Wichita | Wichita-Hutchinson Plus | 67212 | | 37.7007/ -97.4383 | AT&T U-verse/ AT&T U-verse |
| 24.248.225.42 | US | KS | Wichita | Wichita-Hutchinson Plus | 67203 | | 37.7076/ -97.3637 | Cox Business/ Cox Business |
| 24.248.224.234 | US | KS | Wichita | Wichita-Hutchinson Plus | 67214 | | 37.7051/ -97.3133 | Cox Business/ Cox Business |

**This concludes Section B**

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000057
PTRN-STARK_000619



# Section C: Additional Information Provided by NCMEC

Section C contains information collected by NCMEC staff based on the information electronically submitted by the Reporting Person, NCMEC Call Center or Reporting ESP. Section C may contain a variety of additional information, including data gathered from queries on publicly-available, open-source websites. Any queries conducted by NCMEC staff will be documented and any query results will be saved to the electronic filing system when possible. The CyberTipline cannot confirm the accuracy of information found in public records or whether the results are affiliated with any parties relating to this report.

| | |
|---|---|
| NCMEC Priority Level: | E (Report submitted by a registered Electronic Service Provider) |
| NCMEC Classification*: | Apparent Child Pornography (Unconfirmed) |
| International Country: | United States |
| NCMEC Date Processed: | 02-10-2020 15:13:30 UTC |
| Made Available to Law Enforcement by NCMEC: | Yes |
| Associated CyberTipline Reports: | 61621395 |

NCMEC Classification is based on NCMEC's review of the report **OR** a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

## NCMEC Note #1

*ECD-KNA 02-10-2020 15:13:30 UTC*

There are multiple reports on this suspect. Please see CT #61621395 for all analysis.

## Uploaded File Information

**Files Viewed by NCMEC:**

NCMEC staff have viewed the following uploaded files which had not been previously viewed and categorized by NCMEC at the time this report was generated.

### Files Viewed by NCMEC

| Filename | MD5 |
|---|---|
| IJ0zdwgTLUXHDgNS.mp4 | e9629ca57a1e26211cefb8356ceea94b |
| EJUP0BUXkAAkJD2.jpg | 60fe71c3403af0bcbec38570dc66f90f |
| EMAFlpAWsAUgOi5.jpg | 312e5d0168967bcfaca9f41c500da1ae |
| EL_9NOxXYAABXnV.jpg | d1f13b3544621ab055eb9c914c1a366e |
| EJV3rBjWwAA42yK.jpg | c7e0cc05273852818fcdc4fa52a7c3fd |

**Files Not Viewed by NCMEC:**

NCMEC staff have not viewed the following uploaded files submitted with this report and have no information concerning the content of the uploaded files other than information voluntarily provided in the report by the reporting ESP.

### Files Not Viewed by NCMEC

| Filename | MD5 |
|---|---|
| mikeyfromtumbl1-1166023345470615552-2019-12-23-2274158.zip | 731c046c2855a9aa41d318b58a9541d3 |

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000058
PTRN-STARK_000620



This concludes Section C

If you need further information regarding the contents of this Report, please contact the CyberTipline at null or 1-877-446-2632, ext. 6702.

For more information regarding images containing identified child victims, please contact the Child Victim Identification Program (CVIP) at cvip@ncmec.org.

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000059
PTRN-STARK_000621



# Section D: Law Enforcement Contact Information

The report was made available to the Law Enforcement Agency listed below.

## Wichita/Sedgwick County Exploited and Missing

Investigator:

| | |
|---|---|
| Assigned Officer: | Access VPN |
| Title: | Sergeant Jeff Swanson |
| City/State: | KS |
| Country: | United States |
| Phone Number: | 316-660-9447 |
| Email Address: | Jeff.Swanson@sedgwick.gov |

Time/Date was made available: 02-10-2020 15:13:30 UTC

This concludes Section D

This concludes CyberTipline Report 61606638

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-000060
PTRN-STARK_000622

**GOVERNMENT'S EXHIBIT 2**



# CyberTipline Report 71133752

## Priority Level: E
## (Report submitted by a registered Electronic Service Provider)

Received by NCMEC on 04-28-2020 00:19:53 UTC

All dates are displayed as MM-DD-YYYY

Except for times provided in Additional Information sections, all time zones are displayed in UTC

---

## Executive Summary

The following is a brief overview of information contained in this CyberTipline report:

**Incident Type:** Apparent Child Pornography (Unconfirmed)

NCMEC Incident Type is based on NCMEC's review of the report **OR** a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

NCMEC staff have viewed one or more of the files submitted with this CyberTipline report and have categorized one or more of the files as designated in the Incident Type.

Please see Section C for additional information related to the files that were viewed and categorized by NCMEC.

**Total Uploaded Files:** 2

The National Center for Missing & Exploited Children (NCMEC) was incorporated in 1984 by child advocates as a private, non-profit 501(c)(3) organization to serve as a national clearinghouse and resource center for families, victims, private organizations, law enforcement, and the public on missing and sexually exploited child issues. To further our mission to help find missing children, reduce child sexual exploitation, and prevent future victimization, NCMEC operates the CyberTipline and Child Victim Identification Program. NCMEC makes information submitted to the CyberTipline and Child Victim Identification Program available to law enforcement and also uses this information to help identify trends and create child safety and prevention messages. As a clearinghouse, NCMEC also works with Electronic Service Providers, law enforcement and the public in a combined effort to reduce online child sexual abuse images. NCMEC performs its programs of work pursuant to its own private mission and independent business operations. NCMEC does not act in the capacity of or under the direction or control of the government or law enforcement agencies. NCMEC does not investigate and cannot verify the accuracy of the information submitted by reporting parties.

RD01_SPORN-001491
PTRN-STARK_000623



## Contents

---

## Section A: Reported Information     1

Reporting Electronic Service Provider (ESP)     1

Company Information     1

Incident Information     2

Webpage/URL     2

Suspect     2

Additional Information Submitted by the Reporting ESP     3

Uploaded File Information     3

## Section B: Automated Information Added by NCMEC Systems     4

Explanation of Automated Information (in alphabetical order)     4

Geo-Lookup (Suspect)     4

## Section C: Additional Information Provided by NCMEC     5

NCMEC Note #1     5

NCMEC Note #2     5

Uploaded File Information     6

## Section D: Law Enforcement Contact Information     8

Wichita/Sedgwick County Exploited and Missing     8

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001492
PTRN-STARK_000624



# Section A: Reported Information

> The following information was submitted to the CyberTipline by the Reporting Person or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

## Reporting Electronic Service Provider (ESP)

**Submitter:**
Twitter, Inc. / Vine.co
Twitter Inc.
1355 Market St Suite 900
San Francisco, CA 94103 US

**Point of Contact for Law Enforcement:**
https://support.twitter.com/articles/41949-guidelines-for-law-enforcement

## Company Information

Twitter has provided NCMEC with the following explanation on how it reports to the CyberTipline.

General information:
This report was submitted from the Electronic Service Provider (ESP) Twitter, a free service that provides micro-blogging to its users. This is being reported to NCMEC in accordance with Title 18 U.S.C. 22558A. The submitted media along with the .zip file containing preservation files will be kept for 90 days for law enforcement follow-up. Twitter retains different types of information for different time periods. Given Twitter's real-time nature, some information may only be stored for a very brief period of time. Information on our retention policies can be found in our Privacy Policy (https://twitter.com/privacy).

Please note that for Twitter accounts reported to NCMEC, we provide a copy of the preserved files, mentioned above, within the report in the form of a .zip file.

Time zones:
All times in this report are in UTC.

Incident Date/Time:
The incident date/time is the timestamp from the earliest reported Tweet; however, if a Tweet is not reported, then the incident date/time will represent the account creation timestamp.

IP addresses:
Twitter logs IPs in connection with user authentications to Twitter (i.e., sessions, which may span multiple days) rather than individual Tweet postings; as a result, we are unable to provide insight into which IP address a specific Tweet was posted from. While Twitter does not capture IPs for individual Tweets, we have provided an accurate log of IPs for the timeframe relevant to the report.

Matching IP sessions with reported media:
The Tweet ID/Status ID is the numeric portion of the URL associated with each reported Tweet.
Copy this Status ID .
Open the [username]-tweets.txt file and using Ctrl+F(PC)/Cmd+F(Mac), paste in the Tweet ID to highlight the corresponding Tweet information.
Once you have obtained the date/time information for the Tweet from the [username]-tweets.txt file, open the [username]-ipaudit.txt file. The IP address most likely associated with the session in which the reported Tweet occurred will be the most recent IP in the log before the date/time of the Tweet.

Matching Direct Message (DM) media to DM text:

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001493
PTRN-STARK_000625



The DM ID is the numeric portion of the filename of media found within the [username]-dm-media folder.
For the DM media file, copy the numeric portion of the filename.
Open the [username]-dm-media-preserve.txt file and using Ctrl+F(PC)/Cmd+F(Mac), and paste in the DM ID to highlight the corresponding DM information (user ID if sender, message, user ID of recipient)

User-generated information:
The account name, bio, URL, and location found in the Additional Information section are user-generated.

Tweet text:
Text content of Tweets from the reported account are contained in the file named USERNAME-tweets.txt (attached to the report in the zip file). The file contains status IDs, the text content of the Tweet, and a timestamp in UTC.

Special Instructions:
When law enforcement serves legal process, law enforcement should reference both the CyberTipline report number and the account username (example: @username or twitter.com/username) and user ID.

Additional questions:
For more information, please refer to the Evidence Key included in the reported zip file, or to our Guidelines for Law Enforcement (https://support.twitter.com/articles/41949#section4).

## Incident Information

| | |
|---|---|
| Incident Type: | Child Pornography (possession, manufacture, and distribution) |
| Incident Time: | 12-31-2019 19:50:54 UTC |

## Webpage/URL

| | |
|---|---|
| URL: | https://pbs.twimg.com/profile_images/1229869733966684166/LZ--tZEM.jpg |
| Additional Information: | Type: Profile Image |

## Suspect

| | |
|---|---|
| Phone: | +13168072272 |
| Email Address: | jordanpatterson3150@gmail.com |
| Screen/User Name: | Survivinglife8 |
| ESP User ID: | 1212098776556437504 |
| Profile URL: | https://twitter.com/Survivinglife8 |
| IP Address: | 24.248.224.234 (Registration) 12-31-2019 19:50:54 UTC |
| IP Address: | 104.211.50.90 (Login) 04-25-2020 00:07:10 UTC |
| IP Address: | 40.117.138.77 (Login) 04-04-2020 00:09:16 UTC |
| IP Address: | 66.73.6.87 (Login) 04-03-2020 13:45:15 UTC |
| IP Address: | 24.248.224.234 (Login) 02-28-2020 18:30:20 UTC |
| IP Address: | 66.73.6.87 (Login) 02-28-2020 12:24:33 UTC |
| Device ID (Twitter for Android): | d48c46156e89e99a 02-26-2020 19:32:13 UTC |

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001494
PTRN-STARK_000626



| Additional Information: | User-provided account information: |
| --- | --- |
| | Full Name: Survivinglife |
| | Location: |
| | Description: my name is Mikey, I'm a nudist. Please help if you can.  Cashapp $mikeythenudist |
| | URL: |
| | Additional user emails on record: |
| | Additional user phone numbers on record: |

## Additional Information Submitted by the Reporting ESP

This user engaged with apparent child sexual exploitation material. This account is part of an active law enforcement investigation.
Investigating agency: Minnesota Bureau of Criminal Apprehension
Investigating officer: Santa Ledman
Investigating officer's email/phone: Santa.Ledman@state.mn.us and 6517931044
Country: USA

## Uploaded File Information

| Number of uploaded files: | 2 |
| --- | --- |

## Uploaded File Information

| Filename: | LZ--tZEM.jpg |
| --- | --- |
| MD5: | 5cb6ff4c39b3058d89ffbea81119a277 |
| Did Reporting ESP view entire contents of uploaded file? | Yes |
| Did Reporting ESP view the EXIF of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | Yes |
| Original URL Where File was Located: | https://pbs.twimg.com/profile_images/1229869733966684166/LZ--tZEM.jpg |

## Uploaded File Information

| Filename: | Survivinglife8-1212098776556437504-2020-04-28-100673.zip.zip |
| --- | --- |
| MD5: | d0feec3df5bb81c4e9eb29f029238dfa |
| Did Reporting ESP view entire contents of uploaded file? | (Information Not Provided by Company) |
| Were entire contents of uploaded file publicly available? | (Information Not Provided by Company) |

This concludes Section A. All of the information in this section was submitted electronically to the CyberTipline by the Reporting Person, NCMEC Call Center or Reporting ESP. The information appearing in Section A is information received in the original submission. The reporting of information in Section A, other than the "Incident Type" and "Incident Time," is voluntary and undertaken at the initiative of the Reporting Person or Reporting ESP.

This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.
Please treat all information in this Report as confidential.

RD01_SPORN-001495
PTRN-STARK_000627



# Section B: Automated Information Added by NCMEC Systems

Upon receipt of a CyberTipline report, NCMEC Systems may conduct automated processes on the information submitted in Section A. The information found in Section B of this CyberTipline Report has been automatically generated by NCMEC Systems. If the CyberTipline Report was submitted by a member of the public, Section B will be blank.

## Explanation of Automated Information (in alphabetical order)

**Geo-Lookup:** When a Reporting ESP voluntarily reports an IP address for the "Suspect," NCMEC Systems will geographically resolve the IP address via a publicly-available online query. The results of this lookup are displayed.

Geolocation data is approximate and may not display a user's exact location. Please be aware that the geolocation information provided is not exact but is providing a reliable estimate of location based on IP address(es) voluntarily provided by the reporting ESP.

## Geo-Lookup (Suspect)

| IP Address | Country | Region | City | Metro Area | Postal Code | Area Code | Lat/Long | ISP/Org |
|---|---|---|---|---|---|---|---|---|
| 24.248.224.234 | US | KS | Wichita | Wichita-Hutchinson Plus | 67208 | | 37.7042/ -97.2778 | Cox Business/ Cox Business |
| 66.73.6.87 | US | KS | Wichita | Wichita-Hutchinson Plus | 67203 | | 37.7076/ -97.3637 | AT&T U-verse/ AT&T U-verse |
| 104.211.50.90 | US | VA | Washington | Washington, DC (Hagerstown) | 22747 | | 38.7095/ -78.1539 | Microsoft Corporation/ Microsoft Azure |
| 40.117.138.77 | US | VA | Washington | Washington, DC (Hagerstown) | 22747 | | 38.7095/ -78.1539 | Microsoft Corporation/ Microsoft Azure |

**This concludes Section B**

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001496
PTRN-STARK_000628



# Section C: Additional Information Provided by NCMEC

Section C contains information collected by NCMEC staff based on the information electronically submitted by the Reporting Person, NCMEC Call Center or Reporting ESP. Section C may contain a variety of additional information, including data gathered from queries on publicly-available, open-source websites. Any queries conducted by NCMEC staff will be documented and any query results will be saved to the electronic filing system when possible. The CyberTipline cannot confirm the accuracy of information found in public records or whether the results are affiliated with any parties relating to this report.

| | |
|---|---|
| NCMEC Priority Level: | E (Report submitted by a registered Electronic Service Provider) |
| NCMEC Classification*: | Apparent Child Pornography (Unconfirmed) |
| International Country: | United States |
| NCMEC Date Processed: | 05-11-2020 20:33:16 UTC |
| Made Available to Law Enforcement by NCMEC: | Yes |

NCMEC Classification is based on NCMEC's review of the report **OR** a "Hash Match" of one or more uploaded files. NCMEC may not have viewed all uploaded files submitted by the reporting ESP.

## NCMEC Note #1

*ECD-LCM 05-11-2020 14:55:40 UTC*

I reviewed the uploaded files and found content that appears to be UNCONFIRMED CHILD PORNOGRAPHY.

## NCMEC Note #2

*ECD-EKH 05-11-2020 20:33:16 UTC*

CT/TA results for: jordanpatterson*
-----------------------------------
71133752
61621395 KS, Wichita/Sedgwick County Exploited and Missing
61606638 KS, Wichita/Sedgwick County Exploited and Missing


CT/TA results for: 66.73.6.87
--------------------------
71133752


CT/TA results for: 24.248.224.234
-----------------------------
71133752
61621395 KS, Wichita/Sedgwick County Exploited and Missing
61606638 KS, Wichita/Sedgwick County Exploited and Missing


CT/TA results for: d48c46156e89e99a
-----------------------------
71133752

---

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001497
PTRN-STARK_000629



61621395 KS, Wichita/Sedgwick County Exploited and Missing
61606638 KS, Wichita/Sedgwick County Exploited and Missing


CT/TA results for: Survivinglife8
------------------------------
71133752
64617522


CT/TA results for: 1212098776556437504
----------------------------------
71133752


CT/TA results for: +13168072272
---------------------------
71133752


CT/TA results for: 3168072272
-------------------------
No results.

Reports appear related. CT 64617522 was submitted by the public and was left for federal review. Prior reports were sent to KS ICAC

====

VPN : KS ICAC based on prior reports


## Uploaded File Information

**Files Viewed by NCMEC:**

NCMEC staff have viewed the following uploaded files which had not been previously viewed and categorized by NCMEC at the time this report was generated.

### Files Viewed by NCMEC

| Filename | MD5 |
|---|---|
| LZ--tZEM.jpg | 5cb6ff4c39b3058d89ffbea81119a277 |


**Files Not Viewed by NCMEC:**

NCMEC staff have not viewed the following uploaded files submitted with this report and have no information concerning the content of the uploaded files other than information voluntarily provided in the report by the reporting ESP.

### Files Not Viewed by NCMEC

| Filename | MD5 |
|---|---|
| Survivinglife8-1212098776556437504-2020-04-28-100673.zip.zip | d0feec3df5bb81c4e9eb29f029238dfa |


### This concludes Section C

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001498
PTRN-STARK_000630



If you need further information regarding the contents of this Report, please contact the CyberTipline at ecuassistance@ncmec.org or 1-877-446-2632, ext. 6702.

For more information regarding images containing identified child victims, please contact the Child Victim Identification Program (CVIP) at cvip@ncmec.org.

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001499
PTRN-STARK_000631



# Section D: Law Enforcement Contact Information

The report was made available to the Law Enforcement Agency listed below.

Wichita/Sedgwick County Exploited and Missing

Investigator:

| | |
|---|---|
| Assigned Officer: | Access VPN |
| Title: | Sergeant Jeff Swanson |
| City/State: | KS |
| Country: | United States |
| Phone Number: | 316-660-9447 |
| Email Address: | Jeff.Swanson@sedgwick.gov |

Time/Date was made available: 05-11-2020 20:33:16 UTC

This concludes Section D

This concludes CyberTipline Report 71133752

*This Report is provided solely for informational purposes pursuant to NCMEC's nonprofit mission.*
*Please treat all information in this Report as confidential.*

RD01_SPORN-001500

PTRN-STARK_000632