# EXHIBIT 7

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF FLORIDA
2                  FORT MYERS DIVISION

3    _____
                                     )
4    UNITED STATES OF AMERICA,       )
                                     )
               Plaintiff,            )
5                                    )
     vs.                             )Case No.:  2:21-cr-75-SPC-NPM
6                                    )
     HERIBERTO BATISTA MONTIJO,      )
7                                    )
               Defendant.            )
8    _____)

9                MOTION HEARING PROCEEDINGS
        BEFORE THE HONORABLE SHERI POLSTER CHAPPELL
10
                     December 7, 2021
11                      9:05 a.m.

12   APPEARANCES:

13   FOR THE PLAINTIFF:   YOLANDE G. VIACAVA, ESQUIRE
                          United States Department of Justice
14                        Office of the United States Attorney
                          2110 First Street, Suite 3-137
15                        Fort Myers, Florida 33901

16

17   FOR THE DEFENDANT:   GEORGE ELLIS SUMMERS, JR., ESQUIRE
                          Federal Public Defender's Office
18                        2075 West First Street, Suite 300
                          Fort Myers, Florida 33901

19

20

21   COURT REPORTER:      Stacey E. Raikes, RMR, CRR
                          2110 First Street, Suite 2-194
22                        Fort Myers, Florida 33901

23

24   ALSO PRESENT:   HERIBERTO BATISTA MONTIJO, DEFENDANT

25   Proceedings reported and transcribed by computer-aided
     stenography.

PTRN-STARK_000366

2

1                          TABLE OF CONTENTS
                                TRIAL
2                             WITNESSES

3

4      On behalf of the Government:

5      RACQUEL MORGAN

6          Direct examination by Ms. Viacava............   6
           Cross-examination by Mr. Summers.............  59
7          Redirect examination by Ms. Viacava..........  80
           Recross-examination by Mr. Summers...........  88
8
       PATRICK BARICELLI

9
           Direct examination by Ms. Viacava............  91
10         Cross-examination by Mr. Summers............. 136
           Redirect examination by Ms. Viacava.......... 151
11

12

13

14                          EXHIBITS

15     On behalf of the Government:
                                                   Admitted
16
       Numbers 1, 2, 4A, 4B, 5A, 5B......................   4
17     Number 6, pages 1-3..............................  40
18

19

20                          MISCELLANY

21     Proceedings, December 7, 2021.....................   3
       Certificate of Court Reporter..................... 198
22
23

24

25

                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION

PTRN-STARK_000367

3

<pre>
 1                    P R O C E E D I N G S

 2                  (Court called to order.)

 3            THE DEPUTY CLERK:  Calling case 2:21-cr-75-SPC-NPM:

 4   The United States of America versus Heriberto Batista Montijo.

 5            MS. VIACAVA:  Good morning.  Yolande Viacava

 6   representing the government.  And with me at counsel table is

 7   Task Force Officer Patrick Baricelli with the FBI.

 8            THE COURT:  Good morning.

 9            MR. SUMMERS:  Good morning, Your Honor.  Ellis

10   Summers on behalf of Heriberto Batista Montijo, who is present

11   in court.

12            THE COURT:  All right.  And we have our interpreters,

13   so the first thing that we'll go ahead and do is swear the

14   interpreters in so that they can assist in interpreting for the

15   Court and Heriberto Batista Montijo.

16            THE DEPUTY CLERK:  Do you solemnly swear or affirm

17   that you will make a true translation from Spanish to English

18   and English to Spanish in the matter that is now before the

19   Court?

20            THE INTERPRETER:  I do.  Leon Fontova, certified

21   Spanish court interpreter.  Good morning, Your Honor.

22            THE COURT:  Good morning.

23            THE INTERPRETER:  I do.  Gabriella Loncar,

24   L-O-N-C-A-R, Spanish interpreter.

25            THE COURT:  Good morning.
</pre>

PTRN-STARK_000368

4

```
 1              THE INTERPRETER:  Good morning.
 2                      (Interpreters sworn.)
 3              THE COURT:  All right.  We are here on a motion to
 4      suppress, Mr. Batista, that was filed by your counsel and there
 5      have been briefs that were filed.  He filed a response to the
 6      government's brief so I believe we're prepared to go forward
 7      today with the hearing.
 8              At this time, I would allow the government, if you
 9      wish, to call your first witness.
10              MS. VIACAVA:  Your Honor, prior to doing that, the
11      government has spoken with defense counsel and, after providing
12      copies of exhibits, which came from discovery, the government
13      believes there's a stipulation as to Exhibits 1, 2, 4A, and B
14      composite and 5A and B composite.  I believe the only one that
15      is not stipulated to at this time is Exhibit 3.
16              THE COURT:  Is that correct?
17              MR. SUMMERS:  That is correct, Your Honor.
18              THE COURT:  All right.  Then, at this time, the Court
19      would introduce Exhibits 1, 2, 4A and B, and 5A and B; is that
20      correct?
21              MS. VIACAVA:  Yes, 1, 2, 4A and B, and 5A and B, yes,
22      Your Honor.
23              THE COURT:  All right.  Those are introduced at this
24      time.
25                      (Government's Exhibit Numbers
```

PTRN-STARK_000369

1                        1, 2, 4A, 4B, 5A, 5B, admitted into evidence.)

2              MS. VIACAVA:  And, with that, the government will

3    call its first witness, who is Racquel Morgan.

4              THE COURT:  All right.  And I would just advise

5    counsel, if you feel comfortable, if you are at counsel table,

6    you can remove your mask while you're speaking.  If you do not

7    want to do that, that's fine.  While you're moving around the

8    courtroom, you do need to put your mask back on.

9              MS. VIACAVA:  I'll keep it with me then.  If I may

10   step out to get the witness.

11             THE COURT:  Yes, you may.

12             (Pause.)

13             THE COURT:  If you would step forward and stand over

14   here.  We'll have you raise your right hand and then the clerk

15   is going to swear you in as soon as you're in place.

16             (Pause.)

17             THE DEPUTY CLERK:  Do you solemnly swear or affirm

18   that the testimony you're about to give in the case that is now

19   before the Court will be the truth, the whole truth, and

20   nothing but the truth?

21             THE WITNESS:  I do.

22             THE DEPUTY CLERK:  Thank you.  Please state your full

23   name, spell your last name, and then have a seat when you're

24   done.

25             THE WITNESS:  Racquel Morgan.  M-O-R-G-A-N.

| | |
|---|---|
| 1 | THE COURT:  You may be seated. |
| 2 | And, Ms. Morgan, if you feel comfortable, you may |
| 3 | remove your mask while you testify. |
| 4 | THE WITNESS:  Okay. |
| 5 | THE COURT:  You may inquire. |
| 6 | Thereupon, |
| 7 | RACQUEL MORGAN, |
| 8 | Having been called as a witness on behalf of the |
| 9 | Government, and having been first duly sworn by the |
| 10 | Courtroom Clerk, was examined and testified as follows: |
| 11 | (Time noted:  9:09 a.m.) |
| 12 | DIRECT EXAMINATION ON BEHALF OF THE GOVERNMENT |
| 13 | BY MS. VIACAVA: |
| 14 | Q.      Good morning.  Ms. Morgan, how are you employed? |
| 15 | A.      I'm a legal analyst at Meta Platforms. |
| 16 | Q.      And prior to Meta Platforms, was the company known by |
| 17 | any other name? |
| 18 | A.      Yes.  Facebook. |
| 19 | Q.      Could I get you to pull the microphone?  You may have |
| 20 | the same problem I do where our voices don't carry. |
| 21 | A.      Sure. |
| 22 | Q.      And how long have you worked for Facebook, Inc., now |
| 23 | Meta? |
| 24 | A.      Four-and-a-half years. |
| 25 | Q.      And what are your general duties and responsibilities |

PTRN-STARK_000371

1    for the company?

2    A.        I review legal process and I testify as needed.

3    Q.        And are you considered a custodian of records for

4    Facebook?

5    A.        Yes.

6    Q.        And do you have access routinely to Facebook records?

7    A.        Yes.

8    Q.        And, in this particular case, were you asked to

9    prepare a declaration?

10   A.        Yes.

11   Q.        So you are familiar with this particular case

12   involving an incident that took place in January of -- January

13   23rd of 2021 involving a Facebook customer?

14   A.        Yes.

15   Q.        Now, what type of company is Facebook?

16   A.        It is a social media platform that allows account

17   holders to share and connect.

18   Q.        And is it a free service?

19   A.        Yes.

20   Q.        And what types of free services does Facebook offer

21   to its customers?

22   A.        It allows account holders to share anything that they

23   choose to share such as photos, videos, private messages.

24   Q.        Are there other services that Facebook offers besides

25   just the normal Facebook social media service?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PTRN-STARK_000372

1    A.       In connection to the Facebook platform, you can --

2    you can have Messenger.

3    Q.       And what is Messenger, briefly?

4    A.       It allows account holders to share privately.

5    Q.       From one Facebook account user to another Facebook

6    account user?

7    A.       Yes.

8    Q.       And would Facebook messages allow the same thing as

9    sharing text messages, videos, pictures, things of that nature?

10   A.       Yes.

11   Q.       And is it considered to be almost like an instant

12   messaging service?

13   A.       That's correct, yes, it is private messages between

14   account holders.

15   Q.       Now, does Facebook -- it's a free service, but does

16   Facebook, in order for a person to join Facebook, do they

17   provide an individual with terms of service for the use of

18   their products?

19   A.       Yes.

20   Q.       And is that routine for every user that's joining

21   Facebook?

22   A.       Yes.

23   Q.       And do the terms of service provide information as to

24   what Facebook expects of the user and what the user can expect

25   of Facebook?

PTRN-STARK_000373

9

```
1    A.        Yes.

2              MS. VIACAVA:  Your Honor, at this time, the

3    government would publish Government's Exhibit No. 2 that's been

4    admitted into evidence.

5              THE COURT:  You can publish Exhibit 2.

6              BY MS. VIACAVA:

7    Q.        In looking at Government's Exhibit No. 2, would these

8    have been the terms of service that were in effect in January

9    23rd of 2021?

10   A.        Yes.

11   Q.        Could you please read what is displayed on the screen

12   regarding the terms of service for Facebook?

13   A.        Sure.  Facebook builds technologies and services that

14   enable people to connect with each other, build communities,

15   and grow businesses.  These terms govern your use of Facebook,

16   Messenger, and the other products, features, apps, services,

17   technologies, and software we offer (the Facebook products or

18   products) except where we expressly state that separate terms,

19   and not these, apply.  These products are provided to you by

20   Facebook, Inc.

21   Q.        So, specifically, it's mentioned such products as

22   Messenger?

23   A.        Yes.

24   Q.        And these would be the terms of service that also

25   would apply to the Messenger use?
```

PTRN-STARK_000374

1    A.         That's correct.

2    Q.         Can you please read what is displayed in the next

3    paragraph of the terms of service?

4    A.         We don't charge you to use Facebook or other products

5    and services covered by these terms.  Instead, businesses and

6    organizations pay us to show you ads for their products and

7    services.  By using our products, you agree that we can show

8    you ads that we think will be relevant to you and your

9    interests.  We use your personal data to help determine which

10   ads to show you.

11   Q.         And does the terms of service specifically provide

12   the services that Facebook provides to the user?

13   A.         Yes.

14   Q.         At the bottom of page 1, I would ask that you read

15   what's displayed.

16   A.         Our mission is to give people the power to build

17   community and bring the world closer together.  To help advance

18   this mission, we provide the products and services described

19   below to you.

20   Q.         Could you read from the first -- beginning the first

21   full paragraph where it says we use?

22   A.         We use the data we have, for example, about the

23   connections you make, the choices and settings you select, and

24   what you share and do on and off our products to personalize

25   your experience.

PTRN-STARK_000375

1    Q.       So, in the terms of service, Facebook notifies users

2    that Facebook is monitoring activity; is that correct?

3            MR. SUMMERS:  I'm going to object, Your Honor.

4    Leading question.

5    A.       Yeah.

6            THE COURT:  Sustained.

7    Q.       Okay.

8            THE COURT:  And rephrase it.

9    Q.       Can you please read what's displayed on page 2 of the

10   terms of service that's Government's Exhibit No. 2?

11   A.       There are many ways to express yourself on Facebook

12   and to communicate with friends, family, and others about what

13   matters to you.  For example, sharing status updates, photos,

14   videos, and stories across the Facebook products you use,

15   sending messages to a friend or several people, creating events

16   or groups, or adding content to your profile.

17   Q.       Now, in the terms of service, does Facebook provide

18   information regarding what users are not able to do or put on

19   their service?

20   A.       Yes, it does.

21   Q.       At this time, I would ask you to read the paragraph

22   that is displayed?

23   A.       Combat harmful conduct and protect and support our

24   community.  People will only build community on Facebook if

25   they feel safe.  We employ dedicated teams around the world and

1    develop advanced technical systems to detect misuse of our

2    products, harmful conduct towards others, and situations where

3    we may be able to help support or protect our community.  If we

4    learn of content or conduct like this, we will take appropriate

5    action.  For example, offering help, removing content, removing

6    or restricting access to certain features, disabling an

7    account, or contacting law enforcement.  We share data with

8    other Facebook companies when we detect misuse or harmful

9    conduct by someone using one of our products.

10   Q.       So from the terms of service that a user -- in order

11   to use Facebook, does a user agree to these terms of service?

12   A.       Yes.

13   Q.       And, in here, what you just read, it indicated that

14   Facebook takes certain steps to protect its products; correct?

15   A.       Yes.

16   Q.       And when it talked about contacting law enforcement,

17   based on your training and experience, are you aware of whether

18   Facebook routinely will report instances to law enforcement?

19   A.       Yes.

20   Q.       And in what capacity or what circumstances would

21   Facebook report content that is found on their service to law

22   enforcement?

23   A.       To law enforcement, it would be when there's imminent

24   harm.

25   Q.       Okay.  And, in addition to contacting law

PTRN-STARK_000377

1    enforcement, is there any other entity that Facebook routinely

2    would notify if content is found on Facebook that is deemed to

3    be harmful?

4    A.         As it pertains to children, any harmful content

5    regarding children, it would be reported to NCMEC, which is the

6    National Center for Missing and Exploited Children.

7    Q.         And has Facebook been reporting instances to National

8    Center of Missing and Exploited Children for the entire time

9    that you've worked at Facebook?

10   A.         Yes.

11   Q.         And, to your knowledge, has Facebook been providing

12   such information to National Center of Missing and Exploited

13   Children even prior to working for the company?

14   A.         Yes.

15   Q.         And this particular provision that talks about

16   combating harmful conduct and protecting and supporting the

17   community, it does specifically tell a user that there will be

18   instances, based on the content, that they could report to law

19   enforcement?

20   A.         Yes.  Can I just ask that you speak a little closer

21   to the microphone?

22   Q.         Yes, sorry.  If at any point, you can't hear me --

23   A.         I'm hearing two hearings going on at the same time.

24   Q.         No problem.  If at any point you can't hear me or

25   need me to repeat a question, please let me know that.

PTRN-STARK_000378

1   A.        Yes, thank you.

2   Q.        Starting at the first full sentence, can you please

3   read what is displayed on Government's Exhibit No. 2 that is --

4   appears on the screen?

5   A.        Sure.  And we develop automated systems to improve

6   our ability to detect and remove abusive and dangerous activity

7   that may harm our community and the integrity of our products.

8   Q.        Based on your training and experience, are you aware

9   of what automated systems are being referred to here?

10  A.        Yes.

11  Q.        Can you please explain the automated systems that are

12  referenced here?

13  A.        Artificial intelligence, MD5 hash computer learning,

14  machine learning.

15  Q.        When you talk about MD5 hash, what is MD5 hash?

16  A.        It's a string of letters and numbers that create a

17  hash in order to create an identification for a file, for a

18  video file, for -- or an image.

19  Q.        And is that MD5 hash value specific to a particular

20  file?

21  A.        Yes.

22  Q.        It's unique to a particular file?

23  A.        It is unique to --

24            MR. SUMMERS:  Objection, Your Honor.  Objection.

25  Leading question.

PTRN-STARK_000379

1              THE COURT:  Sustained.  Go ahead and rephrase your

2     question.

3              MS. VIACAVA:  Okay.

4              BY MS. VIACAVA:

5     Q.        With the MD5 hash value, based on your training and

6     experience and working with Facebook, what does Facebook use

7     MD5 hash value for?

8     A.        To match it exactly to another file, image file or

9     video file.

10    Q.        And if two files have the same MD5 hash, what does

11    that signify?

12    A.        It means that they're exactly the same image or

13    video.

14    Q.        So, essentially, the MD5 hash value is specific to

15    that file?

16             MR. SUMMERS:  Objection.  Leading question.

17             THE COURT:  Sustained.

18             BY MS. VIACAVA:

19    Q.        From looking at the terms of service that you've read

20    here today in court and from your training and experience, does

21    the terms of service make clear to a user that Facebook is

22    monitoring content and activity on their service?

23    A.        Yes.

24    Q.        Can you please read what's displayed on the screen,

25    which is page 4 of 12 of the terms of service that's

PTRN-STARK_000380

1   Government's Exhibit No. 2 that's been admitted into evidence?

2   A.        We provide these services to you and others to help

3   advance our mission.  In exchange, we need you to make the

4   following commitments.

5   Q.        Can you please read what's displayed on page 6 of the

6   terms of service as Government's Exhibit No. 2?

7   A.        What you can share and do on Facebook.

8             We want people to use Facebook to express themselves

9   and to share content that is important to them, but not at the

10  expense of the safety and wellbeing of others or the integrity

11  of our community.  You, therefore, agree not to engage in the

12  conduct described below or to facilitate or support others in

13  doing so.

14            You may not use our products to do or share anything

15  that violates these terms, our community standards, and other

16  terms and policies that apply to your use of Facebook that is

17  unlawful, misleading, discriminatory, or fraudulent.

18  Q.        Now, looking at this, it talks about the community

19  standards.  What are the community standards?  Are they a

20  written policy available to users?

21  A.        It is, absolutely.

22  Q.        And what, based on your training and experience, what

23  is included in the community standards or what is laid out or

24  explained to users?

25  A.        What they can and cannot do on the platform.  Make

PTRN-STARK_000381

1    sure that they don't share anything that is unlawful or goes

2    against our policies.

3    Q.        And when you talk about unlawful, in this particular

4    instance, what information or what content would Facebook

5    consider to be unlawful?

6    A.        Anything that would put anyone's safety in danger,

7    including children.

8    Q.        Would unlawful -- you indicated that Facebook

9    routinely will report information to National Center of Missing

10   and Exploited Children.  What information does Facebook report

11   routinely from the content that's found on their service?

12   A.        Any activity that might show a prepubescent or

13   preadolescent minor showing any explicit actions or poses.

14   Q.        When you say explicit actions, what are you referring

15   to?

16   A.        Sexually explicit.

17   Q.        Okay.  And, based on what's in front of the screen,

18   that would be something that Facebook would deem to be

19   unlawful?

20   A.        Yes.

21   Q.        Images of children engaged in sex acts?

22   A.        That's correct.

23            MR. SUMMERS:  Objection.  Leading question.

24            THE COURT:  Sustained.

25            BY MS. VIACAVA:

1    Q.        Please read what's displayed on the screen.

2    A.        We can remove or restrict access to content that is

3    in violation of these provisions.

4              MS. VIACAVA:  One moment please, Your Honor.

5              THE COURT:  Yes.

6              (Pause.)

7              BY MS. VIACAVA:

8    Q.        Could you please read what's displayed on the screen

9    that's on page 7 of 12 of Government's Exhibit No. 2?

10   A.        Specifically, when you share, post, or upload content

11   that is covered by intellectual property rights on or in

12   connection with our products, you grant us a nonexclusive,

13   transferable, sub-licenseable, royalty free, and worldwide

14   license to host, use, distribute, modify, run, copy, publicly

15   perform or display, translate, and create derivative works of

16   your content consistent with your privacy and application

17   settings.  This means, for example, that if you share a photo

18   on Facebook, you give us permission to store, copy, and share

19   it with others, again, consistent with our settings -- with

20   your settings, excuse me, such as service providers that

21   support our service or other Facebook products you use.  This

22   license will end when your content is deleted from our systems.

23   You can delete content individually or all at once by deleting

24   your account.

25   Q.        So --

PTRN-STARK_000383

1    A.        Learn more about how to delete your account.

2    Q.        So, looking at this provision, in the terms of

3    service, is a user notified that Facebook maintains photos or

4    what they've posted?

5    A.        Yes.

6    Q.        And does it also inform a user that they can delete

7    the content if they choose?

8    A.        That's correct.

9    Q.        So a user is agreeing to these terms of service in

10   using the product?

11   A.        That's correct.  Excuse me, I'm just going to serve

12   myself some water.

13             (Pause.)

14   Q.        Can you please read what's displayed on the screen

15   that's page 12 of 12 of the terms of service, Government's

16   Exhibit No. 2?

17   A.        Other terms and policies that may apply to you.

18   Community standards.  These guidelines outline our standards

19   regarding the content you post to Facebook and your activity on

20   Facebook and other Facebook products.

21   Q.        So the terms of service notify a user that there are

22   community standards?

23   A.        That's correct.

24   Q.        And, from the terms of service, is there a link

25   provided to the user so they could further understand the

1    community standards?

2    A.        Yes.

3              MS. VIACAVA:  May I approach the witness, Your Honor?

4              THE COURT:  Yes, you may.

5              (Pause.)

6    Q.        I'm now handing you what's previously marked as

7    Government's Exhibit 3 for identification.  Do you recognize

8    Government's Exhibit 3?

9    A.        Yes.

10   Q.        How do you recognize Government's Exhibit No. 3?

11   A.        This is a portion of the community standards.

12   Q.        And is this Government's Exhibit No. 3, is this a

13   document that you provided to the government?

14   A.        Yes.

15   Q.        And where did you get the copy of the document from?

16   A.        From our website.

17   Q.        Okay.  And, during the time period that you have been

18   employed by Facebook and as a records custodian, have the

19   community standards been the same as what is contained in

20   Government's Exhibit No. 3?

21   A.        Yes.

22   Q.        And, specifically, in Government's Exhibit No. 3, are

23   these community standards that are available online for users

24   to further reference, review, and are mentioned in the terms of

25   service?

PTRN-STARK_000385

1    A.        Yes.

2    Q.        And are these community standards consistent with the

3    community standards that were utilized by Facebook in January

4    of 2021?

5    A.        Yes, to my knowledge.

6    Q.        Have you had an opportunity to review the content?

7    A.        Yes.

8    Q.        And are those consistent with what's displayed in

9    Government's Exhibit No. 3, is that consistent with the

10   policies that you are aware of that Facebook has utilized for a

11   number of years?

12   A.        Yes.

13             MS. VIACAVA:  Your Honor, at this time, the

14   government would seek to admit into evidence Government's

15   Exhibit No. 3?

16             MR. SUMMERS:  Your Honor, may I voir dire the witness

17   about the exhibit?

18             THE COURT:  Yes, you may.

19             MR. SUMMERS:  May I approach and retrieve the

20   exhibit?

21             THE COURT:  Yes, you may.

22             MR. SUMMERS:  Your Honor, may I put it on the

23   projector so I can ask her specific questions --

24             THE COURT:  Yes.

25             MR. SUMMERS:  -- about the exhibit itself?

```
1              MS. VIACAVA:  I'm sorry, let me get this off so you
2    can use the screen.
3              THE COURT:  I think we can just flip over.  You're
4    fine.
5      VOIR DIRE EXAMINATION ON BEHALF OF THE DEFENSE
6    BY MR. SUMMERS:
7    Q.       Good morning, Ms. Morgan.  How are you?
8    A.       Good morning.  I'm well, thank you.
9    Q.       Now, you had said that this exhibit, or this proposed
10   Exhibit No. 3, this was consistent with the community standards
11   as of January 2021, to your knowledge; correct?
12   A.       That's correct.
13   Q.       So you had a knowledge qualifier in there?
14   A.       Yes.
15   Q.       It's fair to say you did not draft these standards;
16   is that fair?
17   A.       Can you repeat the question, please?
18   Q.       You did not draft these community standards?
19   A.       I did not.
20   Q.       That is not your job?
21   A.       That is not my job.
22   Q.       There's a lawyer, I'm guessing, at Facebook or Meta
23   who does that?
24   A.       That's correct.
25   Q.       I bet there's even outside counsel who then reviews
```

PTRN-STARK_000387

1    that; is that fair to say?

2    A.        That's fair to say.

3    Q.        And they're probably constantly making changes to

4    these community standards; is that fair to say?

5    A.        I don't know.

6    Q.        You don't know.  So you don't know when changes are

7    made?

8    A.        No.

9    Q.        Okay.  So I'm going to show you page 1 of the

10   community standards.

11            (Pause.)

12            MR. SUMMERS:  The government has generously offered

13   to let me use their equipment --

14            THE COURT:  Okay, thank you.

15            MR. SUMMERS:  -- to speed things up here.

16            BY MR. SUMMERS:

17   Q.        So that word, was that word on the community

18   standards in January 2021?

19   A.        No.

20   Q.        So that was a change to the community standards

21   policy?

22   A.        Yes.

23   Q.        So this exhibit would not be, at least with respect

24   to that word, would not be consistent with the policy as of

25   January 2021?

PTRN-STARK_000388

1    A.      Yes.

2            MR. SUMMERS:  I'm sorry, Your Honor.

3            THE COURT:  That's okay.

4            MR. SUMMERS:  I just have to flip through.

5            THE COURT:  We're -- IT is coming up.

6            THE DEPUTY CLERK:  I can try something else he said.

7            THE COURT:  Just one moment.  We'll try one more

8    thing and --

9            MR. SUMMERS:  Okay.

10           BY MR. SUMMERS:

11   Q.      So, Ms. Morgan, looking at this exhibit, or this page

12   of the proposed exhibit, that chart, that relates to the year

13   2021; is that fair to say?

14   A.      Yes.

15   Q.      And that includes a chunk of the year of 2021, which,

16   most likely, is well beyond January 2021; is that fair to say?

17   A.      Yes.

18   Q.      So that was also something that was not part of the

19   community standards as of January 2021?

20   A.      What part was not?

21   Q.      This graph that we're looking at right here of --

22   A.      Oh.

23   Q.      -- 2021, that was not part of it?

24   A.      It's possible.  I don't know.

25   Q.      Well, it's extremely unlikely, isn't it, that you'd

PTRN-STARK_000389

1    have a graph of 2021 which includes what looks like a pretty

2    lengthy chunk of the year in January; is that fair to say?

3    A.        It's fair.

4    Q.        And you didn't draft this so you don't really know?

5    A.        I don't know.

6    Q.        Okay.  And so this chart -- and this, by the way,

7    would be from page 11 of page 13 of the proposed exhibit --

8    this relates to April 2021, May, June, and then it appears to

9    end in July 2021.  That was not part of the community standards

10   as of January 2021 either, was it?

11   A.        Would you be able to zoom on that, again, please?

12   Q.        Sure.  Absolutely.

13   A.        I see.  No, it was not.

14   Q.        And, of course, it wasn't your job to put that new

15   chart in the community standards; right?

16   A.        No.

17   Q.        Because you don't draft the community standards?

18   A.        I don't.

19   Q.        So, as they make changes, you really don't know what

20   they're changing if they're changing a word here or graph

21   there?

22   A.        Yes.

23   Q.        That's not your job?

24   A.        That's correct.

25   Q.        And so this would be page 12 of -- this would be page

1   10 of 13 of the proposed exhibit.  And so this is another graph

2   from the community standards and this graph is also kind of

3   going well into 2021; is that fair to say?

4   A.        Yes.

5   Q.        And so it's very unlikely this graph was there in

6   January 2021?

7   A.        It's possible.

8   Q.        You don't really know, anyway, because you don't

9   draft them?

10  A.        I don't know.

11          MR. SUMMERS:  Your Honor, we would object to this

12  exhibit.  This exhibit clearly has changed since January 2021.

13  The proposed exhibit here was printed off on January 2, '21, at

14  2:36 p.m.  I'll show that to the Court.

15          And so it was printed off on January 2nd, just a few

16  days ago.  Obviously, the community --

17          THE COURT:  December 2nd.

18          MR. SUMMERS:  I'm sorry, Your Honor.

19          THE COURT:  That's okay.  I just wanted to make it

20  clear for the record it's December 2nd of 2021.

21          MR. SUMMERS:  I apologize.  Yes, it was printed off

22  on December 2, 2021, at 2:36 p.m.  This was not the community

23  standards that were in effect on January 23, 2021.  It's very

24  clear that this witness is not the person who drafts these

25  standards.  It's very clear there have been multiple changes

1    that have occurred since January 2021.  She doesn't -- she

2    wasn't aware that those changes were there.  To her knowledge,

3    it's the same as of January 2021, but as we've proven, it has

4    changed since then.  She's not drafting this document so she

5    doesn't know whether a sentence has been changed here or words

6    have been changed there.  That, of course, is corporate

7    counsel's job, if not outside counsel, and as a result, Your

8    Honor, the Court -- the government has failed to authenticate

9    this document as true and accurate as of January 23, 2021, and

10   we would ask that it not be included.

11             Thank you, Your Honor.

12             THE COURT:  Does the government have any follow-up

13   questions for her in regard to this document?

14             MS. VIACAVA:  Yes, Your Honor.

15     VOIR DIRE EXAMINATION ON BEHALF OF THE GOVERNMENT

16   BY MS. VIACAVA:

17   Q.       Ms. Morgan, were you --

18             MS. VIACAVA:  I'm sorry, can I put this down so I

19   can --

20             THE COURT:  Yes, go ahead.

21             BY MS. VIACAVA:

22   Q.       Ms. Morgan, were you tasked with looking at the

23   information in this particular case and preparing a

24   declaration?

25   A.       Yes.

```
1    Q.       In so doing, in your declaration that you prepared,
2    did you reference and review the community standards?
3    A.       Yes.
4    Q.       And is that referenced in your declaration?
5    A.       Yes.
6    Q.       And does it also indicate that there is a link to the
7    community standards and that the version was in place on
8    January 23rd through 24th of 2021?
9    A.       Can you repeat the question, please?
10            MS. VIACAVA:  May I please approach the witness?
11            THE COURT:  Yes, you may.
12            BY MS. VIACAVA:
13   Q.       Would it assist if you reviewed your declaration that
14   was provided in this case?
15   A.       Sure.
16   Q.       Can you please review paragraph 2, and when you're
17   done, look up.
18            (Pause.)
19   Q.       In so doing, did that refresh your recollection as to
20   whether or not you referenced the community standards in your
21   declaration?
22   A.       Yes.
23   Q.       And, at the time, would you have reviewed the
24   community standards -- the Facebook's community standards that
25   were applicable January 23rd through 24th of 2021?
```

1    A.        Yes.

2    Q.        And, in your declaration, you provided a link; is

3    that correct?

4    A.        Yes.

5    Q.        And you also provided what's been marked as

6    Government's Exhibit No. 3 for identification; correct?

7    A.        Yes.

8    Q.        And did you have an opportunity to review the policy

9    rationale?

10   A.        Yes.

11   Q.        And, particularly, is that the same policy rationale

12   that was in effect on January 23 - 24, 2021?

13   A.        Yes.

14            MR. SUMMERS:  Your Honor, we're going to object to

15   that.  The witness has already said it's to her knowledge.

16   There's multiple things in the document that were different

17   from January to now.  I'm not sure how the witness could have

18   memorized that section and be certain that what she reviewed at

19   a different time is now the same as what's in this proposed

20   exhibit.

21            THE COURT:  I'll allow you to voir dire on that issue

22   as soon as the government's done asking their questions.

23            MS. VIACAVA:  May I have just one moment, please,

24   Your Honor?

25            THE COURT:  Yes.

PTRN-STARK_000394

1          (Pause.)

2          BY MS. VIACAVA:

3    Q.        Okay.  Let me ask you this question:  In the

4    community standards, were you able to determine that there

5    were, in fact, community standards applicable to Facebook in

6    January 23rd through January 24th of 2021?

7    A.        Yes.

8    Q.        So the community standards are not a new concept; it

9    was something that Facebook always utilized?

10   A.        Yes.

11   Q.        And, in the community standards, what type of

12   information is provided to a user?

13   A.        The guidelines or the standards that the user must

14   abide by.

15   Q.        And has the community standards involving the sexual

16   exploitation of children or child sexual exploitation, the

17   abuse and nudity policies, have they always indicated that

18   Facebook will report to the National Center of Missing and

19   Exploited Children?

20   A.        Yes.

21   Q.        And that has been consistent the entire time that

22   you've worked for Facebook?

23   A.        Yes.

24   Q.        And does the community standards reference that

25   they're falling out of the law?

PTRN-STARK_000395

```
1    A.      Yes.

2            MR. SUMMERS:  Your Honor, we're going to object under

3    the best evidence.  She's, essentially, now testifying to what

4    the community standards are.  If they want to authenticate the

5    community standards, that's one thing, but that would be

6    hearsay and best evidence.

7            THE COURT:  Sustained.  Rephrase.

8            MS. VIACAVA:  Okay.

9            BY MS. VIACAVA:

10   Q.      Does the Facebook's community standards that are

11   referenced in the terms of service, does it provide for what

12   materials should not be posted or what content --

13   A.      Yes.

14   Q.      -- qualifies as a violation of the community

15   standards?

16   A.      Yes.

17   Q.      And, based on your training and experience, as a

18   records -- sorry, as the records custodian, are you aware of

19   what Facebook's community standards are or what would be in

20   violation of?

21   A.      So I don't know them by heart, but I do know,

22   generally, what they state and what we consider violating.

23   Q.      And, based on your training and experience, what is

24   specified as to being in violation of community standards?

25           MR. SUMMERS:  I'm going to object, Your Honor.
```

```
 1    Hearsay and best evidence.
 2              THE COURT:  I don't think that necessarily goes to
 3    this particular exhibit.  I mean, if we're still talking about
 4    this exhibit, then you need to authenticate the exhibit.  There
 5    might be other questions you can ask her outside of that, but
 6    if we're still trying to get Exhibit 3 in --
 7              MS. VIACAVA:  No, Your Honor, at this time, I'm just
 8    asking her if she's aware of the community standards.  I'm just
 9    trying to establish what she's aware of, what Facebook
10    indicates would be in violation of and I believe that is
11    something that she should be able to testify based on her being
12    employed at Facebook, based on the fact that she indicated that
13    she normally deals with service of process.  So I'm asking
14    about her knowledge without going through the exhibit at this
15    point.
16              THE COURT:  Okay.  Overruled.  Go ahead and ask your
17    question.
18              BY MS. VIACAVA:
19    Q.       Based on your training and experience as being a
20    custodian of records for Facebook, are you aware of the
21    community standards?
22    A.       Yes.
23    Q.       And how they were violated in terms of child sexual
24    exploitation material?
25    A.       Yes.
```

1    Q.        And how are you aware of the policy of Facebook?

2    A.        I was made aware of it when I was hired.

3    Q.        Okay.  And that would have been over four years ago?

4    A.        Four-and-a-half, yes.

5    Q.        And has the policy been consistent in terms of what

6    is permitted in terms of child sexual exploitation material?

7    A.        Yes.

8    Q.        And what is the policy or what has the policy been of

9    Facebook, which includes up to January of 2021?

10   A.        Users are not allowed to --

11             MR. SUMMERS:  I'm going to object on this.  This,

12   once again, is hearsay and best evidence.  She's testified to

13   what the policy is.

14             THE COURT:  Response?

15             MS. VIACAVA:  Your Honor, this particular instance,

16   she's indicating that she routinely responds to process.  She's

17   indicated that she has looked at this particular case.  She's

18   looked at these standards.  She's indicated that she did

19   provide a declaration in which, at the time, she referenced the

20   community standards and I'm asking her to explain what those

21   community standards are, as she's indicated in her declaration.

22             THE COURT:  Overruled.  Go ahead.

23             BY MS. VIACAVA:

24   Q.        So, based on your training and experience, what are

25   the community standards that would be in violation pertaining

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PTRN-STARK_000398

1    to child sexual exploitation material as they were in January

2    of 2021?

3    A.        When there's sexually explicit content of children,

4    it will be reported to NCMEC.

5    Q.        And is that made clear and has that always been made

6    clear in the community service standards?

7              MR. SUMMERS:  Objection, Your Honor.  Once again,

8    hearsay and best evidence.

9              THE COURT:  Overruled.

10             BY MS. VIACAVA:

11   Q.        You may answer the question.

12   A.        Yes.

13             MS. VIACAVA:  May I approach the witness, Your Honor?

14             THE COURT:  You may.

15             MS. VIACAVA:  Your Honor, I'd ask to mark this

16   exhibit, maybe a substitute Exhibit 3 or could be referenced as

17   Government's Exhibit 6.  It is -- I just think the witness will

18   testify whether or not she's aware of this being the community

19   standards she referenced in her declaration.

20             THE COURT:  All right.  So it will be marked as

21   Exhibit 6 because we want to make sure that we retain Exhibit 3

22   that was shown to her.  And, at this time, that is not in

23   evidence.

24             BY MS. VIACAVA:

25   Q.        I'm now handing you what's been identified as

PTRN-STARK_000399

1    Government's Exhibit No. 6.  In your declaration, when you

2    refer to a version in place in January 23rd to 24th and

3    indicate that there's a link and it's attached as Exhibit A, is

4    that the document you're referring to?

5    A.        Yes.

6    Q.        And is that the document that you have reviewed in

7    preparing your declaration?

8    A.        Yes.

9    Q.        And does that document still display the name of

10   Facebook?

11   A.        Yes.

12   Q.        And, looking at it under the policy rationale, is it

13   still consistent with Government's Exhibit No. 3?

14   A.        Yes.

15             MS. VIACAVA:  Your Honor, at this time, the

16   government would seek to admit into evidence Government's

17   Exhibit No. 6 rather than Government's Exhibit No. 3.

18             THE COURT:  Any objection?

19             MR. SUMMERS:  Your Honor, may I voir dire the witness

20   on this exhibit?

21             THE COURT:  Yes, you may.

22             MR. SUMMERS:  May I approach to get the exhibit?

23             THE COURT:  Yes, you may.

24             MR. SUMMERS:  This one's going to be trickier.

25             (Pause.)

PTRN-STARK_000400

```
 1              VOIR DIRE EXAMINATION ON BEHALF OF THE DEFENSE

 2    BY MR. SUMMERS:

 3    Q.        So, Ms. Morgan, this particular proposed Exhibit 6

 4    that's in my hand, is this copy -- the first time you've seen

 5    this copy today?

 6    A.        No.

 7    Q.        But did --

 8    A.        Oh, that particular copy?

 9    Q.        Yeah, this exhibit.

10    A.        Oh, yes.

11    Q.        This is not the copy that you provided to the

12    government?

13    A.        The print -- the PDF that I provided was the other

14    one, Exhibit 3.

15    Q.        Okay.  But you didn't bring this with you from -- I

16    think you're from Texas?

17    A.        Yes.

18    Q.        You didn't bring this with you from Texas; is that

19    fair to say?

20    A.        No, I did not.

21    Q.        And you did not print this copy off and bring it with

22    you?

23    A.        No.

24    Q.        And when you prepared your declaration, you looked at

25    a version of the community standards?
```

PTRN-STARK_000401

1    A.        Yes.

2    Q.        And where did you go to get that version?

3              THE WITNESS:  May I look at the declaration?

4              THE COURT:  Yes, you may.

5    A.        Okay.  It would be the link that's provided on

6    paragraph 2.

7    Q.        So you went to the link on the website?

8    A.        That's right.

9    Q.        Okay.  And when did you prepare your declaration?

10             THE WITNESS:  May I look at it, again?

11             THE COURT:  Yes, you may.

12             THE WITNESS:  Thank you.

13   A.        That was November 3, 2021.

14   Q.        Okay.  So it's fair to say that you obtained this --

15   the policy details for the community standards, this came from

16   the link from November 3, 2021?

17   A.        Yes, from our community standards.

18   Q.        Okay.  And so this was not obtained from January 23,

19   2021, it wasn't printed off that day?

20   A.        No.

21   Q.        You did not talk to corporate counsel or outside

22   counsel and ask them what is the version that was the version

23   on January 23, 2021?

24   A.        No.

25   Q.        And so looking at -- there's no page numbers on this,

1   but looking at this graph, once again, the graph is going into

2   2021?

3   A.        Yes.

4   Q.        And it's hard to tell because there's no dates, but,

5   I mean, it looks like a fairly significant chunk of 2021; is

6   that fair to say?

7   A.        I don't know.

8   Q.        Okay.  This graph is, again, going into 2021?

9   A.        Yes.

10  Q.        And, once again, you did not draft the community

11  standards policy?

12  A.        No.

13  Q.        You are not involved in the changes that occurred in

14  the community standards policy?

15  A.        No.

16  Q.        So if they changed the policies on February 1st and

17  they put it on the website, you don't know that, do you?

18  A.        I do not, no.

19  Q.        And if they put it on the website on July 1st, you

20  would have no idea?

21  A.        No.

22  Q.        And you printed this policy off on November 3, 2021?

23  A.        I reviewed it on the website, yes.

24  Q.        And so you have no idea whether this is the same

25  policy from January 23, 2021?

PTRN-STARK_000403

```
1    A.         I don't know.
2              MR. SUMMERS:  Your Honor, we would continue our
3    objection.
4         VOIR DIRE EXAMINATION ON BEHALF OF THE GOVERNMENT
5    BY MS. VIACAVA:
6    Q.         You do indicate in your declaration that the version
7    attached as Exhibit A was in place on January 23rd through 24th
8    of 2021?
9    A.         Based on my understanding, it's the same.
10   Q.         And, in preparing the declaration, did you speak with
11   legal counsel?
12   A.         I did.
13   Q.         And, to your knowledge and in speaking with legal
14   counsel, is this the version that Facebook had utilized at or
15   near that time in reference here in January 23rd through 24th
16   of 2021?
17   A.         Yes.  As per my conversation with legal counsel, yes.
18   Q.         And, looking at the policy rationale, it appears to
19   be the same policy rationale that's consistent with Facebook
20   procedures that you're aware of?
21   A.         Yes.
22             MS. VIACAVA:  Your Honor, at this time, the
23   government would seek to admit into evidence Government's
24   Exhibit No. 6.
25             THE COURT:  Mr. Summers?
```

PTRN-STARK_000404

1           MR. SUMMERS:  Your Honor, we continue our objection.

2    I just asked her the question before if she received from

3    counsel the version from January 23, 2021, and she said no.

4    She didn't know if it was the same version, what she printed

5    off on November 3, 2021.  She didn't know if there had been

6    changes in February.  She didn't know if there was changes in

7    July.  There is no surety that that is the same version from

8    January 23, 2021.  The witness has acknowledged that she has no

9    idea if it was.

10          Typically, Your Honor, with the, you know, custodian

11   of records, they would bring in the policy.  It would be

12   certified at corporate headquarters; they would print it off

13   there; they'd bring it with them with a certification that this

14   was the version that was true and accurate on January 23, 2021.

15   We do not have any of those assurances here with this document

16   so we would object to it being introduced.

17          THE COURT:  Can I see the document, please?

18          MS. VIACAVA:  Yes.

19          (Pause.)

20          THE COURT:  The Court is going to overrule the

21   objection as to pages 1 through 3 of Government's Exhibit No.

22   6.  Those will come in.  As to pages 4 through 10, the Court is

23   going to sustain the objection.  Those pages will not come in.

24                              (Government's Exhibit Number

25                              6, pages 1 - 3, admitted into evidence.)

1          THE COURT:  You may proceed with your questioning.

2          MS. VIACAVA:  May I have the three pages --

3          THE COURT:  Yes.

4          MS. VIACAVA:  -- that were admitted?

5          (Pause.)

6          MS. VIACAVA:  Of course, I would have to use the Elmo

7    for this one.

8          BY MS. VIACAVA:

9    Q.          Under the policy rationale, can you please read the

10   first paragraph that's displayed?

11   A.          We do not allow content that sexually exploits or

12   endangers children.  When we become aware of apparent child

13   exploitation, we report it to the National Center of Missing

14   and Exploited Children (NCMEC) in compliance with applicable

15   law.  We know that sometimes people share nude images of their

16   own children with good intentions; however, we generally remove

17   these images because of the potential for abuse by others and

18   to help avoid the possibility of other people reusing or

19   misappropriating the images.

20   Q.          Can you please read the second paragraph?

21   A.          We also work with external experts, including the

22   Facebook Safety Advisory Board, to discuss and improve our

23   policies and enforcement around online safety issues,

24   especially with regard to children.  Learn more about the

25   technology we're using to fight against child exploitation.

PTRN-STARK_000406

1   Q.        And can you please read the top portion under do not

2   post?

3   A.        Content that depicts participation in or advocates

4   for the sexual exploitation of children, including but not

5   limited to:

6             Engaging in any sexual activity involving minors,

7   adults soliciting minors, minors soliciting minors, minors

8   soliciting adults, using our products and site functionality

9   with the intention of sexualizing minors.

10  Q.        And can you start reading from this point to the

11  first bullet point?

12  A.        I'm sorry, can you point, again, to the first part?

13  Q.        The content and ends at the first bullet point.

14  A.        Content including photos, videos, real world art,

15  digital content, and text that depicts any sexual activity

16  involving minors.

17  Q.        And, in this case, did you have an occasion to look

18  into the CyberTip lead or CyberTip report that was made in

19  reference to this particular case?

20  A.        Yes.

21  Q.        And, on January 23rd of 2021, what information or

22  what information did Facebook have regarding a particular user

23  that's relevant to this case?

24  A.        There were information such as basic subscriber

25  information, name, email.

PTRN-STARK_000407

1   Q.        Well, let's start with what drew Facebook's attention

2   to this particular case.

3   A.        Oh.  It was a MD5 hash that depicted an exact image

4   of a minor in a sexual act.

5            MS. VIACAVA:  Your Honor, at this time, the

6   government would publish Government's Exhibit No. 1 that's been

7   admitted into evidence.

8            THE COURT:  You may.

9            BY MS. VIACAVA:

10  Q.        In this particular instance, looking at what's

11  displayed on the screen and based on your looking into this

12  particular case, what did Facebook find?

13  A.        Child pornography.

14  Q.        And in what device that belonged to Facebook?

15  A.        The service would be Messenger.

16  Q.        And, briefly, what is Messenger, again?

17  A.        It is a platform that allows account holders to share

18  privately.

19  Q.        And what was the date and time of the incident?

20  A.        That was January 23, 2021, at 17:25:15 UTC.

21  Q.        And, based on your review of that CyberTip, how did

22  Facebook come across the child exploitation image?

23  A.        Again, it was found through an MD5 hash that was

24  exact image of what the image that was shared by the user.

25  Q.        And did you do any research or check Facebook records

1    to determine when Facebook initially became aware of that

2    particular file or MD5 hash?

3    A.         Yes, on March 3, 2020.

4    Q.         And, on March 3, 2020, what action, if any, did

5    Facebook take?

6    A.         The MD5 hash --

7              MR. SUMMERS:  Your Honor, I'm going to object on

8    hearsay grounds.  The witness is testifying to what they

9    reviewed in records.  We haven't been provided any of these

10   records and the witness is really testifying from things that

11   they read somewhere else, which would make it hearsay.

12             THE COURT:  Your response?

13             MS. VIACAVA:  Your Honor, this is the records

14   custodian.  She's indicated that she deals with service of

15   process.  So, in this particular case, she was tasked with

16   reviewing this incident and providing the information which she

17   ultimately put in the declaration.  In so doing, she did check

18   the records to find out where that MD5 hash value came from,

19   when Facebook became aware of it, and that's what I anticipate

20   that she'll be testifying to regarding their records that

21   Facebook maintains of when images and such materials are

22   located on their service.

23             THE COURT:  Does the government have any of those

24   documents or is that memorialized in these exhibits?

25             MS. VIACAVA:  I anticipate that what -- Government's

PTRN-STARK_000409

1    Exhibit 1 is the actual report.  The information that's

2    provided by Facebook details how they became aware of the hash

3    or whether or not they had looked at it or how they determined

4    that particular file or the contents of that file.  It is

5    relevant for this case.  And based on their procedures, she is

6    the records custodian that would have access to those records

7    and she has, as I indicated, provided a declaration.  Defense

8    counsel can certainly cross-examine her on it; however, based

9    on Facebook records that they maintain, she's already testified

10   they routinely report to NCMEC.  She's indicated that have

11   automated systems.  She's indicated how Facebook maintains this

12   information.  She would be the person that would be qualified

13   to testify regarding these materials and she did research prior

14   to coming here today in court and we do anticipate that she

15   should be able to testify to the findings.

16             THE COURT:  Overruled.  You may proceed.

17             BY MS. VIACAVA:

18   Q.      Does Facebook have procedures in effect for

19   maintaining or monitoring content of their service?

20   A.      Yes.

21   Q.      And what type of service or entity do they employ?

22   A.      Can you repeat the question?  I don't understand.

23   Q.      For example, does Facebook have a review team?

24   A.      Oh.  Yes, there is a review team that reviews the

25   content that is violating.

PTRN-STARK_000410

1   Q.        And how long -- while you've worked there for over

2   four years, has Facebook always maintained this review team?

3   A.        Yes.

4   Q.        And who makes up or comprises the review team?

5   A.        Employees and contractors.

6   Q.        And have they received any particularized training?

7   A.        Yes.

8   Q.        And, in this instance, Facebook reported a particular

9   file.  Did Facebook have any previous contact with that file or

10  a similar file?

11  A.        Yes.

12  Q.        And what did you find in terms of Facebook's records

13  regarding that MD5 hash value?

14  A.        That it was reviewed by two -- by two employees or

15  contractors of Facebook and they both came to the conclusion

16  that it is, in fact, violating and it was entered into a

17  repository in order to keep it as a way to match any other

18  images that are exactly like that one.

19  Q.        Is that part of the automated systems that was

20  referred to in the terms of service?

21  A.        Yes.

22  Q.        And you said violating.  Specifically, the

23  information that is maintained by Facebook, did it classify or

24  categorize what that file depicted or contained?

25  A.        Yes.

PTRN-STARK_000411

1    Q.         And what information did Facebook maintain on that

2    MD5 hash?

3    A.         That it was child pornography.

4    Q.         Specifically, did it indicate what type of child

5    pornography or what was depicted?

6    A.         Yes, it was an explicit prepubescent act, a sexual

7    act by a prepubescent.

8    Q.         Prepubescent minor?

9    A.         That's correct.

10   Q.         At the time that Facebook saw this around March 3rd

11   of 2020 -- is that the date you provided?

12   A.         Yes.

13   Q.         What actions did they take after it was reviewed by

14   the review team and determined to depict a prepubescent engaged

15   in a sexual act?

16   A.         It was added to a repository.

17   Q.         Did Facebook create the MD5 hash value to identify

18   that file?

19   A.         Yes.

20   Q.         And what is the purpose of the MD5 hash being added

21   to the repository?

22   A.         To match it to any exact files that look like that

23   initial MD5 hash.

24   Q.         So the MD5 hash identifies the specific file?

25   A.         That's correct.

PTRN-STARK_000412

1    Q.        And Facebook routinely maintains a repository that

2    identifies files they've previously encountered on their

3    service that they believe to be child exploitation material?

4    A.        Yes.

5              MR. SUMMERS:  Objection.  Leading question.

6              THE COURT:  Sustained.  You need to rephrase your

7    question.

8              MS. VIACAVA:  Okay.

9              BY MS. VIACAVA:

10   Q.        And when the MD5 hash value matches another file,

11   what is the significance of that?

12   A.        It means that it is exactly the same image or video.

13   Q.        Okay.  And does Facebook routinely rely upon the MD5

14   hash?

15   A.        Yes.

16   Q.        And, in this particular instance for this particular

17   CyberTip, what information did Facebook -- what did they do

18   with the information once they found that a user on January 23,

19   2021, had uploaded the specific file?

20   A.        It was reported to NCMEC.

21   Q.        And when they report to NCMEC, did they -- was it

22   Facebook that categorized what the file contained?

23   A.        Yes, from our previous MD5 hash.

24   Q.        And, looking as what's displayed on Government's

25   Exhibit No. 1 that's on the screen currently, what was the

1   image categorization by the ESP or electronic service provider?

2   A.      A1.

3   Q.      And, based on your training and experience, are you

4   familiar with what A1 designates?

5   A.      Yes.

6   Q.      What does A1 designate?

7   A.      A represents a prepubescent minor and 1 is an

8   explicit sexual act.

9   Q.      Looking at what's displayed on the screen, which is

10  page 5 of Government's Exhibit No. 1, does it provide the

11  similar description of what A1 stands for?

12  A.      Yes.

13  Q.      And, at the time that Facebook reported that

14  particular file had been uploaded, did Facebook know the

15  contents of the file?

16  A.      Yes.

17  Q.      And is that based on previously encountering that

18  exact file?

19  A.      That's correct.

20  Q.      When Facebook reports this information to National

21  Center of Missing and Exploited Children, what information is

22  routinely provided?

23  A.      Any user information.  Basic subscriber information,

24  which is name, email, phone number, the captured IP address at

25  the time that they created the account.

PTRN-STARK_000414

1   Q.      What is the purpose of Facebook providing such

2   information to the National Center of Missing and Exploited

3   Children?

4   A.      To be able to identify the user that shared the

5   content.

6   Q.      And does Facebook, once Facebook becomes aware and

7   knows that they have a child pornographic image, to your

8   knowledge, are they required to report it?

9   A.      Yes.

10  Q.      And do they, in fact, report it routinely in

11  compliance with the law?

12  A.      That's correct.

13  Q.      So looking at page 1 of Government's Exhibit No. 1,

14  does it depict information that would have been provided from

15  Facebook regarding the Facebook user?

16  A.      Yes.

17  Q.      And, looking at the screen, what was the name

18  provided?

19  A.      Junior Martinez.

20  Q.      Does Facebook take any steps to verify an

21  individual's name or identity or is that voluntary information

22  provided?

23  A.      Voluntary information provided.

24  Q.      And did Facebook provide the date of birth as the

25  user may have provided to Facebook?

1    A.        Yes.

2    Q.        So Facebook provides any identifying information they

3    have regarding the individual; is that correct?

4    A.        Yes.

5    Q.        Looking at this, did Facebook provide an email

6    address for the customer or user?

7    A.        Yes.

8    Q.        And, looking at the screen, it indicates verified.

9    Did Facebook take any steps to verify the email or what is

10   meant by verified?

11   A.        When the user provides their email, a link is sent to

12   that email and they click on it in order to verify that it is,

13   in fact, their email.

14   Q.        So Facebook has had some contact with the person at

15   that email?

16   A.        Yes.

17   Q.        And did Facebook provide the screen name?

18   A.        No.  I'm sorry, the user created it and, yes,

19   Facebook provided it to NCMEC.

20   Q.        Okay.  And, in this particular instance, looking at

21   the screen, the email address that was provided by Facebook,

22   what is the email address that's provided?

23   A.        BatistaHeriberto@gmail.com.

24   Q.        And what is the date of the -- the IP addresses that

25   are provided, was that also provided from Facebook recording

PTRN-STARK_000416

1    that particular user account?

2    A.        Yes.

3    Q.        And what is the date of the first one that is

4    indicated log-in?

5    A.        January 11, 2021, at 23:48:59 UTC.

6    Q.        And does that come from Facebook records for that

7    particular account?

8    A.        Yes.

9    Q.        And, looking at the second IP address provided, did

10   that also come from Facebook records?

11   A.        Yes.

12   Q.        And what is the date of that particular IP address

13   that was captured?

14   A.        January 23, 2021, at 16:02:50 UTC.

15   Q.        And is that the same date of the upload of the

16   incident or the upload of the file?

17   A.        Yes.

18   Q.        And what is the purpose of providing the IP address

19   to National Center of Missing and Exploited Children?

20   A.        To show the possible location of the user.

21   Q.        And is that also consistent with complying with the

22   law?

23   A.        Yes.

24   Q.        And there's additional information regarding the

25   estimated location as of January 24, 2021.  Is that information

1    that's also provided?

2    A.        Yes.

3    Q.        So, at this time, what's displayed on the screen, is

4    this information provided by Facebook in terms of the file

5    name, the MD5 hash, is that information that would have been

6    provided from Facebook?

7    A.        Yes.

8    Q.        And this particular file with the file name and the

9    MD5 hash, is this the file that Facebook identified as

10   containing child exploitation material?

11   A.        Yes.

12   Q.        Looking at the next page that's marked page 3 of

13   Government's Exhibit No. 1, is there additional information

14   that was provided by Facebook regarding that particular file?

15   A.        Yes.

16   Q.        And the information listed here, when it refers to

17   Messenger thread, what is that in reference to?

18   A.        That is a private conversation between two users.

19   Q.        So everything that was reported in the CyberTip

20   report came from the same conversation?

21   A.        The same conversation as the explicit content.

22   Q.        And the conversation that took place on the same

23   date, January 23, 2021?

24   A.        That's correct.

25   Q.        And did Facebook actually provide the image to the

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PTRN-STARK_000418

1    National Center of Missing and Exploited Children?

2    A.        Yes.

3    Q.        In addition to providing the file that appeared to

4    contain or the file that Facebook believed contained child

5    pornography, did Facebook provide any other information or any

6    other files?

7    A.        Yes.

8    Q.        What other files did they provide?

9    A.        Such as profile photo and, as you showed before,

10   additional information which shows conversation before and

11   after the content.

12   Q.        Looking at what's displayed on the screen, what was

13   the content of this particular file that was provided by

14   Facebook?

15   A.        That's the profile picture for the account.

16   Q.        And what is the purpose in providing the profile

17   picture to National Center of Missing and Exploited Children?

18   A.        It could possibly identify the identity of the user.

19   Q.        And this profile picture, is this something that the

20   user utilized for that account, they created their profile

21   picture?

22   A.        Yes.

23   Q.        And, in looking at this, the profile picture, is that

24   a file or profile picture that's available to the public, a

25   user on Facebook?

PTRN-STARK_000419

1    want to make sure I've finished all my questions.  One second.

2              (Pause.)

3              BY MS. VIACAVA:

4    Q.        Aside from the file that you've indicated that

5    Facebook initially saw that depicted a minor having -- engaged

6    in a sex act, the other two files that were provided, were they

7    also image files from the same thread?

8    A.        Yes.

9    Q.        Does Facebook routinely take certain action or follow

10   any particular procedure to verify the content of a file before

11   they take the steps of reporting a user to the National Center

12   of Missing and Exploited Children?

13   A.        Yes.

14   Q.        Briefly, what steps does Facebook take to ensure what

15   they're reporting?

16   A.        In particular to the MD5 hash?

17   Q.        Yes, in this particular case, yes.

18   A.        Okay.  So when an image is received, two employees or

19   contractors review that image and make sure that it is, in

20   fact, violating or explicit and they --

21   Q.        Let's be clear.  Violating -- Facebook has a lot of

22   terms.  When you say violating, what is made certain before

23   it's reported?

24   A.        That it is, in fact, child exploitation imagery.

25   Q.        Okay.  Meaning a child involved in a sex act?

PTRN-STARK_000422

1    A.        That's correct.

2    Q.        And, once that determination is made, what procedures

3    are followed?

4    A.        Then an MD5 hash is created and it is put in a

5    repository.  And once that -- another image that has been

6    received that matches exactly that MD5 hash number or a series

7    of numbers and letters, then it is reported to NCMEC.

8    Q.        And, at the time that it's reported, is Facebook

9    relying upon that MD5 hash that they've previously created to

10   identify that other file?

11   A.        Yes.

12   Q.        So at the time -- why does Facebook routinely check

13   their products for child exploitation materials?

14   A.        Because it happens often.  It is something that is --

15   would be violating and it would need to be removed from our

16   platforms.

17   Q.        And is that for protection of the product?

18   A.        Yes, correct, and to abide by the law.

19            MS. VIACAVA:  I don't have any additional questions

20   for this witness.

21            THE COURT:  All right.  We're going to take a

22   15-minute recess.  We'll be in recess until 10 to 11.

23            Ms. Morgan, you can step down.

24            THE WITNESS:  Okay.

25            THE COURT:  And just don't discuss your testimony

1    with anyone.

2              (Recess taken at 10:34 a.m. - 10:52 a.m.)

3              THE COURT:  All right, cross-examination.  And I

4    would just note the witness is back on the stand.  The

5    defendant is present in court with his counsel.

6        CROSS-EXAMINATION ON BEHALF OF THE DEFENSE

7    BY MR. SUMMERS:

8    Q.        Good morning, again, Ms. Morgan.

9    A.        Good morning.

10   Q.        So it's fair to say Facebook has access to large

11   amounts of data entrusted with it by its users?

12   A.        Yes.

13   Q.        And Facebook takes privacy very seriously; is that

14   fair to say?

15   A.        Yes.

16   Q.        In fact, that's something that they make very clear

17   to their users, that privacy is important to Facebook?

18   A.        Yes.

19   Q.        Now, I know that you had testified earlier Facebook

20   actually has a limited license to use that data?

21   A.        Yes.

22   Q.        And so they use that data, you know, to mine the data

23   to try and, I guess, in their words, better provide products to

24   their -- to the customers?

25   A.        Yes.

PTRN-STARK_000424

```
1    Q.        And they use it to sell advertising?

2    A.        Yes.

3    Q.        But that license is limited, is it not?

4    A.        Yes.

5    Q.        It can't do whatever they want with that information?

6    A.        No.

7    Q.        Their users believe their information is private?

8    A.        Yes.

9    Q.        They believe that the data they put on Facebook or on

10   Messenger, that that information or data is being kept private?

11   A.        Yes.

12             MR. SUMMERS:  May I approach, Your Honor?

13             THE COURT:  Yes, you may.

14             (Pause.)

15             BY MR. SUMMERS:

16   Q.        Now, I know you testified earlier regarding the terms

17   of service that Facebook has.

18   A.        Yes.

19   Q.        And I'm going to direct your attention to page 2 of

20   Government's Exhibit No. 2.

21             And so, in the last two sentences on page 2, it reads

22   if we learn of content or conduct like this, we will take

23   appropriate action.  For example, offering help, removing

24   content, removing or restricting access to certain features,

25   disabling an account, or contacting law enforcement.  And then
```

PTRN-STARK_000425

1    it says we share data with our Facebook companies when we

2    detect misuse or harmful conduct by someone using one of our

3    products.

4                So it's fair to say, in those two sentences, the

5    terms of service are referencing share data with other Facebook

6    companies; correct?

7    A.        Yes.

8    Q.        It does not anywhere in there mention sharing data

9    with law enforcement, does it?

10   A.        No, it says contacting law enforcement.

11   Q.        But, as far as sharing data, it does not reference

12   sharing data with law enforcement?

13   A.        It does not reference it.

14   Q.        It only references contacting law enforcement?

15   A.        Yes.

16   Q.        And when it comes to sharing data, it only references

17   sharing data with Facebook companies?

18   A.        Yes.

19             MR. SUMMERS:  Your Honor, may I approach?

20             THE COURT:  Yes, you may.  You can freely move about.

21             MR. SUMMERS:  Thank you, Your Honor.

22             Your Honor, I'd publish Government's Exhibit 6, page

23   1.

24             BY MR. SUMMERS:

25   Q.        And in the policy rationale, the first two sentences

1    read we do not allow content that sexually exploits or

2    endangers children.  When we become aware of apparent child

3    exploitation, we report it to the National Center of Missing

4    and Exploited Children, in compliance with applicable law.

5              Now, in there, once again, it's using the word

6    report, is it not?

7    A.        Yes.

8    Q.        It doesn't say we're going to share your data with

9    the National Center of Missing and Exploited Children, does it?

10   A.        No, it does not.

11   Q.        Now, if you could, describe to me how one would get

12   to the terms of use on Facebook's website?

13   A.        If you go to Facebook or Meta Platforms, Inc., there

14   will be terms of service at the very bottom.

15   Q.        Okay.  And so you're looking at the Facebook page?

16   A.        At least that's when I went, yes.

17   Q.        And so the top of the screen, it sort of has the

18   Facebook name; is that sort of how it is?

19   A.        That's correct.

20   Q.        And then there's maybe like a picture on one side

21   that's kind of like your personal picture; is that on the

22   webpage somewhere?

23   A.        Yeah.  I mean, well, it just depends on where you're

24   going to find the terms of service.

25   Q.        Okay.

PTRN-STARK_000427

1    Q.        And are you aware if the software is regularly

2    serviced to make sure it's reliable?

3    A.        No.

4    Q.        No, it's not serviced or no, you're unaware of

5    whether it is serviced or not?

6    A.        I'm not aware of whether it is or it's not or how.

7    Q.        Okay.  So you're not aware if they do regular checks

8    to make sure it's working properly?

9    A.        I don't know.

10   Q.        Now, your testimony is that this hash tag was placed

11   in a hash tag repository.  Where is the hash tag repository,

12   where is that maintained?

13   A.        On our servers.

14   Q.        Do you know where?

15   A.        No.

16   Q.        And do you know if that repository, is that regularly

17   serviced to make sure there's no issues with that?

18   A.        I don't know.

19   Q.        And so there could be reliability issues with respect

20   to the hash tag repository, but you don't really know about

21   that, do you know?

22   A.        It's outside of my scope so I don't know.

23   Q.        Okay.  So you really can't testify to whether the

24   hash tag itself is reliable and you can't testify to whether

25   the hash tag repository itself is reliable; is that fair to

PTRN-STARK_000438

1    say?

2    A.        Based on my knowledge, I can say that it is reliable.

3    We do rely on those systems to help us identify when there is

4    child exploitation imagery.

5    Q.        But, with respect to your own technical knowledge,

6    not including stuff that other people have told you, you don't

7    know whether the hash tag technology is reliable and you don't

8    know if the repository itself is reliable?

9    A.        No, I don't know firsthand.

10   Q.        Now, you weren't the one who prepared the

11   CyberTipline report which is Government's Exhibit No. 1?

12   A.        No.

13   Q.        Someone else prepared that?

14   A.        Someone from NCMEC.

15   Q.        Someone from NCMEC prepared it?

16   A.        Yes, it's reported to NCMEC and they create a report.

17   Q.        Okay.  So you provide them certain information and

18   then the report is created?

19   A.        That's correct.

20            MR. SUMMERS:  So, Your Honor, I would be publishing

21   Government's Exhibit 1, page 4.

22   Q.        So this uploaded file name with 184_N.MP4, that was

23   the first file which was provided by Facebook to NCMEC?

24   A.        Yes.

25   Q.        And when asked did reporting ESP view entire contents

PTRN-STARK_000439

1    of uploaded file, it reads information not provided by company.

2    A.        Yes.

3    Q.        And so the ESP, that would be Meta or Facebook?

4    A.        That's correct.

5    Q.        And the question is, essentially, asking you if that

6    was viewed by Facebook and the answer was?

7    A.        It was not provided.

8    Q.        Yeah, not answered or not provided.

9              And then for were the contents uploaded or file

10   publicly available, also, no information was provided?

11   A.        That's correct.

12   Q.        And so the additional information here, essentially,

13   provides that it was sent two messages before the CEI was

14   uploaded.  And so this first file, this was never reviewed by

15   Facebook either; correct?

16   A.        No, it was not.

17   Q.        And --

18   A.        Well, not that I'm aware of based on the report.

19   Q.        Okay.  And so this file wasn't viewed in March 2020

20   or in any other time, to your knowledge?

21   A.        Not to my knowledge.

22   Q.        Okay.  So, of course, the second file is the one that

23   was categorized as A1; correct?

24   A.        Yes.

25   Q.        And for the question did reporting ESP view entire

PTRN-STARK_000440

1    contents of uploaded file, the answer is no; correct?

2    A.        That's correct.

3    Q.        And so, essentially, Facebook or Meta said that no

4    one there viewed the entire contents of the uploaded file?

5    A.        That's correct.

6    Q.        And where did they get that information?

7    A.        I don't know.

8    Q.        Okay.

9    A.        It's provided by, I believe, Facebook.

10   Q.        Because your declaration was that two contractors

11   reviewed those, that file; correct?

12   A.        Two contractors reviewed the content of the -- of

13   what was -- excuse me.

14             Two contractors reviewed March -- the content of

15   March 3, 2020, not -- not this.

16   Q.        Okay.

17   A.        Okay.

18   Q.        But so but the answer here was that no one at

19   Facebook had viewed the entire contents of the uploaded file.

20   It doesn't mention two contractors, does it?

21   A.        It does not.

22   Q.        And now there's an additional information section as

23   well on the next page and nowhere in there does it indicate

24   that there was a hash tag match?

25   A.        On the additional information?

PTRN-STARK_000441

1    Q.        Yeah, it doesn't indicate that anywhere, does it?

2    A.        No.

3    Q.        And, in fact, nowhere in this report does it indicate

4    that there was a hash tag match?

5    A.        No.

6    Q.        And so the next file, file number 3, this one, also,

7    there's the question did reporting ESP view entire contents of

8    uploaded file and answer to that one is also information not

9    provided by company; right?

10   A.        Yes.

11   Q.        And this file was never reviewed by Facebook, was it?

12   A.        It doesn't indicate that it was.

13   Q.        To your knowledge, it was never reviewed by Facebook?

14   A.        To my knowledge, it was not reviewed.

15   Q.        And, as the records custodian, you're not aware of

16   any records out there to say that anyone ever reviewed that

17   file?

18   A.        I don't know, no.

19   Q.        Okay.  And, once again, the additional information

20   section, it just says it was sent three messages before this

21   CEI was uploaded?

22   A.        That's correct.

23   Q.        And, to your knowledge, there was no AI or anything

24   like that in that file?

25   A.        That's correct.

PTRN-STARK_000442

1   Q.        And so the last one, the fourth file, this is another

2   one where the company did not view the file before it was sent

3   to NCMEC; is that fair to say?

4   A.        That's correct.

5   Q.        And this was a -- was it a Facebook profile or

6   something like that?

7   A.        I'm sorry, was the uploaded file information?

8   Q.        Yes.

9   A.        Yes, it indicates that this is the profile picture

10  for the account.

11  Q.        Okay.  And it appears it says were the entire

12  contents of the uploaded file publicly available and it says

13  yes.  What does that mean?  Because, I mean, certainly, some

14  Facebook accounts, you have to let the person be your friend or

15  whatever to become publicly available.  Are you aware if that

16  was something that's actually out there or was that something

17  that was sort of within the Facebook account of that Facebook

18  holder?

19  A.        I'm sorry, is your question pertaining to this

20  particular account or just accounts in general?

21  Q.        Well, just to that picture.  It appears it's a

22  profile picture, but do you know if that profile picture was

23  actually publicly available or was that something you had to

24  have like a extra access to view it?

25  A.        Well, I don't know what the settings were for this

PTRN-STARK_000443

1    account, but based on this report, it indicates that the file

2    was publicly available.

3    Q.        But you never -- you didn't independently review that

4    to see if it actually was publicly available?

5    A.        No.

6    Q.        Okay.

7              MR. SUMMERS:  Your Honor, may I have a moment?

8              THE COURT:  Yes, you may.

9              (Pause.)

10             MR. SUMMERS:  Your Honor, I have no further

11   questions.

12             THE COURT:  Redirect?

13             MS. VIACAVA:  At this time, I would publish

14   Government's Exhibit No. 2 that's been admitted into evidence.

15             (Pause.)

16             MS. VIACAVA:  It doesn't appear that -- I'm sorry,

17   when I closed the lid, it must have shut down.  Just one

18   moment.

19             THE COURT:  Okay.

20             THE DEPUTY CLERK:  I think we got you once you log

21   in.

22             (Pause.)

23             MS. VIACAVA:  I apologize, it's my mistake.  I may

24   have actually, instead of the escape key, hit the power.

25             THE COURT:  Okay, go ahead.

PTRN-STARK_000444

1    evidence.

2    Q.        As Government's Exhibit No. 1, is this a copy of the

3    CyberTipline report that you received that relates to this

4    particular case?

5    A.        Yes, it is.

6    Q.        And is this -- the nature of this report, is it

7    consistent with the previous reports you have seen?

8    A.        Yes.

9    Q.        And does it have designated sections or information

10   provided?

11   A.        Yes, it does.

12   Q.        Based on your training and experience, for what

13   purpose is this National Center of Missing and Exploited

14   tipline report provided to law enforcement?

15   A.        This is used for a social media platform that

16   distributes or transmits or uploads child pornography.

17   Q.        Well, not the platform, but a user on the platform?

18   A.        The user on the platform; correct.

19   Q.        So is there procedures in effect for internet service

20   providers or electronic service providers to report any

21   instances of child pornography or child exploitation materials

22   to the National Center of Missing and Exploited Children?

23   A.        Yes, there is.

24   Q.        And, in fact, are you aware of whether or not there

25   is a law that requires internet service providers to provide

PTRN-STARK_000459

1  information to the National Center of Missing and Exploited

2  Children?

3  A.        Yes, there is.

4  Q.        And under what circumstances, based on your training

5  and experience, are these CyberTips provided to the National

6  Center of Missing and Exploited Children?

7  A.        Well, there's different ways.  Each social media

8  platform has different ways to report it.  They have hash marks

9  for images that are -- that they have, at one point in time,

10  designated as child pornography.  And each one of these social

11  media platforms has databases which they store that in after

12  they verified that it is, in fact, child pornography and

13  they're responsible by law to run the information that people

14  are using through their PSN to see if it is not child

15  pornography and they're mandated to report that.

16  Q.        Well, to be clear, are they mandated to search for

17  child pornography or are they mandated to report if they find

18  it?

19  A.        They're mandated to report if they find it.

20  Q.        Okay.  So, once they became aware of something on

21  their product or service, they are then required to report it?

22  A.        Correct.

23  Q.        So and are they required to report -- are they

24  required to provide the material or the image file or video

25  file that they find --

PTRN-STARK_000460

1    A.       Yes.

2    Q.       -- that they believe to be child pornographic?

3    A.       Correct.

4    Q.       Are there also required to provide information

5    regarding the individual or user that was responsible for

6    uploading the material or receiving material?

7    A.       Yes.

8             MR. SUMMERS:  Objection.  Leading question.

9             THE COURT:  Go ahead and rephrase.

10           MS. VIACAVA:  Okay.

11           THE COURT:  Sustained.

12           BY MS. VIACAVA:

13    Q.       By law, to be in compliance with the law,

14    specifically, Title 18 United States Code Section 2258(a), is

15    there designated information that these internet service

16    providers are required to provide to the National Center of

17    Missing and Exploited Children?

18    A.       Yes, there is.  They're supposed to give a complete,

19    overall view of what's going on with that account with the

20    child pornography.

21    Q.       Are they required to provide identifying information?

22    A.       Yes.

23    Q.       What is included or what is usually provided with

24    identifying information for the individual?

25    A.       The initial information like a screen name, IP

PTRN-STARK_000461

1    address, contact information, the images that are -- that they

2    identified as the child pornography.  And, particularly, in

3    conversations, they have to be complete and give, like, a full

4    snapshot of what happens.  So that's why they may give more or

5    less images that are surrounding that one.

6    Q.        And are they required to give a geographic location?

7    A.        Yes.

8    Q.        Okay.  And so, once this information is provided to

9    the National Center of Missing and Exploited Children, does

10   that information then get sent out to a particular law

11   enforcement agency that may be in the suspect's area?

12   A.        Yes.

13   Q.        And is this how you received this particular

14   CyberTip --

15   A.        Correct.

16   Q.        -- that's in front of you on the screen, Government's

17   Exhibit No. 1?

18   A.        Yes.

19   Q.        Looking at the CyberTip, did it provide information

20   regarding the suspect?

21   A.        Yes, it did.

22   Q.        And what information was provided?

23   A.        The name as Junior Martinez, the date of birth,

24   approximate age, an email address, a screen name address, ESP

25   user ID, profile, IP address of the time of log-in and an IP

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PTRN-STARK_000462

1    address of time of a transmission.

2    Q.        And, under additional information, what's provided?

3    A.        It says estimated location on January 24, 2021, Lee

4    County -- Lehigh Acres, Florida, United States.

5    Q.        And is Lehigh Acres, Florida, in the territory of the

6    Middle District of Florida?

7    A.        Yes, it is.

8    Q.        Okay.  And, looking at the email address that's

9    provided, does that indicate that that information was verified

10   at some point by the provider?

11   A.        Yes, it does.

12   Q.        And, in this report, does it indicate who the

13   submitter is for the report?

14   A.        Yes, it does.

15   Q.        And what information is provided as to who provided

16   this CyberTip?

17   A.        Facebook.

18   Q.        Have you had previous occasions of dealing with

19   CyberTips provided specifically by Facebook?

20   A.        Yes, I have.

21   Q.        And, based on your training and experience, have you

22   found that information that is reported has been reliable?

23   A.        Yes.

24   Q.        When Facebook, specifically, as an internet service

25   provider identifies the contents of a file, have you had

1    occasions to look at the contents of the file to determine if,

2    in fact, it is consistent with what they've reported?

3    A.        Yes, I have.

4    Q.        And have you found their categorization or their

5    reporting of a file to be reliable?

6              MR. SUMMERS:  Objection, Your Honor.  Leading.

7              THE COURT:  Overruled.

8              BY MS. VIACAVA:

9    Q.        You can answer the question.

10   A.        Yes, they're very accurate.

11   Q.        And, on this particular report, does it indicate what

12   the incident involved?

13   A.        Yes, child pornography possession, manufacture, and

14   distribution which occurred on 1/23/2021 at 17:25:15 UTC.

15   Q.        So the incident type involved child pornography;

16   correct?

17   A.        Yes.

18   Q.        Okay.  And did it provide information as to where the

19   upload occurred?

20   A.        Yes.

21   Q.        And what was the service that Facebook identified as

22   where the upload occurred?

23   A.        It was a Messenger.

24   Q.        And do you have any training and experience regarding

25   the Messenger service of Facebook?

PTRN-STARK_000464

1    A.        Yes.

2    Q.        What type of service or program is Messenger?

3    A.        Messenger is a program or -- that Facebook provides

4    that you can do one-on-one conversations with somebody instead

5    of being publicly and you can communicate back and forth via

6    this service.

7    Q.        Okay.  And does it allow you to do -- what kind of

8    activities does it allow you to do when you're using Messenger?

9    A.        You can write each other messages or talk about stuff

10   and send images back and forth.

11   Q.        And, in this particular report, did it provide how --

12   or how many files that Facebook provided?

13   A.        Yes, four.

14   Q.        Now, at the time that you received this CyberTip

15   report, what did you do with this report?  How did you review

16   it, what actions did you take?

17   A.        Well, I look at the time that the uploads happened.

18   I also look at the suspect information and I look at the

19   categorization of the image that they sent us.

20   Q.        So, in this instance, there were four files.

21   A.        Correct.

22   Q.        In looking at the report, was your attention drawn to

23   any particular file?

24   A.        Yes, the one that was marked A1.

25   Q.        Why was your attention drawn to that particular file?

PTRN-STARK_000465

1    A.        Because the categorization as an A1, which would be

2    prepubescent child engaging in some type of sex act.

3    Q.        And are you familiar with that categorization?

4    A.        Yes, I am.

5    Q.        And does the NCMEC CyberTip report also provide

6    specification as to what that A1 designation or category

7    signifies?

8    A.        Yes, the definitions are listed within the report.

9    Q.        Okay.  And what is the purpose of the National Center

10   for Missing and Exploited Children providing this information

11   to law enforcement?

12   A.        It shows, at some point in time, they viewed that

13   image and they categorized it as part of the definition that

14   they have on the CyberTip.

15   Q.        And when you saw this A1 designation, what did you

16   believe or what did you think at that particular time?  Or did

17   it signify anything to you?

18   A.        That this image was that of a prepubescent child

19   engaging in some type of sexual act with an adult.

20   Q.        Does this report indicate who categorized that as

21   being A1?

22   A.        Yes, it says the ESP, which would be Facebook.

23   Q.        So, in this instance, with Facebook being the

24   individual or the entity that categorized the file, what, if

25   anything, did you think about the contents of the file?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

1    A.         That this was a legitimate child-on-adult child

2    pornography that was classified A1, which is the worst.

3    Q.         And did you have reason to believe that Facebook was

4    aware of the contents at that time?

5    A.         Yes, because they categorized it.

6    Q.         And, looking at the next page involved with that same

7    file, did it provide any additional information regarding that

8    particular file that they categorized at A1?

9    A.         Yes, it said when it was uploaded and it had part of

10   the conversation between the two individuals.

11   Q.         And does it provide where this information was found?

12   A.         Yes, in the Messenger.

13   Q.         Does it indicate Messenger thread?

14   A.         What was the question?

15   Q.         Does it indicate a Messenger thread?

16   A.         Yes.

17   Q.         And the Messenger thread that's provided, the

18   messenger thread name, is that the same entity that was

19   reported in the report as being the recipient?

20   A.         Yes.

21   Q.         After looking at this information provided, what

22   action, if any, did you take at that point?  Did you have any

23   belief as to what that file would contain?

24   A.         Yeah, due to the categorization, it was classified as

25   an A1, which is child pornography, some type of child engaging

PTRN-STARK_000467

1    in some type of sex act.  I opened it up to see if there was

2    any identifying children in there that I can further my

3    investigation.

4    Q.        And did you also open the file to verify the content?

5    A.        Yes.

6    Q.        And what did you find when you looked at the file?

7    A.        This was a prepubescent child engaging in sexual

8    activity with an adult.

9    Q.        And was that consistent with the categorization

10   provided by Facebook of being A1?

11   A.        Yes.

12   Q.        And, prior to opening that file, did you have reason

13   to believe that that's what would be contained in the file?

14   A.        Yes, due to the categorization of the file by

15   Facebook.

16   Q.        In addition, did you take any other steps or look at

17   any other materials that were provided by Facebook?

18   A.        Yes, I did.

19   Q.        What did you then do?

20   A.        I looked at the other three images that they

21   provided.

22   Q.        Did you look at them in any particular order?

23   A.        I looked at the Facebook, I believe, photo first,

24   then the video, and then the still image.

25   Q.        Okay.  So the first one you looked at was the one

PTRN-STARK_000468

1   blocks of IP addresses that only assign a given IP address to

2   one customer at a time.  Your affiant knows that these IP

3   addresses can assist law enforcement in finding a particular

4   computer on the internet.  Once an IP address is known, a

5   subpoena can be issued to the appropriate ISP for business

6   records related to the subscriber assigned to that IP address

7   at a particular time and date.  The ISP will typically provide

8   information concerning the name, address, and other identifying

9   information of the subscriber using the particular ISP.  This

10  process has proven to be very reliable in identifying suspects

11  using the internet in many different types of investigations,

12  including online child exploration.  One way --

13  Q.       Exploitation.

14  A.       Exploitation.  Sorry.

15           One way in which reports of possible sexual

16  exploration --

17  Q.       Exploitation?

18  A.       -- exploitation of children are received by law

19  enforcement is through a process known as CyberTips.

20  Q.       And so, in your affidavit, do you provide information

21  regarding CyberTips?

22  A.       Yes.

23  Q.       All right.  Please continue reading.

24  A.       The National Center for Missing and Exploited

25  Children, N-C-M-E-C, or NCMEC, accepts reports regarding the

PTRN-STARK_000478

1    sexual exploration of children.  These reports are called

2    CyberTips and can be made by anyone through one of most common

3    types of CyberTips receiving regarding the internet exploration

4    of children comes --

5    Q.         Exploitation?

6    A.         -- exploitation of children comes from large

7    electronic service providers or ESPs such as online-based

8    social media platforms or cloud storage companies like

9    Microsoft SkyDrive.  NCMEC works with the ICAC task force and

10   forwards CyberTips to the appropriate ICAC commander based on

11   the geographical location determined by the IP addresses -- or

12   IP address assigned to the suspect.  The ICAC commander then

13   assigns the cases or case to the appropriate ICAC affiliate

14   based on jurisdiction.  CyberTip reports frequently contain

15   information concerning the suspect user account, the IP address

16   of the suspect at the time of the relevant activity, and copies

17   of the content that is being reported as unlawful.  This

18   information is provided by NCMEC directly from the ESP.  Your

19   affiant has received and investigated numerous CyberTips and

20   found the information to be reliable and accurate.  Your

21   affiliate has -- or have searched -- conducted search warrants

22   based on this information has found to be reliable and

23   accurate.

24   Q.         And, specifically, in your affidavit, did you provide

25   information regarding your training and experience as well as

PTRN-STARK_000479

1    probable cause?

2    A.        Yes, ma'am.

3    Q.        And, specifically, in this particular section of page

4    7 of Government's Exhibit No. 4A, did you provide information

5    regarding where you got the information from?

6    A.        Yes, I did.

7    Q.        Can you please read the sentence or the paragraph?

8    A.        On January 24, 2021, the National Center of Missing

9    and Exploited Children, NCMEC, received a tip from Facebook of

10   possession, manufacture, and distribution of child sexual abuse

11   material.  On March 1, 2021, this tip was assigned to the Lee

12   County Sheriff's Office, under CFS number 21-100307, to

13   Detectives Baricelli and Ridenour.

14   Q.        And, in this particular paragraph, please read what's

15   contained in your affidavit.

16   A.        Detectives Baricelli and Ridenour reviewed the tip as

17   well as the four uploaded images and/or videos.  Detectives

18   determined that at least one of the videos were child

19   exploration -- child sexual exploration material through their

20   training and experience.

21             MS. VIACAVA:  I may need the record to reflect that

22   most of what's read is child exploitation --

23             THE WITNESS:  Child exploitation, I'm sorry.

24             MS. VIACAVA:  -- instead of exploration.

25             THE WITNESS:  Sorry.

PTRN-STARK_000480

1          MS. VIACAVA:  I just want to make clear what the

2     actual document, what it says.

3          (Pause.)

4          BY MS. VIACAVA:

5     Q.        And, in there, did you provide information regarding

6     identifying user information that came from Facebook?

7     A.        Yes, I did.

8     Q.        And did that include the name that Facebook had as

9     well as the email address associated with the account?

10    A.        Yes, it did.

11    Q.        And did you provide information regarding the IP

12    address that was also provided by Facebook?

13    A.        Yes, I did.

14    Q.        And, specifically, did you provide the IP address

15    that was captured on January 23, 2021?

16    A.        Yes, I did.

17    Q.        And, in your affidavit, you indicate that one of the

18    videos contains child sexual exploitative material; correct?

19    A.        Yes.

20    Q.        And did you provide a description of that one file?

21    A.        Yes, I did.

22    Q.        Is that the only file that you described?

23    A.        Yes.

24    Q.        That was the only file that you provided towards

25    probable cause; correct?

PTRN-STARK_000481

1    A.        Yes.

2    Q.        You didn't provide descriptions of either of the

3    other files?

4    A.        No, ma'am.

5    Q.        You acknowledged you looked at them, but you didn't

6    rely upon them?

7    A.        Yes.

8    Q.        And can you please read the description of this video

9    that you provided in your affidavit?

10   A.        A 1.54-minute video depicting a nude adult male

11   standing over a prepubescent female who is nude from the waist

12   down.

13   Q.        And do you continue to provide descriptive

14   information about the video?

15   A.        Yes.

16   Q.        And, in your description, does it provide sexually

17   explicit conduct involving that minor?

18   A.        Yes, it does.

19   Q.        And does your description indicate that it's a

20   prepubescent minor?

21   A.        Yes.

22   Q.        And, by prepubescent, are you referring to a minor

23   that's 12 or under?

24   A.        Correct.

25   Q.        And is that the only description of a video file

1    provided from the NCMEC tip that you included?

2    A.       Yes.

3    Q.       And that description that is provided in here, which

4    file was that from the NCMEC tip?

5    A.       That was the one that they classified as A1.

6    Q.       And the description you provided, although more

7    detailed, ultimately, did it provide the same general

8    categorization?

9    A.       Yes.

10   Q.       And, in your affidavit, did you provide information

11   as to how you located the residence to include getting

12   information from Comcast?

13   A.       Yes, I did.

14   Q.       And, in addition, in your probable cause -- in your

15   affidavit, did you provide information regarding information

16   you learned regarding the individual Heriberto Batista Montijo?

17   A.       Yes.

18   Q.       Specifically, did you include information

19   regarding -- I'm sorry, hold on -- regarding the DCF report?

20   A.       Yes, I did.

21   Q.       And what was your purpose in providing information

22   from the DCF report?

23   A.       Because it was directly related to the allegation of

24   child pornography.

25   Q.       Did it involve information or a complaint that was

1    made regarding inappropriate conduct with a minor?

2    A.        Yes.

3    Q.        And was it based on the description of the one video

4    as well as the Department of Children and Family Services

5    report that you relied upon in terms of providing probable

6    cause to the Court?

7    A.        Yes.

8    Q.        There were no other images or videos that was

9    detailed in the four corners of that affidavit?

10   A.        No.

11             THE COURT:  Counsel, before you move on to your next

12   line of questioning, are you finished questioning him about

13   this?  Then we're going to take our noon recess.  Or do you

14   want --

15             MS. VIACAVA:  I think I have two questions.

16             THE COURT:  Finish your thought.  Okay, go ahead.

17             MS. VIACAVA:  I have two questions and I'll be done

18   with this exhibit.

19             BY MS. VIACAVA:

20   Q.        And, ultimately, what's displayed on the screen, does

21   it, again, just reference the file that you've described as

22   well as a DCF report?

23   A.        Yes, it does.

24   Q.        And that was the information relied upon in order to

25   obtain a search warrant?

PTRN-STARK_000484

1    A.        Yes, it was.

2    Q.        And did you, in fact, obtain a search warrant for the

3    residence?

4    A.        Yes, I did.

5    Q.        And what date did you submit your affidavit for the

6    search warrant?

7    A.        May 13, 2021.

8            MS. VIACAVA:  This is a good stopping place, Your

9    Honor.

10           THE COURT:  All right, thank you.  Then we're going

11   to go ahead and take our afternoon recess.  We'll be in recess

12   until 1:25.

13              (Luncheon recess taken at 12:24 p.m.)

14                    AFTERNOON SESSION

15                 (Time noted:  1:26 p.m.)

16           THE COURT:  All right, let the record reflect the

17   defendant is present in court with counsel, the interpreters

18   are present, and the witness is on the witness stand.  The

19   government is in the midst of the direct examination so you may

20   proceed.

21           Mr. Potter, we don't have any ETA on the plea at this

22   point yet.

23              (Pause.)

24           THE COURT:  All right.

25           MS. VIACAVA:  Your Honor, at this time, the

1    government would seek to -- I believe we left off with the end

2    of the previous search warrant.  At this time, the government

3    would seek to publish Government's Exhibit No. 5, and just for

4    clarification, the government did file an amended exhibit list

5    in which we listed No. 6 that was admitted into evidence so

6    that has been filed.

7              THE COURT:  Okay, thank you.  And you may publish 5A

8    and B, if you wish, or --

9              MS. VIACAVA:  At this time, the government would

10   publish government's 5A.

11             BY MS. VIACAVA:

12   Q.        After you obtained the search warrant for the

13   residence, did you, in fact, execute the search warrant for the

14   residence in Lehigh Acres?

15   A.        Yes.

16   Q.        And, in so doing, did you find any evidence that was

17   seized pursuant to the search warrant?

18   A.        Yes.

19   Q.        Briefly, what did that evidence include?

20   A.        It was computers, phones, and particularly a

21   surveillance camera.

22   Q.        A surveillance camera that was found where in the

23   residence?

24   A.        In a common area within the residence.

25   Q.        And it was a security camera inside the facility,

PTRN-STARK_000486

1   though, not on the outside, it was inside?

2   A.        Correct.  Correct, yes.

3   Q.        Okay.  And, in addition to seizing that evidence, did

4   you come into contact with Mr. Heriberto Batista Montijo on

5   that day?

6   A.        Yes, I did.

7   Q.        Was he at the residence?

8   A.        No, he was not.

9   Q.        And did you have an occasion to contact Mr. Heriberto

10  Batista Montijo?

11  A.        Yes, I did.

12  Q.        How did you contact him?

13  A.        Via phone.

14  Q.        Okay.  And, after contacting him on the phone, did

15  you identify yourself?

16  A.        Yes, I did.

17  Q.        And did Mr. Heriberto Batista Montijo agree to meet

18  with you?

19  A.        Yes, he did.

20  Q.        And where did you agree to meet?

21  A.        It was outside the Stonybrook community in Estero.

22  Q.        Now, you indicated previously that Government's

23  Exhibit No. 4A and 4B, the affidavit for search warrant as well

24  as the search warrant, that was obtained on May 13, 2021?

25  A.        Correct.

PTRN-STARK_000487

1    Q.        And when was it executed?

2    A.        I believe it was the same day.

3    Q.        So on or about May 13, 2021?

4    A.        Correct.

5    Q.        And is that the date that you made arrangements to

6    meet with Mr. Heriberto Batista Montijo?

7    A.        That is correct, yes.

8    Q.        Okay.  And did you, in fact, meet with him in Lee

9    County, Florida?

10   A.        Yes, I did.

11   Q.        At the time that you met with Mr. -- the defendant in

12   this case, Mr. Montijo, did you have an occasion to seek out

13   any additional evidence?

14   A.        Yes.

15   Q.        Were you searching for anything additionally?  You

16   executed the search warrant in the house.

17   A.        Yes, I did.  And that was his personal cell phone

18   that was he was using at the time.

19   Q.        His cell phone as well as were you seeking his

20   vehicle?

21   A.        Well, yeah, we were looking for his vehicle because

22   during -- while we were talking to him, he says he left his

23   cell phone in his vehicle.

24   Q.        Okay.  Well, going back.

25   A.        Okay.

1

2                     CERTIFICATE OF REPORTER

3

4    UNITED STATES DISTRICT COURT )

5    MIDDLE DISTRICT OF FLORIDA    )

6

7         I, Stacey E. Raikes, RMR, CRR, Official Court

8    Reporter for the United States District Court, Middle District

9    of Florida, do hereby certify, pursuant to Section 753, Title

10   28, United States Code, that I was authorized to and did

11   stenographically report the foregoing proceedings; and that the

12   foregoing pages constitute a true and complete computer-aided

13   transcription of my original stenographic notes taken by the

14   undersigned in the above-entitled matter to the best of my

15   knowledge, skill, and ability.

16       I further certify that I am not a relative, employee,

17   attorney, or counsel of any of the parties, nor am I a relative

18   or employee of any of the parties' attorneys or counsel

19   connected with the action, nor am I financially interested in

20   the action.

21       IN WITNESS WHEREOF, I have hereunto set my hand at Fort

22   Myers, Lee County, Florida, this 14th day of December 2022.

23

24   _____
     STACEY E. RAIKES, RMR, CRR
25         Official Court Reporter

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PTRN-STARK_000563