# EXHIBIT 69

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    1

1   UNCERTIFIED ROUGH DRAFT TRANSCRIPT

2

3   THE STENOGRAPHIC NOTES TAKEN IN THIS DEPOSITION

4   PROCEEDING ARE BEING TRANSLATED INSTANTANEOUSLY INTO

5   THEIR ENGLISH EQUIVALENTS THROUGH AN AUTOMATIC

6   PROCESS CALLED REALTIME TRANSLATION.

7

8   AS A RESULT, A REALTIME ROUGH DRAFT IS AVAILABLE TO

9   ALL COUNSEL AT A PREDETERMINED CHARGE.  YOU MAY

10   RECEIVE THIS REALTIME ROUGH DRAFT IN ASCII FORM

11   THROUGH EMAIL.

12

13   THE REALTIME DRAFT IS UNEDITED AND UNCERTIFIED AND

14   MAY CONTAIN UNTRANSLATED STENO, AN OCCASIONAL

15   REPORTER'S NOTE, A MISSPELLED PROPER NAME AND/OR

16   NONSENSICAL ENGLISH WORD COMBINATIONS.  AS SUCH, THE

17   REALTIME DRAFT IS INTENDED ONLY FOR THE PURPOSE OF

18   AUGMENTING COUNSEL'S NOTES AND IS NOT INTENDED TO BE

19   USED OR CITED IN ANY COURT PROCEEDING.  ALL SUCH ENTRIES

20   WILL BE CORRECTED ON THE FINAL CERTIFIED

21   TRANSCRIPT UPON ITS DELIVERY TO YOU IN ACCORDANCE

22   WITH STANDARD DELIVERY TERMS, OR ON AN EXPEDITED

23   BASIS SHOULD YOU DESIRE FASTER DELIVERY.

24

25

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                              2

1  November 7, 2023

2                    P R O C E E D I N G S

3                         -o0o-

4            VIDEOGRAPHER:  Good morning.  We are going

5  on the record on November 7, 2023 at 9:41 a.m.  This is

6  the recorded deposition of Judd Oostyen in the matter

7  of Brayden Stark versus Patreon, Inc., filed in the

8  United States District Court, Northern District of

9  California, San Francisco division.  The case number is

10  322-cv-03131-JCS.  The location of this deposition is

11  at Ray Quinney & Nebeker in Salt Lake City, Utah.

12            My name is Stewart Smith.  I'm the

13  videographer.  The court reporter is Abby Johnson.

14            Will the counsel please state their names

15  and who they represent for the record.

16            MR. WALKER:  My name is Nathan Walker, and

17  I'm with the Norton Law Firm.  And I represent

18  Defendant Patreon in the litigation.  And I'm here with

19  my colleague Celine Purcell, also with the Norton Law

20  Firm also representing Patreon.

21            MR. GAA:  Reid Gaa from Girard Sharp on

22  behalf of the plaintiff along with my colleague,

23  Anthony *Regari.

24            VIDEOGRAPHER:  Thank you.  Will the court

25  reporter please swear in the witness.

            ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    3

 1  Thereupon --

 2                    JUDD OOSYTEN,

 3   was called as a witness, and having been first duly

 4   sworn to tell the truth, the whole truth, and nothing

 5            but the truth, testified as follows:

 6            VIDEOGRAPHER:  Thank you, you may proceed.

 7                    EXAMINATION

 8  BY MR. WALKER:

 9       Q.    Good morning.  My name is Nathan walker.

10  And I'm an attorney.  And I represent Patreon in this

11  litigation.  And I'm going to be asking you some

12  questions here today?

13       A.    Mm-hmm.

14       Q.    Okay?

15       A.    Yeah.

16       Q.    Would you please state your name for the

17  record?

18       A.    My name is Judd Oostyen.

12        A.    A handful of pages.

13        Q.    These are documents that came -- that were

14 provided to you by your counsel?

15        A.    Yes.

16        Q.    Okay.  Other than those documents, are you

17 able to identify any documents that you reviewed to

18 prepare for your deposition here today?

19        A.    Not -- nothing else other than I have

20 already done so.

21        Q.    Okay.  So when this lawsuit was filed,

22 there were three additional plaintiffs other than

23 yourself.

24              Do you understand that?

25        A.    Yes.

                ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    17

1         Q.    Do you know the names of any of those other

2 three plaintiffs?

3         A.    Only -- the only one I remember is Brayden

4 Stark.  The other two I can't say I remember.

5         Q.    Have you ever met Brayden Stark?

6         A.    No.

7         Q.    Have you ever spoken with Brayden Stark?

8         A.    Nope.

9        Q.    Did you ever meet with either the other two

10   named plaintiffs?

11       A.    No.

12       Q.    Did you ever speak with either of the other

13   two named plaintiffs?

14       A.    No.

15       Q.    Have you ever communicated with Brayden

16   Stark by any means?

17       A.    No.

18       Q.    So you have filed a complaint in a lawsuit

19   against Patreon correct?

20             MR. GAA:  Objection to form.

21             THE WITNESS:  Yes and no.

22   BY MR. WALKER:

23       Q.    What's the "no"?

24       A.    Not would be not me personally.  The yes is

25   in tandem with counsel.

              ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    18

1        Q.    Fair enough.  You are a named plaintiff in

2    a lawsuit against Patreon; correct?

3        A.    Yes.

4        Q.    What do you understand the lawsuit to be

5    about?

6        A.    I understand that it's about my personal

7   information being shared from Patreon to Meta via the

8   Metapixel.

9        Q.    What person information?

10            MR. GAA:  Objection to form.

11            THE WITNESS:  Namely my Facebook videos and

12  videos watched on Patreon's platform.

13  BY MR. WALKER:

14       Q.    Any other personal information?

15            MR. GAA:  Objection to form.

16            THE WITNESS:  Not that I can specifically

17  remember.

18  BY MR. WALKER:

19       Q.    Mr. Oostyen, do you believe that you have

20  suffered injury as a result of any disclosure of your

21  Facebook ID and videos that you watched on Patreon to

22  Meta?

23            MR. GAA:  Objection to form.

24            THE WITNESS:  Yes.

25  BY MR. WALKER:

             ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                19

1        Q.    How?

2        A.    Being a particularly private individual,

3   it's not something I would have elected to have done.

4        Q.    How have you been injured?

5              MR. GAA:  Objection to form.

6              THE WITNESS:  Could you expand on the

7  question?

8  BY MR. WALKER:

9        Q.    So you told me that you believe you've been

10  injured --

11       A.    Mm-hmm.

12       Q.    -- as a result of Patreon's alleged

13  disclosure of perm information of yours to Meta;

14  correct?

15       A.    Yes.

16       Q.    And you told me that the personal

17  information that you believe was disclosed was your

18  Facebook ID and videos that you watched on Patreon;

19  correct?

20       A.    Mm-hmm.

21       Q.    And then the question for you to:  Do you

22  believe you've been injured as a result of that alleged

23  disclosure of information from Patreon --

24       A.    Mm-hmm --

25       Q.    -- to Meta?

                ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

        ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    20

1        A.    It's -- it's hard to quantify in a way that

2  I've been injured because it's not -- it's not

3  necessarily information that you wanted a third party

4  to have.

5        Q.   Do you believe you've been injured as a

6  result of that alleged disclosure?

7        A.   Yes.

8        Q.   How have you been injured?

9        A.   I'm not entirely sure.

10       Q.   Mr. Oostyen, what was the value -- strike

11 that.

12            You've told me that you believe that

13 Patreon disclosed to Meta your Facebook ID and videos

14 that you watched on Patreon; correct?

15       A.   Yes.

16       Q.   And that's your personal information in

17 your view; correct?

18       A.   Yes.

19       Q.   What was the value of that information

20 prior to when you believed Patreon disclosed it to

21 Meta?

22            MR. GAA:  Objection to form.

23            THE WITNESS:  As far as a -- I want to say

24 a monetary value, I personally am unfit to -- to

25 calculate that amount, but as far as a personal value,

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

1  all of my personal information is something that I

2  can't quantify or specifically define, but is

3  infinitely value to me.

4  BY MR. WALKER:

5      Q.    What was the value of the -- before the

6  time --

7      A.    Mm-hmm.

8      Q.    -- you believe Patreon disclosed your

9  personal information to Meta --

10     A.    Mm-hmm.

11     Q.    -- what was the value of the information

12 that you believe was disclosed?

13         MR. GAA:  Objection to form.

14         THE WITNESS:  That's -- that's something

15 that I'm unfit to quantify but either -- either now or

16 in the future counsel will retain an expert who can do

17 that.

18 BY MR. WALKER:

19     Q.    Do you believe the -- the information had

20 value before the time you believe Patreon disclosed it

21 to Meta?

22         MR. GAA:  Objection to form.

23         THE WITNESS:  Yes.

24  BY MR. WALKER:

25       Q.    Do you believe the value of that

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    22

1  information has been or was diminished as a result of

2  Patreon's disclosure of it to Meta?

3       A.    Again, something I -- I'm not fit to

4  calculate, but as I stated before --

5       Q.    So whether or not your fit to calculate --

6       A.    Mm-hmm.

7       Q.    -- how much has been diminished, do you

8  believe it has been diminished.

9            MR. GAA:  Objection to form.

10           THE WITNESS:  I guess I wouldn't -- I

11 wouldn't know.

12 BY MR. WALKER:

13      Q.    Has anybody ever offered you any money for

14 that information before this lawsuit?

15      A.    No.

16      Q.    Have you ever tried to place a value on

17 that information prior to this lawsuit?

18           MR. GAA:  Objection to form.

19           THE WITNESS:  I -- not monetarily.

20 BY MR. WALKER:

21      Q.    Has anyone tried to place a value on that

22   information prior to this lawsuit by any other means?

23              MR. GAA:  Objection to form.

24              THE WITNESS:  The only individual would be

25   myself personally, and personal value is immense.

                 ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    23

 1   BY MR. WALKER:

 2        Q.    Mr. Oostyen, you've told me that you

 3   believe Patreon disclosed your Facebook ID and videos

 4   you watched on Patreon to Meta; correct?

 5        A.    Yes.

 6        Q.    Are there more people who know that

 7   information about you than did before Patreon

 8   purportedly disclosed that information to Meta?

 9              MR. GAA:  Objection to form.

10              THE WITNESS:  Yes.

11   BY MR. WALKER:

12        Q.    Who?

13        A.    I'm sorry.  I may have misunderstood your

14   last question.

15        Q.    You've told me that you believe Patreon

16   disclosed --

17        A.    Mm-hmm.

18        Q.    -- your Facebook ID and videos you watched

19   on Patreon --

20         A.    Mm-hmm.

21         Q.    -- to Meta?

22         A.    Yes.

23         Q.    Correct.

24         A.    Yes.

25         Q.    Are there more people who know that

                 ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    24

1   information than did before Patreon purportedly

2   disclosed it to Meta?

3         A.    Yes, I would assume yes.

4         Q.    What would that assumption be based on?

5         A.    It would be based on whoever may be over --

6   receiving the information from Patreon or from the

7   Metapixel at Meta.

8         Q.    Do you have any basis to believe that an

9   actual human being has ever seen your Facebook ID and

10  the videos you watched on Patreon at Meta?

11              MR. GAA:  Objection to form.

12              THE WITNESS:  No.

13  BY MR. WALKER:

14        Q.    I will restate it just to make sure that

15  the form was correct.

16              Do you believe -- strike that.

17          Do you have any basis to believe that any

18   human being at Meta has ever seen or looked at or

19   actually accessed your Facebook ID and videos that you

20   watched on Patreon?

21          A.    This, I wouldn't know.  So, no.

22          Q.    Does it matter to you whether any human

23   being at Meta ever actually looked at the data?

24          A.    No.

25          Q.    Why not?

              ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

1          A.    Because they -- they have other systems and

2    way to analyze and utilize that data.

3          Q.    What are -- what are those systems?

4          A.    I don't know.  I know that they use

5    personal information similar to that for advertising

6    purposes and -- and whatnot.

7          Q.    Do you have any basis to believe that Meta

8    has actually used your Facebook ID and the videos you

9    watched on Patreon?

10          A.    No.

11          Q.    Mr. Oostyen, you have a Patreon account;

12   correct?

13          A.    Yes.

14        Q.    You created your Patreon account in 2021;

15   correct?

16        A.    I can't remember the -- the exact time

17   frame in which I made it.

18        Q.    Did you create your Patreon account in

19   early 2021?

20        A.    I can't remember when.

21        Q.    Fair enough.  Sometime in 2021 you created

22   your Patreon account; correct?

23        A.    Again, I don't remember.  I don't remember

24   the exact time frame.

25              (Exhibit No. 1 was marked

                 ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    26

1                    for identification.)

2    BY MR. WALKER:

3         Q.    All right.  I'm going to hand you what has

4    been marked Exhibit No. 1.  This is Defendant's Exhibit

5    No. 1?

6         A.    Mm-hmm.

7               MR. WALKER:  Reid, this is the same exhibit

8    that was used in Mr. Stark's deposition.

9               Do you need a copy?

10              MR. GAA:  If you have an additional one,

11   that would be great.  Thank you.

7  2021?

8       A.    Yes.

9       Q.    Why did you create your Patreon account?

10      A.    To support a creator I was interested in

11  supporting.

12      Q.    Which creator?

13      A.    I believe it is a creator that goes by the

14  name of "Worthy Kids. "

15      Q.    How did you first hear of worthy kids?

16      A.    YouTube.

17      Q.    Did you view worthy kids content on

18  YouTube?

19      A.    Yes.

20      Q.    And you viewed worthy kids content on

21  YouTube before you created your Patreon account?

22      A.    Yes.

23      Q.    You said that you wanted to support a

24  creator that you were interested in; correct?

25      A.    Yes.

              ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    29

1       Q.    What do you mean by support a creator?

2       A.    Subscribing monthly payments.

3       Q.    And after you created your Patreon

4   account --

5        A.    Mm-hmm.

6        Q.    -- did you subscribe to Worthy Kids on

7   Patreon?

8        A.    Yes.

9        Q.    And did you -- over what period of time --

10  strike that.

11             Over what period of time did you subscribe

12  to Worthy Kids on Patreon?

13       A.    I don't remember an exact period of time.

14  I know it was for several months, but I was going

15  through a lot of that time and lost track of payments.

16       Q.    To prepare for your deposition here today,

17  did you look at any documentations related to what

18  creators you did or did not subscribe to on Patreon?

19       A.    Yes.  I did look at some.

20       Q.    What documents were those?

21       A.    I don't remember what they are called.

22       Q.    Can you describe them for me?

23       A.    I believe there was a spreadsheet.  And

24  then there was also a series of old emails.

25       Q.    This spreadsheet you mentioned --

                ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    30


1        A.    Mm-hmm.

2      Q.     -- do you know where that spreadsheet came

3  from?

4      A.     I do believe I remember now that that one

5  was produced by Patreon.

6      Q.     Okay.  And then you mentioned old emails?

7      A.     Mm-hmm.

8      Q.     Were those your e-mails?

9      A.     Yes.

10     Q.     Did you look at any other documents related

11  to -- related to which creators you did or didn't

12  subscribe to on Patreon?

13             MR. GAA:  Objection to form.

14             THE WITNESS:  None that I remember.

15             MR. WALKER:  Counsel, we would ask that the

16  emails that the witness referred to here be produced to

17  the extent they haven't already.

18             MR. GAA:  Understood.  We will look into

19  that.

20  BY MR. WALKER:

21     Q.     You told me earlier you had watched Worthy

22  Kids's content on YouTube before you created your

23  Patreon account?

24     A.     Yes.

25     Q.     Do you have a Google account?

             ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    31

1          A.    Yes.

2          Q.    And when you watched video on YouTube, are

3   you logged into your Google account?

4          A.    Yes.

5          Q.    When you watched Worthy Kids content on

6   YouTube, did you ever comment on the content?

7          A.    I don't believe so.

8          Q.    Did you ever click a like button for the

9   content on YouTube?

10         A.    There is a possibility.

11         Q.    Have you ever viewed Worthy Kids's content

12  anywhere else other than on YouTube?

13         A.    Yes.

14         Q.    Where?

15         A.    Instagram and Patreon.

16         Q.    When you created your Patreon account, you

17  had to content to the Patreon terms of use; correct?

18         A.    Yes.

19         Q.    And in fact you did content to the Patreon

20  terms of use; correct?

21         A.    Yes.

22         Q.    Did you review the Patreon terms account --

23  strike that.

24          Have you ever reviewed the Patreon terms of

25  use?

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    32

1        A.    No.

2        Q.    Have you ever reviewed any portion of the

3  Patreon terms of use?

4        A.    No.

5        Q.    Whether or not you've reviewed any portion

6  of the Patreon terms of use, you agree that you

7  accepted them; correct?

8        A.    Yes.

9        Q.    And you agree that you're bound by them;

10  correct?

11       A.    Correct.

12       Q.    And if the Patreon terms of use contain a

13  consent to the disclosure of your information, you're

14  agreeing to that, too correct?

15             MR. GAA:  Objection to form.

16             THE WITNESS:  From what I understand, it

17  depends on the circumstances of the agreement.

18  BY MR. WALKER:

19       Q.    What is that understanding?

20       A.    That the concerning information that has

21  been shared, that that information required a separate

22   content.

23        Q.    Separate from?

24        A.    The terms of use.

25        Q.    Do you know whether the Patreon terms of

               ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

↟

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    33

1   use contain a content to the disclosure of your

2   information?

3        A.    No.

4        Q.    If the Patreon terms of use contain a

5   consent -- strike that.

6              If the Patreon terms of use disclose to you

7   that Patreon could disclose your information related to

8   your use of Patreon to third parties, would you drop

9   your complaint in this lawsuit against Patreon?

10        A.    No.

11        Q.    Why not?

12        A.    Again, to my understanding, the information

13   that was shared requires a separate form of consent.

14        Q.    And it's significant to you that there be a

15   separate form of consent?

16        A.    Yes.

17        Q.    Why?

18        A.    Because I -- it would give me the

19  opportunity to choose whether or not I consented to it

20  specifically.

21       Q.    But you didn't read the Patreon terms of

22  use?

23       A.    No.

24       Q.    You didn't check to see whether the Patreon

25  terms of use contained any consent to the disclosure of

                     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                          34

 1  your information?

 2       A.    That's correct.

 3       Q.    Do you understand that Patreon in addition

 4  to the terms of use also has a privacy policy?

 5       A.    Yes.

 6       Q.    Have you ever looked at the Patreon privacy

 7  policy?

 8       A.    I don't believe I did.

 9       Q.    Did you ever look at the Patreon privacy

10  policy before you filed this lawsuit?

11       A.    No.

12       Q.    Did you ever look at the Patreon privacy

13  policy after you filed this lawsuit?

14       A.    I don't think I did, no.

15       Q.    Do you understand that Patreon has a cookie

16  policy?

17      A.      Yeah.

18      Q.      Have you ever been looked at the Patreon

19 cookie policy?

20      A.      No.

21      Q.      Mr. Oostyen, you have a Facebook account;

22 correct?

23      A.      Yes.

24      Q.      And did you personally create your Facebook

25 account?

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    35

1       A.      Yes.

2       Q.      When?

3       A.      I don't remember exactly when.  It was --

4 the earliest that I can attest to is before 2016.

5       Q.      Is it your testimony you created your

6 Facebook account in 2016?

7       A.      It would be predating.

8       Q.      Some time before 2016?

9       A.      Yes.

10      Q.      Okay.  When you created your Facebook

11 account, you agreed to the Facebook terms of use;

12 correct?

13      A.      Yes.

14      Q.    Have you ever read any portion of the

15 Facebook terms of use?

16      A.    I don't believe so.

17      Q.    Do you know whether the Facebook terms of

18 use contains a consent that allows Facebook to disclose

19 your personal information related to your use of

20 Facebook?

21      A.    No, I don't know.

22      Q.    Do you know whether the Facebook terms of

23 use include disclosures about what information Facebook

24 collects about you when you're on the internet?

25      A.    Again, I don't know.

              ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                      36

1       Q.    You understand that on line platforms

2 sometimes update their terms of use --

3       A.    Yes.

4       Q.    -- correct?

5       A.    Yes.

6       Q.    In the last four years, have you ever

7 clicked on anything whereby you agreed to Facebook's

8 updated terms of use?

9             MR. GAA:  Objection to form.

10            THE WITNESS:  Not that I can recollect, but

11 most likely.

12  BY MR. WALKER:

13      Q.    Have you ever read any portion of

14  Facebook's updated terms of use?

15      A.    Not in detail.

16      Q.    Have you ever read any portion of

17  Facebook's terms of use at all?

18      A.    I may have skimmed one of the documents,

19  but, again, not in detail.

20      Q.    Do you actually recall skimming Facebook

21  terms of use?

22      A.    Not a specific date, but I do remember

23  looking over it once.

24      Q.    When was that?

25      A.    Most likely the last time I was asked to

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                           37

 1  accept an update.

 2      Q.    When was that?

 3      A.    I can't recall.

 4      Q.    Was it in the last year?

 5      A.    I believe so.

 6      Q.    Do you recall what portion of the Facebook

 7  updated terms that you looked at?

 8      A.    No.

9        Q.    Did you look to see whether the updated

10   Facebook terms of use contained any form of consent

11   that allowed Facebook or Meta to disclose your

12   information about your use of Facebook to others?

13        A.    No.

14        Q.    You didn't check?

15        A.    I didn't -- didn't check.

16        Q.    It wasn't important to you?

17             MR. GAA:  Objection to form.

18             THE WITNESS:  It was not what I was focused

19   on at that very moment.

20   BY MR. WALKER:

21        Q.    What were you focused on?

22        A.    Reactivating the Facebook account as I had

23   lost the password.

24        Q.    You told me earlier that you understand

25   that in order to did you say close your Facebook ID and

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                      38

1    the videos that you watched on Patreon, that the

2    consent would need to be in a separate form or

3    document.

4             Do you recall that testimony?

5        A.    Yes.

6        Q.    Mr. Oostyen, when you signed up for Patreon

7   in 2021 -- correct?

8         A.    Yes.

9         Q.    If Patreon had provided to you a form that

10  asks you to consent to allow Patreon to disclose your

11  video viewing history on Patreon to Meta, would you

12  have consented?

13              MR. GAA:  Objection to form.

14              MR. WALKER:  Strike that.

15  BY MR. WALKER:

16        Q.    If in 2021, when you signed up for your

17  Patreon account --

18        A.    Mm-hmm.

19        Q.    -- if Patreon had given you a separate form

20  or document under which you were given an opportunity

21  to consent to allow Patreon to disclose your video

22  viewing history on Patreon to Meta, would you have

23  consented?

24        A.    Most likely, no.

25        Q.    Why is that?

                ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    39

1         A.    I -- I would have likely read the document

2   or the agreement presented to me because I would have

3   found it unusual to receive the -- the second

2    A.    Around the -- the last two, two and a half

3 years, roughly.

4    Q.    When did you first talk steps to prevent

5 websites from installing cookies on your browser?

6    A.    It would have been some time in either 2020

7 or 2021.

8    Q.    Okay.  What did you do in -- what have you

9 done to prevent websites from installing cookies on

10 your browser?

11    A.    I guess it depends on the website itself.

12 Most of them have a little pop up, right, you can

13 accept, reject or -- fortunately some of them have now

14 have -- like, you can select how much, basically,

15 access to that ability they have.

16    Q.    Have you ever taken any steps with respect

17 to the settings on your browser to control what cookies

18 would be installed on your browser?

19    A.    Minimally.

20    Q.    What steps, if any, have you taken?

21    A.    None that I remember exactly.

22    Q.    Do you recall any?

23    A.    I do.  It's so long ago, I don't remember,

24 again, exactly what I did.

25    Q.    Okay.  How long ago?

                ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

1      A.    Again, that would have been probably 2021.

2      Q.    So you created your Patreon account in

3 2021; right?

4      A.    Yes.

5      Q.    And you were aware of the existence of

6 cookies at the time you created your Patreon account;

7 correct?

8      A.    Yes.

9      Q.    And when you created your Patreon account,

10 did you have an understanding one Waugh or the other as

11 to whether there were cookies that could be installed

12 on your browser by one website that would track what

13 you did on a different website?

14      A.    No.

15      Q.    Do you have an understanding about that one

16 Waugh or the other now?

17      A.    A very surface-level understanding.

18      Q.    What is your understanding?

19      A.    I guess, mostly the -- you know, that's a

20 possibility that they exist, and that websites do use

21 them.

22      Q.    And when did you first come to understand

23 that there are cookies that can be installed on your

24  browser by one website that track what you do on a

25  different website?

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    42

1       A.      Again, not -- not a specific time frame,

2  but most likely -- not most likely, but within the last

3  year I became more familiar with that.

4       Q.      Did you become aware of that before you

5  filed this lawsuit?

6       A.      No.

7       Q.      So you've --

8       A.      I guess, the cookies correct.

9       Q.      So --

10      A.      Yeah.

11      Q.      -- did you first come to understand before

12  this lawsuit was filed that there are cookies that can

13  be installed on your browser by one website that can

14  track what you do on another website?

15      A.      The answer is still no.

16      Q.      Did you come to that understanding after

17  the lawsuit was filed?

18      A.      Yes.

19      Q.      How did you come to that understanding?

20      A.      Not that I've done extensive research or

21  anything, but I came through it passively through just

22  gaining general knowledge about cookies and how they

23  function.

24      Q.    Did you read something that causes you to

25  come to this understanding?

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    43

1                MR. GAA:  Objection to form.

2                THE WITNESS:  Yes, yes.

3  BY MR. WALKER:

4      Q.    What did you read?

5      A.    An article on the internet.  I don't

6  remember exact details.

7                MR. WALKER:  I think this would be a good

8  time to take a first break.

9                VIDEOGRAPHER:  We are going off the record.

10  The time is 10:50.

11                (Recess was taken.)

12                VIDEOGRAPHER:  We are back on the record.

13  The time is 11:00.

14  BY MR. WALKER:

15      Q.    Mr. Oostyen, during the break, did you

16  speak with your counsel?

17      A.    Briefly.

18      Q.    Did you talk to them about the testimony

19  that you've given in this deposition?

20       A.    Nope.

21       Q.    Did you talk to them about the questions

22  that I've asked?

23       A.    Nope.

24       Q.    Did you talk to them about the questions

25  that I might ask --

                    ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

        ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    44

1        A.    No.

2        Q.    -- later in the deposition?

3        A.    No.

4        Q.    I asked you earlier about cookies, and you

5  told me that you had sometimes are presented with the

6  opportunity to either consent to cookies or to decline

7  cookies when you're on line?

8        A.    Yes.

9        Q.    Do you recall that testimony?

10       A.    Yes.

11       Q.    Have you ever consented to allow cookies?

12       A.    Oh, there are times, yes.

13       Q.    And have you, sometimes, declined cookies?

14       A.    Yes.

15       Q.    On what basis -- strike that.

16             For which websites have you declined

17   cookies?

18        A.    Mostly websites I'm unfamiliar with or find

19   a passing.  A good number of this.

20        Q.    Do you recall any particular?

21        A.    No, no specifics.

22        Q.    Other than whether or not you're familiar

23   with a site, are there any other bases that have caused

24   you in the past to decline cookies?

25        A.    Yes, based on the credibility of the

                      ROUGH DRAFT ONLY NOT FOR OFFICIAL USE

     ROUGH DRAFT ONLY NOT FOR OFFICIAL USE                    45

1   website as well.

2        Q.    Okay.  Are there any other bases that would

3   cause you to decline cookies?

4        A.    None that I can recall at this moment.

5        Q.    Okay.  And since 2020, you've been familiar

6   with the Patreon website correct?

7        A.    Yes.

8        Q.    And since 2020, you've been familiar with

9   the Facebook site?

10        A.    Yes.

11        Q.    In your view, do you consider Patreon to be

12   a credible website?

13        A.    Patreon itself, yes.