AARON MACKEY (SBN 286647)
amackey@eff.org
F. MARIO TRUJILLO (SBN 352020)
mario@eff.org
ADAM SCHWARTZ (SBN 309491)
adam@eff.org
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333

SAMIR JAIN (SBN 181572)
sjain@cdt.org
CENTER FOR DEMOCRACY & TECHNOLOGY
1401 K Street, NW
Washington, DC 20005
Telephone: (202) 407-8843

JACOB A. SNOW (SBN 270988)
jsnow@aclunc.org
MATTHEW T. CAGLE (SBN 286101)
mcagle@aclunc.org
CHESSIE THACHER (SBN 296767)
cthacher@aclunc.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493

*Counsel for Amici Curiae Electronic Frontier Foundation,
Center for Democracy & Technology, American Civil Liberties
Union Foundation of Northern California, and American Civil
Liberties Union*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Brayden STARK, Judd OOSTYEN, Kevin BLACK, and Maryann OWENS, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>PATREON, INC.,<br><br>*Defendants*. | Case No. 3:22-cv-03131-JCS<br><br>**AMICUS CURIAE BRIEF OF ELECTRONIC FRONTIER FOUNDATION, CENTER FOR DEMOCRACY & TECHNOLOGY, THE AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA, AND THE AMERICAN CIVIL LIBERTIES UNION IN SUPPORT OF THE VIDEO PRIVACY PROTECTION ACT'S FACIAL CONSTITUTIONALITY**<br><br>Date: March 15, 2024<br>Time: 9:30 a.m.<br>Judge: Hon. Joseph C. Spero |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT ............................................................................................................................... 2

    I.    The VPPA Directly Advances The Government's Substantial And Compelling Interest In Protecting The Privacy And Free Expression Of Video Viewers. .............................................................................................. 2

        A.    The VPPA Supports Video Viewers' Free Expression. ................................ 2

            1.    Video Has Become A Primary Means By Which Internet Users Consume News, Commentary, And Art. ............................................. 3

            2.    The VPPA Advances The First Amendment Right To Receive Information. ........................................................................................ 3

            3.    The VPPA Advances The First Amendment Right To Privacy In One's Consumption Of Media. ........................................................ 4

        B.    The VPPA Protects Video Viewers' Privacy Rights. .................................... 6

            1.    The Government's Interest In Consumer Data Privacy Is Substantial And Compelling. ............................................................... 6

            2.    The Government's Interest In Video Privacy Is Particularly Compelling Because The Data Is So Revealing. ................................ 6

        C.    Privacy And Speech Interests Have Special Significance When They Protect Against Disclosure To The Government. ................................ 8

    II.    The VPPA's Plainly Legitimate Sweep Renders Facial Invalidation Inappropriate. ............................................................................................................ 8

        A.    The Language And Scope Of The VPPA Reflect The Law's Focus On Regulating Commercial Activity ............................................................. 9

        B.    The Vast Majority Of VPPA Applications Fit Squarely Within The Scope Of Constitutional Privacy Laws ........................................................ 10

    III.    Any Unconstitutional VPPA Applications Are Best Addressed As Applied ........... 11

CONCLUSION .......................................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Clearview AI, Inc.*,
　No. 20 CH 4353, 2021 WL 4164452 (Ill. Cir. Ct. Aug. 27, 2021) ............................................... 6

*Amazon.com LLC v. Lay*,
　758 F. Supp. 2d 1154 (W.D. Wash. 2010) .................................................................................. 8

*Bartnicki v. Vopper*,
　532 U.S. 514 (2001) ...................................................................................... 3, 4, 11, 12

*Board of Education v. Pico*,
　457 U.S. 853 (1982) .................................................................................................... 2, 5

*Boelter v. Advance Mag. Publishers Inc.*,
　210 F. Supp. 3d 579 (S.D.N.Y. 2016) ......................................................................................... 6

*Boelter v. Hearst Inc.*,
　192 F. Supp. 3d 427 (S.D.N.Y. 2016) ......................................................................................... 6

*Branzburg v. Hayes*,
　408 U.S. 665 (1972) .................................................................................................................... 4

*Broadrick v. Oklahoma*,
　413 U.S. 601 (1973) .................................................................................................................... 1

*Carpenter v. United States*,
　138 S. Ct. 2206 (2018) ................................................................................................................ 7

*Central Hudson Gas & Elect. Corp. v. Public Serv. Comm'n of N. Y.*,
　447 U.S. 557 (1980) .................................................................................................................... 6

*Coplin v. Fairfield Pub. Access Television Comm.*,
　111 F.3d 1395 (8th Cir. 1997) ................................................................................................... 10

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
　472 U.S. 749 (1985) .............................................................................................................. 9, 10

*Gates v. Discovery Communications, Inc.*,
　34 Cal.4th 679 (Cal. 2004) ........................................................................................................ 12

*In re Clearview AI, Inc., Consumer Priv. Litig.*,
　585 F. Supp. 3d 1111 (N.D. Ill. 2022) ...................................................................................... 10

*In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*,
　706 F. Supp. 2d 11 (D.D.C. 2009) .............................................................................................. 8

*In re Grand Jury Subpoena to Amazon.com Dated Aug. 7, 2006*,
　246 F.R.D. 570 (W.D. Wis. 2007) .............................................................................................. 5

*Judge v. Saltz Plastic Surgery, P.C.*,
　367 P.3d 1006 (Utah 2016) ....................................................................................................... 10

Case 3:22-cv-03131-JCS   Document 95-1   Filed 12/20/23   Page 4 of 19

*King v. Gen. Info. Servs., Inc.*,
  903 F. Supp. 2d 303 (E.D. Pa. 2012) .................................................................................... 6

*Lamont v. Postmaster General*,
  381 U.S. 301 (1965) .......................................................................................................... 4, 5

*McIntyre v. Ohio Elections Commn.*,
  514 U.S. 334 (1995) ............................................................................................................. 4

*NAACP v. Alabama*,
  357 U.S. 449 (1958) ............................................................................................................. 4

*Osborne v. Ohio*,
  495 U.S. 103 (1990) ............................................................................................................. 8

*People v. Seymour*,
  536 P.3d 1260 (Colo. 2023) ................................................................................................. 5

*Reuber v. Food Chem. News, Inc.*,
  925 F.2d 703 (4th Cir. 1991) ............................................................................................. 10

*Riley v. California*,
  573 U.S. 373 (2014) ............................................................................................................. 7

*Shulman v. Group W Productions, Inc.*,
  18 Cal.4th 200 (Cal. 1998) ........................................................................................... 10, 12

*Smith v. Daily Mail Publishing Co.*,
  443 U.S. 97 (1979) ............................................................................................................. 12

*Snyder v. Phelps*,
  526 U.S. 443 (2011) ........................................................................................................... 10

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ........................................................................................................... 10

*Stanley v. Georgia*,
  394 U.S. 557 (1969) ..................................................................................................... 3, 4, 8

*Stark v. Patreon, Inc.*,
  656 F. Supp. 3d 1018 (N.D. Cal. 2023) ............................................................................ 2, 9

*Tattered Cover, Inc. v. City of Thornton*,
  44 P.3d 1044 (Colo. 2002) ................................................................................................... 5

*Telecommunications Ass'n v. F.C.C.*,
  555 F.3d 996 (D.C. Cir. 2009) ............................................................................................. 6

*Trans Union Corp. v. FTC*,
  245 F.3d 809 (D.C. Cir. 2001) ............................................................................................. 6

*Trans Union LLC v. F.T.C.*,
  295 F.3d 42 (D.C. Cir. 2002) ............................................................................................... 6

*Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*,
  603 F. Supp. 3d 1334 (S.D. Fla. 2022) .............................................................................. 10

*U.S. v. Stevens*,
  559 U.S. 460 (2010) ............................................................................................................. 1

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ............................................................................................................. 2

*United States v. Rumely*,
  345 U.S. 41 (1953) ........................................................................................................... 5, 8

*Zurcher v. Stanford Daily*,
  436 U.S. 547 (1978) ......................................................................................................... 5, 8

**Statutes**

18 U.S.C. § 2710 ..................................................................................................................... *passim*

**Other Authorities**

Arvind Narayanan & Vitaly Shmatikov, *Robust De-Anonymization of Large
  Sparse Datasets*, in Proc. of the 2008 Ieee Symp. on Security and Privacy ................................... 7

Bureau of Labor Statistics, *Television, capturing America's attention and
  prime time and beyond* (Sept. 2018) ..................................................................................... 7

Kasey Moore, *Netflix Codes 2023: Every Movie and Series Category on Netflix*,
  What's on Netflix (Jan. 17, 2023) ......................................................................................... 7

Kevin Roose, *RabbitHole, Episode Two: Looking Down, Transcript*,
  The New York Times (Apr. 23, 2020) .................................................................................. 7

Neil Richards, *Intellectual Privacy*, 87 Texas L. Rev. 387 (2009) ..................................................... 4

Paul Ohm, *Broken Promise of Privacy: Responding to the surprising
  failure of anonymization*, UCLA L. Rev. 1701 (2010) ........................................................ 7

Privacy Rights Clearinghouse, *Data Breach Chronolog* ................................................................... 7

*Report: Data Breach in Adult Site Compromises Privacy of All Users*,
  VPNMentor ........................................................................................................................... 8

S. Report. 100-599, 100th Cong., 2d Session 7 (Oct. 21, 1988) ......................................................... 7

Second Restatement of Torts § 652 .................................................................................................. 10

Testimony, Janlori Goldman on behalf of the ACLU, Joint Hearing
  on the Video and Library Privacy Protection Act of 1988 (Aug. 3, 1988) ............................ 7

Testimony, Vans Stevenson, Video Software Dealers' Association,
  Joint Hearing on the Video and Library Privacy Protection Act of 1988 (Aug. 3, 1988) ........... 11

**Constitutional Provisions**

U.S. Const. Am. I ................................................................................................................ *passim*

**INTRODUCTION**

Striking down the Video Privacy Protection Act ("VPPA") would put the First Amendment interests of millions of Americans at risk. Given the ubiquity of online video, the medium has become a dominant way for Americans to receive news, art, entertainment, and more. Records of a person's video search and watch history are both comprehensive and revealing. Thirty-five years after Congress enacted the VPPA's interrelated protections for privacy and free expression, the law remains essential and constitutional. Video viewers' First Amendment interests predominate here, not those of video service providers. The VPPA provides Americans with critical, private space to view expressive material, develop their own views, and to do so free from unwarranted corporate and government intrusion. That breathing room is often a catalyst for people's free expression.

Patreon's overbreadth attack thus lacks merit. The VPPA focuses its restrictions on commercial actors engaged primarily in commercial speech. The statute's "plainly legitimate sweep" protects the millions of Americans who watch videos online, and there are not "a substantial number" of unconstitutional applications. *U.S. v. Stevens*, 559 U.S. 460, 473 (2010). The overbreadth doctrine's primary concern is that a "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Here, the opposite is true: the VPPA advances the First Amendment interests of millions of video viewers who are not before the Court, rather than chilling them. To the extent the Court believes it is necessary to address video providers' First Amendment rights in the rare situation when disclosure of viewing history is a matter of public concern, it should hold that as-applied challenges provide robust First Amendment protections.

Indeed, the overwhelming majority of the VPPA's applications are constitutional. The VPPA prohibits entities that offer videos to consumers from disclosing a person's viewing habits—which generally are not any matter of public concern—absent the person's written consent or a valid statutory exception. The VPPA is subject to and passes intermediate scrutiny. Like many privacy laws that limit a providers' disclosure of personal data obtained through their provision of services, the VPPA promotes both consumer privacy and free expression.

This Court has already explained how the intermediate-scrutiny test applies when the VPPA limits commercial speech. *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1027, 1032–34 (N.D. Cal. 2023). *Amici* do not repeat that analysis. Instead, this brief focuses on the issues left open by this Court: the VPPA's constitutional applications relative to any potentially unconstitutional applications. *Id.* at 1037–39. The scope of the VPPA's constitutional applications is vast. It regulates information that video service providers obtain solely through the course of a commercial transaction or exchange, where the government has a compelling interest in protecting the privacy of video viewers, and the free speech enabled by this privacy. And the circumstances in which a video service provider's First Amendment interests in disclosing viewing data could overcome the privacy interests of users will be vanishingly small. Even assuming that, in violation of the VPPA, video providers may sometimes have a right to disclose a person's viewing history on a matter of public concern, existing First Amendment defenses dispel fears that the statute impermissibly chills providers' speech. The Court does not need to decide when as-applied challenges to the VPPA are subject to strict or intermediate scrutiny because that issue can be resolved on a case-by-case basis.

## ARGUMENT

**I.     The VPPA Directly Advances The Government's Substantial And Compelling Interest In Protecting The Privacy And Free Expression Of Video Viewers.**

    **A.     The VPPA Supports Video Viewers' Free Expression.**

The First Amendment interests of all Americans who view videos online must be central in this facial challenge to the VPPA. The First Amendment protects internet users' rights to receive information and to freely associate with others. The right to receive information is "a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Board of Education v. Pico*, 457 U.S. 853, 867 (1982). It is through receiving others' speech that "our convictions and beliefs are influenced, expressed, and tested" so that we can "bring those beliefs to bear on Government and on society." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 817 (2000). "In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger . . . can have a seriously inhibiting effect upon the willingness to

voice critical and constructive ideas." *Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001).

Thus, the government's interest in enabling people to exercise their free speech rights is compelling, and it is furthered by the VPPA. By protecting against unknown and nonconsensual disclosure of people's private video viewing habits, the VPPA enables their free expression to flourish. Otherwise, their receipt of a variety of video content, and any subsequent expression enabled by that information, would be chilled.

### 1. Video Has Become A Primary Means By Which Internet Users Consume News, Commentary, And Art.

Hundreds of millions of people watch videos online through subscription and free services that offer a diverse range of content, including films, news reporting, and commentary. Major streaming services such as Netflix have hundreds of millions of subscribers who watch movies, television shows, and documentaries.[1] An estimated 83 percent of U.S. consumers were subscribed to a streaming service in 2023, a 10 percent increase since 2018.[2] More than 70 percent of Americans watch videos on YouTube, with a quarter of adults using the site to get their news.[3]

### 2. The VPPA Advances The First Amendment Right To Receive Information.

Americans' freedom to watch the vast amount of online video content is grounded in the First Amendment's protections for receiving information. This right to watch visual media in private "is fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

Privacy can be key to ensuring that individuals feel free to exercise their First Amendment

---

[1] *See* Rachel Moskowitz and Kaleb A. Brown, *Celebrate National Streaming Day with the most popular streaming services*, USA Today (May 19, 2023), https://www.usatoday.com/story/tech/reviewed/2023/05/19/national-streaming-day-most-popular-streaming-services-ranked-netflix-disney/70235316007/.

[2] Julia Stoll, *Subscription video-on-demand user shares in the U.S. 2015-2023*, Statista (Sept. 7, 2023). https://www.statista.com/statistics/318778/subscription-based-video-streaming-services-usage-usa/.

[3] Galen Stocking, Patrick Van Kessel, Michael Barthel, Katerina Eva Matsa and Maya Khuzame, *Digital News Landscape: Many Americans Get News on YouTube, Where News Organizations and Independent Producers Thrive Side by Side*, Pew Rsch. Ctr. (Sept. 28, 2020), https://www.pewresearch.org/journalism/2020/09/28/youtube-news-consumers-about-as-likely-to-use-the-site-for-opinions-as-for-facts/.

right to receive information. *See Lamont v. Postmaster General*, 381 U.S. 301, 305–07 (1965); *see also Stanley*, 394 U.S. at 565 (First Amendment protects "the right to be free from state inquiry into the contents of [a person's] library" and "private thoughts"). The First Amendment protects many other private interactions, which all are advanced by private receipt of information, including: confidential expressive association, *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); anonymous speech, *McIntyre v. Ohio Elections Commn.*, 514 U.S. 334, 357 (1995); private conversation, *Bartnicki*, 532 U.S. at 532–33; and news gathering from undisclosed sources, *Branzburg v. Hayes*, 408 U.S. 665, 709–10 (1972) (Powell, J., concurring).

Privacy may be most obviously necessary when it protects against unwarranted disclosure to the government, but similar concerns justify laws that ensure privacy from private actors as well. People using video services would be chilled from viewing content—and being inspired by it—if they knew services were in the business of freely disclosing their viewing histories. Privacy thus shields "the imagination of the human mind" from corporate and government surveillance. Neil Richards, *Intellectual Privacy*, 87 Texas L. Rev. 387, 403–04 (2009). The imagination is the "engine of free expression," that powers democratic self-governance. *Id*.

### 3. The VPPA Advances The First Amendment Right To Privacy In One's Consumption Of Media.

The VPPA's statutory protections advance video viewers' constitutional rights because disclosing details about the videos people watch infringes upon their First Amendment right to receive information. While First and Fourth Amendment jurisprudence protects people only from governmental intrusions, private intrusions raise many of the same hazards. For example, in many cases where a business collects or discloses personal data, the chilling effect on users increases—due to the threat of misuse, breach, and police seizure. In addition, the knowledge that one's personal viewing habits could be disclosed publicly (even by a private actor) is chilling. Thus, Congress properly codified protection against both types of intrusions when it enacted the VPPA. The U.S. Supreme Court has expressed special concern for attempts to discover people's interest in specific written or visual material. *See Stanley*, 394 U.S. at 565. Searches of places such as

bookstores and libraries that allow people to look for and access reading material are especially disfavored. "Once the government can demand of a publisher the names of the purchasers of his publications, . . . [f]ear of criticism goes with every person into the bookstall." *United States v. Rumely*, 345 U.S. 41, 57 (1953) (Douglas, J., concurring).

Recognizing this, Colorado has expressed special concern for reader and user privacy and anonymity. The Colorado Supreme Court has held that readers are entitled to anonymity in requesting information, "because of the chilling effects that can result from disclosure of identity." *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002). That court recently ruled that demands to disclose internet users' web search history implicate the same concerns: "online search history . . . could reveal intimate details about an individual's private life." *People v. Seymour*, 536 P.3d 1260, 1271 (Colo. 2023).

Courts closely scrutinize demands to disclose a person's consumption of media because they permit "the government to peek into the reading habits of specific individuals without their prior knowledge or permission." *In re Grand Jury Subpoena to Amazon.com Dated Aug. 7, 2006*, 246 F.R.D. 570, 572 (W.D. Wis. 2007). These First Amendment concerns animate the Fourth Amendment's search-and-seizure requirement that warrants implicating expressive materials must be executed with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564–65 (1978).

The VPPA buttresses the First Amendment's protections by giving video viewers solace, knowing that what they choose to watch is protected against unwarranted disclosures. The VPPA builds on the First Amendment by generally limiting the disclosure of people's video viewing habits to any third party. Absent this statutory protection, people would hesitate to view many kinds of videos, whether the content is controversial or unpopular. These chilled viewers will be diminished speakers, having less to say about the videos, the ideas they express, and the ideas they inspire. Further, this chilling causes collateral harm to the video makers, who will have smaller audiences: "[i]t would be a barren marketplace of ideas that had only sellers and no buyers." *Pico*, 457 U.S. at 867 (quoting *Lamont*, 381 U.S. at 308 (Brennan, J., concurring)).

**B.     The VPPA Protects Video Viewers' Privacy Rights.**

The government has a substantial and compelling interest in promoting consumer data privacy in general and video viewing data privacy in particular.

### 1. The Government's Interest In Consumer Data Privacy Is Substantial And Compelling.

Courts have consistently upheld laws protecting personal information because they advance "substantial" interests in protecting privacy by limiting how that information can be collected, used, and disclosed. *See Trans Union Corp. v. FTC* (*Trans Union I*), 245 F.3d 809, 819 (D.C. Cir. 2001) (consumer credit report); *Individual Reference Servs. Grp., Inc. v. F.T.C.*, 145 F. Supp. 2d 6, 42 (D.D.C. 2001) (consumer financial account information); *Trans Union LLC v. F.T.C. (Trans Union II)*, 295 F.3d 42, 53 (D.C. Cir. 2002) (credit report); *Nat'l Cable & Telecommunications Ass'n v. F.C.C.*, 555 F.3d 996, 1001 (D.C. Cir. 2009) (phone call detail records); *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 310 (E.D. Pa. 2012) (arrest records in credit reports); *Boelter v. Hearst Inc.* (*Boelter I*), 192 F. Supp. 3d 427, 450–51 (S.D.N.Y. 2016) (consumer preferences, curiosities, and interests); *Boelter v. Advance Mag. Publishers Inc. (Boelter II)*, 210 F. Supp. 3d 579, 599 (S.D.N.Y. 2016) (purchasing, rental, and borrowing history); *ACLU v. Clearview AI, Inc.*, No. 20 CH 4353, 2021 WL 4164452 (Ill. Cir. Ct. Aug. 27, 2021) (biometrics).

Courts can uphold commercial speech regulations on matters of purely private concern when there is a "substantial" government interest, including promoting consumer data privacy like the VPPA. *Central Hudson Gas & Elect. Corp. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 557, 566 (1980). Nonetheless, some courts have gone further, finding a "compelling" interest in consumer data privacy laws, especially when disclosure can cause reputational injury. *See, e.g.*, *King*, 903 F. Supp. 2d at 310. The government's compelling interest in protecting the privacy of video viewing is also bolstered by First Amendment values. *See supra* Part I.A.

### 2. The Government's Interest In Video Privacy Is Particularly Compelling Because The Data Is So Revealing.

Congress explained that video records are "a window into our loves, likes, and dislikes" creating a "subtle and pervasive form of surveillance." S. Report. 100-599, 100th Cong., 2d

Session 7 (Oct. 21, 1988). As the ACLU testified to Congress in support of the VPPA, "[t]he movies we view in the privacy of our home may reveal a great deal about our politics and personalities, the most personal, sensitive aspects of ourselves that we may choose to express outside the scope of the public's gaze."[4] And every disclosure creates inherent risk of redisclosure.[5]

Like cellphone contents and location records, video viewing data can reveal the "privacies of life." *Riley v. California*, 573 U.S. 373, 403 (2014); *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). This is partly because the records can be so comprehensive.[6] For example, searching through a person's YouTube viewing history—which can total tens of thousands of videos—is like "going through someone's diary."[7] Video records can be so revealing that individuals can be re-identified based on seemingly "anonymous" data about their watch history and ratings.[8]

Using this data, companies may attempt to draw sensitive, potentially incorrect, and harmful inferences about, for example, a person's race, politics, religious views, or attitudes towards gay people. *Id.* at 1722. Even titles and genres can be revealing. Netflix, for example, has nearly 4,000 ways to categorize its content—including genres like "Chinese Gay & Lesbian Movies," "Jewish Dramas," and "African-American Political Movies."[9] The same hazards arise

---

[4] Testimony, Janlori Goldman on behalf of the ACLU, Joint Hearing on the Video and Library Privacy Protection Act of 1988 (Aug. 3, 1988).

[5] Privacy Rights Clearinghouse, *Data Breach Chronology*, https://privacyrights.org/data-breaches (last visited Dec. 18, 2023) (listing more than 20,000 U.S. data breaches).

[6] Bureau of Labor Statistics, *Television, capturing America's attention and prime time and beyond* (Sept. 2018), https://www.bls.gov/opub/btn/volume-7/television-capturing-americas-attention.htm (noting that U.S. civilians spend 2 hours and 46 per day watching TV).

[7] Kevin Roose, *RabbitHole, Episode Two: Looking Down, Transcript*, The New York Times (Apr. 23, 2020), https://www.nytimes.com/2020/04/23/podcasts/rabbit-hole-internet-youtube-virus.html?showTranscript=1.

[8] Arvind Narayanan & Vitaly Shmatikov, *Robust De-Anonymization of Large Sparse Datasets*, in Proc. of the 2008 Ieee Symp. on Security and Privacy (demonstrating how to de-anonymize movie ratings in Netflix data), https://www.cs.utexas.edu/~shmat/shmat_oak08netflix.pdf; Paul Ohm, *Broken Promise of Privacy: Responding to the surprising failure of anonymization*, 57 UCLA L. Rev. 1701, 1720 (2010), https://www.uclalawreview.org/pdf/57-6-3.pdf.

[9] Kasey Moore, *Netflix Codes 2023: Every Movie and Series Category on Netflix*, What's on Netflix (Jan. 17, 2023), https://www.whats-on-netflix.com/news/the-netflix-id-bible-every-category-on-netflix/.

when companies seek to infer viewers' sexual orientation based on viewing sexual videos.[10]

    **C.**    **Privacy And Speech Interests Have Special Significance When They Protect Against Disclosure To The Government.**

Consumers' right to privacy and expression in the videos they search for and watch is even more compelling when they guard against law enforcement and other government entities' surveillance. *See Stanley*, 394 U.S. at 565; *Zurcher*, 436 U.S. at 564–65; *Rumely*, 345 U.S. at 57 (Douglas, concurring). The VPPA recognizes these constitutional values and operationalizes them in statutory law. *See* 18 U.S.C. § 2710(b)(2)(C) & (b)(2)(F) & (b)(3).

Like with the First Amendment, the VPPA requires the government to overcome special burdens to compel a company to hand over records of a consumer's expressive material—signifying their importance. *See, e.g., In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461 et seq.*, 706 F. Supp. 2d 11, 18 (D.D.C. 2009) (requiring "compelling interest" and "sufficient nexus"). In some cases, the protections of the First Amendment and VPPA overlap. *See Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1169 (W.D. Wash. 2010) (invalidating broad subpoena for purchase details on books, music, and audiovisual material on both grounds).

**II.**    **The VPPA's Plainly Legitimate Sweep Renders Facial Invalidation Inappropriate.**

The Court should not facially invalidate the VPPA because, even if "at its margins [the statute] infringes on protected expression," it "covers a whole range of easily identifiable and constitutionally proscribable conduct." *Osborne v. Ohio*, 495 U.S. 103, 112 (1990) (cleaned up).

The VPPA's purpose, application, and enforcement is overwhelmingly focused on regulating the disclosure of a person's video viewing history in the course of a commercial transaction between the provider and user. Thus the VPPA concerns "expression related solely to the economic interests of the speaker and its audience," which is "commercial speech" that receives "lesser protection" compared to "other constitutionally guaranteed expression." *Central Hudson*, 447 U.S. at 561, 563. Moreover, "speech solely in the individual interest of the speaker and its

---

[10] *Report: Data Breach in Adult Site Compromises Privacy of All Users*, VPNMentor (updated July 17, 2023), https://www.vpnmentor.com/blog/report-luscious-data-breach/.

specific business audience" that concerns "no public issue" warrants "reduced constitutional protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 & n.8 (1985).

As further discussed below, the VPPA applies only to businesses that are uniquely positioned to violate their users' privacy because of their business relationship with them. The statute is thus subject to, and passes, intermediate scrutiny. As this Court already determined, "the VPPA would not be invalid if it only regulated [commercial] speech like Patreon's alleged disclosures to Meta." *Stark*, 656 F. Supp. 3d at 1037. In this overbreadth challenge, the Court should ask whether the rare instances in which providers have a First Amendment defense for their disclosure nonetheless require the strong medicine of facial invalidation. It does not. As explained below, *infra* Part III, even if providers have First Amendment defenses to VPPA claims involving disclosures on a matter of public concern, those can be addressed in as-applied challenges.

### A. The Language And Scope Of The VPPA Reflect The Law's Focus On Regulating Commercial Activity.

The VPPA applies only to "video tape service providers," which includes those "engaged in the business" of rental, sale, or delivery. 18 U.S.C. § 2710 (a)(4). It similarly defines a protected "consumer" as a renter, purchaser, or subscriber of "goods or services" from a provider. *Id.* at (a)(1). Information may be shared if it is disclosed in the "ordinary course of business" of operating a video tape service provider. *Id.* at (b)(2)(E).

Moreover, the VPPA contains numerous statutory exceptions that limit its applicability and further narrow the universe of any possible unconstitutional applications. For one, the VPPA allows disclosure to law enforcement under proper legal process. 18 U.S.C. § 2710 (b)(2)(C). It similarly permits disclosure in civil proceedings pursuant to a court order if notice is given to the consumer. *Id.* at (b)(2)(F). These exceptions protect the government's interest in enforcing the law, private parties' interests in disclosing information in certain circumstances, and video viewers' compelling privacy and speech interests. *See supra* Part I.

Furthermore, the VPPA allows disclosure when a provider obtains written consent from the consumer—a light burden that is typically obtained following a commercial transaction for video

services. 18 U.S.C. § 2710 (b)(2)(B). Ensuring that consent is authentic through writing is not overly restrictive. *See In re Clearview AI, Inc., Consumer Priv. Litig.*, 585 F. Supp. 3d 1111, 1121 (N.D. Ill. 2022) (written consent in biometric law); *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd.*, 603 F. Supp. 3d 1334, 1349 (S.D. Fla. 2022) (written consent in telemarketing law).

### B. The Vast Majority Of VPPA Applications Fit Squarely Within The Scope Of Constitutional Privacy Laws.

The vast majority of potential disclosures prohibited by the VPPA concern commercial exploitation of private citizens' video viewing habits that have no public significance. Such consumer data privacy laws routinely survive First Amendment challenges. *See supra* Part I.B.1.

Other areas of law contain analogous protections for private information, such as the common law privacy torts that limit the collection of truthful private information (intrusion on seclusion) and limit its publication (public disclosure of private facts). *See* Second Restatement of Torts §§ 652B, 652D. "[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder v. Phelps*, 526 U.S. 443, 452 (2011). *See, e.g., Dun & Bradstreet*, 472 U.S. at 757 (defamation); *Snyder*, 562 U.S. at 459 (intentional infliction of emotional distress). Privacy torts do not offend the First Amendment if they do not restrict important discussion of matters of public concern. *See, e.g., Judge v. Saltz Plastic Surgery, P.C.*, 367 P.3d 1006, 1011 & n.4 (Utah 2016); *Shulman v. Group W Productions, Inc.*, 18 Cal.4th 200, 214–16 (Cal. 1998); *Coplin v. Fairfield Pub. Access Television Comm.*, 111 F.3d 1395, 1404 (8th Cir. 1997); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 719 (4th Cir. 1991).

Further, a consumer privacy law regulating commercial activity is not invalid merely because it makes content-based distinctions: "This is not to say that all privacy measures must avoid content-based rules." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 574 (2011). Coherent privacy legislation like the VPPA is necessary because "[t]he capacity of technology to find and publish personal information . . . presents serious and unresolved issues with respect to personal privacy and the dignity it seeks to secure." *Id*. at 579.

The VPPA falls within this set of constitutional privacy laws. The video-viewing behavior

of millions of individual consumers is not a matter of public concern and is only made available to the service providers through their commercial relationship with the viewer. Online video service providers, like Patreon, harvest user data to sell or target ads for their own commercial interests. The overwhelming majority of tracked and targeted consumers will not engage in matters of public concern in relation to their video-viewing behavior. Many businesses that collect this information do not distribute it, and those that do typically distribute it only to a select set of paying clients for their commercial interests.

### III. Any Unconstitutional VPPA Applications Are Best Addressed As Applied.

To the extent video providers like Patreon wish to assert a First Amendment right to disclose people's viewing habits in circumstances that arguably conflict with the VPPA, they should proceed on a case-by-case basis.[11] Courts have long recognized that privacy statutes and common law torts can sometimes conflict with a speaker's First Amendment rights. In those cases, courts seek to protect the First Amendment interests at stake while continuing to allow application of those privacy laws in the ordinary course. This approach accommodates the broad and legitimate sweep of those privacy protections while vindicating speakers' First Amendment rights. The same analysis should be applied to the VPPA.

For example, *Bartnicki* concerned a civil suit under the federal Wiretap Act alleging that defendants including news media disclosed private communications, illegally intercepted by an unknown third party, that concerned a public issue. 537 U.S. at 517–18.[12] Defendants argued that the First Amendment protected the disclosure because it was on a matter of public concern. *Id*. at

---

[11] The Court should expect these applications to be rare. It would be an odd business model for a company to promise its users privacy protection, except on matters of public concern. *See* Testimony, Vans Stevenson, Video Software Dealers' Association, Joint Hearing on the Video and Library Privacy Protection Act of 1988 (Aug. 3, 1988) (describing corporate policy that "rental and sales records are privileged matters between the retailer and the customer").

[12] The VPPA applies to an even smaller set of entities than the disclosure prohibition in the Wiretap Act at issue in *Bartnicki*. Unlike the Wiretap Act, the VPPA's disclosure prohibition does not sweep up third parties (outside of those identified in 18 U.S.C. § 2710(b)(2)(D)) such as the news media. Thus the VPPA applies to a far narrower set of circumstances in which a provider itself discloses users' viewing habits in violation of the VPPA.

520–21. The Supreme Court characterized the privacy and free expression issues presented as "a conflict between the interests of the highest order," *id*. at 518, and its holding was narrow: "In these cases, privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id*. at 534. The application of the Wiretap Act in *Bartnicki* implicated the core purposes of the First Amendment because it limited the disclosure of truthful information on a matter of public concern. *Id*. at 533–34. The Court also indicated that in most other scenarios that did not concern disclosures on a matter of public concern, the Wiretap Act could likely be enforced without offending the First Amendment. *See id*.

The disclosure of private facts tort contains a similar principle. In *Shulman*, the California Supreme Court vindicated the First Amendment interests of a television show that gathered and published details of emergency aid provided to the plaintiffs after their car crashed. 18 Cal.4th at 209–10. The court explained that the lack of "newsworthiness" was an element of the private facts tort, and "a constitutional defense to, or privilege against, liability for publication of truthful information." *Id*. at 216. The state high court once more confirmed that the same constitutional privilege immunizes speakers from tort claims based on the disclosure of truthful information on a matter of public concern. *See Gates v. Discovery Communications, Inc.*, 34 Cal.4th 679, 675 (Cal. 2004). Outside of that context, however, the tort remains a valid cause of action.

*Bartnicki, Shulman,* and *Gates* reinforce that when privacy protections come into conflict with First Amendment rights, privacy rights may yield when the speech is truthful and on a matter of public concern. *See also Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 104 (1979). The cases proceed on an as-applied basis, while leaving in place the legitimate sweep of the privacy laws and torts. This Court should follow the same path here: an as-applied challenge will best harmonize the speech and privacy interests of everyone, including millions of people who watch videos online.

## CONCLUSION

For the foregoing reasons, the Court should rule that the Video Privacy Protection Act is not substantially overbroad and subject to facial invalidation.

Dated: December 20, 2023

Respectfully submitted,

By:  /s/ *Aaron Mackey*

Aaron Mackey
F. Mario Trujillo
Adam Schwartz
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Telephone: (415) 436-9333
Email: amackey@eff.org, mario@eff.org, adam@eff.org

*Counsel for Amicus Curiae*
*Electronic Frontier Foundation*

Samir Jain
CENTER FOR DEMOCRACY & TECHNOLOGY
1401 K Street, NW
Washington, DC 20005
Telephone: (202) 407-8843
Email: sjain@cdt.org

*Counsel for Amicus Curiae Center for Democracy & Technology*

Jacob A. Snow
Matthew T. Cagle
Chessie Thacher
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Email: jsnow@aclunc.org, mcagle@aclunc.org, cthacher@aclunc.org

*Counsel for Amici American Civil Liberties Union of Northern California and American Civil Liberties Union*