Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Trevor T. Tan (SBN 280145)
Reid Gaa (SBN 330141)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
apolk@girardsharp.com
sgrille@girardsharp.com
ttan@girardsharp.com
rgaa@girardsharp.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAYDEN STARK and JUDD OOSTYEN, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>PATREON, INC.,<br><br>        Defendant. | Case No. 3:22-cv-03131-JCS<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT PATREON INC.'S MOTION FOR SUMMARY JUDGMENT ON FIRST AMENDMENT GROUNDS**<br><br>Judge: Hon. Joseph C. Spero<br>Date: March 15, 2024<br>Time: 9:30 a.m. |

**REDACTED - FILED UNDER SEAL**

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ............................................................................................................. 1

II.     STATEMENT OF FACTS ............................................................................................... 2

III.    LEGAL STANDARD ...................................................................................................... 3

IV.     ARGUMENT ................................................................................................................... 3

        A.      History and Scope of the VPPA. ......................................................................... 3

        B.      The VPPA Does Not Categorically Prohibit Any Speech. .................................. 5

        C.      Patreon's As-Applied Challenge Fails Because Its Disclosures to Meta Are at Most
                Commercial Speech Subject to Intermediate Scrutiny. ...................................... 7

                1.      The VPPA Protects Substantial Government Interests. ........................... 8

                        i.      The VPPA is neither an attack on the free press nor paternalistic. ........ 10

                        ii.     Patreon's disclosures harmed Plaintiffs. ................................. 11

                2.      The VPPA Advances Government Interests and Is Narrowly Tailored............. 12

        D.      The Court Should Reject Patreon's Facial Challenge Because the VPPA Does Not
                Substantially Infringe on Protected Speech........................................................ 15

                1.      The VPPA Withstands Strict Scrutiny Because It is Narrowly Tailored to
                        Protect a Compelling Interest of the Highest Order. ........................... 15

                        i.      Safeguarding intellectual freedom is a compelling state interest. .......... 16

                        ii.     The VPPA is narrowly tailored. ............................................. 17

                2.      Patreon's Overbreadth Challenge Fails Because the Record Shows the VPPA
                        Does Not Substantially Abridge Protected Speech. ............................ 18

V.      CONCLUSION ............................................................................................................. 25

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

**Cases**

4

*Aargon Agency, Inc. v. O'Laughlin*,
   70 F.4th 1224 (9th Cir. 2023) ................................................................................................. 15

5

*Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*,

6

   846 F.3d 391 (D.C. Cir. 2017) ............................................................................................... 16

7

*Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*,
   498 U.S. 517 (1991) ............................................................................................................... 23

8

*Amazon.com LLC v. Lay*,

9

   758 F. Supp. 2d 1154 (W.D. Wash. 2010) ............................................................................... 8

10

*American Civil Liberties Union v. Clearview AI, Inc.*,
   2021 WL 4164452 (Ill. Cir. Ct. Aug. 27, 2021) .................................................................... 16

11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   140 S. Ct. 2335 (2020) ............................................................................................................. 8

12

*Bartnicki v. Vopper*,

13

   532 U.S. 514 (2001) ............................................................................................................... 16

14

*Billups v. City of Charleston*,
   194 F. Supp. 3d 452 (D.S.C. 2016) ........................................................................................ 18

15

*Boelter v. Advance Mag. Publishers Inc.*,

16

   210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........................................................... 9, 10, 13, 14, 15

17

*Boelter v. Hearst Commc'ns, Inc.*,
   192 F. Supp. 3d 427 (S.D.N.Y. 2016) ................................................ 3, 9, 10, 12, 13, 14, 17, 24

18

*Borges v. SmileDirectClub, LLC*,
   2022 WL 4269564 (S.D. Fla. Sept. 15, 2022) ......................................................................... 8

19

*Brickman v. Facebook, Inc.*,

20

   230 F. Supp. 3d 1036 (N.D. Cal. 2017) ........................................................................... 17, 18

21

*Broadrick v. Oklahoma*,
   413 U.S. 601 (1973) ............................................................................................................... 19

22

*Camfield v. City of Oklahoma City*,
   248 F.3d 1214 (10th Cir. 2001) ................................................................................. 16, 17, 22

23

24

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018) ............................................................................................................. 9

25

*Carter v. Scripps Networks, LLC*,
   2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ......................................................................... 5

26

*Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*,

27

   447 U.S. 557 (1980) ................................................................................................................. 7

28

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*,
  746 F.3d 1082 (D.C. Cir. 2014) ....................................................................24

*City of San Diego v. Roe*,
  543 U.S. 77 (2004) .........................................................................................23

*Clemens v. ExecuPharm Inc.*,
  48 F.4th 146 (3d Cir. 2022) ..........................................................................14

*Contest Promotions, LLC v. City & Cty. of San Francisco*,
  874 F.3d 597 (9th Cir. 2017) ...........................................................................7

*Dahlstrom v. Sun-Times Media, LLC*,
  777 F.3d 937 (7th Cir. 2015) ....................................................................13, 18

*Daniel v. Cantrell*,
  375 F.3d 377 (6th Cir. 2004) .........................................................................22

*Dirkes v. Borough of Runnemede*,
  936 F. Supp. 235 (D.N.J. 1996) ....................................................................22

*Drazen v. Pinto*,
  74 F.4th 1336 (11th Cir. 2023) ......................................................................14

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) .........................................................................................7

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) .................................................................3, 5, 12

*Ellis v. Cartoon Network, Inc.*,
  803 F.3d 1251 (11th Cir. 2015) .......................................................................5

*First Resort, Inc. v. Herrera*,
  860 F.3d 1263 (9th Cir. 2017) .........................................................................7

*Fla. Bar v. Went For It, Inc.*,
  515 U.S. 618 (1995) ....................................................................................8, 11

*Gakuba v. Hollywood Video, Inc.*,
  2015 WL 5737589 (D. Or. Sept. 30, 2015) ...................................................22

*Gardener v. MeTV*,
  2023 WL 4365901 (N.D. Ill. July 6, 2023) .....................................................5

*Ghanaat v. Numerade Labs, Inc.*,
  2023 WL 5738391 (N.D. Cal. Aug. 28, 2023) .................................................5

*Greenley v. Laborers' Int'l Union of N. Am.*,
  271 F. Supp. 3d 1128 (D. Minn. 2017) ..........................................................17

*Gresham v. Swanson*,
  866 F.3d 853 (8th Cir. 2017) .........................................................................16

*Heglund v. Aitkin Cnty.*,
  871 F.3d 572 (8th Cir. 2017) .........................................................................14

iii

*IMDb.com Inc. v. Becerra,*
  962 F.3d 1111 (9th Cir. 2020) ............................................................................ 4

*In re Facebook, Inc. Internet Tracking Litig.,*
  956 F.3d 589 (9th Cir. 2020) .............................................................................. 25

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.,*
  846 F.3d 625 (3d Cir. 2017) ........................................................................... 8, 12

*In re Los Angeles Times Commc'ns LLC,*
  628 F. Supp. 3d 55 (D.D.C. 2022) ..................................................................... 24

*In re Nat'l Sec. Letter,*
  33 F.4th 1058 (9th Cir. 2022) ...................................................................... 16, 18

*In re Nickelodeon Consumer Privacy Litig.,*
  827 F.3d 262 (3d Cir. 2016) ..................................................................... 5, 21, 22

*In re Vizio, Inc., Consumer Priv. Litig.,*
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ............................................................... 4

*Individual Reference Servs. Grp., Inc. v. FTC,*
  145 F. Supp. 2d 6 (D.D.C. 2001) ....................................................................... 13

*Kellman v. Spokeo, Inc.,*
  599 F. Supp. 3d 877 (N.D. Cal. 2022) .......................................................... 8, 25

*King v. Blue Cross & Blue Shield of Ill.,*
  871 F.3d 730 (9th Cir. 2017) .............................................................................. 22

*King v. Gen. Info. Servs., Inc.,*
  903 F. Supp. 2d 303 (E.D. Pa. 2012) ................................................................ 25

*Kuklinski v. Binance Cap. Mgmt.,*
  2023 WL 2788654 (S.D. Ill. Apr. 4, 2023) ....................................................... 16

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ........................................................................................... 23

*Los Angeles Police Dep't v. United Reporting Pub. Corp.,*
  528 U.S. 32 (1999) ............................................................................................. 20

*Maracich v. Spears,*
  570 U.S. 48 (2013) ............................................................................................... 7

*Marquez-Reyes v. Garland,*
  36 F.4th 1195 (9th Cir. 2022) ............................................................................ 25

*Missouri ex rel. Nixon v. Am. Blast Fax, Inc.,*
  323 F.3d 649 (8th Cir. 2003) ......................................................................... 7, 14

*Mollett v. Netflix, Inc.,*
  795 F.3d 1062 (9th Cir. 2015) ......................................................................... 4, 5

*Munden v. Stewart Title Guar. Co.,*
  8 F.4th 1040 (9th Cir. 2021) ................................................................................ 3

iv

*NAACP v. Alabama*,
   357 U.S. 449 (1958) ............................................................................................. 1

*Nat'l Cable & Telecomm'ns Ass'n v. FCC*,
   555 F.3d 996 (D.C. Cir. 2009) ............................................................................ 7

*Nat'l Endowment for the Arts v. Finley*,
   524 U.S. 569 (1998) ........................................................................................... 15

*Nation Mag., Wash. Bureau v. U.S. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) ............................................................................ 23

*Nayab v. Cap. One Bank (USA), N.A.*,
   942 F.3d 480 (9th Cir. 2019) ............................................................................ 12

*NetChoice, L.L.C. v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) ............................................................................. 21

*NLRB v. Kolkka*,
   170 F.3d 937 (9th Cir. 1999) ............................................................................ 23

*Oberstein v. Live Nation Ent., Inc.*,
   60 F.4th 505 (9th Cir. 2023) ............................................................................... 6

*Patel v. Facebook, Inc.*,
   932 F.3d 1264 (9th Cir. 2019) ................................................................... 4, 8, 14

*Patriotic Veterans, Inc. v. Zoeller*,
   845 F.3d 303 (7th Cir. 2017) ............................................................................ 14

*Pena v. Lindley*,
   898 F.3d 969 (9th Cir. 2018) ............................................................................ 13

*People v. Martinez*,
   15 Cal. 5th 326 (2023) ................................................................................. 10, 16

*Perry v. Cable News Network, Inc.*,
   854 F.3d 1336 (11th Cir. 2017) .................................................................... 3, 12

*Potts v. Zettel*,
   220 F. App'x 559 (9th Cir. 2007) ..................................................................... 11

*Recycle for Change v. City of Oakland*,
   856 F.3d 666 (9th Cir. 2017) ............................................................................ 17

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ........................................................................................... 16

*Retail Digital Network, LLC v. Prieto*,
   861 F.3d 839 (9th Cir. 2017) ........................................................................... 7, 8

*Riley v. California*,
   573 U.S. 373 (2014) ............................................................................................. 8

*Rodriguez v. Hershey Co.*,
   2023 WL 6798506 (S.D. Cal. Oct. 12, 2023) ..................................................... 4

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

*Rosenbach v. Six Flags Ent. Corp.*,
129 N.E.3d 1197 (Ill. 2019) ................................................................................ 10

*Rowan v. Post Office Dept.*,
397 U.S. 728 (1970) ............................................................................................ 25

*Seattle Times Co. v. Rhinehart*,
467 U.S. 20 (1984) .............................................................................................. 24

*Smallwood v. Allied Van Lines, Inc.*,
660 F.3d 1115 (9th Cir. 2011) ............................................................................ 23

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ................................................................. 6

*Snyder v. Phelps*,
562 U.S. 443 (2011) .............................................................................................. 7

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......................................................................... 6, 16, 17, 18, 25

*Sosa v. Onfido, Inc.*,
600 F. Supp. 3d 859 (N.D. Ill. 2022) ................................................................. 16

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016), *as revised* (May 24, 2016) ............................................... 14

*Stanley v. Georgia*,
394 U.S. 557 (1969) ........................................................................................... 1, 9

*Stover v. Fingerhut Direct Mktg., Inc.*,
709 F. Supp. 2d 473 (S.D.W. Va. 2009) ............................................................. 10

*Sweezy v. State of N.H. by Wyman*,
354 U.S. 234 (1957) .............................................................................................. 9

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
951 F.3d 1142 (9th Cir. 2020) ............................................................................ 22

*The Fla. Star v. B.J.F.*,
491 U.S. 524 (1989) ............................................................................................ 10

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002) ............................................................................................ 11

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) .............................................................................. 6

*Trans Union Corp. v. FTC*,
245 F.3d 809 (D.C. Cir. 2001) .............................................................. 7, 10, 12, 14

*Trans Union Corp. v. FTC*,
267 F.3d 1138 (D.C. Cir. 2001) ................................................................ 7, 10, 13

*Trans Union LLC v. FTC*,
295 F.3d 42 (D.C. Cir. 2002) ............................................................................. 10

vi

*TransUnion LLC v. Ramirez,*
   141 S. Ct. 2190 (2021) .................................................................................... 12

*Turner Broad. Sys., Inc. v. FCC,*
   512 U.S. 622 (1994) ......................................................................................... 17

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press,*
   489 U.S. 749 (1989) ......................................................................................... 25

*United States v. Edge Broad. Co.,*
   509 U.S. 418 (1993) ......................................................................................... 10

*United States v. Hansen,*
   25 F.4th 1103 (9th Cir. 2022) .......................................................................... 19

*United States v. Hansen,*
   599 U.S. 762 (2023) ........................................................................... 19, 20, 23

*United States v. Jones,*
   565 U.S. 400 (2012) ........................................................................................... 9

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.,*
   407 U.S. 297 (1972) ........................................................................................... 9

*United States v. Williams,*
   553 U.S. 285 (2008) ........................................................................... 19, 20, 23

*Van Patten v. Vertical Fitness Grp., LLC,*
   847 F.3d 1037 (9th Cir. 2017) ......................................................................... 14

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ................................................................... 19, 20, 21, 22

*Wash. State Grange v. Wash. State Repub. Party,*
   552 U.S. 442 (2008) ......................................................................................... 15

*Whalen v. Roe,*
   429 U.S. 589 (1977) ......................................................................................... 16

*Williams-Yulee v. Fla. Bar,*
   575 U.S. 433 (2015) ............................................................................. 15, 17, 18

**Statutes**

18 U.S.C. § 2258A .................................................................................................. 22

18 U.S.C. § 2710(a)(1) ............................................................................................. 4

18 U.S.C. § 2710(a)(4) ............................................................................................. 4

18 U.S.C. § 2710(b)(2) ............................................................................................. 5

18 U.S.C. § 2710(b)(2)(B) .................................................................................. 6, 14

18 U.S.C. § 2710(b)(2)(C) ...................................................................................... 20

18 U.S.C. § 2710(c) .................................................................................................. 3

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

**Other Authorities**

158 Cong. Rec. H6849–01 (Dec. 18, 2012) ........................................................5

S. Rep. 100-599 (1988) ......................................................1, 3, 4, 5, 8, 9, 14, 24

S. Rep. 112-258 (2012) ..........................................................................5

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................3

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

1   I.      **INTRODUCTION**

2           Congress passed the Video Privacy Protection Act ("VPPA") in 1988 to protect consumer

3   privacy and intellectual freedom, recognizing that Americans often receive information and ideas

4   through films and videos and that new technologies can be more intrusive than ever before. The

5   legislative history invokes the Supreme Court's holding that "the relationship between the right of

6   privacy and intellectual freedom is a central part of the first amendment" and "[p]rotecting an

7   individual's choice of books and films is a second pillar of intellectual freedom under the first

8   amendment." S. Rep. 100-599 at 4-5 (citing *NAACP v. Alabama*, 357 U.S. 449 (1958); *Stanley v.*

9   *Georgia*, 394 U.S. 557, 565 (1969)). In giving citizens control over how their private viewing habits are

10  shared, the VPPA furthers First Amendment values by ensuring that all Americans—including elected

11  officials, judges, and government employees—can freely watch films and videos in private and view

12  controversial, dissident, unpopular, or even offensive ideas without fear of exposure or ridicule.

13          Plaintiffs and other subscribers to Patreon's platform can access video and other content "for a

14  fee" (Mot. at 1), including non-mainstream political views and "Not Safe for Work" content. Although

15  it assures users that they will retain control over their personal information, Patreon disclosed what its

16  subscribers watched to Meta for financial gain, without complying with the VPPA's consent

17  requirements. Faced with potential liability under a statute now on the books for 35 years, Patreon

18  contends the VPPA violates the First Amendment even though the law permits a business to obtain

19  users' consent to sharing their information, allowing its disclosure and obviating any plausible claim of

20  censorship. The Court denied Patreon's facial challenge as premature (Dkt. 59 at 25-26); now, with the

21  benefit of a developed record, the Court should deny its challenge on the merits.

22          After abandoning its as-applied challenge in its second motion to dismiss, Patreon again shifts

23  course and attempts to revive that challenge. As the Court has already held, however, Patreon's speech

24  is commercial and limitations on such speech must only withstand intermediate scrutiny. The VPPA

25  passes this test with flying colors—rather than threatening First Amendment values, it secures not only

26  consumer privacy but intellectual freedom and the unrestrained flow of ideas. Patreon also raises

27  factual arguments regarding the harm it caused Plaintiffs and asserts that consumers can protect their

28  privacy online even without the VPPA, but the record supports Plaintiffs' claims of concrete harm and

shows they had no realistic way to protect themselves from Patreon's secret disclosures.

Fears about the VPPA's alleged overbreadth have also proven unfounded. Although Patreon focuses on the VPPA's hypothetical tension with a different law requiring electronic service providers to report child pornography to law enforcement, Patreon has failed to identify a single case where a business has faced liability for doing so. Far from chilling protected speech, evidence shows internet companies like Google and Meta routinely report illegal conduct without fear of VPPA liability. Having failed to substantiate any overbreadth, let alone the substantial overbreadth that would be required for invalidation, Patreon resorts to speculation, such as unsupported claims that the VPPA prevents teachers from speaking despite not even being subject to the law. Patreon also briefly argues that the VPPA fails to withstand strict scrutiny when applied to non-commercial speech, but the law provides the least restrictive means of protecting essential societal interests and Patreon's proposed alternatives raise other concerns and would be less effective than the VPPA in safeguarding privacy.

Patreon's motion for summary judgment on First Amendment grounds should be denied.

## II.    STATEMENT OF FACTS

Plaintiffs Brayden Stark and Judd Oostyen ("Plaintiffs") each created a Patreon account to support content creators on Patreon's platform and paid for access to that content. *See* Declaration of Trevor Tan, Ex. A (Stark Tr. at 22:22-24); Ex. B (Oostyen Tr. at 30:17-19).[1] ███████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. Ex. C (PATREON_004271); Ex. D (Montgomery Tr. at 38:18-22). Patreon uses ████████████████████████████████████ ████████████████. Ex. E (PATREON_003728); Ex. D (Montgomery Tr. at 51:24-52:21); Ex. F (Principe Tr. at 37:19-23). ████████████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. G (PATREON_005899); Ex. D (Montgomery Tr. at 129:10-17); Ex. F (Principe Tr. at 42:14-20, 44:12-20); Ex. H (Byttow Tr. at 42:5-7). The Meta Pixel is a segment of programming code that tracks "events"—users' activities on a website—and transmits this data to Meta. Plaintiffs allege that through the Pixel installed on Patreon's website, Patreon sent Meta its subscribers' Facebook IDs and the titles of the videos they watched on its website, violating the VPPA. Dkt. 41 at 5-8.

---

[1] Unless otherwise noted, all exhibits cited in this Opposition are appended to the Tan Declaration.

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

Plaintiffs greatly value their privacy. Ex. A (Stark Tr. at 20:2-10); Ex. B (Oostyen Tr. at 22:25-23:8). Patreon's unauthorized disclosure of their video viewing history ███████████████ ████████████████████████████████████████████████. Ex. I (PATREON_019019). Stark subscribed to a creator whose videos included ███████████████████████████. *Id.* Patreon also divulged to Meta the titles of videos Stark watched concerning ██████████████, such as those related ███████████████████████████████████████████████████ ███████████. *Id.* Similarly, Patreon's disclosures revealed Oostyen's subscription to creators of ████████████. *Id.*; Ex. B (Oostyen Tr. at 88:25-90:13). Patreon did not obtain Plaintiffs' informed consent for these disclosures, thereby denying them the right to control their private personal information. Ex. A (Stark Tr. at 17:15-20, 21:3-22:8); Ex. B (Oostyen Tr. at 20:25-21:5).

## III.   LEGAL STANDARD

Summary judgment must not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"; the Court draws all reasonable inferences in favor of the nonmoving party. *Munden v. Stewart Title Guar. Co.*, 8 F.4th 1040, 1044 (9th Cir. 2021) (quoting Fed. R. Civ. P. 56(a)).

## IV.   ARGUMENT

### A.   History and Scope of the VPPA.

The VPPA "follows a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals." S. Rep. 100-599 at 2; *see also Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 448 n.13 (S.D.N.Y. 2016) (at least twelve states have enacted similar laws). The legislative history shows that Congress passed the VPPA to ensure that the free exchange of ideas and expressive activity are not chilled by unwanted disclosure. S. Rep. 100–599 at 5, 7-8; *see* Ex. J Expert Report of Prof. Neil Richards ("Richards Rpt."), ¶¶ 76-80.

The VPPA authorizes a private right of action for "aggrieved" consumers, providing for statutory damages. 18 U.S.C. § 2710(c). A VPPA violation has been likened to the "the tort of intrusion upon seclusion" where "[t]he *intrusion itself* makes the defendant subject to liability, even though there is no publication or other use, meaning a showing of additional harm is not necessary to create liability." *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1340 (11th Cir. 2017) (emphasis in original); *see Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (noting that "[v]iolations of the right to

3

1   privacy have long been actionable at common law"); *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1272 (9th

2   Cir. 2019) (further explaining that "[t]hese common law privacy rights are intertwined with

3   constitutionally protected zones of privacy."); *see also* Richards Rpt., ¶¶ 26-59.

4       The text and legislative history of the VPPA show that Congress aimed the law at commercial

5   speech, as the definition of "personally identifiable information" "is intended to be transaction-oriented.

6   It is information that identifies a particular person as having engaged in a specific transaction with a

7   video tape service provider." S. Rep. 100–599 at 11-12. "The Act allows consumers to maintain control

8   over personal information divulged and generated in exchange for receiving services from video tape

9   service providers. The Act reflects the central principle of the Privacy Act of 1974: that information

10  collected for one purpose may not be used for a different purpose without the individual's consent."

11  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (quoting S. Rep. 100–599 at 8); *see also*

12  *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1124 (9th Cir. 2020) (stating that the VPPA and other federal

13  privacy laws permissibly "regulate data collection and disclosure without implicating the First

14  Amendment" because they only "regulate the misuse of information by entities that obtain [consumer]

    information from individuals through some exchange.") (quotation marks omitted).

15      The VPPA applies when (1) the defendant is a "video tape service provider" or "VTSP", (2) the

16  user is a "consumer", (3) the information disclosed constitutes "personally identifiable information" or

17  "PII", (4) the disclosure was made knowingly, and (5) the disclosure does not fall under one of the

18  enumerated exceptions under section 2710(b)(2). *See Mollett*, 795 F.3d at 1066. The VPPA applies only

19  to a "person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or

20  delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

21  To be subject to the VPPA, a defendant must be "substantially involved" with and its business

22  "significantly tailored" toward video content. *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d

23  1204, 1221 (C.D. Cal. 2017). Companies peripherally involved in video content likely are not VTSPs.

24  *See, e.g.*, *Rodriguez v. Hershey Co.*, 2023 WL 6798506, at *2 (S.D. Cal. Oct. 12, 2023) (chocolate

25  company was not a VTSP). Further, only those who purchase, rent, or subscribe to "goods or services

26  from a" VTSP, 18 U.S.C. § 2710(a)(1), are considered "consumers"—meaning only a plaintiff who pays

27  or exchanges personal information for video-related services from the defendant likely qualifies as a

28

"consumer" under the statute. *Carter v. Scripps Networks, LLC*, 2023 WL 3061858, at *6 (S.D.N.Y. Apr. 24, 2023); *Gardener v. MeTV*, 2023 WL 4365901, at *5 (N.D. Ill. July 6, 2023).

"The [VPPA] does not restrict the disclosure of information other than personally identifiable information." S. Rep. 100–599 at 11-12. PII is limited to information that allows an ordinary person to learn that someone watched specific videos. *See Eichenberger*, 876 F.3d at 985 (citing *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 274 (3d Cir. 2016)). And even if a VTSP disclosed a consumer's specific video information, it is only liable if it did so knowingly, and for civil penalties only. *See Ghanaat v. Numerade Labs, Inc.*, 2023 WL 5738391, at *5 (N.D. Cal. Aug. 28, 2023).

**B.       The VPPA Does Not Categorically Prohibit Any Speech.**

While the VPPA generally prevents the nonconsensual or secret disclosure of a consumer's video watching history, "[t]he VPPA . . .  does not prohibit *all* disclosures." *Mollett*, 795 F.3d at 1066 (emphasis in original). "The Act provides several exceptions to the disclosure prohibition" including "when the consumer has provided written consent . . . ." *Id.* (citing 18 U.S.C. § 2710(b)(2)). Since its enactment, Congress has made it significantly easier for businesses to obtain consent from consumers to share their video watching history. Recognizing that the internet and social media have dramatically changed how Americans consume and discuss video content, "Congress amended the VPPA in 2012 'to reflect the realities of the 21st century'" by giving "consumers greater flexibility to share their video viewing preferences, while maintaining their privacy, by clarifying that video tape service providers may obtain informed, written consent of consumers on an ongoing basis via the Internet." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1253 (11th Cir. 2015) (citing 158 Cong. Rec. H6849–01 (Dec. 18, 2012)). While the original version of the VPPA required "written consent . . . every time a disclosure is sought", Congress "amend[ed] the VPPA to allow consumers to provide their informed, written consent to disclose video viewing information—if they wish—one time in advance . . . on an ongoing basis for a period of up to two years at a time[.]" S. Rep. 112-258 at 3.

In other words, the VPPA is not a law that completely prohibits the discussion of an entire subject matter. Rather, it merely prohibits the secret or otherwise nonconsensual disclosure of sensitive data about who has been watching what videos. The VPPA also carefully balances privacy rights with the commercial interests of VTSPs, providing a clear pathway for them to disclose PII if they obtain

5

"informed, written consent" (1) from the consumer "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer"; (2) no more than two years in advance or at the time the disclosure is sought; and (3) permitting the consumer to either withdraw his or her consent "from ongoing disclosures" or on a case-by-case basis. 18 U.S.C. § 2710(b)(2)(B).

Hence there is no dispute that Patreon could have disclosed Plaintiffs' PII to Meta after it had taken the basic step of obtaining their consent in the manner the VPPA requires; Patreon just failed to do so. Although Patreon has submitted a declaration from one of its engineers claiming that complying with the VPPA's consent requirements would "come at a high cost" (Dkt. 78, Byttow Decl., ¶ 42), the declarant does not deny that Patreon could have done so and businesses routinely obtain consent from consumers online, including in agreements waiving their right to a jury trial or the right to bring a class action. *See, e.g.*, *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1020 (9th Cir. 2016). Patreon's evidence confirms that businesses regularly warn users that the users cannot use the services to engage in illegal activity and risk being reported to law enforcement if they do. *See, e.g.*, Dkt. 80, Morris Decl., ¶¶ 5, 14; Dkt. 82, Nelson Decl., ¶ 3. Patreon requires its customers to agree to its terms of service as a condition of its service using a "sign-in wrap" agreement, and it has given no credible reason why, as a sophisticated business, it could not have added informed VPPA consent to its contract-formation process. Byttow Decl., ¶¶ 12-34 (outlining the steps Plaintiffs took to sign up for Patreon); Ex. H (Byttow Tr. at 62:13-20, 63:12-18). For instance, it could have implemented a separate pop-up window to obtain consent from consumers as many other companies already do to comply with other privacy laws. *E.g.*, Tan Decl., Exs. K-R. *See also Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) ("Courts routinely find" agreements obtained using "a pop-up screen" enforceable).

While Patreon protests the VPPA's specific consent requirements, it has yet to cite—after three rounds of briefing—a single case suggesting that requiring informed consent to disclose sensitive information violates the First Amendment. To the contrary, in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011), the Supreme Court cited the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as a well-drafted law even though it broadly prohibits the disclosure of sensitive health information without the patient's consent. *See also Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 954 (N.D. Cal. 2017) (noting "HIPAA's heightened authorization requirements"). Similarly, highlighting

6

"[t]he importance of the consent requirement" in protecting privacy, the Court declined to adopt a broader reading of one of the exceptions to the restrictions of the Driver's Privacy Protection Act ("DPPA"). *See Maracich v. Spears*, 570 U.S. 48, 67 (2013). Additionally, courts have upheld other "opt-in" requirements against First Amendment challenges even when it is unlikely consumers would consent, such as to unsolicited faxes. *See Trans Union Corp. v. FTC*, 267 F.3d 1138, 1143 (D.C. Cir. 2001) ("*Trans Union II*") (upholding Fair Credit Reporting Act's "opt-in scheme"); *Nat'l Cable & Telecomm'ns Ass'n v. FCC*, 555 F.3d 996, 1002 (D.C. Cir. 2009); *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 658 (8th Cir. 2003).

### C. Patreon's As-Applied Challenge Fails Because Its Disclosures to Meta Are at Most Commercial Speech Subject to Intermediate Scrutiny.

Patreon argues that the VPPA cannot prohibit its disclosures of Plaintiffs' video preferences to Meta. Mot. at 16. "An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1275 (9th Cir. 2017). The restrictions on Patreon's speech do not trigger heightened First Amendment scrutiny, for the public has no legitimate interest in whether citizens watched particular videos on Patreon's website. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985); *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). Because this speech is "solely in the interest of the speaker and its specific business audience," it is only entitled to "reduced constitutional protection." *Trans Union Corp. v. FTC ("Trans Union I")*, 245 F.3d 809, 818 (D.C. Cir. 2001). Thus, to the extent data transfers can be viewed as "speech," it is commercial in nature and limitations on such speech warrant only intermediate scrutiny. *See Retail Digital Network, LLC v. Prieto*, 861 F.3d 839, 844 (9th Cir. 2017) (citing *Central Hudson Gas & Electric Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). The Court has already held that Patreon's speech is commercial and Patreon has not presented any evidence calling that conclusion into doubt. Dkt. 59 at 16.

"[A] law need not deal perfectly and fully with an identified problem to survive intermediate scrutiny." *Contest Promotions, LLC v. City & Cty. of San Francisco*, 874 F.3d 597, 601 (9th Cir. 2017). The VPPA satisfies intermediate scrutiny: it furthers substantial governmental interests in protecting consumer privacy and intellectual freedom, directly advances those interests, and is not more extensive

than necessary. *See Retail Digital Network*, 861 F.3d at 844.

1. **The VPPA Protects Substantial Government Interests.**

The VPPA protects substantial, indeed compelling, governmental interests in consumer privacy and intellectual freedom. Privacy is a societal norm and a fundamental right dating back centuries and "privacy torts have become well-ensconced in the fabric of American law." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017) (citation omitted); *see* Richards Rpt., ¶¶ 16-31. Consumer privacy "is a well-recognized substantial government interest." *Borges v. SmileDirectClub, LLC*, 2022 WL 4269564, at *7 (S.D. Fla. Sept. 15, 2022); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2348 (2020) (noting "Congress's continuing interest in protecting consumer privacy"); *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 900 (N.D. Cal. 2022).

The VPPA also advances an even more foundational interest by protecting intellectual freedom. S. Rep. 100-599 at 4-7. Congress recognized that awareness of being watched "directly affect[s] the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard." *Id.* at 7; *see Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995) (speech restrictions may be justified "based solely on history, consensus, and 'simple common sense[.]'") (citation omitted). As a VPPA sponsor explained, "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. 100-599 at 7. By protecting privacy to view video content, Congress buttressed a key First Amendment "pillar": the right to receive and exchange ideas through videos in private, a right that safeguards "dissident beliefs," protects citizens from unwanted government intrusion, and prevents the chilling of unpopular or non-mainstream ideas. *Id.* at 4-7; *see Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1167 (W.D. Wash. 2010).

There has been an age-old fear in American society that "new technologies w[ill] chip away at traditional privacy safeguards." S. Rep. 100-599 at 4-5; Richards Rpt., ¶¶ 57-61; *see also Patel*, 932 F.3d at 127. The devices Americans use everyday—including to watch videos—can easily be exploited to reveal their private behavior and preferences. *See Riley v. California*, 573 U.S. 373, 396 & 403 (2014) (information from smartphone apps "together can form a revealing montage of the user's life" and

"[w]ith all they contain and all they may reveal, they hold for many Americans the privacies of life[.]")
(quotation marks and citation omitted); *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J.,
concurring) (data "reflects a wealth of detail" about Americans). The VPPA's drafters recognized the
threat from technologies that allow for the collection of vast amounts of personal data. S. Rep. 100-599
at 6 (commenting that "we have the ability to be more intrusive than ever before. Every day Americans
are forced to provide to businesses and others personal information without having any control over
where that information goes. These records are a window into our loves, likes, and dislikes.").

As technology has made surveillance and data collection easier, the VPPA continues to protect a
governmental interest of the highest order because the "right to receive information and ideas, regardless
of their social worth, is fundamental to our free society." *Stanley*, 394 U.S. at 565 (citation omitted);
*Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018) ("seismic shifts in digital technology" have
made tracking possible "not for a short period but for years," and corporations "are not your typical
witnesses. Unlike the nosy neighbor who keeps an eye on comings and goings, they are ever alert, and
their memory is nearly infallible."). Academic research shows that "people who are watched act less
freely, and that people who are watched while they are thinking, reading, communicating, or otherwise
engaging with ideas incline their behaviors, thoughts, and beliefs towards social conformity rather than
free and autonomous belief formation." Richards Rpt., ¶¶ 71-72. The exchange of ideas, especially
unpopular ones, is a bedrock of free society and unwanted disclosures of what a person views in private
directly threaten these vital liberty interests. *See Stanley*, 394 U.S. at 565; *see also Sweezy v. State of
N.H. by Wyman*, 354 U.S. 234, 251 (1957) (noting "the virtue of political activity by minority, dissident
groups"); *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 312 (1972) ("Bill of
Rights . . . shields private speech from unreasonable surveillance").

The government has substantial and compelling interests in ensuring that Plaintiffs can watch
videos on divisive topics or featuring highly controversial figures without fear of their interest being
revealed without their consent. Thus the VPPA and state laws modeled on it, as well as other similar
data privacy statues, do not violate the First Amendment, but protect First Amendment interests. *See,
e.g.*, *Hearst*, 192 F. Supp. 3d at 448; *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 599
(S.D.N.Y. 2016) ("Compilations of one's choices in books, magazines, and videos may reveal a great

1  deal of information that a person may not want revealed[.]"); *see also Rosenbach v. Six Flags Ent.*

2  *Corp.*, 129 N.E.3d 1197, 1206 (Ill. 2019) ("[B]ecause technology now permits the wholesale collection

3  and storage" of vast quantities of personal data, the "procedural protections" data privacy laws offer "are

4  particularly crucial in our digital world[.]") (citation omitted).

5     Without addressing any of the cases upholding other privacy protection statutes, Patreon insists

6  that the governmental interest here is not substantial because Patreon disclosed accurate information, the

7  disclosures did not harm Plaintiffs, and they allegedly consented and had other tools to protect their

8  privacy. Mot. at 17. Setting aside that the inquiry does not focus on Plaintiffs but sweeps more broadly,

9  *see United States v. Edge Broad. Co.*, 509 U.S. 418, 427 (1993), Patreon's unduly narrow framing of the

10 interests at stake is wrong as a matter of law and ignores the substantial harm its disclosures caused to

11 Plaintiffs, who could not have feasibly protected themselves against Patreon's data sharing.

12            **i.    The VPPA is neither an attack on the free press nor paternalistic.**

13    While Patreon continues to rely on cases in which media organizations successfully brought

14 challenges to laws punishing reporting and publication on matters implicating public interests, the VPPA

15 is not aimed at the press. Patreon's secretive transfers, moreover, are purely commercial and do not

16 inform the public of anything. Mot. at 17-18 (citing, *inter alia, The Fla. Star v. B.J.F.*, 491 U.S. 524

17 (1989)). These cases thus offer no support to Patreon's as-applied challenge. *See Trans Union II*, 267

18 F.3d at 1140 (rejecting reliance on *Florida Star* and other cases because they "involve speech on matters

19 of public concern"). Where commercial speech and privacy rights come into conflict, "it is the right to

20 privacy that generally carries more weight." *Stover v. Fingerhut Direct Mktg., Inc.*, 709 F. Supp. 2d 473,

21 480 (S.D.W. Va. 2009). Courts have consistently applied intermediate scrutiny to uphold "regulations

22 restricting sales of customer data." *People v. Martinez*, 15 Cal. 5th 326, 345 (2023) (citation omitted).[2]

23    Patreon insists that the VPPA is nothing more than a paternalistic law that assumes consumers

24 cannot make their own decisions, claiming that the Supreme Court has looked upon such laws with

25 disfavor. Mot. at 17-19. But the Supreme Court has been skeptical of "paternalistic" concerns to justify

26

27  [2] *See, e.g., Hearst*, 192 F. Supp. 3d at 445; *Advance Mag.*, 210 F. Supp. 3d at 597; *Trans Union I*, 245
   F.3d 809, 818-19 (D.C. Cir. 2001); *Trans Union II*, 267 F.3d at 1142; *Trans Union LLC v. FTC*, 295
28  F.3d 42, 52 (D.C. Cir. 2002).

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

banning truthful *advertising* where "citizens have at their disposal ample means of averting any substantial injury inhering" from the delivery of such advertising. *Fla. Bar*, 515 U.S. at 631; *see Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002). The VPPA is a privacy statute. It does not limit truthful advertising. And by requiring informed consent to share video viewing choices, the VPPA permits citizens to make autonomous, free choices regarding with whom their data is shared, empowering them to make informed decisions about their intellectual activities. Further, the harm the VPPA guards against—the nonconsensual disclosure of private facts that may undermine engagement with controversial ideas—"cannot be eliminated by a brief journey to the trash can," *Fla. Bar*, 515 U.S. at 631, but occurs and is complete upon transmission.

Patreon also argues that the VPPA is unnecessary because Plaintiffs "are adults", blaming them for not opting out of Meta tracking cookies or using other tools that would supposedly protect them from Patreon's surreptitious disclosures. Mot. at 18-19. But Plaintiffs' experiences underscore why the VPPA's informed consent requirement is reasonable. Contrary to Patreon's portrayal of Plaintiffs as sophisticated users, they had either a "very surface-level understanding" of cookies (Ex. B (Ooysten Tr. at 43:24)) or none at all prior to this litigation (Ex. A (Stark Tr. at 37:25-38:7)). Moreover, even though their familiarity with internet privacy protections is subject to dispute, neither was aware of the Pixel prior to this litigation. Ex. A (Stark Tr. at 56:6-11); Ex. B (Ooysten Tr. at 76:13-25). Patreon also identifies no case requiring consumers to utilize third-party programs to protect their privacy against undisclosed threats. Mot. at 4. It is unrealistic to impose such burdens on consumers; surveys have consistently shown that, while consumers overwhelmingly care about their privacy and personal data online, most do not know how to protect themselves. Ex. S (Owen Decl., ¶ 3); Ex. T; Ex. U (Rosenberg Decl., ¶ 5); *see also Fla. Bar*, 515 U.S. at 626–27; *Potts v. Zettel*, 220 F. App'x 559, 561 (9th Cir. 2007).

### ii.    Patreon's disclosures harmed Plaintiffs.

Raising another fact-intensive argument, Patreon claims its disclosures were "so narrow and devoid of meaningful content that no genuine privacy interests are implicated" because it revealed only the "titles of videos that appeared on paywalled webpages Stark and Oostyen had requested or obtained." Mot. at 18. Patreon's efforts to downplay the harm its disclosure caused to Plaintiffs is contrary not only to the evidence but to common law, which has long treated the privacy intrusion itself

11

1  as actionable without the showing of any additional harm. *See Eichenberger*, 876 F.3d at 983; *see also*

2  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The VPPA's statutory damages provision

3  simply reflects the longstanding recognition that a defendant may be liable for disclosing private facts

4  because the disclosure itself constitutes the injury-producing violation. *Perry*, 854 F.3d at 1341.

5  Moreover, Patreon's disclosures to Meta *did* cause Plaintiffs embarrassment and emotional

6  distress. It does not matter how long the video they watched was, or "whether it had sound, color, or

7  moving images" (Mot. at 18), because the title of the video can reveal a great deal by itself. For

8  instance, Patreon revealed that Stark watched videos entitled ███████████████████████████

9  ██████████████████████████████████████████ Ex. I

10  (PATREON_019019). Patreon also disseminated information about Stark's interests in ████████

11  ██████████████████████. *Id.* Similarly, Patreon revealed Oostyen's interest in ████████

12  ███████ *Id.* As the Ninth Circuit recognized, when such private information is revealed without

13  authorization, "the consumer is harmed because he or she is deprived of the right to keep private the

14  sensitive information about his or her person." *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 492

15  (9th Cir. 2019); *see also In re Horizon*, 846 F.3d at 638. Plaintiffs do not know and cannot control how

16  Meta will use their information. *Eichenberger*, 876 F.3d at 983 ("The VPPA does not protect only

17  against harms such as embarrassment and harassment . . . [but] also protects privacy interests more

18  generally by ensuring that consumers retain control over their personal information.").

19  **2.    The VPPA Advances Government Interests and Is Narrowly Tailored.**

20  Further, the VPPA is narrowly tailored to advance the governmental interests discussed above.

21  The law is aimed only at the entities most likely to possess *and* disclose PII for financial reasons. *See*

22  *Hearst*, 192 F. Supp. 3d at 449 ("The statute brings within its ambit the individuals who sell those

23  goods, restricting the reasons for which they can disclose the identifying information they collect about

24  their customers. Preventing the disclosure of consumer data to third parties by sellers—those most

25  likely to possess and collect that information—reduces the likelihood of consumers' private details

26  becoming public."); *Trans Union I*, 245 F.3d at 819 ("[W]e think it not at all inappropriate for Congress

27  to have singled out consumer reporting agencies for regulation."). Likewise, the VPPA does not

28  regulate the disclosure of PII from sources *other* than a VTSP. *See Hearst*, 192 F. Supp. 3d at 452.

Like the Michigan statute modeled on the VPPA, the law "advances the [government]'s goals without unduly burdening Defendant's ability to engage in commerce." *Hearst*, 192 F. Supp. 3d at 449; *Advance Mag.*, 210 F. Supp. 3d at 602. The VPPA strikes a balance between personal privacy and autonomy, on one hand, and business interests, on the other, including by allowing disclosures made with informed consent. Importantly, "the government cannot promote its interest . . . *except* by regulating speech because the speech itself (dissemination of [private] data) causes the very harm the government seeks to prevent." *Trans Union II*, 267 F.3d at 1142 (emphasis added); *Advance Mag.*, 210 F. Supp. 3d at 601 ("The law protects Condé Nast's interests in collecting payments and direct marketing, and it permits disclosure for any reason with the customer's permission."). The law's other "narrow, sensible exceptions do not handicap the law's ability to advance the [government's] goals." *Hearst*, 192 F. Supp. 3d at 449. In further limitations, for example, the VPPA imposes civil liability only when the disclosure reveals the plaintiff's interest in specific video content and the plaintiff proves the defendant acted knowingly. *See Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 955 (7th Cir. 2015) (the DPPA's scienter requirement "provide[s] fair warning to potential offenders"). In short, the VPPA "aim[s] directly at its intended target" and "sweeps only as broadly as necessary to accomplish its goal: protecting the privacy of personal [video] information. A narrower restriction would immediately lead to increased disclosure of such information." *Trans Union II*, 267 F.3d at 1143.

Having failed to comply with a federal law governing its business model—and having offered no reason why it failed to take the straightforward consent path that the law contemplates for sharing PII—Patreon asks the Court to rewrite (and gut) the VPPA to excuse its own noncompliance. Patreon focuses its as-applied challenge on the consent and statutory damages provisions, asking that the Court at least strike down and sever those provisions. Mot. at 19-20. Yet "[r]egulations prohibiting the use and disclosure of [consumer] information without the consent of the consumer clearly advance that interest" in privacy protection. *Individual Reference Servs. Grp., Inc. v. FTC*, 145 F. Supp. 2d 6, 43 (D.D.C. 2001). It is irrelevant that Patreon identifies other privacy statutes with less extensive consent requirements because Congress need not adopt the "least restrictive means" of achieving its valid objective. *Pena v. Lindley*, 898 F.3d 969, 979 (9th Cir. 2018). As such, the possibility that Congress could have established a more permissive consent regime for the VPPA is not grounds for invalidation, particularly when Congress has already amended the VPPA to make obtaining consumer consent much

13

easier. *See Trans Union I*, 245 F.3d at 818-19 (Congress was not required to adopt an "opt out"

approach); *Hearst*, 192 F. Supp. 3d at 450-51 (similar); *Advance Mag.*, 210 F. Supp. 3d at 602 (similar).

Nor has Patreon shown the absence of factual disputes as to whether the VPPA's consent

requirement is or is not "unworkably burdensome" or "onerous" (especially for a sophisticated

company like Patreon). The VPPA allows businesses to obtain durable consent for up to two years and

requires only that consumers receive "an opportunity" to opt out. 18 U.S.C. § 2710(b)(2)(B). Patreon's

engineering declarant complains about the burden but nowhere denies that Patreon could have complied

with the VPPA by obtaining Plaintiffs' consent to disclose their private video watching habits. *See*

*Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 660 (8th Cir. 2003) (the "TCPA has not

eliminated the fax machine as an available channel of communication. If an advertiser wishes to

promote its business by fax, there are many ways for it to secure the consent of willing potential

customers[.]"); *see also Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 305 (7th Cir. 2017).

Patreon also complains about the VPPA's statutory damages provision, asserting Congress had

"zero legitimate interest in imposing liability for speech that causes no proven harm." Mot. at 19. On

the contrary, the government has a legitimate interest in ensuring compensation for those whose

privacy interests are violated. *See Patel*, 932 F.3d at 1272 ("We have also recognized the common law

roots of the right to privacy."). Again, while there is evidence Plaintiffs suffered concrete injuries from

Patreon's disclosures, privacy violations often result in real—but intangible—harms. Statutory damages

are "necessary to remedy the intangible harm caused by privacy intrusions" (S. Rep. 100-599 at 8), and

not only is Congress's judgment in enacting the VPPA broadly consistent with the common law but

"Congress is well positioned to identify intangible harms" from the invasion of privacy interests,

exercising judgment that is "instructive and important" when it creates a cause of action. [3] *Spokeo, Inc.*

*v. Robins*, 578 U.S. 330, 341 (2016), *as revised* (May 24, 2016). Moreover, the disclosures the VPPA

prohibits "present the precise harm and infringe the same privacy interests Congress sought to protect

in enacting" the law. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).

---

[3] *See, e.g.*, *Heglund v. Aitkin Cnty.*, 871 F.3d 572, 577 (8th Cir. 2017) (concluding that the privacy
interested protected by the DPPA "was a cognizable interest at common law"); *Clemens v. ExecuPharm*
*Inc.*, 48 F.4th 146, 154 (3d Cir. 2022); *Drazen v. Pinto*, 74 F.4th 1336, 1339 (11th Cir. 2023).

14

After claiming the VPPA is overinclusive, Patreon does an about-face, claiming the law is *under*inclusive for not restricting even more speech or not applying to additional entities like public libraries. Mot. at 20. But privacy protections in the United States are "sectoral," arising from both federal and state regulations, a reality Congress was aware of this when it passed the law. Richards Rpt., ¶¶ 87-98. There is no need for the VPPA to cover libraries because libraries (now as in 1988) are subject to a host of state laws that protect library user privacy, and libraries do not have the same economic incentives as commercial entities like Patreon to disclose consumer data. *See Aargon Agency, Inc. v. O'Laughlin*, 70 F.4th 1224, 1233 (9th Cir. 2023) (statute was not underinclusive where other entities "have different incentives"); *Advance Mag.*, 210 F. Supp. 3d at 599 (48 states and Washington D.C. have library confidentiality laws); Richards Rpt., ¶¶ 93-96 (some states also have laws protecting reader privacy). The stated purpose of the VPPA is to protect Americans' privacy interests in the videos they watch and nothing more. *Id.* ¶ 97. Thus, it is unsurprising the VPPA does not cover other forms of expression like books, magazines, newspapers, or music. Even if the VPPA does not cover live as opposed to prerecorded content (Mot. at 20), the government "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee*, 575 U.S. at 449. With the VPPA, Congress reasonably focused on prerecorded video content, which may be more likely to reveal one's personal beliefs or contain controversial content or topics, as compared, for example, to live television programming that a consumer has less control over.

### D.   The Court Should Reject Patreon's Facial Challenge Because the VPPA Does Not Substantially Infringe on Protected Speech.

"Facial challenges are disfavored," *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 450 (2008) and even after extensive discovery, Patreon has not met its "heavy burden" to justify applying the "strong medicine" of facially invalidating a longstanding statute that protects key First Amendment interests. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998).

### 1.   The VPPA Withstands Strict Scrutiny Because It is Narrowly Tailored to Protect a Compelling Interest of the Highest Order.

In less than a page, Patreon asks the Court to strike down the entire VPPA, arguing that it does not withstand strict scrutiny when applied to non-commercial speech. Mot. at 25. As an initial matter, Plaintiffs acknowledge that the Court held that the VPPA is subject to strict scrutiny to the extent it

1   reaches non-commercial protected speech, but respectfully submit that the VPPA is *not* a content-based

2   restriction because it does not single out particular viewpoints. *See Reed v. Town of Gilbert*, 576 U.S.

3   155, 165–67 (2015). The VPPA "does not regulate the conduct of any other person" and "focuses on the

4   transmission of information . . . for a commercial purpose . . . and not on the dissemination of [the]

5   information more generally." *Martinez*, 15 Cal. 5th at 342-47.[4] But even if strict scrutiny were to apply,

6   the VPPA would survive. "[T]he Supreme Court has emphasized that strict scrutiny is not fatal in fact,"

7   *In re Nat'l Sec. Letter*, 33 F.4th 1058, 1073 (9th Cir. 2022), and has further suggested that privacy

8   restrictions do not raise the same concerns as other content-based restrictions. *See Sorrell*, 564 U.S. at

9   574 ("This is not to say that all privacy measures must avoid content-based rules.").

10                      **i.    Safeguarding intellectual freedom is a compelling state interest.**

11          As discussed above, together with the compelling state interest in personal privacy and

12   autonomy, the VPPA safeguards the intellectual freedom necessary to a free society. *See supra* pp. 8-10;

13   *Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001) (noting "fear of public disclosure of private conversations

14   might well have a chilling effect on private speech."); *Whalen v. Roe*, 429 U.S. 589, 606 (1977).

15          One of the cases Patreon cites as an instance of a supposedly impermissible application of the

16   VPPA highlights its ongoing importance. In *Camfield v. City of Oklahoma City,* 248 F.3d 1214 (10th

17   Cir. 2001), police seized a copy of a foreign film called *The Tin Drum*, "described as a complex

18   allegorical fantasy intended to symbolize the rise of Nazism and the corresponding decline of morality

19   in Nazi Germany," after a citizen complained that it contained child pornography because part of the

20   film depicted the main character as a young boy who engaged in simulated sex. *Id.* at 1218. Police

21   obtained the names and addresses of several customers who had rented the movie, and eventually

22   located and forced the plaintiff to turn over his videotape copy of the film. *Id.* at 1218-19. The plaintiff

23   then sued the city and officers for violating the VPPA and infringing his First Amendment and other

24   constitutional rights. *Id.* at 1220. During the lawsuit, Oklahoma implicitly conceded that its anti-

---

25   [4] *See also, e.g.*, *Gresham v. Swanson*, 866 F.3d 853, 856 (8th Cir. 2017) ("The statute as a whole
26   disfavors robocalls to strangers, but it allows them with consent."); *Act Now to Stop War & End Racism
      Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391, 403-05 (D.C. Cir. 2017); *Sosa v.
27   Onfido, Inc.*, 600 F. Supp. 3d 859, 880 (N.D. Ill. 2022); *Kuklinski v. Binance Cap. Mgmt.*, 2023 WL
      2788654, at *12 (S.D. Ill. Apr. 4, 2023); *American Civil Liberties Union v. Clearview AI, Inc.*, 2021
28   WL 4164452, at *7 (Ill. Cir. Ct. Aug. 27, 2021).

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

pornography law was overbroad, and the legislature revised the law to "narrow[]" the definition of "child pornography" such that the law no longer covered the artistic depictions in the film. *Id.* at 1222-23. Hence, the plaintiff enlisted the VPPA to *vindicate* important privacy protections embedded in the First Amendment.

Particularly now, with various controversial films and books facing bans, the VPPA's protections are vital to securing intellectual freedom.[5] The Court need not posit examples of free expression that likely would be chilled without the VPPA; ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████ *See* Richards Rpt. ¶ 86. In ensuring that citizens can watch, reflect on, and debate such content without fear of exposure or other sanction, the VPPA protects compelling governmental interests.

### ii.    The VPPA is narrowly tailored.

The VPPA also withstands strict scrutiny because it is narrowly tailored and represents the least restrictive means of furthering the goals of protecting intellectual freedom and Americans' privacy interests in what they watch. Narrow tailoring does not require that a statute be "perfectly tailored," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015), and the VPPA is neither over nor underinclusive.

The VPPA strikes an appropriate balance, limiting "a narrow slice of speech" from commercial service providers only when the specific videos that a particular consumer watched would be revealed. *Williams-Yulee*, 575 U.S. at 452 *cf. Hearst*, 192 F. Supp. 3d at 450. Further, the law does not discriminate based on topic or viewpoint. *See Sorrell*, 564 U.S. at 574; *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 655 (1994) (regulations not "activated by any particular message spoken by cable operators and thus exact no content-based penalty."); *Recycle for Change v. City of Oakland*, 856 F.3d 666, 673 (9th Cir. 2017). And far from indiscriminately banning speech, the VPPA exempts disclosures made with permission. *See Brickman v. Facebook, Inc.*, 230 F. Supp. 3d 1036, 1048 (N.D. Cal. 2017) ("[S]peech that would otherwise be prohibited by the TCPA is immediately removed from the purview of the statute once express consent is provided."); *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1150 (D. Minn. 2017) (similar). Like HIPAA, the VPPA's other exceptions are limited.

---

[5] *E.g.*, https://www.usatoday.com/story/news/nation/2023/03/28/ruby-bridges-disney-movie-banned-florida-school/11556725002/; https://www.texastribune.org/2022/09/19/texas-book-bans/.

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

*See Sorrell*, 564 U.S. at 573 ("[T]he State might have advanced its asserted privacy interest by allowing the information's sale or disclosure in only a few narrow and well-justified circumstances."). In addition, once PII is disclosed, the VPPA does not punish further dissemination. *See Dahlstrom*, 777 F.3d at 949 (any concerns about law were diminished because it is "agnostic" about further disclosures).

Patreon contends that Congress should have drafted a law with more exceptions and a more permissive consent process. Mot. at 25. Again, however, strict scrutiny requires only that the VPPA "be narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee*, 575 U.S. at 454. Moreover, "a reviewing court should 'decline to wade into th[e] swamp' of calibrating the individual mechanisms of a restriction." *In re Nat'l Sec. Letter*, 33 F.4th at 1073 (quoting *Williams-Yulee*, 575 U.S. at 454)). The Supreme Court's caution in this regard is especially relevant because the intangible harms the VPPA guards against make precise tailoring unrealistic. *See Williams-Yulee*, 575 U.S. at 454 (stating that "the impossibility of perfect tailoring is especially apparent when the State's compelling interest is . . . intangible" and therefore the broad measure of "banning all personal solicitations by judicial candidates is narrowly tailored to address that concern.").

Patreon offers a series of creative alternatives, none of which would be as effective as the VPPA in protecting the compelling interests at stake. *See Billups v. City of Charlesto*n, 194 F. Supp. 3d 452, 474 (D.S.C. 2016) ("If [the party challenging a law] could prevail by simply identifying some speculative less restrictive alternative, regardless of whether that alternative would actually work, the First Amendment would hardly allow for any regulation at all."). For instance, authorizing disclosures based on an after-the-fact finding that the information concerned a public interest is impractical and likely would have a chilling effect. *See Brickman*, 230 F. Supp. 3d at 1049 (proposed alternative "would not prevent the privacy intrusion from the phone call in the first place" and "opt-out" regime "would obviously not be as effective in achieving residential privacy.").

### 2. Patreon's Overbreadth Challenge Fails Because the Record Shows the VPPA Does Not Substantially Abridge Protected Speech.

As the Court correctly noted, "[e]ven if the VPPA does not satisfy strict scrutiny. . . it is subject to facial invalidation only if it" sweeps in a substantial amount of protected speech. Dkt. 59 at 25. The factual record now before the Court demonstrates there is no realistic danger that the VPPA significantly

18

infringes on speech entitled to heightened First Amendment protection. Even if one could conceive of some impermissible applications, any overbreadth is not *substantial* because the VPPA has myriad legitimate applications and protects the video content Americans consume in private from being revealed for profit. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973) ("[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."); *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) ("[T]here comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law" given the "substantial social costs *created* by the overbreadth doctrine") (emphasis in original).

Patreon previously relied heavily on the Ninth Circuit's holding in *United States v. Hansen*, 25 F.4th 1103 (9th Cir. 2022), that a federal statute that prohibited encouraging someone to illegally enter the country was overbroad because it hypothetically covered "[m]any commonplace statements and actions" and "everyday statements or conduct that are likely repeated countless times across the country every day." *Id.* at 1110. The Supreme Court reversed the Ninth Circuit. It reiterated that overbreadth doctrine should not be "casually employed" and "[t]o justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." 599 U.S. 762, 770 (2023). In *Hansen*, "the ratio of unlawful-to-lawful applications" was "not lopsided enough" to justify invalidation. *Id.* at 784-85.

Patreon, too, has failed to show that the VPPA suffers from a substantially lopsided volume of unlawful applications. It argues that the VPPA sweeps in several categories of protected speech: (1) notifying law enforcement of illegal activity or emergencies; (2) discussions of public officials; (3) disclosures made during criminal proceedings and civil litigation; (4) and reports from continuing education providers, schools, and teachers about what their students watched. Mot. at 20-23. Yet the evidence Patreon relies on directly undercuts its overbreadth challenge because it confirms that businesses are *routinely reporting illegal activity* and schools and businesses are disclosing what their students or clients watch without incurring VPPA liability. Thus, because it is now abundantly clear that "[i]n the vast majority of its applications, this statute raises no constitutional problems whatever," as discussed further below, the Court should reject this overbreadth challenge on the merits. *United States v. Williams*, 553 U.S. 285, 303 (2008).

19

*Potential Crimes and Emergencies.* Patreon's principal overbreadth argument is that the VPPA prevents businesses from reporting illegal activity on their platforms, including child sexual exploitation material ("CSAM") reports made to the National Center for Missing & Exploited Children's ("NCMEC") CyberTipline. Mot. at 6-7, 21 (arguing there are millions of such reports). Yet the number of reports alone disproves Patreon's contention that the VPPA substantially chills protected speech.[6]

The overbreadth doctrine arises "out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes *criminal sanctions*." *Hicks*, 539 U.S. at 119 (emphasis added). Put differently, courts apply overbreadth out of fear that "persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 38 (1999). The VPPA is not a criminal law, and to avoid the "obvious harmful effects" from "invalidating a law that in some of its applications is perfectly constitutional," the Supreme Court "vigorously enforce[s] the requirement that a statute's overbreadth be *substantial*, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292 (emphasis in original). Therefore, in order "[t]o justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770. Substantial overbreadth exists only when there is a "lopsided enough" "ratio of unlawful-to-lawful applications" focusing on actual prosecutions under the challenged statute. *Hansen*, 599 U.S. at 784-85.

No such lopsided ratio exists here. First, reflecting the VPPA's careful tailoring, it expressly permits a VTSP to disclose PII pursuant to a warrant or court order. 18 U.S.C. § 2710(b)(2)(C). Second, the VPPA only provides for civil penalties. *See Hansen*, 599 U.S. at 782 ("When we turn to the other side of the ledger, we find it pretty much blank. [Respondent] fails to identify a single prosecution

---

[6] While Patreon places great emphasis on the reports made to NCMEC's CyberTipline, the figures it relies on are misleading for purposes of evaluating overbreadth. For one thing, the overwhelming majority of reports in any year—up to 94.7%—are from abroad. Dkt. 79-5 at 4. Moreover, not every tip discloses information constituting PII as defined under the VPPA. *See, e.g.*, Dkt. 79, Shehan Decl., ¶¶ 15, 20 (service providers *may* submit the title of the video or URL and noting its data also includes images); Dkt. 79-1 (exemplar NCMEC report identifying only "images" and static "jpg" files).

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

1  for ostensibly protected expression in . . . 70 years"). Third, Patreon's overbreadth argument not only

2  ignores these points but erroneously focuses only on the supposed number of impermissible

3  applications without accounting for the law's vast legitimate sweep to protect the privacy of citizens.

4  *See id.* ("So the 'plainly legitimate sweep' of the provision is extensive.").

5       The VPPA permissibly limits the disclosure of citizens' viewing habits on popular websites and

6  apps that provide video content. Meta's records show, for example, that in just the period between ███

7  ████████████████████, its Pixel ███████████████████████████████████████████

8  ████████████████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████

11 *See* Ex. V. And this data, ████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████  *See, e.g.*, *In re*

13 *Nickelodeon*, 827 F.3d at 268-69 (litigation concerning Google tracking cookie).

14       The number of impermissible applications pales by comparison. Patreon's own evidence refutes

15 any suggestion that, as a result of the VPPA, "[m]any persons, rather than undertake the considerable

16 burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose

17 simply to abstain from protected speech" when the law does not even impose criminal penalties. *Hicks*,

18 539 U.S. at 119. The VPPA applies only to VTSPs and only to the extent such companies have a video-

19 related relationship with a "consumer" under the law. Patreon has not established as a matter of law that,

20 even if companies like Google or Meta are potentially subject to VPPA liability for reporting criminal

21 activity, they will be deterred by $2,500 in damages when there is a "public safety emergenc[y]." Mot.

22 at 22. The record shows otherwise: not only do Google and Meta account for a large portion of the

23 CyberTipline reports (Dkt. 79 at 2), but both companies' Terms of Service state that they do provide

24 information to the NCMEC and other law enforcement entities. Morris Decl., ¶ 13; Nelson Decl., ¶ 3.

25 Moreover, Google and Meta have substantial resources to vindicate their constitutional rights, are no

26 strangers to litigation and have a track record of defending their First Amendment interests up to the

27 Supreme Court. *See, e.g.*, *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 446 (5th Cir. 2022), *cert. granted*

28 *in part sub nom.* 2023 WL 6319650 (Sept. 29, 2023). If Patreon were correct that the VPPA is

consistently infringing on protected speech, one would expect to see a series of constitutional challenges to the VPPA involving non-commercial speech. But, confirming that its constitutional argument is far-fetched, Patreon has not identified a single such case over the last 35 years.

Further undermining Patreon's overbreadth challenge, although the CyberTipline provides millions of "actionable" reports to law enforcement a year (Dkt. 79-5 at 8), Patreon cites *only a handful of cases* where a criminal defendant filed a VPPA claim against a *bona fide* VTSP, and *none* where the defendant was reported through the NCMEC. *See, e.g.*, *Daniel v. Cantrell*, 375 F.3d 377, 383 (6th Cir. 2004) (rejecting VPPA challenge of criminal defendant). One case involved a frivolous lawsuit filed by a *pro se* plaintiff who did not even serve the video rental company. *See Gakuba v. Hollywood Video, Inc.,* 2015 WL 5737589, at *2, *7 (D. Or. Sept. 30, 2015). The other cases Patreon cites did not involve VTSPs. In *Camfield*, 248 F.3d at 1221, the plaintiff successfully brought a VPPA claim against Oklahoma City police, but the Tenth Circuit did not address the merits of the VPPA claim or how the sergeants could be VTSPs. And the Third Circuit disagreed with the ruling in *Dirkes v. Borough of Runnemede*, 936 F. Supp. 235, 240 (D.N.J. 1996), that allowed a VPPA claim against police. *See In re Nickelodeon*, 827 F.3d at 280-91 (noting that "[n]o other court has interpreted the Act th[e] way" the district court did in *Dirkes*). The handful of outlier, questionable decisions relied on by Patreon are nowhere near enough to strike down the VPPA, particularly given the important privacy interests it protects. *See Hicks*, 539 U.S. at 119 (even "significant" overbreadth may not justify invalidation if doing so imposes "substantial social costs").

Patreon also perceives a possible tension between the VPPA and other statutes that require VTSPs (to the extent they are also electronic service providers) to report CSAM or other illegal activity to law enforcement, *see, e.g.*, 18 U.S.C. § 2258A, but any such tension does not pose a First Amendment problem. Courts have a duty to "attempt to harmonize" federal laws that appear to conflict. *See Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1156 (9th Cir. 2020); *King v. Blue Cross & Blue Shield of Ill.*, 871 F.3d 730, 740 (9th Cir. 2017) (courts can "give effect to two statutes that overlap, so long as each reaches some distinct cases."). Even positing a conflict between the VPPA and a later-enacted statute mandating reporting of criminal activity, courts would construe the other statute as repealing the VPPA to the extent "necessary to make the [later enacted law] work, and even

22

1    then, only to the minimum extent necessary." *NLRB v. Kolkka*, 170 F.3d 937, 941 (9th Cir. 1999)

2    (alteration in original); *see also, e.g.*, *Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1125 (9th

3    Cir. 2011). Moreover, even if a "consumer" sues a VTSP for reporting that he watched CSAM, it is

4    unlikely he would prevail under the VPPA because the Constitution does not recognize a protected

5    interest in such content, *see Williams*, 553 U.S. at 288, and the claim would fall outside the zone of

6    interests the VPPA protects. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

7    129 (2014); *Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 524

8    (1991). In any event, should a case asserting a conflict with section 2258A ever arise, it should be

9    resolved through the development of a factual record specific to that case, not Patreon's speculation.

10   That Patreon is unable to identify any such case is a further indication that the VPPA is not overbroad.

11        ***Public Officials.*** Patreon also argues that the VPPA was enacted to stifle speech concerning

12   public officials, such as reporting when they take hypocritical positions. Mot. at 21. True, the VPPA

13   was spurred by a high-profile invasion of privacy—but the law as enacted protects everyone equally.

14   Although Patreon claims "Judge Bork is the most prominent example" (Mot. at 20), he is in fact *the*

15   *only potential example* Patreon can muster and the incident itself predates the VPPA. *See Hansen*, U.S.

16   at 783 (absence of any actual prosecutions under the law was fatal to overbreadth challenge). Unable to

17   identify a concrete instance where the VPPA prevented reporting on a public official, Patreon insists

18   based on a few articles about inappropriate conduct by government workers that "the video-watching

19   behavior of all public employees continues to be of great interest and importance to the public." Mot. at

20   5. But federal, state and local governments are not VTSPs, and the very existence of the articles shows

21   that the VPPA is not preventing the news media from reporting. Moreover, despite Patreon's

22   assumption, what videos a government worker watches is not necessarily a matter of public importance

23   that can be freely disseminated without invading that individual's privacy rights. On the contrary, "[a]

24   government employee does not relinquish all First Amendment rights otherwise enjoyed by citizens

25   just by reason of his or her employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).[7]

26   ───────────────

27   [7] In addition, because political and other public figures still retain privacy rights, their video habits are
     not presumptively matters of public interest either. *See Nation Mag., Wash. Bureau v. U.S. Customs*

28   *Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746

***Criminal Proceedings and Civil Litigation.*** Patreon next argues that the VPPA is overbroad

because it does not permit disclosures during criminal proceedings, but "personally identifiable

information may be disclosed to a law enforcement agency pursuant to a warrant issued under the

Federal Rules of Criminal Procedure, an equivalent state warrant, a grand jury subpoena, or a court

order." S. Rep. 100-599 at 13. Patreon's suggestion that the VPPA permits disclosure in the early stages

of a criminal investigation but not during the proceeding itself makes no sense. Section 2710(d) implies

that PII obtained through the VPPA's procedures is admissible and can be disclosed. And as with

Patreon's other arguments, its inability to cite any lawsuits arising from this scenario reveals that this

concern is entirely hypothetical. To the extent Patreon is challenging the VPPA's limitation on civil

proceedings, Congress may set reasonable limits on what can be revealed during civil proceedings

without violating the First Amendment. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33-34 (1984).

***Continuing Education Providers, Schools, and Teachers.*** According to Patreon, the VPPA

sweeps in non-commercial speech from continuing education providers, traffic schools, and teachers

who cannot report that their subscribers or students have completed specific video courses without

violating the VPPA. Mot. at 22-33. The VPPA readily permits such disclosures with prior consent

obtained online and Patreon does not explain why students and participants in online courses would

object when the reason they are taking the courses in the first place is so that the provider can certify

that they did so. Patreon also insists that the VPPA's consent procedure is "unworkable" for teachers

and schools (Mot. at 23), but neither teachers nor schools are VTSPs subject to the law.[8]

***Other Arguments.*** Patreon recycles several other arguments that remain unpersuasive. Relying

on the Ninth Circuit's decision in *IMDb*, Patreon claims that the VPPA is overbroad because it

prohibits disclosure of viewing information "if that consent does not comply with the VPPA's peculiar

formalities." Mot. at 23. That case lends no support to Patreon's position because not only did the

F.3d 1082, 1092 (D.C. Cir. 2014); *In re Los Angeles Times Commc'ns LLC*, 628 F. Supp. 3d 55, 68
(D.D.C. 2022).

[8] Patreon's contention that the VPPA cannot restrict a video store clerk from revealing that someone
watched pornographic or violent videos is devoid of support and only underscores the importance of
the VPPA's protections. Mot. at 9-10. *See Hearst*, 192 F. Supp. 3d at 452 ("Indeed, this is precisely
what the law was designed to do—to preclude sellers of certain goods from being the source that
discloses that a certain individual purchased those goods.")

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

*IMDb* court expressly distinguish the California law at issue from the VPPA, but it struck down that law for being fatally underinclusive and singling out IMDb—not because of its consent provision. *Id.* at 1127. What's more, informed consent promotes consumer autonomy by giving them a choice in how they want their data to be shared and allows VTSPs to avoid liability. Thus, as the Supreme Court recognized in *Sorrell*, a consent regime can "insulate privacy measures from First Amendment challenge." 564 U.S. at 573-74 (citing *Rowan v. Post Office Dept.*, 397 U.S. 728 (1970)).

Lastly, Patreon contends the VPPA is overbroad because it provides for statutory damages and prohibits disclosing video viewing history even if a consumer may have disclosed it to others and regardless of whether the disclosure is harmful to a privacy interest. Mot. at 23-24. Patreon continues to ignore that "both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 763 & n.15 (1989); Richards Rpt., ¶¶ 18-19. Moreover, privacy is commonly understood not as being absolute, but as a matter of degree, as with the attorney-client privilege. Richards Rpt., ¶¶ 19, 25. Consistent with this understanding, the Supreme Court has rejected the "cramped notion of personal privacy" where a citizen's "privacy interest in avoiding disclosure . . .. approaches zero" when the information was "previously disclosed to the public[.]" *Reps. Comm.*, 489 U.S. at 762; *see, e.g.*, *Kellman*, 599 F. Supp. 3d at 900-01 (rejecting First Amendment challenge). Hence "the mere fact that an individual piece of information may be found in a public record does not mean that it should receive widespread publicity if it does not involve a matter of public concern." *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 312 (E.D. Pa. 2012) (citing *Reps. Comm.*, 489 U.S. at 763 n.15); *see also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020).

Patreon has failed to substantiate its claim that the VPPA is overbroad. The record instead demonstrates that there is no realistic danger that the VPPA routinely suppresses protected speech. *See Marquez-Reyes v. Garland*, 36 F.4th 1195, 1207 (9th Cir. 2022) ("[T]o the extent the statute may reach some protected speech, it is not substantially overbroad relative to its legitimate sweep.").

## V.   **CONCLUSION**

For the foregoing reasons, the Court should deny Patreon's motion for summary judgment.

1    Dated: December 21, 2023                  Respectfully submitted,

2

3                                     /s/ *Trevor T. Tan*

                                      Adam E. Polk (SBN 273000)

4                                       Simon Grille (SBN 294914)

                                      Trevor T. Tan (SBN 281045)

5                                       Reid Gaa (SBN 330141)

                                      **GIRARD SHARP LLP**

6                                       601 California Street, Suite 1400

                                      San Francisco, CA 94108

7                                       Telephone: (415) 981-4800

                                      apolk@girardsharp.com

8                                       sgrille@girardsharp.com

                                      ttan@girardsharp.com

9                                       rgaa@girardsharp.com

10                                       *Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS

### CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically send notification of the filing to all counsel of record. I also certify that I caused the under seal documents to be served on counsel *via electronic mail*.

/s/ *Trevor T. Tan*
Trevor T. Tan

PLAINTIFFS' OPPOSITION TO PATREON INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:22-cv-03131-JCS