EXHIBIT A

CONFIDENTIAL

1         UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF CALIFORNIA
3            SAN FRANCISCO DIVISION
4
5   BRAYDEN STARK AND JUDD OOSTYEN,    )CASE NO.
    ON BEHALF OF THEMSELVES AND ALL    )3:22-cv-03131-JCS
6   OTHERS SIMILARLY SITUATED,         )
                                       )
7        PLAINTIFFS,                   )
                                       )
8   v.                                 )
                                       )
9   PATREON, INC.,                     )
                                       )
10       DEFENDANT.                    )
    _____)
11
12
13
14            CONFIDENTIAL TRANSCRIPT
15    VIDEO-RECORDED DEPOSITION OF BRAYDEN STARK
16                 OCTOBER 4, 2023
17
18
19
20
21
22
23   JOB NO. 6108020
24   REPORTED STENOGRAPHICALLY BY:
25   MARY K. MEDLEY, CSR NO. 9557

Page 1

| | | |
|---|---|---|
| 1 | address, name, address, date of birth, and other | 09:51:58 |
| 2 | personal info. | 09:52:06 |
| 3 | Q. To the extent that Patreon does not profit | 09:52:38 |
| 4 | from the use of the information you described, what | 09:52:42 |
| 5 | effect would that have on your complaint? | 09:52:46 |
| 6 | MR. GRILLE: Object to form. | 09:52:50 |
| 7 | THE WITNESS: Could you rephrase that. | 09:52:52 |
| 8 | MR. NORTON: | 09:52:57 |
| 9 | Q. If, in fact, Patreon does not profit at all | 09:52:57 |
| 10 | from the use of the information you described, do | 09:53:00 |
| 11 | you have any problem with what Patreon has done? | 09:53:03 |
| 12 | A. Yes. | 09:53:05 |
| 13 | MR. GRILLE: Object to form. | 09:53:05 |
| 14 | MR. NORTON: | 09:53:06 |
| 15 | Q. And so if Patreon does not profit from the | 09:53:07 |
| 16 | use of the information that you described, what is | 09:53:10 |
| 17 | your grievance with Patreon? | 09:53:14 |
| 18 | A. They collected data of mine and others | 09:53:19 |
| 19 | without our consent and that has also devalued our | 09:53:22 |
| 20 | data because they shared it. | 09:53:28 |
| 21 | Q. When you say has devalued your data, what | 09:53:41 |
| 22 | do you mean? | 09:53:48 |
| 23 | A. My data has less value monetarily. | 09:53:50 |
| 24 | Q. And what specific data of yours has less | 09:53:58 |
| 25 | value as the result of what you think Patreon did? | 09:54:01 |

```
 1           A.   No.                                            09:56:43

 2           Q.   Had you ever tried to place a value on that    09:56:52

 3      data prior to this lawsuit?                              09:56:55

 4           A.   Not monetarily.                                09:56:56

 5           Q.   In some other sense?                           09:56:58

 6           A.   Just the value it has to me personally.        09:57:07

 7           Q.   What is the value -- What do you mean when     09:57:18

 8      you say the value it has to you personally?              09:57:20

 9           A.   The amount of people who know about it.        09:57:30

10      Like -- Yeah.                                            09:57:38

11           Q.   Do you -- As a result of what you contend      09:57:48

12      Patreon did in this lawsuit, that is, disclose           09:57:54

13      information about you to Meta, do you have an            09:57:58

14      understanding that more people know your personal        09:58:02

15      information than knew it before?                         09:58:07

16           A.   Sorry, could you repeat it one more time.      09:58:10

17           Q.   Sure.                                          09:58:12

18                In response to my prior question, you said    09:58:13

19      that the value of the data to you personally related    09:58:15

20      to how many people know about it and now my question   09:58:19

21      to you in follow-up is, do you have an understanding   09:58:23

22      that more people know about it now than they did        09:58:26

23      before absent what you think Patreon did?                09:58:29

24           MR. GRILLE:   Object to form.                       09:58:31

25           THE WITNESS:   Absent to what Patreon did?  So     09:58:42
```

Page 20

```
 1     could you rephrase?                                     09:58:45
 2         MR. NORTON:  Yeah, sure.                            09:58:46
 3         Q.  Are there actually more people who know         09:58:51
 4     personal information about you than did before          09:58:55
 5     Patreon purportedly disclosed your information to       09:59:00
 6     Facebook?                                               09:59:03
 7         A.  Yes, there are more people.                     09:59:04
 8         Q.  All right.  And how do you know that?           09:59:05
 9         A.  Because that information was not in the         09:59:18
10     hands of Facebook before Patreon gave it to them.       09:59:21
11         Q.  And does it matter to you whether any human     09:59:27
12     being at -- Excuse me.                                  09:59:29
13             Does it matter to you whether any human         09:59:31
14     being at Facebook ever actually looked at that data?    09:59:34
15         A.  As long as they had access to look at it,       09:59:45
16     yes, it matters.                                        09:59:47
17         Q.  And why does mere access matter?                09:59:57
18         A.  Because then they have the option to view       10:00:05
19     it and use it.                                          10:00:07
20         Q.  And why does it matter to you that they         10:00:09
21     have the option to view it and use it if, in fact,      10:00:11
22     no human being ever does?                               10:00:15
23         A.  Because they shouldn't have had the data in     10:00:22
24     the first place.                                        10:00:24
25         Q.  How are you harmed if Facebook has access       10:00:25
```

| | | |
|---|---|---|
| 1 | to information about you that it never uses in any | 10:00:28 |
| 2 | way? | 10:00:33 |
| 3 | A. Them having the data period is what harms | 10:00:45 |
| 4 | me. | 10:00:47 |
| 5 | Q. And my question to you is, how? | 10:00:47 |
| 6 | MR. GRILLE: Object to form. | 10:00:51 |
| 7 | THE WITNESS: Because they got it without my | 10:00:55 |
| 8 | consent and them having it devalues it. | 10:00:56 |
| 9 | MR. NORTON: | 10:01:13 |
| 10 | Q. Anything else? | 10:01:13 |
| 11 | A. No. | 10:01:18 |
| 12 | Q. Now, you've said a few times this morning | 10:01:32 |
| 13 | that information was obtained without your consent. | 10:01:34 |
| 14 | Why do you say it was obtained without your | 10:01:39 |
| 15 | consent? | 10:01:41 |
| 16 | A. Because I did not consent for Patreon to | 10:01:42 |
| 17 | share said information. | 10:01:46 |
| 18 | Q. When did you create your Patreon account? | 10:01:49 |
| 19 | A. Believe it was 2019. | 10:01:54 |
| 20 | Q. Do you remember what month? | 10:02:01 |
| 21 | A. No. | 10:02:02 |
| 22 | Q. Why did you create a Patreon account? | 10:02:04 |
| 23 | A. To view content creators had put on the | 10:02:07 |
| 24 | website that wasn't available anywhere else. | 10:02:13 |
| 25 | Q. Were there particular creators that you | 10:02:18 |

Page 22

| | | |
|---|---|---|
| 1 | Q. When you watch NerdBallerTV on YouTube, did | 10:22:37 |
| 2 | you take some effort to prevent YouTube from | 10:22:47 |
| 3 | installing cookies on your browser? | 10:22:51 |
| 4 | A. Not at that moment. | 10:22:56 |
| 5 | Q. At some subsequent moment? | 10:22:58 |
| 6 | A. More recently, the past year or so, yes, | 10:23:01 |
| 7 | I've taken steps to protect myself better online. | 10:23:04 |
| 8 | Q. All right. So in the past year, you've | 10:23:09 |
| 9 | taken steps to prevent websites from installing | 10:23:11 |
| 10 | cookies on your browser? | 10:23:14 |
| 11 | A. Past year or two, yes. | 10:23:15 |
| 12 | Q. All right. Prior to the filing of the | 10:23:17 |
| 13 | lawsuit, had you ever done that? | 10:23:18 |
| 14 | A. No. | 10:23:20 |
| 15 | Q. Now, when you created your Patreon | 10:23:23 |
| 16 | website -- Sorry. | 10:23:26 |
| 17 | When you created your Patreon account, you | 10:23:27 |
| 18 | were aware of the existence of cookies; right? | 10:23:30 |
| 19 | A. Yes. | 10:23:33 |
| 20 | Q. Now, did you have an understanding one way | 10:23:53 |
| 21 | or the other when you created your Patreon website | 10:23:55 |
| 22 | that there are cookies that can be installed by one | 10:23:59 |
| 23 | website that track your activity on other websites? | 10:24:05 |
| 24 | A. Sorry, could you repeat the question? | 10:24:10 |
| 25 | Q. Sure. | 10:24:11 |

Page 37

| | | |
|---|---|---|
| 1 | When you created your Patreon account, did | 10:24:12 |
| 2 | you have an understanding one way or the other that | 10:24:14 |
| 3 | there were cookies that could be installed on your | 10:24:16 |
| 4 | browser by one website that would track what you did | 10:24:20 |
| 5 | on a different website? | 10:24:24 |
| 6 |     MR. GRILLE:  Object to form. | 10:24:25 |
| 7 |     THE WITNESS:  No. | 10:24:27 |
| 8 |     MR. NORTON: | 10:24:28 |
| 9 |     Q.  Do you have an understanding about that one | 10:24:38 |
| 10 | way or the other now? | 10:24:39 |
| 11 |     A.  Yes. | 10:24:41 |
| 12 |     Q.  When did you first come to understand that | 10:24:41 |
| 13 | there are cookies that can be installed on your | 10:24:43 |
| 14 | browser by one website that track what you do on | 10:24:45 |
| 15 | other websites? | 10:24:49 |
| 16 |     A.  Shortly before filing this lawsuit. | 10:24:50 |
| 17 |     Q.  Do you know where that's actually disclosed | 10:24:53 |
| 18 | in Facebook's terms of use? | 10:24:56 |
| 19 |     A.  I do not. | 10:24:58 |
| 20 |     Q.  When you created your Patreon account, I | 10:25:16 |
| 21 | think you said you weren't -- you didn't recall | 10:25:19 |
| 22 | which device you were using to create that account; | 10:25:21 |
| 23 | is that fair? | 10:25:23 |
| 24 |     A.  Yes. | 10:25:24 |
| 25 |     Q.  All right.  This was 2019. | 10:25:25 |

| | | |
|---|---|---|
| 1 | Q. Was it on the Girard Sharp website? | 11:07:50 |
| 2 | A. I don't know. | 11:07:54 |
| 3 | Q. And then the law firm called you; is that | 11:08:13 |
| 4 | right? | 11:08:14 |
| 5 | A. Yes. | 11:08:15 |
| 6 | Q. Did you learn about the Meta Pixel at some | 11:08:28 |
| 7 | point prior to the law firm calling you? | 11:08:30 |
| 8 | A. No. | 11:08:39 |
| 9 | Q. Was the first time that you were aware of | 11:08:42 |
| 10 | the Meta Pixel when the law firm called you? | 11:08:44 |
| 11 | A. Then or shortly after, yes. | 11:08:52 |
| 12 | Q. Did you interview any other law firms other | 11:09:11 |
| 13 | than the law firm whose ad you saw on Instagram? | 11:09:15 |
| 14 | A. I don't know if it was the law firm's ad, | 11:09:29 |
| 15 | but, no, I did not reach out to any other law firms. | 11:09:30 |
| 16 | Q. The law firm that contacted you after you | 11:09:33 |
| 17 | responded to the ad, is that the law firm that | 11:09:37 |
| 18 | represents you now in this lawsuit? | 11:09:40 |
| 19 | A. Yes. | 11:09:41 |
| 20 | Q. That law firm is Girard Sharp? | 11:09:42 |
| 21 | A. Yes. | 11:09:44 |
| 22 | Q. And just to be clear, you did not interview | 11:09:44 |
| 23 | or explore any other counsel to represent you in | 11:09:47 |
| 24 | this case besides the law firm that -- whose | 11:09:51 |
| 25 | advertisement you saw on Instagram; correct? | 11:09:55 |