EXHIBIT J

**United States District Court**
**Northern District of California**

**Case No. 3:22-cv-03131-JCS**

**Stark et al v. Patreon, Inc.**

**Expert Report of Professor Neil Richards**

**September 22, 2023**

## *Introduction*

1. My name is Neil Richards. I am the Koch Distinguished Professor in Law at Washington University School of Law in St. Louis, Missouri, where I have taught courses on privacy and the First Amendment for over twenty years, and where I co-direct the Cordell Institute for Policy in Medicine and Law, which focuses on problems involving the collection and use of human data. I am an affiliate scholar with the Stanford Center for Internet and Society, the Yale Information Society Project, and the Berkman-Klein Center at Harvard Law School, and a Fellow with the Center for Democracy and Technology. I have also taught short courses on a range of U.S. and transatlantic privacy, security, and consumer protection issues at other institutions including Georgetown University, the University of Amsterdam in the Netherlands, and the University of Bocconi in Italy.

2. As one of the leading figures in the field of information privacy, my scholarship and teaching have spanned a wide range of privacy issues, but at their core they can be described as explaining both the historical importance of privacy and the continued importance of privacy rights and protections in our digital, networked society with particular reference to the ways in which privacy and the First Amendment are related. I believe it to be both true and generally accepted in my field that I am the leading scholar in the world working at the intersection of privacy and the First Amendment. I set out further details of my qualifications and background in Appendix A, which contains my C.V., including a list of my academic and other publications.

3. I have been retained to provide an expert opinion on behalf of the Plaintiffs in this case regarding (1) the concepts of privacy and intellectual privacy, (2) the history of privacy rights in the United States and how the Video Privacy

Protection Act (VPPA) fits within that broader historical context and (3) the interplay between privacy laws, including the VPPA, and First Amendment interests.

4.  I am compensated at the rate of $1000/hour. My compensation does not depend upon the outcome of the case. In the event of any recovery in this case, I understand that I will be excluded from the definition of any proposed or certified class and consent to such exclusion.

### Materials Reviewed

5.  In preparing this opinion, I have considered an extensive set of materials, which I have identified in the text and footnotes of this Report and in Appendices A-B.

### Qualifications and Background

6.  *Education and clerkships.* I am a 1997 graduate of the University of Virginia School of Law, from which I also graduated with a Master's degree in legal history. In law school, I was the Executive Editor of the *Virginia Law Review*, and was awarded several academic prizes, including the Order of the Coif. Following law school, I clerked twice for federal judges, first for Judge Paul V. Niemeyer of the United States Court of Appeals for the Fourth Circuit, and then for Chief Justice of the United States William H. Rehnquist. My clerkship with Chief Justice Rehnquist involved assisting him during the impeachment trial of President Clinton in the United States Senate. Following my clerkships, I was the inaugural Hugo Black Fellow at the University of Alabama Law School, and then a Temple Bar Fellow with the Inns of Court in London. I then practiced law for a number of years with Wilmer, Cutler, and Pickering (now WilmerHale), in its Washington, D.C. Office. At Wilmer, my practice was split between privacy law and litigation.

7.  *Professional experience.* Since I entered academia, I have been highly active in professional activities relating to privacy and technology law. I am an elected member of the American Law Institute and served as an Advisor on the ALI's project on the *Principles of the Law of Data Privacy*. I am a member of the Advisory Board of the Future of Privacy Forum, a Washington, D.C.-based think-tank composed of privacy and security law experts in industry and academia that seeks to advance responsible data practices, as well as of the Society of Legal Scholars of the United Kingdom and Ireland. I have also consulted with law firms and companies about practical privacy and security issues. Between 2015 and 2017, I served as an elected national trustee of the

Freedom to Read Foundation, a non-profit legal and educational organization affiliated with the American Library Association that protects and defends the First Amendment to the Constitution and supports the right of libraries to collect – and individuals to access – information. I have testified before the US Senate on privacy issues, and been invited by the Federal Trade Commission and international governments to speak on questions of data privacy and data protection. In April 2022, Commissioner Lina Khan, the Chair of the Federal Trade Commission favorably quoted my work in her first major speech outlining the agency's new priorities for privacy and data security actions, which includes the privacy issues implicated by this case.

8. *Litigation.* I have also been active in important litigation involving privacy, security, and consumer protection law in the United States, Britain, and Europe. I have consulted, advised, testified, and submitted amicus briefing in a range of important cases in these areas. For example, I was asked by the Irish government to be one of their two U.S. privacy law experts in the closely-watched cross-border data case of *Data Protection Commissioner v. Schrems*, better known as "*Schrems 2.*" My evidence was accepted by the Irish High Court, and sustained on appeal by both the Supreme Court of Ireland and then the European Court of Justice in Luxembourg in July, 2020, where it formed part of the factual predicate of the Court's ruling striking down the cross-border data-sharing agreement known as the EU-US Privacy Shield. My evidence in these cases has invariably gone beyond the law to include the social and historical contexts of privacy and privacy law, themes that have been at the forefront of my academic work for over a quarter of a century.

9. *Scholarship.* My written scholarship has been devoted almost entirely to questions of information privacy law, and it has frequently offered a historical perspective on questions of contemporary privacy law, drawing on my academic training both as a lawyer and as a historian. I am fortunate that my work has been well-received and I am one of the five most-cited scholars in my field.[1] I am also the nineteenth most-cited law professor in the United States in any field born after 1970.[2] My article "The Dangers of Surveillance," which appeared in the *Harvard Law Review* in 2013, is one of the most-read articles

---

[1] *10 Most-Cited Law & Technology Scholars in the US*, 2016-2020, BRIAN LEITER'S LAW SCHOOL REPORTS, https://leiterlawschool.typepad.com/leiter/2021/09/10-most-cited-law-technology-scholars-in-the-us-2016-2020.html.

[2] Fred R. Shapiro, *The Most-Cited Legal Scholars Revisited*, 88 U. CHI. L. REV. 1595 (2021).

in the field of privacy law. I am also the author of over forty other academic articles, and my scholarship has appeared in many of the leading law reviews, including the *Harvard Law Review*, *Yale Law Journal, Columbia Law Review*, *Virginia Law Review*, *California Law Review*, and the *Georgetown Law Journal*. I have been cited in over 1,200 separate law review articles. I have also written extensively for a general audience about a range of privacy, security, and consumer protection law issues, and my work has appeared in numerous publications including: *The Guardian*, *Slate, Salon, MIT Technology Review, WIRED UK,* and *The Chronicle of Higher Education.*

10. *Books.* I am also the author of two academic books on privacy, each of which are directly relevant to the issues at stake in this case, as I understand them. In *Intellectual Privacy* (Oxford University Press, 2015), I explained how and why as a matter of history and legal theory a particular kind of privacy – intellectual privacy – is not only compatible with the values safeguarded by the First Amendment but essential to them. As I explained in the book[3] and will explain in greater detail below, the Video Privacy Protection Act is the quintessential intellectual privacy statute. In my second book, *Why Privacy Matters* (Oxford University Press, 2021), I explained, relying on my work as a privacy scholar over two decades, why privacy is best understood as a fundamental right.

11. *Publications authored in the previous 10 years*: A list of all publications I have authored in the last ten years is contained at pp. 57-63 of Appendix C.

12. *Media.* I have regularly appeared in the media giving expert commentary on a wide range of consumer privacy and internet law issues. I have appeared as a guest on television and radio programs, including CNN, PBS, National Public Radio, the BBC, and Fox News. I have been quoted as an expert on privacy and constitutional law in newspapers such as *The New York Times*, *The Washington Post*, the *Wall Street Journal*, *The Guardian*, *The Chicago Tribune*, and *The Boston Globe.*

### Prior Expert Testimony

13. I have provided sworn testimony (either at trial or by deposition) as an expert in the following cases within the past four years:
   - *In re Google RTB Consumer Privacy Litigation*, Case No. 21-cv-2155-YGR (N.D. Cal. 2021).

---

[3] Neil Richards, Intellectual Privacy: Rethinking Civil Liberties for the Digital Age 132-34 (2015).

### *Summary of Opinions*

14. At a high level, my opinions can be summed up in four straightforward propositions.

   - *First*, privacy is a foundational *societal norm and fundamental right* with deep roots in U.S. social, cultural, legal, and political history.

   - *Second*, privacy rights, particularly those involving the intellectual activities of (1) reading text, (2) viewing video, and (3) communicating with others *actively support the values of free expression* that are safeguarded by existing First Amendment doctrine, as has been documented by a vibrant academic literature in law and other disciplines.

   - *Third*, the history prompting the passage of the VPPA in 1988 shows that Congress sought to protect the privacy of records of video watching behavior in order to safeguard intellectual privacy and intellectual freedom.

   - *Fourth, Congress intentionally enacted the VPPA as a key part of a web of protections at the state and federal level for intellectual records.* Unlike many other countries that have general privacy statutes, protection for privacy in the United States is both sectoral and specific, as well as divided between federal and state rules.

### *Expert Opinions*

15. The following paragraphs contain my expert opinions as a scholar trained in the disciplines of law and history who has thought, written about, researched, discussed, and taught about the importance of privacy in the United States and its relationships to the First Amendment for over twenty-five years. These opinions are offered with respect to privacy in its broader social context as a contextual and historical aid to assist the triers of law and fact in this matter with their ultimate determinations.

**I.  Privacy is a foundational *societal norm and fundamental right* with deep roots in U.S. social, cultural, legal, and political history.**

### A.  *Privacy, Intellectual Privacy, Confidentiality, and Control*

16. In the most general sense, privacy is the freedom from interference or intrusion, the right "to be let alone," a foundational and long-standing formulation most famously cited by Samuel Warren and Louis Brandeis in

their groundbreaking 1890 paper on privacy.[4] This concept recognizes that each person has a sphere of existence and activity that belongs *to that individual alone*, where he or she is free of constraint, coercion, and uninvited observation or surveillance. In the historical literature and the law, discussed below, this protected privacy sphere includes one's personal opinions, one's personal communications, how one behaves behind closed doors, and behavior within one's family and other intimate or confidential relationships.

17. There is a lot of confusion about how to think about privacy in our digital age. Our information is collected, used, and analyzed in ways consumers do not understand. One of the biggest concerns in the modern information economy is that personal information obtained from customers will be used by third parties to expose them to harm. And when technology companies set up complex and overwhelming systems that create the illusion of control with default settings that override privacy rights, this serves on the whole to *enable* those companies' ability to process and sell personal data rather than being a meaningful restriction on it.[5]

18. Five additional points about the nature of privacy are worth making here. *First, privacy is a matter of degree.* Although it might be easy to think about "private" as being the opposite of "public," in reality, most human information about most people most of the time for most of human history has dwelled in the middle of a continuum between a fact only one person knows (like what they dreamed about last night) or a fact known to virtually everyone (like that Argentina won the most recent Men's World Cup). When it comes to privacy, the obscurity of information matters, as does its social context.[6] In other words, it is a mistake to talk about privacy separate and apart from the ways and contexts in which human information is collected, processed, disclosed, and used.

19. *Second, privacy involves not just the collection of human information but also, critically, the use and disclosure of that information once it has been collected.* While it might seem facially plausible that privacy might end once information

---

[4] Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890).

[5] Neil Richards, Why Privacy Matters 90-100 (2021).

[6] For obscurity, see Woodrow Hartzog, Privacy's Blueprint: The Battle to Control the Design of New Technologies 15 (2018); for context, see Helen Nissenbaum, Privacy in Context: Technology, Policy, and the Integrity of Social Life (2009).

is collected or shared, nothing could be further from the truth. A secret is still a secret once I tell it to my confidante, my doctor, my therapist, my reference librarian, or my lawyer. It is still "private," too. Even the actions of large technology companies reflect this basic insight. Consider for example Patreon's own privacy policy, which is accompanied by the statement "We're taking a different approach to privacy – SHOW ME."[7] Clicking the "SHOW ME" link takes one to Patreon's Privacy Center, which proclaims that "The Privacy Center puts you in the driver's seat. Patreon's Privacy Center is powered by Transcend, a partner of ours. Transcend serves this Privacy Center, and operates our data privacy infrastructure behind the scenes. Transcend helps put you in charge of your data, and helps us efficiently accommodate your privacy decisions. Through encryption, the data you request access to is kept a secret between you and Patreon."[8] This notion – that data shared with Patreon will be kept a secret, is what privacy lawyers, privacy professionals, privacy scholars and many others call *confidentiality* – the idea that information can be shared in trust with another and not shared indiscriminately with third parties or the public as a whole. Confidentiality is an ancient concept in the Anglo-American common law, and is the basis for many relationships and legal rules, including those that attorneys have with their clients, law clerks with their judges, doctors with their patients, librarians with their patrons, and many more.[9]

20. *Third,* privacy also includes *"information privacy,"* a privacy concept that involves learning, knowing, and using what I refer to in my book, *Why Privacy Matters*, as "human information."[10] Information privacy is often defined in terms of "personal information" or "personal data"[11] – in very basic terms, this is information that is linked to or that can be reasonably associated with a human being.[12] Information privacy is essential because information is power, and human information confers the power to influence, nudge, and manipulate the humans to whom it relates – even when those people might not be known

---

[7] Patreon Privacy Policy, https://privacy.patreon.com/policies.

[8] Patreon Privacy Center, https://privacy.patreon.com/about.

[9] Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123 (2007).

[10] NEIL RICHARDS, WHY PRIVACY MATTERS 21-26 (2022)

[11] *Id.*, at 24-25.

[12] *See, e.g.*, CAL. CIV. CODE § 1798.80(e) (defining "personal information" as "any information that identifies, relates to, describes, or is capable of being associated with, a particular individual….").

by name. Within "information privacy," there are in turn a number of distinct kinds of privacy that have been recognized by scholars, courts, and others. These include health privacy, location privacy, financial privacy, sexual privacy, and, as particularly relevant to this case, *intellectual privacy*.

21. This brings me to my *fourth* point about the nature of privacy which is *the importance of intellectual privacy*. Intellectual privacy is privacy for the processes by which we make sense of the world – by thinking, reading books, watching videos, researching ideas, and engaging in private speech with our confidantes about what we believe, who we are, and what is true or beautiful or false or ugly. It places a protective sphere around the intellectual freedom that is at the core of free citizens of free societies, and as such it is not only closely related to but necessary for meaningful free expression, personal autonomy, and democratic self-government. I have written extensively about the nature and importance of intellectual privacy as a historical, jurisprudential, and policy matter in my career, and in my 2015 book *Intellectual Privacy*, I define it as follows:

> "[P]rivacy and free speech are not always in conflict. In fact, a specific kind of privacy is necessary to protect our cherished civil liberties of free speech and thought. I'll call this second kind of privacy "intellectual privacy." Intellectual privacy is protection from surveillance or interference when we are engaged in the processes of generating ideas— thinking, reading, and speaking with confidants before our ideas are ready for public consumption. Law has protected intellectual privacy indirectly in the past. But the digital revolution in the way we think and speak has raised the stakes. More and more, the acts of reading, thinking, and private communication are mediated by electronic technologies, including personal computers, tablets, e-books, and smartphones. Whenever we shop, read, speak, and think, we now do so using computers that create records of these activities. Your ISP, for instance, has records of every website you've visited—a virtual transcript of your intellectual explorations, of your reading and thinking. And many powerful entities, from Facebook to the National Security Agency, have shown an interest in our intellectual records— our reading habits, web-surfing habits, and private communications. Surveillance or interference of our reading and thinking can drive it to the average, the mainstream, and the boring. And in a world of "multiveillance"—surveillance not just by the state but by companies,

marketers, and those in our social networks—we need to reconsider the ways we allow monitoring and access."[13]

As I will explain in greater detail below, the VPPA is recognized as the quintessential intellectual privacy statute – but it is far from being the only one, as both federal and state governments have enacted a complex and mutually-supportive web of intellectual privacy protections over the years.

22. Intellectual privacy enables us to think, read, and communicate freely and fearlessly, but when our intellectual privacy is violated, it produces real harms. I explain this idea in my *Harvard Law Review* article "The Dangers of Surveillance":

> With respect to civil liberties, consider surveillance of people when they are thinking, reading, and communicating with others in order to make up their minds about political and social issues. Such intellectual surveillance is especially dangerous because it can cause people not to experiment with new, controversial, or deviant ideas. To protect our intellectual freedom to think without state oversight or interference, we need what I have elsewhere called "intellectual privacy." A second special harm that surveillance poses is its effect on the power dynamic between the watcher and the watched. This disparity creates the risk of a variety of harms, such as discrimination, coercion, and the threat of selective enforcement, where critics of the government can be prosecuted or blackmailed for wrongdoing unrelated to the purpose of the surveillance.[14]

23. Similarly, in 2013, the UN General Assembly approved a resolution entitled "The right of privacy in the digital age,"[15] affirming that a fundamental right of privacy – expressed as "*the presumption that individuals have an area of autonomous development, interaction and liberty*, a 'private sphere' with or without interaction and free from State intervention and from excessive unsolicited intervention by other uninvited individuals – applies online as well as offline, and declaring that the "mere existence of secret surveillance,"

---

[13] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 5.

[14] Neil M. Richards, *The Dangers of Surveillance*, 126 HARV. L. REV. 1934, 1935 (2013).

[15] UN General Assembly, Resolution 68/167, "The right to privacy in the digital age," A/RES/68/167 (Dec. 18, 2013), https://undocs.org/en/A/RES/68/167.

whether undertaken by governments or by private actors, amounts to "an interference with this right."[16]

24. Subsequent scholarship on the harms that come from violations of intellectual and other kinds of privacy have articulated a broader explanation of harms that come from privacy violations. For example, the leading privacy scholars Danielle Citron and Daniel Solove have categorized the harms that privacy violations can cause, including autonomy harms (e.g., coercion, manipulation, failure to inform, thwarted expectations, a lack of control, and chilling effects), discrimination harms, psychological harms (such as emotional distress and disturbance), physical harms, economic harms, reputational harms, and relationship harms (such as the loss of confidentiality and damage to the trust that is necessary for many important personal, professional, and commercial relationships to flourish).[17]

25. *Fifth*, *the ability to control information about oneself* has been a hallmark of the ways legislatures have sought to protect privacy over the years. Another well-recognized element of privacy – and one that has particular importance in the world of the informational-processing capabilities of a computers and Internet-based communication – is our ability to decide what information about ourselves is shared and with whom. A confidence or secret retains its confidential quality even if I tell it to my doctor, my therapist, my lawyer, or if it is disclosed under seal in litigation. As noted above, it is still "private" too. To understand whether such sharing is consistent with societal privacy norms, the important considerations include: (1) the "obscurity" of information (how hard it is for others to discover), (2) one's ability to confidently share information with only those persons of one's choosing, as well as (3) social context.[18] In other words, it is a mistake to talk about privacy separate and apart from the ways and contexts in which human information is collected, and processed, and how it is shared and used. Instead, it is important to focus on the ways in which human information is used to identify humans, observe their

---

[16] *See* UN General Assembly, Report of the Office of the High Commission for Human Rights, "The right to privacy in the digital age," 2-4, 12-15 (Aug. 3, 2018), https://documents-dds-ny.un.org/doc/UNDOC/GEN/G18/239/58/PDF/G1823958.pdf?OpenElement.

[17] Danielle Keats Citron & Daniel Solove, *Privacy Harms*, 102 B.U. L. REV. 793 (2022).

[18] For obscurity, *see* Woodrow Hartzog, *Privacy's Blueprint: The Battle to Control the Design of New Technologies* 15, 95-96 (2018); for context, *see* Helen Nissenbaum, *Privacy in Context: Technology, Policy, and the Integrity of Social Life* (2009).

behavior (whether physically or online), and influence the decisions they make. And, particularly in an online setting, a critical consideration is whether all such processes are both transparent and comprehensible when individuals are making decisions about what to share, how, when, and with whom. The VPPA's strict consent requirements for sharing are some of the best and most effective examples in our law of ensuring control of private information by protecting privacy by default and only allowing consent to share where strict (and understood) permission to share has been given. In this way, the VPPA serves its policy goal of protecting the intellectual privacy of video viewing records, and placing consumers and citizens in control of any departures from the baseline that the videos one watches at home are private and confidential.

26. Thus, one consistently recognized tenet of privacy involves the ability to control, participate or exercise meaningful agency over one's own personal information and its dissemination, a concept I see reflected in the case law. Thus, for example, in the Ninth Circuit's VPPA case of *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017), quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989), the court explained that "[a] right to privacy 'encompass[es] the individual's control of information concerning his or her person.'"

27. The U.S. Department of Commerce's National Institute of Standards and Technology ("NIST") includes this tenet in its definition of "privacy," which NIST defines as "assurance that the confidentiality of, and access to, certain information about an entity is protected; the right of a party to maintain control over and confidentiality of information about itself; freedom from intrusion into the private life or affairs of an individual when that intrusion results from undue or illegal gathering and use of data about that individual."[19]

28. In the present matter, I note that Patreon's Privacy Center, in the language quoted above, also recognizes that its paying patrons will retain control of data about them and how they interact with its platform. It promises that the Privacy Center will "put you in charge of your data, and … efficiently accommodate your privacy decisions."[20]

---

[19] National Institute of Standards and Technology, Computer Security Resource Center, "Glossary," https://csrc.nist.gov/glossary/term/privacy.
[20] Patreon Privacy Center, https://privacy.patreon.com/about.

**B.** *Privacy is a societal norm and fundamental right deeply rooted in American history*

29. The central tenets of privacy described above have long been protected as a fundamental and important societal value in the U.S. While many believe that these privacy concepts stem from Warren and Brandeis' famous 1890 article,[21] an examination of American legal history shows that rules to protect these values are even older and have ancient roots in the common law.

30. Warren and Brandeis certainly gave this set of rules a name and some organizing principles in their famous article, but they were mining deep resources that in many respects were part of the bedrock of American law.[22] As stated by privacy scholar Amy Gajda, "the right to privacy as a legal concept has always existed in some sense in U.S. law, ever since the very first long-form newspaper reported titillating scandal in 1690 and was immediately shut down."[23] While central to our societal and cultural fabric for centuries, these historical privacy tenets have continued to the present day. Professor Gajda acknowledges this persistent normative thread in her work: "…. Our right to privacy—the right to decide our public face and who we are in our most intimate moments even when we've shared those moments with others—is not a right born of today's new and invasive technologies but has long persisted as a counterbalance to truth and press and speech freedoms and the right to know."[24]

31. In this section of my report, I will show how privacy in general—and intellectual privacy in particular—has long been a foundational societal value recognized and protected in American law, and that it is best understood via three constructs—(1) constitutional law rules, (2) tort law rules, and (3) statutory law including data protection rules[25]—all of which recognize the central privacy tenets I discuss above, and further underscore the long-held

---

[21] *See* Note 2, above.

[22] Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123 (2007).

[23] Amy Gajda, *Seek and Hide: The Tangled History of the Right to Privacy,* xi-xii (2022).

[24] *Id.*

[25] This division of the sources of American privacy law into four categories is drawn from and reflected in William McGeveran, *Privacy and Data Protection Law* (2016), a leading case book in U.S. privacy law.

belief in American society that not only is privacy an important value but a fundamental right deserving legal protection.

### 1.    Constitutional Law

#### a.    Federal Constitutional Law

32. Privacy as a fundamental, constitutional right dates back at least to the origins of the American Republic, with antecedents in the English common law that are even older. The United States Constitution of 1787 and the Bill of Rights of 1789 do not use the word "privacy" expressly, but protections for informational privacy run throughout the documents. As the Supreme Court recognized in *Griswold v. Connecticut,* 381 U.S. 479, 484 (1965), "specific guarantees in the Bill of Rights," read together, can be seen as creating a relatively coherent protection for privacy against the state. Indeed, in the subsequent case of *Whalen v. Roe*, 429 U.S. 589, 599 (1977), the Court read *Griswold* as expressly recognizing a privacy right including "the individual interest in avoiding disclosure of private matters."[26]

33. Beyond the "constitutional privacy" cases, other bodies of constitutional doctrine reflect the societal interest in privacy and its protection. The First Amendment, for example, has long been read to value and protect anonymous speech and association.[27] In *Intellectual Privacy*, after reviewing the legal history of U.S. First Amendment jurisprudence, I explain that the freedom of thought—including the ability to engage freely with text and ideas—is at the core of what the First Amendment protects. I conclude that "Modern cases continue to reflect this legacy. The [Supreme] Court has repeatedly declared that the constitutional guarantee of freedom of thought is at the foundation of what it means to have a free society. In particular, freedom of thought has been invoked as a principal justification for preventing punishment based upon possessing or reading dangerous media. Thus, the government cannot punish a person for merely possessing unpopular or dangerous books or images based upon their content. As Alexander Meiklejohn put it succinctly, the First Amendment protects, first and foremost, 'the thinking process of the community.' Freedom of thought thus remains, as it has for centuries, the foundation of the Anglo-American tradition of civil liberties. It is also the core

---

[26] Neil M. Richards, *The Information Privacy Law Project*, 94 Geo. L. J. 1087, 1105 (2006).

[27] *E.g.*, *NAACP v. Alabama*, 357 U.S. 449 (1958) (anonymous association); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) (anonymous expression).

of intellectual privacy.[28] As I have explained in other scholarship, "Surveillance deters bad behavior. But when we are talking about freedom of the mind, bad ideas don't exist. As Justice Powell famously put it, 'Under the First Amendment there is no such thing as a false idea.' And keeping out those who would monitor our reading and private writing is essential if we want to explore or generate new ideas, a fact our law has long recognized in subtle and sometimes underappreciated ways."[29]

34. Both the linkages between free expression and privacy and our constitutional heritage of recognizing this fact was expressly recognized by Congress when it passed the VPPA in 1988. The Senate Report accompanying the law described its legal justification by explaining that:

> Acknowledging the relationship between the right of privacy and intellectual freedom is a central part of the First Amendment. The Supreme Court recognized the important tie between the disclosure of lists that reveal personal and political beliefs and the first amendment right of association in *NAACP v. Alabama,* 357 U.S. 449 (1958). In that case, the Court held that Alabama could not obtain the membership lists of the NAACP, reasoning that "privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." Protecting an individual's choice of books and films is a second pillar of intellectual freedom under the first amendment. In *Stanley v. Georgia*, 394 U.S. 557, 565 (1969), the Court declared, "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his house, what books he may read and what films he may watch."[30]

35. The Third Amendment's prohibition of the quartering of soldiers in private homes during peacetime is also the essence of a privacy right.[31] If privacy means anything, it means the right to keep others—whether soldiers,

---

[28] *Id.* at 119 (citations omitted).
[29] See Neil M. Richards, *The Perils of Social Reading*, 101 GEO. L.J. 689, 706 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)).
[30] The Video Privacy Protection Act of 1988, S. Rep. 100- 599, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 4342–1.
[31] U.S. CONST. AMEND. III; see also *Griswold,* 381 U.S. at 484 (making precisely this point).

marketers, spies, door-to-door salesmen, advertising partners, or anyone else—out of your home, your affairs, and your information.

36. Perhaps the most famous body of constitutional privacy doctrine is that of the Fourth Amendment. The Fourth Amendment alludes to intellectual privacy in its text, by reference to the explicit protection of "papers" alongside "persons," "houses," and "effects."[32] As I explain in *Intellectual Privacy,* while today we might think of the Fourth Amendment as primarily protecting our homes and persons against searches for contraband like drugs, "the Fourth Amendment's origins come not from drug cases but as a bulwark against intellectual surveillance by the state. In the eighteenth century, the English Crown had sought to quash political and religious dissent through the use of 'general warrants,' legal documents that gave agents of the Crown the authority to search the homes of suspected dissidents for incriminating papers."[33] After recounting the influential case of John Wilkes, I conclude:

> By taking a stand against the king and intrusive searches, Wilkes became a cause célèbre among Britons at home and in the colonies. This was particularly true for many American colonists, whose own objections to British tax policy following the Treaty of Paris culminated in the American Revolution. The rebellious colonists drew from the Wilkes case the importance of political dissent as well as the need to protect dissenting citizens from unreasonable (and politically motivated) searches and seizures. The Fourth Amendment was intended to address this problem by inscribing legal protection for "persons, houses, papers, and effects" into the Bill of Rights. A government that could not search the homes and read the papers of its citizens would be less able to engage in intellectual tyranny and enforce intellectual orthodoxy. In a pre-electronic world, the Fourth Amendment kept out the state, while trespass and other property laws kept private parties out of our homes, paper, and effects. The Fourth and Fifth Amendments thus protect the freedom of thought at their core. As Stuntz explains, the early English cases establishing these principles were "classic First Amendment cases in a system with no First Amendment." Even in a legal regime without protection for dissidents who expressed unpopular political or religious opinions, the English system protected those

---

[32] U.S. Const. Amd. IV.
[33] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 117 (citations omitted).

dissidents in their private beliefs, as well as the papers and other documents that might reveal those beliefs.[34]

37. Given its origins, then, it should thus be no surprise that Fourth Amendment jurisprudence has long recognized the societal value of intellectual privacy in the form of privacy and confidentiality protection for communications. In *Ex Parte Jackson* (1878), the Supreme Court ruled that the Fourth Amendment required the government to obtain a warrant before it read the contents of letters in the mails, even though such letters were in the possession of the government from the moment a letter was sent until the moment it was received.[35] *Jackson* itself represents the codification into constitutional law of postal confidentiality norms and rules dating back to the colonial period—a recognition that communications (including the sending of reading material and ideas) are no one's business but the sender and the recipient.[36]

38. Modern interpretations of the Fourth Amendment since the 1960s have been built on the foundation of *Katz v. United States*.[37] *Katz* is best known for its recognition that privacy as a fundamental right protects reasonable, objective expectations of privacy that people have about their information (*Katz* itself recognized the importance of communications privacy in the context of the telephone booth). But from a historical perspective, two dimensions of *Katz* and its legacy are worth highlighting.

39. First, *Katz* recognized the fundamental right to Fourth Amendment privacy articulated by Justice Louis Brandeis in his famous dissent in *Olmstead v. United States*.[38] In that wiretapping case, Brandeis had argued that the fundamental societal tenets of privacy meant that it is essential for the law to keep up with changing technologies and social practices. Concerned that "[d]iscovery and invention have made it possible for the Government, by means far more effective than stretching upon the rack, to obtain disclosure in court of what is whispered in the closet,"[39] Brandeis argued for a broad interpretation of the Fourth Amendment that preserved its underlying

---

[34] *Id*. at 117-18 (citations omitted).

[35] *Ex parte Jackson*, 96 U.S. 727, 733 (1877).

[36] Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1452-56 (2017); *see also* Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123, 140-44 (2007).

[37] 389 U.S. 347 (1967).

[38] 277 U.S. 438 (1928).

[39] *Id.,* at 473.

substantive privacy protections notwithstanding changed circumstances. In the opinion, which ultimately became the foundation for the modern understanding of the Fourth Amendment, he discussed the need for the Fourth Amendment to be interpreted flexibly in the face of changing technologies, so that courts could continue to protect core societal privacy values, including "the significance of man's spiritual nature, of his feelings and of his intellect."[40] From a historical standpoint, this is a clear expression of intellectual privacy principles, a point I have made in other published scholarship.[41]

40. Second, recognizing these historically rooted norms as well as Justice Brandeis's concern about the law failing to evolve to protect historical values, recent Supreme Court cases applying *Katz* have interpreted it to apply naturally to digital technologies. In this line of cases, the Court has recognized the value of privacy in the context of new and potentially invasive technologies, ranging from the use of thermal scanners to scan private homes,[42] to GPS transponders revealing the location of cars,[43] to smart phones revealing large quantities of personal data,[44] to the location data held by cell phone companies from customers making phone calls.[45]

41. These decisions are notable for their recognition, in new technological contexts, of the well-established historical societal privacy norms in one's private home, family relations or household, in one's location and travels (which itself may reflect private information about a person), and in one's private thoughts, communications and behaviors as the rights of citizens in a democratic society. Based upon my experience and research over the past twenty-five years into the American law and history of privacy, I believe that these cases identify the societal risks of invasive digital monitoring like the surveillance of communications or data (like location or browsing activity) that might be revealing of communications. These risks are present regardless of whether it

---

[40] *Id.*, at 478. *See also* Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1458-60 (2017).

[41] *E.g.*, Neil M. Richards, *The Puzzle of Brandeis, Privacy, and Speech*, 63 VAND. L. REV. 1295, 1338-42 (2010).

[42] *Kyllo v. United States*, 533 U.S. 27 (2001).

[43] *United States v. Jones*, 565 U.S. 400 (2012).

[44] *Riley v. California*, 573 U.S. 373 (2014).

[45] *Carpenter v. United States*, 138 S.Ct. 2206 (2018).

is private or public actors engaging in such monitoring.[46] Indeed, as I have explained in my scholarship, in today's world, "More and more, the acts of reading, thinking, and private communication are mediated by electronic technologies, including personal computers, tablets, e-books, and smartphones. Whenever we shop, read, speak, and think, we now do so using computers that create records of these activities."[47] Unsurprisingly, consumers are particularly concerned about what happens to that data once it is collected by those who help them to think, read, and speak in private.[48]

### b. California Constitutional Law

38. The recognition that privacy is an important right is not limited to the federal Constitution. For example, California's state Constitution expressly recognizes privacy as a fundamental societal and cultural norm—and, indeed, establishes and protects privacy as an inalienable human right. Added in 1974, Article 1, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, *and privacy*."[49] Thus, for over 50 years, the right to privacy has expressly sat at the core of those rights enshrined in California law.

39. It is notable as a historical matter that the California Constitution came to protect the right to privacy not only in terms of the concept of intellectual privacy, but also as a concrete guarantee of such privacy against private companies as well as the state. This "inalienable right[ of] pursuing and obtaining … privacy" was intended to be an express expansion of the existing right to privacy of all Californians, and to extend to the sharing of private information. As a California court explained in interpreting the provision to apply to the non-public sharing of college grades shortly after its enactment,

---

[46] *See, e.g.*, Neil M. Richards, *The Dangers of Surveillance*, 126 HARV. L. REV. 1934, 1935, 1945-1952, 1958-59 (2013); Neil M. Richards, *The Perils of Social Reading*, 101 GEO. L.J. 689 (2013).

[47] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 5.

[48] E.g., Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information -*
*Majorities think their personal data is less secure now, that data collection poses more risks than benefits, and believe it is not possible to go through daily life without being tracked*, PEW RESEARCH CENTER, Nov. 15, 2019.

[49] CAL. CONST., ART I, §1 (1974) (emphasis added).

"[t]he right to privacy is much more than 'unnecessary wordage.' It is fundamental to any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will extend various court decisions on privacy to insure protection of our basic rights."[50] Similarly, shortly after its enactment, in a case involving the monitoring of college classrooms, the California Supreme Court explained that the provision was directed against four principal "mischiefs": "(1) 'government snooping' and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records.'"[51]

40. Two decades later, in *Hill v. NCAA* (1994), the California Supreme Court again traced this Constitutional provision back to the voter initiative that gave rise to it, which had emphasized: "The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution'"[52] The Court further underscored the provision's reference to the historical societal interest in privacy as "a fundamental and compelling interest" that includes, within its protected sphere, "our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose."[53] Read in the context of the historical materials I have presented thus far, it is obvious that language of this sort is fully consistent with and seeks to protect intellectual privacy as a fundamental right.

41. Additionally, as pertinent here, the ballot arguments in favor of Article 1, Section 1 directly acknowledge the present and increasing "capacity of both governmental and nongovernmental agencies to gather, keep, and disseminate sensitive personal information without checking its accuracy or restricting its

---

[50] *Porten v. Univ. of San Francisco*, 64 Cal. App. 3d 825, 829 (1976) (quoting Cal. Ballot Pamp. at 28 (1972)).

[51] *White v. Davis*, 13 Cal. 3d 757, 775, 533 P.2d 222, 234 (1975).

[52] *Hill v. NCAA*, 7 Cal. 4th 9, 21 (1994) (citing Ballot Pamp., Proposed Stats. and Amends. to CAL. CONST. with arguments to voters, Gen. Elec. (Nov. 7, 1972), at 27).

[53] *Id.*, 7 Cal. 4th at 24.

use to mutually agreed or otherwise legitimate purposes."[54] It was against that backdrop that the California Supreme Court held that "the overbroad collection and retention of unnecessary personal information by government and business interests" and "the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party" were two of the principal "'mischiefs'" this constitutional right was designed to guard against and protect.[55]

### 2.    Tort Law

38. Another important recognition of societal privacy norms over time in U.S. legal history has been tort law. Tort law, in fact, was the primary way in which privacy rights spread through American state law over the course of the twentieth century, spurred by the work of Warren and Brandeis and then by William Prosser, the Dean of University of California, Berkeley Law School, whose work as a scholar, casebook author, treatise-writer, and reporter of the Restatement of Torts gave his work tremendous influence.

39. Of course, privacy rights long predate Warren, Brandeis, and Prosser in the Anglo-American common law. One of the reasons that privacy was able to flourish as an idea in the twentieth century is that it was a new word for a concept with deep common-law roots.[56]

40. As a result of Prosser's careful work on privacy from the 1940s to the 1970s, today virtually all states recognize one or more of the four societal privacy norms recognized by Prosser in his scholarship and in the *Restatement (Second) of Torts* (1977), for which he served as Reporter:

> 1. Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs.
>
> 2. Public disclosure of embarrassing private facts about the plaintiff.
>
> 3. Publicity which places the plaintiff in a false light in the public eye.

---

[54] *Id.*, 7 Cal. 4th at 17.

[55] *Id.*, 7 Cal. 4th at 17-18.

[56] Neil M. Richards & Daniel J. Solove, *Privacy's Other Path: Recovering the Law of Confidentiality*, 96 GEO. L.J. 123, 140-44 (2007).

    4. Appropriation, for the defendant's advantage, of the plaintiff's name or likeness.[57]

Courts have likened the right of action the VPPA creates to the tort of intrusion upon seclusion. In *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017), the Eleventh Circuit explained that the VPPA "is similar" to the tort "but subjects a video service provider to liability only when that provider actually discloses the consumer's personal information."

41. California common law has generally followed Prosser's classification of privacy interests, recognizing the four privacy torts of intrusion, disclosure, false light and appropriation of name or likeness.[58] And, while "[t]he privacy tort seeks to vindicate multiple and different interests that range from freedom to act without observation in a home, hospital room, or other private place to the ability to control the commercial exploitation of a name or picture," each privacy tort category "identifies a distinct interest association with an individual's control of the process or products of his or her personal life."[59] The common denominator among them, the California Supreme Court observed in *Hill*, "appears to be improper interference (usually by means of observation or communication) with aspects of life consigned to the realm of the 'personal and confidential' by strong and widely shared social norms."[60]

42. Importantly, the common law privacy torts *do not require* additional consequences to be actionable. In this way, the privacy torts reflect a U.S. societal norm that the privacy intrusion is, *itself,* a tortious harm and is compensable as such.[61] Courts have recognized the "VPPA functions in the same way."[62]

---

[57] Neil M. Richards & Daniel J. Solove, *Prosser's Privacy Law: A Mixed Legacy*, 98 CALIF. L. REV. 1889 (2011)

[58] *See* 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 580-594, pp. 674-693.

[59] *Hill v. NCAA*, 7 Cal. 4th at 24.

[60] *Id.*, 7 Cal.4th at 24-25

[61] *See, e.g.*, *Restatement (Second) of Torts* § 652B cmt. b (recognizing the tort of intrusion upon seclusion, for which the "intrusion itself" makes the defendant liable).

[62] *Eichenberger*, 876 F.3d at 983 ("Tellingly, privacy torts do not always require additional consequences to be actionable."); see also *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204, 210 L. Ed. 2d 568 (2021) (recognizing that "disclosure of private information" was an intangible harm "traditionally recognized as providing a basis for lawsuits in American courts").

43. The historical notion that the privacy intrusion is, itself, the harm remains so even in today's digital era. As the legal scholar Jacqueline D. Lipton has observed, "the greatest harms in the present age often come from unauthorized uses of private information online" including the improper collection, aggregation, processing, and dissemination of information.[63]

### 3.    Statutory Law and the FIPs

44. The historical U.S. privacy norms described above are also reflected in numerous state and federal statutes, including in statutes that address data protection. For example, a leading practitioner's treatise that catalogs and describes these laws at the federal and state level runs to just shy of 4,000 pages over two volumes.[64] I therefore discuss only a few of the relevant privacy statutes below.

#### a.    Federal Statutes

45. An important example of a statute developed with intellectual privacy norms in mind is the Wiretap Act of 1968, enacted shortly after the Supreme Court's decision in *Katz*. The legislative history and statutory text of the Wiretap Act demonstrate that Congress intended to protect the historical intellectual privacy rights discussed above when it passed the Act, adding a criminal prohibition and private right of action for those who have been wronged by either private or government wiretapping.[65]  It is thus a clear and undeniable protection for intellectual privacy, in the context of communications, against both private and government actors.[66]

46. With the prospect of widespread electronic communications on the horizon, Congress updated the Wiretap Act in 1986 by passing the Electronic Communications Privacy Act and Stored Communications Act, collectively referred to as "ECPA."[67] ECPA protects against warrantless and unconsented wiretapping and email interception by both state and private parties, while the

---

[63] Jacqueline D. Lipton, *Mapping Online Privacy*, 104 NW. U. L. REV. 477, 498-99 (2010)

[64] *See* Andrew B. Serwin, *Information Security and Privacy: A Guide to Federal and State Law and Compliance* (2016).

[65] *See* S. Rep. No. 99-541, at 2 (1986) ("[The Wiretap Act] is the primary law protecting the security and privacy of business and personal communications in the United States today.")

[66] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 145.

[67] *See* McGeveran, *supra*, at 339-40.

SCA protects both stored communications and customer data held by communications providers.[68] Once again, the statute's legislative history and text evidence a Congressional intent to protect existing U.S. societal norms concerning privacy: "[The SCA] is modeled after the Right to Financial Privacy Act, 12. U.S.C. § 3401 *et seq.* to protect privacy interests in personal and proprietary information…."[69]

47. These federal statutes illustrate and represent the codification of a long American struggle against the privacy invasions of wiretapping, and the continued emphasis on privacy in one's own thoughts, communications, and ideas from not only governmental but private actors, that has continued in a variety of forms since the adoption of the telegraph and the telephone in the nineteenth century through to Internet and electronic communications today.[70]

### b. The Fair Information Practices Principles ("FIPs")

47. While not formally statutory, the Fair Information Practices Principles, or "the FIPs," are a collection of widely accepted principles to evaluate information systems, processes, programs, and activities that affect individual privacy, and form the conceptual basis for (or are consistent with) many privacy laws in the U.S. and around the world.

48. Like many privacy concepts, the FIPs have a long tradition, and though they have been highly influential around the world, they were invented in the United States. The FIPs were the product of growing anxiety in the late 1960s and early 1970s regarding large databases of information about people being developed by government and business entities and relying on the new technology of computers. They represent an ethic of fair information processing in the service of values of the protection and empowerment of people whose data is being processed. And they represent (in one form or another) the basic structure of legislative protection for privacy (sometimes known as data

---

[68] *See* 18 USC §§ 2510 et seq. *See also* Neil Richards, *The Third-Party Doctrine and the Future of the Cloud*, 94 WASH. U. L. REV. 1441, 1463 (2017) (recounting this history in greater detail).

[69] S. Rep. No. 99-541, at 3. The Ninth Circuit Court of Appeals appears to concur with this reading of the law's statutory purpose. *See In Re Facebook, Inc., Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020).

[70] *See generally* Brian Hochman, *The Listeners: A History of Wiretapping in the United States* (2022).

protection) in the United States and around the world.[71]

49. The origin of the FIPs was a highly influential report researched and drafted by a special advisory committee to the Secretary of the U.S. Department of Health, Education and Welfare (HEW) in 1973. This report, entitled "Records, Computers, and the Rights of Citizens," created the FIPs as a set of ethical guidelines for the processing of personal data. Among the fundamental principles tested by the facts of this case are the prohibition on secret processing, the importance of control over one's personal data, and protections against data collected for one legitimate purpose being used for unrelated purposes. As Professor Woodrow Hartzog and I have explained in our scholarship:

> As formulated by the HEW Report, the original Fair Information Practices protected a set of six substantive and procedural bedrock principles. First, they included a prohibition on secret databases ("There must be no personal data record-keeping systems whose very existence is secret."). Second, they provided for notice of recordkeeping ("There must be a way for an individual to find out what information about him is in a record and how it is used."). Third, they gave rights to prevent data used for one purpose being used for another without consent ("There must be a way for an individual to prevent information about him that was obtained for one purpose from being used or made available for other purposes without his consent."). Fourth, they contemplated rights of data access and correction ("There must be a way for an individual to correct or amend a record of identifiable information about him."). Finally, they provided for protections of data reliability and against data misuse ("Any organization creating, maintaining, using, or disseminating records of identifiable personal data must assure the reliability of the data for their intended use and must take precautions to prevent misuse of the data.").[72]

50. Thus, from the inception of what is now sometimes called data protection law, it has been incumbent on companies and others who process personal data (particularly in large quantities) to (1) not process in secret, (2) make it possible

---

[71] *See generally* Robert Gellman, *Fair Information Practices: A Basic History* (2016), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2415020.
[72] Woodrow Hartzog & Neil Richards, *Privacy's Constitutional Moment and the Limits of Data Protection*, 61 B.C. L. REV. 1687, 1700-01 (2020).

for people to find out how their data is being processed, (3) make sure that data collected for one purpose is not used for another purpose in unconsented ways, (4) allow access and correction of false data, and (5) make sure that the data is reliable and not misused in in any way.

51. The FIPs also have served as the conceptual backbone for several federal privacy laws, including the federal Privacy Act of 1974, 5 U.S.C. § 552a, and the Children's Online Privacy Protection Act of 1998, 15 U.S.C. §§ 6501–6506. Indeed, in passing the Privacy Act, whose purpose is to establish a code of Fair Information Practices that governs the collection, maintenance, use, and dissemination of personally identifiable about individuals maintained in systems of records by federal agencies, Congress placed the societal privacy norm that exists in the U.S. upfront, declaring in the statute's preamble that "the right to privacy is a personal and fundamental right protected by the Constitution of the United States."[73] The FIPS are also the conceptual backbone for the VPPA, which as I will show below is further evidence of the ways in which the VPPA functions as part of a larger whole of sectoral statutes protecting privacy in general and intellectual privacy in particular.[74]

### c.   California Statutes

52. California's statutory regime is particularly noteworthy as it is one of the strongest state communications privacy regimes in the country, both in the number of statutes and in the strength of their protections. California's scheme includes at least four relevant statutes.

53. First, there is the California Invasion of Privacy Act ("CIPA"),[75] which is the California state-law analog to ECPA.[76] CIPA's legislative history and text from 1967—before the express adoption of the express constitutional right to privacy—show that the California legislature intended to protect the historical societal privacy norms discussed above when it enacted the law and granted civil and criminal penalties to those aggrieved by its violations.[77] Indeed, the enacted statute opens with the finding that "The Legislature hereby declares

---

[73] PUB. L. 93-579 § 2 (1974).

[74] Development, *The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 HARV. L. REV. 1766 (2018).

[75] CAL. PENAL CODE § 630, et seq.

[76] CAL. PENAL CODE § 631(a).

[77] CAL. PENAL CODE § 630 (noting that CIPA was passed "to protect the right of privacy of the people of this state").

that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques have created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state."[78]

54. Second, there is California's next-generation communications privacy statute, the California Electronic Communications Privacy Act ("CalECPA").[79] CalECPA went beyond the existing state law (which was already more protective than the federal standard) to require a warrant before any state law enforcement official can compel a business to turn over any digital communications or "metadata" relating to communications activities, among other forms of digital surveillance and compulsion.[80]

55. Third, there is the California Consumer Privacy Act of 2018 ("CCPA"). Among other things, the CCPA gives consumers the right to know what information a business has collected about them, the right to delete their personal information, the right to stop businesses from selling their personal information, including using it to target them with ads that follow them as they browse the internet from one website to another, the right to hold businesses accountable if they do not take reasonable steps to safeguard their personal information, the right to correct inaccurate data about them, and the right to limit the use and disclosure of sensitive personal information.[81] In November 2020, California voters approved Proposition 24, the California Privacy Rights Act (CPRA), which amended the CCPA – it did not create a separate, new law – with additional data privacy protections.[82]

56. Fourth, there is the California Reader Privacy Act of 2011 ("CRPA"), an intellectual privacy statute that protects reader privacy in books. I will discuss this law below alongside the many other state laws protecting reader privacy.

---

[78] CAL STAT. CH. 1509 § 631 at 3584.

[79] CAL. PENAL CODE § 1546 *et seq*.

[80] *See* CAL. PENAL CODE § 1546 *et seq*.

[81] *See* Cal. Department of Justice, Office of the Attorney General, *California Consumer Privacy Act (CCPA)*, updated May 10, 2023, https://www.oag.ca.gov/privacy/ccpa.

[82] *Id*.

### C.   Privacy is Recognized as a Fundamental Right by Consumers in the United States

57. Historically and through to the present day, American consumers have considered privacy to be of critical importance to their lives.

58. It is undeniable that privacy, data security, and concerns about the use of personal information remain substantial matters of concern for consumers, particularly where information is shared or sold outside a relationship in which information was collected. The vast number of popular books and articles on privacy—along with the sustained attention given to the revelations of former NSA employee Edward Snowden, the Facebook-Cambridge Analytica scandal, and the well-documented problem of data breaches—are just a few illustrations of Americans' interest in protecting fundamental societal privacy norms.

59. Historically, privacy has been a concern of Americans for a very long time. In my book *Why Privacy Matters*, I note that contemporary concern about the alleged "death of privacy" are in fact a historical phenomenon that can be traced back to the late nineteenth century—in fact, to the concern about the perceived erosion of privacy due to gossip columns and instantaneous cameras that prompted Warren and Brandeis to write their famous article. There was another "privacy is dead" panic in the 1960s, and we have witnessed a third one (or even multiple ones) since the dawn of the Internet. As I have explained in my scholarship multiple times, the best historical interpretation of these phenomena is not that privacy has died or that Americans have ceased to care about privacy, but rather that privacy talk of this sort is how Americans express their anxiety about their privacy being violated. In other words, privacy talk of this sort is evidence that Americans care deeply about their privacy, that they have done so for a very long time, and that they continue to do so today.[83]

60. My conclusions on this point are buttressed by the work of three academic historians who have recently published major studies of privacy in the United States over the course of the twentieth century. First, as I have already noted, Professor Amy Gajda concludes based upon her historical research that privacy rights—and ordinary people's demand for privacy—can be traced throughout

---

[83] RICHARDS, WHY PRIVACY MATTERS, *supra*, at 1-11, 100-08; Neil Richards, *Four Privacy Myths*, in A WORLD WITHOUT PRIVACY? (Austin Sarat ed. 2015).

American history.[84] Second, Professor Lawrence Cappello concludes that Americans continually invoked privacy claims against new threats over the course of the twentieth century, and how "with each new threat to privacy came new articulations about its value and the consequences of it being imperiled."[85] Third, Professor Sarah Igo who documents in her history of privacy in modern America a variety of privacy struggles over the past century or so, in which some Americans sought to know more about other people, and how the subjects of that scrutiny resisted those attempts to make them known. Igo convincingly concludes that these episodes were invariably fights over social status and power in which privacy was the indispensable "mediator of modern social life." As she puts it well, "What remained remarkably consistent [about the way Americans thought about privacy] was their recourse to privacy as a way of arguing about their society and its pressures on the person."[86] In another section of her book, Igo explains how claims of the right to privacy in American history have frequently been claims to free and equal democratic citizenship. As she puts it well, "[t]o invoke [privacy's] shelter was to make a claim about the latitude for action and anonymity a decent, democratic society ought to afford its members. Responses to that claim evoked the fault lines of civic membership. Which citizens, after all, could be entrusted with privacy, and therefore be liberated from official scrutiny?"[87]

61. In addition to this scholarship by historians, a robust literature of empirical work and consumer surveys confirms that privacy rights remain a keen source of consumer concern today,[88] and that the more informed consumers are about

---

[84] Amy Gajda, *Seek and Hide: The Tangled History of the Right to Privacy,* xi-xii (2022).

[85] LAWRENCE CAPPELLO: NONE OF YOUR DAMN BUSINESS: PRIVACY IN THE UNITED STATES FROM THE GILDED AGE TO THE DIGITAL AGE 4 (2019).

[86] SARAH E. IGO, THE KNOWN CITIZEN: A HISTORY OF PRIVACY IN MODERN AMERICA 11-12 (2018).

[87] *Id.* at 3.

[88] *E.g.,* Joseph Turow et al., *Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data—Making What Companies Do Illegitimate*, Annenberg Sch. Of Comm., Univ. Pa. (February 2023); Pew Research Center, *Americans' Views About Data Collection and Security*, May 20, 2015, https://www.pewresearch.org/internet/2015/05/20/americans-views-about-data-collection-and-security/; Pew Research Center, *Americans' Attitudes About Privacy, Security and Surveillance*, May 20, 2015, https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-

---

data practices, the more likely they are to support regulation of technology companies so that company practices preserve and protect historical societal privacy norms.[89]   This is best illustrated by three recent studies that demonstrate how American consumers continue to care—and to care deeply—about their privacy, even though in practice it is becoming increasingly difficult for them to meaningfully protect it on their own in practice.

privacy-security-and-surveillance/; Pew Research Center, *Privacy and Information Sharing*, January 14, 2016, https://www.pewresearch.org/internet/2016/01/14/privacy-and-information-sharing/; Pew Research Center, *Americans and Digital Knowledge in 2019*, October 9, 2019, https://www.pewresearch.org/internet/2019/10/09/americans-and-digital-knowledge/; Pew Research Center, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Nov. 15, 2019, https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/; Pew Research Center, *Most Americans support right to have some personal info removed from online searches*, Jan. 27, 2020, https://www.pewresearch.org/fact-tank/2020/01/27/most-americans-support-right-to-have-some-personal-info-removed-from-online-searches/; Pew Research Center, *Half of Americans Have Decided not to Use a Product or Service Because of Privacy Concerns*, April 14, 2020, https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/; Pew Research Center, *Roughly six-in-ten online daters in the U.S. are concerned about data collection*, May 29, 2020, https://www.pewresearch.org/fact-tank/2020/05/29/roughly-six-in-ten-online-daters-in-the-u-s-are-concerned-about-data-collection/; Pew Research Center, *Half of Americans have decided not to use a product or service because of privacy concerns*, April 14, 2020, https://www.pewresearch.org/fact-tank/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/; Pew Research Center, *56% of Americans Support More Regulation of Major Technology Companies*, July 20, 2021, https://www.pewresearch.org/fact-tank/2021/07/20/56-of-americans-support-more-regulation-of-major-technology-companies/; Forbes Advisor, *The Fear of Internet Surveillance in 2023*, May 8, 2023, https://www.forbes.com/advisor/business/fear-internet-surveillance/; Forbes Advisor, *VPN Statistics and Trends in 2023*, Feb. 9, 2023, https://www.forbes.com/advisor/business/vpn-statistics/.

[89] *E.g.*, Pew Research Center, *56% of Americans Support More Regulation of Major Technology Companies*, July 20, 2021, https://www.pewresearch.org/fact-tank/2021/07/20/56-of-americans-support-more-regulation-of-major-technology-companies/; NiemanLab, *It Turns Out No One Wants to be Tracked all Across Their iPhones by Facebook (or Anyone Else)*, May 7, 2021, https://www.niemanlab.org/2021/05/it-turns-out-no-one-wants-to-be-tracked-all-across-their-iphones-by-facebook-or-anyone-else/.

62. First, a 2020 meta-analysis of a significant amount of empirical work across a range of social science disciplines including psychology, computer science, and economics concluded that consumers continue to care deeply about their privacy and take significant steps to protect it. The authors found that "contrary to depictions of online sharing behaviors as careless," there was significant evidence that consumers take a wide variety of actions to protect their privacy. As they noted,

> "[s]tudies, field studies, and experiments—as well as common sense— show that consumers engage in privacy-regulating behaviors continually and in both online and offline scenarios, crossing the many diverse dimensions and definitions of privacy…. The drive for privacy is under-appreciated in part because individual actions to protect privacy are so ubiquitous and second nature that they go unnoticed, or are not construed as privacy behaviors."[90]

This finding is notable since there was also evidence cited in the analysis of how, in practice, "prohibitively difficult it is to attain desired, or even desirable levels of privacy through individual action alone." These scholars concluded "highlighting how the resiliency—and apparent universality—of a human drive for privacy provides hope for a future that balances privacy with sharing and data utility."[91]

63. Second, a 2023 study by the International Association of Privacy Professionals (IAPP) about consumer attitudes about privacy reached a number of findings that are relevant here. First, the IAPP concluded that the more consumers learn about privacy practices, the more concerned they become.[92] Second, the IAPP found that "consumers take action when they feel their privacy is threatened," which is significant because while "consumers who are concerned about their privacy take real-world actions to protect it[, e]ven consumers who stated they are not concerned with privacy take such actions."[93] The IAPP study made resoundingly clear that a core consumer concern when it comes to privacy is the sharing of their personal information in ways that they had little

---

[90] Alessandro Acquisti et al., *Secrets and Likes: The Drive for Privacy and the Difficulty of Achieving It in the Digital Age*, 30(4) J. CONSUMER PSYCH. 736 (2020), https://myscp.onlinelibrary.wiley.com/doi/10.1002/jcpy.1191.
[91] *Id.*
[92] Müze Fazlioglu, *Privacy and Consumer Trust*, International Association of Privacy Professionals 8 (2023).
[93] *Id.*, at 8-10.

knowledge or control over.[94] Moreover, the unconsented sharing of personal data with third parties was the data practice that made consumers the most uncomfortable – even more so than data breaches.[95]

64. Third, another 2023 study by an interdisciplinary group of social scientists at the Annenberg School of Communications at the University of Pennsylvania reached similar conclusions. Its title is an accurate summary of those conclusions with respect to consumers' interest in their personal information and the importance of society's historical preference that individuals have meaningful control over who knows about their personal thoughts, interests and data: "*Americans Can't Consent to Companies' Use of Their Data: They Admit They Don't Understand It, Say They're Helpless to Control It, and Believe They're Harmed When Firms Use Their Data—Making What Companies Do Illegitimate.*" The report found that "[h]igh levels of frustration, concern, and fear compound Americans' confusion: 80% say they have little control over how marketers can learn about them online; 80% agree that what companies know about them from their online behaviors can harm them. These and related discoveries from our survey paint a picture of an unschooled and admittedly incapable society that rejects the internet industry's insistence that people will accept tradeoffs for benefits and despairs of its inability to predictably control its digital life in the face of powerful corporate forces."[96]

## D.   Privacy is Recognized as a Fundamental Right by Technology Companies in the United States

65. Technology companies are sophisticated entities that are well aware consumers highly value privacy. An essential underlying characteristic of privacy when it comes to technology and the digital economy is trust. Trust is essential in informational relationships – those common relationships in our digital society in which information is shared with the expectation that it will not be abused.[97]

---

[94] *Id.*, at 31.

[95] *Id.*, at 32.

[96] Turow *et al.*, *supra*, at 2.

[97] *See* Neil Richards & Woodrow Hartzog, *Taking Trust Seriously in Privacy Laws*, 19. Stan. L. & Tech. 431 (2016); Neil Richards & Woodrow Hartzog, *Trusting Big Data Research*, 65 DEPAUL L. REV. 579 (2017); Neil Richards & Woodrow Hartzog, *A Duty of Loyalty for Privacy Law*, 99 WASH. U. L. REV. 963 (2021). A community of scholars in law, business, and the social sciences have written about how historical societal privacy norms and rules protecting privacy acknowledge the concept of

66. Recognizing that privacy is essential to consumer trust, major technology companies take pains to commit (or at least to appear to commit) themselves to the importance of maintaining and protecting their customers' privacy in order to retain the information relationships on which their business depends.

67. For example, Microsoft declares at the outset of its privacy website that "*Microsoft believes privacy is a fundamental human right*. We are committed to providing you with products, information, and controls that allow you to choose how data is collected and used."[98] Apple's page is similarly clear, stating that "*Privacy is a fundamental human right*. It's also one of our core values. Which is why we design our products and services to protect it. That's the kind of innovation we believe in."[99] Many of the leading technology companies such as Meta, Google and Microsoft have also recognized the foundational, fundamental importance of trust and privacy, for their customers and for society generally, by joining the Global Network Initiative Principles (GNI Principles).[100] One of the GNI Principles is "Privacy," explaining that "Privacy is a human right and guarantor of human dignity. Privacy is important to maintaining personal security, protecting identity and promoting freedom of expression in the digital age."[101]

## II. Privacy protections for intellectual records and activities support and enable First Amendment values.

68. It follows from the foregoing paragraphs American courts, legislatures, constitutions, scholars, consumers, and companies have repeatedly

---

trust that our emerging digital society needs to survive. *See, e.g.,* Jack M. Balkin, *Information Fiduciaries and the First Amendment*, 49 U.C. DAVIS L. REV. 1183 (2016); Kiel Brennan-Marquez, *Fourth Amendment Fiduciaries*, 84 FORD L. REV. 611 (2015); Dennis D. Hirsh, *Privacy, Public Goods, and the Theory of Trust Commons: A Response to Professors Fairfield and Engel*, 65 DUKE L. J. ONLINE 67 (2016); Ari Ezra Waldman, *Privacy as Trust: Sharing Personal Information in a Networked World*, 69 U. MIAMI L. REV. 559, 561 (2015); Kirsten Martin, *Transaction Costs, Privacy, and Trust: The Laudable Goals and Ultimate Failure of Notice and Choice to Respect Privacy Online*, 18 FIRST MONDAY (Dec. 2013), http://firstmonday.org/ojs/index.php/fm/article/view/4838/3802.

[98] Microsoft, "Privacy at Microsoft," https://www.microsoft.com/en-us/trustcenter/privacy/%E2%80%AF.

[99] Apple, "Privacy," https://www.apple.com/privacy/.

[100] Google, "Human Rights," https://about.google/intl/ALL_us/human-rights/.

[101] https://globalnetworkinitiative.org/gni-principles/.

recognized over time that intellectual privacy rights support First Amendment values.

69. In a 2008 article, also called "Intellectual Privacy" that laid the groundwork for my subsequent research in this area, I demonstrated (drawing on the history of free expression and its jurisprudence) not only that each of the traditional understandings of why we protect free speech under the First Amendment are consistent with protections for intellectual privacy, but they depend upon it. This is the case because each of the three major theories about why the First Amendment is special under American law—the search for truth, democratic self-government, and human autonomy—depend upon freedom of thought, which itself depends upon the ability to read, think, and discuss privately, freely, and in a manner unchilled by the potentially disapproving gaze of others (including as internalized by the citizen).[102] As I put it in my later book of the same name, "if we care about free speech, we should care about speakers having something interesting to say."[103] Moreover, I argued, "if we are interested in freedom of speech and the ability to express new and possibly heretical ideas, we should care about the social processes by which these ideas are originated, nurtured, and developed. After all, a society that cares about the free exchange of ideas should be committed to producing new ideas and not just in shouting the same old ones as loudly as possible."[104]

70. The converse proposition is also true. Where there is limited or no protection for intellectual privacy, the First Amendment value of intellectual freedom is at stake. As I concluded from my research in my *Intellectual Privacy* book, "surveillance of intellectual activity deters people from engaging with new ideas and inclines our intellectual explorations to the boring, the bland, and the mainstream. If we know that someone is watching and listening, we will be careful with not just what we say but also what we read and even what we think."[105]

71. The work of the law and social sciences scholar Jonathon Penney is instructive in this regard. In his experimental work, his research, and his analytical work, Professor Penney has documented an additional empirical

---

[102] Neil M. Richards, *Intellectual Privacy,* 87 TEX. L. REV. 393 (2008).
[103] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 98.
[104] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 103.
[105] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 101.

basis for our law and culture's longstanding intuitions that people who are watched act less freely, and that people who are watched while they are thinking, reading, communicating, or otherwise engaging with ideas incline their behaviors, thoughts, and beliefs towards social conformity rather than free and autonomous belief formation.[106]

72. Penney is not the only scholar to have demonstrated the linkage between an absence of intellectual privacy and a chilling effect on expressive activities. In *Intellectual Privacy,* I collected additional evidence that when people are watched their behavior inclines towards mainstream behaviors, at odds with the free and fearless commitment to intellectual freedom that democracy (and our First Amendment jurisprudence) demands.[107] And in *Why Privacy Matters*, I surveyed the empirical evidence for the proposition that "surveillance, being watched, inclines us to the boring, the bland, and the mainstream in matters of identity and politics," and I found that "that there is excellent evidence that … surveillance normalizes us. It makes us act in ways that are socially acceptable[,]" and I "highlight[ed] some of the evidence from the humanities and the social sciences illustrating the stifling effects of surveillance on our expression, our behavior, and our identity development.[108]

73. Beyond academic research, the practical context in which intellectual privacy rights have been most fiercely tested in American history has been in the context of libraries. Both before the advent of the Internet and today, librarians' decisions regarding what materials to keep in their collections, as well as whether to protect the privacy and confidentiality of their patrons have been a crucial context in which intellectual privacy and intellectual freedom have operated in practice. In this regard, it is instructive that professional librarians, guided by American Library Association and its Office of Intellectual Freedom, have since the 1940s unequivocally come down on the side of privacy and confidentiality as promoting the intellectual freedom of their patrons. As I explained in *Intellectual Privacy,* "[m]odern American librarians have enshrined their ethical views about intellectual freedom and intellectual privacy in the American Library Association's (ALA)

---

[106] Jonathon W. Penney, Understanding Chilling Effects, 106 MINN. L. REV. 1460 (2022). Penney collects numerous such studies throughout his article, but in particular, see, e.g., sources collected at 1461 n.9.
[107] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 103-08.
[108] RICHARDS, WHY PRIVACY MATTERS, *supra*, at 126-30.

1948 Library Bill of Rights and in a series of official interpretations of that document spanning the period from World War II to the Patriot Act."[109] Consistent throughout this period is a professional, expert recognition that the privacy and confidentiality of library records reflecting reading, watching, and listening of all kinds are essential to intellectual freedom and ultimately, to the development of an educated, informed, citizenry—and that it is the right of the patron, and not that of the librarian to decide what is appropriate. From this perspective, "privacy" "is the right to engage in open inquiry without having the subject of one's interest examined or scrutinized by others," while "confidentiality" means the keeping of reader records on the library patrons' behalf, and only to release such records when mandated by court order.[110]

74. To this day, the ALA's Office of Intellectual Freedom has led librarians as a matter of professional ethics to protect intellectual privacy in order to serve both their patrons and free, democratic self-government itself. As I explain in *Intellectual Privacy*, in a passage that I believe is worth quoting in full*:*

> The ALA's fullest exploration of reader privacy and its relationship to intellectual freedom is its 2002 document, *Privacy: An Interpretation of the Library Bill of Rights*. Recognizing at the outset that "[p]rivacy is essential to the exercise of free speech, free thought, and free association," it makes two separate commitments to user privacy and confidentiality. The first commitment deals with the rights of library users. This interprets Article IV of the Library Bill of Rights' commitment to free access as giving library users as much control as possible to select, access, and use library material. It asserts that "[l]ack of privacy and confidentiality has a chilling effect on users' choices. All users have a right to be free from any unreasonable intrusion into or surveillance of their lawful library use." Moreover, the policy maintains that patrons have the right to use a library without any inferences made between their reading habits and their behavior.

> The policy's second commitment deals with the responsibilities of librarians and library users to each other. It declares that because "[t]he library profession has a long-standing commitment to an ethic of facilitating, not monitoring, access to information," libraries must take

---

[109] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 177 (citations omitted).
[110] *Id.* at 178.

care to only collect personal information that is necessary to provide mission-critical library services. Moreover, the commitment to intellectual freedom means that everyone in a library, whether librarian or fellow user, "has a responsibility to maintain an environment respectful and protective of the privacy of all users."

Beyond the Library Bill of Rights, the ALA has engaged in advocacy to protect reader privacy. A 2009 position paper declares that "the impulse to be curious, to read, and to learn is essential for the health of our democracy and our economy." The paper also recognizes the critical relationship between intellectual privacy and political freedom. It explains that "[t]he freedom to read and receive ideas anonymously is at the heart of individual liberty in a democracy. It ensures a person's right to gain knowledge and form opinions according to his or her own conscience. It is the foundation for self-determination and meaningful participation in the political process." Crucially, the OIF also articulates the importance of privacy to avoid the "chilling effect" on reading caused by surveillance:

> When the right to privacy is eroded or stripped away, people are more likely to abandon or curtail their exploration of unpopular and unorthodox points of view. This chilling effect puts the intellectual development of our citizenry at risk. The very character of the American mind, which is premised on open inquiry, is thereby robbed of the free flow of ideas that makes innovation possible.[111]

75. In protecting the confidentiality and intellectual privacy of their patrons from the mid-twentieth century to the present, librarians struck upon a particularly important principle of First Amendment law—we often depend upon the role of intermediaries for the full sweep of First Amendment-protected expressive activities—thinking, reading, discussing, and expressing ourselves.[112] While that was certainly true with librarians in the mid-twentieth century, it is particularly true in today's era of internet-mediated reading, thinking, and communications. As I shall explore in the next section, it has also been protected at both the state and federal levels by a web of

---

[111] *Id.* at 179-80 (citations omitted).
[112] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 165-68.

overlapping statutory protections of which the VPPA is but one part of a greater whole.

### III. The VPPA's legislative history shows that Congress sought to protect the privacy of records of video-watching behavior in order to safeguard intellectual privacy and intellectual freedom.

76. The Video Privacy Protection Act of 1988 was passed by Congress as a consequence of Judge Robert Bork's nomination to the United States Supreme Court. When Judge Bork was nominated, Michael Dolan was a reporter for Washington, DC's alternative weekly newspaper, the *Washington City Paper*. Dolan was aware that both he and Bork frequented the same video store, Potomac Video, in the Palisades neighborhood of Northwest Washington, DC. Dolan went to the store and asked the assistant manager of the video store if he could see a list of Bork's video rentals, which the manager produced for him as a Xerox copy. Dolan took the document and used it to write an article that was published in the *City Paper* entitled "The Bork Tapes Saga: Never mind his writings on Roe vs. Wade. The Inner Workings of Robert Bork's Mind Are Revealed by the Videos He Rents."[113] As Dolan argued in the article, knowing Bork's video rentals allows access to his mind and beliefs. As he expressed the point, "[t]he only way to figure out what someone is like is to examine what that someone likes — take a hard look at the tools of leisure he uses to chip away life's rough edges."[114]

77. Concerned about the threat to intellectual privacy posed by the publication of video rental records, Congress swiftly passed the Video Privacy Protection Act in order to respond to the problem of a lack of protection for records of videos watched. There is abundant evidence that in passing the VPPA, Congress was concerned that video records not only revealed one's intellectual preferences, but that video records were unprotected and needed to be protected in order to safeguard democracy itself.

78. As Senators Leahy and Simpson argued at the Bork hearings after the publication of Dolan's article, "It is nobody's business what Oliver North or

---

[113] Michael Dolan, *The Bork Tapes*, WASH. CITY PAPER (Sept. 25–Oct. 1, 1987), https://web.archive.org/web/20160313041803/http://theamericanporch.com/bork5.htm [https://perma.cc/37V2- T2ZD]

[114] Michael Dolan, The Bork Tapes, WASH. CITY PAPER (Sept. 25–Oct. 1, 1987), https://web.archive.org/web/20160313041803/http://theamericanporch.com/bork5.htm [https://perma.cc/37V2- T2ZD].

Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. … [Privacy] is not a conservative or a liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone."[115]

79. As the legislative history of the Act made clear, the purpose of the bill was to protect video privacy because—just as with what one reads—the disclosure of video rentals revealed too much about us as individuals. Floor debates recognized that:

> [Our] right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read. These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people.[116]

80. Congress was particularly concerned that the issue raised by the Bork video privacy violation was one that could expose ordinary Americans to harm. As the sponsor of the House version of the bill that became the VPPA explained, "[t]here's a gut feeling that people ought to be able to read books and watch films without the whole world knowing. Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet and reflection. This intimate process should be protected from the disruptive intrusion of the roving eye."[117] The VPPA's legislative history also recounts that the "vice-president of the Video Software Dealer's Association, stated that the attorney for a woman in a child custody proceeding made in informal request for the records of every film rented by her husband in an effort to show that, based on his viewing habits, he was an unfit father."[118] The Senate report also noted that

---

[115] 134 Cong. Rec. S5398–5401 (daily ed. May 10, 1988 (quoting *Hearings on the Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States Before the Senate Committee on the Judiciary*, 100th Cong. 1st Sess. 1372, 1374 (Sept. 28, 1987).

[116] 134 Cong. Rec. S5398–5401 (daily ed. May 10, 1988).

[117] S. REP. NO. 100-599, at 7 (1988).

[118] S. REP. NO. 100-599, at 6 (1988).

"these records are a window into our loves, likes, and dislikes."[119] Finally, it favorably quoted testimony by the American Civil Liberties Union that made reference similar to the issues in the present matter that

> Private commercial interests want personal information to better advertise their products. The government is interested in sensitive information to enhance political surveillance. And, the intelligence community may be looking at reading lists to protect our national security. The danger here is that a watched society is a conformist society, in which individuals are chilled in their pursuit of ideas and their willingness to experiment with ideas outside of the mainstream.[120]

81. As a result of these hearings, Congress passed the VPPA, which places a confidentiality obligation on businesses who sell, rent, or deliver videos. Reflecting the dominant video technology at the time, the statute applies to "videotape service providers," defined as those in the business of selling, renting, or delivering "prerecorded video cassette tapes or similar audio visual materials."[121] Such covered businesses may only disclose customer's video-watching records subject to limited exceptions such as compulsion under a search warrant or the consent of the customer to whom the records relate.[122]

82. In my teaching, I cover the VPPA as a model privacy statute and a model intellectual privacy statute every year. I have taught the VPPA to hundreds of law students over the years at Washington University and also at Georgetown University. Every year, I explain to my students that the VPPA was a well-drafted statute intended to endure as the technologies by which people watched videos at home evolved. This, in my opinion, is revealed by a piece of clever and far-sighted drafting in the statute. Although at first blush the statute talks about video tapes, it defines the relevant activity being regulated as the sale or rental of "prerecorded video cassette tapes or similar audio visual materials."[123] This is what has enabled the VPPA to continue to protect intellectual privacy notwithstanding the changes in technology from

---

[119] *Id.* at 7.
[120] *Id.*
[121] 18 U.S.C. § 2710(a)(4).
[122] 18 U.S.C. §2710(b)(2).
[123] *See* 18 U.S.C. § 2710(a)(4).

VHS to streaming.[124] Recent VPPA court decisions applying it to streaming services continue to apply its protections to the present day.[125] Professor William McGeveran, the author of one of the two leading privacy law casebooks also concurs in both this conclusion as well as that the VPPA implicates the important value of intellectual privacy.[126]

83. It is also my opinion, as the scholar who has probably taught and written about the VPPA more than any other, that the VPPA's ability to evolve to protect the intellectual privacy of video purchases and rentals as the technology of video has evolved over the past thirty-five years was a wise one. After all, while the technology of video delivery has changed from VHS to DVD to Blu-Ray to streaming, and while our screens have become thinner, the social practice of video watching at home has hardly changed one bit since 1988 – people continue to sit on their sofas alone or in small groups, they continue to privately watch videos provided by a company with which they have a relationship, and they continue to engage intellectually and emotionally with the ideas and the stories in those videos. This social practice has not changed with the move from VHS rentals from Potomac Video to digital videos from Patreon. Professor McGeveran also concurs with this conclusion.[127]

84. In my own published scholarship, I have characterized the VPPA as an essential intellectual privacy statute. In addition to the similar views of Professor McGeveran that I have noted, an article by the *Harvard Law Review* in 2018 characterized by its title, "The Video Privacy Protection Act

---

[124] I have also made this argument in print. See, e.g., RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 58.
[125] E.g., *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1167-69 (W.D. Wash. 2010); *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017).
[126] William McGeveran, *The Law of Friction*, 2013 U. CHI. L. FORUM 15, 24 (2013).
[127] See *id.* ("After almost twenty-five years one might expect the statute to have become outdated, but its drafters took care to make the VPPA flexible and technology-neutral. Long after VCRs were displaced by DVDs and now by online streaming, the VPPA remained current because it included "similar audio-visual materials" in the definition of its scope."). *Accord* Development, *The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 HARV. L. REV. 1766, 1769-70 (2018).

as a Model Intellectual Privacy Statute."[128] Also noting the flexibility of the VPPA's language that has allowed it to endure despite changes in technology and business models, this article concluded that "[i]n the United States' patchwork privacy regime, the VPPA is a unique gap-filler, extending protection — if only in part — to the expressive activities recognized as vital to the First Amendment but left underprotected by the Fourth."[129]

85. As I have explained above,[130] the uncontrolled disclosure of what one watches in private is dangerous because it can cause people not to experiment with new, controversial, or deviant ideas. This is a point that is built into First Amendment doctrine that not only resonates with cultural insights like the work of George Orwell, but is also supported by a substantial and growing body of empirical evidence.

86. As part of my work on this matter, I have examined the content that is available for Patreon's customers (known as "patrons") to subscribe to and support. This content spans a wide range of traditional categories of what privacy lawyers call "sensitive data," including content dealing with adult video games, erotic art, fetish materials, LGBTQ+ content, politics (including conspiracy theories and non-mainstream political views), polyamory, religion, and sex education.[131] These would also be classic examples of what the Senate Report for the VPPA was particularly concerned about—the kind of "ideas outside the mainstream" that monitored citizens would be chilled from engaging with if their experimentation was watched or disclosed to "private commercial interests [who] want personal information to better advertise their products" or the government.[132] Based upon the foregoing and also on my expertise from a quarter of a century of studying free expression and privacy in the internet context, it is my expert opinion that a significant amount of content on Patreon is of the sort that people would be chilled from engaging with if patrons knew that the content was being disclosed in ways that were linked to their names and the other personally identifying information on their Facebook profiles.

---

[128] Development, *The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 HARV. L. REV. 1766 (2018).

[129] *Id.* at 1769.

[130] See *supra* Part II.

[131] I have listed these Patreon sites, categorized as above, as Appendix B.

[132] S. REP. NO. 100-599, at 7 (1988).

IV. **The VPPA is an important part of a broader web of federal and state protections for privacy in general and intellectual privacy as a whole.**

87. The final point which I would like to make about the VPPA is that it is important not to look at the VPPA in isolation when it comes to legal protection of intellectual privacy. The VPPA should be examined in the context of American privacy law as a whole. From this perspective, the VPPA is of course what the *Harvard Law Review* called it in 2018 – both a "model intellectual privacy statute" and an "important gap-filler" at the intersection of constitutional protections for expression and privacy.[133] But the VPPA is but one piece of a complex web of federal and state privacy laws, rules, constitutional protections, regulations, and other laws dealing with intellectual privacy in particular and information privacy more generally.

88. Most democracies other than the United States protect privacy primarily through a single comprehensive statute, of which Europe's General Data Protection Regulation ("GDPR"), which took effect on May 25, 2018 is the most well-known.[134] The approach in the United States is different, and takes a "sectoral" rather than a general approach. As I explained in Part I, privacy in general and intellectual privacy in particular are protected in American law through a complex set of sometimes intersecting and overlapping rules. In an article I wrote a few years ago intended as a general introduction to U.S. privacy law, my coauthors and I explained that:

> In order to understand American privacy, we believe that it is important to understand five of its guiding principles. First, American privacy law is bifurcated into two discrete regulatory regimes – one covering the government and the other covering the private sector of individuals, corporations, and other institutions. Second, American privacy law takes a sectoral or sectorized approach, meaning that rather than having a federal omnibus privacy or data protection law, U.S. law regulates particular sectors of human activity in a way that is both piecemeal and more specific where it applies. Third, it is impossible to understand American privacy without taking account of the role of the Federal Trade Commission, a consumer protection regulator that is more than a century old, and which functions

---

[133] Development, *The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 HARV. L. REV. 1766, 1768 (2018).
[134] Commission Regulation 2016/679, 2016 O.J. (L 119) 1 (EU).

something like a data protection authority with a limited but general authority over trade practices that are unfair or deceptive. Fourth, American privacy law is federalized: both the national government and the fifty state governments have passed privacy laws. In this regime, national ("federal") law is supreme where it applies, but the state privacy laws remain very important, particularly those of California which has been an aggressive privacy regulator. Fifth, and finally, questions of privacy harm run throughout American privacy law, both as a threshold question required for private litigants to sue, again at the level of damages, as well as in the class certification process for private enforcement in the United States."[135]

While the U.S. approach lacks the uniformity of the European approach, the sectoral approach does have the advantage of specificity in areas where a sectoral statute applies with special effect. Perhaps most famously, the United States is able to regulate health data with greater specificity and attention to context through laws like HIPAA than the EU can, which must rely on the general provisions of the GDPR.

89. As I have also explained in Part III, the VPPA fills a small but important gap by protecting video records. It is, however, important to understand that many different privacy rules in the United States protect intellectual privacy. In Part I, for example, I discussed the Fourth Amendment (which of course applies only to state actors), the Electronic Communications Privacy Act, which implements the Fourth Amendment but protects communications privacy and communications data against both state and private actors. I also discussed state law rules like the California constitutional right of privacy (which applies generally against state and private actors) as well as California's complex web of state privacy statutes, many of which protect intellectual privacy specifically (e.g., CalECPA) or generally (e.g., the CCPA).

90. In addition, there are other intellectual-privacy protective statutes at both the federal and state levels. At the federal level, complementing the VPPA, there is the Cable Communications Policy Act of 1984, which is also sometimes referred to as the CCPA—an abbreviation that is confusing given

---

[135] Neil M. Richards et al., *Understanding American Privacy,* at 2-3, RESEARCH HANDBOOK ON PRIVACY AND DATA PROTECTION LAW: VALUES, NORMS AND GLOBAL POLITICS (Gloria González Fuster, Rosamunde van Brakel and Paul De Hert (eds.), Edward Elgar Publ'g 2018).

the California Consumer Privacy Act, but shows that there are so many federal and state privacy statutes that there is a shortage of good abbreviations for them. This federal statute—which I will call the Federal Cable Act for clarity, establishes a federal standard for the ways in which operators of cable television services collect, use, and disclose the personal data of their cable customers.[136] The Federal Cable Act mandates that cable companies create and provide privacy policies to their customers.[137] Like the VPPA, the Federal Cable Act requires that, apart from exceptions such as those for consent and government process, "a cable operator shall not disclose personally identifiable information concerning any subscriber without the prior written or electronic consent of the subscriber concerned and shall take such actions as are necessary to prevent unauthorized access to such information by a person other than the subscriber or cable operator."[138] The Federal Cable Act is thus a complementary 1980s-era statute to the VPPA— one dealing with cable television privacy, and the other dealing with video store privacy, forming a comprehensive federal privacy regime for all videos watched on one's televisions at home, since 1980s broadcast television had no inherent means of collecting data about who was watching what. As I have also explained, the VPPA has, over time, been able to apply to digital, internet-delivered video, due to its clever and intentionally technology-neutral drafting.

91. In addition to the authorities already mentioned, there is also a federal regulatory regime for telephone data privacy that extends beyond the protections for the contents of communications in the Electronic Communications Privacy Act, the protections for subscriber data in the Stored Communications Act, and the protections for phone numbers dialed in the Pen Register Act.[139] As Professor McGeveran explains, "In 1996, as a small part of massive legislation to overhaul telecommunications law, Congress directed the Federal Communications Commission (FCC) to develop regulations governing the disclosure of certain account information by telephone companies (defined in terms which now include local, long distance, wireless, and VoIP carriers). The data, called customer proprietary network

---

[136] 47 U.S.C. §§551 et seq.
[137] 47 U.S.C. §§551(a).
[138] 47 U.S.C. §§551(c).
[139] See 18 U.S.C. §§ 2510 et seq. (ECPA); 18 U.S.C. §§ 2701 et seq.; 18 U.S.C. §§ 3123.

information ("CPNI"), includes information about calls such as numbers dialed and time and duration of calls, similar to the metadata at the heart of debates over NSA surveillance…. Under the current version of the CPNI rules, 47 C.F.R. § 64.2003, companies may use CPNI internally for marketing purposes—such as to sell additional services to existing customers—unless those customers opt out of such uses. They must receive affirmative opt-in consent for disclosures of CPNI to third parties, including "joint venture partners." … The regulations do permit disclosure of aggregate data. They also allow for the provision of call data to law enforcement and intelligence authorities consistent with other legal requirements."[140]

92. Finally, extending the privacy protection for telephones to prevent unwanted sales calls, the Telephone Consumer Protection Act ("TCPA") of 1991 places limitations on telephone solicitations.[141] It is also the basis for the popular Federal Do Not Call Registry, which is maintained by the FTC and which has over 200 million residential and wireless phone numbers on it from people who have requested that sales calls not interrupt the privacy of their homes.[142] The TCPA has its own analogue for email marketing, the Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM Act").[143]

93. There are also a large number of state-level intellectual privacy statutes dealing with video, book and library privacy. First, there are a number of state-law video privacy statutes modeled on the VPPA, some of which offer even greater protections than the federal law and, unlike the VPPA, criminal punishment for violations. As I explained in *Intellectual Privacy*, "Maryland and Connecticut treat video records as confidential, prohibit their sale, and impose criminal penalties in cases of unlawful sale or disclosure. Other states with video privacy laws include California, Delaware, Iowa, Louisiana, New York, and Rhode Island."[144]

94. As noted above, California's book-privacy law is the California Reader Privacy Act of 2011 ("CRPA"), an intellectual privacy statute that protects reader privacy in books. According to its sponsors, the law "mirrors the strong privacy

---

[140] WILLIAM A. MCGEVERAN, PRIVACY AND DATA PROTECTION LAW 939-40 (2d ed. 2023).

[141] 47 U.S.C. § 227.

[142] WILLIAM A. MCGEVERAN, PRIVACY AND DATA PROTECTION LAW 957 (2d ed. 2023).

[143] 15 U.S.C. §§ 7701 *et seq.*

[144] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 133.

and free speech standards that are already in place and extends them to digital books and electronic reading records" – essentially, "updating [Californians'] privacy for the 21st Century."[145] The law arose out of a concern that digital books allow libraries and digital booksellers (including Amazon and Google) to collect and use detailed personal information about readers, invading First Amendment protections for and traditional societal norms of privacy in what individuals read, and allowing for surveillance of persons by government and private actors alike.[146] To protect these historical privacy interests, the law defines "personal information" broadly as "[a]ny information that identifies, relates to, describes, or is associated with a particular user," and includes digital data including "unique identifier[s] or Internet Protocol address[es]…used to identify, relate to, describe, or be associated with a particular user or book, in whole or in partial form," or "[a]ny information that relates to, or is capable of being associated with, a particular user's access to or use of a book service or book, in whole or in partial form."[147]

95. Second, the privacy of books in the United States is primarily a creature of state law. As I also explained in *Intellectual Privacy*, "In Colorado, the state constitution's free speech guarantee limits government access to bookstore records. Perhaps the strongest book privacy law is California's Reader Privacy Act of 2012, which places a confidentiality rule on books, broadly defined to include emerging technologies such as e-books. It prohibits the disclosure of reader information except where stringent requirements are met, such as a court order for disclosure to government or to a private entity only where the user has given her 'informed, affirmative consent to the specific disclosure for a particular purpose.'"[148]

96. Third, and finally, virtually every state has a privacy law protecting the confidentiality of library records. Many of these statutes follow a similar form. As I also explained in *Intellectual Privacy*, "most states protect the confidentiality of library records from sale or other disclosure. A typical

---

[145] EFF.org, Reader Privacy Act of 2011, https://www.eff.org/cases/sb-602-californias-reader-privacy-act-2011.

[146] *See* EFF, Press Release, *California's Reader Privacy Act Signed into Law*, EFF.org, October 3, 2011, https://www.eff.org/press/archives/2011/10/03

[147] CAL. CIV. CODE § 1798.90. The stature's definition of "personal information" also extends to and explicitly includes the definition of "personal information" contained in Cal. Civ. Code § 1798.80, a data records privacy law dating back to 2000. *See* Cal. Civ. Code § 1798.90(b)(5)(A).

[148] RICHARDS, INTELLECTUAL PRIVACY, *supra*, at 133.

example, the Missouri library confidentiality statute provides that 'no library or employee or agent of a library shall be required to release or disclose a library record or portion of a library record to any person or persons,' except where the person gives written request to the disclosure or subject to a court order. Moreover, the scope of what constitutes 'library material' is very broad, covering books, films, music, art works, or any 'other library property which a patron may use, borrow or request.'"[149] The American Library Association also keeps an extensive list of state library privacy and confidentiality statutes as well as equivalent state attorney general opinions on library privacy.[150] As the ALA explains, "Forty-eight states and the District of Columbia have laws protecting the confidentiality of library records. Two states, Kentucky and Hawaii, have attorney generals' opinions protecting library users' privacy. The language of these provisions vary from state to state. The majority of these laws declare that a library user's records and information are confidential, and not subject to disclosure, unless certain conditions are met, such as a user's consent or the service of a court order."[151]

97. Critically, Congress was well aware of this statutory backdrop when it enacted the VPPA, and it expressly intended the VPPA to fit into this broader web of federal and state statutes when it passed the law. Thus, in the Senate Report accompanying the VPPA, the VPPA's drafters explained that "the Video Privacy Protection Act follows a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals. In each case, Congress has expanded and given meaning to the right of privacy."[152] This statement was followed by a series of paragraphs covering over a dozen federal privacy laws—the Fair Credit Reporting Act of 1970[153]; the Family Educational Rights and Privacy Act of 1974[154]; the Privacy Act of 1974[155]; the Tax Reform Act of 1976[156]; the Right to Financial

---

[149] *Id.*

[150] See Am. Library Ass'n, *State Privacy Laws Regarding Library Records*, https://perma.cc/YXA6-6LB6.

[151] *Id.*

[152] S. Rep. No. 100-599, at 2 (1988).

[153] 15 U.S.C. 1681 et seq.

[154] 20 U.S.C. 1232(g) et seq.

[155] 5 U.S.C. 552a

[156] 26 U.S.C. 6103.

Privacy Act of 1978[157]; the Privacy Protection Act of 1980[158]; the Electronic Funds Transfer Act of 1980[159]; the Fair Debt Collection Act[160]; the Cable Communications Policy Act of 1984[161]; the Electronic Communications Privacy Act[162]; and the Computer Matching and Privacy Protection Act of 1988.[163] This explanation of the broader federal information privacy scheme was followed by an overview of the constitutional values that privacy in general and intellectual privacy in particular serve (with special attention to the essential linkages between intellectual privacy and the First Amendment since "the relationship between the right of privacy and intellectual freedom is a central part of the first amendment.").[164]

98. In conclusion, looking at the web of federal and state statutes protecting intellectual privacy, as well as the professional ethics of librarians, it is my opinion that these laws create an overlapping set of protections for intellectual privacy at both the federal and state levels. The VPPA is of course a key part of this web, but it is by no means the only part of it, as the importance of intellectual privacy to both intellectual freedom and democracy has resulted in its protection by literally dozens and dozens of state and federal laws.

## *Conclusion*

99. In sum, it is my opinion that (1) Privacy is a foundational *societal norm and fundamental right* with deep roots in U.S. social, cultural, legal, and political history; (2) Privacy rights, particularly those involving the intellectual activities of (a) reading text, (b) viewing video, and (c) communicating with others *actively support the values of free inquiry, free expression and democratic debate* that are safeguarded by existing First Amendment doctrine; (3) the history prompting the passage of the VPPA in 1998 shows that *Congress sought to protect the privacy of records of video watching behavior in order to safeguard intellectual privacy and intellectual freedom and their links to democratic self-government and political freedom*, which are central goals of the First

---

[157] 12 U.S.C. 3401 et seq.
[158] 42 U.S.C. 2000(a).
[159] 15 U.S.C. 1693, et seq.
[160] P.L. 97- 365.
[161] P.L. 98-549.
[162] 18 U.S.C. 2510 et seq.
[163] P.L. 100-503.
[164] S. Rep. No. 100-599, at 4 (1988).

Amendment; and (4) *Congress intentionally enacted the VPPA as part of a web of protections at the state and federal level for intellectual records.*

Executed on September 22, 2023, in St. Louis, Missouri.

Neil Richards

## Appendix A: List of Case-Specific Materials Consulted

The following materials from *Stark v. Patreon*, No. 22-cv-03131-JCS (N.D. Cal.):

- Plaintiffs' First Amended Complaint (Dkt. No. 41).
- February 17, 2023 Order Regarding Motion to Dismiss First Amended Complaint (Dkt. No. 59).
- United States of America's Notice of Intervention and Memorandum in Support of the Constitutionality of the Video Privacy Protection Act (Dkt. No. 49-1).
- Patreon's Motion to Dismiss First Amended Complaint (Dkt. No. 48) and Plaintiffs' Opposition (Dkt. No. 51).
- Transcript from February 10, 2023 hearing regarding Patreon's Motion to Dismiss First Amended Complaint.

## Appendix B: Examples of Patreon "Creators" Offering Sensitive Content

Note: Each Patreon "Creator," is listed by a general category, followed by creator name, creator description listed on their creator page (in parenthesis), and a URL to the site's location.

### Adult Games

Shadow Portal (creating ADULT games (NSFW 18+)): https://www.patreon.com/shadow_portal

### Art

Furrsshino's NSFW World (Creating NSFW Art, Request and More!): https://www.patreon.com/furrsshino

Hayashi 2.0 Hentai Anime Ai Art (Creating adult NSFW & SFW Anime / Manga inspired Ai Art): https://www.patreon.com/hayashi_nsfw_ai_art

Mama Mixira (Creating NSFW Content): https://www.patreon.com/mixiasmr

ModrawManga (Dark & Sexy SciFantasy Romance Comics): https://www.patreon.com/modrawmanga

NSFW Belle Random (No censura uwu): https://www.patreon.com/Nopixelnoproblem

Ophelia (is creating ASMR videos on YouTube): https://www.patreon.com/OpheliaASMR

Sara Valta (creating comics with hot elves and monsters!): https://www.patreon.com/sarasadeart/about

Vortex 00 (Creating Hentai games): https://www.patreon.com/vortex00

World of Cadence (creating character voice overs & ASMR): https://www.patreon.com/worldofcadence

### Fetish

BAgelBomb (Creating cute DiD and bondage pin-ups): https://www.patreon.com/bagelbombed

BDSM Kinky Club en Espanol (Tu Rncón para Disfrutar):
https://www.patreon.com/user?u=97245866

Bondage World (ONLY FOR BONDAGE LOVERS):
https://www.patreon.com/BondageWorld435/about

Domme Claire (creating a safe & educational space for the BDSM community):
https://www.patreon.com/domme_claire

Evie Lupine (creating educational BDSM content):
https://www.patreon.com/EvieLupine

Jillian Keenan (creating videos and community support for spanking fetishists):
https://www.patreon.com/KinkingOutLoud

Lazarus Redmayne (Creating Friendly tutorials on rope bondage):
https://www.patreon.com/TheDuchy

Magnolia (Creating Cute and Kinky Bondage Illustrations, Comics, Stories):
https://www.patreon.com/MagnoliaDucky

Ms. Elle X (wisdom to dominate in life and love):
https://www.patreon.com/ellexerotica

Sharie (Female Supremacy Training with Sharie):
https://www.patreon.com/sharietraining

Spanking Sethral (Former Spankee dedicated to preserve 15 years of memories of High Quality M/M Spanking Video Productions):
https://www.patreon.com/SpankingSethral

Spankingtoons (creating Spanking and ABDL Toon Pinups):
https://www.patreon.com/spankingtoons

Submissive Guide (creating a community exploring BDSM through education):
https://www.patreon.com/subguide

Watches and Cuffs (Images and videos for watch fetishists and metal bondage lovers): https://www.patreon.com/watchesandcuffs

**LGBTQ+**

Alayna (Creating queer content covered in cat hair):
https://www.patreon.com/MissFenderr/about

Kaiju (Creating Novae, a Queer Historical Romance Comic):
https://www.patreon.com/bePatron?c=498037&fc=true

Glopossum (Creating queer furry comics & illustrations): https://www.patreon.com/glopossum

Queer as Fact (A queer history podcast): https://www.patreon.com/queerasfact

## Politics

Covid Vaccines Injured & Bereaved Legal Fund (Legal Support for Those Affected by the Covid-19 Vaccines): https://www.patreon.com/user?u=87994238

Milspec OpsMonkey (creating Werx for the soul): https://www.patreon.com/monkeywerxus

## Polyamory

Black & Poly (creating meetups for polyamorous Black people and those who love): https://www.patreon.com/blackandpoly

Cassian Lotte Lodge (creating Poly in Pictures): https://www.patreon.com/polyinpictures

Morgan (creating Resources and Peer Support for Polyamory): https://www.patreon.com/chillpolyamory

Multiamory (Creating better relationships through better education):https://www.patreon.com/multiamory

Poly Philia (creating polyamory and non-monogamy education and entertainment): https://www.patreon.com/polyphiliablog/posts

Professor Polyamory (creating Writing on Sex Positivity and my own photography and 3d): https://www.patreon.com/LiberumSexux

## Religion

Bare Marriage (Let's Change the Evangelical Conversation Around Sex): https://www.patreon.com/baremarriage

## Sex Educators

Hannah Witton (creating a community of curious sex nerds!): https://www.patreon.com/hannahwitton

---

**Appendix C: CV of Professor Neil Richards**

# NEIL M. RICHARDS

**Koch Distinguished Professor in Law**
**Washington University in St. Louis**
**One Brookings Drive**

**St. Louis, Missouri 63130**

**Office : (314) 935-4794**

**Email: nrichards@wustl.edu**

---

## EMPLOYMENT & PROFESSIONAL SERVICE:

**Koch Distinguished Professor in Law**, Washington University School of Law, St. Louis, Missouri.

- Koch Distinguished Professor in Law, January 2019-present.
- Founding Director, Cordell Institute for Policy in Medicine & Law, October 2016-present.
- Thomas & Karole Green Professor of Law, July 2016-December 2018.
- Professor of Law with tenure, July 2008-June 2016.
- Associate Professor of Law, July 2003-July 2008.
- Awards
  - o Voted Professor of the Year by student body, 2003-04 Academic Year.
  - o Israel Treiman Faculty Fellow, 2005-06, 2018-19 Academic Years.
- Courses
  - o Law School: Information Privacy Law, Advanced Privacy Law, First Amendment Law, Constitutional Law, Fourteenth Amendment Law, Property Law, Digital Civil Liberties Seminar, First Amendment Theory Seminar, Law and Politics Colloquium.
  - o Arts & Sciences: The Digital Society (undergraduate trans-disciplinary course).
  - o School of Engineering: Privacy & Security Law and Ethics.
- Conferences Organized
  - o Cordell5: Why Privacy Matters, December 2-3, 2021.
  - o Cordell4: The Future of Consent for Privacy and Health, April 23, 2021.
  - o Cordell3: Ethics of Human Gene Editing, October 2019.
  - o Cross-Border Privacy & Speech Roundtable, Berkeley Law, May 2019.
  - o Cordell Institute Launch Symposium, Sept. 2018.
  - o "Privacy and Trust in a Digital Age," *Washington University Law Review* Symposium, Sept. 2018.
  - o Institute for Policy in Medicine and Law Planning Symposium, Sept. 2017.

---

- o Washington University-Cambridge University International Privacy Conference, Clare College, Cambridge, June 2012, July 2013.
- o Washington University First Amendment Roundtable, 2013-15.
- Institutional Service
  - o Dean Search Committee, 2023-24.
  - o Chair, Law School Sesquicentennial Committee, 2015-17.
  - o Chair, Institutional Profile Committee, 2014-15; Committee member 2015-16.
  - o Chair, Faculty Appointments, 2010-11; Committee 2004-05, 2008-09, 2018-20.
  - o Chair, Clerkships Committee, 2016-18, 2020-22; Faculty Clerkships Advisor, 2003-04, 2005-06, 2009-2011.
  - o Decanal Review Committee, Spring 2010.
  - o Washington University Faculty Senate Council, Law School Elected Representative, 2008-2011.
  - o Faculty Chair, Washington University Social Media Committee, 2013-14.
  - o Institute for Informatics Internal Advisory Board, 2018-present.
  - o Provost's Online Education Committee, 2014-2017.
  - o University Data Policy Committee, 2017-present.
  - o University IT Council, 2014-2019.
  - o Scholarship Committee, 2015-16.
  - o Faculty Promotions Committee, 2012-13.
  - o Faculty Marketing Committee, 2013-14.
  - o Faculty Advisor, *Washington University Law Review*, 2004-2010.
  - o Curriculum Committee, 2006-07 and 2009-10.
  - o Student Life Committee, 2011-12.
  - o Law School Liaison to Arts & Sciences, 2011-15.

**Visiting Professor of Law**, University of Bocconi, Milan, Italy, November 2021, May 2023
- Taught 12-hour module on "Artificial Intelligence and Human Rights."

**Visiting Professor of Law**, Georgetown Law School, Spring 2021.
- Taught 3-credit course on Information Privacy Law.

**Faculty Associate,** Berkman-Klein Center for Internet and Society at Harvard University, August 2022-present.

**Advisory Board Member**, Electronic Privacy Information Center, June 2022-present.

**Affiliate Fellow,** Yale Information Society Project, Yale Law School, March 2015-present.

**Affiliate Scholar,** Stanford Center for Internet & Society, Stanford Law, Jan. 2015-present.

**Member**, American Law Institute, 2015-present.

**Advisory Board Member,** Future of Privacy Forum, 2010-present.

**Adviser,** American Law Institute Project on Privacy Law, Sept. 2012-2019.

**IViR (Institute for Information Law) Fellowship,** University of Amsterdam, The Netherlands, Summer 2014. **Faculty Member,** IViR Summer Course on Privacy Law and Policy, 2014-2018.

**Distinguished Visiting Scholar**, Notre Dame Law School, October 2017.

**Trustee,** Freedom to Read Foundation, July 2015-July 2017.

**Visiting Professor of Law**, Utrecht University, the Netherlands, January 2012.
- Taught one-credit short course on Comparative Free Speech Law.

**Visiting Professor of Law**, University of Illinois College of Law, October 2010.
- Taught one-credit short course on Privacy and the First Amendment.

**Associate**, Wilmer, Cutler & Pickering, Washington, D.C. 2000-2003.
- Practice included privacy, electronic commerce, and appellate litigation.

**Hugo Black Faculty Fellow**, University of Alabama School of Law, Tuscaloosa, Alabama. Academic Year 1999-2000; Spring Semester 2003. Inaugural research and teaching fellow in a visiting faculty program for former Supreme Court clerks. Courses: Property Law, Constitutional Law, First Amendment. Chaired Clerkships Committee, 1999-2000.

**Temple Bar Scholar**, American Inns of Court. London, England. October 2000.

**Law Clerk**, Hon. William H. Rehnquist, Chief Justice of the United States, United States Supreme Court, Washington, D.C. July 1998-July 1999. Served during the Supreme Court's 1998-99 Term and the 1999 Presidential Impeachment Trial.

**Law Clerk**, Hon. Paul V. Niemeyer, United States Court of Appeals for the Fourth Circuit, Baltimore, MD. August 1997-July 1998.

**Summer Associate**, Powell, Goldstein, Washington, D.C. (now Bryan Cave) Summers 1996-97.

**Research Assistant**, Professor A.E. Dick Howard, University of Virginia School of Law, Charlottesville, VA. 1995-1997.

## EDUCATION:

**University of Virginia School of Law**, J.D. May 1997.

    **Activities:** Executive Editor, *Virginia Law Review*. Teaching Assistant, First-Year Study Skills Workshop. Legal Education Project. Editorial Board, *Virginia Journal of International Law.*

    **Honors:** Order of the Coif. Slaughter Honor Prize.

**University of Virginia**, M.A. Legal History. Secondary Field of Study in Early American History. May 1997.

    **Master's Thesis:** *Clio and the Court: A Reappraisal after Three Decades*.

**George Washington University**, B.A. History with Special Honors, *summa cum laude*, Phi Beta Kappa, University Honors Program. Minor in Economics, Secondary Field of Study in International Affairs. May 1994.

    **Honors Thesis:** *The Last Days of the Horse: The U.S. Cavalry and Technology in the 20th Century.*

    **Awards:** National Merit Scholar (1990). Hubbard Prize for best student of American history. Distinguished Academic Achievement Awards. Strasser Essay Prize. Presidential Honor Scholarship (full tuition).

# PUBLICATIONS:

**Books:**

WHY PRIVACY MATTERS (Oxford University Press 2021).
- Translated into Simplified Chinese and published by Social Sciences Academic Press, 2022.
- Portuguese and Spanish language editions are forthcoming.
- Awarded the 2023 Roy C. Palmer Civil Liberties Prize, honoring "a work of scholarship exploring the tension between civil liberties and national security in contemporary American society."
- Selected as an Amazon "Editor's Choice" as one of the ten best works of nonfiction published in December 2021.

INTELLECTUAL PRIVACY: RETHINKING CIVIL LIBERTIES IN THE DIGITAL AGE (Oxford University Press, 2015) (paperback ed. 2017).

**Works in Progress:**

- *Fourth Amendment Notice and the Cloud*, BOSTON UNIVERSITY LAW REVIEW (forthcoming 2022) (with Jesse Lieberfeld).

**Articles and Essays in Law Reviews:**

35. *Legislating Data Loyalty*, 97 NOTRE DAME L. REV. REFLECTION 356 (2022) (with Woodrow Hartzog).
34. *The GDPR As Privacy Pretext and the Problem of Co-Opting Privacy*, 73 HASTINGS L.J. 1511 (2022).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4166261
33. *The Surprising Virtues of Data Loyalty*, 71 EMORY L.J. 985 (2022) (with Woodrow Hartzog).
   - Selected for the Future of Privacy Forum's "Privacy Papers for Policymakers" award 2022.
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3921799
32. *A Duty of Loyalty for Privacy Law*, 99 WASH U.L. REV. 961 (2022) (with Woodrow Hartzog).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3642217
31. *Review of Lawrence Cappello, None of Your Damn Business: Privacy in the United States from the Gilded Age to the Digital Age,* 126 AMERICAN HISTORICAL REVIEW 1280 (2021).
30. *A Relational Turn for Data Protection?* 6 EUROPEAN DATA PROTECTION LAW JOURNAL 4 (2020) (with Woodrow Hartzog).
29. *Privacy's Constitutional Moment and the Limits of Data Protection*, 61 B.C. L. REV. 1687 (2020) (with Woodrow Hartzog).
   - Selected for the Future of Privacy Forum's "Privacy Papers for Policymakers" award 2020.
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3441502

---

28. *The Pathologies of Digital Consent*, 96 WASH. U. L. REV. (2019) (with Woodrow Hartzog).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3370433
27. *Four Preconditions for Digital Expression (You Won't Believe #3!)*, 95 WASH. U. L. REV. 1353 (2018) (with Danielle Citron).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3155384
26. *Privacy's Trust Gap*, 126 YALE L.J. 908 (2017) (with Woodrow Hartzog).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2899760
25. *The Third-Party Doctrine and the Future of the Cloud,* 94 WASH. U. L. REV. 1441 (2017).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3123199
24. *Secret Government Searches and Digital Civil Liberties*, in NATIONAL CONSTITUTION CENTER, A TWENTY-FIRST CENTURY FRAMEWORK FOR DIGITAL PRIVACY (2017).
   - Available at: https://constitutioncenter.org/digital-privacy
23. *Free Speech and the Twitter Presidency*, 2017 U. ILL. L. REV. ONLINE: TRUMP 100 DAYS (April 29, 2017).
   - Available at: https://illinoislawreview.org/symposium/first-100-days/free-speech-and-the-twitter-presidency/
22. *Trusting Big Data Research*, 66 DEPAUL LAW REVIEW 579 (2017) (invited Symposium Issue) (with Woodrow Hartzog).
   - SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2717868
21. *Taking Trust Seriously in Privacy Law*, 19 STAN. TECH. L. REV. 431 (2016) (with Woodrow Hartzog).
   - Selected for The Future of Privacy Forum's "Privacy Papers for Policymakers 2015."
   - Selected for regular and encore discussion at the 2015 Privacy Law Scholars Conference.
   - SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2655719
20. *Why Data Privacy Law Is (Mostly) Constitutional,* 56 WILLIAM AND MARY LAW REVIEW 1501 (2015).
   - Selected for The Future of Privacy Forum's "Privacy Papers for Policymakers 2013"
   - SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2335196
19. *The Internet Grows Up?* B.U. L. REV. ANNEX (2015).
   - Available at: http://www.bu.edu/bulawreview/richards-the-internet-grows-up/
18. *Big Data Ethics,* 49 WAKE FOREST LAW REVIEW 393 (2014) (with Jonathan H. King).
   - SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2384174
17. *The Dangers of Surveillance*, 126 HARVARD LAW REVIEW 1934 (2013).
   - SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2239412
16. *The Perils of Social Reading*, 101 GEORGETOWN LAW JOURNAL 689 (2013).
   - Selected for encore and regular discussion at the 2012 Berkeley-GW Privacy Law Scholars Conference.
   - Awarded the 2012 University of Houston IPIL Sponsored Scholarship Grant prize.
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2031307
15. *Three Paradoxes of Big Data*, 66 STANFORD LAW REVIEW ONLINE 41 (2013) (with Jonathan H. King).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2325537
14. *The Limits of Tort Privacy*, 9 J. TELECOM. & HIGH TECH. L. 357 (2011).
   - Invited submission for Conference on "Privacy and the Press," Silicon Flatirons Center, University of Colorado School of Law, Dec. 3, 2010.

- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1862264

13. *Prosser's Privacy Law: A Mixed Legacy*, 98 CALIFORNIA LAW REVIEW 1887 (2011) (with Daniel J. Solove).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1567693

12. *The Puzzle of Brandeis, Privacy, and Speech*, 63 VANDERBILT LAW REVIEW 1295 (2010).
   - Selected for discussion at the 2010 Berkeley-GW Privacy Law Scholars Conference.
   - https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1584831

11. *Rethinking Free Speech and Civil Liability* (with Daniel J. Solove), 109 COLUMBIA LAW REVIEW 1650 (2009).
   - Selected for plenary discussion at the 2009 Berkeley-GW Privacy Law Scholars Conference.
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1355662

10. *Privacy and the Limits of History,* 21 YALE JOURNAL OF LAW AND THE HUMANITIES 165 (2009) (review essay discussing Lawrence Friedman, *Guarding Life's Dark Secrets: Legal and Social Controls over Reputation, Propriety, and Privacy* (2007)).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1396888

9. *Intellectual Privacy,* 87 TEXAS LAW REVIEW 387 (2008).
   - Selected for discussion at the 2008 Berkeley-GW Privacy Law Scholars Conference.
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1108268

8. *Privacy's Other Path: Recovering the Law of Confidentiality,* 96 GEORGETOWN LAW JOURNAL 123 (2007) (with Daniel J. Solove).
   - Selected for the 2007 Michigan-Illinois Comparative Law Works-in-Progress Workshop.
   - Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=969495

7. *The Information Privacy Law Project,* 94 GEORGETOWN LAW JOURNAL 1087 (2006) (essay).
   - Reprinted in Practicing Law Institute, EIGHTH ANNUAL INSTITUTE ON PRIVACY AND SECURITY LAW: PATHWAYS TO COMPLIANCE IN A GLOBAL REGULATORY MAZE, 902 PLI/Pat 11 (July 2007).
   - Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=941181

6. *Reconciling Data Privacy and the First Amendment,* 52 U.C.L.A. LAW REVIEW 1145 (2005).
   - Excerpted in Daniel J. Solove, Marc Rotenberg & Paul Schwartz, INFORMATION PRIVACY LAW (Aspen: 3d ed. 2008).
   - Excerpted in Rodney Smolla, ed., THE FIRST AMENDMENT LAW HANDBOOK (Thompson West: 2006).
   - SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=598370

5. "The Good War," the Jehovah's Witnesses, and the First Amendment, 87 VIRGINIA LAW REVIEW 781 (2001) (book review).

4. The Supreme Court Justice and "Boring" Cases, 4 THE GREEN BAG 2D 401 (2001).

3. Sallie Mae, The Gunderson Effect, and My Plumber, 3 THE GREEN BAG 2D 251 (2000) (with Christopher P. Bowers).

2. Clio and the Court: A Reassessment of the Supreme Court's Uses of History, 13 JOURNAL OF LAW & POLITICS 809 (1998).

1. U.S. Term Limits v. Thornton and Competing Notions of Federalism, 12 JOURNAL OF LAW & POLITICS 521 (1996) (student note).

**Book Chapters:**

8. *Understanding American Privacy*, in RESEARCH HANDBOOK ON PRIVACY AND DATA PROTECTION LAW: VALUES, NORMS AND GLOBAL POLITICS, (Edward Elgar: Gloria González Fuster, Rosamunde van Brakel and Paul De Hert eds., 2021) (with Andrew Serwin & Tyler Blake).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3256918

7. *Digital Civil Liberties and the Translation Problem,* in THE OXFORD HANDBOOK OF CRIMINAL PROCESS (Oxford: Darryl K. Brown, Jenia Iontcheva Turner, & Bettina Weisser eds., 2019) (with Michael Washington).
- SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3678698

6. *Big Data and the Future for Privacy*, in RESEARCH HANDBOOK ON DIGITAL TRANSFORMATIONS (Edward Elgar: F. Xavier Olleros & Majlinda Zhegu eds., 2016) (with Jonathan H. King).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2512069

5. *How Should the Law Think About Robots?* in ROBOT LAW (Edward Elgar: Ryan Calo, Michael Froomkin & Ian Kerr eds., 2016) (with William Smart).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263363

4. *Privacy and Free Speech: The Transatlantic Divide,* in COMPARATIVE DEFAMATION AND PRIVACY LAW (Cambridge Press: Andrew T. Kenyon ed., 2015) (with Kirsty Hughes).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2648307

3. *Four Privacy Myths,* in A WORLD WITHOUT PRIVACY? (Cambridge Press: Austin Sarat ed., 2015).
- Keynote address, Amherst College/University of Alabama Conference on "A World Without Privacy? What Can/Should Law Do?" Jan. 17, 2014.
- Selected for The Future of Privacy Forum's "Privacy Papers for Policymakers 2014"
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2427808

2. *Privacy and Intellectual Freedom*, in THE HANDBOOK OF INTELLECTUAL FREEDOM (Unwin: M. Alfino ed., 2014) (with Joanna F. Cornwell).
- SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2501448

1. *Tort Privacy and Free Speech*, in THE RIGHT TO PRIVACY - PERSPECTIVES FROM THREE CONTINENTS (De Gruyter: Dieter Doerr & Udo Fink eds., 2012).

**Other Writings:**

64. Comments of the Cordell Institute on the Prevalence of Commercial Surveillance and Data Security Practices that Harm Consumers, FTC Rulemaking Nov. 21, 2022.

63. We're So Close to Getting Data Loyalty Right, IAPP PRIVACY PERSPECTIVES, June 14, 2022 (with Woodrow Hartzog).

62. Facebook can change its name to Meta Platforms or anything else, but its current leadership cannot be trusted, MARKETWATCH, Dec. 24, 2021.

61. Creepiness Is the Wrong Way to Think About Privacy, SLATE, Dec. 2, 2021.

60. The U.S. Urgently Needs a Comprehensive Privacy Law that Goes Beyond the Fair Information Practices, CIPLblog, Nov. 30, 2021.

59. South Korea's COVID Success Stems From an Earlier Infectious Disease Failure, SLATE, Jan. 29. 2021.

58. A Duty of Loyalty for Privacy Law, OXFORD BUSINESS LAW BLOG, University of Oxford (UK), Oct. 28, 2020.

57. What Kind of First Amendment Do We Want? Legal scholar Neil Richards on the uses and abuses of free speech in the digital age, SLATE, Oct. 27, 2020 (interviewed by Chloe Hadavas).

56. Getting the First Amendment Wrong, BOSTON GLOBE, Sept. 4, 2020 (with Woodrow Hartzog).

55. Welcome to Cordell Perspectives, Cordell Perspectives, Cordell Institute for Policy in Medicine & Law, May 1, 2020 (with Jonathan Heusel).

54. Why Europe's GDPR Magic Will Never Work in the US, THE WIRED WORLD IN 2020, WIRED (UK), Feb. 20, 2020 (with Woodrow Hartzog).

53. There's A Lot to Like About the Senate Privacy Bill, If It's Not Watered Down, THE HILL, Dec. 6, 2019 (with Woodrow Hartzog).

52. Who is Who, and What Do They Do? Executive Powers over Surveillance, part two, IAPP.ORG, March 26, 2019 (with Andrew Serwin).

51. Who is Who, and What Do They Do? Executive Powers over Surveillance, IAPP.ORG, Jan. 29, 2019 (with Andrew Serwin).

50. It's Time to Try Something Different on Internet Privacy, WASHINGTON POST, Dec. 20, 2018 (with Woodrow Hartzog).

49. Who is Who and What Do They Do? Deconflicting Cyber, IAPP.ORG, Oct. 30, 2018 (with Andrew Serwin).

48. The Intelligence Community: Who Is Who and What Do They Do?, IAPP.ORG, Sept. 25, 2018 (with Andrew Serwin).

47. Why the Logan Pauls of the world can push the boundaries of privacy and good taste, THE HILL, Jan. 16, 2018.

46. We will work out the commercial, clinical, ethical and legal issues around genome sequencing. THE WIRED WORLD IN 2018, WIRED (UK), 2017 (with Jonathan Heusel).

45. Should Supreme Court Justices Continue to Have Life Tenure?, (revised), JUNIOR SCHOLASTIC MAGAZINE, Feb. 2017.

44. Should Supreme Court Justices Continue to Have Life Tenure?, (revised), NEW YORK TIMES UPFRONT MAGAZINE, Sept. 2016.

43. The future of espionage: What techniques will spies be using in ten years' time?, WIRED (UK), July 16, 2016.

42. Privacy and Respect for Individuals, ALA CHOOSE PRIVACY WEEK, May 4, 2016.

41. The iPhone Case and the Future of Civil Liberties, MICROSOFT TECHNOLOGY/ACADEMICS/POLICY BLOG, March 7, 2016.

40. Apple's Code = Speech Mistake, MIT TECHNOLOGY REVIEW, March 1, 2016.

39. The iPhone Case and the Future of Civil Liberties, BOSTON REVIEW, Feb. 25, 2016.

38. *Apple v. The FBI*: Why the 1789 All Writs Act Is the Wrong Tool, THE GUARDIAN, Feb. 24, 2016.

37. Facebook's New Digital Assistant M Will Need to Earn Your Trust, THE GUARDIAN, Sept. 9, 2015.

36. Privacy Law: From a National Dish to a Global Stew, LINKEDIN PULSE BLOG, April 8, 2015 (with Daniel J. Solove).

35. The Electronic Panopticon, THE CHRONICLE OF HIGHER EDUCATION, March 16, 2015.

34. Digital Laws Evolve, GQ KOREA, Feb. 2015.

33. Google Has Captured Your Mind, SALON, Feb. 26, 2015.

32. The *Fifty Shades of Grey* Paradox, SLATE, Feb. 13, 2014.

31. Why Regulating Revenge Porn Isn't Censorship, AL-JAZEERA AMERICA, Feb. 11, 2015 (with Danielle Citron).

30. How Encryption Protects Our Intellectual Privacy (And Why You Should Care), WIRED (UK), Jan. 7, 2015.

29. Digital Laws Evolve, THE WIRED WORLD IN 2015, WIRED (UK).

28. Will We Have Any Privacy After the Big Data Revolution?, TIME, Sept. 25, 2014.

27. Big Data Isn't Magic, ZOCALO PUBLIC SQUARE, Sept. 24, 2014.

26. Can and Should Perez Hilton Be Held Liable for Reposting Celebrities' Private Nude Photos Without their Consent?, FORBES, Sept. 3, 2014 (with Danielle Citron).

25. Can Technology Prevent Another Ferguson?, CNN.COM, Sept. 2, 2014.

24. Privacy Is Not Dead—It's Inevitable, BOSTON REVIEW, May 28, 2014.

23. The Promises and Pitfalls of Big Data, AL-JAZEERA AMERICA, May 8, 2014.

22. What's Up With Big Data Ethics?, FORBES, March 28, 2014 (with Jonathan H. King).

21. What's Up With Big Data Ethics?, O'REILLY STRATA BLOG, March 21, 2014 (with Jonathan H. King).

20. Gigabytes Gone Wild, AL-JAZEERA AMERICA, March 2, 2014, (with Jonathan H. King).

19. Obama's Surveillance Reforms, BOSTON REVIEW, Jan. 22, 2014.

18. Watching the Watchers: The Rise of Sousveillance, THE WIRED WORLD IN 2014, WIRED (UK).

17. They Know Where You Are (But They Shouldn't), BOSTON REVIEW, Aug. 26, 2013.

16. Opinion: Don't Let U.S. Government Read Your E-mail, CNN.COM, Aug. 18, 2013.

15. Surveillance After the Boston Bombing, THE CHRONICLE OF HIGHER EDUCATION, Issue #35, May 10, 2013.

14. Opinion: Surveillance State No Answer to Terror," CNN.COM, April 23, 2013.

13. Keep Your Update to Yourself, THE WIRED WORLD IN 2013, WIRED (UK).

12. Choose Privacy Week 2012: The Perils of Social Reading, PRIVACYREVOLUTION.ORG, May 2, 2012.

11. Rethinking Privacy in the Digital Age, WASHINGTON UNIVERSITY LAW MAGAZINE, Spring 2012, at p. 47.

10. Guest Blogger, CONCURRINGOPINIONS.COM, 2007-2012.

9. *Should Supreme Court Justices Continue to Have Life Tenure?* (revised) NEW YORK TIMES UPFRONT MAGAZINE, Sept. 21, 2009.

8. *William Hubbs Rehnquist,* in ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (West: 2008).

7. *Missouri v. Holland,* in ENCYCLOPEDIA OF THE SUPREME COURT OF THE UNITED STATES (West: 2008).

---

6. *Foreword: The Rehnquist Court and the First Amendment*, 21 WASH. U. J. L. & POL. 1 (2006).

5. *Griswold v. Connecticut*, in THE ENCYCLOPEDIA OF PRIVACY (William Staples *et al.* eds., 2006).

4. *Should Supreme Court Justices Continue to Have Life Tenure?* NEW YORK TIMES UPFRONT MAGAZINE, March 7, 2005.

3. *The Constitutionality of Federal and State Historic Preservation Grants to Religious Properties* SJ053 ALI-ABA 873 (2004).

2. *Ex Ante: Taxing Cases,* 5 THE GREEN BAG 2d 2 (2001).

1. *The Electronic Communications Privacy Act and Internet Privacy Litigation,* LIBEL DEFENSE RESOURCES COUNCIL CYBER SPACE PROJECT (2001).

## ACADEMIC & PUBLIC PRESENTATIONS:

380. "A Concrete Proposal for Data Loyalty," Privacy Law Scholars Conference, U.C. Boulder, Boulder, Colorado, June 1, 2023.

379. "Why Privacy Matters," Université Paris 1 - Panthéon-Sorbonne, Paris, France, May 26, 2023.

378. "Duties of Data Loyalty and the Future of Data Protection," CPDP Conference, Brussels, Belgium, May 24, 2023.

377. "Cross-Border Data Flows and 'Commercial Surveillance,'" Stanford Law School, May 12, 2023.

376. "Three AI Case Studies," University of Bocconi, Milan, Italy, April 27, 2023.

375. "Regulatory Approaches to AI," University of Bocconi, Milan, Italy, April 27, 2023.

374. "Critical Perspectives on AI," University of Bocconi, Milan, Italy, April 26, 2023.

373. "Why Privacy Matters," University of Bocconi, Milan, Italy, April 26, 2023.

372. "What is Artificial Intelligence and How Should We Think About It," University of Bocconi, Milan, Italy, Aril 24, 2023.

371. "Loyal AI," NIH Voice AI Symposium, Bethesda MD, April 19, 2023.

370. "Loyal AI," Washington University School of Law Alumni Weekend Keynote, April 15, 2023.

369. "Palmer Prize Award Lecture: Why Privacy Matters," Chicago-Kent Law School, Chicago, IL, April 12, 2023.

368. "Academia Meets Private Practice: Building Better Privacy Laws," IAPP Global Privacy Summit, Washington, DC, April 5, 2023.

367. "ChatGPT and Academic Dishonesty," Washington University School of Law, April 4, 2023.

366. "A Concrete Proposal for Data Loyalty," Harvard Law School, March 31, 2023.

365. "The Future of AI Regulation," Washington University-Sorbonne Seminar, March 24, 2023.

364. "Subjective Expectations and Privacy: Zeitouni on the Psychology of Privacy," NYU Law JSD Forum, New York, NY, March 2, 2023.

363. "Why Loyalty Matters for Video Game Companies," Entertainment Software Ratings Board, January 30, 2023.

362. "Loyal AI," Ohio State University Program on Data Governance, January 25, 2023.

361. "Why Privacy Matters," Ohio State University Data Points Lecture, Columbus, Ohio, January 25, 2023.

361. "Why Privacy Matters Chinese Edition Book Launch," Digital Silk Road Security Think Tank, Suzhou Information Security Institute, Xi'an Jiangtong University and Institute of

Cybersecurity and Rule of Law, Xi'an Jiaotong Institute of Science and Education, Dec. 8, 2022. (10,000 attendees).

360. "Why Privacy Matters," London School of Economics, London, England, December 6, 2022.

359. "Discussion and Q&A with Professor Richards," Oxford Internet Institute, University of Oxford, England, December 1, 2022.

358. "Why Privacy Matters," Corpus Christi College, University of Oxford, England, December 1, 2022.

357. "A Duty of Loyalty for Privacy Law," Information Accountability Foundation Policy Call Webinar, Nov. 17, 2022.

356. "Trust, Loyalty, and Customers," Information Accountability Foundation Annual Retreat, Washington, DC Nov. 8, 2022.

355. "Why Privacy Matters," UCLA Law School, Nov. 4, 2022.

354. "Privacy's Social Dimensions," Berkeley Law School, Oct. 21, 2022.

353. "Why Privacy Matters," Yale Law School, Sept. 29, 2022.

352. "The Future of US Privacy Law," Ditchley Foundation, Chipping Norton, England, Sept. 23, 2022.

351. "A Duty of Loyalty for Privacy Law," Georgia Tech University, Atlanta, Georgia, Sept. 19, 2022.

350. "Why Privacy Matters," Monash University Law and Business Seminar Series, Melbourne, Australia, August 31, 2022.

349. Why Privacy Matters, Universidad de San Andrés, Buenos Aires, Argentina, August 18, 2022.

348. A Duty of Loyalty for Privacy Law, Information Accountability Foundation, August 18, 2022.

347. Panelist, DLA Piper Workshop on Data Sustainability, San Diego, CA, June 28, 2022.

346. The Surprising Virtues of Data Loyalty, Harvard Berkman-Klein Center, June 23, 2022.

345. Opening Keynote: Why Privacy Matters, Future of Privacy Forum Advisory Board Annual Meeting, Middleburg, Virginia, June 13, 2022.

344. Panelist, Workshop on Location Data in the Context of Public Health, Research, and Law Enforcement, National Academies of Sciences, June 9, 2022.

343. Fourth Amendment Notice in the Cloud, Privacy Law Scholars Conference, Northeastern University, June 3, 2022.

342. Privacy's Social Dimensions, Privacy Law Scholars Conference, Northeastern University, June 2, 2022.

341. Against Engagement, Privacy Law Scholars Conference, Northeastern University, June 2, 2022.

340. Participant, New Remedies for Platform Harms Workshop, Boston University School of Law, June 1, 2022.

339. "Why Privacy Matters and the Future of Data Protection Law," Computers, Privacy & Data Protection Conference, Brussels, Belgium, May 25, 2022.

338. "Closing Keynote: Why Privacy Matters," MERIT Network Annual Conference, Detroit, Michigan, May 11, 2022.

337. "Why Privacy Matters," University of Graz, Austria, May 5, 2022.

336. "Why Privacy Matters," Cato Institute Free Thought Podcast, April 19, 2022.

335. Moderator, "Keynote Panel: Privacy Journalism," IAPP Global Privacy Summit 2022, Washington, DC, April 13, 2022.

334. "Academia Meets Private Practice: Developing the "Best" State Privacy Law," IAPP Summit 2022, Washington, DC April 13, 2022.

333. "Why Privacy Matters," University of Virginia School of Law, April 11, 2022.

332. "Intellectual Privacy," University of Virginia School of Law, April 11, 2022.

331. "Why Privacy Matters," Washington University School of Law Alumni Weekend, April 9, 2022.

330. First Amendment and Data Privacy Roundtable, University of Colorado Law School, April 8, 2022

329. "Why Privacy Matters," University of Georgia School of Law, April 8, 2022.

328. Participant, Silicon Flatirons First Amendment/Privacy Roundtable, University of Colorado Boulder, April 8, 2022.

327. "The Surprising Virtues of Data Loyalty," Cordell Ideas Lunch, Washington University School of Law, April 7, 2022.

326. "Privacy @ WashU Law," Hire WashU Event, Washington University School of Law, April 7, 2022.

325. Co-Host, WashU Law Musical Showcase, March 31, 2022.

324. "Why Privacy Matters," Saint Louis University Law School, March 29, 2022.

323. "Comparative Perspectives on the Metaverse," Cordell-Institute Sorbonne Seminar, March 25, 2022.

322. "Fourth Amendment Notice and the Cloud," Washington University Cordell Institute Ideas Lunch, March 24, 2022.

321. "Why Privacy Matters," Radboud University/Tilburg University, The Netherlands, March 8, 2022.

320. "Why Privacy Matters," University of Maine Law School, Feb. 28, 2022.

319. "*Schrems* and the Future of Cross-Border Transfers," Stanford Law School, Feb. 22, 2022.

318. "Why Privacy Matters," Scheer Intelligence, KCRW Radio Los Angeles, Feb. 15, 2022.

317. "Why Privacy Matters," University of Virginia School of Law "Common Law" Podcast, Feb. 9. 2022.

316. "The Surprising Virtues of Data Loyalty," Future of Privacy Forum "Privacy Papers for Policymakers" Award Program, Washington, DC, Feb. 4, 2022.

316. "Why Privacy Matters," St. Louis on the Air, KWMU Radio, Feb. 3, 2022.

315. "Why Privacy Matters: An Interview with Neil Richards," AirBnb, January 28, 2022..

314. "Data Privacy Day: Why Privacy Matters," Duke Law School/Kenan Center for Ethics, Jan. 28, 2022.

313. "Why Privacy Matters," Fordham Law School, Jan. 24, 2022.

312. "Platform Governance: Trust and Transparency," Yale Information Society Project, Dec. 10, 2021.

311. "Why Privacy Matters," Washington University College Republicans, Dec. 7, 2021.

310. "Concluding Remarks: Why Privacy Matters," Cordell5: Why Privacy Matters, Cordell Institute at Washington University, Dec. 3, 2021.

309. "Why Privacy Matters," Washington University School of Law, Dec. 2, 2021.

308. "Why Privacy Matters," Osgood Hall School of Law, Toronto, Canada, Nov. 30. 2021.

307. "AI, Discrimination, and Manipulation," University of Bocconi Law School, Milan, Italy, Nov. 19, 2021.

306. "Regulatory Approaches to AI," University of Bocconi Law School, Milan, Italy, Nov. 19, 2021.

305. Host, Washington University-Sorbonne Information Law Salon, Nov. 12, 2021.

304. "Why Privacy Matters," Berkeley Law School, November 9, 2021.

303. "Co-Opting Privacy," Pound Civil Justice Institute Annual Conference, Hastings Law School, San Francisco, California, November 6, 2021.

302. "A Conversation with Ari Waldman about *Industry Unbound*," Cordell Institute @ Washington University/St. Louis IAPP, November 3, 2021.

301. "What Is Artificial Intelligence and How Should We Think About It?" University of Bocconi Law School, Milan, Italy, Nov. 2, 2021.

300. "Why Privacy Matters," Washington University Parents Council, Oct. 29, 2021.

299. "Social Media and 'Publicly Available' Information," Facebook Oversight Board/Annenberg Public Policy Center, University of Pennsylvania, Sept. 20, 2021.

298. "The Surprising Virtues of Data Loyalty," Yale ISP Ideas Lunch, Yale Law School, July 22, 2021.

297. "The Surprising Virtues of Data Loyalty," Washington University School of Law, June 23, 2021.

296. Host, Junior Scholars Mentoring Session, Privacy Law Scholars Conference, Georgetown Law School, June 3, 2021.

295. Commentator, Hannah Bloch-Wehba, Democratic Algorithms, Privacy Law Scholars Conference, Georgetown Law School, June 3, 2021.

294. "The Surprising Virtues of Data Loyalty," Privacy Law Scholars Conference, Georgetown Law School, June 3, 2021.

293. "Intellectual Privacy and Surveillance," Stanford Technology Law Review Symposium on Privacy and Surveillance, Stanford Law School, May 15, 2021.

292. Co-Host, Washington University Musical Showcase, April 15, 2021.

291. "A Duty of Loyalty for Privacy Law," Princeton University, March 23, 2021.

290. "The Cordell Institute for Policy in Medicine & Law," Washington University Eliot Society, Feb. 25, 2021.

289. "A Conversation with Judge Michael Y. Scudder," Washington University School of Law, Feb. 23, 2021.

288. "The Schrems Litigation and the Future of Transatlantic Privacy," Stanford Law School, Feb. 22, 2021.

287. "A Conversation with Judge Julia Smith Gibbons," Washington University School of Law, Feb. 12, 2021.

286. "Why Privacy Matters: What Privacy Isn't," University of Colorado School of Law, Feb. 8, 2021.

285. "Why Privacy Matters: Consumer Protection," Florida State College of Law, Feb. 4, 2021.

284. "Free Speech In 2021 Requires Oversight, But From Whom?" St. Louis on the Air, KWMU Public Radio, Jan. 28, 2021.

283. Panelist, "Schrems 2: Looking Back, Looking Forward," CPDP, Brussels, Belgium, January 28, 2021.

282. "Burns Night Special - Meet the author: Neil Richards," University of Edinburgh School of Law, January 25, 2021.

281. "A U.S. GDPR?" American Association of Law Schools Annual Meeting, joint session of the Section on Privacy and Defamation Law and Section on European Law, Jan. 5, 2021.

280. Participant, Privacy Redress Options Workshop, Tech Policy Lab, University of Washington, Dec. 10, 2020.

279. The Invalidation of the EU-US Privacy Shield and the Future of Transatlantic Data Flows, testimony before United States Senate Committee on Commerce, Science, and Transportation, Washington, DC. Dec. 9, 2020.

278. "Why Privacy Matters," Osgoode Hall Law School, York University, Toronto, Canada, Nov. 18, 2020.

277. "Why Privacy Matters," Berkeley Law School, Nov. 9, 2020.

276. "Do We Need a First Amendment 2.0?" New America Foundation/Slate/American University webcast, Oct. 28, 2020.

275. "A Duty of Loyalty for Privacy Law," Yale Law School, New Haven, CT, Oct. 22, 2020.

274. "Privacy's Constitutional Moment and the Limits of Data Protection," Hinshaw & Culbertson, LLP, Chicago, IL, Oct. 8, 2020.

273. "The 'Innovation' Myth," Saint Louis University School of Law Childress Lecture Conference, Oct. 1, 2020.

272. "The Future of Federal Privacy Legislation," Future of Privacy Forum Annual Meeting, Sept. 24, 2020.

271. "A Duty of Loyalty for Privacy Law," Washington University Faculty Workshop, July 8, 2020.

270. "The Future First Amendment," Conference on "Free Speech in the 21st Century," Alma Mater Europaea, Maribor, Slovenia, July 3, 2020.

269. "A Duty of Loyalty for Privacy Law," Privacy Law Scholars Conference, George Washington University Law School, Washington, DC, June 4, 2020.

268. "A Duty of Loyalty for Privacy Law," Northeastern Law School, Boston MA, April 27, 2020.

267. "Privacy's Constitutional Moment and the Limits of Data Protection," Georgetown Law School, Washington, DC, Feb. 24, 2020.

266. "Privacy's Constitutional Moment and the Limits of Data Protection," Future of Privacy Forum Privacy Papers for Policymakers, United States Senate, Washington, DC, Feb. 6, 2020.

265. Participant, Roundtable on Julie Cohen's *Between Truth and Power*, Notre Dame Law School, Jan. 31, 2020.

264. Chair, "A US GDPR? Prospects of Legislation, Regulation, and Adequacy," Computers, Privacy, and Data Protection (CPDP) 2018, University of Brussels, Brussels, Jan. 24, 2020.

263. Panelist, "Turning the Tables: Academics in the Hot Seat," Computers, Privacy, and Data Protection (CPDP) 2018, University of Brussels, Brussels, Jan. 23, 2020.

262. "Lessons from the Clinton Impeachment," Washington University School of Law, Oct. 30, 2019.

261. "Why Privacy Matters," Koch Distinguished Professor in Law Installation, Washington University, St. Louis, Missouri, Oct. 28, 2019.

260. "Privacy's Constitutional Moment," PLSC-Europe, The University of Amsterdam, The Netherlands, Oct. 25, 2019.

259. "Introduction: The Ethics of Human Genome Editing," Cordell3 Conference, St. Louis, Missouri, Oct. 11, 2019.

258. Moderator, "The Science of Biohacking," St. Louis Young Presidents' Organization, Oct. 10, 2019.

257. "The Pathologies of Digital Consent," Stanford University Program on Democracy and the Internet, Palo Alto, California, Oct. 4, 2019.

256. "The Future of Human Data in Health Care & Beyond," MOMENTUM: The Inauguration of Chancellor Andrew D. Martin, Washington University, St. Louis, MO, Oct. 3, 2019.

255. "Why Privacy Matters," Washington University Political Theory Workshop, Sept. 13, 2019.

254. "Why Privacy Matters," Society of Law Scholars Annual Meeting, University of Central Lancashire, Preston, England, Sept. 4, 2019.

253. "Law Students vs. Technology," Washington University School of Law Orientation, St. Louis, Missouri, Aug. 16, 2019.

252. "Private-Sector Threats to Privacy," Dartmouth College Summer Lecture Series, Aug. 8, 2019.

251. "Information Fiduciaries and Trust Models for Data," Multidisciplinary Workshop on the Future of Health Data, Yale University, June 13, 2019.

250. "Privacy's Constitutional Moment," Privacy Law Scholars Conference, Berkeley Law, May 30, 2019.

249. Convenor and Moderator, Cross-Border Speech and Privacy Roundtable, Berkeley Law, May 29, 2019.

248. "Digital Searches and Privacy," Duke University Kenan Center for Ethics, April 19, 2019.

247. "Why Privacy Matters," Duke University Kenan Center for Ethics, April 18, 2019.

246. "Notice and Choice," FTC Hearings on Competition and Consumer Protection in the 21st Century, Washington DC, April 10, 2019.

245. Commentator, "Timothy Bartley, Big Data, Small Governance? Self-Regulation of Predictive Analytics in the Private Sector," Washington University Political Theory Workshop, April 5, 2019.

244. "Why Privacy Matters," Boston University, March 20, 2019.

243. "Genomic Privacy and Ethics," St. Louis Academy of Science, St. Louis, Missouri, Feb. 28, 2019.

242. "Author Communication and the Law Reviews," Washington University School of Law, Feb. 22, 2019.

241. Panelist, "Inside the Marble Palace: A Conversation with Four Former Supreme Court Clerks," Washington University School of Law, Feb. 12, 2019.

240. Chair & panelist, "Clashing Constitutional Norms, Cross-Border Data, and Free Expression," Computers, Privacy, and Data Protection (CPDP) 2018, University of Brussels, Belgium, Feb. 1, 2019.

239. "Why Privacy Matters," University of Tel Aviv, Israel, Dec. 10, 2018.

238. Moderator, "Panel Discussion: *Carpenter v. United States*," Washington University School of Law, Oct. 30, 2018.

237. "Privacy Colonialism: The EU as US Privacy Regulator," Amsterdam Privacy Conference (APC), University of Amsterdam, The Netherlands, Oct. 2018.

236. "Privacy and Free Expression in a Time of Fake News," Tulane Law School, Sept. 28, 2018.

235. "Surveillance and Free Expression," Yale Law School, Sept. 26, 2018.

234. "The Pathologies of Consent," Washington University Law Review Symposium, Sept. 14, 2018.

233. "Privacy Colonialism: The EU as US Privacy Regulator," Society of Law Scholars Annual Conference, Queen Mary School of Law, London, England, Sept. 6, 2018.

232. "The Supreme Court Speaks on the Fourth Amendment: *U.S. v. Carpenter*," Thomas Eagleton Federal Courthouse, St. Louis MO, Aug. 23, 2018.

231. "Law Students vs. Technology," Washington University Law Orientation, Sept. 22, 2018.

230. "Why Privacy Matters," University of Amsterdam, The Netherlands, July 5, 2018.

229. Commentary, "Designing without Privacy?," Privacy Law Scholars' Conference, George Washington University, Washington DC, June 2018.

228. "Four Preconditions for Digital Expression (You Won't Believe #4!)," Privacy Law Scholars' Conference, George Washington University, Washington DC, June 2018.

227. "Privacy and Design," Notre Dame Law School, April 27, 2018.

226. "Thoughts on *Privacy's Blueprint*," Notre Dame Law School, April 27, 2018.

225. "Why Privacy Matters," UCLA Law School Faculty Colloquium, April 2, 2018.

224. "Why Privacy Matters," Washington University Institute for Informatics Annual Symposium, St. Louis MO, March 31, 2018.

223. "Why Privacy Matters," Washington University Dallas-Fort Worth Regional Cabinet Annual Dinner, Dallas, Texas, March 8, 2018.

222. "Data Transfer-Where Have We Been and Where Are We Going?" International Privacy + Security Forum, George Washington University, Washington DC, Feb. 26, 2018.

221. Commentator, "Ari Waldman, Designing Without Privacy," Privacy Law Scholars Conference (Europe), University of Brussels, Belgium, Jan. 28, 2018.

220. Moderator, "Finding a Way Forward for Cross-Border Data Requests," Computers, Privacy, and Data Protection (CPDP), University of Brussels, Belgium, Jan. 25, 2018.

219. "Four Preconditions for Digital Expression (You Won't Believe #4!)," Washington University School of Law, Jan. 20, 2018.

218. "Privacy's Trust Gap," Institute for Informatics, Washington University Medical School, Dec. 18, 2017.

217. "Six Preconditions for Digital Expression (You Won't Believe #5!)," Princeton University Department of Philosophy, Dec. 15, 2017.

216. "Intellectual Privacy," International Association of Privacy Professionals (IAPP), St. Louis Chapter, Dec. 13, 2017.

215. "Distinguished Commentary: SidleyAustin Lecture on 'Privacy and the Collection/Use Distinction,'" Center for Data & Governance, Ohio State University, Nov. 9, 2017.

214. "Why Privacy Matters," Notre Dame Law School Faculty Workshop, South Bend, Indiana, Oct. 27, 2017.

213. "Amicus Briefing Before the U.S. Supreme Court," Microsoft Corporation, Brussels, Belgium, Oct. 18, 2017.

212. "Trust and Connected Toys," Privacy + Security Forum, George Washington University, Washington, DC, Oct. 6, 2017.

211. Panelist, "The Interrelation Between Privacy and Free Expression," University of Michigan School of Law, Sept. 22, 2017.

210. "Closing Remarks: Genomics, Privacy, and Trust," Institute for Policy in Medicine & Law Planning Symposium, Washington University, Sept. 18, 2017.

209. "An Evening with Edward Snowden," St. Louis, MO, Sept. 16, 2017.

208. "Law Students v. Technology," Washington University Law Orientation, Aug. 24, 2018.

207. Panelist, "Fake News, Trolling, & Cyberbullying: Debating Social Media Companies' Rights & Responsibilities," AEJMC, Chicago, Illinois, Aug. 9, 2017.

206. "Why Privacy Matters," University of Amsterdam, The Netherlands, July 6, 2017.

205. "Why Privacy Matters," Privacy Law Scholars Conference, Berkeley, CA, June 2, 2017.
204. Commentator, "Sarah Igo, Surveillance and Transparency Since the Sixties," Privacy Law Scholars Conference, Berkeley, CA, June 2, 2017.
203. "Intellectual Privacy," Washington University Science on Tap, St. Louis, MO, April 26, 2017.
202. Participant, "Algorithms and Us," National Endowment for the Humanities, SUNY Stony Brook, Stony Brook NY, April 4-5, 2017.
201. "Free Speech and the Twitter Presidency," University of Illinois College of Law, April 11, 2017.
200. "Keynote: Why Privacy Matters," American Medical Informatics Association Annual Meeting, San Francisco, CA, March 27, 2017.
199. "Privacy and the Future of the Cloud," Washington University School of Law, Dec. 14, 2016.
198. "Why Privacy Matters," WindowGroup, St. Louis, MO, Dec. 7, 2016.
197. "Challenges to the Enforcement of Consumer Privacy in the Information Age," ICPEN Annual Meeting, Bad Wiessee, Germany, Sept. 29, 2016.
196. "The Dangers of Surveillance," Fontbonne University, St. Louis, MO, Sept. 22, 2016.
195. "Oliver Stone's *Snowden*," ACLU of Eastern Missouri Movie Premiere, St. Louis, MO, Sept. 13, 2016.
194. "Why Privacy Matters," Fontbonne University Convocation Address, St. Louis, MO, Aug. 24, 2016.
193. "A Conversation with Judge Coleman," Washington University School of Law, Aug. 22, 2016.
192. "Why Privacy Matters," University of Amsterdam, The Netherlands, July 6, 2016.
191. "Intellectual Privacy and Intermediary Liability," Senate of Argentina, Buenos Aires, Argentina, June 8, 2016.
190. "Intellectual Privacy and Intermediary Liability," Seminar on International Internet Politics, Universidad de San Andrés, Buenos Aires, Argentina, June 6, 2016.
189. "Privacy and the Future of the Cloud," Privacy Law Scholars Conference, Washington, DC, June 1-2, 2016.
188. "Privacy and Genomic Science," Washington University Genomics Retreat, April 29, 2016.
187. "Trusting Big Data Research," Washington University School of Law, April 22, 2016.
186. "Code = Speech?" Washington University First Amendment Roundtable, April 15, 2016.
185. "Design, Privacy, and Trust," UC Berkeley Law School, April 8, 2016.
184. "Comments on *Privacy's Blueprint*," UC Berkeley Law School, April 7, 2016.
183. "Big Data: How will regulation affect your use of data analytics in the years ahead?" Microsoft Envision Conference, New Orleans, LA, April 4, 2016.
182. "The Future of Privacy Laws," Microsoft Envision Conference, New Orleans, LA, April 4, 2016
181. "Drones and Privacy," Washington University Assembly Series, March 31, 2016.
180. "Taking Trust Seriously in Privacy Law," Saint Louis University School of Law, Feb. 19, 2016.
179. "Justice Scalia: The Legacy and the Vacancy," Washington University School of Law, Feb. 17, 2016.
178. "Trusting Big Data Research," University of Toronto School of Law, Jan. 22, 2016.
177. "Privacy and Trust," Dartmouth College Geisel School of Medicine, Jan. 15, 2016.

176. "Taking Trust Seriously in Privacy Law," Future of Privacy Forum "Privacy Papers for Policymakers 2015," Washington, DC, Jan. 13, 2016.

175. Adviser, "American Law Institute Restatement of Information Privacy Principles," Philadelphia, Pennsylvania, Dec. 17, 2015.

174. "Intellectual Privacy," Sever Institute Analytics Roundtable, Washington University, Dec. 15, 2015.

173. "Trusting Big Data Research," Washington and Lee Law Review/Future of Privacy Forum Conference on "Beyond IRBs?" Washington, DC, Dec. 10, 2015.

172. "Privacy and Trust," Dartmouth College Geisel School of Medicine, Nov. 15, 2015.

171. "The Right to Be Forgotten and Free Expression," ASIS&T Annual Meeting, St. Louis, Missouri, Nov. 10. 2015.

170. "Guardians of Data: How to Be Trusted in an Untrustworthy World," Microsoft Corporation, Redmond, Washington, Nov. 7, 2015.

169. "Intellectual Privacy," Microsoft Corporation, Redmond, Washington, Nov. 7, 2015.

168. "Intellectual Privacy," Washington University Seattle Regional Council Annual Dinner, Seattle, Washington, Nov. 6, 2015.

167. "Commentary: Internet Search and Mass Surveillance," Conference on Empirical Research and the Law 2015, St. Louis, MO, Oct. 30, 2015.

166. "Privacy, Security, and Trust," Fontbonne University, St. Louis, MO, Oct. 29, 2015.

165. "Taking Trust Seriously In Privacy Law," Privacy Law Scholars Conference Europe, Amsterdam, The Netherlands, Oct. 26, 2015.

164. "Intellectual Privacy and Personalized Media," Amsterdam Privacy Conference, Amsterdam, The Netherlands, Oct. 27, 2015.

163. "Algorithms and Policing," Washington University School of Law Public Law and Policy Speaker Series, Oct. 20, 2014.

162. "Intellectual Privacy and Libraries," The Digital Shift Online Library Conference, Oct. 14, 2015.

161. "Intellectual Privacy," Washington University Management Team, St. Louis MO, Oct. 12, 2015.

160. "Four Privacy Myths," STL SecureWorld Expo, St. Louis, MO, Sept. 22, 2015.

159. "Intellectual Privacy," Washington University Law Alumni Weekend, Sept. 19, 2015.

158. "Security Roundtable: The Right to Be Forgotten," Washington University, Sept. 17, 2015.

157. "Intellectual Privacy," Fordham Law School, Sept. 16, 2015.

156. "Intellectual Privacy," Yale Law School, Sept. 15, 2015.

155. "Intellectual Privacy and the Hague Declaration," University of Brescia, Italy, July 22, 2015.

154. "Privacy and Civil Liberties," Michigan State University Spartan Debate Institute (videoconference), July 17, 2015.

153. "Intellectual Privacy," Washington University Law Eliot Society, St. Louis, MO, July 16, 2015.

152. "Intellectual Privacy," University of Amsterdam, The Netherlands, July 9, 2015.

151. "Intellectual Privacy," University of Leuven, The Netherlands, July 8, 2015.

150. "Intellectual Privacy," American Library Association Annual Meeting, San Francisco, California, June 29, 2015.

149. "Intellectual Privacy," Washington University Law Eliot Society, Chicago, IL, June 24, 2015.

148. "A Theory of Privacy and Trust," Privacy Law Scholars Conference, Berkeley, California, June 5, 2015.

147. "Privacy and Free Speech: A Transatlantic Divide," Privacy Law Scholars Conference, Berkeley, California, June 5, 2015.

146. "Choose Privacy Week: Intellectual Privacy," University of Wisconsin-Milwaukee, May 4, 2015.

145. Moderator, "Plenary Session: The First Amendment and Image Capture," Yale Free Expression Scholars Conference, New Haven, Connecticut, May 3, 2015.

144. "Intellectual Privacy," Berkman Center for Internet and Society, Harvard University, Cambridge, Massachusetts, April 28, 2015.

143. "Intellectual Privacy," Washington University Boston Regional Council Annual Dinner, Boston, Massachusetts, April 28, 2015.

142. "Privacy Myths," Microsoft Corporation, Redmond, Washington, April 24, 2015.

141. "Intellectual Privacy," University of Washington Tech. Policy Lab, April 23, 2015.

140. "Intellectual Privacy," Washington University San Francisco Regional Council Annual Dinner, April 22, 2015.

139. "Intellectual Privacy," Berkeley Law School, Berkeley, California, April 22, 2015.

138. "Intellectual Privacy," Stanford Law School, Palo Alto, California, April 21, 2015.

137. "Intellectual Privacy," Saint Louis University Law School, April 13, 2015.

136. "Intellectual Privacy," Washington University School of Law, March 30, 2015.

135. "Intellectual Privacy," University of Maryland School of Law, Baltimore, Maryland, March 27, 2015.

134. "Intellectual Privacy," Washington University Pre-Law Society, March 25, 2015.

133. "Big Data Ethics," National Academies of Sciences, Irvine, California, March 13, 2015.

132. "Intellectual Privacy," Chicago-Kent School of Law, Chicago, Illinois, Feb. 23, 2015.

131. "Intellectual Privacy," Fordham Law School, New York, NY, Feb. 2, 2015.

130. "Law Enforcement Use of Body-Worn Cameras," IAPP Webinar, Jan. 30, 2015.

129. Invited Delegate, LIBER Declaration on Data Mining, The Hague, The Netherlands, Dec. 9, 2014.

128. "Ferguson and Free Speech," Washington University School of Law, Dec. 2, 2014.

127. "Four Privacy Myths," American Association of University Women, St. Louis Chapter, Chesterfield, Missouri, Nov. 13, 2014.

126. "Intellectual Privacy," Sever Analytic Roundtable, Washington University School of Engineering, Nov. 11, 2014.

125. Discussant, American Law Institute Restatement of Information Privacy Principles, San Francisco, California, Nov. 6, 2014.

124. "Privacy and Technology," Eliot Society Seminar Series, Washington University, Oct. 28, 2014.

123. "A Theory of Privacy and Trust," Notre Dame Law School, Oct. 24, 2014.

122. "Big Data and the Future for Privacy," University of Quebec at Montreal, Oct. 17, 2014.

121. "Big Data Ethics," Washington University Olin School of Business, Oct. 10, 2014.

120. "Why Privacy Matters," Washington University Political Theory Workshop, Sept. 19, 2014.

119. Panelist, "Our Enduring Constitution," Washington University Constitution Day Event, Sept. 17, 2014.

118. Panelist, "If You Have Nothing to Hide…" Missouri Bar Association Annual Meeting Plenary Session, Kansas City, Missouri, Sept. 11, 2014.

117. "Why Privacy Matters," Saint Louis University Faculty Workshop Series, Sept. 3, 2014.

116. "Why Privacy Matters," University of Amsterdam IViR, Amsterdam, the Netherlands, July 24, 2014.

115. "Intellectual Privacy," University of Amsterdam, IViR Summercourse on Privacy Law and Policy, Amsterdam, The Netherlands, July 10, 2014.

114. "Big Data Ethics," The Guardian Newspaper HQ, London, England, June 12, 2014.

113. "Four Privacy Myths," Privacy Law Scholars Conference, GW Law School, Washington, DC, June 5, 2014.

112. "Big Data Ethics," StampedeCon Big Data Conference, St. Louis Missouri, May 30, 2014.

111. "Why Data Privacy Law Is (Mostly) Constitutional," Yale Free Expression Scholars Conference, Yale Law School, New Haven, Connecticut, May 3, 2014.

110. "Privacy and Free Speech: The Transatlantic Divide," University of Melbourne Conference on Privacy and Defamation, Melbourne, Australia, April 24, 2014. (via Skype)

109. "Four Privacy Myths," Washington University Law National Council, April 25, 2014.

108. "Four Privacy Myths," Washington University Cyber-Security Roundtable, April 18, 2014.

107. "The Dangers of Surveillance (Robots)," 2014 WeRobot Conference, University of Miami School of Law, Miami, Florida, April 5, 2014.

106. "Four Privacy Myths," Loyola Law School, Chicago, Illinois, March 31, 2014.

105. Facilitator, White House Office of Science & Technology Policy/Data & Society Institute Conference on The Social, Cultural & Ethical Dimensions Of "Big Data," NYU School of Law, New York, NY, March 17, 2014.

104. "Why Data Privacy Law Is (Mostly) Constitutional," Future of Privacy Forum Privacy Papers for Policymakers, United States Congress, Washington, DC, March 5, 2014.

103. "Why Data Privacy Law Is (Mostly) Constitutional," William and Mary Review First Amendment Conference, Williamsburg, Virginia, Feb. 22, 2014.

102. "Four Privacy Myths," Keynote Address, University of Alabama Conference on Privacy Law, Tuscaloosa, Alabama, Jan. 17, 2014.

101. "Four Privacy Myths," Ethical Society of St. Louis, Jan. 14, 2014.

100. "The Dangers of Surveillance," Weidenbaum Center Policy Breakfast, Washington University, St. Louis, Missouri, Dec. 16, 2013.

99. "Four Privacy Myths," Washington University School of Law Faculty Workshop, Dec. 5, 2013.

98. "Why Surveillance Is Dangerous," Yale Information Society Project Thompson-Reuters Lecture Series, Yale Law School, Dec. 3, 2013.

97. "Privacy and Security: A Roundtable," Washington University Interdisciplinary Program in the Humanities, St. Louis Missouri, Nov. 20, 2013.

96. "Big Data Ethics," University of Pennsylvania Invisible Harms Conference, Philadelphia, Pennsylvania, Nov. 15, 2013.

95. "Cyber-Security, Social Media, and Big Data," Washington University School of Engineering, Oct. 29, 2013.

94. "Big Data Ethics," Wake Forest Law Review Symposium on Privacy, Winston-Salem, North Carolina, Oct. 24, 2013.

93. "Three Paradoxes of Big Data," Stanford Law Review/Future of Privacy Forum Conference on Privacy and Big Data, Washington, DC, Sept. 10, 2013.

92. "The Dangers of Surveillance," 2013 Society of Law Scholars Annual Meeting, University of Edinburgh School of Law, Edinburgh, Scotland, Sept. 5, 2013.

---

91. "Intellectual Privacy," Washington University-Cambridge University International Privacy Law Conference, Clare College, Cambridge, England, July 29-31, 2013.

90. "Data Privacy and the Right to be Forgotten after *Sorrell*," George Mason Law School Conference on the Law & Economics of Search and Social Media, Arlington, Virginia, May 15, 2013.

89. "Data Privacy and the Right to be Forgotten after *Sorrell*," Center for Democracy and Technology, Washington, D.C., May 14, 2013.

88. "Associations and Social Networks," Yale Law School Free Expression Scholars Conference, New Haven, Connecticut, May 4, 2013.

87. "The Dangers of Surveillance," Yale Law School Free Expression Scholars Conference, New Haven, Connecticut, May 4, 2013.

86. "Data Privacy and the Right to be Forgotten after *Sorrell*," Berkeley-GW Privacy Law Scholars Conference, Berkeley Law School, Berkeley, California, June 6-7 2013.

85. "The Dangers of Surveillance," University of Illinois Faculty Workshop, Champaign, Illinois, April 18, 2013.

84. "Free Speech Issues in the Standard & Poor's Case," Washington University Law/Business Roundtable, Washington University Olin School of Business, April 3, 2013.

83. Conference Organizer and participant, Washington University First Amendment Conference, Washington University School of Law, March 21-22, 2013.

82. "Intellectual Privacy," Amherst College Department of Law, Jurisprudence, and Social Thought, Amherst, Massachusetts, Feb. 22, 2013.

81. "Intellectual Privacy" Fordham Law School Center for Information Law and Policy Workshop, Jan. 19, 2013.

80. Panelist, Federal Trade Commission Workshop on "The Big Picture – Comprehensive Consumer Data Collection," Federal Trade Commission, Washington, DC, Dec. 6, 2012.

79. "The Dangers of Surveillance," *Harvard Law Review* Symposium on Information Privacy in the Twenty-First Century, Harvard Law School, Cambridge, Massachusetts, Nov. 9, 2012.

78. Invited participant, American Law Institute Invitational Conference on Information Privacy Law, San Francisco, California, Sept. 28, 2012.

77. "The Dangers of Surveillance," Washington University Political Theory Workshop, Sept. 7, 2012.

76. Invited Commenter, Ronald Krotoszynsky Faculty Workshop, Saint Louis University Law School Faculty Workshop, Sept. 6, 2012.

75. "Intellectual Privacy," Duke Law School Faculty Workshop, Aug. 31, 2012.

74. "The Perils of Social Reading," Comparative Perspectives on Privacy Conference (conference co-organizer), Clare College, Cambridge University, Cambridge, England, June 27, 2012.

73. "The Perils of Social Reading," Berkeley-GW Privacy Law Scholars Conference, Washington, DC, June 8 & June 9 (encore session), 2012.

72. "The Perils of Social Reading," Washington University School of Law Faculty Workshop, May 2, 2012.

71. "How Should the Law Think About Robots?" WeRobot Conference, University of Miami, Coral Gables, Florida, April 22, 2012.

70. "The Perils of Social Reading," University of Maryland Law Faculty Workshop, March 23, 2012.

69. "Freedom of Assembly and Intellectual Privacy," Engaging *Liberty's Refuge* Conference, Washington University School of Law, March 2, 2012.
68. Discussant and Google Fellow, Privacy Law Salon, Miami, Florida, Feb. 2, 2012.
67. "Tort Privacy and Intellectual Privacy," University of Durham Law Faculty Workshop, Durham, England, Sept. 12, 2011.
66. "Tort Privacy and Intellectual Privacy," Society of Law Scholars, Downing College, University of Cambridge, England, Sept. 6, 2011.
65. "Intellectual Privacy: Rethinking Civil Liberties in the Digital Age," Washington University Faculty Workshop, Aug. 3, 2011.
64. "Free Speech and Tort Privacy," Privacy Discussion Forum, Mainz, Germany, June 23, 2011.
63. "Tech Talk: Intellectual Privacy," Google Campus, Mountain View, California, June 6, 2011.
62. Discussant, "Sandra Petronio, Privacy Perils: Deciding to Disclose or Protect Confidentialities," Berkeley-GW Privacy Law Scholars Conference, June 3, 2011.
61. Discussant, "What's Wrong with Spying?" Washington University Political Theory Workshop, April 15, 2011.
60. "The Limits of Tort Privacy," University of California Berkeley School of Law, March 31, 2011.
59. "The Limits of Tort Privacy," Notre Dame Law School Faculty Workshop, March 4, 2011.
58. Participant, "Workshop on Meeting the Challenge of Online Hate," Stanford Center for Internet and Society, Jan. 14, 2011.
57. "The Limits of Tort Privacy," Conference on "Privacy and the Press," Silicon Flatirons Center, University of Colorado School of Law, Dec. 3, 2010.
56. "The Puzzle of Brandeis, Privacy, and Speech," University of California, Davis Faculty Workshop, Nov. 9, 2010.
55. "Why Privacy Matters," ACLU of Eastern Missouri, Sept. 21, 2010.
54. "Snyder v. Phelps and the First Amendment," Washington University School of Law Supreme Court Preview, Sept. 20, 2010.
53. "The First Amendment in the 21st Century," Gephardt Center for Public Service, Washington University, Sept. 17, 2010.
52. "The Puzzle of Brandeis, Privacy, and Speech," 2009 Berkeley-GW Privacy Law Scholars Conference, George Washington University School of Law, Washington, DC, June 4, 2010.
51. "The Puzzle of Brandeis, Privacy, and Speech," Washington University School of Law Faculty Research Seminar, Feb. 24, 2010.
50. *"Prosser's Privacy Law: A Mixed Legacy," California Law Review* Symposium on the 50th Anniversary of William Prosser's "Privacy" Article, GW Law School, Washington, DC, Jan. 29, 2010.
49. Panelist, "Constitutional Law, Pharmaceutical Regulation, and Commercial Speech," Section on Law, Medicine, and Health Care and Section on Constitutional Law, Association of American Law Schools Annual Meeting, New Orleans LA, Jan. 2010.
48. "Librarians, Privacy, and the First Amendment," Missouri Library Association Annual Meeting, Columbia MO, Oct. 9, 2009.
47. "The Shadow First Amendment," Washington University School of Law Faculty Incubator Workshop, July 1, 2009.
46. "Rethinking Free Speech and Civil Liability," 2009 Berkeley-GW Privacy Law Scholars Conference, Berkeley School of Law, Berkeley CA, June 5, 2009.

45. Principal Commentator, "Frank Lovett, Legal Realism," Washington University Political Theory Workshop, Spring 2009.

44. "Rethinking Free Speech and Civil Liability," Washington University School of Law Faculty Research Seminar, April 2009.

43. "Brandeis, Privacy, and Speech," Washington University Political Theory Workshop, Feb. 2009.

42. "Rethinking Free Speech and Civil Liability," Fordham Law School Center on Law and Information Policy Workshop, Dec. 5, 2008.

41. "Intellectual Privacy," 2008 Berkeley-GW Privacy Law Scholars Conference, George Washington University School of Law, Washington, DC, June 13, 2008.

40. "Brandeis, Privacy and Speech," Oklahoma City College of Law Faculty Workshop, March 25, 2008.

39. "The Supreme Court," StreetLaw St. Louis Seminar, Feb. 15, 2008.

38. "Intellectual Privacy," Loyola Los Angeles School of Law Faculty Workshop, Jan. 31, 2008.

37. "Intellectual Privacy," Washington University Political Theory Workshop, Jan. 25, 2008.

36. Discussant, "Ian McMullen, Bong Hits 4 Citizens?," Washington University Political Theory Workshop, Nov. 16, 2007.

35. "*Branzburg v. Hayes* and Intellectual Privacy," Conference on *Branzburg v. Hayes*, University of Oregon Schools of Law and Communications, Eugene, Oregon, Oct. 5, 2007.

34. Panelist, Washington University Political Theory Conference, Aug. 27, 2007.

33. "Intellectual Privacy," Washington University School of Law Faculty Research Seminar, August 15, 2006.

32. "Foundations, Trends, and Directions: Privacy and Security Law in 2007," PLI Eighth Annual Institute on Privacy Law, New York, NY, June 25, 2007.

31. "Intellectual Privacy," University of Illinois Law School Faculty Workshop Series, Champaign, IL, May 2, 2007.

30. "Intellectual Privacy," University of Missouri-Columbia Faculty Workshop Series, April 9, 2007.

29. "Intellectual Privacy," University of Nebraska Faculty Workshop Series, March 22, 2007.

28. "Privacy's Other Path," St. John's University Law School Faculty Workshop Series, Feb. 12, 2007.

27. "Privacy's Other Path," Invited Participant, Michigan-Illinois Works-in-Progress Workshop on Comparative Law, Champaign, IL, Feb. 8-10, 2007.

26. Panelist, "Information, Technology, and Privacy: What's Next?" Section on Defamation and Privacy Law, AALS Annual Meeting, Washington, D.C., Jan. 3, 2007.

25. Participant and Discussant, Workshop on Binding Corporate Rules, Fordham University School of Law, Nov. 13-14, 2006.

24. "Privacy without Confidentiality," Washington University School of Law Faculty Research Seminar, Nov. 8, 2006.

23. "Privacy after September 11," Missouri Bar Association Annual Meeting, Sept. 28, 2006.

22. "*Griswold*, Privacy, and the First Amendment," presented at the American Association of Law Librarians Annual Meeting, St. Louis, MO, July 11, 2006.

21. Conference Organizer, Welcoming Remarks, and Panel Moderator, Conference on the Rehnquist Court and the First Amendment, Washington University School of Law, Nov. 18, 2005.

20. "The Historiographical Poverty of Information Privacy Law," Symposium on "Privacy Law in the New Millennium: A Tribute to Richard C. Turkington," Villanova Law School, Oct. 28, 2005.

19. "The Information Privacy Law Project," Washington University School of Law Faculty Research Seminar, Oct. 26, 2005.

18. "The Information Privacy Law Project," Works-In-Progress Intellectual Property Colloquium 2005, Washington University School of Law, Oct. 8, 2005.

17. "The Nomination of John Roberts and the Future of the Supreme Court," Pomona College, Pomona, California, Sept. 16, 2005.

16. "The Information Privacy Law Project," Whittier Law School, Sept. 15, 2005.

15. "The Information Privacy Law Project and the Limits of Metaphor," 2005 Cardozo/Berkeley/Stanford/DePaul IP Scholars Conference, Cardozo Law School, Aug. 11, 2005.

14. Chair and Discussant, "*The Digital Person* and the Information Privacy Law Project," Law and Society Association Annual Meeting, Las Vegas, NV, June 2, 2005.

13. "Information Privacy, Free Speech, and *Lochner*," Fordham Law Review Symposium on Law and the Information Society. Fordham Law School, April 7, 2005.

12. "Brandeis, Privacy, and Speech," Washington University School of Law Faculty Research Seminar, March 31, 2005.

11. "The Constitutionality of Don't Ask, Don't Tell," Washington University School of Law, Feb. 24, 2005.

10. "The War on Terror Cases and Separation of Powers," Washington University School of Law Student-Faculty Supreme Court Workshop, Sept. 1, 2004.

9. "Journalism and the First Amendment," Bar Association of Metropolitan St. Louis, July 24, 2004.

8. "Reconciling Data Privacy and the First Amendment," Washington University School of Law Faculty Research Seminar, July 14, 2004.

7. "Rehnquist Court" faculty conference, Northwestern University School of Law, April 23-24, 2004.

6. "*Lawrence v. Texas* and Privacy Law," Washington University School of Law Student-Faculty Supreme Court Workshop, October 1, 2003.

5. "Reconciling Data Privacy and the First Amendment," University of Alabama School of Law Faculty Workshop, April 14, 2003.

4. "Reconciling Data Privacy and the First Amendment," University of Virginia School of Law, October 10, 2002.

3. "The Lessons of Past Federal Privacy Regulation for the Contemporary Privacy Debate," University of Alabama Faculty Workshop, April 22, 2002.

2. "Family Law and the Supreme Court," Annual Meeting, Alabama State Bar Family Law Section, July 20, 2000.

1. "The Supreme Court Law Clerk: An Agent with Many Masters," The Federalist Society, Montgomery (Alabama) Lawyers Chapter, April 14, 2000.