Fred Norton (CA SBN 224725)
fnorton@nortonlaw.com
Nathan Walker (CA SBN 206128)
nwalker@nortonlaw.com
Bree Hann (CA SBN 215695)
bhann@nortonlaw.com
Celine G. Purcell (CA SBN 305158)
cpurcell@nortonlaw.com
Gil Walton (CA SBN 324133)
gwalton@nortonlaw.com
Emily Kirk (CA SBN 348547)
ekirk@nortonlaw.com
THE NORTON LAW FIRM PC
299 Third Street, Suite 200
Oakland, CA 94607
Telephone: (510) 906-4900

Attorneys for Defendant
PATREON, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BRAYDEN STARK and JUDD OOSTYEN, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>    v.<br><br>PATREON, INC.,<br><br>        Defendant. | Case No. 3:22-cv-03131-JCS<br><br>**DEFENDANT PATREON, INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FACTS ................................................................................................................... 4

    A.    Undisputed Facts As Established By The Briefing .................................. 4

        1.    Undisputed Facts Relevant to the As-Applied Challenge ......................... 4

        2.    Undisputed Facts Relevant to the Facial Challenge ................................. 5

    B.    Objections to Evidence Offered by Plaintiffs and Amici .................................. 6

III.   ARGUMENT .......................................................................................................... 9

    A.    The Court Should Reject The United States' Untimely Suggestion To Defer A Decision On The Constitutional Question ................................................. 9

    B.    The VPPA Is Unconstitutional As Applied On The Facts Of This Case Because It Unreasonably Prohibits Truthful Disclosures Made With Consent In The Absence Of Harm, Without Advancing Any Substantial Interest In Privacy ............................... 11

        1.    Plaintiffs and the United States Cannot Defend the VPPA by Invoking Broadly Framed Interests in "Privacy" or "Intellectual Freedom" ...................... 11

        2.    Regardless of How the Interest Is Defined, the VPPA Does Not Advance It Directly or Materially, or Ultimately at All ............................................ 14

        3.    On the Facts of this Case, the VPPA Does Not Advance any Substantial Interest by Narrowly Tailored Means ......................................... 18

    C.    The Court Should Find The VPPA Unconstitutional As Applied And Grant Patreon Summary Judgment, Or In The Alternative Sever The Separate Consent Clause And The Presumed Damages Clause ........................................................ 22

    D.    The VPPA Is Unconstitutional On Its Face Because It Proscribes Millions Of Constitutionally Protected, Non-Commercial Disclosures That Are Substantial In Relation To Any "Plainly Legitimate Sweep" Of The Law ................................ 23

        1.    The VPPA, by Its Express Terms, Impermissibly Burdens Numerous Categories of Protected Non-Commercial Speech ................................. 24

        2.    The Fact that the VPPA Has Not Silenced All Non-Commercial Speech that It Unconstitutionally Burdens Does Not Save It; Patreon Has No Obligation to Quantify the Amount of Speech Actually Chilled .......................... 29

        3.    The VPPA's Unconstitutional Applications Are Substantial in Relation to Any "Plainly Legitimate Sweep" of the VPPA ................................. 33

IV.   CONCLUSION ..................................................................................................... 35

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Actmedia, Inc. v. Stroh*,
  830 F.2d 957 (9th Cir. 1986) ............................................................................... 15

*Ashcroft v. Am. C.L. Union*,
  542 U.S. 656 (2004) .................................................................................... 20, 21

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) .................................................................................... 23, 31

*Bartnicki v. Vopper*,
  532 U.S. 514 (2001) .......................................................................................... 24

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853 (1982) .......................................................................................... 13

*Boelter v. Advance Mag. Publishers Inc.*,
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) ................................................................. 14

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ................................................................. 14

*Borges v. SmileDirectClub, LLC*,
  No. 21-CV-23011, 2022 WL 4269564 (S.D. Fla. Sept. 15, 2022) ........................ 13

*Brahmana v. Lembo*,
  No. C-09-00106 RMW, 2010 WL 965296 (N.D. Cal. Mar. 17, 2010) ................... 22

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) .......................................................................................... 34

*Buckley v. Valeo*,
  424 U.S. 1 (1976) .............................................................................................. 12

*Camfield v. City of Oklahoma City*,
  248 F.3d 1214 (10th Cir. 2001) .......................................................................... 27

*Cappello v. Walmart Inc.*,
  No. 18-CV-06678-RS, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ................... 20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
  447 U.S. 557 (1980) .................................................................................. *Passim*

*Charles v. Nike, Inc.*,
  No. C-05-00044 EDL, 2005 WL 8177655 (N.D. Cal. Dec. 22, 2005) .................... 7

*Chase v. Davelaar*,
  645 F.2d 735 (9th Cir. 1981) .............................................................................. 28

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) .......................................................................................... 18

*City of Houston, Texas v. Hill*,
  482 U.S. 451 (1987) .................................................................................... 31, 32

ii

*Comcast Cable Commc'ns, LLC v. F.C.C.*,
  717 F.3d 982 (D.C. Cir. 2013) .................................................................................. 12

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
  657 F.3d 936 (9th Cir. 2011) ..................................................................................... 4

*Council of Ins. Agents & Brokers v. Molasky-Arman*,
  522 F.3d 925 (9th Cir. 2008) ................................................................................... 22

*Edenfield v. Fane*,
  507 U.S. 761 (1993) ......................................................................................... 14, 16

*Edwards v. D.C.*,
  755 F.3d 996 (D.C. Cir. 2014) .................................................................................. 21

*Eichernberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017) ................................................................................... 21

*Fla. Bar v. Went for It, Inc.*,
  515 U.S. 618 (1995) ......................................................................................... 13, 14

*Friends of Yosemite Valley v. Norton*,
  194 F. Supp. 2d 1066 (E.D. Cal. 2002) ....................................................................... 8

*Fulton v. City of Philadelphia*,
  593 U.S. ___, 141 S. Ct. 1868 (2021) ................................................................. 11, 15

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
  527 U.S. 173 (1999) ............................................................................................... 16

*Green v. Miss United States of Am., LLC*,
  52 F.4th 773 (9th Cir. 2022) ........................................................................ 10, 11, 12

*Hartford v. Ferguson*,
  No. 3:23-CV-05364-RJB, 2023 WL 3951208 (W.D. Wash. June 12, 2023) ...................... 8

*High Sierra Hikers Ass'n v. Powell*,
  150 F. Supp. 2d (N.D. Cal. 2001) .............................................................................. 8

*Hill v. Nat'l Collegiate Athletic Assn.*,
  865 P.2d 633 (Cal. 1994) ........................................................................................ 21

*King v. Gen. Info. Servs., Inc.*,
  903 F. Supp. 2d 303 (E.D. Pa. 2012) ......................................................................... 14

*Konikov v. Orange Cnty., FL*,
  290 F. Supp. 2d 1315 (M.D. Fla. 2003) ....................................................................... 8

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) ................................................................................... 32

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ............................................................................................... 16

*M. K. v. Google LLC*,
  No. 21-cv-08465-VKD, 2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) ......................... 3, 29

*Mason v. Fla. Bar*,
  208 F.3d 952 (11th Cir. 2000) ................................................................................. 21

iii

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ................................................................................................ 31

*Metcalf v. Daley,*
   214 F.3d 1135 (9th Cir. 2000) .................................................................................. 8

*Metro Lights, L.L.C. v. City of Los Angeles,*
   551 F.3d 898 (9th Cir. 2009) .................................................................................. 18

*N.L.R.B. v. Kolkka,*
   170 F.3d 937 (9th Cir. 1999) .................................................................................. 27

*Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson,*
   357 U.S. 449 (1958) ................................................................................................ 13

*Nayab v. Cap. One Bank (USA), N.A.,*
   942 F.3d 480 ............................................................................................................ 21

*Osborne v. Ohio,*
   495 U.S. 103 (April 18, 1990) ................................................................................ 26

*Perry v. Schwarzenegger,*
   591 F.3d 1126 (9th Cir. 2009) ................................................................................ 13

*Preminger v. Peake,*
   552 F.3d 757 (9th Cir. 2008) .................................................................................. 22

*Reno v. Am. C.L. Union,*
   521 U.S. 844 (1997) .......................................................................................... 13, 25

*Retail Digital Network, LLC v. Prieto,*
   861 F.3d 839 (9th Cir. 2017) ............................................................................ 11, 15

*Riley v. California,*
   573 U.S. 373 (2014) ................................................................................................ 13

*Roberts v. U.S. Jaycees,*
   468 U.S. 609 (1984) ................................................................................................ 13

*Rubin v. Coors Brewing Co.,*
   514 U.S. 476 (1995) .................................................................................... 11, 15, 17

*Silva v. Hearst Corp.,*
   No. CV97-4142 DDP(BQRX), 1997 WL 33798080 (C.D. Cal. Aug. 22, 1997) ......... 22

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers,*
   531 U.S. 159 (2001) .......................................................................................... 10, 11

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) .......................................................................................... 17, 19

*Sportvision, Inc. v. SportsMEDIA Tech. Corp.,*
   No. C 04-03115 JW, 2005 WL 8177792 (N.D. Cal. Apr. 12, 2005) ........................ 8

*Stanley v. Georgia,*
   394 U.S. 557 (1969) ................................................................................................ 13

*Sunbelt Rentals, Inc. v. Victor,*
   43 F. Supp. 3d 1026 (N.D. Cal. 2014) .................................................................... 21

*Sweezy v. State of N.H. by Wyman,*
    354 U.S. 234 (1957) .................................................................................................... 13

*Tennessee Valley Auth. v. Hill,*
    437 U.S. 153 (1978) .................................................................................................... 25

*The Fla. Star v. B.J.F.,*
    491 U.S. 524 (1989) .................................................................................................... 22

*United States v. Brodie,*
    858 F.2d 492 (9th Cir. 1988) ....................................................................................... 7

*United States v. Hansen,*
    599 U.S. 762 (2023) ............................................................................................. *Passim*

*United States v. Jones,*
    565 U.S. 400 (2012) .................................................................................................... 13

*United States v. Rumely,*
    345 U.S. 41 (1953) ...................................................................................................... 12

*United States v. Stevens,*
    559 U.S. 460 (2010) ............................................................................................. *Passim*

*United States v. Treasury Employees,*
    513 U.S. 454 ................................................................................................................ 25

*United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.,*
    407 U.S. 297 (1972) .................................................................................................... 13

*United States v. Williams,*
    553 U.S. 285 (2008) .......................................................................................... 23, 29, 33

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*
    425 U.S. 748 (1976) .................................................................................................... 28

*Valle Del Sol Inc. v. Whiting,*
    709 F.3d 808 (9th Cir. 2013) ..................................................................................... 28

*Village of Schaumburg v. Citizens for a Better Environment,*
    444 U.S. 620, (1980) .................................................................................................. 10

*Virginia v. Hicks,*
    539 U.S. 113 (2003) .................................................................................................... 30

*Webb v. Smart Document Sols., LLC,*
    499 F.3d 1078 (9th Cir. 2007) ................................................................................... 19

*WildEarth Guardians v. Jeffries,*
    370 F. Supp. 3d 1208 (D. Or. 2019) ........................................................................... 8

*Williams-Yulee v. Fla. Bar,*
    575 U.S. 433 (2015) .............................................................................................. 18, 24

*Zhang v. Am. Gem Seafoods, Inc.,*
    339 F.3d 1020 (9th Cir. 2003) ..................................................................................... 7

**Statutes**

8 U.S.C. § 1324................................................................................................29, 30

18 U.S.C. § 48...........................................................................................23, 26, 31

18 U.S.C. § 2258A...............................................................................................*Passim*

18 U.S.C. § 2702................................................................................................19, 26

18 U.S.C. § 2710..................................................................................................*Passim*

18 U.S.C. § 2258B..................................................................................................26

28 U.S.C. § 1746................................................................................................7, 8

47 U.S.C. § 338(i)(4)(A)..........................................................................................19

47 U.S.C. § 551(b)(1)............................................................................................19

Cal. Civ. Code § 3515............................................................................................21

Mich. Comp. Laws Ann. § 445.1713......................................................................19

**Rules**

Fed. R. Civ. Pro. 16(b)(4)......................................................................................10

Fed. R. Civ. Pro. 56(c)(4)....................................................................................7, 8

Fed. R. Evid. 603.................................................................................................7, 8

Fed. R. Evid. 702....................................................................................................7

**Regulations**

65 Fed. Reg.  (Dec. 28, 2000)................................................................................19

**Other Authorities**

Rest.2d Torts, § 892A..............................................................................................21

*The Right to Privacy*,
    4 Harv. L. Rev. 193 (1890)...........................................................................21, 24

# I.     INTRODUCTION

On the facts of this case, as applied to Patreon, the VPPA fails intermediate scrutiny and is unconstitutional.

***First*,** the VPPA does not directly advance the lofty government interests that Plaintiffs, the United States, and Amici now attribute to it in their defense.  The VPPA is ***not*** a bulwark protecting the rights of American citizens to receive information about controversial or divisive ideas in the service of free speech and intellectual freedom.  Far to the contrary, the VPPA readily allows VTSPs to disclose the identities of consumers along with the genres, performers, directors, political views, sexual content, and every other detail of pre-recorded video that those consumers watch.  The VPPA allows disclosure of every detail, including the titles, of live video a consumer watched.  The VPPA allows the disclosure of every detail, including the titles, if the viewer obtained a video from the VTSP but did not purchase, rent, or subscribe to the video.  The VPPA allows the disclosure of every detail of media a consumer obtains if it is not "video," but rather a book, a newspaper, a magazine, a song, a speech, a podcast, or a political cartoon.  Instead, the VPPA focuses exclusively and myopically on the identification of "specific" prerecorded videos a defined "consumer" requested or obtained from a VTSP, nothing else, nothing more.  Plaintiffs and the United States have the burden to prove the VPPA directly and materially advances the asserted interest in privacy and intellectual freedom, prevents a real harm, and does so by means that are no more extensive than necessary.  They cannot carry that burden.

***Second***, where it does apply, the VPPA tramples over the ***actual*** First Amendment right to free speech that it supposedly (indirectly) protects.  In this case, there is no factual dispute that each Plaintiff actually consented, in writing, to Patreon's alleged disclosure to Meta, yet the VPPA would punish speech that Plaintiffs permitted.  It is no response to argue, as Plaintiffs and the United States attempt to do, that the VPPA allows disclosures with "informed consent."  The undisputed facts here establish it would be unduly burdensome for Patreon to comply with the VPPA's uniquely onerous and arbitrary consent clause requirements, if it could be done at all.  Other federal privacy statutes have straightforward consent clauses that avoid these defects, proving Congress had a better alternative.

At the same time, Plaintiffs can identify no injury they suffered from Patreon's truthful speech that would warrant imposition of $2500 in presumed damages.  As a matter of law, there simply is no

1

injury to privacy from a disclosure made ***with actual consent***.  And even if there were no valid consent, the VPPA's imposition of $2500 in presumed damages would be unconstitutional here, where the two plaintiffs claim no public embarrassment, humiliation, harm to reputation, or other injury to a privacy interest, nor any economic loss – they claim injury solely in the fact of the disclosure itself.  That type of injury might be sufficient to meet the minimal threshold of standing.  But when privacy interests and the free speech clash, the First Amendment requires a more egregious showing of harm:  a disclosure that a reasonable person would find highly offensive.  No such harm is claimed or present here.

On these facts, the VPPA does not directly advance any substantial governmental interest; it is not narrowly tailored.  It is unconstitutional as applied.

In addition, the VPPA is unconstitutional on its face because it is overbroad.  All parties agree that the test for overbreadth of a law is whether "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).  And there is no dispute that the VPPA, by its actual, literal terms, applies to a startlingly broad swath of constitutionally protected, non-commercial speech:  core political speech; speech on matters of public concern; reports of suspected criminal behavior and other petitioning; speech to protect public safety; speech in educational institutions; speech made with consent; speech that causes no harm.  None of these categories is hypothetical or speculative.  Each is illustrated by specific, unchallenged evidence of real-world examples that cumulatively number in the ***millions*** – "substantial" by any measure.

The arguments by Plaintiffs and the United States to defend the VPPA are unavailing.

The VPPA forbids millions of disclosures that VTSPs make each year to law enforcement and NCMEC.  In response, Plaintiffs and the United States assert that the VPPA does not actually apply to those reports.  The government first argues that the Court should disregard the actual text of the VPPA and pretend that it applies only to disclosures of "constitutionally protected videos" where it uses the term "videos," thus carving out disclosures of videos to report crimes.  But courts are not free to disregard the text of a statute to save it from constitutional error.  Plaintiffs and the United States then both argue that disclosures to NCMEC at least are authorized by a different law, 18 U.S.C. § 2258A, and so must be implicitly carved out from the VPPA.  But that reading disregards the actual text of both

statutes, as Patreon showed in its opening brief.  Neither Plaintiffs nor the United States address Patreon's argument on this point at all.

Switching tactics, Plaintiffs and the United States argue that even if the VPPA does forbid reports to law enforcement and NCMEC, the law is not overbroad if people speak in spite of the prohibition.  Given the evidence that VTSPs have been making many such reports, they argue, there is no chilling and no overbreadth.  That is not the law.  The overbreadth test does not require proof that speakers have been sued or that all speakers have been silenced – just that the law actually and impermissibly applies to a substantial amount of speech that is protected.  That test is met here.

Of course, the VPPA was enacted for the express purpose of silencing disclosures about political figures and their video-watching, an issue of undisputed continuing public interest and concern, and yet another category of impermissible prohibition.  Since the enactment of the VPPA there have been no published reports of VTSPs disclosing the videos an elected or appointed official had watched.  Here, then, there is evidence of not just chilling, but silencing.  But in response, Plaintiffs and the United States invoke the maxim, "heads I win, tails you lose."  If there are *no* ongoing examples of disclosures like the one about Judge Bork, Plaintiffs and the United States contend, the example is not substantial and the statute survives.  If there are *millions* of examples of these particular disclosures, as with NCMEC, Plaintiffs and the United States contend, there is no chilling so – again – the statute survives.  Their self-serving test is unworkable, but more importantly, it is not the test the Supreme Court and Ninth Circuit have established.  The determining factor is the amount of protected speech that the statute, by its terms, *proscribes*.  And in the case of the VPPA, that amount is enormous.

The VPPA also applies to disclosures in a wide variety of educational settings, where schools use software to deliver video content, monitor student activity, and report student progress.  Such valuable software is used by thousands of schools and millions of students every day in ways that violate the VPPA.  Plaintiffs inexplicably argue (without citing law) that the VPPA does not apply at all in this context.  They ignore the decision from this District, *M. K. v. Google LLC*, No. 21-cv-08465-VKD, 2023 WL 4937287, at *4-7 (N.D. Cal. Aug. 1, 2023), cited by Patreon in its brief, which holds the opposite.  The United States avoids that error but argues these disclosures are commercial speech and fall outside the overbreadth analysis even if unconstitutional.  The United States is mistaken.  Newspapers provide

information as a service, but that does not make the publications commercial speech. So too information about student activity that is provided as part of a software subscription.

Plaintiffs and the United States attempt to minimize or distinguish Patreon's other examples of protected speech that the VPPA proscribes, without success. Ultimately, it is clear that the VPPA "suppresses a great quantity of speech that does not cause the evils that it seeks to eliminate." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950–51 (9th Cir. 2011) (cleaned up). That overbroad suppression cannot be justified by arguing that the VPPA has a "plainly legitimate sweep" in its other applications to commercial speech. In every application, the VPPA restrains speech, while doing little if anything to protect privacy, and never furthering privacy by the least restrictive means. The VPPA is facially invalid. The Court should order summary judgment for Patreon.

## II.   FACTS

### A.   Undisputed Facts As Established By The Briefing

Plaintiffs and the United States do not contest any of the factual assertions on which Patreon relied to move for summary judgment. *Compare* Patreon MSJ Br. 8-12 *with* Plntf. Opp. Br. 11-12; US Opp. Br. 10-13. They made no objection to Patreon's evidence and submitted no evidence of their own that controverted any of Patreon's factual contentions.

#### 1.   Undisputed Facts Relevant to the As-Applied Challenge

**The Plaintiffs gave consent.** Each Plaintiff affirmatively consented to Patreon's disclosure of the videos they watched, both in Patreon's terms of use and in Meta's. Patreon MSJ Br. 9-11. Both Plaintiffs and the United States argue that these two Plaintiffs did not give "informed consent," by which they mean they did not read the contract terms that they knew they were agreeing to.

**The VPPA's consent requirement is unworkably burdensome.** For Patreon to comply with the more onerous consent requirements of the VPPA, it would "require substantial engineering work," and would "degrade the user's experience on the website, if it were possible at all," especially because of the VPPA's requirement that a consumer be able to give and revoke consent on a case-by-case basis. Patreon MSJ Br. 21, 26; Byttow Decl. (Dkt. 78) ¶ 42. In response to that evidence, Plaintiffs' counsel speculates that Patreon could have used a "pop-up" window to obtain initial consent every time a user requested a video, *see* Pl. Opp. Br. 15, but that unsubstantiated conjecture fails to address the

4

degradation of user experience and the unworkable burdens of managing case-by-case **revoked** consent.

**Disclosure of the title of a video on Patreon conveys little if anything about the video content.**  Patreon's creators host millions of videos, and the specific video content that Plaintiffs watched on the Patreon website was restricted to paying subscribers of the specific creators who offered that content.  Patreon MSJ Br. 9; Byttow Decl. (Dkt. 78) ¶¶ 35-39.  As a result, if the title or URL of a particular video was disclosed to a third party (like Meta), the third party still could not access the underlying video, know what that video actually was, or know what it was about.  Patreon MSJ Br. 9.  In response, Plaintiffs contend that **some** video titles reveal **something** about their interests, Pl. Opp. Br. 12, 21, but that is not true at all with respect to Mr. Oostyen, *see* Tan Decl. Ex. I (Dkt. 100-04), and as to Mr. Stark a third party still cannot know how or even whether the video content corresponds to a title.

**Plaintiffs could have used available technology to prevent disclosures.**  Each Plaintiff was generally aware of tracking technology on the internet and took steps to mitigate it.  Patreon MSJ Br. 11.  Even after consenting, each Plaintiff had the means to prevent Patreon's disclosure to Meta through the Pixel, both through their Facebook settings and third-party apps.  *Id.*

**The only injury Plaintiffs claim is the disclosure itself, nothing more.**  Neither Plaintiff suffered any public embarrassment, humiliation, harm to reputation, or other injury to a privacy interest, nor any economic loss, as a result of the confined disclosure.  Patreon MSJ Br. 9.  In their **brief**, Plaintiffs' **counsel** argue that each Plaintiff suffered "embarrassment," Pl. Opp. Br. 12, 21, but neither Plaintiff so testified and neither Plaintiff submitted a declaration so claiming.  Instead, they testified that the fact of the disclosure alone caused injury.  Dkt. No. 87-12 (Ex. 68 to Norton Decl. – Stark Depo. Excerpts) at ECF 9-12; Dkt. No. 87-13 (Ex. 69 to Norton Decl. – Oostyen Depo. Excerpts) at ECF 8-11.

## 2.   Undisputed Facts Relevant to the Facial Challenge

**The VPPA has silenced disclosures of video watching by public officials.**  The VPPA was enacted to silence public debate about public officials' video-watching.  No party can find an example of such a disclosure since Judge Bork.  The VPPA worked as intended, even though the public remains concerned about the videos public officials watch, especially while at work.  Patreon MSJ Br. 13 & n.3.

**VTSPs have made millions of disclosures to NCMEC that specific consumers requested or obtained specific videos.**  Large, well-known VTSPs like Google, Facebook, WhatsApp, Omegle, and

Twitter have made millions of reports to NCMEC that identify specific subscribers and video the subscribers requested or obtained.  Patreon MSJ Br. 13-14.[1]

**VTSPs voluntarily disclose that specific consumers requested or obtained specific videos.** To report possible crimes and to protect public safety, VTSPs do provide information to government and other third parties about specific users requesting or obtaining specific videos.  Patreon MSJ Br. 14-17. The United States receives such tips but does not track them and cannot quantify them.  *Id.* 15.

**Continuing education providers disclose to third parties that specific consumers requested or obtained specific videos.**  A wide range of entities provide courses to satisfy mandatory education requirements (for lawyers, tax advisers, insurance brokers, etc.) and disclose to third parties that specific users requested or obtained specific videos.  Patreon MSJ Br. 18-19.

**Millions of students in thousands of schools use learning management software that reports to the school that they watched specific videos.**  Providers of learning management software host and distribute videos to students on behalf of educational institutions, and disclose to the schools what specific videos specific students watched.  Such software is used by students of all ages all across the country.  Disclosures are not limited to instruction or assessment, but also behavioral issues, school safety, and discipline.  Patreon MSJ Br. 19-20.

**B.     Objections to Evidence Offered by Plaintiffs and Amici**

Pursuant to Civil Local Rule 7-3, Patreon submits, in its Reply Brief, its objections to evidence offered by Plaintiffs and Amici.  (The United States offers no evidence with its opposition).

**Unproduced documents.**  No party has disputed or contradicted the evidence that Patreon submitted in support of its summary judgment motion.  Plaintiffs have, however, attempted to submit evidence that they failed to produce in response to discovery requests specifically targeted at the First Amendment issue.  In particular, on August 3, 2023, Patreon propounded document requests on Plaintiffs seeking all documents they would rely upon to defend the constitutionality of the VPPA.  Dkt.

---

[1] In a footnote, Plaintiffs argue that Patreon has overstated the number of NCMEC reports from the US that contain PII.  Pl. Opp. Br. 29 n.6.  Plaintiffs are wrong.  As the Shehan Declaration explains in detail, NCMEC filtered its data at Patreon's request to calculate the number of ***domestic*** reports that contain ***both video and personal identifiers***.  Shehan Decl. ¶ 21; Shehan Decl. Ex. F (Dkt. 79-6).

6

104-1 ¶ 6.  On September 15, Plaintiffs responded that, subject to various objections, they would "produce responsive, nonprivileged documents on which they affirmatively rely" to defend the constitutionality of the VPPA and would do so no later than October 16, 2023.  *Id.* ¶ 7.  However, at no time prior to filing their summary judgment opposition on December 19, 2023, did Plaintiffs produce the documents that they now submit as Exhibits K through R of the Tan Declaration, Dkt. 100-1, 100-6 – 100-15.  Having improperly withheld this evidence, Plaintiffs cannot rely on it now.  *See Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1028 (9th Cir. 2003) (affirming a "district court may validly exclude, as a discovery sanction, evidence not produced in discovery."); *Charles v. Nike, Inc.*, No. C-05-00044 EDL, 2005 WL 8177655, at *6 (N.D. Cal. Dec. 22, 2005) (sustaining objection to exhibit filed for the first time in opposition to summary judgment motion where exhibit was requested, but not produced, in discovery).

**Inadmissible "expert" opinion on matters of law.**  Plaintiffs also submitted an expert report by law professor Neil Richards in an attempt to establish the legal proposition that consumer privacy is a compelling state interest.  Dkt. 100-05.  The report is inadmissible for two reasons.  ***First***, Mr. Richards' report is offered as expert opinion testimony, but it is merely signed, not sworn.  *Id.* at 50.  As a result, it is not admissible for any purpose.  *See* Fed. R. Evid. 603; Fed. R. Civ. Pro. 56(c)(4); 28 U.S.C. § 1746.

***Second***, Mr. Richards's opinion is inadmissible under Fed. R. Evid. 702.  He has not conducted any studies or surveys specific to this case.  He does not opine on or analyze the facts of this case.  His report cites almost exclusively statutes, cases, law review articles, and his own book, and is indistinguishable from a law review article itself.  Throughout their opposition, Plaintiffs cite Mr. Richards solely for propositions of law.  This is not the role of an expert.  "Experts 'interpret and analyze factual evidence.  They do not testify about the law.'"  *United States v. Brodie*, 858 F.2d 492, 496 (9th Cir. 1988) (citation omitted).  None of Mr. Richards's generalized legal opinions meet the standard for admissibility under Fed. R. Evid. 702 and they should be excluded in their entirety.

> Rule 702 does not allow a witness to testify about purely legal issues… Thus, federal courts typically prohibit lawyers, professors, and other experts from interpreting the law for the court or from advising the court about how the law should apply to the facts of a particular case…  Expert testimony which articulates and applies the relevant law ... circumvents the fact finder's decision-making function by telling it how to decide the case.

*Sportvision, Inc. v. SportsMEDIA Tech. Corp.*, No. C 04-03115 JW, 2005 WL 8177792, at *2 (N.D. Cal. Apr. 12, 2005) (internal quotations and citations omitted).  *See also Konikov v. Orange Cnty., FL*, 290 F. Supp. 2d 1315, 1318 (M.D. Fla. 2003) (granting motion to exclude an expert attorney testimony, finding that "an attorney, may not testify as to the constitutionality of a law, or as to the legal implications of conduct").

 **Extra-record evidence offered by Amici**.  For the reasons stated in its opposition to the request for leave to file an amicus brief, Dkt. 104 at 3-7, Patreon objects to the submission of extra-record evidence by Amici that was not produced by any party in discovery.  To be sure, Amici have not submitted evidence in the sense contemplated by the rules of evidence; they merely cite various web pages in the footnotes of their brief and ask the Court to accept the assertions on those web pages, if they can be found, as true.  Dkt. 95-1, notes 1-11.  That is not evidence.  *See* Fed. R. Evid. 603; Fed. R. Civ. Pro. 56(c)(4); 28 U.S.C. § 1746.  But even if Amici had tried to comply with the Rules, it is improper for amici to submit extra-record evidence.  *See Metcalf v. Daley*, 214 F.3d 1135, 1141 n.1 (9th Cir. 2000) (granting "appellees' joint motion to strike the extra-record documents that the Humane Society submitted with its amicus brief"); *High Sierra Hikers Ass'n v. Powell*, 150 F. Supp. 2d at 1045 (N.D. Cal. 2001) ("Plaintiffs seek to strike extra-record evidence contained in the amici brief…  At this stage, Amici are not parties and cannot introduce evidence….  Accordingly, the extra-record evidence submitted by Amici is excluded."); *Friends of Yosemite Valley v. Norton*, 194 F. Supp. 2d 1066, 1074 (E.D. Cal. 2002) (striking extra-record exhibits and sections of the brief relying there-on finding "the attachment of such exhibits goes beyond the proper purpose of an amicus brief"); *WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208, 1228 (D. Or. 2019) (denying amicus's motion to submit extra-record evidence where "Amicus has not moved to intervene and does not have the prerogatives of a proper party in this action, such as filing a motion to consider extra-record evidence"); *Hartford v. Ferguson*, No. 3:23-CV-05364-RJB, 2023 WL 3951208, at *1 (W.D. Wash. June 12, 2023) ("The Proposed Amici include extra-record facts in the briefs. Insofar as it may be appropriate to add claims or facts, it should be done through the parties' counsel, so the protections found in due process, the Federal Rules of Civil Procedure relating to discovery, and the Federal Rules of Evidence are assured.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III.     ARGUMENT

#### A.     The Court Should Reject The United States' Untimely Suggestion To Defer A Decision On The Constitutional Question

In its opposition, the United States (but not Plaintiffs) argues that the Court should not reach the constitutional question presented by this motion at all, but should wait until all other possible grounds for judgment in Patreon's favor have been considered and rejected.  US Opp. Br. 14-17.  The untimely argument is both waived and without merit.

At the hearing on Patreon's motion to dismiss on February 10, 2023, the Court indicated that the constitutional question would require further fact development.  Dkt. 60 at 5, 11.  Patreon and Plaintiffs then submitted a proposed schedule to resolve the constitutional question as a threshold issue, which was discussed at the case management conference on April 14, 2023, attended by all parties, including the United States.  Dkt. 65.  At the April 14 conference, the Court discussed the proposed schedule and then, without any objection from the United States, set a schedule for early resolution of the constitutional issue.  *Id.*  Only months later, as Patreon was preparing its summary judgment motion pursuant to the case schedule, the United States questioned whether a decision on the constitutionality of the VPPA would be premature.  Dkt. 70 at 4.  At the CMC on October 6, 2023, the Court expressed its view that it could properly exercise discretion to decide the constitutional question before reaching other merits issues, and reminded the United States that it had acquiesced in the schedule the parties discussed at the April CMC.  To resolve the timing issue, the Court ordered Plaintiffs and the United States to "file an opening brief on the issue of when the Court should consider the constitutionality [of the] statute by 10/13/2023."  Dkt. 72.

The United States made no effort to comply with the Court's unambiguous order.  Instead, the United States notified the Court that "upon further consideration, it has elected not to file a separate motion to modify the scheduling order in this matter," but "reserve[d] the right" to argue the timing issue in opposition to summary judgment.  Dkt. 73.  But a party – not even the United States – cannot just ignore orders of the Court as it pleases.  The United States waived the timing issue when it agreed to the original schedule, waived the issue again when it declined to brief the question as ordered, and even now has not even tried to meet the good cause standard of Rule 16, which applies to any modification of

9

the case schedule.  Fed. R. Civ. Pro. 16(b)(4).

The Court need not consider the United States' argument now, but if it does, the Court should reject it, for the same reasons that the Ninth Circuit rejected that reasoning in *Green v. Miss United States of Am., LLC*, 52 F.4th 773 (9th Cir. 2022).  In *Green*, the Ninth Circuit held that the Oregon Public Accommodations Act violated the First Amendment to the extent that it required a beauty pageant to include transgender women.  The dissenting opinion argued, like the United States here, that it was improper to consider the First Amendment issue before resolving other merits defenses.  52 F.4th at 808-20.  But there is no such absolute requirement, as the Ninth Circuit held:

> If every non-constitutional claim must be exhausted before reaching a constitutional issue, it is not clear how any constitutional question could ever be decided on a pre-trial motion, which happens routinely.  Nor is it clear how courts could retain any level of discretion about what order to decide issues when resolving cases.  Given these far-reaching implications of the dissent's argument, it is unsurprising that this view of constitutional avoidance finds no support from other courts.

*Id.* at 795.[2]  The *Green* court also noted that the Supreme Court has "bypassed a disputed and dispositive factual question at summary judgment to resolve the claim immediately on First Amendment grounds." *Id.* at 796 (citing *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, (1980)); *see also id.* at 796-97 (describing practice, in Second Amendment cases, of assuming restrictions applied and implicated the Second Amendment, and proceeding directly to constitutional question).

The United States ignores *Green*'s thorough reasoning, fails to discuss *Village of Schaumburg* at all, and string-cites a list of out-of-circuit authority that, even if accurate, would not permit this Court to ignore *Green*.  In arguing that it would be "reversible error" to decide the constitutional question now, the United States does not cite any Ninth Circuit case.  US Opp. Br. 16.  It cites **one** Supreme Court case, *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), but that decision did not reverse a lower court for deciding a constitutional issue.  It merely construed the

---

[2] The United States notes that Patreon has expressed confidence it can prevail on other issues, such as the absence of any evidence from Meta that it received information from Patreon that identified specific videos Plaintiffs watched.  But these issues are subject to extensive dispute and ongoing discovery, are not ripe, and might not be resolved at summary judgment.  Notably, Plaintiffs have a pending motion to compel Meta to produce additional information that Plaintiffs contend is relevant to these disputes, which Meta opposes, and which has not been decided.

Clean Water Act in such a way that it was unnecessary to interpret the Commerce Clause. *Id.* at 162. Although the Seventh Circuit **had** proceeded directly to the constitutional issue, *id.* at 166, the Supreme Court did not find fault, it merely decided the case on other grounds.

The First Amendment issue is ripe, the parties – including the United States – agreed to have it decided as a threshold question, and the Court has the discretion to decide it now.

### B. The VPPA Is Unconstitutional As Applied On The Facts Of This Case Because It Unreasonably Prohibits Truthful Disclosures Made With Consent In The Absence Of Harm, Without Advancing Any Substantial Interest In Privacy

For purposes of summary judgment, Patreon assumes that its alleged disclosures are commercial speech subject to intermediate scrutiny. Under the *Central Hudson* test, where (1) the subject of the challenged speech is lawful and not misleading, as is undisputed here, the constitutionality of the law depends on whether (2) "the asserted governmental interest is substantial," (3) the law "directly advances the governmental interest asserted," and (4) and the law "is not more extensive than is necessary to serve that interest." *Retail Digital Network, LLC v. Prieto,* 861 F.3d 839, 844 (9th Cir. 2017) (en banc) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 566 (1980)); *accord,* Pl. Opp. Br. 16; US Opp. Br. 17. The burden of establishing each element falls on the defenders of the VPPA. *See Rubin v. Coors Brewing Co.,* 514 U.S. 476, 487 (1995).

### 1. Plaintiffs and the United States Cannot Defend the VPPA by Invoking Broadly Framed Interests in "Privacy" or "Intellectual Freedom"

In its opening brief, Patreon cited controlling authority that the interest offered to defend a law against constitutional challenge must be defined precisely; a "broadly formulated interest" like "privacy" will not suffice. Patreon MSJ Br. 23-24 (citing *Fulton v. City of Philadelphia*, 593 U.S. ___, 141 S. Ct. 1868, 1881 (2021); *Green*, 52 F.4th at 791). Consistent with this rule, Patreon – which has no burden to articulate or defend the purported governmental interest – explained that the interest that Plaintiffs and the government must defend here is prohibiting Patreon from disclosing (a) lawfully acquired, accurate information, (b) to Meta alone, (c) consisting of titles of videos that appeared on paywalled webpages that Stark and Oostyen had requested or obtained, (d) without disclosing the content of the videos themselves, (e) with Stark's and Oostyen's affirmative consent, (f) where Stark and Oostyen have means to prevent the disclosure if they choose to do so, and (g) that narrowly confined disclosure causes no

embarrassment, humiliation, or other injury to privacy interests.  Patreon MSJ Br. 24.

Plaintiffs, the United States, and Amici make no effort to defend that interest.  They ignore the requirement of narrow framing and invoke a broad, abstract "right to privacy" that in turn, they argue, is essential to "intellectual freedom" and the values of the First Amendment.  Pl. Opp. Br. 17-18; US Opp. Br. 10, 17-19; Amici Br. 9-14.  This is too broad and general.  The failure to properly define the interest is reason enough to reject the argument of Plaintiffs and the United States and grant summary judgment to Patreon.  *See Green*, 52 F.4th at 792 (rejecting proffered interest in "eliminating discrimination against LGBTQ individuals" as too broad and holding state thus failed to meet its burden).

As a threshold matter, the VPPA's defenders cannot invoke First Amendment values to curtail free speech.  Prohibitions on speech cannot be justified by arguing they might foster more speech by others.  "[A]s the Supreme Court stated in one of the most important sentences in First Amendment history, '*the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment*.'"  *Comcast Cable Commc'ns, LLC v. F.C.C.*, 717 F.3d 982, 994 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (quoting *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976)) (emphasis added).

Plaintiffs do suggest an alternative, narrower formulation of the interest:  "The government has substantial and compelling interests in ensuring that Plaintiffs can watch videos on divisive topics or featuring highly controversial figures without fear of their interest being revealed without their consent."  Pl. Opp. Br. 18.  While that formulation might be narrow enough to comply with *Fulton* and *Green*, the problem for Plaintiffs, the United States, and Amici (in addition to the fact Plaintiffs **did** consent) is that they cannot cite any case that holds that interest, so described, **is** substantial (much less compelling).

Instead, Plaintiffs, the United States, and Amici each cite a blizzard of inapposite cases that emphasize the importance of receiving and communicating ideas, in public and in private, free from intrusion or surveillance **by the state itself.**  Pl. Opp. Br. 17-19; US Opp. Br. 17-19; Amici Br. 9-14.[3]

---

[3] Plaintiffs, the United States, and Amici support their purported interest citing *United States v. Rumely*, 345 U.S. 41, 57 (1953) (Douglas, J. concurring) ("Once **the government** can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears. Then **the spectre of a government agent** will look over the shoulder of everyone who reads. The purchase of a book or pamphlet today may result in a **subpoena** tomorrow. Fear of criticism goes with every person into the

None of these cases establishes a substantial interest in preventing private parties like Patreon from exercising their own free speech right to disclose truthful, lawfully acquired information.

Unable to find a case that actually endorses the interest they advance, Plaintiffs cherry-pick references to the word "privacy" in other cases, involving other statutes, that advance other interests. For example, Plaintiffs cite an unpublished decision, *Borges v. SmileDirectClub, LLC*, No. 21-CV-23011, 2022 WL 4269564, at *7 (S.D. Fla. Sept. 15, 2022), for the proposition that "consumer privacy protection is a well-recognized substantial government interest." But that case has nothing to do with disclosures of private information or intellectual freedom; it concerns an entirely different sense of "privacy." *Borges* involved regulation of unwanted telephonic sales calls into the home, where people have an interest in being left alone in quiet. *Id.* For its part, the United States leads with the proposition "it has long been recognized that 'the protection of … privacy is a substantial state interest.'" US Opp. Br. 17 (purporting to quote *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618, 625 (1995)). But that case concerned a prohibition on attorneys sending targeted direct-mail solicitations to victims and their

---

bookstall." (emphasis added)); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 251 (1957) (invoking First Amendment's protection of "political activity by minority, dissident groups" from ***state interference*** to hold that compelled disclosure of university professor's past political activities in ***Red Scare legislative investigation*** violated due process); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 451 (1958) (order of ***Alabama state court*** compelling disclosure of names and addresses of all NAACP members in state violated First Amendment right of association); *Stanley v. Georgia*, 394 U.S. 557, 565 (1969) (reversing conviction for possession of allegedly obscene material solely in the home; "Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home. If the First Amendment means anything, it means that ***a State has no business*** telling a man, sitting alone in his own house, what books he may read or what films he may watch." (emphasis added)); *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 312-13 (1972) (Bill of Rights shields private speech from unreasonable surveillance "***by Government***" (emphasis added)); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 858 (1982) (***public school board's*** removal of books it deemed morally objectionable from ***public school library*** violated citizens' First Amendment rights to read books); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622-23 (1984); (***despite*** First Amendment right to associate to "shield[] dissident expression from suppression by the majority," state could compel Jaycees to admit women); *Reno v. Am. C.L. Union*, 521 U.S. 844, 870 (1997) (***government*** regulation of content on the internet subject to the First Amendment); *Riley v. California*, 573 U.S. 373, 380 (2014) (warrantless search of cell phone ***by police***); *United States v. Jones*, 565 U.S. 400, 402, 404 (2012) (***FBI and local police's*** warrantless placement of GPS tracking device on suspect's car while at his home was a search and seizure); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1132, 1135 (9th Cir. 2009) (federal court's compelled disclosure of internal campaign communications impermissible under First Amendment).

relatives immediately after an accident or disaster.  It contains no sweeping endorsement of a broad right to privacy, as the words the government elided show:  "Our precedents also leave no room for doubt that the protection of **potential clients'** privacy is a substantial state interest.'"  *Went for It,* 515 U.S. at 625 (quoting *Edenfield v. Fane*, 507 U.S. 761, 769 (1993)) (emphasis added).  Amici also embellish, claiming that "some courts have gone further, finding a 'compelling' interest in consumer data privacy laws, especially when disclosure can cause reputational injury." Amici Br. 12 (citing *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 310 (E.D. Pa. 2012)).  But *King* also does not apply here.  It observes that "individuals' privacy interest [in credit reports] can be not only substantial but compelling where disclosure of information could inflict serious reputational injury and even be 'career ending,'" *id.*, concerns and circumstances that are entirely absent here.

The only authority the VPPA's defenders can cite that suggests there is a substantial interest in preventing private parties from disclosing lawfully acquired information about the media consumers obtain are the two district court decisions involving the Michigan Video Rental Privacy Act.  Neither helps.  The court in *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 448 (S.D.N.Y. 2016), found a "substantial interest" in privacy broadly by making the same error Plaintiffs and the United States make here.  Contrary to the edict of *Buckley*, the *Hearst* court reasoned that the government has an interest in restricting the speech of some to "enhanc[e] the relative voice" of those who would watch video in private.  The *Hearst* court reached that incorrect result entirely by relying on the same inapposite cases about government interference with speech rights that Plaintiffs, the government, and Amici rely on here.  The subsequent decision in *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 599 (S.D.N.Y. 2016), then uncritically adopted the error of *Hearst*.  *See id.* ("[W]e adopt much of the analysis set forth in *Hearst*.").

Neither Plaintiffs nor the United States nor Amici have shown a governmental interest that is "substantial" and the VPPA thus fails the *Central Hudson* test.

### 2. Regardless of How the Interest Is Defined, the VPPA Does Not Advance It Directly or Materially, or Ultimately at All

Whether the asserted interest is framed broadly or narrowly, the defenders of the VPPA have failed to show the law advances that interest directly and materially, as *Central Hudson* requires.

14

1    ***First***, Plaintiffs cannot defend the VPPA by arguing that it protects "intellectual freedom" as a

2    consequence of protecting "privacy."  Even if one assumed "intellectual freedom" was specific enough

3    to be a substantial state interest, *cf. Fulton*, 141 S.Ct. at 1881, and further assumed the VPPA actually

4    does anything to foster "intellectual freedom" by enhancing privacy, the law would be advancing

5    intellectual freedom ***indirectly***, not directly.  That is not enough.  In *Actmedia, Inc. v. Stroh*, 830 F.2d

6    957 (9th Cir. 1986), a panel of the Ninth Circuit upheld a California statute regulating liquor advertising

7    because the law "operates indirectly to promote temperance."  *Id.* at 967.  In *Prieto*, the Ninth Circuit

8    sitting *en banc* disapproved that reasoning and overruled *Actmedia*, holding that "indirect advancement

9    fails to satisfy *Central Hudson*'s third factor."  *Prieto*, 861 F.3d at 851.  The VPPA cannot be upheld by

10   citing other interests that are purportedly served – indirectly – by fostering privacy.

11   ***Second***, the VPPA does not "directly and materially advance" the lofty interest its defenders

12   proffer, *e.g.*, a "state interest is in protecting consumers' privacy and intellectual freedom, as expressed

13   through their private viewing choices."  US Opp. Br. 19.  To meet this prong of the test, the VPPA's

14   defenders must show that the harms are real and the law's "restriction will in fact alleviate them to a

15   material degree."  *Rubin*, 514 U.S. at 487.  The "harm" cited by Plaintiffs, the United States, and Amici

16   is the possibility that video tape service providers will reveal that consumers watch "videos on divisive

17   topics or featuring highly controversial figures."  Pl. Opp. Br. 18; *accord* US Opp. Br. 11 (harm is

18   possible disclosure that discourages people from considering "ideas outside of the mainstream"), 19

19   (VPPA protects "against disclosure of viewing habits that are legal … but with which consumers may

20   not want to be publicly associated" such as "videos concerning core political speech, along with violent

21   movies, non-obscene pornography, and films expressing publicly disfavored views"); Amici Br. 11 (risk

22   of disclosure would make people "hesitate to view many kinds of videos, whether the content is

23   controversial or unpopular").

24   Plaintiffs, the United States, and Amici all assume these harms are real, and that disclosures of

25   private video viewing by private parties necessarily cause consumers to avoid controversial or

26   disfavored ideas.  But that is not self-evident, particularly on the facts of this case.  The two Plaintiffs

27   contend that Patreon used their video viewing history and demographic data to "improv[e] its ability to

28   promote its content and services to its Users," Dkt. 41 (FAC) ¶ 61, that is, to provide Plaintiffs ***more***

15

content of the kind that they had been watching.  Further, neither Plaintiff stopped watching video on Patreon, even five months after they had filed this lawsuit.  *Id.* ¶¶ 22, 27.  And the actual titles of the videos Plaintiffs watched were, in many cases, completely uninformative.  They revealed little about Mr. Stark and essentially nothing about Mr. Oostyen.

Regardless of whether the harms are real, the VPPA is completely useless to advance the asserted interest or prevent the supposed harm.  First and foremost, ***nothing*** in the VPPA prevents a VTSP from disclosing the consumer's name with the video's subject matter, performers, content, political slant, violent nature, pornographic nature, and every other detail, so long as the VTSP does not identify a specific identifiable video.  18 U.S.C. § 2710(a)(3), (b)(1).  Under the VPPA, a VTSP remains completely free to announce that a specific named user watches videos about any conceivable controversial or embarrassing subject, about any person, advocating for any cause.  *See* Amici Br. 13 (arguing that disclosing video "genres" reveals private details).  Plaintiffs' arguments in this case prove the point.  They claim they suffered harm because disclosure of the titles of videos they watched would reveal their interest in particular embarrassing or controversial topics.  Pl. Opp. Br. 12, 21.  But the VPPA does not prevent Patreon from telling the world the subject matter and genres of videos that Mr. Stark watches, or the subject matter and genres of videos Mr. Oostyen watches.  The VPPA ignores everything in the book; it cares only about the cover.

The VPPA falls short in the same way as the regulation on tobacco advertising the Supreme Court struck down in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001).  In *Lorillard*, tobacco companies challenged a regulation ostensibly enacted to advance the substantial state interest in preventing tobacco use by minors.  *Id.* at 539.  The regulation required that indoor tobacco advertising at a retail establishment within 1000 feet of a school had to be at least five feet above the floor.  *Id.* at 536.  The Supreme Court easily found that the point-of-sale regulation did not advance the claimed interest:

> A regulation cannot be sustained if it "'provides only ineffective or remote support for the government's purpose,'" *Edenfield*, 507 U.S., at 770 (quoting *Central Hudson*, 447 U.S. at 564), or if there is "little chance" that the restriction will advance the State's goal, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193 (1999).  As outlined above, the State's goal is to prevent minors from using tobacco products and to curb demand for that activity by limiting youth exposure to advertising.  The 5-foot rule does not seem to advance that goal.  Not all children are less than 5 feet tall, and those who are certainly have the ability to look up and take in their surroundings.

16

*Id.* at 566 (cleaned up).  Saying the VPPA ensures the privacy of the sensitive, embarrassing, or controversial nature of a consumer's video-watching by forbidding disclosure that identifies a particular video, but allowing disclosure of ***everything else*** about the video, is just as senseless as hiding tobacco advertisements from children by placing them five feet high, at the level of their parents' heads.

Likewise, in *Rubin*, the Supreme Court struck down a provision of the Federal Alcohol Administration Act that purportedly served a substantial interest in curbing competition among beer brewers based on higher alcohol content, a "valid goal." 514 U.S. at 483-84, 489.  But the regulation could not "directly and materially advance its asserted interest because of the overall irrationality of the Government's regulatory scheme." *Id.* at 488.  Brewers could not disclose alcohol content on labels, but they could disclose it in advertising; brewers could still signal higher alcohol content by labeling beer as "malt liquor"; and the statute did not regulate higher-alcohol beverages at all.  *Id.* at 488-89.  The VPPA is no different.  Its myopic focus on a single attribute of the video, the title, leaves every other meaningful aspect of viewer privacy unprotected.

More recently, in *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), the Supreme Court struck down a content- and speaker-based restriction on sale and disclosure of pharmacy records for marketing purposes.  The State of Vermont sought to justify its law by arguing it served a substantial interest in preserving prescription confidentiality.  *Id.* at 572.  But the law did not advance that interest, because "[u]nder Vermont's law, pharmacies may share prescriber-identifying information with anyone for any reason save one: They must not allow the information to be used for marketing." *Id.* at 573.  Once again, like the VPPA, the Vermont law failed to advance the stated purpose because it targeted just one attribute of the disclosure, and ignored all others that were material to the claimed interest.

That would be more than enough to strike down the VPPA, but there is much more.  Or rather, in the case of the VPPA, there is much less, because the law is so underinclusive it cannot plausibly advance any interest in protecting consumer privacy or "intellectual freedom."  It permits disclosures that a named consumer watched live video, video that the consumer did not pay for, or video made available by an entity that is not a VTSP.  Patreon MSJ Br. at 27.  And it is absurd to assert that the VPPA is a "pillar of intellectual freedom," Pl. Opp. Br. 10; US Opp. Br. 11, when it has nothing to say about privacy in books, newspapers, magazines, photography, or music.  Patreon MSJ Br. at 27; *see also*

17

*City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 428 (1993); *Metro Lights, L.L.C. v. City of Los Angeles*, 551 F.3d 898, 904-06 (9th Cir. 2009).

In response to the VPPA's under-inclusiveness problem, Plaintiffs, the United States, and Amici argue that one gap, the problem of disclosures by libraries, is covered by state law, Pl. Opp. Br. 24, US Opp. Br. 23, and that Congress "need not address all aspects of a problem in one fell swoop," US Opp. Br. 22 (quoting *Williams-Yulee v. Fla. Bar,* 575 U.S. 433, 449 (2015)).  The United States adds that "states have enacted regulations that cover many of the situations to which Defendant points," US Opp. Br. 23, but cites no such regulations.  The United States does cite a website that it says has a compendium of state laws "to protect digital privacy," *id.*; that website identifies laws by just *five* states. But ultimately the VPPA's flaw is not just that it fails to address "all aspects of [the] problem," its flaw is that it fails to directly address the supposed problem at all.

Because the VPPA does not directly and materially advance any interest in privacy, no matter how broadly or narrowly framed, it cannot survive intermediate scrutiny.

### 3. On the Facts of this Case, the VPPA Does Not Advance any Substantial Interest by Narrowly Tailored Means

The final prong of the *Central Hudson* test requires Plaintiffs and the government to show the VPPA is "narrowly tailored" to achieve its objective and that there is an appropriate "fit" between means and ends.  The state "cannot regulate speech that poses no danger to the asserted state interest," *Central Hudson*, 447 U.S. at 565, and "if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable," *Discovery Network*, 507 U.S. at 417 n.13.

The VPPA is not narrowly tailored in at least three material respects.  (1) The law imposes liability even where there is actual consent, and so no danger to the asserted interest, unless the VTSP complies with an unworkable and arbitrary consent process.  (2) It imposes liability for disclosures despite the fact that there are and were readily available settings and apps the two Plaintiffs could have used to prevent disclosures to Meta.  (3) The VPPA unnecessarily imposes presumed damages even in the absence of any injury to any privacy interest, or even an injury at all.

**Consent.**  Each Plaintiff affirmatively consented, in writing, to the alleged disclosures they

18

challenge now.  Patreon MSJ Br. 9-11.  That should be enough, and Amici appear to agree.  Amici Br. 16 ("Ensuring that consent is authentic through writing is not overly restrictive.").  But the VPPA requires more than just written consent and Plaintiffs did not give consent in the form required by the VPPA.  Patreon has shown that the VPPA's uniquely complex consent regime is not narrowly tailored. Other federal statutes that are intended to protect consumer privacy, including privacy related to video, require just written consent or even just "consent," plainly a less burdensome alternative.  Patreon MSJ Br. 26 (citing 47 U.S.C. § 551(b)(1) (Cable Communications Privacy Act); 47 U.S.C. § 338(i)(4)(A) (disclosure of information about satellite television viewers); 18 U.S.C. § 2702(b)(3) (Electronic Communications Privacy Act)).  *See also* Michigan Video Rental Privacy Act, Mich. Comp. Laws Ann. § 445.1713(a) (requiring only "written permission" for disclosure of video records).

In response, the United States argues that the additional requirement of a separate document was necessary to obtain "informed consent" but does not explain why "informed consent" was vital to protecting consumer privacy in prerecorded video, but unnecessary for cable video, satellite video, and electronic communications.  The United States also offers no defense of the need for case-by-case revocation of consent once granted, which is also unique to the VPPA.  18 U.S.C. § 2710(b)(2)(B)(iii).

Plaintiffs argue that the Health Insurance Portability and Accountability Act of 1996 (HIPAA) also has "heightened authorization requirements" of some kind, Pl. Opp. Br. 15, but HIPAA has a detailed and nuanced disclosure regime established in notice-and-comment rulemaking – and unlike the VPPA, it has no private cause of action for alleged violations.  *See Webb v. Smart Document Sols., LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007) ("HIPAA itself does not provide for a private right of action.") (citing 65 Fed. Reg. 82601 (Dec. 28, 2000).)[4]  The VPPA's burdensome consent regime stands alone.

---

[4] Plaintiffs claim that the Supreme Court has cited HIPAA "as a well-drafted law even though it broadly prohibits the disclosure of sensitive health information without the patient's consent." Pl. Opp. Br. 15, citing *Sorrell*, 564 U.S. at 573.  That is an invention; none of that is in *Sorrell*.  As noted above, *Sorrell* involved a law that prohibited disclosure of pharmacy records for marketing purposes, but otherwise permitted disclosure.  The exceptions so undermined the claimed privacy purpose of the statute that it failed the third prong of *Central Hudson*.  *Sorrell*, 564 U.S. at 573.  The Supreme Court noted that "the State might have advanced its asserted privacy interest by allowing the information's sale or disclosure in only a few narrow and well-justified circumstances," that is, by having fewer exceptions, and cited HIPAA and its regulations as an example.  *Id.*  Contrary to Plaintiffs' claim, the Court did ***not*** describe HIPAA as "well-drafted" and made ***no*** reference to HIPAA's consent terms.

Furthermore, the unnecessary burdens of the VPPA's consent regime are substantial and unchallenged as a matter of fact.  According to Patreon's Jason Byttow, "[i]mplementing a consent mechanism for the Patreon website (or for any video-distribution website) that would meet the foregoing VPPA-consent requirements would (1) require substantial engineering work, and (2) degrade the user's experience on the website, if it were possible at all."  Byttow Decl. ¶ 42.  As Mr. Byttow explains, the tools to implement case-by-case consent for each video would be a "huge burden to user experience;" generalizing the VPPA's rules into global settings "would be a complex design challenge" that would burden Patreon's creators and consumers; tools for revoking consent would require still more tools and a "major engineering effort;" and even then it might not be possible to integrate the consent regime and tools into Patreon's downstream systems.  *Id.*

In response, Plaintiffs and the United States have submitted no admissible evidence.  They merely speculate that Patreon could have used a "popup window" or "click box" each time a user watched a video to obtain consent to disclosure.  Pl. Opp. Br. 15; US Opp. Br. 22.[5]  That argument ignores Mr. Byttow's testimony about the burdens of seeking consent every time a video is watched and the extraordinary difficulty of managing case-by-case revocation of consent once given.

**Plaintiffs could prevent disclosure.**  As Patreon explained in its opening brief, and Plaintiffs and the United States do not dispute, Plaintiffs could have prevented the disclosure they object to now by changing their Facebook settings or using third party apps.  Patreon MSJ Br. 25-26.  Plaintiffs and the United States argue that the availability of technological solutions or self-help is irrelevant to the narrow tailoring inquiry, (Pl. Opp. Br. 20; US Opp. Br. 20), but that is incorrect.  In *Ashcroft v. Am. C.L. Union*, 542 U.S. 656 (2004), the Supreme Court held that the federal Children's Online Privacy Act (COPA) was not narrowly tailored in criminalizing obscene or offensive speech to minors on the internet.  In particular, the Court found, "blocking and filtering software" was "less restrictive than COPA."  *Id.* at 667.  And while the Court acknowledged blocking and filtering software was "not a

---

[5] The United States cites *Cappello v. Walmart Inc.*, No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019), to argue that Patreon could have obtained consent using a click box.  *Cappello* decided a 12(b)(6) motion related to one-time purchases of video on the Walmart website; it did not consider any evidence of burden, much less the burdens on a web-based video platform like Patreon.

perfect solution," *id.* at 668, the government had the burden to prove the technology was less effective than restricting speech. *Id.* at 669. As in this case, the government did not meet that burden and the statute was held unconstitutional. *Id.* at 673; *see also Edwards v. D.C.*, 755 F.3d 996, 1007 n.10 (D.C. Cir. 2014) ("Naturally, market forces are but one factor among a group of relevant considerations when determining the constitutionality of a government's regulation.").

**Presumed damages in the absence of harm.** The VPPA imposes presumed damages of $2500 even when there are no actual damages. 18 U.S.C. § 2710(c)(2)(A). Punishing speech that causes no harm violates the First Amendment in and of itself, and certainly is not narrow tailoring. "Even partial restrictions on commercial speech must be supported by a showing of some identifiable harm." *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000); Patreon MSJ Br. 26.

Neither Plaintiffs nor the United States dispute that harm is a prerequisite to imposing liability for speech. Instead, they argue that when "private information is revealed ***without authorization***, 'the consumer is harmed because he or she is deprived of the right to keep private the sensitive information about his or her person.'" Pl. Br. 21 (quoting *Nayab v. Cap. One Bank (USA), N.A.*, 942 F.3d 480, 492 (9th Cir. 2019 (emphasis added)); *see also* US Opp. Br. 22 ("the VPPA identifies a *substantive* right to privacy that suffers *any time* a video service provider discloses otherwise private information." (quoting *Eichernberger v. ESPN, Inc.*, 876 F.3d 979, 983-84 (9th Cir. 2017)). According to Plaintiffs and the United States, this is the injury Plaintiffs suffered, and it is enough. Wrong on both counts.

***First***, neither Plaintiff suffered ***any*** injury to privacy because any disclosure was made "with authorization," *i.e.*, their undisputed affirmative consent. "The maxim of the law 'volenti non fit injuria' (no wrong is done to one who consents) applies as well to the invasion of privacy tort." *Hill v. Nat'l Collegiate Athletic Assn.*, 865 P.2d 633 (Cal. 1994) (citing Rest.2d Torts, § 892A, com. A; Cal. Civ. Code, § 3515); *see also Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1034 (N.D. Cal. 2014) ("A plaintiff pursuing an invasion of privacy action must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., ***he or she must not have engaged in conduct which manifests a voluntary consent to the invasive actions of defendant***." (citing *Hill*) (emphasis added)). Or, as Justice Brandeis succinctly stated, "The right to privacy ceases upon the publication of the facts by the individual, or with his consent." Samuel D. Warren & Louis D. Brandeis, *The Right to*

21

*Privacy*, 4 Harv. L. Rev. 193, 218 (1890).  The VPPA would punish speech to protect "privacy" even when Plaintiffs' actual consent eliminates any privacy interest.  That is not narrowly tailored.

**Second**, Plaintiffs and the United States confuse the "minimal" injury sufficient to establish standing under Article III, *see Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008), with the type of harm that must be shown before imposing damages for protected speech.  Cases like *Eichenberger* and *Nayab* considered only whether the plaintiff had a sufficiently concrete injury to establish standing.  The standing inquiry requires little, "an identifiable trifle" is enough.  *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008).  But mere "trifles" are not sufficient injury to impose presumed damages for protected speech.  As courts have repeatedly recognized, claims for invasion of privacy are in tension with the First Amendment.  Consequently, privacy plaintiffs must show more than a mere disclosure, they must show that the disclosure is one that "a reasonable person would find highly offensive*." The Fla. Star v. B.J.F.*, 491 U.S. 524, 539 (1989); *see also Silva v. Hearst Corp.*, No. CV97-4142 DDP(BQRX), 1997 WL 33798080, at *2 (C.D. Cal. Aug. 22, 1997) (because of First Amendment concerns, privacy torts require disclosure that would be "highly offensive to a reasonable person"); *Brahmana v. Lembo*, No. C-09-00106 RMW, 2010 WL 965296, at *4 (N.D. Cal. Mar. 17, 2010) (same).  Here, Plaintiffs offered no actual evidence of such harm.  *See* above at II.A.1.

### C.   The Court Should Find The VPPA Unconstitutional As Applied And Grant Patreon Summary Judgment, Or In The Alternative Sever The Separate Consent Clause And The Presumed Damages Clause

Plaintiffs and the United States have not identified with the necessary precision any substantial government interest.  But no matter how the interest is defined, the VPPA does not advance it directly and materially; at best the VPPA provides only ineffective or remote support for the government's stated purpose.  And even if the VPPA did directly advance a substantial government interest, it is not narrowly tailored because it imposes liability for speech that Plaintiffs consented to; it disregards technological and market alternatives to banning speech; and it imposes presumed damages where there is no actual harm.  If the VPPA had only these defects, the Court could sever the arbitrary and onerous consent terms and the presumed damages clause, Patreon MSJ Br. 26-27, but the additional fatal flaws require that the entire statute be held unconstitutional as applied.  The VPPA fails intermediate scrutiny under *Central Hudson*, and Patreon is entitled to summary judgment.

**D.    The VPPA Is Unconstitutional On Its Face Because It Proscribes Millions Of Constitutionally Protected, Non-Commercial Disclosures That Are Substantial In Relation To Any "Plainly Legitimate Sweep" Of The Law**

There is no dispute about the legal standard that the Court applies on an overbreadth challenge under the First Amendment.  The VPPA is invalid if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (citation omitted); *see also Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 244 (2002).  *Accord* Pl. Opp. Br. 27-28; US Opp. Br. 24.  Whether there is a substantial number of applications is an exercise in statutory construction.  "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *United States v. Williams*, 553 U.S. 285, 293 (2008).  The next step is to examine whether the statute, properly construed, covers "a substantial amount of protected activity." *Id.* at 297.  *See also United States v. Hansen*, 599 U.S. 762, 770 (2023).

As Patreon showed in its opening brief, the VPPA by its terms applies to ***millions*** of constitutionally protected disclosures that are real and documented.  Patreon MSJ Br. 12-20.  This "substantial" number is more than enough to establish overbreadth.  For example, in *Stevens*, the Court considered 18 U.S.C. § 48, a federal law that banned depictions of animal cruelty if the conduct depicted was also illegal in the jurisdiction where the depiction was sold.  559 U.S. at 475-76.  The Court observed that "[h]unting periodicals have circulations in the hundreds of thousands or millions," *id.* at 476, *some* hunting magazines include pictures of animals being killed, and *some* of those magazines might be offered in a jurisdiction where hunting is illegal, in violation of Section 48.  *See id.*  That statute was overbroad, the VPPA is even more so.

To avoid the plain result of the overbreadth analysis, Plaintiffs and the United States make three arguments, each of which fails.  (1) They misconstrue the VPPA in an attempt to exclude the millions of documented disclosures concerning suspected child pornography, other crimes, public safety, and student activity, but their arguments only distort the text.  (2)  They mistakenly argue that it is not enough to show the VPPA applies to millions of instances of protected speech, but that Patreon must also show that those speakers have been exposed to litigation and liability and silenced.  There is no such requirement in overbreadth analysis or in First Amendment law generally.  (3)  They claim that the

23

recent wave of class action lawsuits concerning the Meta Pixel demonstrates the statute's "plainly legitimate sweep," but many of those lawsuits do not even state VPPA violations (as the United States itself notes) and many if not all would be subject to the same meritorious as-applied arguments Patreon has made here.  We address each in turn below.

### 1. The VPPA, by Its Express Terms, Impermissibly Burdens Numerous Categories of Protected Non-Commercial Speech

In its opening brief, Patreon documented numerous categories of non-commercial speech that the VPPA impermissibly prohibits or burdens.  Patreon MSJ Br. 12-20.  Because the Court has already held that the VPPA is subject to strict scrutiny in its non-commercial applications, Plaintiffs and the United States have the burden of showing for each cited example that the VPPA's burden on that category of speech furthers a compelling governmental interest, is reasonably tailored to that end, and no less restrictive alternatives are available.  Patreon MSJ Br. 23.  Neither Plaintiffs nor the United States take up that burden at all, conceding the unconstitutionality of each non-commercial application to which the VPPA applies.  Plaintiffs, the United States, and Amici make various other arguments in response but not in the order Patreon presented them.  Below we review each, in the order they were discussed in Patreon's opening brief.

**Disclosures Concerning Public Officials**, Patreon MSJ Br. 12-13, 28.  There is no serious argument by any party that disclosures like the one about Judge Bork, which prompted passage of the VPPA and which it now forbids, are protected speech on matters of public concern.  The Supreme Court has held in clear terms,

> [P]rivacy concerns give way when balanced against the interest in publishing matters of public importance. As Warren and Brandeis stated in their classic law review article: "The right of privacy does not prohibit any publication of matter which is of public or general interest."  The Right to Privacy, 4 Harv. L. Rev. 193, 214 (1890).  One of the costs associated with participation in public affairs is an attendant loss of privacy.

*Bartnicki v. Vopper*, 532 U.S. 514, 534 (2001).  *See also Williams-Yulee*, 575 U.S. at 443 ("As we have long recognized, speech about public issues and the qualifications of candidates for elected office commands the highest level of First Amendment protection.").  Plaintiffs note that not ***every*** government employee's conduct is a matter of public concern, Pl. Opp. Br. 32 & n.7, but the VPPA's restriction is overbroad even if limited to the thousands of federal, state, and local elected officials, judges, and senior

appointees.  Plaintiffs and the United States both make the odd argument that ever since the VPPA

banned this kind of important speech, there has been none of it, so there is nothing to worry about.  Pl.

Opp. Br. 32, US Opp. Br. 33.  Patreon also offered evidence of continuing attention, from Congress and

the media, to government officials watching pornography while at work, demonstrating that the

disclosures the VPPA bans remain a public concern.  The United States argues in response that there is

no need for the speech the VPPA bans because "society reasonably relies on the government to police its

employees."  US Opp. Br. 33.  These arguments are tone deaf to the purposes of the First Amendment

and, unsurprisingly, the ACLU and other Amici do not join them.

**Disclosures Concerning Potential Crimes**, Patreon MSJ Br. 13-16, 28-29.  There is no dispute

that the literal terms of the VPPA apply to VTSPs' voluntary disclosures to law enforcement or NCMEC

about suspected crimes if they identify the user and the video, which occurs regularly.  Patreon MSJ Br.

13-14.  There is also no dispute that these disclosures are protected by the First Amendment.  *Id.* 28

(citing authority).  Instead, Plaintiffs and the United States attempt to argue that the VPPA does not

mean what it plainly says.  They do not succeed.

The United States' first "textual" argument is breathtaking.  The VPPA prohibits disclosures

identifying "specific video materials," 18 U.S.C. § 2710(a)(3), and it is undisputed that reports of

potential crimes routinely identify "specific video materials."  To avoid that problem, the United States

turns to the Humpty Dumpty canon of statutory construction.[6]  According to the United States, "video

materials" should mean "video materials *that are not illegal*."  This makes sense, the government says,

because requesting or obtaining illegal video is not protected by the First Amendment, and presumably

Congress did not intend to protect illegal viewing from disclosure.  US Opp. Br. 27-28.  That's not how

statutory interpretation works.  As the Supreme Court held in *Stevens*:

> "This Court may impose a limiting construction on a statute only if it is 'readily
> susceptible' to such a construction."  *Reno v. American Civil Liberties Union,* 521 U.S.
> 844, 884 (1997).  We "will not rewrite a … law to conform it to constitutional
> requirements," *id.,* at 884–885, for doing so would constitute a "serious invasion of the
> legislative domain," *United States v. Treasury Employees,* 513 U.S. 454, 479, n. 26,

---

[6] "'When *I* use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what *I* choose it to mean—neither more nor less.'" Through the Looking Glass, in The Complete Works of Lewis Carroll 196 (1939), quoted in *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174 n.18 (1978).

(1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," *Osborne,* 495 U.S. at 121.  To read § 48 as the Government desires requires rewriting, not just reinterpretation.

559 U.S. at 481 (cleaned up).  The United States does not ask the Court to interpret the VPPA, it asks the Court to rewrite it.  The Court should decline the invitation.

In any event, the government's argument contradicts the VPPA's text.  The VPPA clearly applies to "illegal video materials" as it anticipates they may be the subject of search warrants and grand jury subpoenas.  *See* 18 U.S.C. § 2710(b)(2)(C).  And even on its own terms, the government's argument would not save the VPPA.  Videos that VTSPs disclose to NCMEC and law enforcement are not necessarily "illegal," they are just suspected of being illegal.  Under the government's novel interpretation, the VPPA still prohibits disclosure of specific video that is suspected of being illegal, but turns out not to be.  That prohibition still violates the First Amendment.

Plaintiffs make a similar counter-textual argument, arguing that if a consumer sued a VTSP for disclosing he watched child pornography, "it is unlikely he would prevail under the VPPA because the Constitution does not recognize a protected interest in such content."  Pl. Opp. Br. 32.  Not so.  While a statute cannot violate the Constitution, it can provide broader protections than the First Amendment might.  Not only would that plaintiff have a VPPA claim, under the express terms of the VPPA he would have ***the right to suppress that evidence in his criminal trial***.  *See* 18 U.S.C. § 2710(d).

Plaintiffs and the United States next argue that a disclosure to NCMEC will not violate the VPPA because disclosure is required by a different statute, particularly 18 U.S.C. § 2258A.  Pl. Opp. Br. 31-32, US Opp. Br. 29.  Patreon anticipated this argument in its opening brief and carefully explained why 18 U.S.C. §§ 2258A and 2258B do not limit or eliminate liability under the VPPA.  Patreon MSJ Br. 28-29.  As Patreon explained, Section 2258B immunizes NCMEC disclosures unless the disclosure is an "intentional" violation of law, which a VPPA violation always must be, so sections 2258A and 2258B do not provide a defense to a VPPA violation.  In addition, the VPPA is part of Title 121, and elsewhere in Title 121, when Congress wanted to provide a defense based on compliance with Section 2258A, it said so expressly, *see* 18 U.S.C. § 2702(b)(6).  Plaintiffs do not respond to that detailed argument at all.  The United States responds in a footnote, US Opp. Br. 29 n.7, complaining that Patreon must be wrong because the result would be "absurd."  Any absurdity is in the poorly conceived VPPA,

not in the interpretation.  *Stevens*, 559 U.S. at 481 (finding statute overbroad and unconstitutional where the government's proposed interpretation required "rewriting [the statute], not just reinterpretation").

For the same reasons, Plaintiffs' and the United States' arguments that Section 2258A should be understood as implicitly modifying the VPPA, or that the statutes should be "harmonized," are unavailing.  US Opp. Br. 29; *see also* Pl. Opp. Br. 31-32 (citing *N.L.R.B. v. Kolkka*, 170 F.3d 937, 941 (9th Cir. 1999)).  As *Kolkka* actually holds*,* "repeal by implication" is "a heavily disfavored construction." *Id.*  "There are two categories of repeals by implication:  (1) cases of irreconcilable conflict and (2) cases in which the later act covers the whole subject of the earlier one." *Id.*  Neither applies here.  Section 2258A does not eliminate liability under the VPPA.

As to warrantless disclosures by VTSPs of other suspected crimes, the United States concedes these are "actual examples of the VPPA's application to non-commercial speech."  US Opp. Br. 33.  The United States tries to diminish these by arguing that only a "handful" appear in reported decisions of suppression motions.  *Id.*  Of course, orders in suppression hearings are rarely reported and rarely appealed, even in cases that do not result in an early guilty plea, so the actual number is certain to be much higher.[7]

**Disclosures Concerning Threats to Individual or Public Safety**, Patreon MSJ Br. 16-17, 29.  There is no dispute that VTSPs do make disclosures of PII, that violate the VPPA, to law enforcement or first responders in circumstances where individual or public safety is at risk.

**Litigation and Testimonial Disclosures**, Patreon MSJ Br. 17-18, 29.  As Patreon explained in its opening brief, the VPPA prohibits disclosures in civil litigation unless there is consent or a court order, which unnecessarily burdens the right to seek relief in the courts.  Patreon MSJ Br. 17.  Worse still, the VPPA has no provision at all for testimonial disclosures in criminal matters, despite the frequent, real-world need for such disclosures in criminal proceedings.  *Id.* 17-18.  The United States has

---

[7] One example Patreon cited of a VTSP's voluntary report of a possible crime in violation of the VPPA is *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1219–20 (10th Cir. 2001) (VPPA violation where video stores voluntarily disclosed to police that plaintiff and others had rented a movie that was obscene under Oklahoma law).  Plaintiffs try to argue that *Camfield* proves the VPPA's value to the First Amendment.  Pl. Opp. Br. 16-17.  Plaintiffs misunderstand and misconstrue that case, in which the plaintiff prevailed by proving the movie was ***not*** obscene under the language of the statute, and the police were held liable under the VPPA for their investigation of the possible crime.

27

1   no response at all to the VPPA's prohibition on testimonial disclosures by VTSP's in criminal cases.

2   Plaintiffs argue that the VPPA does allow disclosure to law enforcement in response to a warrant or

3   grand jury subpoena – true, *see* 18 U.S.C. § 2710(b)(2)(C) – and that it "makes no sense" that the VPPA

4   would not permit disclosure at a later stage of the criminal proceedings.  Pl. Opp. Br. 33.  Again, that is

5   the problem: the text of the VPPA often "makes no sense" or leads to "absurd" results.  But the Court

6   cannot ignore the text to rewrite the law and avoid those problems.  *See Stevens*, 559 U.S. at 481.

7   **Disclosures to and by Continuing Education Providers, Traffic Schools**, Patreon MSJ Br. 18-

8   19, 29-30.  By its terms, the VPPA also prohibits disclosure by continuing education providers and

9   traffic schools, unless they obtain consent in the specific form mandated by the VPPA.  Plaintiffs argue

10  that the consent requirement may be less burdensome in such cases, Pl. Opp. Br. 33, but it is still more

11  burdensome than necessary, especially given the exceedingly slight privacy interest in such materials.

12      The United States makes a different argument, that providers are engaged in commercial speech

13  that falls outside the overbreadth analysis.  US Opp. Br. 33, citing *Valle Del Sol Inc. v. Whiting*, 709

14  F.3d 808, 818 (9th Cir. 2013).  But the commercial speech at issue in *Valle del Sol* was an actual

15  solicitation to perform day labor, *see id.,* a quintessential example of speech that "does no more than

16  propose a commercial transaction."  *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.,*

17  425 U.S. 748, 762 (1976).  Educational providers that report on student activity ***after*** any commercial

18  transaction has been consummated are not engaged in commercial speech, any more than a newspaper is

19  engaged in commercial speech because its subscribers pay for the information it publishes.  *See Chase v.*

20  *Davelaar*, 645 F.2d 735, 738 (9th Cir. 1981).  This is not commercial speech and the VPPA's burdens

21  on it must be evaluated under strict scrutiny.

22      **Disclosures to Teachers and Educational Institutions**, Patreon MSJ Br. 19-20, 30.  It is

23  undisputed that millions of students at thousands of schools in the United States use learning

24  management software, which tracks the specific educational videos students watch and discloses that

25  data and their identities to teachers and educational institutions, contrary to the VPPA.  The United

26  States' sole argument in response is that these disclosures are commercial speech, US Opp. Br. 33,

27  which fails for the reasons stated above.  Plaintiffs respond with a non sequitur, asserting that "neither

28  teachers nor schools are VTSPs subject to the law." Pl. Opp. Br. 33.  Patreon's argument is that

providers of ***learning management software*** are subject to the VPPA, students are consumers, and software providers' unauthorized disclosures to teachers and schools violate to the law – as a court in this District has already held. *See M. K.*, 2023 WL 4937287, at *4–7. This is yet another example of the VPPA's improper application to protected non-commercial speech.

### 2. The Fact that the VPPA Has Not Silenced All Non-Commercial Speech that It Unconstitutionally Burdens Does Not Save It; Patreon Has No Obligation to Quantify the Amount of Speech Actually Chilled

Despite the unrebutted evidence that the VPPA applies to an enormous amount of real, constitutionally protected, non-commercial speech, Plaintiffs argue that the law "does not substantially abridge protected speech." Pl. Opp. Br. 27; *see also* US Opp. Br. 32 (same). In making that argument, Plaintiffs and the United States mis-state and misapply the standard for overbreadth analysis, particularly in their misreading of the Supreme Court's recent decision in *Hansen.*

Hansen was convicted of running an immigration scam in violation of 8 U.S.C. § 1324, a subsection of which forbids "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such [activity] is or will be in violation of law." *Hansen*, 599 U.S. at 766-67. Hansen challenged that law as overbroad and unconstitutional, arguing that the everyday meaning of the terms "encourage" and "induce" would sweep in and punish a wide range of innocuous and protected speech, such as an op-ed or public speech supporting the rights of undocumented noncitizens to remain in the country and many other examples. *See id* at 771, 773-74. As the Supreme Court recognized, "If the statute reaches the many examples that Hansen posits, its applications to protected speech might swamp its lawful applications, rendering it vulnerable to an overbreadth challenge." *Id.* at 774.

The overbreadth analysis in *Hansen* began and ended with the first step under *Williams*, 553 U.S. at 293, construing the statute to determine what it covers. *See Hansen*, 599 U.S. at 774-81. The Supreme Court rejected Hansen's everyday meaning of "encourage or induce" in section 1324 and instead construed that language narrowly, "in its specialized, criminal-law sense – that is, as incorporating common-law liability for solicitation and facilitation." *Id.* at 774. Under that far narrower interpretation, the provision reached "no further than the purposeful solicitation and facilitation of specific acts known to violate federal law." *Id.* at 781. Hansen's examples of overbreadth, in contrast,

29

1    consisted solely of a "string of hypotheticals, all premised on the expansive ordinary meanings of

2    'encourage' and 'induce,'" *id.* at 782, that the Supreme Court held were outside Section 1324's scope.

3    *See also id.* ("Clause (iv) does not have the scope Hansen claims, so it does not produce the horribles he

4    parades.").

5           Plaintiffs and the United States are deaf to the teachings of *Hansen*. Plaintiffs cite *Hansen* as

6    holding that overbreadth analysis requires "focusing on actual prosecutions under the challenged

7    statute," Pl. Opp. Br. 29, and "absence of any actual prosecutions under the law was fatal to overbreadth

8    challenge," Pl. Opp. Br. 32. Not at all. After interpreting the statute, the *Hansen* Court noted that there

9    had been no prosecutions for the expressive conduct Hansen identified because the law did not apply to

10   that conduct in the first place. *Hansen*, 599 U.S. at 782. The United States makes a similar error,

11   asserting that to "determine whether an application was 'realistic,' the Supreme Court in *Hansen*

12   examined how the statute had been applied in practice, discounting 'hypotheticals' conjuring situations

13   in which it theoretically *could* apply." Us. Opp. Br. 24. Again, no. The *Hansen* Court construed the

14   statute to determine whether the statute ***did*** apply to Hansen's hypotheticals. *Hansen*, 599 U.S. at 774-

15   82. It did not, so Hansen lost.

16          Led astray by these errors, both Plaintiffs and the United States argue that the Court should

17   disregard proven examples of extensive non-commercial speech that are within the scope of the VPPA

18   (such as NCMEC reports and use of learning management software), if that speech has not been the

19   subject of litigation and liability and has continued, at least to some extent. Pl. Opp. Br. 28 (arguing that

20   "the evidence Patreon relies on directly undercuts its overbreadth challenge because it confirms that

21   businesses are *routinely reporting illegal activity* and schools and businesses are disclosing what their

22   students or clients watch without incurring VPPA liability"); US Opp. Br. 32 ("the number of such

23   disclosures that Defendant asserts occur demonstrates that (1) video tape service providers do not

24   believe this conduct is covered by the VPPA, and (2) the VPPA is not chilling speech"). To be sure,

25   many cases include language reflecting the purpose of the overbreadth rule, "concern that the threat of

26   enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Virginia v.*

27   *Hicks*, 539 U.S. 113, 119 (2003); *see also Hansen*, 599 U.S. at 770. Plaintiffs and the United States cite

28   that language.

Plaintiffs and the United States confuse the legal **standard** for overbreadth analysis with its underlying **rationale**.  Under the settled standard, a law is invalid if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Stevens*, 559 U.S. at 473.  No case – **none** – has ever held that a law that **actually applies** to a substantial amount of protected speech nonetheless survives overbreadth analysis because some people, even many people, continue to speak.  Many cases hold the opposite, consistent with the rule that "where the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack."  *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984).  And even if the federal government actually **promises** not to prosecute unconstitutional applications of a law, it cannot be saved from overbreadth.  *See Stevens*, 559 U.S. at 480 ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

For example, in *Stevens*, discussed above, the Court held 18 U.S.C. § 48 was unconstitutional because it prohibited widely circulated hunting magazines and television shows.  559 U.S. at 475-76.  Had the Court embraced the reasoning of Plaintiffs and the United States here, it would have held the continuing availability of those publications disproved overbreadth.  The Court did the opposite.

Likewise, in *Ashcroft v. Free Speech Coalition*, the Supreme Court considered the Child Pornography Prevention Act of 1996, finding that it would impermissibly ban a wide range of depictions of teenage sexuality that had artistic merit, protected by the First Amendment.  535 U.S. at 246-47.  Writing in 2002 – six years **after** passage of CPPA – the Court pointed out that in the previous two years, mainstream award-winning movies like *Traffic* and *American Beauty*, as well as other artworks, had depicted teenaged characters engaged in sexual activity that CPPA forbade.  *Id.* at 247-48.  Those prominent examples of banned speech did **not** demonstrate a lack of chilling to save an unconstitutional law, as Plaintiffs and the United States would argue now.  They demonstrated actual overbreadth.  *Id.* at 247-49.

Yet another example, in *City of Houston, Texas v. Hill*, the Supreme Court struck down as facially overbroad a municipal ordinance that made it unlawful to interrupt a police officer in the course of their duties.  482 U.S. 451 (1987).  There was no question that protected speech subject to the law

31

1    was continuing, and continuing every day – that was **why** the law was unconstitutionally overbroad.

> 2    Houston's ordinance criminalizes a substantial amount of constitutionally protected
> 3    speech …. ***The ordinance's plain language is admittedly violated scores of times daily***,
> 4    [cite] yet only some individuals – those chosen by the police in their unguided discretion
>    – are arrested.…  [T]he ordinance is susceptible of regular application to protected
> 5    expression. We conclude that the ordinance is substantially overbroad, and that the Court
>    of Appeals did not err in holding it facially invalid.

6    *Id.* at 466-67 (emphasis added).

7        In yet another case, *Legend Night Club v. Miller*, the Fourth Circuit considered a Maryland law

8 that restricted conduct, attire, and entertainment at establishments licensed to serve alcohol.  637 F.3d

9 291, 294 (4th Cir. 2011).  Intended to address secondary effects of allowing nude dancing and alcohol,

10 the law by its terms swept far more broadly to reach "political satire, a Shakespeare play depicting

11 young love, or a drama depicting the horrors of rape." *Id.* at 299.  To address the overbreadth, the

12 defendants submitted affidavits from enforcement authorities in the counties where the statute applied,

13 "each stating that in the relevant jurisdiction, § 10-405 has never been enforced against an establishment

14 offering productions of clear artistic merit." *Id.* at 300.  That was irrelevant, because as the Fourth

15 Circuit recognized, "no limitation on the scope of the sweeping prohibitions exists *in the statute.*" *Id.*

16 The VPPA is no different.

17        Moreover, the fact that speech subject to the VPPA continues by some does not mean that speech

18 by others is not chilled, or will not be chilled as the VPPA becomes better known.  Over 90% of

19 NCMEC reports come from just five platforms – Facebook, Instagram, Google, WhatsApp, and Omegle.

20 Shehan Decl. (Dkt. 79) ¶ 5.  While those platforms may have the resources to litigate VPPA claims and

21 assert First Amendment rights, a substantial number of the other 1500 providers registered to report, *see*

22 *id.*, likely do not.  Moreover, 18 U.S.C. § 2258A does not require providers to report CSAM to NCMEC

23 unless and until they have "actual knowledge" of an apparent child pornography crime.  *See* 18 U.S.C. §

24 2258A(a)(1)(A).  VTSPs that are worried about VPPA liability may turn a blind eye to CSAM rather

25 than risk triggering an obligation to speak.

26        The flaw in Plaintiffs' and the government's reasoning is further demonstrated by their Catch-22

27 argument in response to the example of disclosures about political figures like Judge Bork.  The

28 example of Judge Bork is "realistic, not fanciful." *Hansen*, 599 U.S. at 770.  But Plaintiffs and the

United States deny this clear evidence of overbreadth because, they point out, there have been no further examples of this kind since the VPPA was passed.  Pl. Opp. Br. 32, US Opp Br. 33.  So, this is the argument:  If there are **no** more examples of disclosures like the one about Judge Bork, the example is not substantial and the statute survives.  If there are **millions** of examples of these covered disclosures, as with NCMEC, there is no chilling so – again – the statute survives.  Heads I win, tails you lose.  Fortunately, that is a rule only on playgrounds, not in courtrooms.

In conducting the overbreadth analysis, the Court must construe the VPPA to determine the scope of what it covers.  *See Hansen*, 599 U.S. at 770; *Williams*, 553 U.S. at 293.  The VPPA covers each of the categories of speech that Patreon has enumerated and described above.  Next the Court must determine whether the unconstitutional applications are "realistic, not fanciful."  *Hansen*, 599 U.S. at 770.  Patreon has provided real-world, concrete examples of every single cited category of speech.  They are indisputably "realistic."  Then the Court must examine whether the statute, properly construed, covers "a substantial amount of protected expressive activity."  *Williams*, 553 U.S. at 297.  The categories covered by the VPPA are substantial, in both importance and in amount, related to matters of grave public concern and numbering in the millions.  No greater showing is required.

### 3.    The VPPA's Unconstitutional Applications Are Substantial in Relation to Any "Plainly Legitimate Sweep" of the VPPA

The final step of the overbreadth analysis requires the Court to judge whether the VPPA's numerous unconstitutional applications are substantial "in relation to the statute's plainly legitimate sweep."  *Stevens*, 559 U.S. at 473.  *See also Hansen*, 599 U.S. at 770 (unconstitutional applications "must be substantially disproportionate to the statute's lawful sweep").

There can be no question that the VPPA's unconstitutional applications are "substantial" in absolute terms, even before one attempts the impossible task of adding in the quantum and importance of speech the VPPA has silenced.  Those unconstitutional applications are also substantial in relation to the other side of the ledger, any "plainly legitimate sweep" of the VPPA.

In *Hansen*, the "plainly legitimate sweep" of the statute was relatively easy to identify, because the law primarily regulated conduct that implicated no First Amendment issue at all.  *See Hansen*, 599 U.S. at 782 (holding the "plainly legitimate sweep" of the provision was "extensive" because the

challenged clause "encompasse[d] a great deal of nonexpressive conduct – which does not implicate the First Amendment at all," such as providing counterfeit immigration documents, and issuing fake social security numbers). *See also Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (origin of "plainly legitimate sweep" principle; "To put the matter another way, particularly ***where conduct and not merely speech is involved***, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." (emphasis added)).

Here, in contrast, Plaintiffs, the United States, and Amici seek to counterbalance the VPPA's substantial unconstitutional applications solely by pointing to its restrictions on other, commercial speech. Pl. Opp. Br. 30; US Opp. Br. 30-31, Amici Br. 16. To that end, Plaintiffs purport to offer evidence of the magnitude of disclosures of video-watching data subject to the VPPA, but their evidence is gibberish – just two columns of numbers, one called "pixel_id" and one called "num_rows." Tan Decl. Ex. V (Dkt. 100-17). In their brief, Plaintiffs state without support that some of these numbers correspond to "user activity on a website" for specific companies, Pl. Opp. Br. 30, but offer no evidence that any of these sites are VTSPs, that any of the data concerns pre-recorded video, or that any of the data concerns "consumers" as defined by the VPPA. That is all Plaintiffs have, nothing more.

The United States also offers just one piece of evidence to show legitimate sweep – the number of lawsuits that have been recently filed against commercial entities claiming violation of the VPPA through use of the Meta Pixel. US Opp. Br. 30-31. This is a curious argument, as these are just complaints, few if any have proceeded past the early stages much less to judgment, and the United States itself points out that a good number of the filed cases are meritless because the VPPA does not apply even on the face of the complaint. US Opp. Br. 26-27 (listing VPPA lawsuits that were dismissed for failure to plead VPPA elements). Still, according to the government, these lawsuits demonstrate the VPPA's legitimate sweep because there are many VPPA lawsuits against commercial actors and the VPPA survives intermediate scrutiny as commercial speech. *Id.* On the other hand, if the VPPA does not withstand intermediate scrutiny, as Patreon argues above, the United States also has ***nothing*** to offer on the "legitimate sweep" side of the ledger. Further, if the as-applied question is even a close one, it would seem that the United States has nothing to offer in terms of "***plainly*** legitimate sweep." *Hansen*, 599 U.S. at 766 (emphasis added).

1   In fact, the VPPA has little if any plainly legitimate sweep.  In its other applications, it fails

2   *Central Hudson* because it does not directly and materially advance a substantial interest in privacy by

3   means that are narrowly tailored.  It does not protect privacy, it just forbids disclosing consumer names

4   with information identifying the video while permitting all other sensitive information to be disclosed.

5   *See* above at III.B.2.  It also fails *Central Hudson* for another reason, it regulates "speech that poses no

6   danger to the asserted state interest," 447 U.S. at 565, such as disclosures that the user actually

7   consented to, disclosures that cause no harm to privacy interests, *see* above at III.B.3, and disclosures of

8   information that is already public, Patreon MSJ Br. 30-31.  In sum, in this case, "[w]hen we turn to the

9   other side of the ledger, we find it pretty much blank."  *Hansen*, 599 U.S. at 782.

10                                        *        *        *

11   The VPPA is unconstitutionally overbroad on its face.  By its terms, it prohibits or significantly

12   burdens constitutionally protected, non-commercial speech across multiple sectors of American society

13   – politics and government, law enforcement, public safety, education – and does so with respect to

14   millions of instances of speech every year.  Its unconstitutional applications are real, documented, and

15   not just substantial, but vast. None of this harm to the First Amendment is justified by the VPPA's

16   "legitimate sweep," which is paltry at best.  Patreon is entitled to summary judgment.

17   **IV.    CONCLUSION**

18   The VPPA is a poorly drafted law that imposes significant, unjustified burdens on commercial

19   and non-commercial free speech rights while doing nothing to materially or directly advance the privacy

20   interests it supposedly was enacted to protect.  It is unconstitutional, and the Court should grant

21   summary judgment to Patreon on the VPPA claims of the two Plaintiffs here.

22

23   Dated:  January 19, 2024                    Respectfully submitted,

24                                              THE NORTON LAW FIRM PC

25                                              */s/ Fred Norton*
                                                Fred Norton
26

27                                              Attorneys for
                                                PATREON, INC.
28