Pages 1 - 74

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Judge

BRAYDEN STARK, et al.,          )
                                )
          Plaintiffs,           )
                                )
   VS.                          )     NO. 22-CV-03131-JCS
                                )
PATREON, INC.,                  )
                                )
          Defendant.            )
_____ )

                         San Francisco, California
                         Friday, April 12, 2024

**TRANSCRIPT OF ZOOM VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    GIRARD SHARP LLP
                    601 California Street, Suite 1400
                    San Francisco, CA 94108
              BY:   **JORDAN S. ELIAS, ATTORNEY AT LAW**
                    **TREVOR T. TAN, ATTORNEY AT LAW**
                    **SIMON S. GRILLE, ATTORNEY AT LAW**
                    **ATTORNEYS AT LAW**

For Defendant:
                    THE NORTON LAW FIRM
                    299 Third Street, Suite 200
                    Oakland, CA 94607
              BY:   **NATHAN L. WALKER**
                    **WILLIAM FRED NORTON, JR.**
                    **ATTORNEYS AT LAW**


          **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

**APPEARANCES: (CONTINUED)**

For Interested Party United States of America:

                        U.S. DEPARTMENT OF JUSTICE
                        Civil Division, Federal Programs Branch
                        1100 L Street, NW
                        Washington, DC 20005
                BY:     **LESLIE COOPER VIGEN, ATTORNEY AT LAW**




REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**Friday - April 12, 2024**                                    **9:35 a.m.**

P R O C E E D I N G S

---o0o---

**THE CLERK:**  Good morning.   The United States District Court for the Northern District of California is now in session, the Honorable Joseph C. Spero is presiding.

Our court reporter this morning is Kendra Steppler.  And I have a brief housekeeping announcement:  Please note that persons granted remote access to court proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings, including those held by telephone or videoconference.  See General Order 58 at paragraph 3.  Any recording of a court proceeding held by video or teleconference, including screenshots or other visual copying of the hearing, is absolutely prohibited.  Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, or any other sanctions deemed necessary by the Court.

We're calling Case Number 22-CV-3131, Stark v. Patreon.  Counsel, please raise your hands.

I have one more to go, Judge.

I'm trying to promote Mr. Grille, but it's -- ah, here he comes.

I'm still having issues getting Mr. Grille to join us as a panelist.

1              **THE COURT:**  You promoted him, but Mr. Grille needs to

2    do something?

3              **THE CLERK:**  On his end, he may have to accept being a

4    panelist.

5              **THE COURT:**  Okay.

6              **THE CLERK:**  It shows he's rejoining now as a panelist

7    in the webinar.  But I got that message before, so...

8              **THE COURT:**  Here he is.  Here he is.

9         Mr. Grille, are you there?

10             **MR. GRILLE:**  I am.  Good morning.

11             **THE COURT:**  Okay.  Good.

12             **THE CLERK:**  Great.  Appearances, please, first

13   starting with the plaintiff, then the defendant, and then also

14   the interested party.

15             **MR. ELIAS:**  Good morning, Your Honor.  Jordan Elias

16   with Girard Sharp LLP for the plaintiffs.  And with me are my

17   colleagues, Simon Grille and Trevor Tan.

18             **THE COURT:**  Welcome.

19             **MR. NORTON:**  Good morning, Your Honor.  Fred Norton on

20   behalf of defendant Patreon.  And with me this morning is my

21   colleague, Nathan Walker.

22             **THE COURT:**  Welcome.

23             **MS. VIGEN:**  Good morning, Your Honor.  Leslie Cooper

24   Vigen on behalf of the United States.

25             **THE COURT:**  Good morning, everyone.

1      So I was -- a couple of questions -- and then we'll go

2  through the as-applied and the facial challenge, and a couple

3  questions as we go through that.  Be cautious, because there is

4  some information that is sealed, and I don't want you to reveal

5  that content.  I'll do my best, as well, because this is a

6  public hearing.

7      The evidence that's submitted that is specific to the

8  individual plaintiffs only refers to two of the plaintiffs --

9  Stark and Oostyen or Oostyen.  There are now a couple of other

10 plaintiffs.  I guess everyone agrees that we can still decide

11 this motion, even though the evidence that is specific to

12 plaintiffs refers only to two of them.

13      **MR. ELIAS:**  From the plaintiffs' point of view, that

14 is correct, Your Honor.

15      **MR. NORTON:**  And defendant agrees.  Thank you.

16      **THE COURT:**  Okay.  Great.

17      Plaintiffs -- I -- it is a small point -- but I guess you

18 agree that, as written, Patreon's policy cover -- privacy

19 policy -- does authorize the conduct that's at issue in this

20 case.

21      I'm having trouble hearing you.

22      **MR. ELIAS:**  To some extent; however, we maintain that

23 they haven't done enough.  They haven't provided the required

24 form under the statute --

25      **THE COURT:**  That's not my -- that's not my question.

1  Of course, my question is not that one.  So I would

2  appreciate --

3          **MR. ELIAS:**  I understand.

4          **THE COURT:**  -- an answer to my question.  You agree

5  that the Patreon policy, as written, does authorize the conduct

6  at issue in this case.

7          **MR. ELIAS:**  We would concede that point.

8          **THE COURT:**  And Facebook's as well?  Facebook's

9  policies -- also Meta's policies -- if they were agreed to --

10  but, as I know, it's in dispute -- but those policies, on their

11  face, do authorize the conduct that's at issue in this case.

12          **MR. ELIAS:**  To the extent anyone is reading those

13  policies, yes, Your Honor.

14          **THE COURT:**  Great.  Well, even if they don't read

15  them, on their face, they authorize them; right?

16          **MR. ELIAS:**  Very well.

17          **THE COURT:**  Right.  And another small item:  You don't

18  oppose Patreon's request for judicial notice.  They attached

19  various archive versions of the sign-up page and the terms of

20  use and that sort of thing.  You don't oppose that; do you?

21          **MR. ELIAS:**  Not for purposes of this motion.

22          **THE COURT:**  Right.

23      The -- going to the as-applied challenge, you know, I

24  thought it was odd that Patreon didn't address any of the

25  Southern District of New York cases that address the Michigan

1    Personal Privacy Act.  And I wanted to -- because those cases,

2    as we know -- right? -- rejected the as-applied challenge and a

3    couple of the cases rejected the facial challenge and held that

4    strict scrutiny doesn't apply.  Did Patreon want to say

5    anything about those cases?

6              **MR. NORTON:**  Sure.  Thank you, Your Honor.

7          Although both parties spent some time on those cases -- or

8    the plaintiffs did at the motion to dismiss stage -- neither

9    side really focused on those now.  Those cases, of course, were

10   decided at the pleading stage.  This is summary judgment.  So I

11   think, for that reason, it's different.  It's also different,

12   though, because those are -- that's a very different statute.

13   And I think it's very hard to defend the VPPA by reference to

14   those decisions.

15         In particular, you know, we pointed out that, in the case

16   of the VPPA, there's this unworkable consent regime.  That's

17   not present in the Michigan statute, which only required

18   written consent.  There's also a significant difference that

19   the Michigan statute only permits actual damages.  And as we

20   pointed out with respect to this statute -- the VPPA -- it

21   imposes a minimum presumed damages that is unrelated to the

22   actual harm.

23         So there were a number of issues with respect to those

24   cases that I think take them out of what we're talking about

25   here.  But probably, most importantly, is that it was decided

1   at the motion to dismiss stage, and this case is not.  So we

2   have evidence about actual consent.

3       Consent was not argued in those cases.  In fact, it was

4   conceded consent was not obtained at all, very different,

5   obviously, from what's been established already in this hearing

6   this morning.  So I just think those cases are not really

7   similar enough to be helpful to the Court's analysis today.

8       And then I would also point out, with respect to whether

9   strict scrutiny applied, as the Court's already found on the

10  facial challenge, in the Ninth Circuit, *IMDb.com*, as well as

11  other cases, but certainly that one, requires that the Court

12  apply strict scrutiny in this case in the Ninth Circuit.  So

13  the Southern District was just faced with a different law,

14  different authority, and different facts.

15      **THE COURT:**  Well, it's -- that's read like an opening

16  argument for a jury, not an argument for a judge.  But I'll

17  pass by it, because I'm not -- it's not particularly useful to

18  me.  No one conceded consent.  And what Mr. Elias said didn't

19  concede consent.  They've applied -- their reference to strict

20  scrutiny is interesting.  It's hard to know exactly what they

21  were talking about.  And I don't think I said strict scrutiny

22  applies to everything in a facial challenge.

23      And the difference is -- but the -- but your -- the

24  substantive argument you make is the consent requirement and

25  the statutory damages requirements are different between the

1    two statutes.  But, otherwise, the -- you know -- I think it's

2    actually bad for you that there is a 12(b) motion as opposed to

3    a summary judgment motion.  But I'll move on from that.  That's

4    not -- not really what I was looking for.

5            **MR. NORTON:**  Well, I apologize --

6            **THE COURT:**  Yeah, go ahead.

7            **MR. NORTON:**  Obviously, those cases do address a

8    similar statute.  When I say that consent here is conceded,

9    certainly we raised, at the summary judgment stage, that there

10   was consent, and it was not disputed.  And that's all I mean by

11   that.  I do think, though, that it is important that the

12   argument --

13           **THE COURT:**  I think consent is very much disputed.  I

14   have no idea what you were talking about.  The consent is

15   disputed.  I mean, it's not disputed that they went through the

16   steps as to whether or not that consent is effective.

17           **MR. NORTON:**  So they -- there's no evidence offered by

18   the plaintiffs that they did not agree to the terms.  They --

19   we put in evidence that they agreed to the terms.  The terms do

20   cover the conduct at issue here.  And they did not offer any

21   evidence that -- to dispute that they actually agreed.  And

22   that's all --

23           **THE COURT:**  Do you think -- do you think it's -- as a

24   matter of law, that's effective consent, in this case, because

25   of the way that the website operates?

1        **MR. NORTON:**  Yes, I do.  The -- the terms of use are

2  an effective contract between the plaintiffs and the -- and

3  Patreon.  And I --

4        **THE COURT:**  Well, I'm talking about consent for the

5  purposes of the VPPA; right?  It's a different question as to

6  whether or not that consent, whatever it was, is effective;

7  right?

8        **MR. NORTON:**  So I want to be clear the distinction I'm

9  making.  And I apologize.  We are not arguing that the consent

10  that was obtained was a consent that complied with the VPPA.

11        **THE COURT:**  No, no, I'm not -- I misspoke.  That is

12  sufficient for you to raise it in connection with an argument

13  about challenge and the constitutionality.  Because there's

14  consent and there's consent; right?

15        **MR. NORTON:**  Yes.

16        **THE COURT:**  It may or may not be, for some purposes, a

17  sufficient contract between the parties.  But the question in

18  this case is whether or not -- when you don't read it -- and

19  there's nothing that calls your attention to the particular

20  consent -- that it is sufficient for the Court to take it into

21  account in deciding the burden or deciding the issues that come

22  up in the as-applied challenge or in the facial challenge.

23  That's really what I'm addressing.

24        **MR. NORTON:**  I -- all right.  And I absolutely agree.

25  There is a disagreement between the parties as to whether --

what the government and the plaintiffs have characterized as
informed consent is really what is required in order to -- for
us to make the arguments that we've made under the First
Amendment.  So I do acknowledge that distinction, and I'm, you
know, certainly prepared to address that.

       **THE COURT:**  That seems the material one to me.

       **MR. NORTON:**  Thank you.  Would you like me to address
that now?

       **THE COURT:**  Yes, please.  Go ahead.

       **MR. NORTON:**  So the -- the consent that's obtained
here is effective consent; right?  So the issue that we have
here is -- and if you look at the cases we've cited that are
more traditional privacy torts -- when a party has consented --
the courts don't make a distinction between the type of consent
that is effective, say, in a contract context.  So, you know,
did you, in fact, consent to the terms when you clicked on the
link?  When a party actually agrees to those terms, then that
would be a defense in a contract case.  That would be a defense
in a privacy tort -- common law privacy tort case.  And we
cited cases to that effect in our reply brief.

    So that is a legally effective consent.  And the question
then becomes -- and this is a narrow issue with respect to our
as-applied challenge -- but with regard to this specific issue
of consent on the as-applied challenge, is there a sufficient
interest -- is the regulation of speech here sufficiently tied

1    to the interest in privacy -- that when a user gives legally

2    effective consent to the disclosure, that the defendant should

3    be prohibited from doing what the consumer actually said that

4    they could do in a contractually binding way.

5          And for the reasons we've discussed more broadly, there's

6    not a sufficient governmental interest in overriding that

7    legally effective consent to prohibit speech.

8               **THE COURT:**  Mr. Elias?

9               **MR. ELIAS:**  May I respond?

10              **THE COURT:**  Yes, please.

11              **MR. ELIAS:**  Well, this is consent protocol that

12   Congress established.  And Congress has latitude to do that

13   when it's regulating in the economic domain.  So, you know, the

14   question is not whether, in a vacuum, if this were a contract

15   dispute, these plaintiffs consented to a private policy or what

16   have you.  The issue is that it's undisputed that Patreon never

17   went through the stand-alone consent form that Congress

18   established, which --

19              **THE COURT:**  So I'm going to -- I'm going to stop you

20   there.

21              **MR. ELIAS:**  Yeah.

22              **THE COURT:**  Because that's not responsive.  This is

23   not a question of whether or not Patreon complied with the

24   statute.  They did not.  That's not disputed.  This is a

25   question of whether there is a substantial government interest

 1  sufficient to justify the restriction under the as-applied

 2  challenge.  And the argument that they're making is that where

 3  there is consent, there is no substantial government interests.

 4  And they argue there is consent because you did whatever was

 5  necessary under the contract to accede to the -- to agree with

 6  the terms that you just say include authorization of these --

 7  of this conduct.

 8      Their argument is that, therefore, there's no government

 9  interest in that consumer privacy where you've already

10  consented to the disclosures.  That's the argument.  It's not

11  about whether or not they complied with the statute.  If you

12  want to respond to that argument, I'd be happy to hear from

13  you.

14      **MR. ELIAS:**  Well, yes, I -- again, this was Congress'

15  decision.  And, at the last argument, I believe I heard Patreon

16  say that they acknowledge this is a compelling interest in

17  privacy that Congress set up.  So it's really up to Congress to

18  establish the quantum of consent that is going to suffice for

19  the company -- the video provider -- to go about making these

20  disclosures.  And it's absolutely compelling interest to -- and

21  it's within Congress' authority -- to say we don't want to have

22  sham consent.  We really care that consumers be able to be

23  protected in the videos that they're watching.

24      **THE COURT:**  Well, okay.  But, bear with me, because

25  you're still not responding to this.  The hypothetical is the

consumers have actually consented.  That's the hypothetical.

What is the substantial government interest in imposing an

additional consent requirement?  What's the substantial

protection that there is interest that's being protected by

imposing the additional consent requirement where consumers

have already agreed?

       **MR. ELIAS:**  Well --

       **THE COURT:**  That's the hypothetical.

       **MR. ELIAS:**  Yes.  Yes.  So --

       **THE COURT:**  Pretend that they've -- pretend that

they've already agreed.

       **MR. ELIAS:**  So the compelling interest is -- it's

right there in the legislative history -- that Congress was

concerned about sham consent.  A separate form is needed --

       **THE COURT:**  Well, no, no, no.  So that's not -- that

is not responsive to this.  Because the argument here -- you're

missing the argument.  The argument here is the hypothetical is

there is an actual consent.  It's not sham.  There's an actual

consent.  So, hypothetically, the only way that somebody gets

their information disclosed by this pixel is with their consent

and they've actually consented.  In that hypothetical, is there

any remaining government interest?

       **MR. ELIAS:**  Well, I think there is.  And the interest

is, again, that this is important information to protect.  So

if you look at a statute like HIPAA, there's a similar consent

1  protocol where the provider has to get a separate authorization

2  in writing if they're going to disclose your medical

3  information for a nonmedical reason.

4      Now the medical provider could try to do what Patreon did

5  and put a privacy policy up that most people are not actually

6  scrutinizing.  And then the medical provider could, in turn,

7  say, well, they consented to disclose the medical information.

8      That doesn't mean that this is not a compelling state

9  interest to protect your medical information.  Congress said

10  the opposite.  And it's very much the same here, where you have

11  to consent in a particular manner so that the compelling state

12  interests is advanced under the statute.

13      And I don't think that it's up to the federal courts to be

14  questioning Congress' assessment of these consent protocols,

15  which also are the same as in certain state laws, like the

16  Illinois Biometric Act.  So we resist this notion that people

17  are consenting when that seems to be a fiction.  And that's

18  exactly why Congress wanted to make sure that people actually

19  knew what they were doing.

20      And they actually made it easier to abide by this regime

21  with the amendment that was at the tech company's behest so

22  that they can get consent online and it lasts for two years.

23      Now, I know I'm talking about the statutory consent again.

24  But I think we have to take the statute as it exists.  And

25  there is a compelling interest there in protecting the personal

1    privacy of these consumers.

2         **THE COURT:**  So while you're on that subject, you

3    didn't respond, in your briefing, to the arguments about

4    *Buckley v. Valeo* and the argument about Justice Kavanaugh's

5    concurrence in *Comcast Cable* about -- about this issue.

6    Perhaps you would like to respond to that.

7         **MR. ELIAS:**  Yes, Your Honor.  So there's a sound bite

8    in *Buckley v. Valeo*, the campaign finance case from the '70s,

9    about how the government can't restrict the speech of some

10   elements of society to enhance the relative voice of others.

11   But that doesn't really capture what's happening here.  Because

12   the relative voices of some are not being elevated.  It's the

13   interest of the people as a whole that are being elevated by

14   this law.

15        And these restrictions only apply to companies who are

16   most likely to have and disclose what videos you watch, which

17   is nobody's business.  And that limitation doesn't exist in

18   order to enhance the relative voices of a subset of society.

19   Instead, it allows every American to watch and think about the

20   videos they're interested in without being surveilled.  And

21   that enhances the free exchange of ideas and innovation.

22        And that's 100 percent consistent with the *Buckley* code,

23   which goes on to say, in the same sentence, that the First

24   Amendment is framed to assure that unfettered interchange of

25   ideas for bringing about social change desired by the people.

1   Now, that is the constitutional purpose that Congress had in

2   mind when it enacted the statute.

3        **THE COURT:**  So, Mr. Norton, do you want to respond to

4   that?  I'm -- I've got to tell you, I'm -- I don't frame it

5   quite the same like Mr. Elias does.  But I'm persuaded that

6   there is -- notwithstanding a check-the-box on consent -- on

7   terms -- not an elimination of any government -- substantial

8   government -- interest in privacy and intellectual freedom, as

9   reflected in what Congress did.  Do you want to respond to that

10  and also those comments about *Buckley/Valeo*?

11       **MR. NORTON:**  Sure.  So I think, on the congressional

12  judgment, at -- what level of consent is required to protect

13  the privacy interest of consumers?  We know that there is a

14  less burdensome, less onerous way of obtaining consent that

15  Congress has employed for other privacy statutes that involved

16  the exact same interests.  So the notion that there is a

17  concern that consent of the type that is obtained when a

18  consumer agrees to -- knowingly agrees -- to Patreon's terms --

19  the idea of that consent is ineffective.

20       Congress had no concern about that in the Cable

21  Communications Privacy Act or the Satellite Viewers Act or in

22  the Electronic Communications Privacy Act, none of which

23  require the kind of consent -- separate consent form -- that

24  the VPPA does.  So that's part of why we argue that there's not

25  a sufficient relationship between the asserted privacy

```
 1   interest, which is the same in those other statutes.

 2          THE COURT:  Just because -- just because Congress, in

 3   one statute, chose not to do it that way?  That's -- that's not

 4   your strongest argument.  Let's just put it that way.

 5          MR. NORTON:  Well, it -- I do want to emphasize that

 6   our argument on the as-applied challenge is not solely about

 7   consent, nor about just this aspect of consent, but it is

 8   absolutely relevant that there are less burdensome

 9   alternatives.  And that is part of the Central Hudson Test:  Is

10   are there less burdensome alternatives that would achieve the

11   same interest -- governmental interest -- in consumer privacy?

12   And we know that there are, because Congress has used them in

13   the statutes that serve the exact same purpose.  So it's

14   relevant.  Is it my -- would I stand on that argument alone?

15   Of course not.  But we know that there are these other

16   alternatives.

17          And as the government pointed out in its brief, those

18   other statutes -- they don't just have a lesser consent --

19   right? -- requirement.  They also have different provisions

20   that foster speech rather than prohibit it.  So, for example,

21   they require that the provider give notice to the consumer of

22   the type of information that the provider collects and might

23   disseminate; right?

24          So -- and this comes up in many of the Central Hudson

25   cases; right?  We looked at, well, what are the less burdensome
```

alternatives?  One is, instead of restricting the speech, to
provide additional information to the consumer so they can make
better informed choices; right?  That seems to go to what
Mr. Elias is arguing.  There is a different way to achieve the
interests that is less burdensome on speech.  Congress has done
that in other contexts.  And that's part of the problem with
the consent regime here.

     **THE COURT:**  I guess, though, that sounds -- that reeks
of strict scrutiny.  I mean, the test is whether the
restrictions are reasonable and not more extensive than
necessary.  And that -- that gives Congress a lot of leeway in
figuring out multiple ways of dealing with a problem.  It
doesn't mean that just because in one -- I mean, it seems like
you're proving too much.  That any time there's some other way
of doing it and that Congress has done it, then they have to do
it that way.  They can't -- if that -- if that arguably works.

     **MR. NORTON:**  I'm not arguing least restrictive.  But
I -- again, the standard is that one of the considerations --
and I'm only arguing it as one consideration -- but one of the
considerations that goes to fit is, are there less burdensome
alternatives?  And, here, we know that there are.  And so it's
one consideration the Court should take into consideration on
the issue of consent.  And --

     **THE COURT:**  Well, isn't it -- isn't it the flip side?
You've got to show that it's overly burdensome.  It's not that

1   there are less burdensome alternatives.  It's that the ones

2   that they picked is overly burdensome.

3       **MR. NORTON:**  And I think that is part of the analysis.

4   Actually, the standard is the availability of less burdensome

5   alternatives is relevant to the question of whether there is a

6   fit.  That is -- so, now, do I have to show that it is overly

7   burdensome?  I do have to show that it impermissibly restricts

8   speech.  And I think I can show that the consent requirement is

9   overly burdensome.  But if I can just address the *Buckley/Valeo*

10  point, and then I'll return to that.

11       **THE COURT:**  Sure.

12       **MR. NORTON:**  So on the *Buckley/Valeo* point, I don't

13  understand Mr. Elias' argument to really address what Justice

14  Kavanaugh has sort of elevated in his *Comcast* concurrence, but

15  also it's -- in *Buckley/Valeo* -- it's also come up recently in

16  the *NetChoice* cases that were argued before the Court, where a

17  number of justices made the same point.

18     There is a party whose speech is being restricted; right?

19  It is Patreon's and all others who are in the same situation

20  who are regulated by the VPPA.  So the *Buckley/Valeo* principle

21  is that you don't restrict the speech of some in furtherance of

22  elevating the speech of others; right?  And that is precisely

23  what is at issue here.  Now --

24       **THE COURT:**  What if I say that it's privacy, and

25  there's no privacy issue in *Buckley v. Valeo* or in *Comcast*?

1          **MR. NORTON:**  I don't -- I think that that -- that the

2     principle in *Buckley v. Valeo* is broader than that; right?

3     The -- and I don't think this is -- I understood this issue to

4     really go to a different point that plaintiffs had raised.  And

5     the different point is that the plaintiffs have argued that the

6     real interest at stake here -- the real interest of the VPPA --

7     is the values of the First Amendment.

8          And so the VPPA protects privacy in furtherance of the

9     First Amendment and, therefore, it is justifiable to restrict

10    the speech of some -- videotape service providers -- in order

11    to enhance the speech of consumers who would be willing to

12    consume material that arguably they otherwise would not.

13         And if that is the argument -- well, *Buckley v. Valeo*

14    says, "No, you can't do that."  If the argument is that VPPA

15    protects privacy, and privacy is a compelling interest or a

16    substantial interest, then I don't think that *Buckley v. Valeo*

17    is directly on point there.  But it's a different set of

18    arguments, because now we've changed the conversation.  Now the

19    interest is privacy, not the First Amendment, which I think is

20    the right way to think about it when you take the First

21    Amendment off the table as the interest that's being furthered

22    by the VPPA.

23              **THE COURT:**  Well, I think it's both.  I mean, it's --

24    it's -- I think it's both.  And I'm not sure that *Buckley v.*

25    *Valeo* or Justice Kavanaugh's comments sweep into everything

1    that is covered by the First Amendment.  The First Amendment

2    has a lot of provisions in it.

3        And so I'm not really sure that -- to the extent that

4    it's -- it is a protection of individuals' intellectual choices

5    to watch something -- that that is -- it's closer to privacy

6    than it is to speech.  So I'm not sure that -- even if you

7    characterize it the way you did -- I disagree.  I think it's

8    both -- that you'd still end up with -- at the same point that

9    Kavanaugh's concurrence in narrower.  It speaks to a particular

10   thing.  That also is Kavanaugh's concurrence.  But that what

11   they're talking about is favoring one group over another.

12       In those cases -- especially *Buckley/Valeo* -- is directly

13   trying to favor one group over another, intentionally trying to

14   restrict the speech of someone so that they would have less of

15   a voice in the public dialogue.  This is not anything like that

16   case.  For one thing, this is commercial speech.  It's nothing

17   like that.  But, for another thing, it's not -- I'm not trying

18   to say that you can't have a voice in the public dialogue or

19   anything like that.  I just -- I find it very difficult to

20   apply either of those things to this case.

21       But let's -- I wanted to -- you wanted to say one more

22   thing.  And then I want to see if the United States wants to

23   weigh in on any of these things we've been discussing.

24           **MR. NORTON:**  Sure.  So the Court suggested that,

25   ultimately, we need to show that the consent regime is not

1    just -- not merely that there are less restrictive

2    alternatives -- but that the consent regime that does exist is

3    unworkable or burdensome -- "overly burdensome" -- I think was

4    the Court's expression.  And we believe we have shown that.

5         In our opening brief, we explained why the consent regime

6    weighed out by the VPPA, which is unique, is unworkable on the

7    facts of this case for Patreon or a similar web-based provider.

8    And we have Mr. Byttow's declaration, and he walked through why

9    it doesn't work.

10        **THE COURT:**  Well, he doesn't really walk through why

11   it doesn't work.  Let's move to that.

12        **MR. NORTON:**  Okay.

13        **THE COURT:**  And I don't know how much we can get into

14   in a public session.  But his declaration, and the other

15   declaration you put in on this, seem, to me, extremely general.

16    And what they don't say is that it's overly burdensome.  It

17   says things like they -- we'll -- they definitely show a

18   burden.  There's no question they show a burden.  But it's not

19   just any burden that is required in order to show the

20   invalidity here.

21        And I don't -- my problem with the way they describe it is

22   twofold:  One is, when they describe the burden, it's pretty

23   general.  And it doesn't -- and all it says is it requires

24   substantial work, essentially, or it degrades this

25   substantially.  It doesn't give the kind of specifics that you

1   could use to say, well, that is so substantial that it's overly

2   burdensome in the context of this analysis.  It's some burden.

3   But I found it very difficult, looking at those, to say, well,

4   he's definitely met his -- shown that the burden is so

5   substantial that the Court should find that the restrictions

6   are not -- are more extensively necessary -- that the

7   restrictions are overly burdensome.

8        So I'm wondering if you -- and maybe I'm missing something

9   in these declarations, but I thought I read them pretty

10  carefully.  But maybe I'm missing something.

11           MR. NORTON:  Well, let me take that in several pieces.

12  So, first, I think it's actually the plaintiffs' and the

13  government's burden to show that the statute is no more

14  extensive than necessary.  So we --

15           THE COURT:  Oh, I think -- I -- where is the case that

16  says that in a challenge -- facial challenge -- in a challenge

17  to the as-applied -- when you're trying to find it -- have me

18  find -- it's unconstitutional that you are anything but the

19  person in -- who has the burden of proof.  I think you have the

20  burden of proof.

21           MR. NORTON:  I believe it -- when a statute regulates

22  commercial speech, we have to show that there's a regulation of

23  commercial speech.  I think it's the government's burden to

24  show that it is no more extensive than necessary.  But I'll --

25  but I'll take on the burden for the argument.

1    So Mr. Byttow's declaration I think makes, you know, two

2    significant points, and that the record that we have before us

3    now reinforces those.  So one is that -- what Mr. Byttow

4    says -- is that to provide a consent regime that the VPPA

5    requires would require substantial engineering work, if it

6    could be accomplished at all.

7    It's never actually been accomplished at Patreon.  They

8    don't have it.  They've never had it.  They've not been able to

9    do it, to date.  So if it could be done at all, it would

10   require substantial engineering.  Now, I agree, that is

11   general.  But that is a significant burden.  And he talks

12   through it some -- a little more detail -- at a high level what

13   that burden would be.  He also talks about if you could even do

14   it.

15   So, secondly, let's assume that that substantial

16   engineering work -- which I think substantial engineering work

17   is a burden -- if that substantial engineering work could be

18   done at all, it would, one, degrade the user experience in a

19   way that would interfere with Patreon's ability to do its

20   business.  And, two --

21           **THE COURT:**  But that's --

22           **MR. NORTON:**  -- it's unclear whether --

23           **THE COURT:**  That's this much.  I mean, you know, if I

24   have to check a second box, I mean, you know, or I have a third

25   box every time I do something that says you can get out of this

1   consent, I mean, is that -- that's what you're talking about?

2          MR. NORTON:  Well, I think -- so if we get into the

3   details of what would, case by case, revocation look like --

4   what would it take to -- so it would be more than, I think,

5   just a box.

6          THE COURT:  Maybe it's just a banner across the top of

7   the page.

8          MR. NORTON:  I don't think that -- it's -- well, so

9   let me -- I'll come to that in just a moment.  But let me

10  finish the thought that I had a moment ago.

11         So it would -- he says it would degrade the user

12  experience.  And there's no challenge to that.  And he says

13  that it would also require modification of the other tools that

14  they have to manage the website -- tools they don't even have

15  now.  So there's three categories there, broadly.

16         Now, what the plaintiffs tried to do, in the supplemental

17  briefing, is say, no, this is actually easier than you think.

18  And there actually are tools.  And I'll be a little general

19  here, because I think some of this is still subject to --

20         THE COURT:  Yes.

21         MR. NORTON:  But there are some other tools provided

22  by third parties that would work.  And Patreon even has them.

23  And what we know now, from the briefing on that, is that, in

24  fact, those tools do not even purport to address this issue.

25  They cannot do -- so that the available third party tools out

1   there, that you can buy from somebody else who's in the

2   business of offering these tools to websites like Patreon --

3   they cannot do this.  They cannot provide the solution that the

4   VPPA requires.  And --

5        **THE COURT:**  I -- so what?

6        **MR. NORTON:**  Well, if neither Patreon has figured out

7   how to do it, nor --

8        **THE COURT:**  There's no evidence that Patreon has

9   devoted any substantial resources to try to figure out how to

10  do it.

11       **MR. NORTON:**  Well, Mr. Byttow --

12       **THE COURT:**  That's definitely not in this declaration.

13       **MR. NORTON:**  Well, so Mr. Byttow, in his declaration,

14  says this is -- it would be difficult to do.  The plaintiffs

15  suggested that it was doable.  And in opposition -- right -- so

16  it's a summary judgment motion.  We put forward evidence that

17  it would be -- that there would be a substantial burden to come

18  up with a solution.

19       The plaintiffs have put up nothing -- right -- that they

20  haven't gone and said, well, look, here's another website that

21  has a VPPA-compliant consent regime; right?  They haven't done

22  that.  And plaintiffs' counsel is the plaintiffs' counsel in

23  many VPPA cases; right?  They know what they defendants are

24  doing in these cases.  There's no evidence anywhere in the

25  record that anyone has a VPPA-compliant consent regime for any

1  website.  And the reason why --

2          THE COURT:  Well, there's a reason for that.  No one

3  thinks they have to have one.

4          MR. NORTON:  I think -- if no one thought they had to

5  have it three, four years ago, before all these lawsuits got

6  filed, they very well might think they would like to have it

7  now.  And the companies like the third party the plaintiffs

8  have identified have an incentive to offer that product.  But

9  it doesn't exist.

10     Nobody's given you a single example of any tool that would

11  allow you -- an in-house tool, third-party tool, anything --

12  that would allow anybody to do what the VPPA requires.  And

13  what -- all you have in the record is Mr. Byttow's declaration,

14  which, although general, says it would be very challenging to

15  do.  And, if it could be done, it would interfere with the user

16  experience.  On the other side, you don't have anything.

17     And if you look at the *Baldwin* case -- which is the only

18  case anybody's pointed to on this -- the *Baldwin* case is the

19  Ninth Circuit's many years ago.  But it deals with, you know,

20  is a burdensome consent requirement, all by itself, enough to

21  violate the First Amendment?  And, in *Baldwin*, the Ninth

22  Circuit said "yes."

23     And there all it was, was -- you know -- you have this --

24  it was a law about whether you could put signs in people's

25  yards; right?  And so what -- you got to get consent.  And so

1   what -- the statute said you have to get written consent.  And

2   the difference between written consent and consent was enough

3   to violate the First Amendment; right?

4        So, here, you know, is this -- is the VPPA more onerous

5   than the written consent requirement in *Baldwin*?  Absolutely,

6   it is.

7             **THE COURT:**  Okay.

8        Does the United States want to weigh in on any of these

9   issues?  Otherwise, I'm going to move on to -- I'm going to get

10  a response from Mr. Elias -- and then I'm going to move on to

11  the facial challenge.

12            **MS. VIGEN:**  If Your Honor has anything specific he

13  would like the United States to address, I would be more than

14  happy to.  I think that, one, if Your Honor had any further

15  questions, in particular, about the interest of the government

16  in the consent provisions, I'd be happy to address that.  But I

17  do think that my colleague in his -- some of his later

18  answers -- got to where the government would have also gotten

19  on that.

20            **THE COURT:**  Okay.

21       Did you want to say anything, Mr. Elias?  And then we'll

22  move on to the facial challenge.

23            **MR. ELIAS:**  Well, I guess, I would just take a step

24  back and say that the consent part of this law is an

25  accommodation that allows companies to make these disclosures.

1    And there's a simple answer, if they can't get the consent

2    mandated by Congress, which is to stop making these

3    disclosures.  You know, there's this VPPA case against Walmart

4    where Judge Seeborg said it's really just not that burdensome

5    to ask a consumer to click a separate box.  We've all seen it.

6        I'm having trouble understanding why it would be so

7    difficult.  They've never denied that they can actually have

8    this capability of creating a consent provision that complies.

9    They just haven't done it.  They haven't even tried.  It seems

10   like they're essentially laundering their distaste with having

11   to come clean with their customers by making a constitutional

12   challenge.  But the actual reason that they don't like the

13   statute's consent provision is that they would lose customers

14   if the customers knew what Patreon was doing with their

15   information.

16       That's kind of the whole point.  Congress decided that

17   companies shouldn't be making this type of disclosure because

18   of the important constitutional interest at stake.  And Patreon

19   is unhappy with its ability to get consent.

20          **THE COURT:**  So I'm not --

21          **MR. ELIAS:**  They report -- they should go to Congress.

22          **THE COURT:**  Yeah.  I'm not really interested in that

23   kind of argument.  Because that's for the jury.  That's not for

24   me.  You've got to respond to the very specific things that

25   Mr. Norton was saying.  And that is you haven't put in any

```
 1   evidence, he says, that there is any way to do this that isn't
 2   overly burdensome.  You haven't put in any evidence.  You've
 3   pointed to the third parties.  They put in declarations from
 4   the engineers and others showing that it doesn't actually do
 5   what the VPPA requires, and it doesn't work that way.
 6        So I'm wondering -- and we've been careful when we're
 7   talking about that, so I'm trying to be careful when I'm
 8   talking about that -- but what he's faulting you for is not
 9   putting in any evidence to rebut his evidence that this is --
10   would require substantial engineering work, would degrade the
11   user experience.  What's your response to that?
12        MR. ELIAS:  Well, Mr. Grille informs me that we have
13   put in evidence that they could implement consent in our
14   supplement.  And, again, it was the tech companies led by
15   Netflix that proposed this consent protocol that was amended in
16   20 --
17        THE COURT:  Well, okay.  One would think that you
18   could come up with some evidence that some tech company has
19   actually implemented this consent.  You got any of that?
20        You didn't.  And what Mr. Grille, I assume, is talking
21   about is the stuff that was rebutted by Patreon.  So, no, that
22   submission actually doesn't work.  So -- well, I can look at
23   the record myself and figure out what it is.  Let's move on
24   to --
25        MR. NORTON:  Your Honor, may I make one point in
```

1  response to an earlier question you asked me?

2          **THE COURT:**  Sure.

3          **MR. NORTON:**  Just with respect to who has the burden.

4          **THE COURT:**  Yeah.

5          **MR. NORTON:**  Supreme Court case of *Ibanez* citing

6  *Central Hudson* (as read):

7              "Commercial speech that is not false, deceptive,

8          or misleading can be restricted, but only if the

9          state shows that the restriction directly and

10         materially advances a substantial state interest in a

11         manner no more extensive than necessary to serve that

12         interest."

13     And then cites *Central Hudson*.  I do believe the law is

14  quite clear that it is not our burden; it is their burden.  And

15  they have not met it.

16         **THE COURT:**  Okay.

17     Do you want to respond to that, Mr. Elias?

18         **MR. ELIAS:**  Well, once we get into the facial

19  challenge, that's a heavy burden --

20         **THE COURT:**  Well, now -- you're really going to have

21  to stop doing what you do.  When I ask you a question, I expect

22  you to answer it directly.

23     Who has the burden of proof of the substantial government

24  interest and the directly advancing that interest in a way that

25  is reasonable and not more than extensively necessary -- not

1  overly -- not overly burdensome?  Do they have the burden of

2  showing that, or do you have the burden of showing that the

3  restrictions are no more extensive than necessary?

4          **MR. ELIAS:**  My understanding is that it's the

5  proponent of the law as being constitutional who bears the

6  burden, but it's not a heavy burden.

7          **THE COURT:**  So you do?

8          **MR. ELIAS:**  I believe so.

9          **THE COURT:**  Okay.  Great.

10      On the -- I don't have much to say about the facial

11  challenge.  I really think the -- I mean, I think the

12  as-applied challenge is tough sledding.  The facial challenge

13  is -- I'm very reluctant to find any statutes, as I should be,

14  invalid in all situations.

15      I guess you don't disagree, Mr. Norton, that there is a --

16  certainly a huge reach of this statute, which is commercial

17  speech.

18          **MR. NORTON:**  Well -- so let's talk -- plainly

19  legitimate sweep is what we put on the other side of the

20  (indiscernible).  And so when we talk about "plainly legitimate

21  sweep" --

22          **THE COURT REPORTER:**  Excuse me.  "The other side of"

23  what?

24          **MR. NORTON:**  The other side of the ledger.  I'm sorry.

25          **THE COURT REPORTER:**  Thank you.

1        **MR. NORTON:**  So is it huge?  I don't agree that it's

2    huge.  And let me explain why.

3        You know, the origins of this plainly legitimate sweep

4    test, you know, is *Broadrick v. Oklahoma*.  And what the Court

5    focused on there is plainly legitimate sweep -- was the stuff

6    that wasn't speech.  It was conduct.  And it said, well, okay,

7    Congress can clearly regulate conduct, so that doesn't

8    implicate any First Amendment issues.  So that's plainly

9    legitimate sweep.

10        So, here, we have only speech.  And then the question is

11    the commercial speech -- and we agree, for purposes of this

12    motion, that what they're talking about, when they talk about

13    the use of pixels, is commercial speech.  But is it plainly

14    legitimate, and is there lots of it?

15        I don't think -- again, their burden -- I don't think --

16    well, actually, on this, it's not as clear who has the burden

17    of showing this aspect of it.  But the evidence on the other

18    side of what is actually plainly legitimate sweep of the

19    VPPA -- all they pointed to on the plaintiffs' side is --

20    literally, all the evidence that they pointed to -- is they

21    have this one document they submitted, which is five columns of

22    a spreadsheet, I think, with some numbers.  We don't know what

23    those numbers are or what they mean.

24        **THE COURT:**  We'll get to that.

25        **MR. NORTON:**  On the government side, what we have is,

1  well, there's a lot of lawsuits involving the VPPA.

2      **THE COURT:**  Well, but you don't -- you don't disagree.

3  I mean, because I don't want to let this rise or fall on how I

4  interpret that exhibit to the Tan declaration.  You don't

5  disagree that the pixel transmits a lot of data.  And that that

6  transmission of data is commercial speech.  And you don't

7  disagree, for purposes of this motion, that a lot of that is

8  PII, for purposes of the statute, for purposes of this motion.

9  You may contest it later, et cetera, et cetera.  But for

10  purposes of this motion, I think you have agreed not to get

11  into that.

12      **MR. NORTON:**  Sure.  So, for purposes of the motion,

13  yes, I agree that the pixel transmits PII.  And I'll -- I don't

14  think this was actually previously addressed or conceded.  But

15  with respect to everybody else's use of the pixel -- you know,

16  the broad sweep -- I'll concede that too.  So the pixel is

17  being used.  The pixel is transmitting information.  The pixel

18  is transmitting the kind of information that the VPPA is

19  intended to address.

20      **THE COURT:**  Okay.

21      **MR. NORTON:**  So conceding all that for purposes of the

22  argument, is it still overbroad?

23      **THE COURT:**  In large amounts.  I mean, it's not --

24  it's not three events.  It's millions and millions of events;

25  right?

1        **MR. NORTON:**  It is -- it is.  It is a lot of discrete

2   events.  And if you add all those up, you will get very large

3   numbers.

4        I still would submit that the VPPA is overbroad on its

5   face.  Because when you look at the amount of speech that is

6   constrained -- prohibited -- by the VPPA -- and we've cited all

7   those examples -- that is a tremendous volume of speech.  And

8   the requirement here is not that we show that there is more of

9   one than there is of the other or that there's some sort of,

10  you know, census counting; right?

11       It's interesting, in the *Stevens* case, which was the

12  animal cruelty videos -- right -- the -- Justice Roberts'

13  opinion actually quantified it, to the extent he quantified it

14  at all, in terms of dollars; right?  Well, you have one

15  industry that is clearly being prohibited from engaging in

16  speech in a way that violates the Constitution.  It's a big

17  industry.  People spend a lot of money on that industry.  On

18  the other hand, we have the stuff that is clearly within the

19  legitimate sweep, and it's like a smaller industry.

20       So I don't think that just counting how many bits get sent

21  on one side versus the other is the way to do the analysis.

22  And we've identified very substantial important speech the VPPA

23  clearly prescribes.  So I think we do meet our burden here.

24       And if you look at the other cases, for example -- you

25  know, *Stevens* is a good one -- but the other overbroad --

1  overbreadth cases -- I think we've actually presented more

2  evidence of actual speeches prescribed by a statute in

3  violation of the Constitution than any other case that I can

4  find.  And that -- that -- any other case -- including but not

5  limited to *Stevens*.  So I think that it actually is a case in

6  which the -- we meet that burden of overbreadth.

7        THE COURT:  So I'm going to go back to Mr. Elias in a

8  moment, but I want to ask you one more question about that.  I

9  don't understand how your interpretation of the VPPA and

10  2255A [sic] aren't irreconcilable.  I just -- I don't

11  understand.

12        MR. NORTON:  I'm sorry.  Was that question addressed

13  to me or to Mr. Elias?

14        THE COURT:  No.  To you, Mr. Norton.  I mean, it seems

15  to me your interpretation of those two statutes makes them

16  irreconcilable.  And that is one of the -- you know -- and that

17  deals with certain statutory interpretations, like it was

18  repealed, or it was partially repealed, or it was changed, or

19  it was -- there was an exception created by this.  Why isn't

20  that the case?

21        MR. NORTON:  So it's a very easy answer.  They are not

22  irreconcilable.  2258A does not require you to do anything.  It

23  only requires you to disclose potential -- "you" being a

24  regulated provider -- requires you to disclose information

25  about suspected CSAM if you are actually -- have actual

1  knowledge of it; right?

2     And so the way that you can comply with both statutes is

3  you stop looking; right?  Now, is that what Congress wanted?

4  No, of course not.  But the problem we have here is that --

5          **THE COURT:**  Well, but that doesn't -- that does not

6  reconcile the statutes.

7          **MR. NORTON:**  Well --

8          **THE COURT:**  That's not -- that doesn't reconcile the

9  statutes.  What happens to the person who knows?

10         **MR. NORTON:**  What happens to the person who knows?

11  The person who knows -- if they -- the problem is that if they

12  know that there is -- that they have actual knowledge of a

13  person distributing child pornography on their platform -- and

14  they report it to the federal government, knowing that they are

15  providing personal identifying information and the

16  identification of the video, then they would violate the VPPA.

17         **THE COURT:**  Right.

18         **MR. NORTON:**  Now -- so there is -- because, when

19  Congress wrote 2258B, it only provided a defense to federal

20  statutes if the conduct was not intentional misconduct; right?

21  And the VPPA, by its terms, because it requires knowledge, is

22  always going to be intentional misconduct.

23     What this goes to is not -- is ultimately that the VPPA is

24  a poorly drafted law that prohibits the type of speech that

25  Congress otherwise wants to permit.  But what it doesn't allow

1    you to do is say, well, I'm just going to ignore what the VPPA

2    actually prescribes, because there's another law that's in

3    tension or even in conflict with it.  That's not how we read

4    statutes.  The problem here is with the VPPA.

5            **THE COURT:**  Well, it is actually one of the lawyers

6    who do read statutes.  Later applied statutes, directly

7    inconsistent, irreconcilable conflict may provide an exception

8    to the earlier statute.

9            **MR. NORTON:**  Well, I -- here, I think the government

10   and the plaintiffs cited *Williams [sic] v. FDA*.  And

11   *Williams [sic] v. FDA* doesn't actually say that.  It doesn't

12   say that just because there's a subsequent law -- this

13   intention with the first one -- that the later law applies, and

14   you just ignore what Congress wrote the first time.

15        What you have is you have two laws from Congress.  One

16   speaks to what you do when you know about CSAM material.  The

17   other goes to when are you allowed to disclose PII about

18   videos.  And there is conflict between those two.  But there is

19   not a categorical rule of statutory interpretation that the

20   later law trumps; right?

21           **THE COURT:**  I don't disagree.  It has to be a

22   particular quality of conflict.  I'm going to analyze it that

23   way.

24           **MR. NORTON:**  Right.  So what we had in FDA v.

25   Williams [sic] was -- or Brown and Williams [sic] -- was an

1  issue of, like, Congress -- the question was whether Congress

2  had permitted the FDA to regulate tobacco advertising; right?

3  And there were a series of laws that had been passed.  And

4  those had to be read together to understand that each of those

5  laws indicated, in combination, that Congress had never

6  intended to grant the FDA that authority.

7      But what -- there -- I don't believe there's a rule of

8  statutory interpretation that says, where Congress has passed a

9  law, and that law, by its terms, clearly prohibits conduct, and

10 then Congress has passed a subsequent law that under some

11 circumstances permits that conduct, that that is an implicit

12 repeal of the first statute.  It's just not.

13     So what you have to do is you have to deal with the fact

14 that the VPPA prohibits speech that Congress, in another

15 context, has indicated that it would like to see happen and --

16     **THE COURT:**  Not "like to see happen," but mandates.

17     **MR. NORTON:**  Well, because you can avoid the

18 liability, I don't know that I would agree with "mandates," but

19 "strongly encourages."

20     **THE COURT:**  Well, the statute itself uses mandatory

21 language.  So I don't think you can say it's anything other

22 than mandatory.

23     **MR. NORTON:**  When those conditions are satisfied,

24 then, yes, it does.

25     **THE COURT:**  Right.

1          **MR. NORTON:**  But the point is --

2          **THE COURT:**  So -- so what's the point?  What's on the

3     other side of the -- of the equation?  You've got two -- in

4     your theory -- completely -- leaving aside the "oh, well, just

5     don't do it" -- irreconcilable statutes as applied to someone

6     who knows.  Completely irreconcilable, what does that person

7     do?  Because I have to decide what the statutory schemes mean

8     for that person to do.

9          **MR. NORTON:**  So let me make two points.  So what are

10    they to do?  I think what they are to do is they are to comply

11    with 2258A.  And if a claim were brought against them under the

12    VPPA, they would raise the First Amendment as their defense,

13    because the VPPA is unconstitutional and prohibiting them from

14    reporting to law enforcement or to NCMEC that a potential crime

15    had been committed.  That would be the defense they would make.

16        The second point I would make is you can't just look at

17    2258A and B.

18          **THE COURT:**  Well, so why don't I wait -- I mean,

19    doesn't that suggest that I shouldn't be dealing with this on

20    its face; I should be dealing with it as an as-applied

21    challenge?

22          **MR. NORTON:**  Well, the fact that there are as-applied

23    challenges doesn't mean that there's not a facial one; right?

24    But two more points on this.  So, one, is that it's not just

25    2258A and B.  It's also if you look at the Electronic

1   Communications Privacy Act.  So there we see -- right there in

2   2702, just a few pages away from 2710 -- Congress says

3   specifically, if you're complying with 2258A, you're not liable

4   under ECPA; right?  So they -- when they want to do it, they

5   say it.  But they didn't do it in VPPA.  And we should assume

6   that means something for statutory interpretation.  You've got

7   to read these things together.

8          **THE COURT:**  Sometimes.

9          **MR. NORTON:**  The second issue, though, that I want to

10  make clear, is you can't entirely avoid it, I don't think,

11  because the VPPA does more than just impose liability; right?

12  So one of the issues is, if you comply with 2258A, and you give

13  information to NCMEC, and that information is relayed to law

14  enforcement, the VPPA has a separate provision that says that

15  information is not admissible in a criminal trial; right?  So

16  that's another problem here with the VPPA that makes it

17  difficult to reconcile, is it --

18         **THE COURT:**  It doesn't say it's not admissible in a

19  criminal trial.  But --

20         **MR. NORTON:**  It says it's not admissible into

21  evidence, at all; right?  Information obtained in violation of

22  the VPPA is not admissible -- cannot be admitted into evidence.

23         **THE COURT:**  I -- yeah, I understand that.  But there

24  are ways to get the information in ways that are admissible.

25  So I'm not -- so let me ask you one other question, because I'm

1   going to lose my train of thought here if I don't.  What do you

2   view as the relationship between -- scope -- between the --

3   2258A's intentional misconduct and the knowing requirement

4   under the VPPA?  Because there is at least an argument that one

5   could interpret them consistent by having intentional conduct

6   be much narrower than, you know, disclosures under the VPPA.

7         **MR. NORTON:**  I do see that argument.  There are cases,

8   particularly in the criminal context, where intentional and

9   knowing are given different definitions.  I think that the

10  scope of intentional and knowing -- whether you use them in a

11  very specific criminal context or in their more general

12  parlance -- I think there's a lot of overlap between the two.

13  So I can imagine scenarios in which you would say in some cases

14  they might not be exactly the same.  But, for the most part,

15  intentional misconduct and knowing conduct I think are going to

16  be the same, and I think those overlap pretty heavily.

17        **THE COURT:**  Let me turn to Mr. Elias.  Do you want to

18  respond to anything?  I'm particularly befuddled by the Tan

19  Exhibit 5.  I don't know what you can say about it that is --

20  that you can say about it -- since the exhibit is under seal.

21  But just general comments, you can --

22        **MR. ELIAS:**  Sorry.  The 2258, Your Honor?

23        **THE COURT:**  I want you to respond to anything you want

24  to talk about.  But one of the things I was -- pieces of

25  evidence -- that you used to support that there's a lot of

1  disclosure here of PII, et cetera, is Tan Declaration

2  Exhibit 5, which is under seal.

3        **MR. ELIAS:**  Yes.

4        **THE COURT:**  So you can't talk specifically about it,

5  but you can look at.  And I read it the way Mr. Norton does.

6  Okay, that's a bunch of numbers.

7        **MR. ELIAS:**  Right.

8        **THE COURT:**  I have no idea what they mean.  And all

9  you do is you cite it, but I'm not -- I don't understand the

10  exhibit.

11        **MR. ELIAS:**  Right.  Well, that's the type of proof

12  that we expect to put on at the class cert stage, because this

13  is what the Meta Pixel -- this is how it works -- these

14  providers are scraping the information.  And it looks --

15        **THE COURT:**  Well, okay.  So I guess you're not

16  prepared.  Are you prepared, if you weren't in the public

17  section, to explain to me how you look at that exhibit and you

18  can see the millions of disclosures you're talking about, or

19  are you not?

20        **MR. ELIAS:**  Well, I don't think I can do that

21  publicly, because it's proprietary to --

22        **THE COURT:**  I didn't -- I didn't ask you whether you

23  could do it publicly.  I asked you whether you could do it if

24  we weren't in the public section.

25        **MR. ELIAS:**  Well, I think Mr. Grille could, because

1   he's been focused on these issues about how the process

2   actually works.

3          **THE COURT:**  Mr. Grille, do you understand Exhibit 5

4   well enough to be able to tell me this column means this and

5   this column means that and this number means this?

6          **MR. GRILLE:**  Yes.  Yes, Your Honor.

7          **THE COURT:**  All right.  I'll figure out whether I'll

8   even bother with that.  It's a letter -- oh -- it's Exhibit V,

9   not Exhibit 5.  Okay.  Thank you, Melissa.

10      Okay.  Do you want to respond, Mr. Elias, to the other

11  things that Counsel just said?

12         **MR. ELIAS:**  Yeah.  I mean, I know we didn't put on

13  this evidence.  It was cited in the amicus brief, for what it's

14  worth.  But I think it's also kind of a matter of common sense

15  that it is a very large, lawful sweep of the VPPA.  And

16  everybody who has an account with Netflix, or Amazon Prime, or

17  Disney+, who's watching the latest streaming platform, they're

18  all video service providers who are restrained by this law in

19  relation to consumers and their legitimate privacy interests.

20         And I think that that can be taken into account, because

21  it's millions of Americans we're talking about, in addition to

22  this novel technique that is a subject of these Meta Pixel

23  cases, where there is a violation, we allege, and it's in the

24  nature of a commercial or economically motivated disclosure.

25         We -- I would just note that we submitted this Boston

federal case that came down this year.  And the court kept the
analysis narrow.  It didn't see fit to reach the facial
challenge at all.  And just said that this is -- this is an
economically motivated use of the pixel.  And so it survives
the as-applied challenge.  And I think that may be informative
to the Court's analysis.

I can also move on to the public safety issue, because I
know that that was a subject of a lot of concern in the
previous hearing.  We just talked about it.  And I don't see a
case or controversy here about children being in danger.
Patreon submitted these declarations from Google and Meta and
TikTok, and they all say they're reporting tens of thousands of
videos.  This is evidence in the record now that the speech is
not being suppressed.

So it's not the VPPA that's doing the chilling here.  If
anything, it's the other way around.  The criminal provision is
what's motivating the companies to make sure they do the
mandatory reporting, even at the risk of over-disclosing,
because they don't want to get into criminal territory.  And,
usually, almost always, it's a criminal law where the Supreme
Court says it's facially overbroad.  This is the civil law.  I
think that that's an important factor, as well.

So Patreon's argument is really speculative.  They -- they
invoke this subsidiary provision -- 2258B -- and that says that
if video platforms act with malice in doing the reporting might

1   leave them open to liability.  Well, I don't read violating the

2   VPPA as the type of malice or intentional criminal behavior

3   that this provision is talking about.  I think it's talking

4   about abetting the child exploitation.  I think these sections

5   have to be read in context.  The VPPA isn't a criminal law.  It

6   only requires knowledge of the disclosure, not intentional

7   misconduct or malice.

8        Patreon just doesn't have a case.  He referred to a case

9   that might arise and what might happen.  But there's no

10   structural impediment to such a case coming up.  It just hasn't

11   happened, because this isn't a problem.  And it's not an issue

12   that implicates the First Amendment.

13        **THE COURT:**  Mr. Norton, did you want to respond to

14   anything?

15        **MR. NORTON:**  I don't have anything further on that.  I

16   certainly take the Court's -- I'm calling it "advice."  But I

17   understand that you're skeptical of the facial challenge.  And

18   to the extent that the Court's time is limited, I would like to

19   spend a little more time on the as-applied.  There are a couple

20   of points I'd like to make.  I don't have any further response

21   to what Mr. Elias just said.

22        **THE COURT:**  Okay.  Why don't you quickly -- we'll wrap

23   this piece up.  I want to go into a sealed proceeding to talk

24   about Exhibit V for a moment.  But why don't you go ahead and

25   say what you want to say.

1        **MR. NORTON:**  Thank you.  So on the as-applied

2    challenge, again, it is plaintiffs' and the government's burden

3    here to defend the law.

4        Now, we talked about the consent.  And we think that if

5    the Court could focus exclusively on the consent, it could find

6    that the VPPA fails to satisfy Central Hudson's test.  But I

7    think you need to step back a little bit and look at, you know,

8    what do we have here in terms of this particular statute and

9    its fit to the assertive interests.

10        So what -- regardless of how you characterize the interest

11    here -- and I think the government and the plaintiffs have

12    characterized the interest more broadly than they're allowed to

13    under the Supreme Court's *Fulton* case -- but it doesn't really

14    matter how you describe it, really.  They need to show that

15    there is a fit between the assertive interest and the

16    regulation of the speech here.

17        And, in some ways, the VPPA works against them in that it

18    actually targets such a narrow disclosure.  And so we pointed

19    this out in our reply brief in response to their articulation

20    of the interest.  The thing that they say they are concerned

21    about is that a videotape service provider could disclose the

22    kinds of videos that they watch in that they are controversial

23    in one respect or another, or that they are considered

24    nonmainstream, or -- et cetera; right?

25        The VPPA doesn't do anything about that.  We are

1   perfectly -- within the scope of the VPPA, any VTSP -- any

2   videotape service provider -- can say that a particular

3   subscriber likes to watch videos about Taylor Swift or

4   professional football or Nazis and can get a lot more specific

5   than that.  You just can't identify the specific video.

6        So if the concern is that the privacy interest here is

7   people might want to watch controversial subject matter, and

8   they're concerned it would be disclosed, the VPPA is completely

9   ineffective in protecting that interest.  And this is where

10  laws fall under the *Central Hudson* test.  And so we pointed

11  out, you know, under --

12       **THE COURT:**  Well, so -- but, I got to tell you, I'm

13  not buying that argument, because it's got to be completely

14  ineffective.  So the -- just because Congress decided that they

15  were going to respect this freedom of speech that you're

16  talking about enough, or at least the commercial speech enough,

17  that they were going to target, very narrowly, the things that

18  they saw as the problem, because, actually, that was the

19  problem in the original case that gave rise to this.

20       You know, I don't understand why, if you -- if you are

21  completely effective in prohibiting the disclosure of all of

22  the titles -- of all of the -- that everybody watches -- that

23  isn't, in and of itself, sufficient.  Just because you might be

24  able to generally characterize what they've done, et cetera, et

25  cetera, why isn't the supression of the title sufficient?

1    **MR. NORTON:**  Well, because -- I think -- with respect,

2    I think you flipped the standard there; right?  I don't have to

3    show that it's in -- that it's completely ineffective.  If it

4    is completely ineffective, they lose.  But I don't have to show

5    it's completely ineffective.  They have to show that it

6    directly and materially advances the stated interest.

7         **THE COURT:**  No.  But I'm -- I'm -- I've not flipped

8    the standard.  The standard is that unless it is completely

9    ineffective, then it materially advances.  That's the test with

10   respect to these arguments that "oh, well, there's someone else

11   who can do this, and somebody else can do that."

12        **MR. NORTON:**  All right.  So I respectfully -- I don't

13   agree with the Court that that is the standard.  So if you look

14   at, for example, *Lorillard* -- right -- now, in *Lorillard*, you

15   had an advertisement.  And it's in a retail establishment.  And

16   it will be effective for some children.  But the opinion

17   doesn't say it's not effective for anybody.  It will be

18   effective, in some cases, to hide that advertisement from some

19   children.  But it's not going to be effective enough; right?

20        If you look at *Rubin* -- right -- in *Rubin*, the issue is

21   can you put the content of the alcohol on the labels --

22   right -- or on -- in advertising.  And the issue is, like,

23   okay, it is somewhat effective to avoid strength wars in

24   advertising of alcohol to have this particular provision.  But

25   there are too many end-runs around it; right?

1      If you look at *Sorrell* -- so, in *Sorrell*, there's a

2    prohibition on the disclosure of physician prescription

3    practices.  Like, what drugs they actually prescribe; right?

4    And so you cannot disclose that in certain circumstances.  But

5    you can disclose it in others.  So the issue is what is the

6    actual interest here?  And *Sorrell* is a good one, because the

7    interest here is confidentiality -- privacy -- right?  Well, we

8    have an interest in privacy, so we're not going to let you

9    disclose a particular category of information.

10      But the problem is, it can be -- that particular

11    interest -- can be subverted by some other disclosure that the

12    statute permits.  And that's exactly what we have with the

13    VPPA.  There's not a fit here, because, yes, you're right, it

14    has effectively prevented one particular type of speech.  But

15    in preventing that particular type of speech, it has not

16    protected the privacy interest that the government here and the

17    plaintiffs here have articulated.

18      Now, I want to emphasize here, their burden -- it's their

19    burden to articulate what that interest is.  And what they said

20    the interest is -- they didn't say the interest is in not

21    knowing what titles I saw.  They said the interest was an

22    interest in people not knowing that I watch videos on divisive

23    or controversial topics.  So they stake out the ground here for

24    the dispute.  And what they said is they didn't want to fight

25    about titles.  They wanted to fight about topics.  They said

```
1    that's the privacy interest here.  Because people need to know

2    that they can watch videos that might be controversial; that

3    might be embarrassing; that, for whatever reason, they wouldn't

4    want people to know that that's the type of video they watch.

5    That's the interest they say this statute is designed to

6    prevent -- to protect -- and --

7              THE COURT:  Well, they don't say it quite -- they

8    don't say it exactly that way.  But, I mean, I understand your

9    point, of course.

10             MR. NORTON:  We --

11             THE COURT:  And I don't care how they characterized

12   it.  Because the question is what it does and what interest I

13   find is substantial.  And if I go with the privacy interest,

14   you're saying a portion of the privacy interest is not

15   protected.  You're not saying that it's completely ineffectual.

16   And you're not -- you're shoeing that, I think.

17             MR. NORTON:  I actually am arguing it is -- it is --

18   the VPPA is the Maginot Line of privacy protection.  The titles

19   are not meaningful.  And if you look at Mr. -- and it's

20   submitted under seal -- but what Mr. Oostyen submitted --

21             THE COURT:  Mm-hm.

22             MR. NORTON:  -- as one of the videos that he watched,

23   look at those titles.  They don't tell you anything.  They

24   don't tell you anything.  He had to put in his brief what he's

25   actually watching.  But the title doesn't disclose that
```

1  information.

2          **THE COURT:**  Well, sometimes it does.

3          **MR. NORTON:**  Sometimes --

4          **THE COURT:**  We know that -- we know that from some of

5  those declarations that it does.

6          **MR. NORTON:**  But on -- on an as-applied challenge, as

7  to Mr. Oostyen, Mr. Oostyen's -- there is no privacy interest

8  of Mr. Oostyen's implicated by the video -- the titles -- that

9  he -- that were revealed, according to him; right?  So does the

10  VPPA --

11          **THE COURT:**  Yeah.  I'm not sure that's right.

12          **MR. NORTON:**  Well, if the Court can look at those

13  titles and can understand what Mr. Oostyen is watching, then it

14  is more insightful than I am.

15      The issue here is the VPPA does not actually protect this

16  privacy interest.  And so that's the first issue; right?  So

17  the first issue on fit is, is there a sufficient connection

18  here?  And there is not; right?  The -- ultimately, the VPPA

19  doesn't really protect privacy, because everything that the

20  plaintiffs say is critical to protecting privacy is fair game.

21  But, beyond that, we've already talked about consent.  So

22  there's not really a fit here, because the VPPA prohibits

23  disclosures that people actually have consented to, which is

24  the opposite of a privacy interest.

25      Further, the VPPA has this minimum presumed damages that

are unrelated to the actual damages.  So is the statute more

burdensome than is necessary?  And is it unrelated to -- does

it have provisions unrelated to the privacy interest?  Well, of

course it does.  Because, by definition, it imposes damages

that are unrelated to and in excess of the actual harm.  You

know, you get damages notwithstanding the lack of actual

damages; right?

So, now, if you look at -- there's a case that both the

government -- that we cited -- *Valle Del Sol* -- right?  In

*Valle Del Sol*, one of the issues there is that was one of these

cases in which the prohibition on speech is a prohibition on

soliciting day laborers on the roadside.  And there was

obviously targeted speech.  And it was defended on the grounds,

like, well, the reason that we have this is traffic concerns.

And one of the reasons why the Ninth Circuit said, no,

that law fails to pass scrutiny under the First Amendment is

that the penalties associated with that particular statute were

completely unrelated to the types of penalties that are usually

imposed for traffic infractions.  They were much, much higher;

right?

So the significance of this is what?  It's that when the

damages that are imposed are not actually related and tied to

the ultimate privacy interest at stake -- the actual harm

caused by the speech -- then that's a lack of fit.  And that's

what the Court had found in *Valle Del Sol*.  It was a lack of

1   fit.

2       And then we know that there are ways in which the statute

3   is more burdensome than it needs to be.  One is the consent.

4   But the other is that it is just the overall lack of fit;

5   right?  Again, it's not a -- it is very, very narrow in what it

6   reaches.  And -- but, in being so narrow, it leaves everything

7   else on the table.  And I think, for all those reasons, if you

8   compare this to the other statutes that the court struck down

9   under *Central Hudson* on speech grounds, this one, I think,

10  is -- it is really no different from, say*, Lorillard* or *Rubin*

11  *v. Coors Brewing*.

12          **MR. ELIAS:**  May I respond to a few of those points,

13  Your Honor?

14          **THE COURT:**  Yes.

15          **MR. ELIAS:**  Thank you.

16      So we view the statute as being narrowly drawn to focus on

17  companies that provide videos as part of this economic

18  exchange.  Because these are the exact companies that are most

19  likely to have and to disclose the information that Congress

20  decided needed to be kept private.

21      And with respect to the title of videos versus the subject

22  matter of videos, I'm not sure I entirely followed his argument

23  there.  Because what the -- what the statute actually says is

24  that what can't be disclosed is the specific video material --

25  or the services -- the specific video services.  And so the

1  statute doesn't actually say "video title."  And that's what

2  people are concerned about.  That's what Congress was concerned

3  about.  That their -- that a citizen's identifiable

4  information -- their name, for example -- their email

5  address -- be sent to a company -- without them allowing it --

6  to a company, like Meta, that says what type of videos they're

7  watching.

8      And both of our -- the two plaintiffs -- who testified,

9  whose testimony is in the record, said they were disturbed, and

10 they did find it offensive that Meta has access to these

11 not-fit-for-work videos that Patreon sent to Meta with their

12 information and with these -- the information in the Excel

13 files -- that shows what type of videos they've been watching.

14     **THE COURT:**  Well, let me just -- let me just ask you

15 this question:  Your interpretation of the VPPA's prohibition

16 is contrary to Mr. Norton's.  You would say -- is this right --

17 do you think that the VPPA would prevent Meta, for example,

18 or -- from saying -- or from -- or, I'm sorry -- Patreon from

19 saying that a particular plaintiff watched videos on current

20 events?

21     **MR. ELIAS:**  On current events?  Well, it's -- then it

22 becomes a question of what's a specific video title -- or a

23 specific video material.  Current events --

24     **THE COURT:**  Yes, that's the question.

25     **MR. ELIAS:**  -- might not be -- current events might

1  not be close enough.  But if you say that they're watching

2  Democratic Party speeches or documentaries, that might be close

3  enough.  That might be specific enough.

4          **THE COURT:**  Well, what is?  I mean, you can't say

5  "might be."  Right?  I'm trying to figure out whether or not

6  there's a fit here.

7          **MR. ELIAS:**  Right.  Well -- so something like

8  pornography -- like, people don't want their name getting out

9  there with them that they're watching pornography of any kind.

10  So I think that that would be --

11          **THE COURT:**  What about -- okay.  That's an easy one.

12  What about, you know, watching Democratic policy speeches?

13          **MR. ELIAS:**  If you ask me -- a jurist might disagree

14  on that -- I think that that is specific enough to warrant

15  protection if the person's name is being disclosed with that

16  information.

17      Now, on the statutory damages, it's not really a surprise

18  that Patreon doesn't like that.  But this damage provision is

19  100 percent consistent with the common law.  It allows for

20  recovery, even without proof of the actual or tangible harm.

21  It's just the intrusion upon seclusion tort.  And the VPPA fits

22  with that, because it protects the ability to control your own

23  personal information.  That is what -- that's what both of our

24  plaintiffs testified.

25      And these statutory damages have never been struck down.

 1    They align with the whole regime of federal privacy law where

 2    Congress imposed statutory damages for violations, even absent

 3    a showing of actual damage or economic loss.  The --

 4            **THE COURT:**  You said that in your brief.

 5        Okay.  So we're going to stop for now.  But I want to go

 6    into a sealed session so that we can discuss whatever there is

 7    to discuss about this Exhibit 5 -- Exhibit V -- I'm sorry --

 8    and the -- then we can talk about that.

 9        But -- so -- so for the individuals who were admitted to

10    this session -- Mr. Elias, Mr. Norton, Mr. Walker, Ms. Vigen,

11    Mr. Tan, Mr. Grille, obviously the court reporter, and my CRD,

12    and myself, and the law clerk -- if you would all go to the

13    private link.  The private link is on the website.  It's -- I'd

14    ask everybody else not to go, though, because it will just --

15    we won't let you in.  But if you all could go to the private

16    link.  It's on the website.  It's called "private for

17    settlement conferences and other proceedings."  We'll have a

18    brief sealed proceeding on that link.

19        I guess, before we do that, let me do one thing.  I may

20    have lost some.  But the -- so you're going to -- are you

21    seeing Judge Fogel again on Monday?  Is that what that means?

22            **MR. NORTON:**  Yes, Your Honor.

23            **THE COURT:**  Okay.  Great.  You know, I really wish you

24    would work out all your issues with Meta.  I mean, I got the

25    tone that you put in your best.  But I wish you could work out

1  your issues with them.  But -- so let me just send you back to

2  try again.  But we'll get to that eventually.

3      Is there anything else we should address in terms of case

4  management at the moment?  We've got a schedule.

5          **MR. GRILLE:**  I don't think there was anything else

6  from the plaintiffs' perspective.

7          **THE COURT:**  Mr. Norton, is there anything?

8          **MR. NORTON:**  Not from Patreon's perspective either.

9  Thank you.

10         **THE COURT:**  Okay.  Well, let's go -- let's all go over

11  to the private -- so we'll stand in recess and go over to the

12  private link.

13     And, Kendra, if you could join us there, as well.

14         **THE COURT REPORTER:**  Yes, I'll be there.

15         **THE COURT:**  Okay.  Great.  Thanks.

16             (Recess taken at 10:57 a.m.)

17  **(Pages 59 through 74 were placed under seal by Order of the**

18             **Court.)**

19

20

21

22

23

24

25





























1    ███████████████████████████████

2                 ---oOo---

3

4              **CERTIFICATE OF REPORTER**

5       I certify that the foregoing is a correct transcript

6 from the record of proceedings in the above-entitled matter.

7

8 DATE:   Wednesday, May 15, 2024

9

10

11    _____

12          Kendra A. Steppler, RPR, CRR

13       Official Reporter, U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25