# Exhibit M

# Nathan Walker

| | |
|---|---|
| **From:** | Jason Harrow <jason@gerstein-harrow.com> |
| **Sent:** | Monday, December 9, 2024 1:33 PM |
| **To:** | Fred Norton; Nathan Walker; Bree Hann; Gil Walton; Celine Purcell; Emily Kirk |
| **Cc:** | Charlie Gerstein |
| **Subject:** | Confidential settlement communication re Patreon |
| **Attachments:** | Letter re Lexclaim v Patreon.pdf; Lexclaim v. Patreon Complaint Confidential.pdf |

You don't often get email from jason@gerstein-harrow.com. Learn why this is important

Dear counsel-

We understand you represent Patreon in *Stark v. Patreon*. Please see the attached letter regarding claims that our client has against Patreon related to those in that case. We also include a draft complaint, which is referenced and explained in our letter. As we mention, both of these are confidential protected settlement communications.

We look forward to your response.

Best,
Jason Harrow

Jason Harrow
Gerstein Harrow, LLP
jason@gerstein-harrow.com

# GERSTEIN HARROW LLP

Fred Norton
fnorton@nortonlaw.com
Nathan Walker
nwalker@nortonlaw.com
Bree Hann
bhann@nortonlaw.com
Gil Walton
gwalton@nortonlaw.com
Celine G. Purcell
cpurcell@nortonlaw.com
Emily Kirk
ekirk@nortonlaw.com
THE NORTON LAW FIRM PC

*Via Email to all recipients*

<u>Re: Confidential Protected Settlement Communication Regarding Claims of Lexclaim Recovery Group US LLC Against Patreon, Inc.</u>

Dear Counsel,

Our firm represents Lexclaim Recovery Group US LLC. We understand from the docket and the filed papers that you represent Defendant Patreon, Inc., in *Stark v. Patreon, Inc.*, No. 22-cv-3131 (N.D. Cal.). We write to discuss a pre-suit resolution of claims that Lexclaim has against Patreon related to its violations of video-privacy laws.

Lexclaim's purpose is to receive assignments of class-action claims and prosecute or settle them. As you know, a settlement in *Stark* recently received preliminary approval. Under that settlement, Patreon agreed to pay $7,250,000, before fees and settlement costs, to resolve the claims of more than 1.4 million class-members. After attorney's fees and administration costs, that would mean an average payment of around $2.98 per class member. Assuming a claims rate of 5% (which is the middle of the range the *Stark* parties proposed to the court), approximately 70,000 class-members will get $59.50 each and everyone else will get nothing but still release all their claims. To remind you, statutory damages in *Stark* are at least $2,500 per person, likely much more, for the VPPA claims. At best the *Stark* settlement represents around one tenth of one percent of the damages to which the class would be entitled at trial.

Lexclaim thinks that the settlement is too low. And so, after the court preliminarily approved the settlement, Lexclaim offered to pay class members $10 upfront and 20% of any amount recovered on their claims in exchange for a complete and irrevocable assignment of their right to bring causes of action against Patreon under the VPPA



Washington, DC
Scottsdale, AZ
Los Angeles, CA

hi@gerstein-harrow.com                gerstein-harrow.com

## Gerstein Harrow llp

and related laws. Each assignor signed a form opting out of the *Stark* class and a declaration swearing under penalty of perjury to the relevant facts. Lexclaim has their signed opt-out forms and plans to mail them according to the requirements of the preliminary approval order no later than January 8. Between November 20 and December 8, 925 people assigned their claims to Lexclaim. (We are happy to share the assignors' names, if that would be helpful to you, so long as you agree in writing that you will use this information solely for the purposes of our settlement discussions and that you or your client will not contact these people or share this information outside of the client and its legal team.)

Please find attached a draft complaint against Patreon in this matter. As explained in greater detail there, Patreon would be liable to Lexclaim at trial for no less than $2,312,500, plus attorney's fees and costs, and likely much, much more—collectively, the assignors of claims that belong to Lexclaim watched approximately 10.4 million videos on Patreon while logged in to Facebook.

Given the complexity and expense of this matter, though, Lexclaim would be willing to resolve it through a global release in exchange for $1,480,000, or $1,600 per assignor.

We look forward to discussing this matter with you shortly. Charlie can be reached at charlie@gerstein-harrow.com or (202) 670-4809. Jason can be reached at jason@gerstein-harrow.com or (323) 744-5293. You may contact either of us, and if you send an email, we would prefer you include both of us.

Given the deadlines in *Stark*, the accompanying end to *American Pipe* tolling, and the coming winter holidays, we would ask for your response no later than Monday, December 16. We are optimistic we will be able to resolve this matter, but if we cannot, we look forward to litigating this matter courteously and professionally with your firm.

Sincerely,
Charlie Gerstein and Jason Harrow



GH   Washington, DC
     Scottsdale, AZ
     Los Angeles, CA         hi@gerstein-harrow.com         gerstein-harrow.com

**CONFIDENTIAL DRAFT**

Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| LEXCLAIM RECOVERY GROUP US LLC, <br><br> Plaintiff, <br><br> vs. <br><br> PATREON, INC., <br><br> Defendant. | Case No. <<CASE NUMBER>> <br><br> *Related to Stark v. Patreon, Inc.*, No. 3:22-CV-0313-JCS <br><br> Hon. Joseph C. Spero <br><br> **COMPLAINT** <br><br> **Date: January 9, 2025** |

**CONFIDENTIAL DRAFT**

**Preliminary Statement**

1. Defendant Patreon, Inc. permits subscribers to watch videos on its website, *patreon.com*. Patreon, using something called the Meta Pixel, then sends the title of every video its subscribers watch alongside personally identifying information to Meta Platforms Inc.'s headquarters in California. This is a clear violation of the Video Privacy Protection Act (VPPA). The VPPA, which recognizes that our video-viewing habits are intimately private, requires companies that sell, rent, or offer subscriptions to prerecorded videos to maintain their customers' privacy and forbids, among other things, the knowing disclosure of customers' video choices to any third party without the customers' specific advance consent.

2. Congress believed that VPPA violations effected invasions of personal privacy severe enough to justify a statutory damages award of $2,500 per violation. In 2022, a class-action case was filed against Patreon alleging VPPA claims on behalf of millions of Patreon subscribers. That case resulted in a settlement with approximately $4,165,000 allocated for damages payable to at least 1.4 million class members and permanently releasing all of their claims unless they affirmatively opt-out of the settlement in writing. Class counsel, to compensate them for recovering approximately *one tenth of one percent* of the damages to which their clients would have been entitled at trial, seeks a $2,175,000 fee at the clients' expense. The parties estimate that on average only 5% of class-members will even submit a claim, giving each claimant approximately $56 and everyone else nothing at all.

3. Plaintiff Lexclaim Recovery Group US LLC is the assignee of the claims of 925 Patreon accountholders, each of whom subscribed to and watched videos on Patreon, each of whom was logged into a Facebook account while watching videos (activating the most invasive of Meta's tracking software), and each of whom opted out of the settlement. The assignors "assign[ed], transfer[ed], convey[ed], and set[] over, without recourse, to Lexclaim all rights in, title to, and interest in any and all

**CONFIDENTIAL DRAFT**

causes of action Assignor[s] may now have, whether or known or unknown, discovered or undiscovered, against Patreon Incorporated related to any violation of the Video Privacy Protection Act." (Ex. A.) In exchange, the assignors received a one-time payment of $10 from Lexclaim and the right to 20% of any money Lexclaim recovers in connection with their claims.

4. Lexclaim brings this action to recover the damages Congress believed each of the assignors was entitled to as a result of Patreon's knowing violation of their rights under the VPPA.

## Parties

5. Plaintiff Lexclaim Recovery Group LLC is a Wyoming limited-liability company headquartered in Washington, D.C. No member of Lexclaim is a citizen of California or Delaware.

6. Defendant Patreon, Incorporated is a Delaware limited-liability company headquartered in San Francisco, California.

## Jurisdiction

7. This Court has subject-matter jurisdiction over this Action under 28 U.S.C. § 1331 because it arises under federal law, and also under 28 U.S.C. § 1332 because all members of Lexclaim are citizens of different states than Defendant.

8. This Court may exercise general personal jurisdiction over Patreon because its principal place of business is in California.

## Venue

9. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Patreon is headquartered here.

## Divisional Assignment

10. Pursuant to Civil L.R. 3-5(b), assignment to the San Francisco Division is appropriate under Civil L.R. 3-2(c) because Patreon is headquartered in San

**CONFIDENTIAL DRAFT**

Francisco and a substantial part of the conduct at issue in this case occurred in San Francisco County.

### The Meta Pixel's Surveillance of Private Internet Activity

11. Meta, which operates Facebook, and is accordingly the world's largest social-media company, makes almost all of its money selling targeted advertising. To target people with advertising, Meta must collect their data so that it can learn their personal characteristics and preferences. One way Meta collects peoples' data is through the Meta Pixel.[1]

12. The Meta Pixel is a piece of software code that Meta offers to websites and services, like Patreon, to integrate into their websites. Meta offers the Pixel free of charge to these sites because the sites agree to give Meta their users' data—in other words, in exchange for Meta's help in collecting and analyzing their users' data for targeted advertising, these websites give Meta their users' data and let Meta use it for any purposes Meta sees fit.

13. When a user accesses a website with a Meta Pixel installed, the Pixel—operating completely in the background, and without users' knowledge or consent—sends a message from the website's server to Meta containing, at least, the user's IP address (a unique number identifying an internet user) and the fact that they interacted with the website.

14. Specifically, this message contains the content of the original request sent to the host website along with the data that the host website operator configured the Meta Pixel to collect, which can include every single key stroke or mouse movement a user makes on a website.

---

[1] *See* FACEBOOK, *About Customer Audiences*, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Jan. 18, 2023); FACEBOOK, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Jan. 18, 2023).

**CONFIDENTIAL DRAFT**

15. Meanwhile, Meta's core business model requires that it be able to track users' activity and link it to known facts about those users. To do this, Meta uses common pieces of software called "cookies." A cookie is a small block of data created by a web server while a user is browsing a website and placed on the user's computer or the user's web browser.

16. Any time a user visits a Meta website, cookies are sent to the user's browser by which Meta can subsequently identify that specific user if they return to any Meta website. Anyone who uses Facebook or Instagram—Meta's two most popular social networks—is sent a cookie that will immediately link that user to the user's personal account.

17. Meta uses these cookies to link the information it gathers from the Pixel with Facebook and Instagram accounts. Indeed, Meta tells advertisers that it "relies on Facebook cookies, which enable [Meta] to match your website visitors to their respective Facebook User accounts," and thereby to create precise audiences to target with advertising.

18. Subscribers with Facebook accounts are assigned a "c_user" cookie from Meta. Any person armed with a user's c_user cookie can immediately identify that user's Facebook page by simply typing "www.facebook.com/[c-user cookie]" with that user's c_user cookie number. For example, Meta CEO Mark Zuckerberg's number is four and the URL "www.facebook.com/4" will take you to Mark Zuckerberg's Facebook page. The c_user cookie is active while users are logged in to their Facebook accounts.

19. Subscribers with Facebook accounts are also sent cookies called "datr" and "fr" cookies. These cookies allow Meta to identify users when they are not logged in to Facebook, and at least the datr cookie is active for two years after a user was last logged in to Facebook. Although the public cannot necessarily use datr and fr cookie values to identify individual users, Meta immediately can.

20. Facebook and Instagram accounts, unsurprisingly, contain a wealth of

**CONFIDENTIAL DRAFT**

personal information about their users, almost always including their names, photographs, and biographical information.

21. Any time Facebook users visit a website with the Pixel installed and with third-party cookies enabled on their browser, then, the website sends Meta a data packet by which the users' activity on the site is immediately personally identifiable.

**Patreon Operates A Subscriber Website And Discloses Members' Private Viewing Information to Meta**

22. Patreon's accountholders ("Subscribers") can access a variety of content on Patreon's website, including music, podcasts, and video content posted by content creators.

23. Many of Patreon's Subscribers pay Patreon subscription fees, typically on a monthly basis. The subscription fees vary because they are related to which creators and shows a Subscriber wishes to follow.

24. Patreon provides and delivers prerecorded audiovisual content to its Subscribers.

25. Patreon allows content creators to upload or share prerecorded videos, which Patreon Subscribers can then view on the content creator's page.

26. The assignors requested and viewed prerecorded audiovisual content from Patreon while in the United States.

27. Collectively, the assignors viewed approximately 10.4 million pre-recorded videos on Patreon between April 1, 2016, and December 8, 2024.

28. While assignors were viewing prerecorded video content on Patreon's website, Patreon transmitted their viewing choices to Meta.

29. Patreon's transmission of viewing information to Meta includes the specific names of video content viewed by Subscribers, as well as the User's FID—a string of numbers unique to each Facebook profile that personally identifies the User.

**CONFIDENTIAL DRAFT**

30. Anyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile, which contains personal information, often in large quantities.

31. A Facebook profile typically shows the Facebook user's name, gender, place of residence, career, educational history, a multitude of photos, and the content of the user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

32. Just as Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of a FID. Facebook admits as much on its website. Thus, equipped with an FID and the video content name and URL—all of which Patreon knowingly provides to Meta without appropriate consent from its subscribers—any ordinary person could determine the identity of the Patreon subscriber and the specific video or media content they viewed on Patreon's website.

33. Patreon transmits the FID and video title to Meta in a single transmission, through the Meta Pixel described above. This transmission occurs when a User views a prerecorded video on Patreon's website.

34. Patreon knew that by installing the Pixel on its website, the Pixel would send Meta information identifying its Subscribers and their video-watching habits.

35. Meta's website explains that, to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website[.]" Patreon made the conscious decision to undertake this installation process.

36. Further demonstrating that Patreon knowingly placed the Pixel in its website code, Meta's website states that "[d]evelopers and marketers can optionally

choose to send information about" a visitor's activity on its website.

37. Meta benefits from websites like Patreon installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from providing more targeted ads. The Pixel is installed on websites all over the internet and, accordingly, provides Meta with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

38. Using the Meta Pixel likewise benefits Patreon's business by improving its ability to promote its content and services to its Subscribers, thereby increasing its profits.

39. Through use of the Meta Pixel, Patreon discloses to Meta the full name of each video a User watched, together with the User's FID, thus linking Subscribers' viewing content choices and preferences to their Facebook profiles. In other words, this single transmission connects a User's viewing content with their FID.

40. Patreon's Subscribers, including the assignors here, did not consent to Patreon's disclosure of their prerecorded video and video services requests and their identities to Meta. Upon information and belief, most Subscribers and assignors were not even aware that such data sharing was occurring.

41. Patreon's website includes its Terms of Use, a Privacy Policy, Data Practices, and a Cookie Policy. None of these informs Subscribers of Patreon's use of the Meta Pixel or its practice of sharing Subscribers' personal information and video content choices with Meta in a way that allows Meta to identify their specific video-watching preferences.

42. The VPPA requires that consent be obtained in a form "distinct and

**CONFIDENTIAL DRAFT**

separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. At no point were Plaintiffs or other Patreon Subscribers given a standalone or any consent form disclosing Patreon's practices at issue and requesting User consent. Hence, no User knew of or consented to Patreon's offending practice of sharing video preferences with third parties.

43. Patreon shared with Meta the personal information of Subscribers, including their video-viewing histories and associated FIDs, which they reasonably expected would be kept private.

### The *Stark* Case And Assignors' Irrevocable Assignment of Their Rights to Lexclaim

44. On May 27, 2022, Brayden Stark and Judd Oostyen filed a putative class-action complaint against Defendant in the United States District Court for the Northern District of California alleging violations of the VPPA, among other violations.

45. On January 30, 2024, after additional proceedings, the plaintiffs in that case filed a Second Amended Complaint adding additional named plaintiffs. *See Stark v. Patreon*, N.D. Cal. No. 22-cv-3131, ECF No. 121.

46. Both before and after that filing, the parties conducted a mediation, resulting in a settlement announced in a filing on August 2, 2024. *See Stark v. Patreon*, N.D. Cal. No. 22-cv-3131, ECF No. 176-1.

47. The *Stark* court granted preliminary approval of that settlement on September 23, 2024. After an initial earlier deadline, it set a modified deadline of January 15, 2025, for settlement class members to opt out. *See Stark v. Patreon*, N.D. Cal. No. 22-cv-3131, ECF No. 195.

48. After the settlement was preliminarily approved, 925 members of the *Stark* settlement class signed agreements reading: "Assignor hereby irrevocable assigns, transfers, conveys, and sets over, without recourse, to Lexclaim all rights in,

**CONFIDENTIAL DRAFT**

title to, and interest in any and all causes of action Assignor may now have, whether or known or unknown, discovered or undiscovered, against Patreon Incorporated related to any violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.*, or any other applicable law (including, but not limited to, the privacy laws of Assignor's home state) relating to information privacy."

49. The assignment agreements each provided that they were effective only when signed by both parties.

50. On January 8, 2025, notices executed by each of the assignors were mailed to the settlement administrator in the *Stark* case. The notices read "I, [Assignor], hereby request to be excluded from the Class certified on September 23, 2024, in *Stark v. Patreon Inc.*, No. 22-cv-03131-JCS (N.D. Cal.)." Each notice provided the assignor's name and a dated signature.

51. Later that day, Lexclaim signed the 925 assignment agreements.

52. Later that day, Lexclaim mailed a notice to the settlement administrator in the *Stark* case reading "Lexclaim Recovery Group US LLC hereby request to be excluded from the Class certified on September 23, 2024, in *Stark v. Patreon Inc.*, No. 22-cv-03131-JCS (N.D. Cal.)." The notice provided a signature from one of Lexclaim's principals.

## Claims for Relief

*Count One:* **Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**

53. Lexclaim incorporates all prior paragraphs by reference.

54. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third party without the "informed, written consent . . . of the consumer" and the opportunity to opt out of disclosures. *See generally* 18 U.S.C. § 2710.

55. Patreon is a "video tape service provider" because it is "engaged in the business, in or affecting interstate commerce, of . . . delivery of prerecorded . . .

**CONFIDENTIAL DRAFT**

audiovisual materials." 18 U.S.C. § 2710(a)(4).

56. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, assignors are subscribers to Patreon's services providing video content to Subscribers on its website and viewed prerecorded videos provided on Patreon's platform. Hence, Plaintiffs are "consumers" under this definition.

57. Patreon disclosed "personally identifiable information" of assignors to Meta because Patreon sent "information which identifies a person as having requested or obtained specific video materials" from Patreon, 18 U.S.C. § 2710(a)(3), specifically the URL and full title of every video watched alongside information that would allow any member of the public to identify the user.

58. Patreon did not seek, let alone get, "informed, written consent" from assignors, 18 U.S.C. § 2710(b)(2), and it never provided them the opportunity to opt out, 18 U.S.C. § 2710(b)(2)(iii).

59. Patreon transmitted personally identifying information to Meta knowingly: Patreon installed the Meta Pixel, which advertises its ability to link user activity to Facebook accounts, on its website and configured the Pixel specifically to gather and disclose to Meta the full title of the videos assignors watched.

60. By knowingly disclosing assignors' personal viewing content, Patreon violated assignors' statutorily protected right to privacy in their video-viewing habits and activities. *See* 18 U.S.C. § 2710(c).

61. Assignors validly opted-out of the settlement class in *Stark*.

62. Assignors validly and irrevocably assigned all rights to, title to, and interest in their claims against Patreon to Lexclaim.

63. Lexclaim, in an abundance of caution, also opted out of the settlement class in *Stark*.

64. Patreon is thus liable to Lexclaim in the amount of $2,500 per violation

COMPLAINT

**CONFIDENTIAL DRAFT**

plus reasonable attorneys' fees and costs.

### Prayer for Relief

Lexclaim Recovery Group US LLC respectfully request:

- An award of statutory damages of $2,500 per violation of the Video Privacy Protection Act;
- An award of reasonable attorneys' fees and costs of litigation;
- A trial by jury on all issues so triable; and
- Any other relief deemed just and proper.

Respectfully submitted,

*/s/ Jason Harrow*
Jason Harrow
(Cal. Bar No. 308560)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Ste. 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

Charles Gerstein
(*pro hac vice application forthcoming*)
GERSTEIN HARROW LLP
1001 G Street NW, Suite 400E
Washington, DC 20001
charlie@gerstein-harrow.com
(202) 670-4809

*Attorneys for Plaintiff*