1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6                                              Case No.  22-cv-03131-JCS

7                                              **ORDER RE:**

8    BRAYDEN STARK, et al.,                    **MOTION FOR FINAL APPROVAL OF**
                                               **CLASS ACTION SETTLEMENT**
              Plaintiffs,
9                                              **CONTINGENT OBJECTIONS OF**
      v.                                       **LAURA HILL AND LEXCLAIM**
10                                             **RECOVERY GROUP US LLC**

     PATREON, INC.,
11                                             **PARTIES' OBJECTION TO 927**
              Defendant.                       **LEXCLAIM OPT-OUTS**
12
                                               **MOTION FOR ATTORNEYS' FEES,**
13                                             **REIMBURSEMENT OF LITIGATION**
                                               **EXPENSES, AND SERVICE AWARDS**
14

15                                             Re: Dkt. Nos. 196, 197, 201, 206

16

17   I.      **INTRODUCTION**

18           This case is a putative class action against Patreon, Inc. ("Patreon") based on its alleged

19   disclosure to Meta Platforms Inc. ("Meta"), without subscribers' consent, of information about the

20   videos its subscribers watched, which Plaintiffs allege violates the Video Privacy Protection Act

21   ("VPPA"), 18 U.S.C. § 2710.   After vigorously litigating the case for almost two years, the parties

22   entered into a class action settlement.  Dkt. no. 164.  On September 23, 2024, following

23   preliminary approval of the settlement by the Court, *see* dkt. no. 192 ("Preliminary Approval

24   Order"), notice of the settlement was sent to class members, who were given the opportunity to

25   object to the settlement or request exclusion from the class ("opt out").  The claims administrator

26   received 1,290 timely requests for exclusion from the proposed settlement, of which 928 were

27   submitted by third party Lexclaim Recovery Group US LLC ("Lexclaim").  Of these, 927 were

28   from individual class members who purportedly assigned their VPPA claims to Lexclaim ("the

927 Lexclaim opt-outs" or "the 927 opt-outs") while one was in Lexclaim's own name ("the Lexclaim opt-out").

Two contingent objections were received: one from class member Laura Hill and another from Lexclaim. Patreon and Plaintiffs, in turn, objected to the 927 opt-outs, asking the Court to hold that the 927 opt-outs and the assignments of these individuals' VPPA claims to Lexclaim are invalid and to issue a curative notice to these putative class members. Dkt. nos. 209, 210. They also ask the Court to hold that the Lexclaim opt-out is invalid. *Id.* Plaintiffs have also filed a Motion for Final Approval of Class Action Settlement ("Final Approval Motion") and a Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards ("Fee Motion").

For the reasons stated below, the Court GRANTS the Final Approval Motion and Fee Motion, overrules the contingent objections of Lexclaim and Hill and sustains Patreon and Plaintiffs' objection.[1]

## II.    BACKGROUND

### A.    Overview of the Settlement Agreement

In the settlement agreement, the class is defined as:

> all persons who, between April 1, 2016, to and through the Preliminary Approval date, requested or obtained video content on the Patreon website (patreon.com) while in the United States and at a time the person had a Facebook account and also had a Patreon account. The Class excludes Patreon, its parents, subsidiaries, affiliates, officers, directors, and employees; any entity in which Patreon has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their staff and immediate family members.

Settlement Agreement (dkt. no. 176-1) § 1.9.

The Settlement Agreement provides for a gross settlement amount of $7,250,000.00. *Id.* § 1.39. That amount has already been placed in an interest-bearing holding account where interest continues to accrue for the benefit of the class members. *Id.* Notice costs, administration expenses, attorneys' fees and costs, and service awards approved by the Court will be deducted

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c). Non-party Lexclaim has represented that were it made a party to this case it would *not* consent to magistrate jurisdiction.

1    from the fund and the balance (the "Net Settlement Fund") will be applied to pay claims submitted

2    by class members. *Id*. § 1.21.

3         The Settlement Agreement provides for disbursement of funds to class members through a

4    claims process that requires class members to submit a claim attesting that they accessed video

5    content on Patreon.com while they had an active Facebook account and provide a link to their

6    Facebook profile. *Id*. §§ 3.2-3.3. Plaintiffs' counsel explains why a claims process makes sense

7    under the circumstances:

> Only Patreon accountholders who accessed video content on
> Patreon.com while they had an active Facebook account are eligible
> to participate in the settlement. Patreon's records show whether a
> person had a Patreon account and requested or obtained video content
> on the Patreon website. While Meta has extensive data received
> through Patreon's Pixel transmissions, undertaking a forensic
> retrieval exercise over Meta's objections would result in further
> delays and substantial additional expense, and the expedient of simply
> requiring an attestation and link to a Facebook account serves as a
> reasonable proxy for proof of class membership, balancing the need
> to limit payments to class members with the imperative of offering an
> easy to understand, streamlined way for Class Members to participate.
> The Claim Form also elicits the information required to confirm
> contact and payment details.

16    Grille Decl., dkt. no. 176-2, ¶ 27.

17        After the claims administrator has determined the number of valid claims, the net

18    settlement fund amount will be divided by that number so that each claimant who has submitted a

19    valid claim will receive a pro rata share.  Settlement Agreement §§ 3.3-3.8. Claimants will have 90

20    days after issuance to cash their checks, at which point there will be a second pro rata distribution

21    of remaining settlement funds; except that "if such a pro rata redistribution would result in each

22    such Class Member receiving less than $10, the uncashed funds will be distributed, subject to

23    Court approval, to a non-profit organization focused on consumer privacy protection that has not

24    filed an amicus brief in this Action or in any other action alleging claims under the Video Privacy

25    Protection Act." *Id.* § 3.11.

26        In addition to monetary compensation, class members will receive non-monetary relief

27    through Patreon's removal or disabling of the Meta Pixel on any Patreon web page that includes

28    video content, with Patreon agreeing not to re-install or operate the Meta Pixel on any patreon.com

United States District Court
Northern District of California

web page that includes video content, except if: (a) the VPPA is amended in relevant part, repealed, or otherwise invalidated; (b) Patreon obtains consent in the form required by the VPPA, 18 U.S.C. § 2710(b)(2)(B); or (c) the Meta Pixel on the relevant Patreon web page otherwise complies with the VPPA. *Id.* §§ 2.4-2.5.

Class members may opt out of the settlement by submitting a timely request for exclusion, "in accordance with the procedures set forth in the Preliminary Approval Order." *Id.* § 7.3. The Settlement Agreement further provides:

> This Settlement Agreement will not bind a Class Member who timely and validly opts out of the Class. The Settlement Agreement will, however, bind any Class Member who does not timely and validly opt out of the Class. Group opt-outs, including "mass" or "class" opt-outs, are prohibited.

*Id.* § 7.4.

Class members who do not opt out of the class release "all claims . . . , whether federal or state, known or unknown, asserted or unasserted, regardless of legal theory, arising out of any facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions and failures to act regarding the alleged disclosures of the Class Members' personally identifiable information and video viewing or requesting behavior that were brought or could have been brought in the Action, including but not limited to claims under the VPPA, claims under California's Unfair Competition Law, and claims for unjust enrichment." *Id.* § 1.33.

The Settlement Agreement provides that the "Court will retain jurisdiction with respect to implementation and enforcement of the terms of [the] Agreement, and all Parties [thereto] submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in this Agreement." *Id.* § 9.16

### B.    Notice

The Settlement Agreement provides for notice to class members via email. *Id.* § 6.2. It includes as attachments both a short-form email notice and a long-form notice, which the Court approved. *See* dkt. nos 191-2, 191-3, 192 ¶¶ 7-15. In addition, the claims administrator (Simpluris) has maintained a settlement website as well as a dedicated toll-free number and email inbox since October 12, 2024. Simpluris Decl., dkt. no. 199, ¶¶ 9-10. The website contains

important case documents, including the Settlement Agreement, long-form notice and an opt-out

form. *Id.* ¶ 9 & Exs. B (long-form notice) & C (opt-out form). The opt-out form asks for the

class member's name, address, telephone number and email address. *Id.* Ex. C. It also states:

> If you opt out of the Settlement Class, you will:
>
> • Not be eligible to receive payment from the Settlement;
> • Not have any rights as a member of the class under the Settlement;
> • Not be bound by any further orders or judgments in this case; and
> • Keep the right, if any, to file a lawsuit against (or continue to sue)
> Patreon about the legal claims brought on behalf of the Settlement
> Class.
>
> Address:
>
> City, State, Zip:
> Phone Number:
> Email Address:
>
> _____ I am under 18 years old and do not want my name included in
> the list of opt-outs filed with the Court.
>
> _____ I want to opt out of the Settlement in Stark et al. v. Patreon,
> Inc., Case No. 3:22-CV-03131-JCS (N.D. Cal.).

*Id.*

Among other things, the email and long-form notices provide information about the

possible amount in compensation a class member who submits a claim will receive. Dkt. nos. 191-

2, 191-3. For example, the email notice states:

> After deduction of the costs of notice and settlement administration,
> any Court-approved award of attorneys' fees (up to 30% of the
> Settlement Fund), litigation costs, and any service awards for the
> Class Representatives (up to $7,500 to each of the six individual Class
> Representatives), the Settlement Fund will be distributed pro rata to
> eligible class members. We will not know the final amount that each
> class member will receive until all claims are evaluated. Based on
> claims rates in similar cases, eligible class members might receive
> between $35 and $175 each. The actual amount that each class
> member receives will be determined once all claims are evaluated,
> and may be higher or lower than these estimates.

Dkt. no. 191-3 at ECF p. 3. The long-form notice contains substantially the same language. Dkt.

no. 191-2 at ECF p. 12.

According to the claims administrator, on October 3, 2024, Patreon provided Simpluris

with a data list containing the names and email addresses for each potential Class Member

United States District Court
Northern District of California

("Potential Class List"). Simpluris Decl., dkt. no. 199, ¶ 7. The Potential Class List contained records for 8,653,241 individuals, of which 8,168,662 contained valid email addresses. *Id.* An initial email notice was sent to each of these addresses between October 12, 2024 and October 31, 2024. *Id.* ¶ 11. This notice was successfully delivered to 8,097,092 potential Class Members. *Id.* Plaintiffs' counsel estimates that this constitutes 99% of the class. Grille Decl., dkt. no. 198, ¶ 39. Plaintiffs' counsel further estimates that the actual class size is approximately 1.6 million people, based on the following reasoning:

> According to Patreon's records, approximately 8,000,000 Patreon account holders accessed video content on Patreon.com while in the United States during the Class Period. Not all of these people are Class Members, however, because they did not all simultaneously maintain a Facebook account such that the Meta Pixel would pass their video viewing choices and personal information to Meta. Based on publicly available data regarding web browsing habits, use of cookie blockers or private browsing, and Facebook login rates, Plaintiffs estimate that about 20% of the 8 million, or 1.6 million people are Class members.

*Id.* ¶ 38.

On November 21, 2024, Simpluris sent a reminder email to Class Members who had not submitted a claim form or a request for exclusion from the class. Simpluris Decl., dkt. no. 199, ¶ 12. According to Simpluris, it has received 2,102 inquiries via email at the email address listed in the notices and on the settlement website and has responded to 2,037 emails. *Id.* ¶ 13. It has received 509 calls between October 12, 2024, and December 8, 2024 at the settlement-specific toll-free telephone number. *Id.*, ¶ 10.

### C. Response of Class Members

According to the claims administrator, as of January 28, 2025, it had received 105,378 claim forms, of which 105,078 had been determined to be valid, 299 remained pending and one had been withdrawn as the class member had intended to submit an opt-out form. Simpluris Supp. Decl., dkt. no. 204-2, ¶ 7. As of the same date, Simpluris had received 1,289 requests for exclusion (opt-outs) from the proposed settlement class and one objection to the proposed Settlement, from class member Laura Hill. *Id.* ¶ 5. With respect to the opt-outs, Simpluris states that "nine (9) are deficient as the Class Member submitted both a request for exclusion and a claim form, one (1)

1  has been withdrawn as the Class Member confirmed their intention was to file a claim, and 927

2  appear to be invalid due to a 'group' opt-out filing by Lexclaim Recovery Group US LLC, which

3  is prohibited in paragraph 7.4 of the Settlement Agreement." *Id.* ¶ 6.

4       In her objection, Hill expressed two concerns about the Settlement Agreement. Dkt. no.

5  201. First, she objected to the extent that under Section 3.11 of the Settlement Agreement, if the

6  individual payments to those who submitted claims came out to less than $10, it was possible there

7  would be no disbursement at all to class members, meaning everything would go to the non-party

8  charity ("*cy pres*"). At the fairness hearing, however, Hill conceded that that objection is now

9  moot because, based on the number of claims that have been filed, it appears that each class

10  member who has filed a claim will receive approximately $42. *See* Simpluris Supp. Decl., dkt. no.

11  204-2, ¶ 10. Second, Hill contends the fairness of the Settlement Agreement may depend on the

12  identity of the *cy pres* – which is not specified in the Settlement Agreement -- if there are funds

13  remaining that are not subject to a second pro rata distribution. At the fairness hearing, however,

14  the Court found that this issue was not ripe and noted that any distribution to a *cy pres* would

15  occur only with Court approval of the specific *cy pres* to which funds are to be distributed.

16  Furthermore, the parties stipulated at the hearing that Hill would be given notice of any request for

17  Court approval of a *cy pres* should the parties seek to distribute any remaining funds to a *cy pres*.

18  Based on her understanding that she would have an opportunity to be heard as to the *cy pres*

19  designation, Hill stated that she does not object to the Settlement Agreement.

20       **D.    Attorneys' Fees, Litigation Costs and Incentive Awards**

21       In the Settlement Agreement, Patreon "agrees that Class Counsel will be entitled to

22  an award of reasonable attorneys' fees and expenses to be paid exclusively out of the Settlement

23  Fund in an amount to be determined by the Court." Settlement Agreement, § 8.1. However, it

24  specifies that "[t]he Parties have reached no agreement on the amount of fees and expenses that

25  Class Counsel will seek" and that "Defendant takes no position as to the amount of fees and

26  expenses to be sought." *Id.* § 8.2. The Settlement Agreement further provides that Class Counsel

27  may apply for Service Awards not to exceed $7,500 for each Class Representative[,]" which "is

28  not a measure of damages, but instead solely an award for the Class Representatives' services,

United States District Court
Northern District of California

United States District Court
Northern District of California

1  time, and effort on behalf of Class Members." *Id.* § 8.6.

2      In the Fee Motion, Class Counsel seek an award of attorneys' fees in the amount of

3  $2,175,000, which is 30% of the $7,250,000 non-reversionary Settlement Fund. Class Counsel

4  also request reimbursement of their out-of-pocket litigation costs of $372,446.74, a $7,500 service

5  award to Plaintiffs Stark and Oostyen, each of whom gave depositions, and $5,000 service award

6  to each of the remaining named Plaintiffs (Isaac Belenkiy, Valerie Burton, Laura Goodfield and

7  Denovias Mack). All of the named Plaintiffs have supplied declarations describing their

8  involvement in litigating this case. *See* dkt. nos. 191-1 through 191-6. In addition, Class Counsel

9  has supplied a detailed declaration describing the named Plaintiffs' participation and documenting

10  the time counsel spent on this case through December 11, 2024 and the rates of the attorneys who

11  worked on it, giving rise to a lodestar amount of $4,010,921.00. Grille Decl., dkt. no. 198, ¶¶ 44-

12  51. Counsel also provides a detailed breakdown of the litigations costs Plaintiffs seek in his

13  declaration. *Id.* ¶¶ 52-54.

14      **E.**    **Settlement Administration Costs**

15      As of January 28, 2025, Simpluris had incurred $261,640.37 in administration costs from

16  case set up, initial email campaign, reminder email campaign, and the claim intake and processing

17  phase. Simpluris Supp. Decl., dkt. no. 204-2, ¶ 11. As of that date, Simpluris estimated that an

18  approximate additional $153,502.63 would be incurred through the anticipated disbursement

19  activities and case closure. *Id.* These amounts are within the Not-to-Exceed amount of $425,000,

20  previously provided to the Court in the Joint Notice Regarding Class Action Settlement (dkt. no.

21  193). In the Preliminary Approval Order, the Court approved an advance payment to Simpluris

22  of $58,953.20 from the Settlement Fund for initial costs associated with notice and administration

23  expenses. Preliminary Approval Order at 4.

24      **F.**    **Lexclaim**

25      Lexclaim is a limited liability company that was formed on August 23, 2024 by Jason

26  Harrow and Charles Gerstein. Walker Decl., dkt. no. 209-2, ¶ 8 & Exs. G and H; Harrow Decl.,

27  dkt. no. 206-1, ¶ 2. In a separate action Lexclaim has brought against Patreon in this Court,

28  *Lexclaim Recovery Group US LLC v. Patreon Inc*., Case No. 3:25-cv-0428 RFL, N.D. Cal. ("the

"Lexclaim Action"), Lexclaim alleges that it was "founded . . . to help people recover a greater share of the money to which they would be entitled in class action cases if those cases had not settled." Lexclaim Action, Compl. ¶ 49. According to Lexclaim, it "does this by offering class members an upfront payment exceeding the average recovery under a class action settlement as well as a percentage of any additional amount recovered in exchange for an assignment of claims." *Id.* ¶ 50. "Lexclaim then prosecutes the claims, ensuring that, no matter what, class members are better off on average than they would be under a class action settlement—indeed, under ordinary circumstances, 95% of class members receive nothing at all under a settlement—and providing them a share of any further recovery." *Id.*

In Lexclaim's contingent objection, dkt. no. 206 ("Lexclaim Objection"), it states that "[a]fter the settlement in this case was preliminarily approved, Lexclaim sought out affected class members to offer them a better deal than they would have gotten in the class settlement." Contingent Objection at 3. In particular, Lexclaim offered "a guaranteed payment of $10 from Lexclaim and the right to 20% of any money Lexclaim recovers in connection with their claims" in exchange for class members' assignment to Lexclaim of "all rights in, title to, and interest in any and all causes of action Assignor[s] may now have, whether or [sic] known or unknown, discovered or undiscovered, against Patreon Incorporated related to any violation of the Video Privacy Protection Act." Lexclaim Action, Compl. ¶ 3. Lexclaim worked with "an advertising service to create a campaign where potential class members could learn about [its] offer and, if interested, sign an agreement offering to assign their claims to Lexclaim." Harrow Decl., dkt. no. 2-6-1, ¶ 7. Harrow states that he did "not personally see any advertisements in the precise manner that they would have been displayed to any user" but that he "approved draft posts that included images, and [he] also approved draft headline and copy language." *Id.* The images and copy language that Lexclaim approved inform Patreon users that their privacy rights may have been violated and encourage them to click on an "Apply Now" button to find out if they were eligible for "financial compensation" or a "cash reward." Harrow Decl., Ex. A, dkt. no. 206-2. The advertising does not mention that there is a pending class action settlement that might entitle them to compensation in an amount that exceeds the amount offered by Lexclaim.

1    Users who clicked on the "Apply Now" button were "directed to a website where they

2    could fill out a questionnaire."  Harrow Decl., dkt. no. 206-1, ¶ 12. That website was not "directly

3    controlled by Lexclaim."  *Id.*  Rather, Lexclaim's advertisers controlled this website, obtaining

4    927 opt-outs that they then "shared" with Lexclaim, giving Lexclaim "access, via the Dropbox

5    cloud service, to individual folders containing files from each of" the 927 opt-outs.  *Id.*  ¶ 19.[2]

6    Screenshots of the user flow associated with the questionnaire reflect that users who

7    clicked on the "Apply Now" button were taken through a series of interactive pages.  First, they

8    were told that they needed to answer a series of questions to determine their "eligibility for a

9    lawsuit related to patreon.com." Walker Decl., Ex. F, dkt. no. 209-8 at ECF p. 3.  The website

10   states next, "If you have subscribed to Patreon.com and watched videos, we'll evaluate your claim

11   to see if you're eligible for an immediate cash payment."  *Id.*  at ECF p. 4.  Based on their answers

12   to a series of questions, users were told that they may be class members in an unidentified case in

13   which a class action settlement has been reached and asked if they would be interested in opting

14   out of the class and giving up their rights in return for an immediate payment of $10 and a portion

15   of any additional recovery Lexclaim might obtain.  *Id.* at ECF p. 9.  A user who clicked "yes" was

16   then taken to a page where they were asked to provide form of payment and contact information,

17   *id.* at 10-11, which was followed by a formal agreement for the user to sign electronically.  *Id.* at

18   ECF p. 14-15 ("Assignment Agreement").

19   In the Assignment Agreement, Lexclaim disclosed, for the first time, that the class action

20   settlement was reached in the United States District Court for the Northern District of California

21   but the case number was not provided.  *Id.*   The Assignment Agreement provides the following

22   information about this case:

23       . . . on September 23, 2024, the United States District Court for the
         Northern District of California granted preliminary approval to a
24       class-action settlement resolving all claims related to video-privacy
         violations committed by Patreon Incorporated ("Patreon"), and

25

26

---

27   [2] According to Patreon, "[i]t appears that three of the alleged 927 opt-out requests may be
     duplicates; the group appears to include two copies of opt-outs from each of the following
28   individuals: Carol Ciocco, Isabel Lundquist, and Melodie Coulter-Pennington."  Patreon Opening
     Supp. Brief, dkt. no. 218 at p. 3 n.1.

United States District Court
Northern District of California

United States District Court
Northern District of California

> . . . the settlement resolves the claims of approximately 1,400,000 people against Patreon for that company's allegedly illegal transmission of video-viewing information to allegedly companies, namely Facebook, in exchange for a payment of $7,250,000, which, after attorneys' fees and administration costs, would be approximately $4,165,000 . . .

*Id.* at ECF p. 14. The Assignment Agreement does not contain any disclosures about the amount of the payment a user might receive if they were to remain in the class and submit a claim. Nor does it disclose that there is a settlement website with further information about the settlement and a toll-free number they could call with questions. The Assignment Agreement states that it is effective only when signed by both parties. *Id.* at ECF p. 15.

Following the Assignment Agreement page, there is a form for users to complete in order to opt out of the class. *Id.* at p. 17. This form states, in its entirety: "I, _____ hereby request to be excluded from the Class certified on September 23, 2024, in *Stark v, Patreon Inc*., No. 22-cv-03131-JCS (N.D. Cal.)." Lexclaim's form, in contrast to the one used by the claims administrator in this case, does not require the class member to provide their address, telephone number or email address. *See* Simpluris Decl., dkt. no. 199, Ex. C. Lexclaim's opt-out form is the first and only point in the process when this case is specifically identified.

On the pages containing the Assignment Agreement, the opt-out form, and a declaration for the user to complete, a drop-down panel on the right side of the page contains a "form checklist" for the page that refers to the user as "client." Walker Decl., Ex. F, dkt. no. 209-8 at ECF pp. 14-15, 17-18.

According to Lexclaim, all 927 opt-outs "signed the assignment contract and other documents after going through the questionnaire" described above. Harrow Decl., dkt. no. 206-1, ¶ 16. Harrow further states that Lexclaim did not directly communicate with the 927 opt-outs during the period when it was collecting the opt-out and assignment agreements. *Id.* ¶ 16. However, Harrow did receive three emails from potential class members, to which he responded. Harrow Decl., Ex. D, dkt. no. 206-5. In one, sent to Lexclaim's public email address on November 21, 2024, the sender stated that he "signed a class action" with Lexclaim. *Id.*

On December 9, 2024, Harrow, acting as counsel for Lexclaim, emailed a letter to Patreon's counsel, stating that Lexclaim was soliciting opt-outs and acquiring class members' VPPA claims.  Walker Supp. Decl., dkt. no. 218-2, ¶ 2 & Ex. M.  Lexclaim demanded that Patreon pay it an additional $1,480,000 to settle those claims, or $1,600 per claimant.  *Id.*   Patreon declined.

On January 13, 2025, Lexclaim mailed the opt-out forms to the claims administrator in this case in a single package.  Lexclaim Action, Compl. ¶ 54; Simpluris Decl., dkt. no. 209-2, ¶ 4.  Lexclaim also submitted an opt-out request in its own name, signed on Lexclaim's behalf by Jason Harrow. Simpluris Decl., dkt. no. 209-2, ¶ 6 & Ex. D.  Upon receipt of the 927 opt-out forms, the claims administrator contacted counsel in an email that stated:

> We received a package that was postmarked on January 13, 2025, and contained approximately 1,000 pages of what appear to be generic opt-out forms. All documents are identical [sic] formatted, and each opt-out only contains an opt-out statement, name, and signature but does not include the individual's address or telephone number. The generic opt-outs do appear to match the opt-outs described in the attached the attached [sic] document for Case No. 24-cv-428. However, knowing that para 7.4 of the Settlement Agreement prohibits "mass" opt-outs, our inclination is to reject or disqualify these opt outs unless the parties disagree.

Simpluris Decl., fkt. no. 209-2, ¶ 4. The parties agreed, dkt. no. 218 at 5, and on January 30, 2025, the claims administrator executed a declaration stating that the group of 927 opt-outs "appear to be invalid due to a 'group' opt-out filing by Lexclaim Recovery Group US LLC, which is prohibited in paragraph 7.4 of the Settlement Agreement."  Simpluris Supp. Decl., dkt. no. 204-2, ¶ 6.

Lexclaim alleges that on the same day it mailed the opt-in forms to the claims administrator (January 13, 2025) it signed the Assignment Agreements that had been signed by the 927 opt-outs.  Lexclaim Action, Compl. ¶ 55.  However, the sample Assignment Agreements it filed with the Court on February 5, 2025 were not signed by Lexclaim.  Harrow Decl., Ex. C, dkt. no. 206-4.  There is no evidence in the record that supports Lexclaim's allegation that it signed the Assignment Agreements.

On February 5, 2025, Lexclaim filed an objection relating solely to the question of whether the Court's judgment should bind the 927 opt-outs whose claims it purportedly owns.  Dkt. no.

206.  In its objection, Lexclaim makes two main arguments:  1)  "the opt-outs are valid because they are not the product of an impermissible 'mass' submission and are not the result of any conceivably misleading communication;" and 2) "although this Court has jurisdiction to approve the class-action settlement in this matter to the extent that it binds parties who have not opted out and who, therefore, implicitly consented to this Court's jurisdiction, it has no power to bind Lexclaim and no power to rule that Lexclaim's assignors' optouts were invalid."  *Id.* at 2. Lexclaim represents that so long as the Court "does not attempt to bind Lexclaim or its assignors to the Court's judgment, [it] takes no position on whether it should approve the settlement." *Id.*

Plaintiffs and Patreon responded by filing an objection to the 927 opt-outs, asking the Court to declare the opt-outs and the purported assignments of these individuals' claims to Lexclaim invalid. Dkt. nos. 209, 210.

The Court held a fairness hearing on February 19, 2025. The parties, Lexclaim and objector Laura Hill (through counsel) appeared.  One class member, Robert Ontiveros, also participated in the hearing but did not object to the settlement agreement.  The Court granted Lexclaim's request for supplemental briefing and that briefing has now been completed.

## III.    CERTIFICATION OF THE CLASS

In the Preliminary Approval Order, the Court found, preliminarily, that it would likely be able to certify the following proposed class ("Class" or "Settlement Class") pursuant to Federal Rule of Civil Procedure 23:

> All persons who, between April 1, 2016, to and through the Preliminary Approval date, requested or obtained video content on the Patreon website (patreon.com) while in the United States and at a time the person had a Facebook account and also had a Patreon account.

Preliminary Approval Order at 2. Excluded from the Settlement Class are Defendant Patreon, Inc., its parents, subsidiaries, affiliates, officers, directors, and employees; any entity in which Patreon has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their staff and immediate family members. *Id.*

In particular, the Court found, as a preliminary matter, that:

a.  Members  of  the  Class  are  so  numerous  as  to  make  joinder

13

impracticable;

b.   There are questions of law and fact common to the Class, and such questions predominate over any questions affecting only individual Class Members for purposes of the Settlement;

c.   Plaintiffs' claims and the defenses thereto are typical of the claims of the Class Members and the defenses thereto for purposes of the Settlement;

d.   Plaintiffs and their counsel have, and will continue to, fairly and adequately protect the interests of the Settlement Class Members in this action with respect to the Settlement; and

e.   A class action is superior to all other available methods for fairly and efficiently resolving this action.

*Id.*

Having considered the parties' submissions in support of final approval, the objections of Hill and Lexclaim, and the response of the class, the Court reaffirms and makes final its provisional findings that, for purposes of the Settlement only, all prerequisites for maintenance of a class action set forth in Federal Rules of Civil Procedure 23(a) and (b)(3) are satisfied. The Court accordingly certifies the Settlement Class described above.

## IV.    ADEQUACY OF NOTICE

The Court finds that notice of the Settlement Agreement was given to settlement class members in accordance with the Preliminary Approval Order and constituted the best notice practicable of the proceedings and matters set forth therein. The Court further finds that the notice provided to the Settlement Class satisfies the requirements of Federal Rule of Civil Procedure 23 and constitutional due process and that the requirements of the Class Action Fairness Act, 28 U.S.C. § 1715, have been met. As discussed further below, however, because of the material omissions and misleading statements in Lexclaim's disclosures about the settlement in this case, a curative notice is required as to the class members who purportedly assigned their claims to Lexclaim and requested exclusion from the class.

## V.    REASONABLENESS OF THE SETTLEMENT AGREEMENT

Judicial policy strongly favors settlement of class actions, "particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "[H]owever, judges have the responsibility of ensuring fairness to all members of the

14

class presented for certification." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). Under Rule 23 of the Federal Rules of Civil Procedure, a district court may approve a class action settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate . . . ." Fed. R. Civ. P. 23(e)(2). Further, following Congress's December 2018 revision of Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021).

In the Preliminary Approval Order, the Court found, as a preliminary matter, that the proposed settlement is fair, reasonable and adequate, based on its finding that:

a. Plaintiffs and Class Counsel have adequately represented the Class;
b. The Class Settlement Agreement was negotiated at arm's length with the assistance of the Hon. Jeremy D. Fogel (Ret.), a former District Judge of the Northern District of California and experienced private mediator;
c. The monetary relief provided to the Settlement Class is adequate given the risks, delay, and uncertainty of continued litigation and trial, the effectiveness of the proposed method of distributing relief to the class, the terms of the proposed award of attorney's fees, and any agreement required to be identified under Rule 23(e)(3); and
d. The Settlement Agreement and proposed method of distributing the relief treat all Class Members equitably relative to each other.

Preliminary Approval Order at 1-2. Having considered the parties' submissions in support of final approval, the objections of Hill and Lexclaim, and the response of the class, the Court reaffirms and makes final its provisional findings that the settlement it is fair, reasonable, and adequate under Fed. R. Civ. P. 23(e)(2).

The Court also expressly finds that there is no evidence of collusion between the parties. In particular, the Settlement Agreement does not contain a "clear sailing" provision with respect to the amount of attorneys' fees to be awarded to class counsel, the amount sought in attorneys' fees is not disproportionate to the amount of the settlement fund, and there is no " 'kicker' or 'reverter' clause [in the Settlement Agreement] that returns unawarded fees to the defendant, rather than the class." *See Briseno*, 998 F.3d at 1023.

## VI.    ATTORNEYS' FEES AND COSTS

"While attorneys' fees and costs may be awarded in a certified class action where so

1    authorized by law or the parties' agreement, Fed.R.Civ.P. 23(h), courts have an independent

2    obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have

3    already agreed to an amount." *In re Bluetooth Headset Prod. Liab. Litig*., 654 F.3d 935, 941 (9th

4    Cir. 2011) (citations omitted).  The Ninth Circuit has approved two different methods for

5    calculating a reasonable attorneys' fee depending on the circumstances: the lodestar method and

6    the percentage-of-recovery method. *Id.* at 941-942.

7        The lodestar is obtained by "multiplying the number of hours the prevailing party

8    reasonably expended on the litigation (as supported by adequate documentation) by a reasonable

9    hourly rate for the region and for the experience of the lawyer" and can be adjusted upwards or

10   downwards based on various "reasonableness" factors; this approach is "appropriate in class

11   actions brought under fee-shifting statutes (such as federal civil rights, securities, antitrust,

12   copyright, and patent acts), where the relief sought—and obtained—is often primarily injunctive

13   in nature and thus not easily monetized, but where the legislature has authorized the award of fees

14   to ensure compensation for counsel undertaking socially beneficial litigation." *Id.* at 941.

15       Alternatively, where a settlement produces a common fund for the benefit of the entire

16   class, courts have discretion to use the percentage-of-recovery method.  *Id.* at 942 (citing *In re

17   Mercury Interactive Corp*., 618 F.3d 988, 992 (9th Cir. 2010) (citing *Powers v. Eichen*, 229 F.3d

18   1249, 1256 (9th Cir. 2000))).  The Ninth Circuit has explained that "[b]ecause the benefit to the

19   class is easily quantified in common-fund settlements, [it] allow[s] courts to award attorneys a

20   percentage of the common fund in lieu of the often more time-consuming task of calculating the

21   lodestar." *Id.*  The benchmark for a reasonable fee award using the common fund approach is 25

22   percent, but courts may adjust this amount upward or downward where there are "special

23   circumstances." *Id.* (citing *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311

24   (9th Cir.1990));  *see also Destefano v. Zynga, Inc*., No. 12-CV-04007-JSC, 2016 WL 537946, at

25   *16 (N.D. Cal. Feb. 11, 2016) ("In common fund cases in the Ninth Circuit, the 'benchmark'

26   award is 25 percent of the recovery obtained, with 20-30 percent as the usual range.").

27       "Relevant factors to a determination of the percentage ultimately awarded include: '(1) the

28   results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the

United States District Court
Northern District of California

16

1    contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made

2    in similar cases.'" *Rodriguez v. Nike Retail Servs., Inc*., No. 14-CV-01508-BLF, 2022 WL

3    254349, at *5 (N.D. Cal. Jan. 27, 2022) (quoting *Tarlecki v. bebe Stores, Inc*., No. C 05–1777

4    MHP, 2009 WL 3720872, at *4 (N.D. Cal. Nov. 3, 2009) (citations omitted)). "The Ninth Circuit

5    encourages district courts 'to guard against an unreasonable result' by cross-checking attorneys'

6    fees calculations against a second method." *Destefano*, 2016 WL 537946, at *18.

7         Class counsel's fee request of $2,175,000 (30% of the $7,250,000 settlement fund) is based

8    on the common fund approach. The Court finds based on consideration of the factors listed above

9    that the request is reasonable.  First, Class Counsel has achieved excellent results, obtaining a

10   settlement that will result in awards to all class members who filed a claim of approximately $42.

11   This is an amount that is within the range of VPPA settlements that have been approved.  *See, e.g.*,

12   *Vela v. AMC Networks, Inc*., No. 1:23-cv-02524-ALC, ECF No. 59 (S.D.N.Y.) (approximately $9

13   per); *Beltran, Jr., et al. v. Sony Pictures Entertainment Inc., d/b/a CrunchyRoll*, Case No. 1:22-cv-

14   04858, ECF No. 52 (N.D. Ill. Dec. 7, 2023) (approximately $30.94 at the time of filing of final

15   approval motion); *Fiorentino v. FloSports, Inc*., Case No. 1:22-cv-11502-AK, ECF No. 72 (D.

16   Mass. Feb. 16, 2024) (approximately $85).  The Settlement Agreement also affords all class

17   members meaningful non-monetary relief through Patreon's removal or disabling of the Meta

18   Pixel on any Patreon web page that includes video content.  Moreover, the percentage of the class

19   that filed claims (approximately 6%) is relatively high compared to other similar cases.  *See, e.g*.,

20   *Fiorentino*,  Case No. 1:22-cv-11502-AK, ECF No. 72 (D. Mass. Feb. 16, 2024) (3.3% claims

21   rate); *Ambrose v. Boston Globe Media Partners, LLC*, Case No. 1:22-cv-10195-RGS, ECF Nos.

22   63, 67 (D. Mass. Sept. 6, 2023) (estimated 2.6% claims rate); *Beltran*, Case No. 1:22-cv-04858,

23   ECF No. 53 (N.D. Ill. Dec. 7, 2023) (1.75% claims rate).

24        Second, the fee request is reasonable in light of the substantial risks present in this

25   litigation. Among other things, Patreon's First Amendment challenge to Plaintiffs' VPPA claims

26   raised difficult questions of first impression.

27        Third, considerable skill was required to prosecute Plaintiffs' claims.  In particular, in

28   addition to the complex legal questions class counsel had to address, counsel had to develop

United States District Court
Northern District of California

1   knowledge of computer science and digital advertising concepts to rebut Patreon's defenses.  In

2   addition, Class Counsel faced highly qualified defense counsel.

3          Fourth, the contingent nature of the representation supports the fee request.  "With respect

4   to the contingent nature of litigation, courts tend to find above-market-value fee awards more

5   appropriate in this context given the need to encourage counsel to take on contingency-fee cases

6   for plaintiffs who otherwise could not afford to pay hourly fees."  *Bellinghausen v. Tractor Supply*

7   *Co.*, 306 F.R.D. 245, 261 (N.D. Cal. 2015).

8          Finally, the fee award requested here is line with awards in other similar cases.  *See, e.g.*,

9   *In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2019 WL 1791420, at *9 (N.D. Cal. Apr.

10  24, 2019) (awarding 30% in consumer privacy litigation); I*n re MCG Health Data Security Issue*

11  *Litigation*, No. 2:22-cv-00849, ECF Nos. 88, 94 (W.D. Wash. Oct. 9, 2024) (awarding 33.3%).

12         The lodestar cross-check amount of more than $4 million dollars, which the Court finds to

13  be based on reasonable time and hourly rates, lends further support to the conclusion that an award

14  of attorneys' fees to Class Counsel in the amount of $2,175,000 is reasonable.  This is especially

15  true because the lodestar estimate does not include the time class counsel spent on supplemental

16  briefing in connection with the Lexclaim Objection.

17         Therefore, the Court awards Class Counsel $2,175,000 in attorneys' fees.   The Court

18  further finds that Class Counsel are entitled to recover the $372,446.74 they have incurred in

19  litigation expenses, which are reasonably incurred and adequately documented in the Grille

20  Declaration, dkt. no. 198, ¶¶ 52-54.  *See Williams v. SuperShuttle Int'l, Inc.*, No. 12-CV-06493-

21  WHO, 2015 WL 685994, at *2 (N.D. Cal. Feb. 12, 2015) ("The prevailing view is that expenses

22  are awarded in addition to the fee percentage.") (citation omitted).

23  **VII.    INCENTIVE AWARDS**

24         Incentive awards "are discretionary . . . and are intended to compensate class

25  representatives for work done on behalf of the class, to make up for financial or reputational risk

26  undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private

27  attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (internal

28  citation omitted). "In this district, a $5,000 payment is presumptively reasonable" and "awards

United States District Court
Northern District of California

1    typically range from $2,000 to $10,000." *Bellinghausen*, 306 F.R.D. at 266. The Court has

2    reviewed the declarations supplied by the named plaintiffs and finds that the awards requested

3    here -- $7,500 to Stark and Oostyen and $5,000 for the remaining named plaintiffs – is appropriate

4    in light of the time and effort each one has devoted to this case for the benefit of the class.

5    Therefore, the Court GRANTS Plaintiffs' request as to the incentive awards.

6    **VIII.   LEXCLAIM OBJECTION**

7        **A.   Whether this Court Has Authority to Declare Lexclaim Opt-outs and
             Assignments Invalid and Issue a Curative Notice**

8         The parties ask the Court to overrule Lexclaim's contingent objection, declare that the 927

9    opt-outs and Lexclaim opt-out are invalid, and issue a curative notice so that the individuals whose

10   opt-out forms were collected by Lexclaim have the opportunity to submit valid opt-out forms or

11   alternatively, file a claim for payment under the Settlement Agreement.  Lexclaim, however,

12   contends that because these individuals' VPPA claims have been assigned to it, it will simply

13   resubmit the opt-out forms if a curative notice is issued.  *See* dkt. no. 222 at 11 ("[E]ven if this

14   Court . . . orders a second opt-out period based on statements that are not false and do in fact

15   present an accurate and genuine statement of the Parties' settlement, it will be Lexclaim's right to

16   opt out, and Lexclaim will take that right.");  *see also*  Hearing Transcript, dkt. no. 16, at 18

17   (Counsel for Lexclaim: "Well, so it's important to note that Lexclaim owns the claims now. Those

18   claims have been assigned to us. And I will tell the Court and the parties now that if there's a

19   curative period during which Lexclaim can opt out of the settlement, Lexclaim will take its

20   opportunity to do so. We have purchased all of the claims.").  Thus, in order for the curative notice

21   to accomplish its objective, the Court must decide not only whether the 927 opt-outs submitted by

22   Lexclaim are invalid but also whether the assignment of these individuals' claims to Lexclaim is

23   valid.  *See id.* at 19 (Plaintiffs' counsel:  " I think the underlying presumption of the curative

24   notice is that the assignment is invalid because it was, again, procured based on statements that

25   weren't complete regarding the settlement and that were misleading.").  The preliminary question

26   the Court must address is whether it has jurisdiction to decide these questions under 28 U.S.C. §

27   636(c) based on the consents of the parties.  The Court finds that it does.

28

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Section 636(c) authorizes magistrate judges, "[u]pon the consent of the parties," to "conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves." 28 U.S.C. § 636(c)(1). In the context of class actions, the Ninth Circuit has held that "the statute requires the consent of the named plaintiffs alone" and does not require the consent of absent class members. *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1076 (9th Cir. 2017). In *Koby*, the Ninth Circuit explained its conclusion as follows:

> As a purely linguistic matter, § 636(c)(1)'s reference to the consent of "the parties" could be read to encompass both the named plaintiffs and the absent class members, for the term does not have a single fixed meaning. In some contexts absent class members are treated as parties, *see In re Cement Antitrust Litigation*, 688 F.2d 1297, 1307–10 (9th Cir. 1982) (judicial recusal statute), while in other contexts they are not, *see Snyder v. Harris*, 394 U.S. 332, 340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) (diversity jurisdiction statute). As the Supreme Court has observed, absent class members may be treated as parties "for some purposes and not for others." *Devlin*, 536 U.S. at 10, 122 S.Ct. 2005.

> Viewing § 636(c) as a whole, it seems clear that Congress did not intend absent class members to be treated as parties in this context. In § 636(c)(2), which specifies the procedures for obtaining party consent under (c)(1), the phrase "the parties" is used multiple times in a way that cannot sensibly be read to include absent class members. For example, the provision states that when a magistrate judge has been designated to exercise jurisdiction under (c)(1), "the clerk of court shall, at the time the action is filed, notify the parties of the availability of a magistrate judge to exercise such jurisdiction." In virtually all class actions, it would be impossible for the clerk of court to issue this notice to absent class members at the time the action is filed. The identities of all absent class members will often not be known until later in the case, after at least preliminary discovery has been conducted. Even if the identities of all absent class members are known at the outset of the case, the clerk would need to compile their names and contact information in order to send the required notice, since that information will not appear in the complaint. And in large class actions, the cost of sending each class member notice of the availability of a magistrate judge would be prohibitive even for the most well-funded district courts. We doubt Congress would have imposed these substantial budgetary and manpower burdens on clerks' offices across the country without making that intent explicit.

> There is an additional reason to believe that Congress intended to require the consent of only the named plaintiffs under § 636(c)(1). As a general matter, the named plaintiffs in a properly certified class action are charged with conducting the litigation on behalf of the class they represent; by definition class actions involve too many plaintiffs to allow each to participate personally. See Fed. R. Civ. P. 23(a)(1).

United States District Court
Northern District of California

1
2
3
4
5
6

> The named plaintiffs serve as representatives of the class and in that capacity are authorized to decide matters of litigation strategy, such as which claims to assert or drop, what discovery to take, what motions to file, and so forth. Deciding whether to consent to a magistrate judge is a matter of litigation strategy of the same order. In fact, it is probably less consequential to the outcome than other decisions the named plaintiffs are ordinarily called upon to make, such as deciding whether to consent to a bench trial or choosing which issues to raise on appeal from an adverse verdict. It would therefore have been sensible for Congress to assume that the named plaintiffs in a class action will decide, on behalf of the absent class members, whether to consent to the jurisdiction of a magistrate judge.

7  *Id.* at 1076-1077.  The court went on to recognize that "[l]imits imposed by the Due Process

8  Clause on the enforcement of class judgments do not curtail a magistrate judge's authority under §

9  636(c) to enter judgment in the first instance." *Id.*  at 1078-1079.

10      Lexclaim attempts to avoid the rule that the consent to magistrate jurisdiction of absent

11  class members is not required by asserting that the 927 opt-outs are, in essence, no longer absent

12  because they opted out and assigned their rights to Lexclaim:

13
14
15

> Unlike in *Koby*, class members here were given a right to opt-out; Lexclaim exercised that right, and so is not an "absent class member." Instead, Lexclaim has appeared and declined magistrate jurisdiction on behalf of itself and as to the resolution of the opt outs of those whose claims it owns.

16  Lexclaim's Response to Defendant Patreon Inc.'s Supplemental Opening Brief ("Lexclaim

17  Response to Patreon"), dkt. no. 221 at 21.  Yet Lexclaim has pointed to no authority that supports

18  its position that a class member who opts out is no longer considered "absent" for the purposes of

19  magistrate consent. Moreover, this argument puts the cart before the horse – the first question

20  presented is whether the unarguably absent class members have opted out.  Lexclaim points to no

21  authority that a magistrate judge, with consent of the named plaintiffs and the defendants, may not

22  determine the validity of attempts by one or more absent class members to opt out in accordance

23  with the rules established by the court. Further, such an approach would be inconsistent with the

24  court's conclusion in *Koby* that "[i]t . . .  would have been sensible for Congress to assume that the

25  named plaintiffs in a class action will decide, on behalf of the absent class members, whether to

26  consent to the jurisdiction of a magistrate judge."  846 F.3d  at 1076.

27      The alternative approach advocated by Lexclaim is that a magistrate judge, having

28  presided over a class action up to the point of settlement, may lose the authority at the final

United States District Court
Northern District of California

1   approval stage of the case to determine *who* is a class member and therefore, by extension, to

2   determine who will be bound by its judgment, thus requiring a separate proceeding before a

3   district judge to resolve that question before a settlement can be approved and final judgment

4   entered.  Such a result would defeat the scheme established by Congress under the reasoning of

5   *Koby*.  Rather, the Court concludes that it has the authority – and the obligation – to determine

6   whether requests to be excluded from the class are valid and to issue a curative notice if

7   appropriate.  Here, that inquiry requires the Court to determine whether absent class members

8   were given insufficient notice or may have been misled, and to address whether the opt-out forms

9   were submitted in accordance with the requirements of the Settlement Agreement.

10          Further, to the extent that the curative notice will give these absent class members an

11  opportunity to submit a new opt-out form (or file a claim under the Settlement Agreement), the

12  Court finds that its authority also extends to the question of what person or entity is authorized to

13  submit an opt-out form (or claim) in response to the curative notice.  To reach a contrary

14  conclusion would mean that a magistrate judge, even with the consent of the parties, would lack

15  the authority to perform its fundamental obligation of protecting absent class members.  Such a

16  result is inconsistent with the reasoning and holding of *Koby*.  Therefore, the Court concludes that

17  magistrate jurisdiction extends to the question of whether the absent class members' assignments

18  of their VPPA claims to Lexclaim were valid.

19          Finally, the Court is not persuaded by Lexclaim's assertion that it is analogous to an

20  intervenor and therefore, that its consent to magistrate jurisdiction is required.  Lexclaim has not

21  been permitted to intervene in this case and therefore, any requirements that apply to intervenors

22  do not apply here.

23          Therefore, the Court concludes that it has jurisdiction to decide whether the 927 opt-outs

24  and Lexclaim opt-out are invalid and whether the assignment of these class members' VPPA

25  claims to Lexclaim is valid.

26   **B.**     **Whether the Opt-Outs are Invalid Because of Lexclaim's Misleading**
            **Communications with Class Members**

27          "Because of the potential for abuse, a district court has both the duty and the broad

28

United States District Court
Northern District of California

authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). Thus, "courts overseeing settlement proceedings have the authority to address improper communications sent by non-parties." *Chalian v. CVS Pharmacy, Inc*., No. 2:16-CV-8979-AB-AGR, 2020 WL 7347866, at *4 (C.D. Cal. Oct. 30, 2020) (citing *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 311 (3d Cir. 2005); David F. Herr, Manual for Complex Litigation § 21.33 (4th ed.)). As the court in *Chalian* explained, "improper communications from non-parties that attempt to do an end run around the court-approved notice of settlement are particularly concerning: the class notice is 'crucial' to the entire scheme of Rule 23 in that it provides a neutral description that enables class members to conduct an 'independent analysis of their own self-interest' in determining whether to object to or opt out of a settlement." *Id.* (cleaned up) (quoting *Georgine v. Amchem Products, Inc*., 160 F.R.D. 478, 490 (E.D. Pa. 1995) (ordering new opt-out process for class members who had opted out because of misleading communications from attorneys opposed to the settlement)); *see also Impervious Paint Indus., Inc. v. Ashland Oil*, 508 F. Supp. 720, 723 (W.D. Ky. 1981) ("It is essential that the class members' decision to participate or to withdraw be made on the basis of independent analysis of its own self-interest. It is the responsibility of the Court as a neutral arbiter, and of the attorneys in their adversary capacity, to insure this type of free and unfettered decision. The mechanism selected for accomplishing this is the class notice, which is designed to present the relevant facts in an unbiased format.").

Thus, for example, in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig*., where a third-party claim aggregator ("ClaimClam") submitted thousands of claims on behalf of class members, the court found that the claims administrator had properly rejected these claims where there was "evidence that the information provided by ClaimClam to Class Members about the . . . Class Settlement and claims process was incorrect or potentially misleading." No. 19-MD-02913-WHO, 2023 WL 6205473, at *9 (N.D. Cal. Sept. 19, 2023). The court explained:

> The Settlement Administrator appropriately rejected the ClaimClam submissions. The method and contents of the notices given to class members – including the explanation of the case and instructions on how to participate, opt-out, or object – were all approved by the Court as required by Federal Rule of Civil Procedure 23(c)(2)(B). The Court

1    also approved the appointment of Epiq as the Claims Administrator
2    based on representations of Epiq's qualifications and experience and
     an outline of administrative and communication services to be
3    provided to class members, under the supervision of Class Counsel
     and ultimately the Court. The Court takes these steps to ensure that
4    class members' due process rights are fully protected. Allowing en
     masse submissions by claims aggregators like ClaimClam raises real
5    risks that Class Members will not receive accurate information
     regarding the scope of the class and the claims process. Allowing a
6    third-party to submit hundreds or thousands of aggregated claims also
     hinders the ability of the Court-appointed Claims Administrator to
7    communicate directly with claimants and conduct required follow up
     to identify fraudulent claims or verify the accuracy of claims and to
8    resolve claim disputes (e.g., confirm hours worked in wage and hour
     suits, or the amount of product purchased in consumer suits).

9    *Id.* The court went on to find that there would be no prejudice to class members because the

10   parties, along with the claims administrator and ClaimClam were ordered to work together to

11   provide notice to the class members' whose claims had been invalidated and an opportunity for

12   them to resubmit their claim.  *Id.*

13        Here, the evidence is clear that class members who submitted opt-out forms through

14   Lexclaim were given incomplete and misleading information about the settlement in this case and

15   their rights under the Settlement Agreement.  Among other things, it is undisputed that the only

16   information provided in Lexclaim's online communications about the amount of the payout each

17   class member would receive was the bare statement that "the settlement resolves the claims of

18   approximately 1,400,000 people against Patreon for that company's allegedly illegal transmission

19   of video-viewing information to other companies, namely Facebook, in exchange for a payment of

20   $7,250,000, which, after attorneys' fees and administration costs, would be approximately

21   $4,165,000."  Walker Decl., Ex. F, dkt. no. 209-8 at ECF p. 14.  Lexclaim insists that this

22   information, which suggests an average recovery of $3 per class member, is not misleading

23   because on *average* – taking into account the 93.5 % of the class who did not submit claims -- the

24   Settlement Agreement will pay $3 per class member.  Hearing Transcript, dkt. no. 216 at 23-25.

25   Yet this is "semantic splitting of hairs" that ignores the fact the Lexclaim fails to inform class

26   members that their likely recovery if they submit a claim instead of assigning their claim to

27   Lexclaim and opting out will be more than ten times that amount. *See Retiree Support Grp. of*

28   *Contra Costa Cnty. v. Contra Costa Cnty.*, No. 12-CV-00944-JST, 2016 WL 4080294, at *7 (N.D.

United States District Court
Northern District of California

24

United States District Court
Northern District of California

1    Cal. July 29, 2016) (finding that statements by third party to class members about proposed

2    settlement were false, despite "semantic splitting of hairs" and therefore, finding that opt-outs

3    obtained as a result were invalid and ordering curative notice).

4        Moreover, this is just the tip of the iceberg.  The scant information provided to potential

5    class members by Lexclaim, through its hired advertisers, failed to inform class members that they

6    had the right to object to the settlement and that there was a fairness hearing that they could appear

7    at; that there was a website and toll free number where they could obtain more information about

8    the settlement; that they were already represented by class counsel, who could be reached by email

9    and by telephone; or that they might be subject to discovery in a future action in which Lexclaim

10   asserted their assigned claims, should Lexclaim decide to proceed with such an action.  *See MSP*

11   *Recovery Claims, Series LLC v. Abbott Lab'ys*, No. CV1921607FLWRLS, 2022 WL 11804007, at

12   *4 (D.N.J. Oct. 17, 2022) ("Generally, a party bringing an assigned claim must produce discovery

13   on the same basis to which the defendants would have been entitled if an assignor had brought the

14   claim directly.") (internal quotations and citations omitted).

15       In addition, the online Assignment Agreement form included a checklist next to it referring

16   to the user as "client," suggesting the creation of an attorney-client relationship.  The potential for

17   confusion on this point, despite small-print disclaimers, is strengthened by the vague statement at

18   the beginning of the questionnaire telling those who completed it that their answers would be used

19   determine "eligibility for a lawsuit related to patreon.com." Walker Decl., Ex. F, dkt. no. 209-8 at

20   ECF p. 3.  In fact, it appears that at least one individual who assigned their claim to Lexclaim did

21   believe that Lexclaim was offering to represent them in a class action.  *See* Harrow Decl., Ex. D,

22   dkt. no. 206-5 (email from Lexclaim opt-out to Lexclaim stating that they "signed a class action"

23   with Lexclaim).

24       In sum, the Court finds that Lexclaim's communications with the individuals who signed

25   the 927 opt-outs were misleading and incomplete, and therefore, the opt-outs are invalid.

26       **C.    Whether Opt-Outs are Invalid Under the Settlement Agreement**

27       The Court also finds, as an additional ground for declaring the 927 opt-outs invalid, that

28   these opt-outs were submitted as a "group" and therefore violate the procedural requirements of

the Settlement Agreement and in particular, § 7.4, prohibiting "[g]roup opt-outs, including 'mass' or 'class' opt-outs."

Recently, Judge Freeman explained that "[d]istrict courts have discretion to accept or reject opt-out requests that do not conform precisely to the exclusion request procedure." *In re Google Assistant Priv. Litig.*, No. 5:19-CV-04286-BLF, 2025 WL 510435, at *3 (N.D. Cal. Feb. 14, 2025) (citing *In re Deepwater Horizon*, 819 F.3d 190, 195 (5th Cir. 2016); *In re Diet Drugs*, 282 F.3d 220, 241 (3d Cir. 2002); *Bellows v. NCO Fin. Sys., Inc.*, No. 07-cv-1413, 2009 WL 10725745, at *4 (S.D. Cal. June 19, 2009), rep. and rec. adopted, No. 07-cv-1413, 2009 WL 10725741 (S.D. Cal. July 13, 2009)). "[A] district court may either 'disregard certain hyper-technical violations' of the opt-out procedure in the 'interests of justice,' or, conversely, it may enforce adherence to those procedures where it believes necessary." *Id.* (citing *In re Centurylink Sales Pracs. & Sec. Litig.*, No. 17-cv-2832, 2020 WL 3512807, at *3 (D. Minn. June 29, 2020)).

Here, the Court finds that Lexclaim's submission of the 927 opt-out forms constituted a "group" opt-out because: 1) the forms were delivered in a single package to the claims administrator; 2) the forms were collected as part of an advertising campaign that offered all of the individuals who submitted opt-out forms the same deal; 3) all of the opt-outs used the same form, which did not meet the requirements of the class notice approved by the Court and thus, were uniformly insufficient with respect to the identifying information provided, in contrast to the 352 requests for exclusion that were found to be valid, all of which provided or updated their email addresses and included an address and telephone number.  Simpluris Second Supp. Decl., dkt. no. 223-1, ¶ 4.

Further, this violation was not "hyper-technical."  As discussed above, Lexclaim obtained opt-outs from potential class members without providing sufficient information to allow them to make informed decisions about the choice to opt out and even misled them; its efforts resulted in almost three quarters of the total opt-outs received by the claims administrator.  Excusing the prohibition on group opt-outs under the circumstances here would threaten the due process rights of the class members who accepted Lexclaim's offer.  It would also diminish the value of the Settlement Agreement to Patreon, substantially increasing the number of class members whose

claims are not released under the Settlement Agreement.

The Court finds further reason to exercise its discretion in favor of enforcing § 7.4 of the Settlement Agreement based on Lexclaim's use of an opt-out form that did not meet the requirements of the Court-approved notice, which provided that any opt-out request "must include your name, address, telephone number, and your signature." Dkt. 191-2 at 13.    The parties represent that the information provided in the Lexclaim opt-out forms is insufficient to ensure that courts in subsequent actions will be able to determine whether a particular individual did, in fact, opt out of the Settlement Agreement in this case. Dkt. no. 218 at 14 ("Many of the names on the forms are common names. Patreon thus cannot tell from the forms who exactly has submitted an opt-out. Moreover, because the names are often common, it would not be possible in subsequent litigation to determine whether a litigant asserting a VPPA claim is the person who submitted an opt-out through Lexclaim or a class member bound by res judicata. This is not mere formalism; whether or not a person validly opted out of a class action settlement is a not infrequent subject of later litigation."). This shortcoming may have practical (and negative) consequences for Patreon to the extent that it will make it harder for it to defend against future claims on the basis of *res judicata.*  Likewise, to the extent that this Court seeks to identify the class members who are and are not covered by its judgment, it may be unable to do so because of defective opt-out form Lexclaim asked potential class members to complete.

Therefore, the Court finds that the 927 opt-outs are invalid for the additional reason that they are not in compliance with the terms of the Settlement Agreement.

## D.    Whether Assignments of VPPA Claims are Invalid

As discussed above, in order for the Court to ensure that absent class members who may have opted out based on Lexclaim's representations (and omissions) relating to the Settlement Agreement are afforded a meaningful remedy, the Court must address the validity of the purported assignments of their VPPA claims to Lexclaim. The parties have submitted fulsome briefing on this question.  For the reasons set forth below, the Court concludes that under the facts of this case, the assignments of VPPA rights by the 927 opt-outs were invalid and therefore, Lexclaim does not own the VPPA claims of any absent class member. Consequently, the Lexclaim opt-out is invalid.

1    First, there is no evidence in the record that Lexclaim signed the Assignment Agreements

2    submitted by the 927 opt-outs.    As the Assignment Agreement states that it is effective "only

3    when it is signed by both parties[,]" Walker Decl., Ex. F, dkt. no. 209-8 at ECF p. 15, this

4    shortcoming alone provides a sufficient basis to find that assignment to Lexclaim of these absent

5    class members' VPPA claims is invalid.  Lexclaim's failure to introduce any evidence on this

6    point is particularly striking given that Patreon explicitly raised this issue in its supplemental brief,

7    pointing out that the only Assignment Agreements in the record – a handful of samples submitted

8    by Lexclaim in February 2025, many months after Lexclaim alleges it countersigned the

9    agreements – are unsigned.  *See* Patreon Opening Supp. Brief, dkt. no. 218, at p. 4 (citing Harrow

10   Decl., Ex. C (Sample Documents), dkt. no. 206-4).  Yet Lexclaim's responsive supplemental

11   briefs, filed on March 5, 2025, were silent on this point and no evidence was introduced to show

12   that the Assignment Agreements had actually been countersigned at the time Lexclaim submitted

13   the 927 opt-outs or when it filed its contingent objection to the settlement in this case – or indeed,

14   ever.  *See* dkt. nos. 221, 222.[3] As there is no evidence in the record that any Assignment

15   Agreements were signed by Lexclaim, Lexclaim does not own any absent class member's VPPA

16   claims.

17   Even assuming that Lexclaim *did* sign the Assignment Agreements or could cure this

18   oversight by signing the agreements now, the Court finds that the VPPA rights that Lexclaim

19   asserts it owns are personal to the absent class members and cannot be assigned.  The VPPA does

20   not address whether the rights it creates are assignable and therefore, the first question that must

21   be addressed is whether state or federal law governs this question.  Patreon contends the

22

23   ─────────────

24   [3] The Court notes that in his declaration, Harrow explained that "[b]ecause of the repetitive nature
     of the documents and the difficulty of combining 927 files and then uploading thousands of pages
25   of documents via CM/ECF, [he did] not include[ ] all 927 PDF files as attachments" to his
     declaration.  Harrow Decl., dkt. no. 206-1, ¶ 20.   Instead, he provided a URL where he said all
26   927 files could be found "until February 19, 2025," stating that the files "may be removed after
     that date."  *Id.*   Parties in this Court routinely use the Court's electronic filing system to file
27   voluminous exhibits.  Whatever documents Lexclaim chose to make temporarily available by use
     of a hyperlink (which has now expired) are not part of the record before this Court.  In any event,
28   the Court presumes the Assignment Agreements that were linked to the URL in Harrow's
     Declaration were unsigned as well as Patreon essentially stated as much in its brief, dkt. no. 218 at
     p. 4, and Lexclaim did not challenge Patreon on that point in its responsive supplemental brief.

1    assignability of VPPA claims in this case is governed by California law by virtue of the fact that

2    Patreon's Terms of Use contain a California governing-law provision.  Patreon Opening Brief, dkt.

3    no. 218 at p. 18-19;  Sullivan Decl., dkt. no. 218-1, ¶¶ 5-15, Exs. 1-9 (Terms of Use) at sections

4    entitled "Dispute resolution" and "Governing law."   Lexclaim contends the Court should look to

5    federal common law.  Lexclaim's Response to Plaintiffs' Supplemental Opening Brief ("Lexclaim

6    Response to Plaintiffs") at 3-5.  The Court need not decide this question, however, because the result is

7    the same under California law and federal common law, neither of which permits assignment of the

8    class members' VPPA claims.

9                    **1.  California Law**

10           Under California Civil Code Section 954, "[a] thing in action, arising out of the violation

11   of a right of property, or out of an obligation, may be transferred by the owner."  Cal. Civ. Code §

12   954. In *Goodley v. Wank & Wank, Inc.*, the court explained that courts applying this "broad rule of

13   assignability have developed a complex pattern of case law underlying which is the basic public

14   policy that (a)ssignability of things in action is now the rule; nonassignability, the exception . . .

15   [a]nd this exception is confined to wrongs done to the person, the reputation, of the feelings of the

16   injured party, and to contracts of a purely personal nature, like promises of marriage." 62 Cal.

17   App. 3d 389, 393–94 (1976) (internal quotations and citations omitted).  "Thus," the court

18   continued, "personal injuries arising out of a tort are not assignable nor are those founded upon

19   wrongs of a purely personal nature such as to the reputation or the feelings of the one injured." *Id.*

20           The Ninth Circuit recognized this rule in *Pony v. Cnty. of Los Angeles*, in which it

21   observed that "[t]he right to sue in tort for personal injury is non-assignable under California law."

22   433 F.3d 1138, 1143 (9th Cir. 2006) (citing *Pac. Gas & Elec. Co. v. Nakano*, 12 Cal.2d 711, 87

23   P.2d 700, 701 (1939) ("It is well settled in this jurisdiction that a purely tort claim is not

24   assignable.").  Invasion of privacy claims are generally considered personal injury claims under

25   California law.  *See Wilson v. City of Oakland*, No. C-11-5377 DMR, 2012 WL 669527, at *3

26   (N.D. Cal. Feb. 29, 2012) (holding that under California law, "[t]he statute of limitations for

27   personal injury actions, which also encompasses actions for . . . invasion of privacy, is two

28   years."); *Mireskandari v. Daily Mail & Gen. Tr. PLC*, No. CV1202943MMMSSX, 2013 WL

12114762, at *15( C.D. Cal. Oct. 8, 2013) (same); *Cain State Farm Mut. Auto Ins. Co*., 62 Cal. App. 3d 310, 313 (1976) (personal injury statute of limitations applies to claims for invasion of privacy). Thus, the default rule seems to be that invasion of privacy claims are non-assignable under California law. *See Flynn v. Higham*, 149 Cal. App. 3d 677, 683 (1983) ("It is well settled that the right of privacy is purely a personal one; it cannot be asserted by anyone other than the person whose privacy has been invaded.]").

In *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 820 (1979), however, the California Supreme Court recognized an exception to that rule with respect to the specific tort of appropriation of likeness, often referred to as the right of publicity, which is one of four torts encompassed by the umbrella tort of invasion of privacy. In *Lugosi*, the widow and surviving son of the movie actor Bela Lugosi, who played Count Dracula in the 1930 film, sought to recover profits made by Universal Pictures in its licensing of that character and to enjoin the defendant from any further such licensing without their consent. 25 Cal. 3d at 816-817. The trial court found in favor of the plaintiffs, holding that Lugosi's "name and likeness [were] 'property' which [could] pass to the heirs[.]" *Id.* at 823 (citations omitted). The Supreme Court reversed, however, looking to "the right of privacy founded in tort[.]" *Id.*

The court in *Lugosi* explained:

> The law of privacy comprises four distinct kinds of invasion of four different interests of the plaintiff, which are tied together by the common name, but otherwise have almost nothing in common except that each represents an interference with the right of the plaintiff, in the phrase coined by Judge Cooley, "to be let alone." Without any attempt to exact definition, these four torts may be described as follows: (P) 1. Intrusion upon the plaintiff's seclusion or solitude or into his private affairs. (P) 2. Public disclosure of embarrassing private facts about the plaintiff. (P) 3. Publicity which places the plaintiff in a false light in the public eye. (P) 4. *Appropriation, for the defendant's advantage, of the plaintiff's name or likeness*.

*Id.* at 819 (quoting Prosser, Privacy (1960) 48 Cal. L. Rev. 383, 389) (emphasis added in *Lugosi*). The italicized tort was the one at issue in *Lugosi* and the court found that it was personal, and therefore, could not be passed on to Lugosi's heirs. *Id.* at 824. In reaching this conclusion, the *Lugosi* court started with the following quote from Prosser:

> There has . . . been a good deal of consistency in the rules that have

been applied to the four disparate torts under the common name. As to any of the four, it is agreed that the plaintiff's right is a personal one, which does not extend to members of his family, unless, as is obviously possible, their own privacy is invaded along with his. The right is not assignable, and while the cause of action may or may not survive after his death, according to the survival rules of the particular state, *There is no common law right of action for a publication concerning one who is already dead.*

*Id.* at 820. (quoting Prosser, Law of Torts (4th ed. 1971), pp. 814-815) (emphasis added in

*Lugosi*). The court observed, "Although . . . the right to exploit one's name or likeness may be

assignable, . . . a number of decisions support the italicized conclusion." *Id.*

The court went on to discuss cases supporting this conclusion, in which heirs had sought,

unsuccessfully, to assert rights to exploit the name and likeness of decedents and explained why

this result makes sense:

If the opportunities of a person to exploit a name or likeness in one's lifetime is inheritable property, may it be assumed that if the first heirs thereof, like their immediate ancestor, do not exploit similar opportunities the right to do so is automatically transferred to succeeding heirs? May the remote descendants of historic public figures obtain damages for the unauthorized commercial use of the name or likeness of their distinguished ancestors? If not, where is the line to be drawn, and who should draw it? Assuming that some durational limitation would be appropriate, it has been suggested that the adoption of such a limitation would be "beyond the scope of judicial authority," and that "legislative action will be required . . . ." (Note (1978) 29 Hastings L.J. 751, 774; see *Maritote v. Desilu Productions, Inc*., supra, 345 F.2d 418, 420.)    Certainly the Legislature by appropriate amendment to Civil Code section 3344 (see fn. 6, Ante ), might recognize a right of action on behalf of the family or immediate heirs of persons such as Lugosi. For the reasons stated above, however, we decline to adopt judicially any such rule.

*Id.*  Thus, the court in *Lugosi* held that, while the right of publicity could not be asserted after the

death of the person involved, the right was otherwise assignable.

In *Timed Out, LLC v. Youabian, Inc*., the court followed *Lugosi* in finding that the

misappropriation of likeness claims of two models could be assigned, rejecting the trial court's

interpretation of *Lugosi* as holding that the right of publicity is personal and therefore non-

assignable.   229 Cal. App. 4th 1001, 1006 (2014). The court pointed out that in *Lugosi,* the

Supreme Court recognized that "the right of publicity *can be assigned* by the celebrity during his

or her lifetime." *Id.*  at 1007 (emphasis in original). The court in *Timed Out* reached the same

United States District Court
Northern District of California

1 conclusion as to the models.  It reasoned that "unlike the other interests grouped under the privacy

2 rubric (see fn. 2 [listing four types of invasion of privacy discussed above]), the right of publicity

3 distinctly protects an 'economic interest.' "  *Id.*  at 1010 (citations omitted).  It further observed

4 that) the assignees of the models' rights to publicity "did not sue for injury to the feelings,

5 emotional distress or personal injuries to the [m]odels[,]" instead seeking "only pecuniary

6 damages for [the defendants'] alleged commercial misappropriation of the [m]odels' images."  *Id.*

7 at 1010.

8       Lexclaim relies on *Timed Out* and *Lugosi* to support its position that the privacy rights

9 protected by the VPPA also are assignable.  Its position is unpersuasive, however, because it does

10 not explain why the rights created by the VPPA are analogous to the right of publicity under

11 California common law that were at issue in those cases.  Nor does it address the case authority

12 likening the rights protected by the VPPA to the common law rights to be free from intrusion on

13 seclusion and for public disclosure of private facts.  *See Eichenberger v. ESPN, Inc.*, 876 F.3d

14 979, 983–84 (9th Cir. 2017) (intrusion on seclusion); *In re Vizio, Inc., Consumer Priv. Litig.*, 238

15 F. Supp. 3d 1204, 1216 (C.D. Cal. 2017) (same); *Pileggi v. Washington Newspaper Publ'g Co.,*

16 *LLC*, 2024 WL 324121, at *5 (D.D.C. Jan. 29, 2024)(same);  *Salazar v. Nat'l Basketball Ass'n*,

17 118 F.4th 533, 541 n.5 (2d Cir. 2024) (public disclosure of private facts); *Feldman v. Star Trib.*

18 *Media Co. LLC*, 659 F. Supp. 3d 1006, 1016 (D. Minn. 2023) (same). Either one of these common

19 law invasion of privacy torts fits the allegations here, where Plaintiffs allege that Patreon violated

20 the VPPA by disclosing their private video history to Meta without their consent.  In contrast,

21 there is no allegation in this case that Patreon appropriated Plaintiffs' and class members'

22 likenesses.  Thus, the exception found in *Lugosi* and *Timed Out* to the general rule that invasion of

23 privacy claims are not assignable under California law does not apply here.  The VPPA claims in

24 this case are not analogous to the right of publicity claims at issue in those cases, which implicated

25 economic interests.  Instead, they are based on personal injury to Plaintiffs and the class resulting

26 from intrusion on seclusion and public disclosure of private facts.   The Court therefore concludes

27 that under California law, Plaintiffs' – and the class members' – VPPA claims are not assignable.

28

### 2. Federal Common Law

Lexclaim asserts that the assignability of class members' VPPA claims is governed by *Sprint Comm'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 271 (2008) ("*Sprint*"), "establishing a 'general rule . . . applicable to federal causes of action' that 'choses in action [are] generally assignable.' " Lexclaim Response to Stark Supplemental Brief, dkt. no. 222, at 1 (quoting *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 995 F.3d 969, 978 (Fed. Cir. 2021) (citing *Sprint*, 554 U.S. 269 (2008)). The Court finds that Lexclaim's reading of *Sprint* is overbroad and that federal common law, like California law, does not permit the assignment of class members' VPPA claims.

In *Sprint*, the Court found that an "assignee of a legal claim for money owed ha[d] standing to pursue that claim in federal court." 554 U.S. at 271. In reaching that conclusion, the Court looked to history and tradition, observing, "[w]e have often said that history and tradition offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." 554 U.S. at 274. The Court began by acknowledging that "[p]rior to the 17th century, English law would not have authorized a suit" for collection of money by an assignee "because, with only limited exceptions, English courts refused to recognize assignments at all." 554 U.S. at 275. The Court explained that these strict rules began to "liberalize" in the 17th century, however, because they "seemed inconsistent with growing commercial needs." *Id.* "Thus, during the 19th century, most state courts entertained suits virtually identical to the litigation [in *Sprint*]: suits by individuals who were assignees for collection only, i.e., assignees who brought suit to collect money owed to their assignors but who promised to turn over to those assignors the proceeds secured through litigation." *Id.* at 280. Likewise, "[d]uring this period, a number of federal courts similarly indicated approval of suits by assignees for collection only." *Id.* at 282 (citations omitted). Even the Supreme Court "long ago indicated that assignees for collection only can properly bring suit." *Id.* (citing *Waite v. Santa Cruz*, 184 U.S. 302 (1902); *Spiller v. Atchison, T. & S.F.R. Co.*, 253 U.S. 117 (1920)). The Court found that this tradition of permitting assignees for collection to bring suit offered "powerful support for the proposition that suits by assignees for collection have long been seen as 'amenable' to resolution by the judicial process." *Id.* at 284. It

1    also noted that "there is also considerable, more recent authority showing that an assignee for

2    collection may properly sue on the assigned claim in federal court."  *Id.*

3        *Sprint* is distinguishable from the facts here, however, in two key respects.  First, there was

4    no dispute that the assignment in that case was valid, in contrast to the facts here.  Second, it did

5    not involve assignment of a claim that is analogous to a tort claim,[4] as is the case here.  In the

6    wake of *Sprint*, a number of courts have decline to read the holding of that case broadly to

7    encompass tort claims.  For example, in *Dotson v. AWA Collections*, the court found that a

8    plaintiff who asserted a claim under the Fair Debt Collection Practices Act ("FDCPA"),

9    purporting to be an assignee of the claim, did not have standing to assert the claim, rejecting the

10   plaintiff's reliance on *Sprint* in support of a contrary result.  No. CIV-22-0014-HE, 2022 WL

11   1504864 (W.D. Okla. May 9, 2022), aff'd, No. 22-6078, 2023 WL 3055574 (10th Cir. Apr. 24,

12   2023).  The court distinguished *Sprint* as follows:

> . . . *Sprint Communications* involved claims different from those at
> issue here. The claims there were for "money owed," based on what
> was essentially a contractual relationship. As such, the holding in
> *Sprint Communications* goes no further than to say that assignments
> of contract claims or "claims for money owed," which have long been
> viewed as assignable, are sufficient to confer Article III standing. It is
> less than obvious that the Court would have reached the same result
> as to standing had it been dealing with a tort claim.

18   *Id.* at *1;  *see also Tisdale v. Enhanced Recovery Co.*, LLC, No. 422CV00286SDJCAN, 2023

19   WL 1810413, at *8 (E.D. Tex. Jan. 17, 2023), report and recommendation adopted, No. 4:22-CV-

20   286, 2023 WL 1802393 (E.D. Tex. Feb. 7, 2023) (distinguishing *Sprint* in case involving

21   purported assignment of  FDCPA and Fair Credit Reporting Act ("FCRA") on the grounds that

22   "assignment of a contractual claim for collection is unlike an assignment of a tort claim, and it is

23   wholly unclear whether the *Sprint* Court would have reached the same standing conclusion when

24   considering claims like those here.").

25       This Court concludes that *Sprint* did not address whether tort claims, such as invasion of

---

[4] As discussed above, numerous courts have found that the privacy rights created by the VPPA are analogous to the common law invasion of privacy torts of intrusion on seclusion and public disclosure of private facts.

United States District Court
Northern District of California

privacy, are assignable under federal common law; rather, its discussion of the evolution of the

common law focused specifically on actions for collection of money in the context of "growing

commercial needs."  554 U.S. at 275.  Therefore, the Court finds that *Sprint* does not overturn the

extensive authority establishing that as a general rule, federal common law prohibits assignment of

personal injury and invasion of privacy claims.  *Lexington Ins. Co. v. S.H.R.M. Catering Servs.,*

*Inc.*, 567 F.3d 182, 185 (5th Cir. 2009) (looking to common law for guidance in determining

whether under federal maritime law, "assignments of unliquidated tort personal injury claims" are

generally permissible and observing that "[u]nder the common law and the law of most states,

'personal injury claims are not assignable absent a statute to the contrary'"); *Evans v. Boyd Rest.*

*Grp., LLC*, 240 F. App'x 393, 398 (11th Cir. 2007) (finding that Title VII discrimination was not

assignable under federal or state law, reasoning that "[t]he remedial scope of Title VII, which

encompasses backpay, front pay, emotional pain and suffering, loss of enjoyment of life, and

punitive damages, . . . makes it more similar to a personal injury tort action than an action to

enforce contractual or property rights."); *Casino Cruises Inv. Co. v. Ravens Mfg. Co*., 60 F. Supp.

2d 1285, 1287 (M.D. Fla. 1999) (finding that personal injury claims were not assignable under

maritime law and observing that "[u]nder the common law and the law of most states, personal

injury claims are not assignable absent a statute to the contrary."); *Dotson v. Transworld Sys., Inc*.,

2022 WL 2655785, at *2 n. 3 (finding that "[e]ven if federal common law governed the

assignability issue, the common law rule is that claims arising from torts are not assignable.");

*Martinez v. Green*, 131 P.3d 492, 494-95 (Ariz. Ct. App. 2006) (holding that TCPA claims cannot

be assigned under general rule of both "state law and federal common law" that "a personal injury

claim cannot be assigned"; analogizing TCPA claims to "invasion of privacy tort claims").[5]

The Restatement, which is often cited by federal courts seeking to elucidate principles of

federal common law, lends further support to the conclusion that under federal common law, the

putative class members' VPPA claims are not assignable.  *See Michigan v. U.S. Army Corps of*

*Eng'rs*, 667 F.3d 765, 780 (7th Cir. 2011) (noting that Restatement (Second) of Torts "has been a

---

[5] Although Patreon cited this authority in its supplemental brief, Lexclaim did not address it in its response.

common reference point for courts considering cases arising under federal common law."). In particular, Restatement (Second) of Torts § 652I states in a comment:

> The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded. *The cause of action is not assignable*, and it cannot be maintained by other persons such as members of the individual's family, unless their own privacy is invaded along with his. The only exception to this rule involves the appropriation to the defendant's own use of another's name or likeness.

Restatement (Second) of Torts § 652I (1977) at cmt. A (emphasis added). Similarly, Restatement (Second) of Contracts recognizes that:

> the historic common-law rule that a chose in action could not be assigned has largely disappeared. It remains applicable to some non-contractual rights, particularly claims for damages for personal injury, and to certain claims against the Government.

Restatement (Second) of Contracts § 317 (1981).

Finally, the Court rejects Lexclaim's assertion that the language of the VPPA itself supports the conclusion that the rights established under the statute may be assigned. *See* Lexclaim Response to Plaintiffs' Supplemental Brief, dkt. no. 222 at 7. Lexclaim points to the following language in the VPPA: "A video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person." 18 U.S.C. § 2710(b). Lexclaim reasons that because this gives the "aggrieved person" a right to recover, without expressly limiting the claim to the person who was actually "aggrieved," the claim is assignable "under modern law." Plaintiffs' Supplemental Brief, dkt.. no. 222 at 7. But this argument is based on the mistaken premise that statutory claims analogous to tort claims are presumed to be assignable absent explicit language to the contrary. As discussed above, however, federal common law does not contain such a presumption as to tort claims. To the contrary, the presumption cuts the opposite direction as to statutes analogous to the invasion of privacy torts of intrusion on seclusion and public disclosure of private facts.

Accordingly, the Court concludes that under federal common law, the class members' VPPA claims are not assignable.

### E.    Remedy

The parties ask the Court to: 1) invalidate the 927 opt-outs, the Lexclaim opt-out and the assignment of  VPPA claims to Lexclaim by the individuals who submitted the 927 opt-outs; 2) issue a curative notice to the 927 opt-outs and give them 60 days to opt out or remain in the class; 3) require Lexclaim to turn over to the parties identifying information for the 927 opt-outs so that notice can be sent to them by the claims administrator; and 4) require Lexclaim to submit to the Court any proposed written communications with class members at least three days before they are used and provide an opportunity for the parties to object and the Court to rule on any objection. *See* dkt. no. 218-11 (Proposed Order and Curative Notice).  The Court finds that the first three remedies are reasonable and appropriate under the facts of this case.  To ensure that the Court's remedy is narrowly tailored, however, it declines to limit Lexclaim's communications with absent class members.[6]

The Supreme Court has held that a district court has "broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil v. Bernard*, 452 U.S. 89, 100–02 (1981).  Further, the use of curative notices to absent class members who may have been misled by deceptive advertising by third parties has, under appropriate circumstances, been found to be consistent with Rule 23(d) and the Court's obligation to protect absent class members.  *See, e.g., In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (MKB) (JAM), 2024 WL 4524076, at *3 (E.D.N.Y. Oct. 18, 2024) (ordering curative notice to merchant class members who received misleading communications from claim-filing service and allowing merchants to cancel contracts formed as a result of improper solicitation); *Masonek v. Wells Fargo Bank*, No. SACV091048DOCRNBX, 2009 WL 10672345, at *3 (C.D. Cal. Dec. 21, 2009) (ordering curative notice where "solicitation from [nonparty] was clearly misleading and confusing, and it encouraged absent class members to pursue individual actions and pay [nonparty] as a litigation manager without properly explaining

---

[6] Of course, if Lexclaim makes further misleading statements to absent class members to induce them to again assign their VPPA claims to Lexclaim and opt out of the settlement, the parties may seek an appropriate remedy with this Court.

the nature of a class action");  *Fox v. Saginaw Cnty., Michigan*, 35 F.4th 1042, 1050 (6th Cir. 2022) (third party's "record of misleading and abusive communications support[ed] the district court barring [third party] from any further communications with the class).

In *Gulf Oil*, the Court addressed the district court's discretion to impose restrictions on communications between class counsel and class members, cautioning that "orders limiting communications between parties and potential class members 'should be based on a clear record and specific findings that reflect a weighing of the need for the limitation and the potential interference with the rights of the parties' upon a specific 'showing by the moving party of the particular abuses by which it is threatened.'" *Taylor v. Shippers Transp. Express, Inc*., No. CV1302092BROPLAX, 2014 WL 12561036, at *2 (C.D. Cal. July 8, 2014) (quoting *Gulf Oil*, 452 U.S. at 101).  In that case, the Court found that the limiting order was not "consistent with the general policies embodied in Rule 23," explaining:

> In the present case, we are faced with the unquestionable assertion by respondents that the order created at least potential difficulties for them as they sought to vindicate the legal rights of a class of employees. The order interfered with their efforts to inform potential class members of the existence of this lawsuit, and may have been particularly injurious—not only to respondents but to the class as a whole—because the employees at that time were being pressed to decide whether to accept a backpay offer from Gulf that required them to sign a full release of all liability for discriminatory acts. In addition, the order made it more difficult for respondents, as the class representatives, to obtain information about the merits of the case from the persons they sought to represent.

452 U.S. at 101.  The Court "[did] not decide what standards are mandated by the First Amendment in this kind of case, [but] observe[d] that the [trial court's] order involved serious restraints on expression."  *Id.*  at 104.  It continued, "This fact, at minimum, counsels caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses."  *Id.*

Lexclaim argues that if the Court were to issue a curative notice informing class members that Lexclaim's communications were misleading, it would be imposing on Lexclaim a form of content-based compelled speech as Lexclaim's communications with class members would have to "not just accurately describe and cite the particular legal case at issue—which Lexclaim did—

38

but . . . also disclose several supposedly important, but ideologically and politically contested, facts about the settlement, even where the listener, as a class member, has already been provided with the identical information via the court-approved class notice." Lexclaim Response to Patreon Supplemental Brief, dkt. no. 221 at 13.  According to Lexclaim, "[s]uch a content-based, compelled speech mandate would violate the First Amendment." *Id.*  The authority Lexclaim cites in support of its position, however, is not persuasive.

First, Lexclaim relies heavily on *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 753 (2018).  But that case did not involve commercial speech and the compelled nature of the speech implicated more serious First Amendment concerns than are at stake here.  There, the plaintiff was an organization that represented "crisis pregnancy" centers opposed to abortion and brought a First Amendment challenge to a statute that obligated licensed providers of family planning services to provide notices to clients informing them of the availability of free or low-cost family planning care, including abortions.   585 U.S. 755, 761-63 (2018). The Court found that this constituted content-based compelled speech because the licensed clinics were required to "provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them" where "[o]ne of those services [was] abortion—*the very practice that petitioners are devoted to opposing*." *Id.* at 766 (emphasis added).  The Court explained, "[b]y requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly 'alters the content' of petitioners' speech." *Id.* (citation omitted).  The Court further found that the notice requirement was not precisely tailored to the interest articulated by the State, noting that "California could inform low-income women about its services without burdening a speaker with unwanted speech." *Id.*  at 775 (internal quotations and citations omitted).

The Court's holding and reasoning in *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626 (1985), cited by Lexclaim, also does not support Lexclaim's position.  Rather, that case supports the conclusion that the remedy sought by the parties does *not* run afoul of the First Amendment.  In *Zauderer*, the plaintiff, an attorney, challenged discipline imposed by the Ohio Supreme Court based, in part, on an advertisement by the attorney offering to represent

1    women who had been injured by use of the Dalkon Shield Intrauterine Device, which included the

2    following statement:  "The cases are handled on a contingent fee basis of the amount recovered. If

3    there is no recovery, no legal fees are owed by our clients."  *Zauderer v. Off. of Disciplinary*

4    *Couns. of Supreme Ct. of Ohio*, 471 U.S. at 631. The Ohio Supreme Court disciplined the plaintiff

5    "for his failure to include in the Dalkon Shield advertisement the information that clients might be

6    liable for significant litigation costs even if their lawsuits were unsuccessful."  *Id.* at 650.

7         The plaintiff in *Zauderer* argued that to satisfy the First Amendment, "the State must

8    establish either that the advertisement, absent the required disclosure, would be false or deceptive

9    or that the disclosure requirement serves some substantial governmental interest other than

10   preventing deception [and further,]. . . that the disclosure requirement directly advances the

11   relevant governmental interest and that it constitutes the least restrictive means of doing so."  *Id.*

12   The Court disagreed, however, observing that the plaintiff "overlook[ed] material differences

13   between disclosure requirements and outright prohibitions on speech."  *Id.*  The Court explained:

> In requiring attorneys who advertise their willingness to represent
> clients on a contingent-fee basis to state that the client may have to
> bear certain expenses even if he loses, Ohio has not attempted to
> prevent attorneys from conveying information to the public; it has
> only required them to provide somewhat more information than they
> might otherwise be inclined to present. We have, to be sure, held that
> in some instances compulsion to speak may be as violative of the First
> Amendment as prohibitions on speech. *See, e.g., Wooley v. Maynard*,
> 430 U.S. 705 (1977); *Miami Herald Publishing Co. v. Tornillo*, 418
> U.S. 241. Indeed, in *West Virginia State Bd. of Ed. v. Barnette*, 319
> U.S. 624 (1943), the Court went so far as to state that "involuntary
> affirmation could be commanded only on even more immediate and
> urgent grounds than silence." *Id.*, at 633.

> But the interests at stake in this case are not of the same order as those
> discussed in *Wooley, Tornillo*, and *Barnette*. Ohio has not attempted
> to "prescribe what shall be orthodox in politics, nationalism, religion,
> or other matters of opinion or force citizens to confess by word or act
> their faith therein." 319 U.S., at 642. The State has attempted only to
> prescribe what shall be orthodox in commercial advertising, and its
> prescription has taken the form of a requirement that appellant include
> in his advertising purely factual and uncontroversial information
> about the terms under which his services will be available. Because
> the extension of First Amendment protection to commercial speech is
> justified principally by the value to consumers of the information such
> speech provides, *see Virginia Pharmacy Board v. Virginia Citizens
> Consumer Council, Inc*., 425 U.S. 74, (1976), appellant's
> constitutionally protected interest in not providing any particular
> factual information in his advertising is minimal. Thus, in virtually all

> our commercial speech decisions to date, we have emphasized that
> because disclosure requirements trench much more narrowly on an
> advertiser's interests than do flat prohibitions on speech, "warning[s]
> or disclaimer[s] might be appropriately required . . . in order to
> dissipate the possibility of consumer confusion or deception." *In re
> R.M.J.*, 455 U.S., at 201. *Accord, Central Hudson Gas & Electric*,
> 447 U.S., at 565; *Bates v. State Bar of Arizona*, 433 U.S., at 384;
> *Virginia Pharmacy Bd.*, *supra*, 425 U.S., at 772, n. 24.

*Id.* at 650-51. The Court went on to "recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech." *Id.* It held, however, "that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* Applying this standard, the Court concluded that "[t]he State's application to appellant of the requirement that an attorney advertising his availability on a contingent-fee basis disclose that clients will have to pay costs even if their lawsuits are unsuccessful (assuming that to be the case) easily passes muster . . . ." *Id.*

The Court here finds, likewise, that a curative notice to class members to dispel confusion that may have been caused by Lexclaim's omission of material information about the Settlement Agreement in its advertising is a reasonable regulation of commercial speech to prevent deception of those who opted out of the settlement based on Lexclaim's advertising. The proposed notice, as discussed below, simply provides "purely factual and uncontroversial information" about the terms of the Settlement Agreement and relevant Court rulings in this case. And although Lexclaim asserts the proposed curative notice contains "ideologically and politically contested [] facts about the settlement," dkt. no. 221 at 13, it does not support that assertion by pointing to any specific statement in the proposed curative notice. Of course, the fact that Lexclaim continues to insist that its advertising was *not* misleading does not make a notice explaining to class members that the Court reached a contrary conclusion either "ideologically" or "politically" contested.

Therefore, the Court rejects Lexclaim's First Amendment argument. The Court further finds that the proposed curative notice advances the goals of Rule 23 and the Court's duty to protect absent class members.

## IX.    CONCLUSION

For the reasons stated above, the Final Approval Motion and Fee Motion are GRANTED.

The Court OVERRULES the Hill and Lexclaim Objections, sustains Patreon's Objections, and orders as follows:

1. The group of 927 settlement opt-out requests that Lexclaim submitted is invalid for three independent reasons: (i) Lexclaim made misleading and incomplete statements that likely induced many if not all of the 927 individuals to provide their opt-outs to Lexclaim; (ii) none of the 927 opt-outs Lexclaim submitted contain the individual's address or telephone number, as the Class Notice expressly requires and which are necessary to verify the identity of persons subject to and excluded from the judgment; and (iii) as the Claims Administrator has reasonably determined, the group of opt-outs submitted by Lexclaim is a "group opt-out" that the settlement expressly prohibits.

2. The opt-out request Lexclaim submitted in its own name—purporting to opt out of the settlement for the entire group of claims of the 927 individuals it purportedly obtained by assignment—is invalid because: (i) as a matter of law, the purported assignments of class members' VPPA claims to Lexclaim are invalid and, thus, Lexclaim had (and has) no standing or ability to exclude those claims from the settlement;  and (ii) the opt-out request Lexclaim submitted is a "group opt-out" that the settlement expressly prohibits.

3. Within seven days of this Order, Lexclaim shall provide to the Claims Administrator, Class Counsel, and Patreon's counsel an electronic spreadsheet containing the 927 individuals' names and email addresses (or other means of primary communication with which Lexclaim communicated with such individuals).

4. Within 21 days of this Order, the Claims Administrator shall issue a curative written notice to the 927 individuals (via the email addresses (or other means of primary communication) Lexclaim provides), on court letterhead, as follows:

Dear Potential Class Member:

This letter is written at the direction of the Court.

The Court is presently handling the privacy class action and settlement in *Stark v. Patreon*, Case No. 3:22-CV-03131-JCS. In 2024, this Court ordered that notice concerning this class action and settlement be given to potential class members. Any class member who wished to make a

claim to obtain payment under the settlement had to file a claim with the Claims Administrator by January 15, 2025. Any class member who wished to be excluded from the settlement had to file a request for exclusion with the Claims Administrator by January 15, 2025. The Claims Administrator received an exclusion request apparently signed by you.

The Court has now determined that (1) your exclusion request was submitted to the Claim Administrator by a third-party called "Lexclaim Recovery Group US LLC" as part of "group opt-out" that the settlement prohibits; (2) Lexclaim made misleading or incomplete statements about the settlement that may have influenced you to assign Lexclaim your settlement rights and to provide an exclusion request to Lexclaim for submission to the Claims Administrator; (3) your exclusion request did not contain your phone number or address, as the class notice requires; and (4) under applicable law, any claims you have against Patreon that are being settled in this case cannot be assigned to a third party such as Lexclaim.

Based on the foregoing, the Court has ordered that your prior exclusion request and assignment of claims are void, and has ordered a second notice and opportunity to make a claim under the settlement or opt out for the potential class members for whom Lexclaim submitted exclusion requests, including you. Accordingly, you now may (1) submit a claim under the settlement directly to the Claims Administrator; (2) submit a second exclusion request directly to the Claims Administrator, if you want to be excluded from this class action and settlement; or (3) do nothing, in which case you will bound by settlement and you will get no payment under the settlement.

Attached is the original Court-approved class notice that provides information about the class action, the settlement, and your options. Additional information about the settlement can be accessed on the settlement website at [www.patreonsettlement.com](www.patreonsettlement.com)

The Claims Administrator has estimated that each class member who submits a valid claim under the settlement will receive a payment of approximately $42.

If, after reading this notice, you decide that you wish to make a claim under the settlement, you need to submit a claim under the settlement to the Claims Administrator, by filling out and submitting a claim form available www.patreonsettlement.com, by [insert date 60 days from date of order providing for this curative notice].

On the other hand, if you decide that you still wish to exclude yourself from the class and the settlement, you need to submit an exclusion request directly to the Claims Administrator by [insert date 60 days from date of order providing for this curative notice]. You can submit an exclusion request by going to www.patreonsettlement.com and filling out the online form, or by sending a letter via first class U.S. mail saying that you want to opt out of the settlement in Stark v. Patreon, Inc., Case No. 3:22-CV-03131-JCS (N.D. Cal.) to the Claims Administrator at the address: Stark v. Patreon, Inc.; c/o Claims Administrator; PO Box 25413 Santa Ana, CA 92799. Your exclusion request must include your name, address, telephone number, and signature. If you are under 18 years old and do not want your name included on the list of optouts filed with the Court, your letter must state that you are under 18.

You have the right to exclude yourself from the settlement and assert your own claims directly against Patreon. Please be aware that if you choose to do so, you could be subject to discovery by Patreon in such litigation. That discovery may include a requirement that you appear

43

for deposition and/or produce documents. In addition, you could have a duty to preserve documents in your possession, custody or control that are relevant to claims against Patreon.

In addition, if you choose to exclude yourself from the settlement and assign your claims against Patreon to a third party such as Lexclaim, please be aware that this Court has found that those claim cannot be assigned to a third party, and even if they can be assigned, you would still potentially be subject to discovery and an obligation to preserve evidence in ant litigation that the third party brought against Patreon.

If you have any questions about this letter, the enclosed notice materials, or this class action and settlement, you should contact your own attorney, or the Court-appointed attorneys for the class. Class counsel's names and addresses are included in the enclosed notice materials.

Sincerely,

Mark B. Busby Clerk, United States District Court Northern District of California U.S. Courthouse
450 Golden Gate Ave.
San Francisco, California 94102

5.  The 927 individuals for whom Lexclaim submitted opt-outs shall have until 60 days after this Order to individually submit a claim under the settlement, individually submit an opt-out request, or do neither.

6.  At the conclusion of the 60-day curative period, the parties shall file a declaration from the Claims Administrator reporting the response to the curative notice (*e.g.*, number of claims filed and opt-outs received) and providing a complete list of all individuals (including those who have already submitted valid requests for exclusion) who have submitted valid opt-out requests.  The parties shall also supply to the Court at that time a proposed form of judgment to enter in this case.

**IT IS SO ORDERED.**

Dated:  June 5, 2025

_____
JOSEPH C. SPERO
United States Magistrate Judge